**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 2014-cv-

AVENUE CAPITAL MANAGEMENT II, L.P., a Delaware limited partnership;
AVENUE INTERNATIONAL MASTER, L.P., a Cayman Islands exempted limited partnership;
AVENUE INVESTMENTS, L.P., a Delaware limited partnership;
AVENUE SPECIAL SITUATIONS FUND VI (MASTER), L.P., a Delaware limited partnership;
MANAGED ACCOUNTS MASTER FUND SERVICES-MAP10, a sub-trust of an umbrella
    unit trust constituted by a trust deed governed by the laws of Ireland;
AVENUE-CDP GLOBAL OPPORTUNITIES FUND, L.P., a Cayman Islands exempted limited
    partnership;
AVENUE SPECIAL OPPORTUNITIES CO-INVESTMENT FUND I, L.P., a Delaware limited
    partnership;
AVENUE SPECIAL OPPORTUNITIES FUND I, L.P., a Delaware limited partnership;
DRAWBRIDGE SPECIAL OPPORTUNITIES FUND L.P., a Delaware limited partnership;
DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LTD, a Cayman Islands company;
FCI HOLDINGS I LTD, a Cayman Islands company;
FCI HOLDINGS II LTD, a Cayman Islands company;
FCOF II UB SECURITIES LLC, a Delaware limited liability company;
FCOF UB INVESTMENTS LLC, a Delaware limited liability company;
FTS SIP L.P., a Jersey limited partnership;
PANGAEA CLO 2007-1 LTD, a Cayman Islands company;
SARGAS CLO I LTD, a Cayman Islands company;
WORDEN MASTER FUND II L.P., a Cayman Islands exempted limited partnership; and
WORDEN MASTER FUND L.P., a Cayman Islands exempted limited partnership,

        Plaintiffs,

v.

RICHARD F. SCHADEN, an individual;
RICHARD E.  SCHADEN, an individual;
FREDERICK H. SCHADEN, an individual;
GREG MACDONALD, an individual;
DENNIS SMYTHE, an individual;
ANDREW R. LEE, an individual;
PATRICK E. MEYERS, an individual;
JOHN M. MOORE, an individual;
THOMAS RYAN, an individual; and
CONSUMER CAPITAL PARTNERS LLC a/k/a CERVANTES CAPITAL LLC, a Delaware
    limited liability company,

        Defendants.

## CIVIL ACTION COMPLAINT AND JURY DEMAND

Plaintiffs Avenue Capital Management II, L.P., Avenue International Master, L.P., Avenue Investments, L.P., Avenue Special Situations Fund VI (Master), L.P., Managed Accounts Master Fund Services – MAP10, Avenue-CDP Global Opportunities Fund, L.P., Avenue Special Opportunities Co-Investment Fund I, L.P., and Avenue Special Opportunities Fund I, L.P. (collectively, "Avenue") and Drawbridge Special Opportunities Fund LP, Drawbridge Special Opportunities Fund LTD, FCI Holdings I LTD, FCI Holdings II LTD, FCOF II UB Securities LLC, FCOF UB Investments LLC, FTS SIP L.P., Pangaea CLO 2007-1 LTD, Sargas CLO I LTD, Worden Master Fund II LP, and Worden Master Fund LP (collectively, "Fortress") (with Avenue and Fortress collectively referenced as the "Investor Plaintiffs"), by and through their attorneys, bring this action against Richard F. Schaden ("Richard Schaden"), Richard E. Schaden ("Rick Schaden"), Frederick H. Schaden ("Fred Schaden"), Greg MacDonald ("MacDonald"), Dennis Smythe ("Smythe"), Andrew R. Lee ("Lee"), Patrick E. Meyers ("Meyers"), John M. Moore ("Moore"), Thomas Ryan ("Ryan") and Consumer Capital Partners LLC a/k/a Cervantes Capital LLC ("CCP") (collectively, the "Defendants"), and allege as follows:

## INTRODUCTION

1.      This case involves a conspiracy orchestrated by certain former high-level executives and board members of Quiznos[1] (or the "Company") to defraud the Investor Plaintiffs by concealing, misrepresenting, and artificially inflating the Company's projected gross profits, cash flow, future store counts, average unit volume ("AUV"), franchisee royalties, and related metrics in an effort to induce the Investor Plaintiffs to purchase equity in the Company, inject liquidity into the Company (solely with respect to Avenue), and restructure debt that the Company owed to the Investor Plaintiffs (the "Transaction").

2.      The conspiracy began in January 2011.  At that time, the Company was experiencing economic turmoil, having seen its adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") drop nearly 50 percent over four years.  The Company's financial footing was made even shakier because certain of the Defendants had saddled the Company with massive amounts of debt in a 2006 transaction.

3.      The Defendants realized that the Company's precarious position meant that a substantial restructuring of its debt was needed, either through an out-of-court restructuring (which became the Transaction) or an in-court bankruptcy reorganization filing (the "Reorganization Plan").

---

[1] "Quiznos" or the "Company" are used herein as shorthand.  The primary operating entity by and through which Quiznos' business is, and at all relevant times was, conducted is QCE, LLC ("QCE"), a Delaware limited liability company.  Quiznos' financial performance historically was consolidated and reported through QCE for the Quiznos ownership structure.  Before the Transaction described herein, QCE's sole member was QCE Finance LLC ("QCE Finance"); after the Transaction, QCE's sole member was QCE Parent LLC, which thereafter renamed itself QCE Finance.  QCE Parent LLC ("QCE Parent"), a Delaware limited liability company, is the successor entity to QCE Finance and is the post-Transaction parent entity of and holding company for QCE.  As set forth herein, QCE Finance guaranteed QCE's debt obligations.

4.      In August 2011, the Company began discussing the Transaction option with the holders of its debt, including the Investor Plaintiffs.  Pursuant to these discussions, the Defendants made numerous representations to the Investor Plaintiffs about the Company and its projected financial condition.

5.      Certain management of the Company became aware that the projections they were using externally leading up to the Transaction were materially over-projecting gross profits, cash flow and other metrics.  Indeed, the Company's minority stakeholders explicitly warned Chief Executive Officer ("CEO") Greg MacDonald that it would be nearly impossible to achieve various projections communicated to the Investor Plaintiffs.

6.      Instead of revising the Company's projections to accurately reflect its current and likely future economic reality, and despite knowing that the Company repeatedly had over-projected its performance throughout 2011, the Defendants (the former CEO, former CFO, controlling shareholders and certain majority members of the Quiznos Board of Managers) conspired to manipulate the Company's projections with short-term operational changes they knew were ultimately doomed, in a last-ditch effort to fill this projection gap to push through the Transaction.

7.      The Defendants knew or recklessly disregarded how these short-term measures would materially and negatively impact, among other things, the Company's future store counts, average unit volume, franchisee royalties, terminations of stores sold but not yet opened ("SNOs"), cash flow, and ability to service the Company's substantial debt burden in the ordinary course.

4

8.      Ignoring the impact the changes would have going forward, the Defendants conspired to manipulate, misstate and omit material information in the Transaction's Confidential Offering Memorandum (the "Offering Memorandum" or "OM") and related transaction documents concerning the Company's projected performance to thereby induce the Investor Plaintiffs to engage in the Transaction.  Indeed, as intended by the Defendants, the Investor Plaintiffs relied upon these projections in assessing the Transaction.

9.      The Defendants fraudulently concealed the anticipated detrimental impact of their operational changes on the Company's financial performance.  After the Transaction closed in January 2012, the detrimental effects of the Defendants' operational changes were realized and took their detrimental economic toll on the Company.

10.     The Investor Plaintiffs, who purchased the Company's securities in the Transaction and were two of its largest lenders both before and after the Transaction, would not have agreed to the Transaction as consummated had they known the truth.  They have suffered hundreds of millions of dollars in damages because of the Defendants' misrepresentations, omissions and wrongful conduct.

11.     As part and parcel of their fraudulent conspiracy, the Defendants committed federal securities fraud and common law fraud in their own rights and aided and abetted each other's respective frauds.

## THE PARTIES

### The Investor Plaintiffs

12.     Avenue and Fortress were two of the largest lenders for the Quiznos operating company (QCE LLC ("QCE")) before the Transaction, owning large portions of both the First and Second Lien Facilities (as described below).

13.     Avenue International Master, L.P., Avenue Investments, L.P., Avenue Special Situations Fund VI (Master), L.P., Managed Accounts Master Fund Services – MAP10, Avenue-CDP Global Opportunities Fund, L.P., Avenue Special Opportunities Co-Investment Fund I, L.P., and Avenue Special Opportunities Fund I, L.P. are funds affiliated with Avenue Capital Management II, L.P., that held substantial debt and/or equity interests in the Company, and hold debt and/or equity interests in the reorganized Company.

