IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02031-PAB-KLM

AVENUE CAPITAL MANAGEMENT II, LP, et al.,

    Plaintiffs,

v.

RICHARD F. SCHADEN, et al.,

    Defendants.

## OFFICER DEFENDANTS' MOTION TO DISMISS COMPLAINT

Greg MacDonald and Dennis Smythe ("Officer Defendants"), by their undersigned counsel and pursuant to Federal Rule of Civil Procedure 12(b)(6), hereby move to dismiss Plaintiffs' Complaint:

## INTRODUCTION

In this case, two highly-sophisticated, multi-billion dollar distressed-debt investment funds, and their Cayman Island and Jersey Island affiliates, assert conclusory fraud claims against the former CEO and CFO of Quiznos based on forward-looking projections that allegedly induced the plaintiffs to acquire the Company. Plaintiffs were repeatedly told they could not rely on the projections as guarantees of future performance and, as highly-sophisticated investment funds, surely knew that already. Having purchased Quiznos debt at a steep discount, Plaintiffs had closely watched Quiznos' financial decline for years. To save their investment, Plaintiffs converted that debt into membership interests, took control of the company, and installed their hand-picked management team, including a new CEO and CFO. Plaintiffs' team failed to turn around the

company. In fact, they drove it into bankruptcy in just two years, at which point Plaintiffs filed this suit in a misdirected and meritless attempt to shift the blame for that failure.

Yet, despite having controlled Quiznos for years (with unfettered access to the Company's internal communications and computer systems), and despite the support of outside forensic experts paid millions of dollars, Plaintiffs have not identified a *single* e-mail or document in which the Officer Defendants expressed disbelief in the Company's ability to hit the projections provided to Plaintiffs or disclosed an intent, or even an incentive, to fool Plaintiffs. At bottom, this is not a case about a Defendants' fraud, but about buyer's remorse. The Officer Defendants' motion to dismiss should be granted with prejudice.

## FACTUAL ALLEGATIONS

Plaintiffs are funds affiliated with Avenue Capital Management II, L.P. (collectively "Avenue") and Fortress Investment Group LLC (collectively "Fortress"). (Compl. ¶¶ 13-14, ECF No. 1.) They allege that former officers of the limited liability companies comprising the Quiznos brand gave them overly optimistic projections that induced them in late 2011 and early 2012 to convert millions of dollars in loans into membership interests in the Company, and to inject an additional $150 million in capital into the Company. (*See id.*¶¶ 22-23, 51-52, 69-76.)

In May 2006, lenders entered into a $650 million "first lien" loan facility, a $225 million "second lien" loan facility, and a $75 million revolver with Quiznos. (Compl. ¶ 51.) After 2006, Quiznos' performance allegedly "began to lag." (*Id.* ¶ 53.) As a result of Quiznos' declining performance, the Company breached certain loan covenants. (*Id.* ¶ 56.) In July 2011, Plaintiffs—Quiznos' two largest lenders—began to consider a restructuring of the Company. (*Id.* ¶¶ 59, 74.) In December 2011, Plaintiffs were presented with the option to vote for either an in-court or out-of-court restructuring, as set forth in three documents: (a) an Offering Memorandum; (b) a

Restructuring Support Agreement; and (c) a Subscription Agreement; and (d) Assignment, Assumption & Release Agreement.[1]  (*Id.* ¶ 68.)

Plaintiffs allegedly elected the out-of-court restructuring based on "misrepresentations" in the transaction documents.  (Compl. ¶ 149.)  Primarily, these "misrepresentations" were projections for 2012-2016, prepared by the Company with its outside financial advisors at Moelis, "to assist the Bankruptcy Court in determining" whether the proposed in-court restructuring would meet the "feasibility" requirements of 11 U.S.C. § 1129(a)(11).  (Compl. ¶ 153; Ex. 1 p. 157.)  In other words, the projections assumed the in-court restructuring that Plaintiffs did *not* elect.  (Compl. ¶ 155; Ex. 1 pp. 163-165.)  Plaintiffs allege the projections were fraudulent because they turned out to be wrong, and misleading because Defendants failed to disclose a $10-11 million gap between gross profit as projected by Quiznos management under its 5-year corporate finance model and the projected gross profit in a food cost "model":  a one-year scenario of food distribution gross profit for 2012 developed by an employee in Quiznos' subsidiary American Food Distributors ("AFD"), which, in fact, *was* considered (with substantial other information) in compiling Quiznos' business plan and corporate finance model.  (Compl. ¶¶ 101, 106-107, 154.)