14.     Drawbridge Special Opportunities Fund LP, Drawbridge Special Opportunities Fund LTD, FCI Holdings I LTD, FCI Holdings II LTD, FCOF II UB Securities LLC, FCOF UB Investments LLC, FTS SIP L.P., Pangaea CLO 2007-1 LTD, Sargas CLO I LTD, Worden Master Fund II LP, and Worden Master Fund LP are funds affiliated with Fortress Investment Group LLC, that held substantial debt and/or equity interests in the Company, and hold debt and/or equity interests in the reorganized Company.

15.     As part of the Transaction, and as described more fully below, in exchange for a nearly 100% ownership stake in the post-Transaction Quiznos parent company (QCE Parent LLC ("QCE Parent"), renamed QCE Finance LLC ("QCE Finance") post-Transaction)), (a)

Avenue provided $150 million in cash to Quiznos, and (b) Avenue and Fortress each restructured debt obligations that QCE owed to them, respectively, which included some debt forgiveness.

## The Defendants

*Relevant Pre-Transaction Quiznos Corporate Structure and Relationship to CCP*

16.     The Defendants operated primarily through QCE Holding LLC ("QCE Holding"), a Delaware limited liability company that was the ultimate parent entity in the pre-Transaction Quiznos corporate structure.

17.     QCE Holding's Board of Managers (the "Board") directly controlled and operated the entirety of the Quiznos entities, which were wholly-owned (or, in the case of QCE Incentive, LLC ("QCE Incentive"), nearly wholly-owned).

18.     QCE Incentive and QCE Finance were entities between QCE Holding (at which entity the management and control of Quiznos rested) and QCE (at which entity the operations actually occurred).  All of the entities in the Quiznos corporate structure had the same, or nearly the same, officers.

19.     Before the Transaction, QCE Holding was majority controlled by QCE Finance and Cervantes Master LLC, entities affiliated with and ultimately controlled and dominated by the Schadens (as described below), with a minority stake in QCE Holding (and thus Quiznos) held by certain J.P. Morgan-affiliated entities.

20.     QCE Finance and Cervantes Master LLC were subsidiaries and/or affiliates of Consumer Capital Partners LLC a/k/a Cervantes Capital LLC ("CCP").

*Defendant CCP*

21.     According to CCP's website, it is "a unique private investment, concept/brand development, & strategic advisory firm."  Rick Schaden is the Founder and Chairman of CCP, and Richard Schaden is a founding partner of CCP.  CCP was the instrumentality and conduit by and through which the Schadens exercised direct and indirect control over Quiznos.

*The Executive Defendants*

22.     Defendant Greg MacDonald was the President and CEO of, among others, QCE Holding, QCE Incentive, QCE Finance and QCE from October 2010 (CEO) and July 2009 (President), respectively, until the Transaction.  After the Transaction, MacDonald remained the President and CEO of QCE Parent and QCE until August 2012.

23.     Defendant Dennis Smythe was the Chief Financial Officer ("CFO") of, among others, QCE Holding, QCE Incentive, QCE Finance and QCE from October 2010 until the Transaction.  He previously served as Executive Vice President of QCE Finance and Accounting, between October 2009 and October 2010.  After the Transaction, Smythe remained the CFO of QCE Parent and QCE until April 2012.  According to CCP's website during 2010 and 2011, Smythe also was CCP's Vice President of Investments and "actively involved in managing the firm's liquid portfolio, *as well as the financial oversight of the firm's majority ownership of Quiznos*." (emphasis added).  Smythe was credited with "help[ing] raise over $1.5Bn of capital in conjunction with 4 financing transactions over two years."  Smythe continued to work at CCP after the Transaction, where he had started in 2004.

8

24.     MacDonald and Smythe are referred to collectively as the "Executive Defendants."  The Executive Defendants and non-defendant executives of Quiznos are referred to collectively as "Management."

25.     As described more fully below, the Executive Defendants intentionally or recklessly misrepresented Quiznos' future projected results and omitted material information related thereto, as set forth in the Offering Memorandum.  The Executive Defendants' intentional or reckless actions constitute securities fraud, common law fraud, and aiding and abetting fraud.

26.     The Executive Defendants not only had ultimate responsibility for the fraudulent projections provided to the Investor Plaintiffs, but also conducted the day-to-day management of all of the Quiznos entities and had full involvement and management in the process and negotiations that culminated in the Transaction.

*The Schadens*

27.     Richard Schaden and his son Rick Schaden owned, through various intermediate entities, a majority stake in Quiznos from 1991 until the Transaction.  During 2010 and 2011 (*i.e.*, before the Transaction), CCP's website stated that Rick Schaden "is the Founder, Chairman and majority shareholder of Quiznos" and that Richard Schaden "and his son Rick are the co-Founders of Quiznos and continue to control the majority of its shares."

28.     Richard Schaden was a member of the Board from May 2006 until the Transaction.

29.     Rick Schaden was a member, and Chairman of the Board, beginning in May 2006 until his resignation.  Rick Schaden also previously served as CEO of QCE Finance.

30.     Fred Schaden is Richard Schaden's brother and Rick Schaden's uncle.  Fred

Schaden was a member of the Board from May 2006 until the Transaction.

31.     Richard Schaden, Rick Schaden and Fred Schaden are referred to collectively as

the "Schadens."

32.     As described more fully below, the Schadens knowingly conspired with the

Executive Defendants and the Majority-Member Manager Defendants to misrepresent the future

projected results of Quiznos, and exercised control over the Company and certain other

Defendants during all times relevant to this case.

33.     The Schadens' control over the Quiznos entities and certain other Defendants was

demonstrated by, *inter alia*, their indirectly held majority equity ownership in QCE Holding's

LLC interests (through several intermediary entities, including CCP, QCE Finance and

Cervantes Master LLC), their close relationships with the Majority-Member Manager

Defendants (as described below), and their consultation and communications with Management

leading upon to the Transaction.

34.     The Schadens' intentional or reckless actions constitute securities fraud, common

law fraud and aiding and abetting fraud.

*The Majority-Member Manager Defendants*

35.     The Majority-Member Manager Defendants were Schaden loyalists who were

drawn from among CCP's ranks and placed on the QCE Holdings' Board at the Schadens'

specific direction.  They had unfettered access to the Company's Management and its books and

10

records.  The Majority-Member Manager Defendants also routinely had confidential Quiznos information, including projections related to the Transaction, sent to their CCP email addresses.

36.     Andrew R. Lee became a member of the Board on or about August 4, 2011, and served on the Board until the Transaction.  In addition, since 2006 Lee has been in-house counsel to RFS Investments, LLC ("RFS Investments"), a private holding company owned by Richard Schaden.  Lee also held various positions with many of the direct and indirect investments and related companies of RFS Investments, including, but not limited to Officer, Manager, General Counsel, Board Member, and Advisory Board Member.

37.     Patrick E. Meyers became a member of the Board on or about May 2006, and served on the Board until the Transaction.  Meyers also held, during the relevant time period, the following positions:  Executive Vice President of QCE Holding, Cervantes Master LLC, and QCE Finance.  In fact, he signed QCE Holding's most recent LLC agreement on behalf of the latter two entities.  Meyers is also a longtime college friend of Rick Schaden.  According to CCP's website, "in 1997 [Meyers] started the general counsel's office at Quiznos, and subsequently became a minority owner of the company.  [He] served at various times as the head of Quiznos legal, finance, administration, information technology and human resources departments."  Meyers presently is the Chief Legal Officer, Managing Director and a Partner of CCP.

38.     John M. Moore became a member of the Board on or about July 29, 2011, and served on the Board until the Transaction.  According to CCP's website during 2010 and 2011, Moore served as CCP's Executive Vice President and General Counsel and previously "was a

Senior Vice President and Special Counsel for Quiznos, and responsible for all commercial transactions, corporate finance, and tax matters there.  In this capacity, he was involved in the negotiation and structuring of more than two billion dollars in transaction value over a four year period."

39.     Thomas Ryan became a member of the Board in August 2008, and served on the Board until the Transaction.  According to CCP's website during 2010 and 2011, Ryan was CCP's Managing Partner and Chief Concept Officer and previously "was the President of the Ventures group, Chief Marketing Officer, and Branding Officer at Quiznos."