In addition to projections, the Complaint identifies two other alleged misrepresentations contained in the transaction documents:  (1) that, by restructuring, Quiznos would "*improve our*

---

[1] Plaintiffs refer to these documents in their Complaint, but do not attach them.  "[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."  *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997); *see also Grossman v. Novell, Inc.*, 120 F.3d 1112, 1116 n.2 (10th Cir. 1997) (considering, on a motion to dismiss, Registration Statement referred to but not incorporated in the complaint).  Accordingly, the Court may consider the transaction documents attached as exhibits to the concurrently-filed Declaration of Nathaniel P. Garrett.  All "Exhibit" citations refer to the Exhibits attached to the Garrett Declaration.

*liquidity position*"; and (2) that "[t]he intent of" a rebranding program by the Company was to increase product quality and customer experience, "*ultimately leading to higher franchise owner [Average Unit Volume] as well as royalties and food distribution revenue for the Company.*"  (Compl. ¶ 156(a), (c).)  Based on these purported misrepresentations, Plaintiffs assert claims for violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, and common law fraud against former Quiznos CEO Greg MacDonald and former CFO Dennis Smythe.

## LEGAL STANDARD

To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  While a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555 (citation omitted).  No weight is given to "legal conclusions" or "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citation omitted).

## ARGUMENT

### I. THE COMPLAINT IS BARRED BY PLAINTIFFS' RELEASES.

Pursuant to Federal Rule of Civil Procedure 10(c), the Officer Defendants adopt the argument in Part I of the Manager Defendants' concurrently-filed motion to dismiss, which demonstrates that the Complaint is barred by two releases that Plaintiffs signed as part of the restructuring transaction.  The Assignment, Assumption and Release Agreement's release provisions apply equally to the Officer Defendants, who were officers of QCE Holding at the time.

## II. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(B) OF THE EXCHANGE ACT.

### A. LLC Interests Are Not Securities for Purposes of Federal Law.

Independent of the releases, Counts One and Two of the Complaint must be dismissed because the LLC interests that Plaintiffs purchased as part of the 2012 transaction are not "securities" under federal law. *Nelson v. Stahl*, 173 F. Supp. 2d 153, 163 (S.D.N.Y. 2001) ("LLC interests are not securities for purposes of federal law").

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a materially false statement or omitted a material fact "in connection with the purchase or sale of *securities*." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (emphasis added). In relevant part, the Exchange Act defines "security" to mean "any note, stock, treasury stock, security future, security-based swap, bond, debenture, … [or] investment contract." 15 U.S.C. § 78c(a)(10).

LLC interests, although they may be "'stock-like' in nature, are not traditional stock." *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 389 (D. Del. 2000). "[S]tock" refers to an instrument that "is both called 'stock' and bears stock's usual characteristics." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985). A fundamental feature of traditional stock is negotiability. *See Robinson v. Glynn*, 349 F.3d 166, 173 (4th Cir. 2003). Here, "like interests in LLCs more generally, [Plaintiffs'] membership interests were not freely negotiable." *Id.* Plaintiffs could transfer their interests only if they first offered other members the opportunity to purchase their interests on similar terms. (Ex. 2 pp. 26-27.) Thus, Plaintiffs' membership interests were not "stock" within the meaning of § 78c. *Robinson*, 349 F.3d at 174; *Great Lakes*, 96 F. Supp. 2d at 389.

Nor can Plaintiffs' membership interests in QCE Parent be characterized as an "investment contract," which connotes: (1) an investment in a common venture; (2) premised on a reasonable

5

expectation of profits; (3) to be derived from the entrepreneurial or managerial efforts of others. *Nelson*, 173 F. Supp. 2d at 164.  Under the third prong of that test, an LLC membership interest can be considered a security only "when the partners are so dependent on a particular manager that they cannot replace him or otherwise exercise ultimate control."  *Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir. 1981).  As long as the LLC member "retains ultimate control, he has the power over the investment and the access to information about it which is necessary to protect against any unwilling dependence on the manager."  *Id.*  If an investment scheme gives rise to a "reasonable expectation … of significant investor control, a reasonable purchaser could be expected to make his own investigation of the new business he planned to undertake and the protection of the [Exchange Act] would be unnecessary."  *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 585 (2d Cir. 1982).