40.     As described more fully below, the Majority-Member Manager Defendants conspired with the Schadens and the Executive Defendants to misstate and misrepresent Quiznos' future projected results and omit material information related thereto, and exercised control over the Company during all times relevant to this case.  Such control was demonstrated by, *inter alia*, their ultimate direct authority over the Quiznos entities and certain other Defendants vis-à-vis their positions at QCE Holding, their intimate involvement in and approval of the Transaction, their involvement with the Transaction-related documents that included material misstatements and omissions, and their indirect authority over Quiznos and certain other Defendants vis-à-vis their positions at CCP and relationships with the Schadens.

41.     The Majority-Member Manager Defendants' intentional or reckless actions constitute securities fraud, common law fraud and aiding and abetting fraud.

12

## JURISDICTION AND VENUE

42.     The Court has original jurisdiction pursuant to 28 U.S.C. § 1331, as the Investor

Plaintiffs bring claims arising under Sections 10(b) and 20(a) of the Securities Exchange Act of

1934 (the "Exchange Act"), codified at 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the

Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5"), codified at 17 C.F.R. §

240.10b-5, which prohibit material misstatements or omissions in connection with the purchase

or sale of a security.

43.     The Court has supplemental jurisdiction over the common law claims arising

under New York law pursuant to 28 U.S.C. § 1367.

44.      The Company was and is managed on a day-to-day basis from offices located in

Denver, Colorado.  CCP is based in Denver, Colorado.  The Schadens all reside in Colorado.

The Board routinely met at the Company's headquarters in Denver.  The Defendants' fraudulent

scheme was conceived, implemented, and consummated in Denver, Colorado, and thus a

substantial part of the events or omissions giving rise to the Investor Plaintiffs' claims occurred

in this District.

45.     Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. §

1391(b).

## FACTS

### Overview of Quiznos' Business Pre-Transaction

46.     Quiznos is one of the world's largest franchisors of restaurants, offering sandwiches, salads, soups, and beverages, as well as catering services within the quick service segment of the restaurant industry.

47.     The first Quiznos restaurant was opened in 1981 in Denver, Colorado.  The Schadens acquired majority control of Quiznos a decade later in 1991.  In 1994, Quiznos completed an initial public offering and became a NASDAQ-listed company.  In 2001, Quiznos returned to private ownership and the control of the Schadens.

48.     As a part of the 2001 return to private ownership, a group of Quiznos investors filed a dissenters' rights complaint in Colorado, seeking a determination of the "fair value" of their Quiznos stock.  In determining the fair value, a Colorado state court found that the Schadens misrepresented the future projected growth of the Company in order to manipulate the share price in the going-private transaction.

49.     The Schadens were found to have undervalued shares by misrepresenting projected new franchise openings as a means to lower the value of shares and effectuate a less expensive buyout.  The Schadens projected an expansion of 85 new franchises by year-end, when, in fact, Quiznos sold 321 franchises.

50.     In 2006, the Schadens – directing Quiznos through their ownership and control of a majority of QCE Holding's membership – sold a portion of their outstanding interests to investment funds affiliated with J.P. Morgan Partners.

14

51.     While the Schadens extracted $585 million out of the Company as a result of the sale, QCE, as borrower, entered into (a) a $650 million loan facility (the "First Lien Facility" and, the lenders thereunder, the "First Lien Lenders"), (b) a $225 million loan facility (the "Second Lien Facility" and, the lenders thereunder, the "Second Lien Lenders"), and (c) a $75 million revolver with a syndicate of lenders.

52.     The First and Second Lien Facilities were evidenced by certain credit agreements dated May 5, 2006.  QCE Finance was the guarantor for the First and Second Lien Facilities. Thus, the Schadens' 2006 windfall was financed through saddling the Company with massive debt.

53.     After the Schadens extracted their millions, the Company's performance began to lag and this massive debt structure burdened the Company.

54.     For example, the Company had a "store count" of approximately 5,200 franchisee restaurant locations in 2007, but had only approximately 3,000 such locations by 2011.  This reduction took a toll on its adjusted EBITDA, which declined from approximately $184 million to approximately $99 million during that time period.

55.     During the same time period, the Company's AUV declined by approximately 23%.  AUV is a key metric used by the Company to analyze its franchisees' profitability and, hence, the Company's profitability.

56.      As a result of the drop in adjusted EBITDA and step-downs in required covenant levels, the Company was not in compliance with its combined leverage ratio covenant required

as of June 30, 2011 and September 30, 2011. The Company's declining adjusted EBITDA was driven both by a reduction in its restaurant base and a decline in AUV.

57.     The covenant violations described above could have resulted in lenders – including the Investor Plaintiffs – taking certain actions, such as calling the debt, accelerating payments, or foreclosing on the assets that secured the debt. Any of these lender actions would have had a material adverse effect on the Company's business.

58.     Realizing this, the Company determined that it needed to take one or more of the following actions: (a) amend or replace its credit facilities, or obtain a waiver of certain of its requirements; (b) restructure its current credit facilities; and/or (c) secure additional capital.

59.     In or around July 2011, certain lenders of both the First and Second Lien Facilities – including the Investor Plaintiffs – formed one or more *ad hoc* groups to consider potential structures for a comprehensive restructuring of the Company's existing obligations, based on the information received from Management. The product of these consultations and negotiations was the Transaction.

**The Transaction to Sell the Company to the Investor Plaintiffs**

60.     On or around August 2011, the Company began discussing the Transaction option with its lenders.

61.     The decision to proceed with the Transaction was made by the Board, on behalf of QCE Holding and the remaining Quiznos entities, and the *ad hoc* groups that had been organized. As set forth above, the majority (*i.e.*, Schaden-affiliated and controlled) members of the Board at this time were Richard Schaden, Fred Schaden, Meyers, Ryan, Moore and Lee.

16

62.     Rick Schaden also was intimately involved with the Transaction, including communicating with the Executive Defendants and Majority-Member Manager Defendants, as well as potential purchasers.

63.     The Executive Defendants continued to forward Rick Schaden Board presentations after his resignation to keep him informed and to consult with him regarding the Company's financial position and future prospects.

64.     In the fall and winter of 2011, the Defendants made numerous representations about the Company and its projected financial condition to the Investor Plaintiffs in order to induce them to consummate the Transaction.

65.     For example, and as more fully described herein, financial projections were created by the Defendants that made it appear that the debt burden and capital structure that would remain in place post-Transaction would be sustainable and appropriate for the Company to undertake the Transaction.

66.     Because the foundations of the Transaction were based on the misrepresentations and omissions of the Defendants, the Transaction left the Company with an unsustainable debt burden and inappropriate capital structure.  After the Transaction, the true financial projections and performance of the Company (which the Defendant knew or recklessly disregarded in order to secure the Transaction) became a reality that severely injured the Company and the Investor Plaintiffs.

17

*Basic Overview of the Transaction*

67.     The Transaction consisted of several key components and was evidenced by several key documents that were relied upon by the Investor Plaintiffs in deciding to consummate the Transaction in January 2012.

68.     Those documents included the (a) Offering Memorandum; (b) Restructuring Support Agreement; and (c) Subscription Agreement.  These documents are dated December 23, 2011 and contained material misstatements, misrepresentations and omissions, upon which the Investor Plaintiffs relied in consummating the Transaction.

69.     Under the Transaction, each First Lien Lender (a) received a payment in cash of all accrued but unpaid interest on its First Lien Indebtedness, and its pro rata share of $75 million of the aggregate principal amount outstanding under the First Lien Facility, and (b) had the option to either (i) modify its First Lien Indebtedness under certain terms or (ii) exchange a portion of its First Lien Indebtedness for new term loans under the New Second Lien Facility.

70.     Each Second Lien Lender received, in exchange for the aggregate outstanding principal and interest amount of the Second Lien Indebtedness, new LLC membership interests issued by QCE Finance.  Those membership interests were assigned to the newly created QCE Parent, the successor by merger to QCE Finance, in exchange for membership interests in QCE Parent.  QCE Finance did not survive the merger.  As set forth above, QCE Parent is the post-Transaction parent company of QCE.

71.     The Restructuring Support Agreement evidenced the lenders' agreement to and approval of the foregoing transactions and restructuring of the existing indebtedness, based on the misrepresentations and related omissions made by the Defendants.

72.     Portions of the foregoing transactions and payments by QCE to its lenders were funded by a private placement of LLC membership interests, including to Avenue, which held more than a 70% stake in the parent entity after the Transaction.  The private placement was governed by the Subscription Agreement.

73.     Under the Subscription Agreement, Avenue was committed to subscribe for QCE Parent Common Shares representing either (i) 60% of the aggregate outstanding Common Shares if QCE consummated the Transaction; or (ii) 75% of the aggregate outstanding Common Shares if QCE affected the Plan of Reorganization through a Chapter 11 filing.  The Defendants' misrepresentations and omissions ensured that the Transaction was consummated instead of the Reorganization Plan.