In an effort to bring themselves under the ambit of federal securities laws, Plaintiffs allege that their LLC interests are "securities" because QCE Parent is "manager-managed and not member-managed," and that "the LLC's officers – not its members – were responsible for day-to-day management and control."  (Compl. ¶ 173.)  But the structure of Plaintiffs' interests in QCE Parent is indistinguishable from the interests analyzed in *Great Lakes*, which rejected application of the federal securities laws.

In that case, Great Lakes sued Monsanto for failure to disclose material information in conjunction with the sale of a LLC.  96 F. Supp. 2d at 377.  On a motion to dismiss, the court held that the plaintiff's purchase of LLC interests was a "commercial transaction" rather than an "investment transaction" because Great Lakes was not "dependent solely on the efforts of others for profits."  *Id.* at 391.  The LLC agreement provided that LLC Members had no authority to directly manage the LLC's business and affairs; that authority was delegated to a Board of Managers.

6

*Id.* at 392. Nonetheless, the Members had the power to remove any Manager with or without cause, and Great Lakes had alleged that, prior to the sale, Monsanto had the power to control the actions of the Managers. *Id.* Under these circumstances, the court found, Great Lakes had "the power to directly affect the profits it received" from the LLC. *Id.*; *see also Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp. 2d 326, 333 (S.D.N.Y. 1999) (control enjoyed by an LLC Member was antithetical to the notion of member passivity).

The LLC interests purchased here are materially indistinguishable. While QCE Parent's LLC Agreement gave a 9-person Board of Managers the authority to manage the LLC, Plaintiffs had the authority to nominate 8 of the 9 Managers, and to terminate them with or without cause. (Ex. 2 pp. 14-15.) And Plaintiffs allege that prior to the sale, the Members of QCE Parent's predecessor "exercised control" over the LLC. (Compl. ¶¶ 19-21, 33, 185.) Under the circumstances, Plaintiffs are not the kind of passive investor the securities laws are designed to protect.

**B. Plaintiffs' Claim Under Section 10(b) is Barred by the Statute of Limitations.**

Even if Plaintiffs' purchase of Quiznos were subject to the Exchange Act, their claims are untimely. A private cause of action that involves a claim of fraud must be brought not later than the *earlier* of "2 years after the discovery of the facts constituting the violation" or "5 years after such violation." 28 U.S.C. § 1658(b).

Section 1658(b)'s 2-year statute of limitations accrues when the plaintiff discovers or "when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation,'" whichever comes first. *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010). The statute of limitations does not wait until "full exposition of the scam itself"; a plaintiff is put on inquiry notice "by evidence of the possibility of fraud." *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1203 (10th Cir. 1998).

Critically, the plaintiff must "plead and prove facts showing that his claim was timely." *Anixter v. Home-Stake Prod. Co.*, 939 F.2d 1420, 1434 (10th Cir. 1991).[2] Plaintiffs bear the burden of stating "affirmatively the time and circumstances of discovery of the allegedly untrue statements or omissions and the reasons why they could not have discovered the untruths or omissions until more than [two] year[s] had elapsed after the" restructuring transaction. *Flinn Foundation v. Petro-Lewis Corp.*, No. 84-C-2413, 1985 U.S. Dist. LEXIS 14017, at *9 (D. Colo. Nov. 8, 1985); *see also Ambraziunas v. Bank of Boulder*, 846 F. Supp. 1459, 1465 (D. Colo. 1994).

Plaintiffs allege that the "conspiracy" began in January 2011, and culminated in January 2012 when Plaintiffs took control of the Company. (Compl. ¶¶ 2, 9.) According to Plaintiffs, the "detrimental effects" of Defendants' alleged fraud "were realized" after the transaction closed in January 2012. (*Id.* ¶ 9.) Yet, despite taking full control of the company as of January 24, 2012 (including control of all company documents, systems and employees), Plaintiffs waited until July 22, 2014, to sue. The Complaint is bereft of any allegation that would explain why Plaintiffs failed to discover the alleged facts more than two years earlier, and why a reasonably diligent owner would not have discovered those facts before July 22, 2012.

### C. Plaintiffs' Claim is Barred by the Bespeaks Caution Doctrine.

Plaintiffs' federal claims should be dismissed for a third reason: the alleged misrepresentations are non-actionable under the "bespeaks caution doctrine." Plaintiffs allege that the "safe harbor" of the Private Securities Litigation Reform Act ("PSLRA") does not apply to statements relating to the operations of an LLC. (Compl. ¶ 167.) But the bespeaks caution doctrine, which "predated the PSLRA and is similar to the statutory safe harbor … survived the PSLRA as an

---

[2] Although *Anixter* concerned 15 U.S.C. § 77m, its analysis "applies to claims brought under § 10(b)" because of similarities between § 77m and § 1658(b). *Sterlin*, 154 F.3d at 1197 n.10.

independent test of materiality." *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 676 (D. Colo. 2007).