74.     Before the Transaction, Avenue and Fortress were QCE's two largest lenders, owning collectively $215 million (33%) of the First Lien Facility and $162 million (72%) of the Second Lien Facility.

75.     Based on the representations and warranties made in these transactional documents and by the Defendants via emails, presentations, and other personal communications (which, as discussed below, establish the Defendants' intent to defraud), as more fully described herein, the Investor Plaintiffs consummated the Transaction and Avenue made an equity

investment of $150 million in exchange for a more than 70% ownership. The $150 million equity infusion was contributed by QCE Parent to QCE, the Company's operating entity.

76.     The Investor Plaintiffs also forgave or otherwise reduced the Company's debt as part of the Transaction.

77.     The Investor Plaintiffs relied on the Defendants' misrepresentations and omissions – described in more detail below – in deciding to restructure the Company's existing debt obligations.

### The Defendants' Fraudulent Scheme

*Certain Executives and Members of the Board Conspire to Manipulate Financial Projections and Omit Material Information to Close the Transaction*

78.     As early as January 2011, the Defendants discussed and analyzed ways to misrepresent the Company's financial condition so it would falsely appear better than reality to its lenders and the Investor Plaintiffs.

79.     For example, on or around January 13, 2011, Smythe stated to MacDonald and others at the Company that it was essential to provide the Investor Plaintiffs with "non-specific" and vague information like "'AUV's are hanging in there' or 'the closure trend has been a mild surprise recently'" instead of definitive and accurate data about the Company.

80.     Certain members of Management and the Board – namely, the Executive Defendants, the Schadens and the Majority-Member Manager Defendants – were aware of the importance of strong projections and the effect of certain drivers on those projections. Accordingly, they conspired to fraudulently misrepresent them to the Investor Plaintiffs.

81.     For example, MacDonald stated on or around January 26, 2011, that it was essential to keep stores open and to limit closures, regardless of the consequences, in order to keep in line with the stated projections.  Specifically, he stated that "I can't remind you guys enough how important it is we hit the budgeted opening #'s for Q1 – a lot of the future of the company depends on showing strong trends in Q1 re: openings and reduced closures . . . we need to do whatever we can not to lose any more stores off this projection."

82.     Throughout the first quarter of 2011, the Defendants discussed and analyzed additional ways to make the projected financial condition of the Company to falsely appear better than reality, with the specific intent to induce the Company's lenders – including the Investor Plaintiffs – to agree to restructure the Company's obligations.

83.     For example, on or around February 8, 2011, Meyers, Smythe and MacDonald exchanged emails with certain Company employees about ideas for manipulating projected EBITDA.  One such idea was to "[i]ncrease food distribution pricing to increase [] EBITDA[.]" The Senior Vice President of Corporate Finance made this suggestion to Meyers, Smythe, MacDonald and another Board member.

84.     In calculating store count, the Defendants' scheme also included misleadingly using different dates for different purposes and including or excluding international stores, depending on the audience.

85.     In April 2011, the Executive Defendants discussed using different dates for store counts, despite knowing that doing so was materially misleading in documents sent to the Investor Plaintiffs.  In fact, their specific intent was to mislead the Investor Plaintiffs.

21

86.     During this period, Smythe and others on the Management team were aware of contract disputes with vendors and of pressure being applied on employees to not book losses. For example, on or about April 12, 2011, an employee in the accounting department emailed Smythe to inform him that those in accounting "are feeling tremendous pressure to not record" losses with respect to certain inventory.  She continued: "Unfortunately, the increased pressures are leading me to believe that people are willing to bend the truth a bit for the sake of the numbers."  She also informed Smythe that one of her superiors "is not going to agree with me on anything that results in us booking a loss."

87.     In July 2011, there were disputes among the Defendants regarding the Company's future financial trends and how misleadingly aggressive they appeared.

88.     On or around July 21, 2011, certain members of Management, including MacDonald and Smythe, discussed future projections and how it was likely that store closure rates would increase and store performance would decrease in 2012.

89.     Then, on or around July 26, 2011, certain non-defendant, minority Board members accused Meyers of including misstatements and misrepresentations in draft projections designed to be (and indeed later) shared externally.  They also asked if he and Rick Schaden (whose "behavior" with respect to Quiznos was described by one minority Board member as "increasingly not rational") had some ulterior "agenda" in pushing excessively aggressive projections.  Another Board member directly asserted that Meyers was in violation of his duties as Board member.

90.     The Defendants ignored and concealed these internal allegations of impropriety in connection with the projections they provided to the Investor Plaintiffs.  The Defendants also failed to correct their known and internally exposed misconduct.

91.     In response, on or about July 27, 2011, Meyers conveyed that "the owners of this business [*i.e.*, the Schadens] believe it can and will *do better than projections extrapolated from recent performance would suggest*.  We do not understand why a significant equity owner [representing the J.P. Morgan minority interest in the Company] would oppose that sentiment, both as a matter of fact and *as a matter of strategy in dealing with creditors*." (emphasis added).

92.     Such correspondence demonstrates the improper pressure the Schadens were placing on Management to make projections regarding the Company as aggressive as necessary, even though they were false and misleading, in order to close the Transaction.

93.     On or around August 2, 2011, Smythe and the Senior Vice President of Corporate Finance (who directly reported to Smythe) discussed that, with respect to Management's most recent draft assertions and projections that had been provided externally to the Investor Plaintiffs and other third parties, there were "lots of spots where assertions we (in the royal sense) made won't stand up to people asking for supporting data."

94.     On or around August 5, 2011, Smythe and MacDonald again discussed using food price increases on franchisees to ensure that projected EBITDA was achieved in the short-term.

95.     Management then began discussing the specific details of the Transaction during August 2011.

96.     By this point, MacDonald and Smythe decided that they needed to restrict the distribution of negative information about the Company – in other words, they decided to conceal it.  For example, on or about August 29, 2011, Smythe circulated a July Investor Financial Update.  On or about September 1, 2011, MacDonald responded to Smythe: "D – we need to be smarter with how we send this out next month.  This reads so bad I can see why the shit is hitting the fan.  Not sure why we even send this to the board unless we have a legal right to.  We should talk to Moelis [*i.e.*, the Company's financial advisor] as well on best strategy as I understand this is the only budget the lenders have."

97.     On or about September 14, 2011, MacDonald was expressly warned by Greg Brenneman, on behalf of the J.P. Morgan minority ownership group, that certain of the Company's 2012 and 2013 AUV and related projections would be "difficult" to achieve: "I would just be careful as I handed this out to the creditors that I did not overpromise." Brenneman advised MacDonald to "eliminate" his "high case (I put the probability of hitting this at less than 5%)[.]"  However, MacDonald never did so and the Defendants' projections never were revised downward to accurately reflect the Company's realistic future prospects.

98.     The very next day, on September 15, 2011, MacDonald proposed restricting the amount of information given to the Investor Plaintiffs on the Company's "re-launch deck" of proposed information and going-forward projections, which were related to an effort to re-brand Quiznos and improve its financial performance.  MacDonald recognized that "Avenue is really pushing" for information, but stated that he wanted to push them off "so we can spend some time making sure we have the right story to tell these guys[.]"  MacDonald, accordingly, set the tone

24

and plan for omitting material information regarding the Company and its projections in correspondence with the Investor Plaintiffs in the Defendants' scheme to conceal the truth from the Investor Plaintiffs in order to defraud them.

*Correspondence with the Investor Plaintiffs and Attempts to Conceal, Downplay and Omit Material Information Regarding the Gap in Financial Models*

99.     In the fall and winter of 2011, the Defendants made numerous misrepresentations and related omissions via emails, conversations, documents, and presentations to the Investor Plaintiffs about the Company and its financial condition.

100.     In order to mislead the Investor Plaintiffs, MacDonald re-assured individuals at Avenue on or around October 22, 2011 that the Company had the "big ship moving the right way" and represented that the Company celebrated several new development deals.  Such statements demonstrate that, as part and parcel of the Defendant's fraudulent scheme, MacDonald was painting a picture for the Investor Plaintiffs that was definitively inconsistent with the known deficiencies in the Company's projections, which were used to induce the Investor Plaintiffs' participation in the Transaction.

101.     Perhaps most illustrative, the Defendants failed to adequately disclose and truthfully describe to the Investor Plaintiffs the fact and implications of an approximately $10-11 million gap that emerged in the fall of 2011 between gross profit as projected by Management in the corporate finance model (the "Corporate Finance Model"), and projected gross profit in a separate, more detailed food costing model (the "AFD Model") derived from the American Food Distributors ("AFD") side of the business.