Under the bespeaks caution doctrine, "forward-looking statements … are not fraudulent as a matter of law if they are accompanied by sufficient cautionary language." *Scantek Med., Inc. v. Sabella*, 583 F. Supp. 2d 477, 496 (S.D.N.Y. 2008). If the cautionary statements are substantive and tailored to the specific future projections, estimates or opinions which the plaintiffs challenge, dismissal is appropriate. *Grossman*, 120 F.3d at 1120.

Plaintiffs' primary charge is that Messrs. MacDonald and Smythe materially misrepresented Quiznos' projections. (Compl. ¶ 153.) The Offering Memorandum, however, was chock-full of substantive and specific statements of caution about forward-looking statements in general and the projections in particular. The Company "cautioned that any forward-looking statements made in" the Offering Memorandum "are not guarantees of future performance and that you should not place undue reliance on any such forward-looking statements." (Ex. 1 p. 11.) With respect to the projections, the Offering Memorandum warned they were based on assumptions, and "that the Company can provide no assurance that such assumptions will ultimately be realized." (*Id.* p. 157; *see also id.* p. 158 ("[F]orward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements[.]")) Indeed, the memorandum specifically warned Plaintiffs the projections were "'forward-looking statements'" that "are subject to a number of assumptions, risks and uncertainties," including the cost of raw materials and general economic conditions. (*Id.* pp. 157-58.) The Company thus made "no representation or warranty as to the accuracy or completeness of any of the following information." (*Id.* p. 158.)

The memorandum also advised investors to read the projections with the risk factors identified in the document. (Ex. 1 p. 157.) These risk factors included:

- Even if the restructuring transaction was consummated, "**our indebtedness and other obligations will continue to be significant. If the current economic environment does not improve, we may not be able to generate sufficient cash flow from operations to satisfy our obligations as they come due, and, as a result, we would need additional funding, which may be difficult to obtain.**" (*Id.* p. 38.)

- "**We incurred a net loss in fiscal 2009, experienced declines in overall restaurant count and revenue in each of the last three fiscal years, and may continue to experience further declines and losses in the future.**" (*Id.* p. 45.)

- "**Our financial results are closely tied to the operating results of our franchise owners.**" (*Id.*)

- "**Weak economic conditions may adversely affect consumer discretionary spending and may negatively impact our business, financial positions or results of operations.**" (*Id.* p. 46.)

- "**Our future operating plans contemplate a re-launch of the brand in 2012**," and "[t]here can be no assurance that our re-launch strategy will be effective … which may have a material adverse effect on the AUVs of our franchise owners, our royalty and food distribution revenue, and our liquidity." (*Id.* p. 47.)

In short, the risks associated with the Company's projections were "covered in great detail" in the Offering Memorandum. *Grossman*, 120 F.3d at 1122. These detailed cautionary statements constitute just the kind of language that supports application of the bespeaks caution doctrine. *See, e.g., id.* at 1121; *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986); *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 768 (11th Cir. 2007); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 365 (3d Cir. 1993).

According to Plaintiffs, the projections were misleading because the Company failed to also disclose a scenario of projected 2012 food distribution gross profit compiled by an employee at Quiznos' subsidiary AFD. (Compl. ¶ 101.) But the Company did not represent that it was disclosing every estimate compiled by any Quiznos employee, even if corporate management did not

10

find the estimate reliably predictive. It *did* caution investors that "***[i]ncreases in the cost of … food, beverage and other products … could have a material adverse effect on our revenues***." (Ex. 1 p. 48 (emphasis in original).) And it also disclosed that the corporate projections were based on assumptions that "are inherently uncertain and unpredictable," and that "***may be incomplete and inaccurate***." (*Id.* p. 158 (emphasis added).) For that reason, the Company warned that "actual results achieved during periods covered may vary from the Summary Financial Projections, and such variations may be material or adverse." (*Id.*) Where, as here, projections are accompanied by statements that "clearly convey the limits of the work done to reach them," Plaintiffs cannot reasonably claim to have been misled otherwise. *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1118 (10th Cir. 2014).