25

102.    The Company's food distribution business generates the majority of its revenue. For example, in 2012 the AFD segment's gross revenue was approximately $245 million, compared to approximately $52 million in royalty-related revenue.  In 2013, the difference was similar as approximately 74% of the Company's total revenue was generated through food distribution and approximately 17% was generated from franchise operations, *i.e.*, royalties and related fees.

103.    Gross profit impacts the Company's cash flow; thus, a change in projected gross profit translates to a change in projected cash flow.  In deciding whether to enter into the Transaction, the Investor Plaintiffs relied on, *inter alia*, the projected cash flows for the Company that were provided by the Defendants.

104.    The model that had projected substantially higher gross profits and other metrics, the Corporate Finance Model, was the model that the Executive Defendants used to generate external reports regarding its financial prospects and the projections in the Offering Memorandum.  These external reports were sent to the Company's lenders, including the Investor Plaintiffs.  In fact, some projections made in the Offering Memorandum with respect to key metrics – such as U.S. weekly AUVs, AUV growth and AFD gross revenue – were even more aggressive than in the Corporate Finance Model's final 2012 budget.

105.    The Corporate Finance Model used overly aggressive assumptions based on higher margins and higher business sales, which deceptively inflated projected EBITDA numbers.  The AFD Model was more accurate because it was a "bottom up" model, which

26

calculated revenue and costs of goods sold ("COGS") starting with individual food prices and volumes.

106.    A senior executive in the AFD business informed MacDonald and Smythe about this gap as early as September of 2011.  The Executive Defendants then disclosed the gap to the remaining Defendants no later than November 2011.

107.    When this Company senior executive with responsibility for financial modeling confronted the Executive Defendants about the use of these overly aggressive and misleading assumptions, the Executive Defendants did not change the numbers in the external reporting, and instead, started scheming ways to close the gap in the projections.

108.    The Executive Defendants expressly were told by this senior executive that the Board, the Company's lenders, and its potential purchasers should be informed of the divergent financial models and that prior shared projections used overly aggressive, improper and misleading assumptions.  However, none of the Defendants disclosed this information to the Company's lenders or potential purchasers, including the Investor Plaintiffs.

109.     On or about October 29, 2011, the Company's Chief Operating Officer (COO) and Smythe exchanged emails in which the COO stated that "I think we found $5 million roughly of the shortfall in the model" based on AUV figures.  In response, Smythe questioned "How have we been using the wrong AUV the whole time….?"  The nature of the "shortfall" was concealed from the Investor Plaintiffs, as was the fact that Management knew that it would not be remedied by any steps already undertaken or planned for in the future.

110.     With the knowing approval of certain members of the Board, the Executive

Defendants did not sufficiently revise their projections to match the economic reality of the gap

and the known deficiencies with Management's response thereto.  Instead, they detrimentally

changed operations, including, for example, increasing food prices on franchisees, in order to

attempt to meet the misleading short-term gross profit projections contained in the Corporate

Finance Model.

111.     The Defendants knew or recklessly disregarded that increasing food prices on

franchisees at that time would significantly hurt the Company's future performance.

112.     For example, as early as January 2011, MacDonald and Smythe were advised by

Bill Flaherty, a Company executive vice president, that "these are dark times in the commodity

markets" and without a positive "store count buffer" to support the Company's existing

projections, "we're going to be compelled to pass commodity price increases along to [the

franchisees] in order to stay on budgeted EBITDA.  If we have a buffer, we can absorb a bit of

the increase, and keep the heat off the stores.  My own vote would be to do that" because "stores

closures" would be a "visible" and direct result of such increases.

113.     Smythe responded that "there's no buffer."  "We wouldn't be able to 'hide' the

higher store count and use as a buffer even if we wanted to since store count is a very obvious

driver."  However, the Defendants later concluded that they would attempt to "hide" the

operational changes and the negative impact on the Company's future performance from the

Investor Plaintiffs.

28

114.    Further, past price increases on the struggling franchisees had been a major source of conflict.  In fact, at a Board meeting or on about March 1, 2011, MacDonald "discussed the impact of commodity price increases and the reaction of franchise owners to increases in prices."

115.    The conflicts between the Company and its franchisees resulted in numerous individual and class action lawsuits concerning, among other issues, the Company's AFD-related business practices.

116.    Moreover, in the past the Company's management had attempted to mitigate its declining profitability at the corporate level by increasing the prices of food and supplies on the franchisees.  While such measures temporarily improved AFD's margins and overall revenue, they further compressed franchisees' shrinking margins, which strained the relationship between the Company and its franchisees and led to additional store closures.

117.    The Defendants did not sufficiently revise the projections that they had provided to the Investor Plaintiffs to accurately reflect the impact that the operational changes would have on projected store closure rates, SNO terminations and store openings, average unit volume, royalty rates, and cash flow and revenues.  This is because the Defendants designed and implemented the operational changes solely to attempt to meet short-term gross profit projections in order to fraudulently secure the Transaction.

118.    Defendants' projections also did not account for the fact that Management repeatedly had failed to meet their internal projections on key metrics during the first few quarters of 2011.

119.     None of the Transaction documents adequately disclosed the nature of the $10-11 million gap to the Investor Plaintiffs, the genesis and financial basis for the gap, the steps that were taken specifically to attempt to close the gap (and the likely operational results therefrom), or the extent of Management's recent history of over-projecting the Company's performance.

120.     For example, in early November 2011, Management discussed an internal draft presentation deck that expressly addressed the fact that four different internal financial models (including the CF and AFD models) had produced varying projections for AFD gross profits. The deck specifically addressed that to close the gap, the Company needed to "ensure accuracy in the model (one model we are all aligned behind)."  Management was looking for "quick wins to close the profit gap" and recognized that "[t]his is an ongoing process to continuously improve the plan and close the AFD profit gap."

121.     The same deck stated that "[e]stimated gross profit margin is not aligning with the current BTE [*i.e.*, Better Than Ever] menu projections" and, under Management's plans, franchise owners "will have higher [food] costs of ~30.7%" that "will squeeze their profitability."  As a result, the Management team working on the Transaction, led by MacDonald and Smythe, collectively questioned: "What profit do [franchise owners] need to stay afloat?" And, most critically, the draft deck stated: "There are levers to pull to bring AFD more profit, *but it doesn't look like the combination of these will completely close the gap*." (Emphasis added). Thus, Management questioned whether "there [are] other creative ways to help manage the situation."

122.    About a month later, in mid-December 2011 and before the Transaction documents were finalized, the COO exchanged emails with certain Company employees to discuss potential additional slides for an upcoming Board presentation.  The draft internal Company slides again specifically addressed the nearly $11 million AFD/CF models' gross profit gap, and explicitly recognized that the CF model had employed incorrect estimates and assumptions, stating: "Gap caused by using the incorrect Rev as a % SWS and GP % in the corporate finance model.  Accidentally used months that did not represent the current run rate."

123.    The draft slides conceded that the steps planned to the close this gap (*e.g.*, price increases on the Company's struggling franchisees) still would leave a nearly $7 million gap between the models' projected gross profit figures.

124.    None of this internal information was disclosed to the Investor Plaintiffs.  Instead, when information was verbally conveyed or referenced in writing, the Management team working on the Transaction, led by MacDonald and Smythe, downplayed the gap, expressed confidence that its projections were accurate, misrepresented the gap as a revenue miss rather than a critical inconsistency in the Company's internal financial modeling, and stated that the "Better Than Ever" ("BTE") re-launch (addressed below) would create the revenue necessary to improve the Company's failing performance.  Given the Company's financial condition, the misrepresentations and omissions regarding the gap were critical and material to the Investor Plaintiffs' consideration of the Transaction.

125.    These misstatements and omissions were not accidental, but intentional.  On or around September 2011, the Defendants discussed how to communicate with investors, lenders, and other outside parties in order to deceptively present the Company's financial condition.

126.    For example, as referenced above, on or around September 1, 2011, MacDonald and Smythe discussed how to revise the monthly Investor Financial Update and ensure that it was not widely distributed or shared.

127.    Further, and also as referenced above, on or around September 15, 2011, MacDonald sought to present the "Better Than Ever" ("BTE") re-launch information to the Investor Plaintiffs in the best light, and thus shortened a deck presentation to include just "big learnings" rather than all of the detailed information.  BTE was a Company-wide re-launch campaign designed to attempt to improve Quiznos' overall performance and implement changes ranging from new menu items, improved marketing, and financial projections.