Plaintiffs' alleged reliance on the projections is particularly unreasonable given their sophistication. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003). Plaintiffs represented in the transaction documents that they had "such knowledge and experience in financial and business matters" that they were "capable of evaluating the merits and risks" of entering into the restructuring transaction, and had "conducted an independent review and analysis of the business and affairs of the Company" that they considered "sufficient and reasonable" for purposes of entering into the transaction. (Ex. 3 p. 8.) As professional investment funds with experience investing in Quiznos, Plaintiffs were aware the Company had suffered declining metrics since 2007 and ought to have known the risks inherent in forward-looking projections. *See* Compl. ¶¶ 13-14, 50-57; *Zissu v. Bear, Stearns & Co.*, 805 F.2d 75, 80 (2d Cir. 1986); *Adler v. Berg Harmon Assocs.*, 790 F. Supp. 1222, 1231 (S.D.N.Y. 1992). Indeed, in a recent bankruptcy filing, Avenue and Fortress (through Quiznos) acknowledged that "[p]rojections are inherently subject to substantial

11

and numerous uncertainties and to a wide variety of significant business, economic and competitive risks," and that "such projections are only an estimate and should not be relied upon as necessarily indicative of future, actual recoveries."[3]  Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization 46, *In re QCE Finance LLC, et al.*, No. 14-10543-PJW (Bankr. D. Del. Mar. 14, 2014), ECF No. 15.  Avenue and Fortress cannot plausibly assert that they recognize the fallibility of projections now, but did not in 2012 during the restructuring transaction.

### D. Plaintiffs Fail to Allege Securities Fraud with Specificity.

In addition to the projections, Plaintiffs point to two additional statements.  (*See* Compl. ¶ 156.)  Neither, however, is actionable.

First, Plaintiffs allege that the Offering Memorandum falsely represented that "[a]s a result of the Restructuring Transactions, we will reduce our indebtedness, *improve our liquidity position* and enhance our capital levels while providing additional resources to execute our business strategies." (Compl. ¶ 156 (emphasis in original).)  Yet Plaintiffs fail to adequately allege "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).  According to Plaintiffs, the restructuring transaction did not improve Quiznos' liquidity position, as demonstrated by the difference between the 2012 projected level of cash and cash equivalents and the actual results.  (Compl. ¶ 156.)  That reasoning, however, makes no sense.  The Offering Memorandum represented that if the restructuring transaction was completed, Quiznos would have greater liquidity than the *status quo*. (Ex. 1 p. 19.)  Any difference between the Company's 2012 projected level of cash and its actual results is irrelevant in the absence of any allegation that Quiznos' cash levels would have been higher had the restructuring not taken place.  In any event, the statement about "improved liquidity

---

[3] This Court may take judicial notice of Plaintiffs' filing in the closely-related bankruptcy proceeding without converting this motion into one for summary judgment.  *See Miller v. U.S. Dep't of Interior*, 635 F. Supp. 2d 1224, 1230 (D. Colo. 2009).

position" is so broad and generic that Plaintiffs cannot plausibly establish the requisite elements of materiality and reasonable reliance. *See In re Level 3 Commc'ns Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012); *Grossman*, 120 F.3d at 1119-20.

Second, Plaintiffs allege the Offering Memorandum falsely represented that "[t]he intent of [the Company's re-branding] program" was to increase the quality of products and customer experience, "*ultimately leading to higher franchise owner AUVs as well as royalties and food distribution revenue for the Company*." (Compl. ¶ 156 (emphasis in original).) Yet the statement merely referred to the Company's *intent* behind the re-branding program, and Plaintiffs do not allege the Company's intent was otherwise.

Similarly groundless is Plaintiffs' alleged reliance on similar statements that the Company "*expects* a positive impact to overall AUVs and other key operating metrics as a result" of the re-branding program, and that "AUVs are *expected* to begin to grow each year throughout the Projection Period." (Compl. ¶ 156; Ex. 1 pp. 158, 159 (emphasis added).) The Offering Memorandum warned that there could be "no assurance" the re-launch strategy would be "effective." (Ex. 1 p. 47.) That the Company "expected" a positive impact notwithstanding is the kind of soft, puffing statement of expectation "that courts routinely dismiss as vague statements of corporate optimism." *Grossman*, 120 F.3d at 1121-22; *see also In re Level 3 Comm'cns*, No. 09-cv-00200-PAB, 2010 U.S. Dist. LEXIS 130757, at *31 (D. Colo. Dec. 10, 2010) ("These aspirational statements were not material misstatements.").