128.    As late as December 2011, Management was discussing whether and how to pass certain soda price increases on to the Company's franchisees.  MacDonald told a group including a senior AFD executive and the Chief Operating Officer on December 6, 2011, that "I don't want to see any more negative hits to AFD ebitda until we know more from the BTE test."

129.    Between October and December 2011, the Defendants also made misrepresentations to the Investor Plaintiffs that addressed the changes being implemented and tested, the scope of the BTE testing, and BTE test results.

130.    MacDonald and Smythe also used the BTE re-launch as a justification to convince other Management team members and the minority Board members that the projections prepared

32

were reasonable.  These statements were repeated to lenders and potential purchasers by

MacDonald and Smythe.  *See*, *e.g.*, December 27, 2011 Presentation to Lenders at 10

("Projections assume a brand re-launch beginning in June 2012" including a "national

advertising campaign" and the "'Better Than Ever' menu[.]'"); *see also id.* at 9 ("Quiznos

management believes that a brand re-launch . . . will revitalize the brand and contribute to

significant upside in the financial outlook of the business[.]").

131.    In discussions with the Board on or around September 23, 2011 about forecasts

based on the BTE re-launch campaign, the Executive Defendants stated that they were confident

that the Company would hit projected target numbers, despite knowing the impact that closing

the gap between the Corporate Finance Model and AFD Model likely would have on the

Company's revenue, profitability and store closures.  Despite their representations, Management

did not yet have sufficient information regarding the impact of the BTE campaign to make the

claim that the BTE campaign would provide the lift they were claiming.

132.    MacDonald downplayed the known gap in gross profit projections with minority

Board Members and other Management, knowingly and falsely claimed that the brand re-launch

and new revenue drivers would close the gap, and made irrelevant the modeling that had shown

the gap, which he dismissed as based on the prior menu board.  As set forth above, MacDonald

had no basis to state that the BTE campaign would positively impact the Company's financial

modeling and projections or result in the projections claimed.

133.    Indeed, the Executive Defendants continued to rely on an internal "cover story"

to justify to certain employees why they were not fully or accurately disclosing the $10-11

33

million gap between the Corporate Finance Model and the AFD Model, much less the likely implications therefrom.  Certain employees were told by MacDonald that the BTE campaign would close the gap over the long-term and bring long-term financial projections in line with what was being reported externally, despite MacDonald's understanding that there was no basis for this claim and knowing that the limited testing done did not support the conclusion that a lift in revenue from the BTE campaign would be sustainable or sufficient to close the gap long-term.

134.    MacDonald also misrepresented that the retention of McKinsey & Co. ("McKinsey") led to McKinsey's assessment and blessing of all aspects of the brand re-launch, its viability, and the Defendants' projections.  In reality, McKinsey's role was more limited, and did not include sufficient analysis regarding the viability of the brand re-launch or the projections.

135.    The Majority-Member Managers Defendants were aware of these actions.  The Executive Defendants communicated to the Board their intent to increase prices on franchisees as a way to increase revenue and meet certain short-term targets that had been represented to the Investor Plaintiffs.  *See*, *e.g.*, October 13, 2011 presentation deck (addressing, *inter alia*, "attempt[] to pass minimal cost increases to Franchise Owners").

136.    The Defendants did not adjust the projections used and disseminated to the Investor Plaintiffs to reflect the likely impact these adjustments would have on the longer-term financial projections that the Defendants touted, and upon which the Investor Plaintiffs relied.

137.    The Executive Defendants knew or recklessly disregarded that the operational adjustments would decrease store openings and increase store closures; cause a decline in royalty

34

payments, gross revenue, and AUV growth; decrease the number of SNOs; increase SNO terminations; and reduce cash flow.

138.  However, meeting the financial targets was the Defendants' priority, as noted by Smythe in an email on or around October 14, 2011 to the Chief Accounting Officer, in which Smythe stated that he did not intend to change his revenue numbers "for external reporting" "so [they] need[] to match my original numbers," which numbers were provided to the Investor Plaintiffs.  Smythe continued: "If we want to use [the] new numbers for internal reporting, that's ok."  The CAO responded: "I completely agree.  However, the challenge will be breaking the forecasted revenue to the lender group in early August into the categories we report on externally."

139.  Board members Lee, Meyers, Moore, Ryan, and Fred Schaden were informed by the Executive Defendants in November 2011 of the status of the gap between the internal projection model and the projection model shared with the Investor Plaintiffs.

140.  Internal Company communications exchanged only days before the January 24, 2012 closing of the Transaction admitted that the Company "didn't have [a] comprehensive model" which resulted in a "gap in projections for 2012[.]"  MacDonald was a party to these communications.

*Summary of the Board's Involvement*

141.  During 2011, the Board was intimately involved with the progress of the Transaction option and exercised control over the Company's affairs consistent with its authority.  For example:

(a)     By resolution of June 15, 2011, the Board (i) approved the creation of a Special Committee of the Board of Managers, to be chaired by Rick Schaden and including Meyers (and later Lee and Moore), to consider options such as the Transaction, potential Reorganization Plan, and other options, (ii) approved the engagement of Moelis & Company as financial advisor to the Company, and (iii) approved the engagement of Paul, Weiss, Rifkin, Wharton & Garrison LLP as special counsel to the Company.

(b)     Considered proposals made by the Executive Defendants and  lenders with respect to restructuring the Company's business at, by way of example, Board meetings held on or about August 19, September 14, and October 12, 2011, respectively, which also were attended by, *inter alia*, Smythe and MacDonald, who briefed the Board on the Company's current and projected future results.

(c)     "[D]etermined [that] it was in the best interests of the Company to proceed with [the] restructuring" as embodied in the Transaction, and "approved the resolutions" attached to the December 21, 2011 Board minutes, which expressly approved "the form, terms and provisions of, and the transactions contemplated by" the Offering Memorandum, the Subscription Agreement, and the Restructuring Support Agreement.

*Summary of the Defendants' Fraudulent Scheme*

142.    The Defendants knew or recklessly disregarded that the operational changes they approved and implemented were intended solely to attempt to close the short-term gross profit gap between internal financial models used by the Executive Defendants and the Board, and did

not accurately reflect the real long-term financial projections of the Company, nor account for the known likely impact of such changes on the Company's franchisees.

143.    The known likely future impact of the price increases on Quiznos franchisees was not disclosed.

144.    The Defendants knew or recklessly disregarded that their projections, which were based originally on the false and misleading Corporate Finance Model and not the more detailed and accurate AFD Model, and which never were sufficiently revised downward to reflect the Company's known likely future performance given its 2011 performance and the operational changes made, were unreasonable and misrepresented Quiznos' business.

145.    As discussed above, the Defendants knew no later than November 2011 that the operational measures contemplated to attempt to close the substantial gross profit gap in the projections would *not* do so.

146.    The Defendants chose to make financial decisions based on the short-term impact on projections and financial modeling used in the Transaction and Offering Memorandum.

147.    They were focused on ensuring the completion of the Transaction, rather than disclosing to the Investor Plaintiffs the realities of the Company's stability, fiscal health and known likely future performance.

148.    In addition, because the systems in place to collect store-level financial information were known to Management to be deficient (for example, the Company did not receive and therefore could not analyze profit and loss statements on a store-by-store basis), the

37

Executive Defendants' misrepresentations regarding future store closures and related projections lacked a reasonable basis in fact.

149.    Based on the Management-prepared, Executive Defendant-sponsored and Board-approved fraudulent projections regarding store growth and closings, royalty payments, gross revenue, AUV growth, SNO count, cash flow, and other key metrics, the Investor Plaintiffs entered into the January 2012 Transaction.

*The Specific Fraudulent Misrepresentations and Omissions to the Investor Plaintiffs*

150.    Material misstatements and omissions were made to the Investor Plaintiffs in, *inter alia*, the Subscription Agreement and the Offering Memorandum.  These misstatements and omissions were expressly or implicitly attributable to one or both of the Executive Defendants. The Majority-Member Manager Defendants and Rick Schaden also are liable for these misstatements and omissions because they controlled the Executive Defendants and the Company for purposes of the federal securities laws.

151.    In the Subscription Agreement, it was represented and warranted, among other things, that "[t]he Offering Memorandum . . . does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading. . . ." (Section 3(a)(xi)).