## III. THE COMPLAINT FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD.

In Count Four, Plaintiffs assert a claim for common law fraud under New York law. (Compl. ¶¶ 195-99.) For the same reasons Plaintiffs' claim under the federal securities laws fails, Count Four fails to state a valid claim. *See Morse v. Weingarten*, 777 F. Supp. 312, 319 (S.D.N.Y. 1991)

13

(because the elements of common law fraud in New York are "substantially identical to those governing § 10(b), the identical analysis applies").

### A. Plaintiffs Fail to Allege Reasonable Reliance on the Projections.

Under New York law, a plaintiff alleging common law fraud bears the burden of establishing both actual reliance and *reasonable* reliance. *Banque Arabe Et Inernationale D'Investissement v. Md. Nat'l Bank*, 850 F. Supp. 1199, 1222 (S.D.N.Y. 1994). Plaintiffs cannot establish reasonable reliance in light of the extensive cautionary language contained in the Offering Memorandum. *See In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 815 F. Supp. 620, 672 (S.D.N.Y. 1993) (dismissing common law fraud claim under New York law because "[a] projection of future prospects which 'bespeaks caution' is not actionable"); *see also San Diego Cnty. Empl. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 123 (S.D.N.Y. 2010) (court's finding that bespeaks caution doctrine defeated securities law claim compelled dismissal of common law fraud claim).

### B. The Other Alleged Representations Are Puffery.

Plaintiffs also point to statements that: (1) the restructuring transaction "will … *improve our liquidity position*"; and (2) the "intent" of the Company's re-branding program was to increase the quality of Company products and customer experience. (Compl. ¶ 156(a), (c).)

Again, the Complaint fails to allege how the first statement was false, given that the restructuring indisputably injected $150 million in capital into the Company. *See O & G Carriers, Inc. v. Smith*, 799 F. Supp. 1528, 1539 (S.D.N.Y. 1992). Moreover, the statement that the restructuring transaction would improve the Company's liquidity is "forward-looking and not actionable." *Global Energy & Mgmt., LLC v. Xethanol Corp.*, No. 07-cv-11049, 2009 U.S. Dist. LEXIS 14400, at *8 (S.D.N.Y. Feb. 23, 2009) (statement that "the pooling of Xethanol management with a world class

scientific team . . . [would] accelerate development and deployment of its biomass technologies" not actionable).

As for the representation that the Company's intent behind the re-branding program was to increase the quality of Company products and customer experience, Plaintiffs must allege facts showing that the statement was false when made. Plaintiffs allege that the re-branding program did not realize the Company's intentions, but "[a]ny inference drawn from the fact that the expectation of performance was not realized is insufficient to sustain a plaintiff's burden of showing that a defendant falsely stated his intentions." *Abelman v. Shoratlantic Dev. Co.*, 545 N.Y.S.2d 333, 334 (N.Y. App. Div. 1989). Since the Complaint is devoid of factual allegations that the defendants knew, at the time the statement was made, that the re-branding program's intent was *not* to increase the quality of Company products and customer experience, Plaintiffs have failed to state a valid claim for fraud. *See id.*

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be granted with prejudice.

Dated: October 3, 2014

Respectfully Submitted,

By: s/ Christopher Lovrien
Christopher Lovrien

Bruce S. Bennett
Nathaniel P. Garrett
JONES DAY
555 S. Flower St., 50th Floor
Los Angeles, CA  90071.2300
+1.213.489.3939 Telephone
+1.213.243.2539 Facsimile

Attorneys for Defendants
GREG MACDONALD, DENNIS SMYTHE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on October 3, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Allen.Lanstra@skadden.com
al.chua@skadden.com
Logan.Wayne@skadden.com
rebecca.isomoto@skadden.com
Thomas.Marks@skadden.com
bbennett@jonesday.com
kfloyd@jonesday.com
cjlovrien@jonesday.com
eytran@jonesday.com
ngarrett@jonesday.com
vdragalin@jonesday.com
dwake@shb.com
hhiatt@shb.com
pheeren@shb.com
ssumpter@shb.com
jdailey@akingump.com
dromani@akingump.com
sbaldini@akingump.com
nymco@akingump.com

                                           s/ Nathaniel P. Garrett
                                           Nathaniel P. Garrett
                                           Attorney for Defendants
                                           JONES DAY
                                           555 California Street, 26th Floor
                                           San Francisco, CA 94104
                                           +1.415.875.5731 Telephone
                                           +1.415.875.5700 Facsimile

                                           Attorneys for Defendants
                                           GREG MACDONALD, DENNIS
                                           SMYTHE