152.    MacDonald signed the Subscription Agreement on behalf of QCE Finance.

153.    Despite this representation and warranty, statements and projections in the Offering Memorandum, and separate statements made by the Defendants via emails,

presentations, and other personal communications internally and to the Investor Plaintiffs (which

separate statements, as set forth above, demonstrate, *inter alia*, the Defendants' intent to defraud)

were not reasonable, factually-based or made in good faith.  These projections included:

(a)      Ending store count, which was projected higher than the Defendants knew, or

were reckless in not knowing, could be achieved (resulting in a one-year variance of -2.8% and a

two-year variance of -22.2% off of the Offering Memorandum's projections, respectively);

(b)      Store openings, which were projected higher than the Defendants knew, or were

reckless in not knowing, could be achieved (resulting in a one-year variance of -7.6% and a two-

year variance of -68% off of the Offering Memorandum's projections, respectively);

(c)      Store closings, which were projected lower than the Defendants knew, or were

reckless in not knowing, could be achieved (resulting in a one-year variance of +6.6% and a two-

year variance of +90% over the Offering Memorandum's projections, respectively);

(d)      Royalty payments, which the Defendants knew, or were reckless in not knowing,

were likely to be materially less than projected (resulting in a one-year variance of -7.8% off of

the Offering Memorandum's projections);

(e)      AFD gross revenue, which the Defendants knew, or were reckless in not knowing,

was likely to be materially less than projected (resulting in a one-year variance of -8.1% off of

the Offering Memorandum's projections);

(f)      Gross profit, which the Defendants knew or, or were reckless in not knowing,

was likely to be materially less than projected, and would result in lower projected cash flow

(resulting in a one-year variance of -5.3% off of the Offering Memorandum's projections);

39

(g)    Total revenue, which the Defendants knew, or were reckless in not knowing, was likely to be materially less than projected (resulting in a one-year variance of -7.2% and a two-year variance of -33.9% off of the Offering Memorandum's projections, respectively);

(h)    U.S. franchisee weekly AUV, which the Defendants knew, or were reckless in not knowing,  would not grow at the projected rate (resulting in a one-year variance of -6.6% and a two-year variance of -14.2% off of the Offering Memorandum's projections, respectively);

(i)    SNO count, which the Defendants knew, or were reckless in not knowing, would not increase, but was likely to materially decrease; and

(j)    SNO terminations, which the Defendants knew, or were reckless in not knowing, would be materially higher than projected.

154.    The Defendants knew or recklessly disregarded that the projections that were disseminated to the Investor Plaintiffs contained material misstatements, misrepresentations and omissions.  The projections in the Offering Memorandum – in which the Defendants omitted material information including, but not limited to, the known gross profits gap between internal financial models and the Company's inability to close it, and the known likely future negative impact that the Defendants' operational changes would have on each key Company metric – were attributable to the Executive Defendants for the reasons set forth herein.

155.    Indeed, the projections in the Offering Memorandum assumed that the Company would pursue the Reorganization Plan instead of the Transaction and, thus, the projections were intended to reflect the worst case scenario: "In particular, the Company expects to realize lower franchise store openings, higher store closures, and higher costs of goods sold *relative to the*

40

*performance of the Company would expect if the Company was not operating in Bankruptcy as*

*Debtors-in-Possession*." OM at 146 (emphasis added); *see also* December 27, 2011 Presentation

to Lenders at 15 ("The out of court restructuring is expected to have less impact on operations

than an in-court process[.]").  As set forth above, the Company's actual 2012 and 2013

performance was materially worse than even this purported worst case.

156.    The misrepresentations also included the following statements:

(a)    In the Offering Memorandum, it was represented that: "As a result of the

Restructuring Transactions, we will reduce our indebtedness, *improve our liquidity position* and

enhance our capital levels while providing additional resources to execute our business

strategies." OM at 8 (emphasis added).

(b)    The Company's liquidity position was not improved as a result of the Transaction,

and the Defendants knew or were reckless in not knowing it would not be, despite Avenue's

injection of $150 million in cash into the Company.  The Company faced a liquidity squeeze in

2012, as evidence by the substantial difference between its projected level of cash and cash

equivalents (approximately $35.3 million) and its actual results ($14.2 million, a difference of -

59.8% from the projections).  Indeed, the Defendants knew or were reckless in not knowing that

the Company's liquidity would not be improved after the Transaction.

(c)    In the Offering Memorandum, it also was represented that: "The intent of [the

Company's re-branding] program is to increase the quality of our products and customer

experience as well as to attract additional customers into our restaurants, *ultimately leading to*

*higher franchise owner AUVs as well as royalties and food distribution revenue for the*

41

*Company*." *Id.* (emphasis added); *see also id.* at 147, 148 (addressing "a positive impact to overall AUVs and other key operating metrics" and that "AUVs are expected to begin to grow each year throughout the Projection Period").  AUVs and revenue substantially declined the same year the Transaction was consummated.  The foregoing demonstrates that the Defendants knew or were reckless in not knowing at the time of the Transaction that the Company could and would not achieve the projections provided to the Investor Plaintiffs.

157.    The Investor Plaintiffs consummated the Transaction based, in part, on these fraudulent misstatements, misrepresentations and omissions.

158.    Several of the Majority-Member Managers and the Executive Defendants had a financial incentive to make these misstatements, misrepresentations and omissions, and push for and ensure the consummation of the Transaction instead of the Reorganization Plan.

159.    For example, in connection with the Transaction, the following individuals retained significant deferred compensation amounts even after the Transaction that may have been eliminated entirely in any bankruptcy proceeding: Ryan (approximately $1.5 million); Smythe (approximately $442,000); Moore (approximately $160,000); and Fred Schaden (approximately $139,000).

160.    Upon information and belief, MacDonald believed that his continued and future employment with the Company would be more secure after the Transaction as opposed to a bankruptcy restructuring.

161.     Similarly, upon information and belief, Smythe believed that his continued and future employment with CCP would be secured with the success of the Transaction.  Indeed, Smythe then continued to work at CCP after the Transaction.

### The Harm Suffered by the Investor Plaintiffs

162.     The Investor Plaintiffs were harmed by pursuing the Transaction based on the Defendants' fraudulent misstatements, misrepresentations and omissions, and suffered substantial "actual damages" within the scope of the securities laws.

163.     The Investor Plaintiffs' "out of pocket" damages and their "rescissory" damages are believed to be several hundred million dollars, in an amount to be proven at trial.

164.     The Investor Plaintiffs also may recover punitive damages against the Defendants, for the reasons set forth herein.

### Inapplicability of the PSLRA Statutory "Safe Harbor"

165.     The statutory "safe harbor" of the Private Securities Litigation Reform Act (the "PSLRA"), applicable to "forward-looking statements" under certain defined circumstances, does not apply to any of the false and misleading statements or omissions alleged herein.

166.     The statutory "safe harbor" does not apply to material omissions, or to purported forward-looking statements that incorporate current or historical facts.

167.     The statutory "safe harbor" also does not apply to statements "made in connection with an offering by, or relating to the operations of, a . . . limited liability company. . . ."  Each of the Quiznos entities is an LLC.

43

168.     The Defendants' misstatements also were not accompanied by any meaningful cautionary language identifying important facts that could cause the Company's actual results to differ materially from those in the purportedly forward-looking statements upon which the Investor Plaintiffs relied.   The Defendants provided only general disclosures that were not accurate in light of their undisclosed true intentions and actions.

169.     For example, the Offering Memorandum provided general "risk" disclosures that did not address, *inter alia*, the facts that the Defendants already had concealed the likely impact of operational changes that would have a negative impact on the Company's future performance. The Defendants also had omitted material information relating to the gap between the Company's internal financial models, the inflated version of which was used for the projections made part of the Transaction.

170.     Further, to the extent the statutory "safe harbor" otherwise would apply to any purportedly forward-looking statements alleged herein, the Defendants are liable for those false or misleading statements because at the time those statements were made, the speakers knew or recklessly disregarded that the statements or omissions were false or misleading (or they were authorized by someone who knew or recklessly disregarded that they were false or misleading).

## CAUSES OF ACTION

### Count I – Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 – The Investor Plaintiffs Against the Executive Defendants

171.    The Investor Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

172.    Section 10(b) and Rule 10b-5 apply to the sale of a privately-held business when "securities" are given in exchange for an investment.

173.    The securities/member ownership interests that were purchased as part of the Transaction are "securities" under the federal securities laws.  For example, the subject LLC(s) at which level actual management was exercised were manager-managed and not member-managed.  Also, the LLC's officers – not its members – were responsible for day-to-day management and control of these entities.

174.    As set forth above, the Executive Defendants carried out a plan, scheme and course of conduct that was intended to, and did, (a) deceive the Investor Plaintiffs regarding the Company's likely future business and financial performance, based on the false and misleading statements and omissions including and related to the Defendants' projections, and (b) cause the Investor Plaintiffs to purchase the securities in reliance on the Defendants' false and misleading misrepresentations and omissions.

175.    As set forth above, the Executive Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a

course of business that operated as a fraud and deceit upon the Investor Plaintiffs, as purchasers of the securities.

176.    The Executive Defendants directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or mails, engaged and participated in a continuous course of conduct to disseminate false and misleading information, as alleged herein.

177.    The Executive Defendants are liable for all materially false and misleading statements made to the Investor Plaintiffs, because the Executive Defendants (a) exercised ultimate authority over the statements made, the fraudulent projections and the process whereby the projections were generated and given to the Investor Plaintiffs, (b) signed Transaction documents in which the statements were made, (c) ratified and approved the statements made, and (d) the statements made were attributable to one or more of the Executive Defendants.  The Executive Defendants also are liable for all materially misleading omissions that deceived the Investor Plaintiffs, because they exercised ultimate authority over all statements they caused to be made, and refrained from disclosing to the Investor Plaintiffs material facts necessary to make the existing statements to the Investor Plaintiffs not misleading.

178.    The allegations herein establish a strong inference of scienter that the Executive Defendants each acted with scienter, in that they had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts.  The Executive Defendants' material misrepresentations and omissions were done knowingly or with recklessness for the purpose and effect of concealing their true plan for inducing the Investor Plaintiffs to consummate the

Transaction. The Executive Defendants also each acted with scienter in that they had the motive and opportunity to defraud the Investor Plaintiffs, as alleged herein.

179. In direct and proximate reliance on the foregoing materially false misrepresentations and omissions, and in ignorance of the Executive Defendants' fraudulent scheme, the Investor Plaintiffs agreed to and consummated the Transaction. Had the Investor Plaintiffs known the truth, they would not have agreed to the Transaction as consummated. Thus, the Investor Plaintiffs relied to their detriment on the Executive Defendants' materially false and misleading statements and omissions in purchasing Quiznos' securities as part of the Transaction.

180. As alleged herein, the Executive Defendants' materially false and misleading statements and omissions directly and proximately caused, and/or were a substantial contributing factor and cause, of the substantial damages the Investor Plaintiffs suffered.

181. The Executive Defendants therefore have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

182. As a direct and proximate cause of the Executive Defendants' fraudulent scheme, the Investor Plaintiffs suffered substantial damages because of their purchase of Quiznos securities based on the Defendants' fraudulent statements and omissions, as set forth herein.

## Count II – Violation of Section 20(a) of the Exchange Act – The Investor Plaintiffs Against All Defendants

183.     The Investor Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

184.     The Defendants acted as controlling persons of QCE Finance, QCE and the Executive Defendants within the meaning of Section 20(a) of the Exchange Act, and thus are jointly and severally liable with the Executive Defendants for securities fraud.

185.     By virtue of (a) their positions as senior executives, majority-member managers and Board committee members of Quiznos during the time period at issue, (b) their participation in and awareness of the fraudulent scheme as described herein, (c) intimate knowledge and express approval of the documents containing material misstatements and omissions made to the Investor Plaintiffs, (d) unfettered access to Management and the books and records on a day-to-day basis, (e) in the case of MacDonald, signing documents containing material misstatements and omissions, (f) in the case of Rick and Richard Schaden, their majority equity ownership of Quiznos, and (g) in the case of CCP, its use as the instrumentality and conduit by and through which the Schadens exercised direct and indirect control over the Company, the Majority-Member Managers and the Executive Defendants, the Defendants had the power to influence and control, and did in fact influence and control, directly and indirectly, the decision-making of QCE Holding and the Executive Defendants with respect to, *inter alia*, the content and distribution of the material misstatements and the decisions to make the fraudulent omissions.

186.     The Defendants also had direct supervisory authority over the day-to-day operations of the Company and, *inter alia*, the review, analysis, and presentation of the

48

Transaction-related documents in which the material misstatements and omissions were made to the Investor Plaintiffs.

187.   The Defendants, including but not limited to the Executive Defendants, also caused the previously alleged violations of Section 10(b) of the Exchange Act and Rule 10b-5.  Thus, by virtue of their respective roles as controlling persons of these entities and the Executive Defendants within the meaning of Section 20(a) of the Exchange Act, all of the Defendants are liable to the Investor Plaintiffs.

188.   The Defendants failed to take any steps to prevent a primary violation of the federal securities laws in this case and, indeed, deliberately concealed their scheme from certain members of Management and minority Board members.

189.   As a direct and proximate cause of the Defendants' fraudulent scheme by means of their control of QCE Finance, QCE and the Executive Defendants, the Investor Plaintiffs suffered substantial damages, as set forth herein.

### Count III – Civil Conspiracy (New York Law) – The Investor Plaintiffs Against All Defendants

190.   The Investor Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

191.   The Schadens, the Executive Defendants and the Majority-Member Manager Defendants entered into an agreement between and among themselves to deceive the Investor Plaintiffs by concealing and misrepresenting the Company's likely future business results, as well as other material information concerning the Transaction that they knew that the Investor Plaintiffs would rely upon in deciding to go through with the Transaction.

49

192.     The Defendants conspired to misrepresent and omit material information from the Offering Memorandum and other related Transaction documents to induce the Investor Plaintiffs to engage in the Transaction.

193.     The Investor Plaintiffs were harmed by the conspiracy.

194.     The Investor Plaintiffs are entitled to all damages they suffered as a result of the Defendants' conspiracy.

## Count IV – Common Law Fraud (New York Law) – The Investor Plaintiffs Against the Executive Defendants

195.     The Investor Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

196.     New York law applies to the operative Transaction documents.

197.     The same allegations that establish the Executive Defendants' liability for federal securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 also establish each of the Executive Defendant's liability for common law fraud under New York law.

198.     As a direct and proximate cause of the Executive Defendants' fraudulent scheme, the Investor Plaintiffs suffered substantial damages, as set forth above.

199.     In addition to the remedies otherwise available for federal securities fraud, as set forth above, the Investor Plaintiffs are entitled to an award of punitive damages against the Executive Defendants under New York common law, based on their intentional, knowing, reckless, malicious, and wanton conduct.

## Count V – Common Law Aiding and Abetting Fraud (New York Law) – The Investor Plaintiffs Against All Defendants

200.    The Investor Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

201.    The foregoing allegations establish the existence of a fraud perpetrated by the Defendants upon the Investor Plaintiffs.

202.    Each of the Defendants actually knew of the fraud being perpetrated upon the Investor Plaintiffs, as set forth above.

203.    Each of the Defendants substantially assisted in the fraud being perpetrated upon the Investor Plaintiffs, as set forth above.

204.    As a direct and proximate cause of the Defendants' fraudulent scheme, and the Defendants' aiding and abetting of the respective actions in furtherance of that scheme, the Investor Plaintiffs suffered substantial damages, as set forth above.

205.    The Investor Plaintiffs are entitled to an award of punitive damages against the Defendants under New York common law, based on their intentional, knowing, reckless, malicious, and wanton conduct.

WHEREFORE, the Investor Plaintiffs respectfully request that this Court enter judgment against the Defendants, jointly and severally, and in favor of the Investor Plaintiffs, on each Count of this Civil Action Complaint, award such damages as determined at trial, and issue such other relief as determined to be just and equitable.

## JURY DEMAND

The Investor Plaintiffs hereby demand a trial by jury on all issues so triable.

/s/Daniel F. Wake

Daniel F. Wake (CO ID No. 18086)
Kali R. Backer (CO ID No. 45436)
SHOOK HARDY & BACON LLP
1660 17th Street, Suite 450
Denver, CO 80202-1254
Telephone: (303) 285-5300
Fax: (303) 285-5301

&

Stephen M. Baldini
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
Bank of America Tower
New York, NY 10036-6745
Telephone: (212) 872-1000
Fax: (212) 872-1002

&

Jeffery A. Dailey
AKIN GUMP STRAUSS HAUER & FELD LLP
Two Commerce Square
2001 Market Street, Suite 4100
Philadelphia, PA 19103-7013
Telephone: (215) 965-1200
Fax: (215) 965-1210

Attorneys for the Avenue Plaintiffs

Allen L. Lanstra
Van C. Durrer, II (*admission pending*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP
300 S. Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600

&

James T. Markus (CO ID No. 25065)
Steven R. Rider (CO ID No. 7921)
MARKUS WILLIAMS YOUNG & ZIMMERMANN
LLP
1700 Lincoln Street, Suite 4550
Denver, CO 80203
Telephone: (303) 830-0800
Fax: (303) 830-0809

Attorneys for the Fortress Plaintiffs


Dated: July 22, 2014