CONFIDENTIAL OFFERING MEMORANDUM

# QCE LLC
# QCE Finance LLC

**Exchange Offer, Consent Solicitation and Solicitation of Acceptances of a Prepackaged Plan of Reorganization**

---

**THE EXCHANGE OFFERS (AS DEFINED HEREIN), REQUEST FOR APPROVAL TO AMEND THE FIRST LIEN FACILITY (AS DEFINED HEREIN) AND SOLICITATION OF ACCEPTANCES (AS DEFINED HEREIN) FOR THE PREPACKAGED PLAN OF REORGANIZATION WILL EXPIRE IMMEDIATELY AFTER 5:00 PM, PREVAILING PACIFIC TIME, ON JANUARY 9, 2012, UNLESS EXTENDED OR EARLIER TERMINATED BY US (SUCH DATE AND TIME, AS THE SAME MAY BE EXTENDED, THE "EXPIRATION DATE"). FIRST LIEN LENDERS (AS DEFINED HEREIN) AND SECOND LIEN LENDERS (AS DEFINED HEREIN) SHOULD REFER TO THE BALLOT ATTACHED HERETO AS APPENDIX B FOR INSTRUCTIONS ON HOW TO VOTE ON THE EXCHANGE OFFERS, THE APPROVAL TO AMEND THE FIRST LIEN FACILITY AND THE PLAN OF REORGANIZATION.**

---

Upon the terms and subject to the conditions set forth in this offering memorandum, request for approval to amend the First Lien Facility, disclosure statement and solicitation of acceptances (as it may be supplemented and amended from time to time, collectively the "**Offering Memorandum and Disclosure Statement**") of a prepackaged Plan of Reorganization, attached hereto as Appendix A (the "**Plan of Reorganization**"), and the related ballot ("**Ballot**"), attached hereto as Appendix B, for accepting or rejecting the Exchange Offers, request for approval to amend the First Lien Facility and the Plan of Reorganization (the "**Solicitation of Acceptances**"), as each may be amended from time to time, QCE LLC ("**Quiznos,**" the "**Company**" or "**we**") and QCE Finance LLC ("**Holdings**") are offering:

- to lenders (the "**First Lien Lenders**") under the credit agreement, dated as of May 5, 2006, among the Company, as borrower, Holdings, the First Lien Lenders, Goldman Sachs Credit Partners L.P., as administrative agent, Deutsche Bank Securities Inc., as syndication agent and Credit Suisse Securities (USA) LLC, Wachovia Bank, N.A. and BNP Paribas Securities Corp., as co-documentation agents (as amended, supplemented or modified from time to time, the "**First Lien Facility**" and the indebtedness thereunder, the "**First Lien Indebtedness**"):

    - payment in cash of all accrued but unpaid interest on each First Lien Lender's First Lien Indebtedness, and payment in cash of each First Lien Lenders' pro rata share of $75.0 million of the aggregate principal amount outstanding under the First Lien Facility (the "**Exchange Offer Repayment**"); and

    - the option to either:

        - modify their First Lien Indebtedness on the terms described herein pursuant to an amendment to the First Lien Facility (the "**First Lien Amendment**"), receive their pro rata portion of a 0.5% consent fee in cash on the remaining outstanding principal amount of indebtedness under the amended First Lien Facility (the "**Amended First Lien Facility**"), and receive a 3.5% consent fee on the remaining outstanding principal amount of the Amended First Lien Facility indebtedness payable in additional Amended First Lien Facility indebtedness; or

        - exchange up to $200.0 million aggregate principal amount (before giving effect to the First Lien Repayment) (the "**New Second Lien Cap**") of First Lien Indebtedness for consideration in the form of an equal amount of new term loans under a new PIK toggle second lien facility (the "**New Second Lien Facility,**" attached hereto as Appendix H,  and such loans, the "**New Second Lien Loans**") (any First Lien Lender electing to receive New Second Lien Loans, an "**Exchanging Lender**"), subject to the limitations described herein, including a Minimum Exchange Amount (as defined herein) (the "**First Lien Exchange Offer**").[1]  All Exchanging Lenders that exchange First Lien Indebtedness for New Second Lien Loans will also receive their pro rata portion of a 5.0% exchange fee on the amount of First Lien Indebtedness so

---

[1] Certain lenders holding First Lien Indebtedness have agreed to exchange, and to use commercially reasonable efforts to cause their affiliates to exchange, in the First Lien Exchange Offer or the Plan of Reorganization, as applicable, a portion of their holdings of First Lien Indebtedness for New Second Lien Loans representing at least the $150.0 million Minimum Exchange Amount for New Second Lien Loans. Therefore, subject to other conditions being satisfied, even if no other holders of First Lien Indebtedness elect to receive New Second Lien Loans, the Exchange Offers or Plan of Reorganization would be capable of being consummated.

Ex. 1 p. 1

exchanged (the "**First Lien Exchange Fee**"), payable in additional New Second Lien Loans. All Exchanging Lenders who validly tender their First Lien Indebtedness pursuant to the Exchange Offer will be deemed to have consented to the First Lien Amendment with respect to such tendered First Lien Indebtedness; and

- to lenders (the "**Second Lien Lenders**") under the credit agreement, dated as of May 5, 2006, among the Company, as borrower, Holdings, the Second Lien Lenders, Deutsche Bank Trust Company Americas, as administrative agent, Goldman Sachs Credit Partners L.P., as syndication agent and Credit Suisse Securities (USA) LLC and BNP Paribas Securities Corp., as co-documentation agents (as amended, supplemented, or modified from time to time, the "**Second Lien Facility**" and the loans thereunder, the "**Second Lien Loans**"), in exchange for the aggregate outstanding principal and interest amount of Second Lien Loans, new limited liability company membership interests to be issued by Holdings (the "**Holdings Common Shares**") representing all of the outstanding Common Shares of Holdings, with such Common Shares of Holdings being simultaneously assigned by the Second Lien Lenders to QCE Parent, LLC ("**QCE Parent**") in exchange for new limited liability company membership interests to be issued to the Second Lien Lenders by QCE Parent ("**Parent Common Shares**" and following the merger references herein to Holdings Common Shares and Parent Common Shares shall be "**Common Shares**"), which after completion of all of the steps in the Recapitalization (as defined herein) will represent 40.0% of the aggregate outstanding Parent Common Shares, before potential dilution from equity to be issued in connection with the Management Incentive Plan (as defined herein). Promptly after the Closing, Holdings will merge with and into QCE Parent, with QCE Parent being the surviving entity in the merger (the "**Merger**"). QCE Parent will change its name to QCE Finance LLC in connection with the merger. Following the merger, references herein to Holdings and QCE Parent refer to the same entity. We refer to this exchange offer as the "**Second Lien Exchange Offer**" and, together with the First Lien Exchange Offer, the "**Exchange Offers**."

If the Company elects to consummate the Exchange Offers, the Company will, immediately prior to completion of the Exchange Offers and the effectiveness of the First Lien Amendment described below, pay each First Lien Lender in cash all accrued but unpaid interest on such First Lien Lender's First Lien Indebtedness and Exchange Offer Repayment. The Company will fund the Exchange Offer Repayment with a portion of the proceeds from a private placement of $150.0 million of Parent Common Shares (the "**Private Placement**") to Avenue Capital Group and its affiliates ("**Avenue**"), with such amounts contributed from QCE Parent to the Company.

The Common Shares will not be listed or quoted on any stock exchange upon consummation of the Exchange Offers.

The Company is also requesting the approval from the First Lien Lenders of the First Lien Amendment, which addresses, among other things, the extended maturity of the First Lien Indebtedness. All First Lien Lenders consenting to the First Lien Amendment will be entitled to receive their pro rata portion of a 0.5% consent fee in cash (the "**First Lien Cash Consent Fee**") on the remaining outstanding principal amount of indebtedness under the amended First Lien Facility (the "**Amended First Lien Facility**"), attached hereto as Appendix G, and 3.5% consent fee (the "**First Lien PIK Consent Fee**" and together with the First Lien Exchange Fee and the First Lien Cash Consent Fee, the "**Exchange and Consent Fees**") on the remaining outstanding principal amount of Amended First Lien Facility indebtedness payable in additional Amended First Lien Facility indebtedness. All Exchanging Lenders who validly tender their First Lien Indebtedness pursuant to the Exchange Offer will be deemed to have consented to the First Lien Amendment with respect to such tendered First Lien Indebtedness. If you are a First Lien Lender, please indicate your consent to amend the First Lien Facility, as described herein, on the Ballot included herewith as Appendix B.

The Exchange Offers are subject to several conditions as further described in this Offering Memorandum and Disclosure Statement, including that holders of at least $150.0 million of outstanding First Lien Indebtedness accept the First Lien Exchange Offer, holders of 100.0% of the First Lien Indebtedness consent to the First Lien Exchange Offer and accept the terms of the First Lien Amendment and eligible holders of 100.0% of the Second Lien Loans accept the Second Lien Exchange Offer. Subject to applicable securities laws and the terms set forth in this Offering Memorandum and Disclosure Statement, we reserve the right to waive any and all conditions to the Exchange Offers that may be waived by us, to extend or terminate the Exchange Offers and voting deadlines with respect to the Plan of Reorganization in our sole and absolute discretion, which may be for any or no reason, and otherwise to amend the Exchange Offers or Plan of Reorganization in any respect.

In the event that the conditions to the Exchange Offers are not satisfied or waived, to the extent waivable, or if we for any reason determine that it would be more advantageous or expeditious, then subject to the consent of Avenue and Fortress Investment Group, LLC and its affiliates ("**Fortress**"), we may seek to file a case under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), which case will include guarantors or obligors under the First Lien Facility and the Second Lien Facility, to consummate the restructuring described in this Offering Memorandum and Disclosure Statement, although no decision has been made to pursue a bankruptcy filing. Through the Plan of Reorganization, all First Lien Lenders would receive payment in cash of all accrued but unpaid interest and payment in cash of their pro rata share of $65.0 million of the aggregate principal amount outstanding under the First Lien Facility and the right to elect to exchange their First Lien Indebtedness for New Second Lien Loans (subject to the New Second Lien Cap), with the remainder of the First Lien Indebtedness to remain outstanding, as modified, under the Amended First

Lien Facility, and Second Lien Lenders would receive in exchange for their Second Lien Loans Common Shares representing 25.0% of the aggregate outstanding Common Shares, before potential dilution from equity to be issued in connection with the Management Incentive Plan. The Company will fund the payment of $65.0 million of the aggregate principal amount outstanding under the First Lien Facility with a portion of the proceeds from the Private Placement (the "**Plan First Lien Repayment**," together with the Exchange Offer Repayment, as applicable, the "**First Lien Repayment**").

Pursuant to the Restructuring Support Agreement (as defined herein), First Lien Lenders and Second Lien Lenders holding not less than two-thirds of the First Lien Indebtedness and not less than two-thirds of the Second Lien Loans have agreed to support the Exchange Offers or the Plan of Reorganization, as applicable.  Certain lenders holding First Lien Indebtedness have agreed to use commercially reasonable efforts to cause their affiliates to agree to elect to exchange, in the First Lien Exchange Offer or the Plan of Reorganization, as applicable, a portion of their holdings of First Lien Indebtedness representing at least the $150.0 million Minimum Exchange Amount. Avenue has committed to enter into a subscription agreement (the "**Avenue Subscription Agreement**") governing the Private Placement, the terms of which shall depend on whether the Company pursues restructuring through the Exchange Offers or the Plan of Reorganization.

Only those parties who actually vote are counted for purposes of the Exchange Offers and the Plan of Reorganization and therefore it is important that you cast a Ballot in accordance with the instructions provided herein.  By electing to participate in either Exchange Offer, accepting the First Lien Amendment, or voting to accept or reject the Plan of Reorganization, you are making certain certifications, as contained in the Ballot.

If you are a First Lien Lender and you vote to accept the Plan of Reorganization and the Exchange Offers but do not make an election to receive either Amended First Lien Facility indebtedness or New Second Lien Loans, then, if the Exchange Offers are consummated, you will receive your pro rata share of the Amended First Lien Facility indebtedness, the First Lien Cash Consent Fee, the First Lien PIK Consent Fee, and the $75 million Exchange Offer Repayment.  If you are a First Lien Lender and you do not vote or you vote to reject the Plan of Reorganization and the Exchange Offers, then upon consummation of the Plan of Reorganization, you will receive your pro rata share of the Amended First Lien Facility indebtedness and the $65 million Plan First Lien Repayment.

You should consider the risk factors beginning on page 24 of this Offering Memorandum and Disclosure Statement before you decide whether to participate in the Exchange Offers and vote on the Plan of Reorganization.

**ONLY ELIGIBLE HOLDERS OF SECOND LIEN LOANS MAY PARTICIPATE IN THE SECOND LIEN EXCHANGE OFFER. NON-ELIGIBLE HOLDERS MAY ONLY VOTE WITH RESPECT TO THE PLAN OF REORGANIZATION AND NO OFFER OF SECURITIES IS BEING MADE TO SUCH HOLDERS OUTSIDE OF THE PLAN OF REORGANIZATION. EACH SECOND LIEN LENDER WHO RECEIVES THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT HEREBY ACKNOWLEDGES THAT ONLY ELIGIBLE HOLDERS MAY RECEIVE COMMON SHARES PURSUANT TO THE SECOND LIEN EXCHANGE OFFER.**

**The Second Lien Exchange Offer is intended to be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), with respect to the issuance of Common Shares in exchange for Second Lien Loans pursuant to the exemption from such registration contained in Section 4(2) of the Securities Act. The Second Lien Exchange Offer and the solicitation of acceptances of the Plan of Reorganization are exempt from state securities law requirements by virtue of Section 18(b)(4)(C) of the Securities Act.**

**NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY OTHER SECURITIES COMMISSION NOR ANY OTHER COURT OR REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THE SECOND LIEN EXCHANGE OFFER, THE PLAN OF REORGANIZATION OR THE ISSUANCE OF COMMON SHARES, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE SECOND LIEN EXCHANGE OFFER OR THE PLAN OF REORGANIZATION OR THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

*The date of this Offering Memorandum and Disclosure Statement is December 23, 2011.*

THIS SOLICITATION OF ACCEPTANCES OF THE PLAN OF REORGANIZATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN OF REORGANIZATION PRIOR TO THE FILING OF A VOLUNTARY CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE. BECAUSE NO CHAPTER 11 CASE HAS YET BEEN COMMENCED, THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE. WE HAVE NOT AT THIS TIME TAKEN ANY ACTION APPROVING A BANKRUPTCY FILING AND, IF THE EXCHANGE OFFERS ARE CONSUMMATED, WE WILL NOT COMMENCE A BANKRUPTCY FILING TO CONSUMMATE THE PLAN OF REORGANIZATION.

**Prior to exchanging First Lien Indebtedness or Second Lien Term Loan, accepting the First Lien Amendment or voting on the Plan of Reorganization, as applicable, First Lien Lenders and Second Lien Lenders are encouraged to read and consider carefully this entire Offering Memorandum and Disclosure Statement, including the Plan of Reorganization (attached hereto as Appendix A) and the matters described in this Offering Memorandum and Disclosure Statement and the Ballot (attached hereto as Appendix B).**

In making a decision in connection with the Exchange Offers, request for approval to amend the First Lien Facility or the Plan of Reorganization, First Lien Lenders and Second Lien Lenders must rely on their own examination of us and the terms of the Exchange Offers, the First Lien Amendment, the restructuring transactions and the Plan of Reorganization, including the merits and risks involved. First Lien Lenders and Second Lien Lenders should not construe the contents of this Offering Memorandum and Disclosure Statement as providing any legal, business, financial or tax advice. Each First Lien Lender and Second Lien Lender should consult with its own legal, business, financial and tax advisors with respect to any such matters concerning this Offering Memorandum and Disclosure Statement, the Exchange Offers, the Plan of Reorganization and the restructuring transactions contemplated thereby.

## NOTICE TO INVESTORS

THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT AND SOLICITATION OF ACCEPTANCES DOES NOT CONSTITUTE AN OFFER TO EXCHANGE IN ANY JURISDICTION IN WHICH, OR FROM ANY PERSON TO OR FROM WHOM, IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION UNDER APPLICABLE FEDERAL SECURITIES OR STATE SECURITIES LAWS.  THE DELIVERY OF THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT AND SOLICITATION OF ACCEPTANCES SHALL NOT UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF OR THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN OR ANY ATTACHMENTS HERETO NOR IN THE AFFAIRS OF THE COMPANY OR ANY OF ITS SUBSIDIARIES SINCE THE DATE HEREOF.

OUR BOARD OF MANAGERS HAS APPROVED THE MAKING OF THE EXCHANGE OFFERS AND THE SOLICITATION OF ACCEPTANCES.  YOU MUST, HOWEVER, MAKE YOUR OWN DECISION WHETHER TO PARTICIPATE IN THE EXCHANGE OFFERS, TO APPROVE THE FIRST LIEN AMENDMENT OR TO VOTE IN FAVOR OF THE PLAN OF REORGANIZATION.  OUR BOARD OF MANAGERS DOES NOT MAKE ANY RECOMMENDATION TO YOU WITH RESPECT TO ANY OF THE FOREGOING, AND NO THIRD PARTY HAS BEEN AUTHORIZED BY US OR OUR BOARD OF MANAGERS TO MAKE ANY SUCH RECOMMENDATION.

No person is authorized in connection with the Exchange Offers and the Plan of Reorganization to give any information or to make any representation not contained in this Offering Memorandum and Disclosure Statement, and, if given or made, such other information or representation must not be relied upon as having been authorized by us.

None of the SEC, any other securities commission nor any other court or regulatory authority, has approved or disapproved the Exchange Offers, the Plan of Reorganization or the issuance of Common Shares, nor have any of

i

the foregoing authorities passed upon or endorsed the merits of the Exchange Offers or the accuracy or adequacy of this Offering Memorandum and Disclosure Statement. Any representation to the contrary is a criminal offense.

The Common Shares offered hereby have not been and will not be registered under the Securities Act. The Second Lien Exchange Offer is being made, and the Common Shares are being offered and issued only (a) in the U.S. to holders of Second Lien Loans who are "accredited investors" within the meaning of Rule 501 of Regulation D under the Securities Act and (b) outside the U.S. to holders of Second Lien Loans who are persons other than U.S. persons in reliance upon Regulation S under the Securities Act. The holders of Second Lien Loans who are eligible to participate in the Second Lien Exchange Offer pursuant to at least one of the foregoing conditions are referred to herein as "eligible holders."

Non-eligible holders of Second Lien Loans receiving this Offering Memorandum and Disclosure Statement may not participate in the Second Lien Exchange Offers, and no offer of securities is being made to such holders. Such holders are being sent this Offering Memorandum and Disclosure Statement solely to consider whether to vote in favor of the Plan of Reorganization. Non-eligible holders of Second Lien Loans wishing to vote with respect to the Plan of Reorganization must properly submit a Ballot to the Voting and Exchange Agent (as defined herein) at or prior to the Voting Deadline. See "Procedures for Voting."

Each prospective investor must comply with all applicable laws and regulations in force in any jurisdiction in which it participates in the Exchange Offer and accept or reject the Plan of Reorganization or possess or distribute this Offering Memorandum and Disclosure Statement and must obtain any consent, approval or permission required by it for participation in the Exchange Offers under the laws and regulations in force in any jurisdiction to which it is subject, and neither we nor any of our representatives shall have any responsibility therefore.

We reserve the right to amend, modify or withdraw any of the Exchange Offers and Plan of Reorganization at any time and we reserve the right to reject any tender or vote, in whole or in part.

This Offering Memorandum and Disclosure Statement contains summaries believed to be accurate with respect to certain documents, but reference is made to the actual documents for complete information. All of those summaries are qualified in their entirety by this reference. Copies of documents referred to herein will be made available to you upon request to the Company.

This Offering Memorandum and Disclosure Statement, the related Ballot and the Plan of Reorganization contain important information that should be read before any decision is made with respect to an exchange of First Lien Indebtedness or Second Lien Loans or acceptance or rejection of the Plan of Reorganization.

## U.S. TREASURY MEMORANDUM 230 NOTICE

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT MEMORANDUM 230, YOU ARE HEREBY NOTIFIED THAT: (i) ANY DISCUSSION OF U.S. FEDERAL INCOME TAX ISSUES IN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY YOU FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"); (ii) SUCH DISCUSSION IS INCLUDED HEREIN BY US IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF MEMORANDUM 230) BY US OF THE TRANSACTION OR MATTERS ADDRESSED HEREIN; AND (iii) YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## NOTICE TO NEW HAMPSHIRE RESIDENTS

**NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE UNIFORM SECURITIES ACT, 1955, AS AMENDED, OR RSA 421-B, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED**

ii

**IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.**

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Market and Industry Data | v |
| Non-GAAP Financial Measures | v |
| Cautionary Note Regarding Forward-Looking Statements | v |
| Summary | 1 |
| Overview | 1 |
| Background to the Restructuring Transactions | 2 |
| Restructuring Transactions | 3 |
| Holdings Recapitalization | 4 |
| Summary Comparison of Treatment in the Exchange Offers and the Plan of Reorganization | 4 |
| Conditions to the Exchange Offers and the Plan of Reorganization | 7 |
| Board of Managers | 8 |
| Our Post-Restructuring Plan | 8 |
| Summary of the Exchange Offers | 10 |
| Summary of the Plan of Reorganization | 14 |
| Summary of the First Lien Amendment | 15 |
| Summary of the New Second Lien Facility | 18 |
| Summary Historical Consolidated Financial Data | 20 |
| Risk Factors | 24 |
| Risks Related to NOT Accepting the Exchange Offers and Rejecting the Plan of Reorganization | 24 |
| Risks Related to Consummation of the Exchange Offers | 26 |
| Risks to Holders of Equity | 27 |
| Risks Related to Consummation of the Plan of Reorganization | 28 |
| Risks Related to the New Second Lien Loans | 33 |
| Risks Related to Our Business | 34 |
| Risks Related to Our Indebtedness | 46 |
| Unaudited Pro Forma Financial Information | 49 |
| Use of Proceeds | 56 |
| Capitalization | 57 |
| Dilution | 58 |
| Selected Historical Consolidated Financial Information | 59 |
| Price Range of Common Shares and Dividend Policy | 63 |
| The Exchange Offers | 64 |
| The Restructuring Support Agreement | 69 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 73 |
| Business | 89 |
| Management | 103 |
| Certain Relationships and Related Party Transactions | 105 |
| The First Lien Amendment | 107 |
| The New Second Lien Facility | 110 |
| Description of Other Material Indebtedness | 111 |
| Description of Equity Securities | 113 |
| Plan of Reorganization | 118 |
| Procedures for Voting | 141 |
| Projections of Certain Financial Data Following Consummation of the Plan of Reorganization | 146 |
| Certain U.S. Federal Income Tax Considerations | 155 |
| Transfer Restrictions | 167 |
| Securities Law Matters | 169 |
| Independent Auditors | 172 |

Ex. 1 p. 7

Where You Can Find More Information ........................................................................................ 172

Plan of Reorganization ............................................................................................................... A

Ballot ......................................................................................................................................... B

Restructuring Support Agreement .............................................................................................. C

Subscription Agreement ............................................................................................................. D

Form of Holdings Operating Agreement ................................................................................... E

Index to Consolidated Financial Statements .............................................................................. F

Amended First Lien Facility ...................................................................................................... G

New Second Lien Facility .......................................................................................................... H

Liquidation Analysis .................................................................................................................. I

Unless the context otherwise requires, references in this Offering Memorandum and Disclosure Statement to "**Quiznos**," "**we**," "**our**," "**us**" and the "**Company**" refer to QCE LLC and its consolidated subsidiaries. "**Holdings**" refers to QCE Finance LLC, our parent. Financial terms in this Offering Memorandum and Disclosure Statement have the meanings set forth under "Summary—Summary Historical Consolidated Financial Data."

## MARKET AND INDUSTRY DATA

This Offering Memorandum and Disclosure Statement contains statistical data that we obtained from public industry publications. These publications generally indicate that they have obtained their information from sources believed to be reliable, but do not guarantee the accuracy and completeness of their information. Although we believe that the publications are reliable, we and Kurtzman Carson Consultants LLC (the "**Voting and Exchange Agents**") have not independently verified market industry data provided by third parties, and we and the Voting and Exchange Agents take no further responsibility for this data. Similarly, while we believe our management's estimates with respect to our industry are reliable, our estimates have not been verified by any independent sources, and we and the Voting and Exchange Agents cannot assure you that they are accurate.

## NON-GAAP FINANCIAL MEASURES

The information in this Offering Memorandum and Disclosure Statement relates to an offering that is exempt from registration under the United States Securities Act of 1933, as amended (the "**Securities Act**"). We believe that our financial statements contained in this Offering Memorandum and Disclosure Statement were prepared in compliance with accounting principles generally accepted in the United States ("**GAAP**").

EBITDA, as provided herein, represents net income (loss) before interest expense (net of interest income), income tax expense and depreciation and amortization. Adjusted EBITDA, as provided herein, represents the Company's calculation, as defined by the existing First Lien Facility and Second Lien Facility, of net income (loss) from continuing operations attributable to us, adjusted for net interest expense, income taxes, depreciation and amortization expense and other adjustments as further described in note 7 to "Summary—Summary Historical Consolidated Financial Data." We also remove our Marketing Fund Trusts (as defined herein) and any unrestricted subsidiaries from Adjusted EBITDA as we believe this better represents our financial performance. We present Adjusted EBITDA as an additional measure by which to evaluate our operating trends. We believe Adjusted EBITDA is a measure frequently used by our primary stakeholders (e.g., our banks and investors) to evaluate our period-to-period performance. Additionally, our management believes that Adjusted EBITDA provides a transparent measure of our recurring operating performance and allows our management to readily view operating trends, perform analytical comparisons and identify strategies to improve operating performance. Adjusted EBITDA should not be considered an alternative to, or more meaningful than, amounts determined in accordance with GAAP including: (a) operating income as an indicator of operating performance; and (b) cash flows from operations as a measure of liquidity. As such, our use of Adjusted EBITDA, instead of a GAAP measure, has limitations as an analytical tool, including the inability to determine profitability or liquidity due to the exclusion of interest expense and the associated significant cash requirements and the exclusion of depreciation and amortization, which represent significant and unavoidable operating costs given the level of indebtedness needed to maintain our business. Some additional limitations are:

- it does not reflect the cash requirements necessary to service interest, or principal payments, on indebtedness;

- it does not reflect income tax expense or the cash necessary to pay income taxes; and

- other companies, including companies in our industry, may not use such measure or may calculate such measure differently than as presented in this Offering Memorandum and Disclosure Statement, limiting its usefulness as a comparative measure.

For these reasons, we use operating income to measure our operating performance and use Adjusted EBITDA only as a supplement.

For a reconciliation of Adjusted EBITDA to net income (loss) attributable to the Company see "Summary—Summary Historical Consolidated Financial Data."

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements under the captions "Summary," "Risk Factors," "Procedures for Voting," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Business" and elsewhere in this Offering Memorandum and Disclosure Statement that are not purely historical are forward-looking statements, including without limitation, statements regarding our management's expectations, hopes, beliefs, intentions or strategies regarding the future. These forward-looking statements are based on our current expectations and beliefs concerning future developments and their potential effects on us. There can be no assurance that future developments affecting us will be those that we have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by such forward-looking statements. In some cases you can identify these statements by forward-looking words such as "may," "will," "should," "expect," "plans," "anticipate," "believe," "estimate," "predict," "seek," "intend" and "continue" or similar words. Forward-looking statements may also use different phrases. These risks and uncertainties include, but are not limited to:

- ability to maintain compliance with the covenants in the Amended First Lien Facility and the New Second Lien Facility;

- risks that the Company will be unsuccessful in its efforts to effectuate a comprehensive restructuring of its debt structure;

- risks if the Company seeks protection under the Bankruptcy Code;

- risks that the Exchange Offers or a chapter 11 filing will harm our franchise owners and customer relationships and cause us to lose revenues;

- the failure of certain First Lien Lenders to satisfy their obligations under their commitments in regard to the Restructuring Support Agreement;

- failure to satisfy the conditions to consummate the Restructuring Transactions specified in the Restructuring Support Agreement;

- the failure to close on the Private Placement of Parent Common Shares to Avenue;

- competition, including product and pricing pressures;

- the ability to attract and retain franchise owners;

vi

- risks of our dependence on our franchise owners;

- development and operating costs;

- advertising and promotional efforts;

- brand awareness and value;

- the existence or absence of positive or negative publicity about us or generally about our plans for restructuring;

- market acceptance of new product offerings, in particular, acceptance of products to be featured in connection with our anticipated 2012 brand re-launch;

- the success of our brand re-launch;

- new product and concept development by competitors;

- changing trends in customer tastes and demographic patterns;

- availability, location and terms of sites for restaurant development by franchise owners;

- the ability of franchise owners to open new restaurants, including the availability of financing for franchise owners;

- the performance by material suppliers of their obligations under their supply agreements;

- changes in business strategy or development plans;

- quality of our and our franchise owners' management;

- availability, terms and deployment of capital;

- existence of outbreaks of disease or terrorist attacks;

- business abilities and judgment of our and our franchise owners' personnel;

- availability of qualified personnel to us and our franchise owners;

- dependence on technology services;

- labor and employee benefit costs;

- availability and cost of raw materials, ingredients and supplies, and the potential impact on the Gross Sales (as defined herein) of franchise owners that could arise from interruptions in the distribution of supplies of food and other products to franchise owners;

- credit risk of franchise owners that have borrowed money from us;

- general economic, business and political conditions in the United States and internationally, including the impact of such conditions on consumer spending;

**Ex. 1 p. 10**

- changes in, or failure to comply with, government regulations, including franchising laws, accounting standards, environmental and climate change legislation and taxation requirements;

- the costs and other effects of legal and administrative proceedings;

- our ability to service and repay indebtedness

- effect of the restructuring on our operations imposed by the Amended First Lien Facility, the New Second Lien Facility and our other indebtedness; and

- other risks and uncertainties referred to in this Offering Memorandum and Disclosure Statement, all of which are difficult or impossible to predict accurately and many of which are beyond our control.

You are cautioned that any forward-looking statements made in this Offering Memorandum and Disclosure Statement are not guarantees of future performance and that you should not place undue reliance on any such forward-looking statements. The forward-looking statements are based on the information currently available and are applicable only as of the date on the cover of this Offering Memorandum and Disclosure Statement. We do not intend, nor do we undertake any obligation, to update the forward-looking statements to reflect future events or circumstances.

Ex. 1 p. 11

## SUMMARY

*This summary highlights information appearing elsewhere in this Offering Memorandum and Disclosure Statement. This summary is not complete and does not contain all of the information that you should consider before participating in the Exchange Offers or voting for the Plan of Reorganization. You should carefully read this entire Offering Memorandum and Disclosure Statement, including the consolidated financial statements and related notes and the section entitled "Risk Factors." Unless the context otherwise requires, references in this Offering Memorandum and Disclosure Statement to "Quiznos," "we," "our," "us" and the "Company" refer to QCE LLC and its consolidated subsidiaries. "Holdings" refers to QCE Finance LLC, our parent. Financial terms in this Offering Memorandum and Disclosure Statement have the meanings set forth under "—Summary Historical Consolidated Financial Data."*

### Overview

We are one of the world's largest franchisors of restaurants offering sandwiches, salads, soups, and beverages, as well as catering services within the quick service restaurant ("**QSR**") segment of the restaurant industry. Quiznos is a well-recognized brand with distinct consumer positioning in its core markets, generating global systemwide sales (comprised of retail sales at our franchise- and company-owned points of distribution) of $1.2 billion in 2010.

Through the consummation of either the Exchange Offers and the First Lien Amendment or the Plan of Reorganization, we intend to reduce our indebtedness, improve our liquidity position and enhance our capital levels while providing adequate time to execute our business restructuring strategy. Upon the terms and subject to the conditions set forth in this Offering Memorandum and Disclosure Statement and the Ballot, we are (i) offering on the first Business Day on which all of the conditions specified in "The Exchange Offers—Conditions to the Exchange Offers," have been satisfied or waived (the "**Closing Date**"): (A) to the First Lien Lenders under the First Lien Facility, the option to exchange up to $200.0 million aggregate principal amount of First Lien Indebtedness for an equal aggregate principal amount of New Second Lien Loans under the New Second Lien Facility, subject to the limitations described herein, including a Minimum Exchange Amount, with any remaining First Lien Indebtedness to be modified on the terms described herein pursuant to the First Lien Amendment, and (B) to the eligible Second Lien Lenders under the Second Lien Facility, in exchange for the aggregate outstanding principal and interest amount of Second Lien Loans, new Holdings Common Shares, which after completion of all of the steps in the Recapitalization will represent 40.0% of the aggregate outstanding Common Shares (which amount will be reduced to 25.0% of the aggregate outstanding Common Shares in the event that the Company effects the Plan of Reorganization through a chapter 11 filing), before potential dilution from equity to be issued in connection with the Management Incentive Plan; (ii) requesting approval from the First Lien Lenders of the First Lien Amendment, which approval will include such First Lien Lenders' consent to the First Lien Exchange Offer; and (iii) soliciting acceptances of the Plan of Reorganization. The remainder of the new Parent Common Shares will be issued to Avenue in connection with the Private Placement, which amount will represent after completion of all of the steps in the Recapitalization (1) 60% of the aggregate outstanding Common Shares if the Company consummates the Exchange Offers or (2) 75% of the aggregate outstanding Common Shares if the Company effects the Plan of Reorganization through a chapter 11 filing, in either case before potential dilution from equity to be issued in connection with the Management Incentive Plan.

If the Company elects to consummate the Exchange Offers, the Company will, immediately prior to completion of the Exchange Offers and the effectiveness of the First Lien Amendment described below, effect the Exchange Offer Repayment, whereby the Company will pay each First Lien Lender in cash all accrued but unpaid interest on such First Lien Lender's First Lien Indebtedness and repay each First Lien Lender in cash its pro rata share of the Exchange Offer Repayment. If the Company instead effects the Plan of Reorganization through a chapter 11 filing, the Company will pay each First Lien Lender in cash all accrued but unpaid interest on such First Lien Lender's First Lien Indebtedness and repay each First Lien Lender in cash its pro rata share of the Plan First Lien Repayment.

All Exchanging Lenders that exchange First Lien Indebtedness for New Second Lien Loans will also receive their pro rata portion of the First Lien Exchange Fee on the amount of First Lien Indebtedness so exchanged. All First Lien Lenders consenting to the First Lien Amendment will be entitled to receive their pro rata portion of the First Lien Cash Consent Fee and the First Lien PIK Consent Fee.

**In connection with the transactions contemplated by the Exchange Offers and the Plan of Reorganization, if you are a Second Lien Lender, you may elect hereunder to (i) participate in the Exchange Offers and vote to accept the Plan of Reorganization, or (ii) not participate in the Exchange Offers and vote to reject the Plan of Reorganization.**

**In addition, in connection with the transactions contemplated by the Exchange Offers and the Plan of Reorganization, if you are a First Lien Lender, you may elect to (i) consent to the First Lien Amendment, and either, (a) amend and modify your First Lien Claims pursuant to the terms and conditions set forth in the First Lien Amendment, or (b) exchange all (or any portion) of your First Lien Claims for an equal principal amount of New Second Lien Loans under the New Second Lien Facility (subject to the New Second Lien Cap).**

If the Company and Holdings consummate the Exchange Offers, offerees will receive the consideration described in this Offering Memorandum and Disclosure Statement except that only those offerees consenting to the First Lien Amendment and electing to participate in the Exchange Offers, as applicable, will receive the Exchange and Consent Fees. If the Company and Holdings do not consummate the Exchange Offers, and the Company elects to proceed with a restructuring under the Plan of Reorganization, offerees will receive the treatment provided in the Plan of Reorganization upon consummation of the Plan of Reorganization, and in such event, no offeree will receive any Exchange and Consent Fees.

If the Exchange Offers are not consummated and the Plan of Reorganization is not accepted, the Company expects, absent some other agreement with the First Lien Lenders and the Second Lien Lenders, that it will likely be necessary to file for chapter 11 protection without the benefit of an agreed Plan of Reorganization, which would have material adverse effects on the Company's business. No decision has been made by the Company's board of managers to file petitions for relief under the Bankruptcy Code.

### Background to the Restructuring Transactions

On May 5, 2006, members of our ultimate parent, QCE Holding LLP, sold a significant portion of its outstanding interests to investment funds affiliated with J.P. Morgan Partners ("**JPMP**"). In conjunction with this member sale transaction, the Company entered into a $650.0 million First Lien Facility, a $225.0 million Second Lien Facility and a $75.0 million revolver with a syndicate of lenders. The Company incurred the debt obligations at a time when its Adjusted EBITDA was significantly higher than it is now. As a result of the drop in Adjusted EBITDA and step-downs in required covenant levels, the Company was not in compliance with its combined leverage ratio covenant requirement as of June 30, 2011 and September 30, 2011. The Company's declining Adjusted EBITDA has been driven by both a reduction in its restaurant base and a decline in average unit value ("**AUV**").

Although the Company has made every scheduled payment of principal and interest through September 30, 2011, the covenant violations described above could result in the exercise of certain remedies available to the lenders, which could include calling of the debt, acceleration of payments or foreclosure on the assets that secure the debt. If the lenders initiate any of the remedies, it would have a material adverse affect on the Company's ability to fulfill its obligations under its franchise agreements. To continue as a going concern, the Company must in the near-term (i) amend or replace its credit facilities or obtain a waiver of certain of its requirements, (ii) restructure the current credit facility, which may involve converting debt for equity, or (iii) otherwise secure additional capital. Therefore, the Company determined that it was in the best interests of its stakeholders to work with its lenders on a consensual restructuring.

In or about July 2011, significant lenders of both the First Lien Facility and the Second Lien Facility formed an ad hoc group (the "**Steering Committee**") and engaged Lazard Frères & Co. ("**Lazard**") as their financial advisor and Akin Gump Strauss Hauer & Feld LLC ("**Akin Gump**") as legal counsel. In addition, in or around July 2011, certain significant lenders under the First Lien Facility formed a committee of First Lien Lenders (the "**First Lien Lender Committee**") and engaged Willkie Farr & Gallagher LLC ("**WF&G**") as legal counsel and subsequently engaged Blackstone Advisory Partners ("**Blackstone**") as their financial advisors. Since that time, the Steering Committee, the First Lien Lender Committee and their respective advisors have been in a constructive dialogue with the Company and its advisors regarding potential structures for a comprehensive restructuring transaction.

After months of intensive good faith and arm's length negotiations, the Company, the Steering Committee and First Lien Lender Committee, comprised of holders of not less than 67% of the outstanding First Lien Indebtedness and holders of not less than 67% of the outstanding indebtedness under the Second Lien Facility (collectively, the "**Participating**

**Ex. 1 p. 13**

Lenders"), recently agreed to a restructuring that will reduce the Company's outstanding indebtedness, resulting in a de-leveraging of the Company's balance sheet, which we believe will provide the Company with sufficient liquidity to meet its projected long term cash needs.

On December 22, 2011, the Company entered into the Restructuring Support Agreement with the Participating Lenders pursuant to which the Participating Lenders have agreed, subject to certain terms and conditions, to the terms of the Exchange Offers and further, to support the Recapitalization and to vote in favor of the Plan of Reorganization when solicited to do so.

### Restructuring Transactions

The Company and the board of managers of Holdings, in consultation with its advisors, continue to develop and execute the Company's plan to restructure the Company's capital structure as described herein (the "**Restructuring Transactions**") in order to significantly improve the Company's free cash flow, reduce its debt service expense and strengthen its balance sheet primarily by retiring the Second Lien Facility and certain of the Company's other outstanding debt and liabilities, and amending the terms of certain of the Company's other outstanding debt while avoiding bankruptcy. The Company believes that the Restructuring Transactions, whether implemented through the Exchange Offers or through the Plan of Reorganization:

- significantly reduce leverage by lowering the Company's aggregate debt balance;

- provide a sufficient period of time to implement a revised business plan before the Company faces significant debt maturities;

- minimize business disruptions by limiting uncertainty as to the viability of the Company as a going concern and the period of time during which the Company is subject to uncertainty;

- offer consideration based on position in the existing capital structure; and

- provide significantly higher value for the Company than a liquidation or bankruptcy filing without an approved plan of reorganization.

The principal elements of the Restructuring Transactions include:

- conducting the Exchange Offers, requesting approval of the First Lien Amendment and soliciting the acceptances of the Plan of Reorganization so that, after the Expiration Date, we may determine based on the participation rate in the Exchange Offers and other circumstances at the time, whether it is in the best interests of the Company and its stakeholders to consummate the Exchange Offers or to file for bankruptcy and seek confirmation of the Plan of Reorganization;

- a private placement of $150.0 million of Parent Common Shares to Avenue, which $150.0 million shall be contributed by Parent to the Company to be used by the Company (a) to fund the First Lien Repayment to the First Lien Lenders contemplated by the First Lien Exchange Offer or the Plan of Reorganization, as the case may be, (b) to pay fees and expenses in connection with the Restructuring Transactions and (c) for working capital and other general corporate purposes;

- the Amended First Lien Facility, the terms of which shall include an extension of the maturity date of the First Lien Indebtedness;

- an amendment (on the terms set forth in that certain Commitment Letter dated as of December 15, 2011 among Vectra Bank Colorado, QAFT, Inc. as Trustee for the Regional Advertising Program Trust, QAFT, Inc., as Trustee for the National Marketing Fund Trust and QCE LLC (as amended, supplemented, or modified from time to time, the "**Vectra Commitment Letter**")) to the credit agreement, dated as of September 26, 2007, among QAFT, Inc., solely in its capacity as trustee for The Regional Advertising Program Trust and The National Marketing Fund Trust, as borrowers, the lenders party thereto (the "**Marketing Fund Lenders**"), and Vectra Bank Colorado,

**Ex. 1 p. 14**

National Association, as administrative agent (as amended, supplemented, or modified from time to time, the "**Marketing Fund Trust Credit Facility**"), pursuant to which, among other things, the term of Marketing Fund Trust Credit Facility will be extended and the line of credit available under the Marketing Fund Trust Credit Facility will be reduced to $12.0 million from $20.0 million; and

- if the Exchange Offers or the Plan of Reorganization are consummated, taking the steps necessary to effectuate the Recapitalization described below.

Pursuant to the Restructuring Support Agreement, the Participating Lenders agreed to support the Restructuring Transactions by (i) assigning and not withdrawing their holdings of First Lien Indebtedness and Second Lien Loans, as applicable, pursuant to the Exchange Offers (ii) providing their consent and voting their holdings of First Lien Indebtedness and Second Lien Loans, as applicable, in favor of the Plan of Reorganization and granting certain releases and (iii) by consenting to and voting their holdings of First Lien Indebtedness in favor of the First Lien Facility Amendment.  Certain lenders holding First Lien Indebtedness have agreed to use commercially reasonable efforts to cause their affiliates to agree to elect to exchange, in the First Lien Exchange Offer or the Plan of Reorganization, as applicable, a portion of their holdings of First Lien Indebtedness representing at least the $150.0 million Minimum Exchange Amount (before giving effect to the First Lien Repayment).  Avenue has committed to enter into the Avenue Subscription Agreement pursuant to which Avenue will subscribe for Parent Common Shares representing, after completion of all of the steps in the Recapitalization either (i) 60% of the aggregate outstanding Common Shares if the Company consummates the Exchange Offers or (ii) 75% of the aggregate outstanding Common Shares if the Company effects the Plan of Reorganization through a chapter 11 filing, before potential dilution from equity to be issued in connection with the Management Incentive Plan. See "The Restructuring Support Agreement."

Upon successful implementation of the Restructuring Transactions, whether through the Exchange Offers or the Plan of Reorganization, the Company believes it will be better positioned to continue its efforts to conduct its business effectively.

### Holdings Recapitalization

If we consummate the Exchange Offers or the Plan of Reorganization, First Lien Lenders and Second Lien Lenders will receive the applicable consideration described in this Offering Memorandum and Disclosure Statement.  In connection with the Exchange Offers, Plan of Reorganization and Private Placement, we intend to seek to effectuate certain recapitalization transactions, including the Private Placement, the merger of Holdings with and into QCE Parent after the closing and the renaming of QCE Parent to QCE Finance LLC (the "**Recapitalization**").  Following the consummation of the Recapitalization, assuming 100% participation in the Exchange Offers and subject to potential dilution from equity to be issued in connection with the Management Incentive Plan, Holdings will have only one class of limited liability company interests outstanding, called Common Shares, and current Second Lien Lenders will hold 40% of the equity and voting power of Holdings, with Avenue holding the remaining 60% of the equity and voting power of Holdings.  If the Company instead effects the Plan of Reorganization through a chapter 11 filing, then following the Recapitalization, subject to potential dilution from equity to be issued in connection with the Management Incentive Plan, current Second Lien Lenders will hold 25% of the equity and voting power of Holdings, with Avenue holding the remaining 75% of the equity and voting power of Holdings.

### Summary Comparison of Treatment in the Exchange Offers and the Plan of Reorganization

| Offeree | The Exchange Offers | The Plan |
|---|---|---|
| First Lien Lenders | • $1,000 principal amount of New Second Lien Loans for every $1,000 of First Lien Indebtedness exchanged, subject to New Second Lien Cap. | • $1,000 principal amount of New Second Lien Loans for every $1,000 of First Lien Indebtedness exchanged, subject to New Second Lien Cap. |

| Offeree | The Exchange Offers | The Plan |
|---|---|---|
|  | • Pro rata portion of $75.0 million in First Lien Repayment prior to consummation of the Exchange Offers. <br><br> • Holders of at least $150.0 million in First Lien Indebtedness (before giving effect to the First Lien Repayment) must agree to exchange their holdings for New Second Lien Loans. <br><br> • Pro rata portion of the 5.0% First Lien Exchange Fee on amounts of First Lien Indebtedness exchanged, payable in additional New Second Lien Loans. <br><br> • Pro rata portion of the 0.5% First Lien Cash Consent Fee on First Lien Indebtedness remaining following the First Lien Repayment and the Exchange Offers, payable in cash, for consenting to the First Lien Amendment. <br><br> • Pro rata portion of the 3.5% First Lien PIK Consent Fee on First Lien Indebtedness remaining following the First Lien Repayment and the Exchange Offers, payable in additional First Lien Indebtedness, for consenting to the First Lien Amendment. <br><br> • First Lien Indebtedness remaining following the exchange offers will be amended by the First Lien Amendment and will remain outstanding under the Amended First Lien Facility. <br><br> • 100% of First Lien Lenders must consent to the First Lien Amendment. | • Pro rata portion of $65.0 million in First Lien Repayment prior to consummation of the Plan of Reorganization. <br><br> • Holders of at least $150.0 million in First Lien Indebtedness (before giving effect to the First Lien Repayment) must agree to exchange their holdings for New Second Lien Loans. <br><br> • No exchange or consent fees will be paid under the Plan of Reorganization. <br><br><br><br><br><br><br><br> • First Lien Indebtedness remaining following the exchange offers will be amended by the First Lien Amendment and will remain outstanding under the Amended First Lien Facility. <br><br> • Holders of at least two-thirds in principal amount of First Lien Indebtedness and at least 50% in number of First Lien Lenders must vote in favor of the Plan. |
| Second Lien Lenders | • Pro rata portion of Common Shares, which after the completion of all of the steps in the Recapitalization will represent 40.0% of the aggregate outstanding Common Shares, before potential dilution from equity to be issued in connection with the Management Incentive Plan. | • Pro rata portion of Common Shares, which after the completion of all of the steps in the Recapitalization will represent 25.0% of the aggregate outstanding Common Shares, before potential dilution from equity to be issued in connection with the Management Incentive Plan. |

Ex. 1 p. 16

| Offeree | The Exchange Offers | The Plan |
|---|---|---|
| | • Eligible holders of 100% of the outstanding Second Lien Loans must agree to exchange all of their Second Lien Loans for Common Shares. | • Holders of at least two-thirds in principal amount of First Lien Indebtedness and at least 50% in number of First Lien Lenders must vote in favor of the Plan. |

### The Exchange Offers

Consummation of the Restructuring Transactions through the Exchange Offers provides several benefits, including:

- an immediate solution to our near term liquidity issues;

- an increased cash distribution to the First Lien Lenders and an increased percentage of Common Shares to Second Lien Lenders; and

- ability to effectuate the restructuring in a relatively short period of time.

Consummating the Exchange Offers also avoids the potential need to seek bankruptcy protection and the related costs and disruptions.  These costs could be material and may include:

- direct costs of bankruptcy, including fees paid to a trustee if one were appointed and to attorneys and other professionals of all interested constituencies; and

- costs of terminations of defaulted borrowing facilities.

Additionally, a bankruptcy filing could have other effects on our business that are more difficult to measure, including indirect costs.

### The Plan of Reorganization

If the Exchange Offers are not consummated, but the First Lien Lenders and Second Lien Lenders accept the Plan of Reorganization in the requisite amounts, consummation of the Restructuring Transactions through the Plan of Reorganization provides for the same treatment of all First Lien Lenders and Second Lien Lenders, regardless of whether they vote to accept the Plan of Reorganization, thereby resolving our near term liquidity issues without the "holdout" problem presented by the Exchange Offers and request for approval to amend the First Lien Facility in connection with the holders of the First Lien Indebtedness and Second Lien Loans that do not participate in the Exchange Offers or approve the amendment to the First Lien Facility.

Other considerations with respect to the Plan of Reorganization include:

- possible disruptions to our business, employees, vendor relationships and franchise owners and the increased time required to consummate a restructuring; and

- reputational damage resulting from the filing of a bankruptcy case.

### Effects of Bankruptcy Filing without an Approved Plan of Reorganization

It is the Company's intention to pursue the Restructuring Transactions through the Exchange Offers or the Plan of Reorganization.  If, however, the Exchange Offers are not consummated and the Plan of Reorganization is not approved, the Company expects that, absent some other agreement with the First Lien Lenders and the Second Lien Lenders, it will

Ex. 1 p. 17

likely be necessary to file for bankruptcy protection, without the benefit of an agreed plan of reorganization.  In the event of a bankruptcy filing without an agreed plan of reorganization, we would likely be subject to a lengthy and costly bankruptcy process, and we believe such a filing could cause substantial damage to our business and reputation.  In addition, such a bankruptcy filing would present obstacles to conducting our business.  Furthermore, lenders and other partners could seek to terminate their relationships with us, require financial assurances or enhanced returns or refuse to provide credit on the same terms as prior to a bankruptcy filing.  No decision has been made by the Company's board of managers to file petitions for relief under the Bankruptcy Code.

### Conditions to the Exchange Offers and the Plan of Reorganization

Consummation of the Exchange Offers is subject to a number of conditions, including:

- holders of First Lien Indebtedness shall have agreed to exchange an aggregate of at least $150.0 million of such First Lien Indebtedness  (before giving effect to the First Lien Repayment) for New Second Lien Loans (the "**Minimum Exchange Amount**"), which Minimum Exchange Amount is expected to be satisfied by commitments of certain lenders pursuant to the Restructuring Support Agreement;

- eligible holders of 100% of the indebtedness under the Second Lien Facility shall have agreed to exchange all of their Second Lien Loans for 100% of the Common Shares, with such Common Shares of Holdings being simultaneously assigned by the Second Lien Lenders to QCE Parent in exchange for 100% of the Parent Common Shares as contemplated by the Recapitalization;

- the Recapitalization shall have been completed concurrently, and all parties receiving Parent Common Shares shall have entered into the Amended and Restated Limited Liability Company Agreement of QCE Parent, which agreement after giving effect to the Merger shall be the limited liability company agreement of QCE Finance LLC ("**Holdings Operating Agreement**");

- the Private Placement of $150.0 million of Parent Common Shares to Avenue, including the use of proceeds therefrom as described herein, shall have been completed;

- the Company shall have received the consents of First Lien Lenders in respect of 100% of the First Lien Indebtedness to approve the First Lien Amendment; and

- pursuant to the Vectra Commitment Letter, the Marketing Fund Trust Credit Facility shall remain outstanding with an extended maturity date, among other amended terms, and the line of credit available under the Marketing Fund Trust Credit Facility will be reduced to $12.0 million from $20.0 million.

Consummation of the Plan of Reorganization is subject to the following conditions, among others:

- the Plan of Reorganization shall have been accepted by First Lien Lenders and Second Lien Lenders holding the requisite amount of First Lien Indebtedness and Second Lien Loans;

- the Plan of Reorganization shall be in form and substance acceptable to Holdings and certain of its subsidiaries (the "**Debtors**") and the Requisite Participating Lenders (as defined herein);

- the Confirmation Order shall have been entered in form and substance acceptable to the Debtors and the Requisite Participating Lenders, and no stay or injunction shall be in effect precluding the consummation of the transactions contemplated by the Plan of Reorganization;

- the Private Placement of $150.0 million of Parent Common Shares to Avenue, including the use of proceeds therefrom as described herein, shall have been completed;

- the Recapitalization shall have been completed concurrently, and all parties receiving Parent Common Shares shall have entered into the Holdings Operating Agreement;

- pursuant to the Vectra Commitment Letter, the Marketing Fund Trust Credit Facility shall remain outstanding with an extended maturity date, among other amended terms, and the line of credit available under the Marketing Fund Trust Credit Facility will be reduced to $12.0 million from $20.0 million; and

- the Exit Facility (as defined herein), if such Exit Facility is deemed necessary by the Debtors and the Requisite Participating Lenders, shall have been entered into by the Debtors and the other parties thereto and all conditions to the initial borrowings under the Exit Facility shall have been satisfied in accordance with the terms thereof (but for the occurrence of the Effective Date).

### *Enterprise Valuation*

The Plan of Reorganization provides for Avenue to make a new money equity investment in the Private Placement in the aggregate amount of $150.0 million for 75% of the Parent Common Shares, before potential dilution from equity issued pursuant to the Management Incentive Plan. The equity investment in the Private Placement implies an equity valuation of the reorganized Debtors of $200.0 million.

The Plan of Reorganization and the equity investment in the Private Placement are the result of several months of arms-length negotiations among the Debtors, Avenue and the other parties in interest.

### Board of Managers

Immediately following the Recapitalization, the Board of Managers of Holdings will be comprised of nine members, one of whom will be our Chief Executive Officer, seven of whom will be appointed by Avenue and one of whom will be appointed by Fortress.  If the Avenue Members or the Fortress Members (or their transferees who then hold the right to designate one or more manager) transfer Shares (as defined herein) equal to more than 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan), the such Member may also transfer its right to designate one manager with respect to each 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) transferred.  If either the Avenue Members or the Fortress Members (or their transferees who then hold the right to designate one or more manager) transfer Shares equal to more than 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) without also transferring the right to designate a manager, then such Member shall forfeit the right to designate one manager for each 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) transferred, and if any such Member (together with its Affiliates and certain Permitted Transferees) ceases to hold an aggregate of at least 5% of all then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan), then such Member shall forfeit the right to designate any managers.  The vacancies created by any such forfeitures shall be filled by the majority vote of all of the Members holding Common Shares, including Avenue and Fortress, voting together as a single class; provided that in no event shall the Members holding Common Shares be entitled to elect more than three managers as a result of such forfeitures.  The size of the Board of Managers shall be reduced automatically to reflect any such changes to the designations of managers.  Avenue and Fortress have board observer rights as well.

### Our Post-Restructuring Plan

As a result of the Restructuring Transactions, we will reduce our indebtedness, improve our liquidity position and enhance our capital levels while providing additional resources to execute our business strategies.   Following the consummation of either the Exchange Offers and the First Lien Amendment or the Plan of Reorganization, we will continue to pursue our broader business plans.

We currently plan to re-launch the Quiznos brand in 2012, which we anticipate will include among other activities a new marketing message, additional marketing in the U.S. and Canada, new menu offerings, additional field support staff, and a store repair program.  The intent of this program is to increase the quality of our products and customer experience as well as to attract additional customers into our restaurants, ultimately leading to higher franchise owner AUVs as well as royalties and food distribution revenue for the Company.  Our re-launch plan, which is subject to final Board of Managers' approval, includes recommendations for additional expenditures to support our re-launch activities, a significant portion of which would be allocated for additional marketing efforts.  We believe the Restructuring Transactions, which include

additional equity investment, are necessary to position the Company to effect our brand re-launch efforts.  There can be no assurance that our re-launch strategy will be effective, however, which may have a material adverse effect on the AUVs of our franchise owners, our royalty and food distribution revenue, and our liquidity.

### Summary of the Exchange Offers

First Lien Exchange Offer............................

We are offering to First Lien Lenders the option to exchange up to $200.0 million of First Lien Indebtedness (including accrued interest and fees thereon and before giving effect to the First Lien Repayment) under the First Lien Facility for an equal principal amount of New Second Lien Loans under the New Second Lien Facility, subject to certain limitations, including the Minimum Exchange Amount.  In the event of oversubscription with respect to the exchange of First Lien Indebtedness for New Second Lien Loans, First Lien Lenders electing to exchange will be limited to exchanging their pro rata portion of First Lien Indebtedness up to the New Second Lien Cap (see "The Exchange Offers—First Lien Exchange Offer").  First Lien Indebtedness assigned to the Company pursuant to the First Lien Exchange Offer will be deemed immediately repaid in full and cancelled.

Any First Lien Indebtedness that is not exchanged for New Second Lien Loans will remain outstanding under the First Lien Facility, as modified by the First Lien Amendment.  See "—Summary of the First Lien Amendment."

Any First Lien Lenders electing to exchange First Lien Indebtedness will receive their pro rata portion of the First Lien Exchange Fee.  Such exchange fee will be payable in additional New Second Lien Loans.

Second Lien Exchange Offer ...........................

We are offering to Second Lien Lenders the option to exchange their Second Lien Loans under the Second Lien Facility for new common equity securities to be issued by Holdings.  Following the Recapitalization, the aggregate of the Common Shares issued to Second Lien Lenders in exchange for the entire outstanding principal and interest amount of Second Lien Loans will after giving effect to the Recapitalization represent 40.0% of the aggregate outstanding Common Shares, before potential dilution from equity to be issued in connection with the Management Incentive Plan.  The remaining 60.0% of the aggregate outstanding Common Shares, before potential dilution from equity to be issued in connection with the Management Incentive Plan, will be issued to Avenue in the Private Placement.  Second Lien Loans assigned to the Company pursuant to the Second Lien Exchange Offer will be deemed automatically contributed to the Company and immediately cancelled.

Holders Eligible to Participate in the Second Lien Exchange Offer .....................................

The Second Lien Exchange Offer is being made, and the Common Shares are being offered and issued only (a) in the U.S. to holders of Second Lien Loans who are "accredited investors" within the meaning of Rule 501 of Regulation D under the Securities Act and (b) outside the U.S. to holders of Second Lien Loans who are persons other than U.S. persons in reliance upon Regulation S under the Securities Act. If you tender your Second Lien Loans in the Second Lien Exchange Offer, you will be deemed to have affirmed that you are an eligible holder. See "Transfer Restrictions."

Withdrawal of Ballots; Revocations................

Withdrawals of Ballots are not permitted after the Voting Deadline (as defined in the Ballot) without Company's prior written consent.  A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such

**Ex. 1 p. 21**

Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by the Voting Exchange Agent in a timely manner at the address set forth on the Ballot. The Company will determine whether any withdrawals of Ballots were valid and expressly reserves the absolute right to contest the validity of any such withdrawals of Ballots.

Important Dates ................................................ The Exchange Offers will expire at 5:00 p.m., prevailing Pacific Time, on January 9, 2012, unless extended by us with respect to either or both of the Exchange Offers.  We, with the consent of the Requisite Participating Lenders, may extend the Exchange Offers for any purpose, including in order to permit the satisfaction and waiver, to the extent waivable, of any or all conditions to the Exchange Offers.

The settlement date of the Exchange Offers will be as soon as practicable following the Original Expiration Date or the Extended Expiration Date (as defined herein), as applicable.

Conditions to the Exchange Offers ................. To effect the Exchange Offers, a number of conditions must be met including:

- holders of First Lien Indebtedness shall have agreed to exchange at least the Minimum Exchange Amount of First Lien Indebtedness for New Second Lien Loans;

- eligible holders of 100% of the indebtedness under the Second Lien Facility shall have agreed to exchange all of their Second Lien Loans for 100% of the Common Shares, with such Common Shares of Holdings being simultaneously assigned by the Second Lien Lenders to QCE Parent in exchange for 100% of the Parent Common Shares;

- the Recapitalization shall have been completed concurrently, and all parties receiving Parent Common Shares shall have entered into the Holdings Operating Agreement;

- the Private Placement of $150.0 million of Parent Common Shares to Avenue, including the use of proceeds therefrom as described herein, shall have been completed;

- the Company shall have received the consents of First Lien Lenders in respect of 100% of the First Lien Indebtedness to approve the First Lien Amendment; and

- pursuant to the Vectra Commitment Letter, the Marketing Fund Trust Credit Facility shall remain outstanding with an extended maturity date and the line of credit available under the Marketing Fund Trust Credit Facility will be reduced to $12.0 million from $20.0 million.

In the event that the conditions to the Exchange Offers are not satisfied or waived, to the extent waivable, by the Original Expiration Date, or if we

for any reason determine that it would be more advantageous or expeditious, and we have received the requisite votes from First Lien Lenders and Second Lien Lenders in respect of the Plan of Reorganization, we may seek to file a case under Chapter 11 of the Bankruptcy Code to consummate the restructuring.  See "Plan of Reorganization."

Corporate Governance and Management of Holdings and the Company ........................... Immediately following the Recapitalization, the Board of Managers of Holdings will be comprised of nine members, one of whom will be our Chief Executive Officer, seven of whom will be appointed by Avenue and one of whom will be appointed by Fortress.  If the Avenue Members or the Fortress Members (or their transferees who then hold the right to designate one or more manager) transfer Shares equal to more than 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan), the such Member may also transfer its right to designate one manager with respect to each 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) transferred.  If either the Avenue Members or the Fortress Members (or their transferees who then hold the right to designate one or more manager) transfer Shares equal to more than 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) without also transferring the right to designate a manager, then such Member shall forfeit the right to designate one manager for each 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) transferred, and if any such Member (together with its Affiliates and certain Permitted Transferees) ceases to hold an aggregate of at least 5% of all then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan), then such Member shall forfeit the right to designate any managers.  The vacancies created by any such forfeitures shall be filled by the majority vote of all of the Members holding Common Shares, including Avenue and Fortress, voting together as a single class; provided that in no event shall the Members holding Common Shares be entitled to elect more than three managers as a result of such forfeitures.  The size of the Board of Managers shall be reduced automatically to reflect any such changes to the designations of managers.  Avenue and Fortress have board observer rights as well.

All parties holding Common Shares (and all persons to whom any such parties may sell their equity in the future and all persons who purchase or acquire equity from Holdings in future transactions), including Avenue through the Private Placement, will be required to enter into the Holdings Operating Agreement, which provides, among other things: (i) the number of managers, (ii) the ability to designate managers; (iii) preemptive rights, (iv) transfer restrictions, (v) right of first offer, (vi) co-sale rights and (vii) drag-along rights.  See "Description of Equity Securities" for further information regarding the Holdings Operating Agreement.

Management Incentive Plan ........................... After the consummation of the Restructuring Transactions, Holdings intends to adopt a Management Incentive Plan (as defined herein).  The Management Incentive Plan may provide for grants of options and/or restrictive shares/equity reserved for management, managers and employees.  Grants made pursuant to the Management Incentive Plan shall not exceed 10.0% of the aggregate outstanding Common Shares.

Common Shares ...................................................  There will be 10.0 million Common Shares outstanding following the Exchange Offers.  We do not intend to list the Common Shares on any exchange.  See "Description of Equity Securities" for information regarding the rights, privileges, terms and conditions of the Common Shares.

Additional Terms...................................................  Concurrently with the consummation of the Exchange Offers, (i) each First Lien Lender shall execute and deliver the First Lien Amendment, and (ii) each Second Lien Lender shall execute and deliver the Subscription Agreement (as defined herein) and the Holdings Operating Agreement.

First Lien Lenders consenting to the First Lien Amendment will receive their pro rata portion of the First Lien Cash Consent Fee and the First Lien PIK Consent Fee.  See "The First Lien Amendment."

Releases...................................................  To the fullest extent permitted by applicable law, on the closing date of the Out-of-Court Restructuring, QCE Holding LLC, QCE Incentive LLC, QCE LLC, the Existing Equity Holders, the Existing Lenders, and with respect to each of the foregoing Persons, such Person's all current and former direct and indirect equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives), shall be deemed to and shall unconditionally and irrevocably each release each other, individually and collectively, from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon actions taken in their respective capacities described above or any omission, transaction, event or other occurrence taking place or arising on or prior to the Effective Date, except for any claims and causes of action for unlawful acts.  The Existing Equity Holders shall also exchange a full release as to any claims that may exist between the Existing Equity Holders.

   You should carefully consider all of the information in this Offering Memorandum and Disclosure Statement.  In particular, you should evaluate the information under "Risk Factors" for a discussion of risks associated with the Exchange Offers and an investment in the Company.

   For more complete information about the Common Shares, see "Description of Equity Securities."

## Summary of the Plan of Reorganization

The following summary describes the Plan of Reorganization attached hereto as Appendix A.  Terms used in this section "—Summary of the Plan of Reorganization" shall have the meanings ascribed to those terms in the Plan of Reorganization attached hereto as Appendix A.

The Plan of Reorganization described herein provides for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to holders of claims against and interests in the Debtors.  In particular, the Plan of Reorganization contemplates Holders of First Lien Claims will receive (i) their pro rata portion of the First Lien Repayment, and (ii) either, at each Holder's election, their pro rata portion of (x) the Amended First Lien Credit Facility or (y) the New Second Lien Facility.  To the extent that First Lien Lenders elect to exchange their First Lien Facility Claims for their pro rata portion of the New Second Lien Loans such that the New Second Lien Loans would otherwise exceed $200.0 million (as adjusted to take into account the First Lien Repayment), such exchanging lenders shall be cut back on a pro rata basis, based upon the relative amounts elected to be exchanged and receive their pro rata portion of the Amended First Lien Facility in respect of such cutback.

The Plan of Reorganization further contemplates that each Holder of Second Lien Claims (as defined in the Plan of Reorganization), in full and complete satisfaction, discharge and release of such Claims, shall receive its pro rata portion of 25% of the Common Shares for 100% of its Second Lien Claims, with such Common Shares of Holdings being simultaneously assigned by the Second Lien Lenders to QCE Parent in exchange for 100% of the Parent Common Shares, subject to potential dilution by any equity issued under the Management Incentive Plan.

Holders of other secured claims, administrative expense claims, and priority tax claims, will be satisfied in full, or otherwise rendered unimpaired (including by reinstatement) under the Plan of Reorganization in accordance with the Bankruptcy Code. General Unsecured Trade Claims, which are those general unsecured Claims directly related to and arising from the receipt of goods and services by the Debtors held by Persons with whom the Debtors are conducting, and will continue to conduct, business as of the Effective Date of the Plan of Reorganization, will also be satisfied in full, or otherwise rendered unimpaired or reinstated.  The Plan of Reorganization provides no recoveries for any other general unsecured claims or equity interests held by non-Debtors.[2]

The Plan of Reorganization also contemplates a New Equity Investment of $150.0 million in Parent Common Shares by the Plan Sponsor, representing 75% of the Parent Common Shares issued and outstanding on the Effective Date subject to potential dilution by any equity issued under the Management Incentive Plan.

The Debtors believe that (i) through the Plan of Reorganization, holders of Allowed Claims will obtain a substantially greater recovery from the Debtors' Estates than the recovery they would receive if (a) the Debtors filed chapter 11 petitions without prior acceptance of the Plan of Reorganization by the requisite amount and number of their creditors for it to be approved by the Bankruptcy Court or (b) the Debtors filed for liquidation relief under chapter 7 of the Bankruptcy Code, and (ii) the Plan of Reorganization will afford the Debtors the opportunity and ability to continue their business as viable going concerns and preserve ongoing employment for the Debtors' employees.  The Classes of Claims against and Equity Interests in the Debtors created under the Plan of Reorganization, the treatment of those Classes under the Plan of Reorganization and distributions, if any, to be made under the Plan of Reorganization are described in "Plan of Reorganization".

---

[2]   Equity interests held by one Debtor in another Debtor will be reinstated post-emergence (other than equity interests in QCE Finance LLC owned by QCE Incentive) to preserve the corporate structure of the Debtors post-emergence.  The Debtors may elect to dissolve certain entities within the corporate group prior to emergence to rationalize their corporate structure.

Ex. 1 p. 25

### Summary of the First Lien Amendment

Amended First Lien Facility............................

The Amended First Lien Facility is expected to consist of (1) an aggregate outstanding principal balance of between $400.0 and $452.6 million of First Lien Term Loans, (such amount depending on the level of participation by the First Lien Lenders in the First Lien Exchange Offer and whether the Restructuring Transactions are effected through the Exchange Offers or the Plan of Reorganization), and (2) subject to obtaining appropriate commitments, a $5.0 million letter of credit and revolving credit facility (the "**New First Lien Revolving Facility**").

The First Lien Lenders will not be under any obligation to provide commitments for the New First Lien Revolving Facility.  The New First Lien Revolving Facility will be fully available for letters of credit and will only be available for revolving loans to the extent required to reimburse the issuing bank for draws under such letters of credit.

Interest Rate and Fees ....................................

Borrowings under the Amended First Lien Facility will bear interest at a rate per annum equal to an applicable margin plus, at the Company's option, either (1) an adjusted base rate determined by reference to the greatest of (a) the prime rate of Deutsche Bank Trust Company Americas, (b) the Federal funds effective rate plus 1/2 of 1% and (c) 2.50% or (2) the greater of (a) an adjusted LIBO rate determined by reference to the costs of funds for U.S. dollar deposits for the interest period relevant to such borrowing adjusted for certain additional costs and (b) 1.50%. The applicable margin for First Lien Term Loans shall be 7.50% per annum for adjusted LIBO rate loans and 6.50% per annum for adjusted base rate loans. The applicable margin for revolving loans under the New First Lien Revolving Facility will be set forth in a supplement to the Amended First Lien Facility.

If the Restructuring Transactions are effected through the Exchange Offers, the First Lien Lenders will receive the 0.5% First Lien Cash Consent Fee and the 3.5% First Lien PIK Consent Fee. Customary agency fees will also be paid, as well as those letter of credit and other fees agreed to in any L/C Supplement.

Mandatory Repayments...................................

We will be required to repay outstanding First Lien Term Loans, subject to certain exceptions, with:

- 100% of the net cash proceeds of non-ordinary course asset sales or other dispositions of assets (including casualty events) by Holdings, the Company or their restricted subsidiaries, subject to reinvestment rights and certain other exceptions;

- 100% of the net cash proceeds of any incurrence of indebtedness by the Company or its restricted subsidiaries other than indebtedness permitted under the Amended First Lien Facility; and

- commencing with the fiscal year ended December 31, 2012, 75% (which percentage will be reduced to 50% if the Company's first lien secured debt leverage ratio is less than a specified ratio) of the annual excess cash flow (as defined in the Amended First

15

Lien Facility) of the Company and its restricted subsidiaries provided, however, that such excess cash flow prepayment shall not be required to the extent it would reduce the unrestricted cash of the Company and its subsidiaries below $35.0 million.

Voluntary Repayments ...................................... We may voluntarily repay outstanding loans under the Amended First Lien Facility at our option at any time together with accrued interest thereon without premium or penalty (subject to customary "breakage" costs with respect to LIBO rate loans).

Amortization and final maturity ...................... The First Lien Term Loans will amortize each year in an amount equal to 1% per annum in equal quarterly installments beginning March 31, 2012 with the balance payable on the fifth anniversary of the closing of the Amended First Lien Facility.

The principal amount outstanding of the loans under the New First Lien Revolving Facility, if any, will be due and payable on the fifth anniversary of the closing of the Amended First Lien Facility.

Guarantees and security .................................. The Amended First Lien Facility will be guaranteed by Holdings and certain of our current and future domestic subsidiaries.

The Amended First Lien Facility will be secured on a first-priority basis by substantially all of our assets, the assets of Holdings and the subsidiary guarantors, subject to certain exceptions, and including a first-priority pledge of 100% of the capital stock of the Company, 100% of the capital stock or equity interests of domestic subsidiaries held by the Company and the subsidiary guarantors and up to 65% of the capital stock of any first-tier foreign subsidiary of the Company and the subsidiary guarantors.

Covenants ....................................................... Our Amended First Lien Facility will contain a number of covenants that, among other things and subject to certain exceptions, will restrict Holdings' and the Company's ability and the ability of their restricted subsidiaries to:

- incur additional indebtedness;

- incur certain liens;

- enter into certain sale and leaseback transactions;

- make investments, loans and advances;

- consolidate or merge, sell assets, including capital stock of our subsidiaries or make acquisitions;

- pay dividends or make other distributions on our equity interests or redeem, repurchase or retire our equity interests;

- engage in transactions with affiliates;

- alter the business we conduct;

- enter into agreements restricting our restricted subsidiaries' ability to pay dividends or make distributions; and

- make payments of principal or interest on certain indebtedness, including the New Second Lien Loans, subject to certain exceptions, including that, subsequent to the second anniversary of the closing date of the Amended First Lien Facility, payments of full cash interest on the New Second Lien Loans shall be permitted to the extent that the Company's pro forma interest coverage ratio is above a certain ratio.

In addition, the Amended First Lien Facility will require us to comply on a quarterly basis with a maximum first lien secured debt leverage ratio beginning on June 30, 2013.

**Summary of the New Second Lien Facility**

New Second Lien Facility ..............................

The New Second Lien Facility is expected to consist of an aggregate outstanding principal balance of between $134.9 and $185.6 million of New Second Lien Loans (such amount depending on the level of participation by the First Lien Lenders in the First Lien Exchange Offer and whether the Restructuring Transactions are effected through the Exchange Offers or the Plan of Reorganization).

Interest Rate and Fees .....................................

Borrowings under the New Second Lien Facility will bear interest at a rate per annum equal to an applicable margin plus, the greater of  (a) an adjusted LIBO rate determined by reference to the costs of funds for U.S. dollar deposits for the interest period relevant to such borrowing adjusted for certain additional costs and (b) 5.00%. The applicable margin for New Second Lien Loans shall be 7.50% per annum for interest paid in additional New Second Lien Loans and 6.00% per annum if the Company makes a Cash Election.

If a PIK Election is made, interest at a rate of an adjusted LIBO rate (with no floor) plus 1.00% will be payable in cash, with the remaining interest payable in additional New Second Lien Loans. If a Cash Election is made, interest will be paid fully in cash.

If the Restructuring Transactions are effected through the Exchange Offers, the Second Lien Lenders will receive their pro rata portion of the 5.0% First Lien Exchange Fee, payable in additional New Second Lien Loans.  Customary agency fees will also be paid.

Mandatory Repayments.....................................

We will be required to repay outstanding New Second Lien Loans, subject to certain exceptions and to the extent not required to prepay loans under the Amended First Lien Facility, with:

- 100% of the net cash proceeds of non-ordinary course asset sales or other dispositions of assets (including casualty events) by Holdings, the Company or their restricted subsidiaries, subject to reinvestment rights and certain other exceptions,

- 100% of the net cash proceeds of any incurrence of indebtedness by the Company or its restricted subsidiaries other than indebtedness permitted under the New Second Lien Facility, and

- commencing with the fiscal year ended December 31, 2012, 75% (which percentage will be reduced to 50% if the Company's leverage ratio is less than a specified ratio) of the annual excess cash flow (as defined in the New Second Lien Facility) of the Company and its restricted subsidiaries provided, however, that such excess cash flow prepayment shall not be required to the extent it would reduce the unrestricted cash of the Company and its subsidiaries below $35.0 million.

**Ex. 1 p. 29**

| | |
|---|---|
| Voluntary Repayments..................................... | We may voluntarily repay outstanding loans under the New Second Lien Facility at our option at any time together with accrued interest thereon without premium or penalty (subject to customary "breakage" costs with respect to LIBO rate loans). |
| Amortization and final maturity ...................... | The New Second Lien Facility does not amortize and is payable in full on a date that is approximately five years and three months after the closing of the New Second Lien Facility. |
| Guarantees and security................................... | The New Second Lien Facility will be guaranteed by Holdings and certain of our current and future domestic subsidiaries. |
| | The New Second Lien Facility will be secured on a second-priority basis by substantially all of our assets, the assets of Holdings and the subsidiary guarantors, subject to certain exceptions, and including a second-priority pledge of 100% of the capital stock of the Company, 100% of the capital stock or equity interests of domestic subsidiaries held by the Company and the subsidiary guarantors and up to 65% of the capital stock of any first-tier foreign subsidiary of the Company and the subsidiary guarantors. |
| Covenants....................................................... | Our New Second Lien Facility will contain a number of covenants that, among other things and subject to certain exceptions, will restrict Holdings' and the Company's ability and the ability of their restricted subsidiaries to: |

- incur additional indebtedness;

- incur certain liens;

- enter into certain sale and leaseback transactions;

- make investments, loans and advances;

- consolidate or merge, sell assets, including capital stock of our subsidiaries or make acquisitions;

- pay dividends or make other distributions on our equity interests or redeem, repurchase or retire our equity interests;

- engage in transactions with affiliates;

- alter the business we conduct;

- enter into agreements restricting our restricted subsidiaries' ability to pay dividends or make distributions; and

- make payments of principal or interest on certain indebtedness, subject to certain exceptions.

19

**Ex. 1 p. 30**

**Summary Historical Consolidated Financial Data**

The following table sets forth the summary historical consolidated financial and other data of QCE LLC and subsidiaries as of the dates and for the periods indicated.  The summary historical financial data as of December 31, 2010, 2009 and 2008 and for each of the years then ended presented in this table have been derived from the QCE LLC and subsidiaries audited consolidated financial statements included elsewhere in this Offering Memorandum and Disclosure Statement.

The summary historical financial data as of September 30, 2011 and 2010 and for the nine months ended September 30, 2010 and September 30, 2011 have been derived from the QCE LLC and subsidiaries unaudited consolidated financial statements for such periods, which are included elsewhere in this Offering Memorandum and Disclosure Statement and which have been prepared on the same basis as our audited consolidated financial statements.  Historical results are not necessarily indicative of the results to be expected for future periods and operating results for the nine months ended September 30, 2011 are not necessarily indicative of the results that may be expected for the fiscal year ending December 31, 2011.

The data in the following table related to EBITDA, Adjusted EBITDA, U.S. AUVs, systemwide sales and number of restaurants are unaudited for all periods presented.

The following summary consolidated financial information should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and related notes thereto included elsewhere in this Offering Memorandum and Disclosure Statement.  In addition, see "Non-GAAP Financial Measures" included elsewhere in this Offering Memorandum and Disclosure Statement.

| | Year Ended December 31, | | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- | --- |
| ($ in thousands, except U.S. AUVs and number of restaurants) | 2008 | 2009 | 2010 | 2010 | 2011 |
| **Income Statement Data:** | | | | | |
| Revenue: | | | | | |
| Franchise operations | $ 154,442 | $ 110,135 | $ 84,838 | $ 65,082 | $ 53,269 |
| Food distribution (1) | 522,229 | 423,762 | 359,163 | 279,376 | 209,623 |
| Company-owned stores | 21,473 | 18,064 | 22,339 | 15,892 | 15,061 |
| Total revenue | 698,144 | 551,961 | 466,340 | 360,350 | 277,953 |
| Cost of revenue: | | | | | |
| Franchise operations | 14,121 | 15,689 | 2,668 | 2,008 | 887 |
| Food distribution | 388,073 | 308,928 | 243,248 | 189,025 | 149,340 |
| Company-owned stores | 11,677 | 9,819 | 12,379 | 8,611 | 7,792 |
| Total cost of revenue | 413,871 | 334,436 | 258,295 | 199,644 | 158,019 |
| Gross margin | 284,273 | 217,525 | 208,045 | 160,706 | 119,934 |
| Operating expenses: | | | | | |
| General and administrative expenses | 101,332 | 68,401 | 77,314 | 59,563 | 45,749 |
| Litigation settlement charges | — | 16,758 | (8,782) | 508 | — |
| Advertising expense | 36,089 | 33,039 | 22,752 | 23,016 | 2,822 |
| Deferred and share-based compensation | 5,077 | 751 | 628 | 471 | 44 |
| Depreciation and amortization | 20,048 | 15,048 | 16,436 | 12,470 | 7,952 |
| Other | 10,134 | 9,274 | 17,754 | 10,460 | 6,806 |
| Total operating expenses (2) | 172,680 | 143,271 | 126,102 | 106,488 | 63,373 |
| Operating profit | 111,593 | 74,254 | 81,943 | 54,218 | 56,561 |

Ex. 1 p. 31

| | Year Ended December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2010** | **2011** |
| Other expense (income): | | | | | |
| Interest expense | 78,677 | 64,136 | 62,080 | 46,832 | 44,246 |
| Interest income | (700) | (173) | (377) | (233) | (555) |
| Gain on debt extinguishment | — | — | — | — | (1,246) |
| Other | (769) | 1,766 | 494 | 496 | 369 |
| Total other expense | 77,208 | 65,729 | 62,197 | 47,095 | 42,814 |
| Income from continuing operations before income tax | 34,385 | 8,525 | 19,746 | 7,123 | 13,747 |
| Income tax expense | 1,656 | 3,043 | 1,787 | 1,341 | 411 |
| Income from continuing operations | 32,729 | 5,482 | 17,959 | 5,782 | 13,336 |
| Income (loss) from discontinued operations (3) | 2,437 | (12,004) | (8,425) | (2,292) | (994) |
| Net income (loss) | 35,166 | (6,522) | 9,534 | 3,490 | 12,342 |
| Net income attributable to noncontrolling interests | 278 | 186 | 183 | 152 | 69 |
| Net income (loss) attributable to QCE LLC | $ 34,888 | $ (6,708) | $ 9,351 | $ 3,338 | $ 12,273 |
| **Balance Sheet Data (at period end):** | | | | | |
| Cash and cash equivalents (4) | $ 2,840 | $ 79,318 | $ 27,365 | $ 56,830 | $ 30,656 |
| Total current assets | 47,421 | 106,111 | 62,509 | 82,811 | 62,049 |
| Working capital (5) | (103,115) | (101,551) | (104,501) | (114,575) | (890,265) |
| Revolving lines of credit | 12,064 | 93,981 | 83,720 | 85,503 | 85,169 |
| Total debt (6) | 864,768 | 854,699 | 811,080 | 812,130 | 805,329 |
| Total member's deficit | (971,621) | (963,101) | (918,777) | (925,472) | (905,275) |
| **Cash Flow and Other Data:** | | | | | |
| Adjusted EBITDA (7) | $ 174,168 | $ 142,511 | $ 118,284 | $ 99,839 | $ 77,527 |
| Capital expenditures | (10,267) | (3,552) | (6,766) | (5,360) | (1,923) |
| Net cash from operating activities (8) | 14,009 | 15,605 | 5,372 | 22,706 | 11,815 |
| Net cash from investing activities (8) | (9,747) | (5,652) | (15,006) | (11,882) | (1,160) |
| Net cash from financing activities | (13,924) | 67,807 | (32,869) | (28,845) | (6,068) |
| U.S. AUVs in dollars (9) | 6,713 | 5,917 | 5,804 | 5,866 | 5,736 |
| Systemwide Sales (10) | $1,812,113 | $1,464,402 | $1,174,638 | $ 906,832 | $ 747,227 |
| Number of restaurants | 4,984 | 4,299 | 3,489 | 3,706 | 3,113 |

---

(1)  We account for operational incentive payments to franchise owners as a reduction of food distribution revenue. We paid franchise owners operational incentive payments of $20.6 million, $11.2 million and $1.9 million for the years ended December 31, 2008, 2009 and 2010, respectively, and $0.3 million and $15.8 million for the nine months ended September 30, 2010 and 2011, respectively.

(2)  Fiscal years 2008, 2009 and 2010 include asset impairment charges of $5.0 million, $3.5 million and $3.3 million, respectively. The nine-months ended September, 2010 and 2011 include asset impairment charges of $1.7 million and $1.7 million, respectively.

(3)  We sold our equipment distribution business in 2009. Net income for 2008 and 2009 includes income and losses from discontinued operations of $2.4 million and $12.0 million, respectively.  Net income for 2010 includes $8.4 million of losses from discontinued operations related to the closure of 57 Company-owned restaurants. An additional 30 restaurants were refranchised during 2010 and 2011, which did not qualify for classification as discontinued operations and therefore losses of $3.4 million and $0.9 million, including $2.0 million and $0.2 million of impairment charges are included in continuing operations for the year ended December 31, 2010 and the nine months ended September 30, 2011, respectively.

(4)  Cash and cash equivalents includes restricted cash related to franchising requirements in certain U.S. states.

(5)   We define working capital as current assets less current liabilities. As is common in the restaurant industry, we maintain relatively low levels of accounts receivable and inventories and vendors grant trade credit for purchases such as food and supplies. As a result, we typically maintain current liabilities in excess of current assets, which results in a working capital deficit. We were not in compliance with one of our financial ratio covenants as of September 30, 2011. As a result of this event of non compliance and since waivers from our lenders had not been obtained, substantially all of our debt and debt issue costs are classified as current as of September 30, 2011.

(6)   We have excluded capital leases from total debt. Our capital leases are arrangements under which we lease certain restaurant equipment located in franchise owner restaurants from vendors. These leases are currently satisfied ratably as our franchise owners ultimately purchase the vendors' products. We have no capital leases which require monthly cash payments at this time.

(7)   The following table includes our earnings before interest, taxes, depreciation and amortization ("**EBITDA**") and EBITDA adjusted for the items described below ("**Adjusted EBITDA**"). EBITDA and Adjusted EBITDA are not presentations made in accordance with GAAP and the use of the terms EBITDA and Adjusted EBITDA may differ from similar measures reported by other companies. We believe that EBITDA and Adjusted EBITDA provide investors with useful information in respect to our historical operations and cash flow. EBITDA and Adjusted EBITDA are reconciled from net income determined under GAAP in the following table.

| | Year Ended December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2010** | **2011** |
| Income from continuing operations | $   32,729 | $     5,482 | $   17,959 | $     5,782 | $   13,336 |
| Interest expense | 78,677 | 64,136 | 62,080 | 46,832 | 44,246 |
| Interest income | (700) | (173) | (377) | (233) | (555) |
| Income tax expense | 1,656 | 3,043 | 1,787 | 1,341 | 411 |
| Depreciation and amortization | 20,048 | 15,048 | 16,436 | 12,470 | 7,952 |
| EBITDA | 132,410 | 87,536 | 97,885 | 66,192 | 65,390 |
| Adjustments: | | | | | |
| Asset impairments (a) | 4,983 | 3,972 | 4,546 | 1,945 | 1,790 |
| Impact of dispositions & acquisitions (b) | 1,540 | 3,592 | 2,926 | 2,238 | 735 |
| Reduction in force and transition costs (c) | 25,368 | 9,338 | 15,950 | 12,537 | 3,073 |
| Exit and other restructuring costs (d) | 3,785 | 4,286 | 626 | 518 | 2,575 |
| Sponsor fees & contributions (e) | 869 | 3,104 | 10,905 | 10,653 | 479 |
| Non-cash adjustments (f) | 5,077 | 751 | 628 | 471 | 44 |
| Non-recurring litigation (g) | (3,758) | 19,722 | (7,611) | 1,565 | 1,281 |
| Other (h) | 1,826 | 989 | 1,715 | 1,748 | 2,331 |
| Deconsolidation adjustments (i) | 2,068 | 9,221 | (9,286) | 1,972 | (171) |
| **Adjusted EBITDA** | $ 174,168 | $ 142,511 | $ 118,284 | $   99,839 | $   77,527 |

(a)   Represents all non-cash impairment charges related to property and equipment, intangibles and investment in area directorships.

(b)   Represents pro forma impact of disposition of equipment business, refranchising of Company-owned restaurants and reacquisition of area director and master franchise rights.

(c)   Represents trailing twelve and nine month impact and actual costs associated with significant reductions in force and related management transitions.

(d)   Represents trailing twelve and nine month impact and actual costs associated with exit activities, primarily contract termination costs and exit of leased corporate facilities.

(e)   Represents management fees paid to our sponsors and contributions received from our sponsors that are earmarked for advertising activity.

(f)   Represents non-cash adjustments, primarily deferred and share-based compensation.

(g)   Represents costs to defend and settle class-wide litigation, net of insurance recoveries which are not expected to recur in future periods.

(h)   Represents the net impact of other non-recurring and individually insignificant adjustments, including deductions for income allocable to noncontrolling interests and gains on extinguishment of notes payable.

(i)   Represents the net impact of the deconsolidation of the Marketing Fund Trusts and any unrestricted subsidiary excluded from net income on a combined basis.  In accordance with the First Lien Facility, our Adjusted EBITDA

**Ex. 1 p. 33**

calculations are prepared on combined basis and therefore exclude the Marketing Fund Trusts and any unrestricted subsidiary.

(8)  Net cash from operating and investing activities excludes cash flows from discontinued operations.

(9)  AUVs represent the average weekly sales volume per restaurant in dollars. AUVs are calculated by dividing the sum of the week's reported Gross Sales for all open and operating restaurants by the number of open and operating restaurants.

(10) Systemwide sales include restaurant-level sales at both franchised and Company-owned restaurants. Franchise restaurant sales are not included in our consolidated results; however, franchise restaurant sales result in royalties, which are included in our franchise operations revenue and generate food distribution revenue and gross profit.

## Risk Factors

*In addition to the other information set forth in this Offering Memorandum and Disclosure Statement, you should carefully consider the risks described below before deciding to participate in the Exchange Offers or to provide your acceptance in the solicitation of consents and acceptances. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business operations. If any of these risks actually occur, they could have a material adverse effect on our business, financial position or results of operations, and you could lose all or part of your investment.*

**Risks Related to NOT Accepting the Exchange Offers and Rejecting the Plan of Reorganization**

***If we receive less than the minimum acceptance conditions for the Exchange Offers and the First Lien Amendment and we cannot implement the Exchange Offers and the First Lien Amendment, there nonetheless may be sufficient votes to accept the Plan of Reorganization to accomplish the Restructuring Transactions.***

The consummation of the Exchange Offers and the First Lien Amendment is conditioned upon, among other things, satisfaction of the conditions requiring that holders of at least $150.0 million of outstanding First Lien Indebtedness accept the First Lien Exchange Offer (the "**First Lien Acceptance Threshold**"), which amendment includes consent to the First Lien Exchange Offer, holders of 100.0% of the First Lien Indebtedness accept the terms of the First Lien Amendment (the "**First Lien Amendment Acceptance Threshold**") and holders of 100.0% of the Second Lien Loans accept the Second Lien Exchange Offer (the "**Second Lien Acceptance Threshold**", and together with the First Lien Acceptance Threshold and the First Lien Amendment Acceptance Threshold, the "**Minimum Acceptance Conditions**"). If we are not able to complete the Exchange Offers and the First Lien Amendment because the Minimum Acceptance Conditions are not met or for any other reason, but we receive acceptances from a sufficient number of holders of impaired claims in an impaired class of claims to allow the Plan of Reorganization to be confirmed under the Bankruptcy Code, or the Plan of Reorganization is otherwise confirmed through the nonconsensual "cram-down" provisions of section 1129(b) of the Bankruptcy Code with respect to any non-accepting impaired claims classes, as an alternative to the Exchange Offers and the First Lien Amendment, we will seek confirmation of the Plan of Reorganization in a chapter 11 proceeding and will use any agreement to accept the Plan of Reorganization we receive through the Offering Memorandum and Disclosure Statement as ballots to accept the Plan of Reorganization. To obtain confirmation of the Plan of Reorganization without invoking the "cram-down" provisions of the Bankruptcy Code, each class of claims or equity interests that is impaired must vote to accept the Plan of Reorganization.

An impaired class of claims (such as First Lien Lenders or Second Lien Lenders) is deemed to accept the Plan of Reorganization if the holders of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the claims in such class who actually cast ballots vote to accept the Plan of Reorganization. If the Plan of Reorganization is confirmed by the Bankruptcy Court, it will bind all holders of claims against, and equity interests in, the Company (and any other affiliate included as a debtor in the chapter 11 cases and the Plan of Reorganization) regardless of whether they voted for or against the Plan of Reorganization and regardless of whether they voted at all on the Plan of Reorganization.

Therefore, assuming the Plan of Reorganization satisfies the other requirements of the Bankruptcy Code, a significantly smaller number of claim holders can bind other claim holders to the terms of the Plan of Reorganization than are required to effect the Exchange Offers and the other transactions contemplated by the Exchange Offers and the First Lien Amendment.

The confirmation and effectiveness of the Plan of Reorganization are subject to certain conditions that may not be satisfied and are different from those under the Exchange Offers and the First Lien Amendment. We cannot assure you that all requirements for confirmation and effectiveness of the Plan of Reorganization will be satisfied or that the Bankruptcy Court will conclude that the requirements for confirmation and effectiveness of the Plan of Reorganization have been satisfied.

*If the Exchange Offers and the First Lien Amendment are not consummated, but we receive sufficient votes to confirm the Plan of Reorganization, Second Lien Lenders that did not vote to accept the Plan of Reorganization nevertheless will receive the Common Shares on account of Second Lien Loans, and the Second Lien Loans will be cancelled and the First Lien Facility will be amended.*

If we effectuate the Restructuring Transactions in the Bankruptcy Court through the Plan of Reorganization, all Second Lien Lenders will receive the same treatment as each other on account of their Second Lien Loans and will be bound by the terms of the Plan of Reorganization whether or not they vote to accept the Plan of Reorganization. Under the Plan of Reorganization, Second Lien Lenders will receive the Common Shares. If the Plan of Reorganization is approved by the Bankruptcy Court, Second Lien Lenders that did not vote to accept the Plan of Reorganization nevertheless will receive the Common Shares on account of Second Lien Loans, and the Second Lien Loans will be cancelled. In addition, First Lien Lenders that did not vote to accept the First Lien Amendment will be bound by the terms of the Plan of Reorganization, including the First Lien Amendment.

We believe that restructuring through the Exchange Offers and the First Lien Amendment or the Plan of Reorganization is critical to an efficient restructuring.

*If neither the Exchange Offers nor the Plan of Reorganization is consummated, we likely would need to seek relief under the Bankruptcy Code without the benefit of having a plan of reorganization pre-approved by our creditors. If we seek bankruptcy relief under these circumstances, First Lien Lenders and Second Lien Lenders may receive consideration that is substantially less than the consideration available through the Exchange Offers or the Plan of Reorganization.*

We believe that seeking relief under the Bankruptcy Code other than in connection with the Plan of Reorganization could materially and adversely affect the relationships between us and our existing and potential customers, franchise owners, employees, vendors, suppliers, and other stakeholders and subject us to other direct and indirect adverse consequences. For example:

- reputational damage could cause franchise owners and customers to move to our competitors;

- such a bankruptcy filing could erode our customers' confidence in our ability to produce and deliver high quality products and, as a result, there could be a significant and precipitous decline in our revenues, profitability and cash flow;

- it may become more difficult to retain, attract or replace key employees;

- we could be forced to operate in bankruptcy for an extended period of time while we try to develop a confirmable reorganization plan;

- our trade creditors and other partners could seek to terminate their relationships with us, require financial assurances or enhanced performance, or refuse to provide credit on the same terms as they provided prior to the reorganization case;

- we may not be able to obtain debtor-in-possession financing or use of cash collateral to sustain operations during the chapter 11 cases; and

- if we were not able to confirm and implement a plan of reorganization, or if sufficient postpetition financing were not available, we may be forced to liquidate under chapter 7 of the Bankruptcy Code.

Any distributions that you might receive in respect of First Lien Indebtedness or Second Lien Loans under a liquidation or under a protracted reorganization case or cases under the Bankruptcy Code other than in connection with the Plan of Reorganization likely would be substantially delayed, and the value of any potential recovery likely would be adversely impacted by such delay and by the potential consequences described above.

Ex. 1 p. 36

Furthermore, in the event of any foreclosure, dissolution, winding-up, liquidation or reorganization, or other insolvency proceeding other than in connection with the Plan of Reorganization, there can be no assurance as to the value, if any, that would be available to First Lien Lenders or Second Lien Lenders. The Second Lien Facility ranks junior to our first lien obligations, including those under our First Lien Facility. Accordingly, upon any distribution to our creditors in any foreclosure, dissolution, winding-up, liquidation or reorganization, or other insolvency proceeding relating to us or our property, other than in connection with the Plan of Reorganization, our First Lien Lenders would be entitled to be paid in full before any payment could be made with respect to the Second Lien Loans and any related obligations under the Second Lien Facility. If you do not vote to exchange the First Lien Indebtedness or the Second Lien Loans, as applicable, or if you vote to reject the Plan of Reorganization, you may receive less value for the First Lien Indebtedness or the Second Lien Loans, as applicable, in the event of any foreclosure, dissolution, winding-up, liquidation or reorganization, or other insolvency proceeding, other than in connection with the Plan of Reorganization, than you would receive under the Exchange Offers or the Plan of Reorganization.

***If the Restructuring Transactions are not consummated in a timely manner, the First Lien Lenders may choose to exercise the remedies available to them due to an existing event of default under our First Lien Facility, which could include  the acceleration of our obligations thereunder and have other adverse consequences.***

If the Restructuring Transactions are not consummated as set forth in the Restructuring Support Agreement, the First Lien Lenders may choose to exercise the remedies available to them due to an event of default under our First Lien Facility. The First Lien Lenders could immediately terminate their revolving loan commitments, require the cash collateralization of outstanding letters of credit and/or declare the amounts that we owe under the First Lien Facility to be immediately due and payable. If this were to occur, we would face an immediate liquidity crisis, and we likely would need to file for bankruptcy without the benefit of an agreed Plan of Reorganization. See "—Risks Related to NOT Accepting the Exchange Offers and Rejecting the Plan of Reorganization." Acceleration of the indebtedness under our First Lien Facility would trigger an event of default under our Second Lien Facility, allowing the Second Lien Lenders to exercise similar remedies subject to the intercreditor agreement dated as of May 5, 2006 among the Company, Goldman Sachs Credit Partners L.P., in its capacity as first lien collateral agent and Deutsche Bank Trust Company Americas in its capacity as second lien collateral agent. Such actions may also trigger adverse consequences in connection with other of our agreements.

**Risks Related to Consummation of the Exchange Offers**

***Even if we desired to waive, and were permitted to waive under the terms of the Restructuring Support Agreement, the Minimum Acceptance Conditions, we may be unable to consummate the Exchange Offers because we may not have sufficient liquidity to meet our immediate obligations under the First Lien Indebtedness or the Second Lien Loans.***

Pursuant to the Restructuring Support Agreement, the Exchange Offers are subject to the Minimum Acceptance Conditions. Pursuant to the First Lien Facility and the Second Lien Facility, we may not waive any term of the Restructuring Support Agreement without obtaining the prior written consent of the Requisite Participating Lenders, or other lenders to the extent the treatment or rights of such lenders are materially and adversely affected by such waiver.  Even if we desired to waive, and our creditors permitted us to waive, the Minimum Acceptance Conditions, we may not be able to consummate the Exchange Offers because we may not have sufficient liquidity to meet our immediate obligations under the First Lien Facility and the Second Lien Facility if any amounts were to remain outstanding.

***Certain conditions to the Restructuring Support Agreement necessary for consummation of the Restructuring Transactions are not completely within our control.***

The terms of the Restructuring Support Agreement governing the Private Placement require us to negotiate certain agreements that are satisfactory to the Requisite Participating Lenders, including but not limited to, an amendment to our headquarters lease and renewal of directors' and officers' insurance policies and renewal of errors and omissions insurance policies.  There can be no assurance that we will be able to reach agreements that are approved by the Requisite Participating Lenders.  If we are unable to negotiate agreements that are approved by the

**Ex. 1 p. 37**

Requisite Participating Lenders, and any such condition of the Restructuring Support Agreement is not waived, we may be unable to consummate the Restructuring Transactions.

***The Exchange Offers could have a material adverse effect on our operations.***

During the period while we seek approval of and participation in the Exchange Offers the relationships between us and our customers, franchise owners, employees, vendors, suppliers and others could be adversely effected. We expect to be unable to sell new franchise agreements until after the Restructuring Transactions have been consummated, which will delay new store openings. In the period between commencement of the Exchange Offer through consummation, franchise owners could move to alternative franchise systems. Any delay in store openings or movement by franchise owners could materially adversely effect our financial conditions and results of operations.

## Risks to Holders of Equity

***Even if we successfully consummate the Restructuring Transactions, our indebtedness and other obligations will continue to be significant. If the current economic environment does not improve, we may not be able to generate sufficient cash flow from operations to satisfy our obligations as they come due, and, as a result, we would need additional funding, which may be difficult to obtain.***

Even if we successfully consummate the Restructuring Transactions, we will continue to have a significant amount of indebtedness and other obligations that are likely to have several important consequences to our business. For example, our indebtedness and other obligations could:

- require us to dedicate a significant portion of our cash flow from operations to the payment of principal and interest on our indebtedness and other obligations, which would reduce the funds available to fund working capital, capital expenditures and other general corporate purposes in running our business;

- make it more difficult for us to satisfy our obligations;

- limit our ability to withstand competitive pressures;

- make us more vulnerable to any continuing downturn in general economic conditions and adverse developments in our industry and business; and

- reduce our flexibility in responding to changing business and economic conditions.

If we are unable to return to sustained profitability as a result of the Restructuring Transactions, and/or if current economic conditions do not improve in the foreseeable future, we may not be able to generate sufficient cash flow from operations in the future to allow us to service our debt (including the Amended First Lien Facility, the New Second Lien Facility and the Marketing Fund Trust Credit Facility and any other debt we may incur), pay our other obligations as required and make necessary capital expenditures, in which case we likely would need to dispose of assets and/or try to raise additional financing. If these alternatives are not available in a timely manner or on satisfactory terms or are not permitted under the Amended First Lien Facility, the New Second Lien Facility and the Marketing Fund Trust Credit Facility, we may default on our debt obligations. Such a default could result in the acceleration of all our debts or have other serious adverse consequences for First Lien Lenders, holders of New Second Lien Loans and Common Shares holders.

***The effective exchange ratios for the Second Lien Exchange Offer will not reflect any independent valuation of the Second Lien Loans or the Common Shares.***

We have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the effective exchange ratio or the relative values of the Second Lien Loans or the Common Shares. If you exchange the Second Lien Loans, you may or may not receive as much value as you would if you choose to keep them.

**Ex. 1 p. 38**

***There are restrictions on the ability to transfer the Common Shares issued in the Exchange Offers.***

The Common Shares offered in the Exchange Offers have not been registered under the Securities Act or any state or other securities laws (and we have no obligation to do so except as provided in the Holdings Operating Agreement).  As a result, the Common Shares may not be offered, sold or otherwise transferred except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws, or pursuant to an effective registration statement.  In addition, pursuant to the Holdings Operating Agreement, certain investors have the right to require us, in certain circumstances, to use commercially reasonable efforts to register the reoffer and resale of the Common Shares under U.S. securities laws.  However, any such registration statement may not become or remain effective. Until the Common Shares are registered pursuant to an effective registration statement, or are otherwise transferable in accordance with the restrictions set forth under the heading "Description of Equity Securities—Transfer Restrictions," the Common Shares will have limited transferability. See "Description of Equity Securities."

***Holdings does not presently intend to make cash distributions.***

The First Lien Facility and the New Second Lien Facility will limit Holdings' ability to make distributions.  Accordingly, Holdings does not intend to make distributions to the holders of Common Shares.  See "Price Range of Common Shares and Dividend Policy."

***Because of the concentration of ownership among a few members of Holdings, such members will be able to exercise control over significant transactions involving Holdings, including a change in control transaction, and the interests of such members may differ from those of Holdings' other members.***

As of December 23, 2011, affiliates of Avenue and Fortress collectively own approximately 71.8% of the outstanding principal and interest amount of Second Lien Loans.  If the Restructuring Transactions are consummated, such Second Lien Loans will be exchanged for Common Shares.  The Recapitalization would further concentrate the ownership among these large holders.  In the event that the Exchange Offers are consummated, affiliates of Avenue and Fortress would collectively own approximately 88.7% of the outstanding Common Shares.  In the event that the Plan of Reorganization is consummated, affiliates of Avenue and Fortress would collectively own approximately 93.0% of the outstanding Common Shares.  Pursuant to the Holdings Operating Agreement to be entered into in connection with consummation of the Restructuring Transactions, Avenue and Fortress have the right to appoint eight of the nine members of the Board of Managers.   As a result, such members will be able to exercise control over significant transactions involving Holdings, including a change in control transaction, even after the consummation of the Exchange Offers or the Plan of Reorganization.  Further, the interests of such members may differ from those of Holdings' other members.

**Risks Related to Consummation of the Plan of Reorganization**

***The Plan of Reorganization may have a material adverse effect on our operations.***

The solicitation of acceptances of the Plan of Reorganization and any subsequent commencement of chapter 11 cases could adversely affect the relationships between us and our customers, franchise owners, employees, vendors, suppliers and others. There is a risk, due to uncertainty about our future, that:

- we will be unable to sell new franchises to new or existing franchise owners;

- franchise owners could move to alternative franchise systems despite terms in our franchise agreements prohibiting such moves;

- there could be an increase in closures of franchises by franchise owners;

- our customers' confidence in our ability to produce and deliver high quality products could erode, resulting in a significant decline in our revenues, profitability and cash flow;

- it may become more difficult to retain, attract or replace key employees;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- our suppliers, vendors, and service providers could terminate their relationship with us or require financial assurances or enhanced performance.

In addition, these factors could adversely affect our ability to obtain confirmation of the Plan of Reorganization. See "—The Bankruptcy Court may not confirm the Plan of Reorganization or may require us to re-solicit votes with respect to the Plan of Reorganization."

**Our business may be negatively affected if we are unable to assume our executory contracts.**

The Plan of Reorganization provides for the assumption of most executory contracts and unexpired leases. Our intention is to preserve as much of the benefit of our existing contracts and leases as possible. However, some limited classes of executory contracts may not be assumed in this way, including licenses with respect to patents, trademarks, copyrights, or other intellectual property. In these cases, we would need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guaranty that such consent either would be forthcoming or that conditions would not be attached to any such consent that make assuming the contracts unattractive. We then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

In addition, some state franchise laws and regulations give the state the discretion to revoke a franchisor's ability to sell franchises if the state determines that the financial condition of the franchisor may impair the franchisor's ability to perform its obligations.  Such states may take into account a chapter 11 petition in determining our financial stability, which in turn, may impact our ability to sell new franchises in such states.  While certain anti-discrimination provisions of the Bankruptcy Code protect against discrimination solely on the basis of having sought bankruptcy protection, it is unclear if such provisions can be successfully used to protect our ability to sell future franchises.

**We may not be successful in obtaining first day orders to permit us to pay our key suppliers in the ordinary course of business.**

We have tried to address potential concerns of our key franchise owners, vendors, employees, and other key parties in interest that might arise from the filing of the Plan of Reorganization through a variety of provisions incorporated into or contemplated by the Plan of Reorganization, including our intention to seek appropriate court orders to permit us to pay our accounts payable to key parties in interest in the ordinary course and, in the case of those key vendors who have agreed to continue to extend business terms to us during and after our bankruptcy proceeding, to provide for the payments of prepetition accounts payable. However, there can be no guarantee that we will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest we may seek to treat in this manner, and, as a result, our business might suffer.

**The Bankruptcy Court may not confirm the Plan of Reorganization or may require us to re-solicit votes with respect to the Plan of Reorganization.**

We cannot assure you that the Plan of Reorganization, if filed, will be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. See "Plan of Reorganization" There can be no

**Ex. 1 p. 40**

assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code have been met with respect to the Plan of Reorganization.

If the Plan of Reorganization is filed, there can be no assurance that modifications to such plan would not be required for confirmation, or that such modifications would not require a resolicitation of votes on the Plan of Reorganization.

Moreover, the Bankruptcy Court could determine that our disclosures made in this document are inadequate and that the votes in favor of the Plan of Reorganization do not count. We then would be required to recommence the solicitation process, which would include re-filing a plan of reorganization and disclosure statement. Typically, this process involves a 60 to 90 day period and includes a court hearing for the required approval of a disclosure statement, followed (after Bankruptcy Court approval) by another solicitation of claim and, if applicable, interest holder votes for the plan of reorganization, followed by a confirmation hearing for the Bankruptcy Court to determine whether the requirements for confirmation have been satisfied, including the requisite claim and, if applicable, interest holder acceptances.

If the Plan of Reorganization is not confirmed, our reorganization cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate our assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of claims and interests and our liquidation analysis are set forth under "The Plan of Reorganization—Liquidation Analysis" and Appendix I hereto.  We believe that liquidation under chapter 7 of the Bankruptcy Code would result in smaller distributions being made to creditors than those provided for in the Plan of Reorganization, or in some instances, no distributions being made to creditors, because of:

- the likelihood that our assets would need to be sold or otherwise disposed of in a less orderly fashion over a short period of time;

- additional administrative expenses involved in the appointment of a trustee; and

- additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of our operations.

If (1) our reorganization cases were dismissed or converted into cases under chapter 7 of the Bankruptcy Code, or if we filed a motion or other pleading with the Bankruptcy Court seeking the dismissal or conversion of the Plan of Reorganization proceeding, or (2) if the Bankruptcy Court (a) grants relief that is materially inconsistent with the Restructuring Support Agreement or the Plan of Reorganization in any respect or (b) enters an order confirming any plan of reorganization other than the Plan of Reorganization, then the Requisite Holders would have the right to terminate the Restructuring Support Agreement.

***If we commence chapter 11 bankruptcy proceedings, other parties in interest might be permitted to propose alternative plans of reorganization that may be less favorable to certain of our constituencies than the Plan of Reorganization.***

If we commence chapter 11 bankruptcy proceedings to confirm the Plan of Reorganization or any other chapter 11 bankruptcy proceeding, other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization. Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization. However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court for cause. If such an order were to be entered, other parties in interest would then have the opportunity to propose alternative plans of reorganization.  The determination of whether cause exists to reduce the exclusive time in which we can file a chapter 11 plan is fact specific.  Courts have found cause exists, among other things where a debtor's case is not complex, where there has been no progress in arranging financing, or where creditors have lost confidence in the debtor's management. We do not believe that

**Ex. 1 p. 41**

cause to reduce exclusivity would exist in our chapter 11 cases. However, there can be no assurances that a Bankruptcy Court would reach the same conclusion.

Alternative plans of reorganization may treat less favorably the claims of a number of other constituencies, including our franchise owners, our employees, our vendors and suppliers. We consider maintaining relationships with our franchise owners, employees, vendors and suppliers as critical to maintaining the value of our business as we restructure, and have sought to treat those constituencies accordingly. However, proponents of alternative plans of reorganization may not share our assessment and may seek to impair the claims of such constituencies to a greater degree. If there were competing plans of reorganization, our reorganization cases likely would become longer, more complicated and much more expensive. If this were to occur, or if our franchise owners, employees or other constituencies important to our business reacted adversely to an alternative plan of reorganization, the adverse consequences discussed in the first risk factor in this section discussing risks related to the Plan of Reorganization also could occur.

**The Bankruptcy Court may disagree with our classification of claims and interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim is substantially similar to the other claims or interests of such class. Although we believe that the classification of claims and interests under the Plan of Reorganization complies with the requirements set forth in the Bankruptcy Code, once chapter 11 cases have been commenced, a claim or interest holder could challenge the classification. In such event, the cost of the Plan of Reorganization and the time needed to confirm the Plan of Reorganization may increase, and we cannot assure you that the Bankruptcy Court will agree with our classification of claims and interests. If the Bankruptcy Court concludes that the classification of claims and interests under the Plan of Reorganization does not comply with the requirements of the Bankruptcy Code, we may need to modify the Plan of Reorganization. Such modification could require a resolicitation of votes on the Plan of Reorganization. The Plan of Reorganization may not be confirmed if the Bankruptcy Court determines that our classification of claims and interests was not appropriate.

**The Bankruptcy Court may find the solicitation of acceptances inadequate.**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). The Federal Rules of Bankruptcy Procedure are referred to as the "**Bankruptcy Rules.**" Section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote;

- the time prescribed for voting is not unreasonably short; and

- the solicitation of votes is in compliance with any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of adequate information.

Section 1125(a)(l) of the Bankruptcy Code describes adequate information as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of claims and interests to make an informed judgment about the plan of reorganization. With regard to solicitation of votes prior to the commencement of bankruptcy cases, if the Bankruptcy Court concludes that the requirements of Bankruptcy Rule 3018(b) have not been met, then the Bankruptcy Court could deem such votes invalid, whereupon the Plan of Reorganization could not be confirmed without a resolicitation of votes to accept or reject the Plan of Reorganization. While we believe that the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018 will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

***Even if all classes of claims that are entitled to vote accept the Plan of Reorganization, we may fail to meet all conditions precedent to effectiveness of the Plan of Reorganization, and the Plan of Reorganization may not become effective.***

Although we believe that the effective date of the Plan of Reorganization would occur very shortly after confirmation of the Plan of Reorganization, there can be no assurance as to such timing.

The confirmation and effectiveness of the Plan of Reorganization are subject to certain conditions that may or may not be satisfied. We cannot assure you that all requirements for confirmation and effectiveness required under the Plan of Reorganization will be satisfied or that the Bankruptcy Court will conclude that the requirements for confirmation and effectiveness of the Plan of Reorganization have been satisfied. See "Plan of Reorganization—Conditions Precedent to Confirmation and Effectiveness of the Plan."

If the conditions precedent to the effective date have not occurred, the confirmation of the Plan of Reorganization could be denied. If this occurs, we expect that it may be necessary to file for bankruptcy protection without the benefit of an agreed Plan of Reorganization, which may require significant and accelerated asset liquidations or result in our liquidation. It is possible that First Lien Lenders and Second Lien Lenders would receive less consideration for their First Lien Indebtedness and Second Lien Loans, respectively, in this situation than they would receive pursuant to the Plan of Reorganization.

***The Bankruptcy Court may utilize the "cram-down" provisions of the Bankruptcy Code to confirm the Plan of Reorganization.***

The Plan of Reorganization provides that two Classes of Claims or Interests are deemed to reject the Plan of Reorganization.  The Bankruptcy Court may nonetheless confirm the Plan of Reorganization at our request pursuant to the "cram down" provisions of the Bankruptcy Code if at least one impaired Class of Claims has accepted the Plan of Reorganization (with such acceptance being determined without including the acceptance of any "insider" in such Class) and, as to each impaired Class which has not accepted the Plan of Reorganization, the Bankruptcy Court determines that the Plan of Reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such impaired class.

Although we believe that the Plan of Reorganization will meet such tests, we cannot assure you that the Bankruptcy Court would reach the same conclusion.  If the Bankruptcy Court does not confirm the Plan of Reorganization, we may pursue one of several alternatives, including: (a) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (b) dismissal of the chapter 11 cases, or (c) liquidation. We cannot predict the amount of time that we would spend in bankruptcy for the purpose of implementing the Plan of Reorganization, and a lengthy bankruptcy proceeding could disrupt our business, as well as impair the prospect for reorganization on the terms contained in the Plan of Reorganization.

While we expect that a chapter 11 bankruptcy filing solely for the purpose of implementing the Plan of Reorganization would be of short duration (*e.g.,* 90 days) and would not be unduly disruptive to our business, we cannot be certain that this necessarily would be the case. Although the Plan of Reorganization is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that we may spend in bankruptcy, and we cannot be certain that the Plan of Reorganization would be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan of Reorganization could itself have an adverse effect on our business. There is a risk, due to uncertainty about our future, that:

- customers, vendors, suppliers and franchise owners could move to our competitors, including competitors that have comparatively greater financial resources and that are in comparatively less financial distress;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- vendors, suppliers and franchise owners could terminate their relationship with us or vendors could require financial assurances or enhanced performance, any of which could impair our prospects.

**Ex. 1 p. 43**

The disruption that a bankruptcy proceeding would have upon our businesses could increase with the length of time it takes to complete the proceeding. If we are unable to obtain confirmation of the Plan of Reorganization on a timely basis, because of a challenge to the Plan of Reorganization or otherwise, we may be forced to operate in bankruptcy for an extended period of time while we try to develop a different reorganization plan that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

***We may seek to amend, waive, modify, or withdraw the Plan of Reorganization at any time prior to the confirmation of the Plan of Reorganization.***

We reserve the right, prior to the confirmation or substantial consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, the Restructuring Support Agreement, the First Lien Facility, the Second Lien Facility and applicable law, to amend the terms of the Plan of Reorganization or waive any conditions thereto, if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan of Reorganization. The potential impact of any such amendment or waiver on the holders of claims and interests cannot presently be foreseen but may include a change in the economic impact of the Plan of Reorganization on some or all of the proposed classes or a change in the relative rights of such classes. All holders of claims and interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to confirmation or the Plan of Reorganization, we seek to modify the Plan of Reorganization, the previously solicited acceptances will be valid only if (1) all classes of adversely affected creditors and interest holders accept the modification in writing or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders accepting claims and interests or is otherwise permitted by the Bankruptcy Code.

### Risks Related to the New Second Lien Loans

***The collateral securing the New Second Lien Loans is subject to control by the First Lien Lenders and subject to the terms of the intercreditor agreement.  If there is a default, the value of the collateral may not be sufficient to repay both the First Lien Lenders and the holders of the New Second Lien Loans.***

The New Second Lien Loans will be secured on a second priority basis by all of our assets and the assets of our subsidiaries that secure the Amended First Lien Facility.  Under the terms of the New Second Lien Facility, we will be permitted in the future to incur additional indebtedness and other obligations that, in certain circumstances, may share in the second priority liens on the collateral securing the New Second Lien Loans and in the first priority liens on the collateral securing the Amended First Lien Facility, as well as certain hedging and cash management obligations, and, under certain circumstances, we will be permitted to contribute cash or other assets held by us or our restricted subsidiaries to unrestricted subsidiaries.

The First Lien Lenders will be entitled to receive proceeds from any realization of the collateral to repay their obligations in full before the holders of the New Second Lien Loans and any other obligations secured by second priority liens will be entitled to any recovery from the collateral.  We cannot assure you that, in the event of a foreclosure, the proceeds from the sale of all of such collateral would be sufficient to satisfy the amounts outstanding under the New Second Lien Facility and other obligations secured by the second priority liens, if any, after payment in full of all obligations secured by the first priority liens on the collateral.  If such proceeds were not sufficient to repay amounts outstanding under the New Second Lien Facility, then holders of the New Second Lien Loans (to the extent not repaid from the proceeds of the sale of the collateral) would only have an unsecured claim against our remaining assets, which claim will rank equal in priority to the unsecured claims with respect to any unsatisfied portion of the obligations secured by the first priority liens or other second priority liens and our other unsecured senior indebtedness.  After giving effect to the issuance of the Exchange Offers, we will have between $406.9 and $452.6 million (such amount depending on participation by the First Lien Exchange Offer, not inclusive of potential letter of credit commitments), of senior secured indebtedness outstanding that constitutes first priority lien obligations.  If a Plan of Reorganization is consummated, we will have between $400.0 and $445.0 million (such amount depending on the amount of First Lien Lenders that elect to exchange into the New Second Lien Credit Facility, not inclusive of potential letter of credit commitments).

In addition, the asset sale covenant and the definition of asset sale, each in the New Second Lien Facility, will have a number of exceptions pursuant to which we would be able to sell collateral without being required to reinvest the proceeds of such sale into assets that will comprise collateral, or collateral of the same type, or to prepay New Second Lien Loans.  See "The New Second Lien Facility—Certain Covenants and Events of Default."

***The lien-ranking provisions set forth in the intercreditor agreement will substantially limit the rights of the holders of the New Second Lien Loans with respect to the collateral securing the New Second Lien Loans.***

The rights of the holders of the New Second Lien Loans with respect to the collateral securing the New Second Lien Loans will be substantially limited pursuant to the terms of the lien-ranking provisions set forth in the intercreditor agreement.  Under those lien-ranking provisions, at any time that obligations that have the benefit of the first priority liens are outstanding, any actions that may be taken in respect of the collateral, including the ability to cause the commencement of enforcement proceedings against the collateral and to control the conduct of such proceedings, will be subject to a standstill period of 180 days.  Additionally, under some circumstances, the holders of the obligations that have the benefit of the first priority liens may release collateral from the second priority lien securing the New Second Lien Loans.  Amendments to the documents governing the New Second Lien Loans are limited pursuant to the intercreditor agreement.  The holders of New Second Lien Loans also waive certain rights normally accruing to secured creditors in a bankruptcy.  See "The New Second Lien Facility—Guarantees and Security."

### Risks Related to Our Business

***We incurred a net loss in fiscal 2009, experienced declines in overall restaurant count and revenue in each of the last three fiscal years, and may continue to experience further declines and losses in the future.***

We incurred a net loss in fiscal 2009 and experienced a decline in revenues in each of the last three fiscal years. The decline in revenue reflects fewer restaurants in operation and lower sales per restaurant.  Our overall restaurant count has declined from 4,984 at the end of 2008, to 4,299 at the end of 2009, to 3,489 at the end of 2010 and, as of September 30, 2011, totaled 3,113, an overall decline of 1,871, or 37.5%, since the end of 2008.  We attribute these declines to weak domestic economic conditions as well as poor location and restaurant-level operational issues during this time. The net loss in fiscal 2009 reflects a $16.8 million expense recorded due to a class action settlement entered in 2009 related to claims against the Company, as well as the sale of our equipment distribution unit and related goodwill impairment of $11.9 million.  Additionally, given that the majority of restaurants are owned by franchise owners who own two or fewer restaurants, and given the lack of geographical concentration of our restaurant base, there may be a lag between franchise owners abandoning a restaurant and our confirmation that the restaurant has closed.  This can result in an overstatement of open and operating locations at any point in time. There can be no assurance that our restaurant count will not continue to decline, and we may experience further revenue declines, litigation charges and net losses in the future.

***Our financial results are closely tied to the operating results of our franchise owners.***

We receive a significant percentage of our revenues in the form of royalties and food distribution revenue, which are generally based on a percentage of Gross Sales at franchised restaurants and food distribution sales to our franchise owners.  Accordingly, our financial results are highly dependent upon the operational and financial success of our franchise owners. AUVs in our U.S. restaurants have declined from $6,713 in 2008 to $5,804 in 2010. If sales volumes or economic conditions deteriorate for franchise owners, their financial results may decline and have a material adverse effect on our royalty, food distribution sales and other revenues. Our accounts receivable and related allowance for doubtful accounts may also increase.  Many factors that are beyond our control, such as labor shortages or increased labor costs, franchise owners' inability to attract, motivate and retain qualified employees or local demographic trends and business conditions, could have a material adverse effect on our franchise owners' Gross Sales. In addition, if our franchise owners fail to renew their franchise agreements or lease agreements, if we are required to restructure franchise agreements in order to induce franchise owners to renew them, or if our franchise owners fail to comply with the terms of their franchise agreements, then our royalty and other revenues may decline.  Franchise owners may cut off our access to auto-debit their bank account, or may deliberately underfund their bank accounts, impacting our ability to collect royalties and advertising fees.  There may be a lag between the time a franchise owner fails to pay royalties or advertising fees and the period of time when a default is

**Ex. 1 p. 45**

issued.  Further, states have varying legal requirements governing the cure period allotted to franchise owners after a notice of default is given.

***Weak economic conditions may adversely affect consumer discretionary spending and may negatively impact our business, financial positions or results of operations.***

We believe that our and our franchise owners' sales, customer traffic and profitability are strongly correlated to consumer discretionary spending, which is influenced by general economic conditions, unemployment levels and the availability of discretionary income.  A protracted economic slowdown, such as the recent global economic crisis, could weaken consumer confidence and lead to decreased discretionary spending.  Any reduction in sales at our or our franchise owners' restaurants will result in lower food distribution revenues and lower royalty payments from franchise owners to us and could have a material adverse effect on our profitability.  In addition, reduced access to financing by us or our franchise owners on reasonable terms as a result of tightened credit markets could have a material adverse effect on our future operations by limiting our or our franchise owners' ability to open new restaurants or causing additional restaurant closures.  Any disruption in the global economic environment or financial markets, or continued high unemployment levels, could have a material adverse effect on our business, financial position or results of operations.

***Our franchise owners could take actions that could harm our business, financial position or results of operations.***

Our franchise owners are contractually obligated to operate their restaurants in accordance with product quality standards and other requirements set forth in our franchise agreements with them.  However, franchise owners are independent third parties that we do not control, and the franchise owners own, operate and oversee the daily operations of their restaurants.  As a result, the ultimate success and quality of any franchise restaurant rests with the franchise owner.  If our franchise owners do not successfully operate restaurants in a manner consistent with our required standards, our brand's image and reputation could be harmed and franchise fees, royalty income and food distribution revenue paid to us could decrease, which in turn could have a material adverse effect on our business, financial position or results of operations. Any disputes with franchise owners could also damage our brand reputation and/or our relationships with the broader franchise owner group.

***Our success depends substantially on the value of our brand and our reputation for product quality.***

Our success is largely dependent upon brand recognition and our reputation for uncompromising quality and taste. Any incident that damages consumer trust in, or affinity for, our brand could significantly reduce its value. Our brand value can be severely damaged even by isolated incidents, particularly if the incidents receive considerable negative publicity or result in litigation.  Some of these incidents may relate to restaurant or product quality, our relationship with our franchise owners, our growth strategies or our development efforts in domestic and international markets.  Other incidents may arise from events that are or may be beyond our control, such as actions taken (or not taken) by franchise owners or employees relating to health, safety, welfare or otherwise; litigation and claims against us or our franchise owners; security breaches or other fraudulent activities associated with our information technology systems; illegal activity targeted at us or others; or widespread negative publicity relating to food-borne illness, food safety, obesity or other health concerns, whether or not directly related to us or our products.  Instances or reports, whether accurate or not, of unclean water supply, food-borne illnesses and food tampering have in the past severely injured the reputations of companies in the food processing, grocery and QSR segments, and any report linking us to such instances or reports could damage our brand value and severely curtail sales of our food products, or potentially lead to product liability claims. Consumer demand for our products, our competitive position and our brand value could diminish significantly if any of these incidents or other matters create an unfavorable public view of us or our products, which would likely result in lower sales, lower royalty and other income, and could have a material adverse effect on our business, financial position or results of operations.

***Changes in consumer preferences and perceptions may decrease the demand for our products, which could reduce sales at our or our franchise owners' restaurants and our revenues.***

The restaurant industry as a whole rests on consumer preferences and perceptions.  If changes in nutritional practices or prevailing consumer tastes or behavior, such as health or dietary preferences or technological advances,

cause consumers to select alternative food options, our and our franchise owners' sales would suffer. For example, in the United States and certain other countries, there is increasing consumer awareness of health risks associated with sedentary lifestyles and high calorie diets, as well as increased consumer and regulatory scrutiny with respect to nutrition and advertising practices that target children or may encourage unhealthy behavior and eating.  Any unfavorable report on the health effects of ingredients present in our products, or negative publicity or litigation arising from other health risks such as obesity, could significantly reduce the demand for our food products. Moreover, because our menu is limited primarily to sandwiches and certain salad selections, if consumer demand for sandwiches and salad offerings should decrease, our business would suffer more than if we had a more diversified menu. In addition, new or enhanced technologies and consumer offerings, such as advances or improvements in vending machine and "ready-to-eat" technology and offerings, may be available in the future.  We may not be able to adequately adapt our menu offerings or delivery options to keep pace with developments in consumer preferences, tastes and eating habits, which may result in a reduction in sales of our food products and lower royalty payments and food distribution sales to us. As a result, our business, financial position or results of operations could be harmed.

### *Our future operating plans contemplate a re-launch of the brand in 2012.*

The Company currently plans on a brand re-launch in 2012, which would include among other activities, a new marketing message, additional marketing in the U.S. and Canada, new menu offerings, additional field support staff, and a store repair program.  The intent of this program is to increase the quality of our products and customer experience as well as to attract additional customers into our restaurants, ultimately leading to higher franchise owner AUVs as well as royalties and food distribution revenue for the Company.  Our re-launch plan, which is subject to final Board of Managers' approval, includes recommendations for additional expenditures to support our re-launch activities, a significant portion of which would be allocated for additional marketing efforts.  There can be no assurance that our re-launch strategy will be effective, however, which may have a material adverse effect on the AUVs of our franchise owners, our royalty and food distribution revenue, and our liquidity.

### *Current restaurant locations may become unattractive, and attractive new locations may not be available at reasonable prices, or at all.*

The success of any restaurant depends in substantial part on its location.  There can be no assurance that our and our franchise owners' current locations will continue to be attractive as demographic patterns change. Neighborhood or economic conditions where our and our franchise owners are located could decline in the future, thus resulting in potentially reduced sales in those locations.  In addition, rising real estate prices in some areas may restrict our ability and the ability of our franchise owners to purchase or lease new desirable locations.  We face significant competition from other restaurant companies and retailers for desirable locations.  Failure to obtain desirable locations at reasonable prices could have a material adverse effect on our ability to execute our business strategy.

### *We must identify and obtain a sufficient number of suitable new restaurant sites for us to achieve a sustainable revenue growth rate.*

We require that all proposed restaurant sites, whether Company-owned or franchised, meet site-selection criteria established by us. We and our franchise owners may not be able to find sufficient new restaurant sites to support our planned expansion in future periods. We face significant competition from other restaurant companies and retailers for sites that meet our criteria and the supply of sites may be limited in some markets. As a result of these factors, our costs to obtain and lease sites may increase, or we may not be able to obtain certain sites due to unacceptable costs. Our inability to obtain suitable restaurant sites at reasonable costs may reduce our growth rate, which may affect the expectations of securities analysts and others and thus our stock price.

### *Outbreaks of disease, terrorist attacks or threats, adverse weather conditions or natural disasters could result in reduced traffic in our or our franchise owners' restaurants and have a material adverse effect on our business.*

Our business, financial position or results of operations could be severely impacted by a widespread regional, national or global health epidemic. A widespread health epidemic, such as influenza or severe acute respiratory

syndrome (also known as SARS), or any negative publicity relating thereto, may cause customers to avoid public restaurants or otherwise change their eating behaviors, which could reduce traffic to our or our franchise owners' restaurants. Even the prospects of a health epidemic could change consumer perceptions of food safety and significantly reduce the demand for our food products.  Since 2004, Asian and European countries have experienced outbreaks of avian flu, or "bird flu." Additional instances of avian flu or other food-borne illnesses, such as "mad cow disease," E.coli, salmonella, or hepatitis A could adversely affect the price and availability of beef, poultry or other food products. As a result, we could experience a significant increase in cost of food.

In addition, like other restaurant chains, consumer preferences could be affected by health concerns about the consumption of poultry, beef, or produce, the key ingredients in many of our menu items, or by negative publicity concerning food quality, illness and injury generally, such as negative publicity concerning, E.coli, salmonella, "mad cow disease" or "bird flu", publication of government or industry findings about food products we serve or other health concerns or operating issues stemming from the food served in our restaurants. Our operational controls and training may not be fully effective in preventing all food-borne illnesses. Some food-borne illness incidents could be caused by food suppliers and transporters and would be outside of our control. If our food suppliers and transporters do not comply with governmental health regulations, they may not be able to deliver food products or we may be subject to food product recalls. Any negative publicity, health concerns or specific outbreaks of food-borne illnesses attributed to one or more of our restaurants, or the perception of an outbreak, could result in a decrease in customer traffic to our restaurants and could have a material adverse effect on our sales, results of operations, business, financial condition and stock price.

In addition, terrorist attacks or threats or natural disasters, such as earthquakes, tsunamis, floods or hurricanes, could damage our or our franchise owners' restaurants, reduce customer traffic, disrupt our supply chain or impact our or our franchise owners' ability to supply certain menu items or staff our or our franchise owners' restaurants. Although we maintain, and our franchise owners are required to maintain, property and business interruption insurance, such coverage may not be sufficient if there is a major disaster or may not continue to be available at reasonable rates or at all.

***Seasonality of our business could result in fluctuations in our financial performance from quarter to quarter within a fiscal year.***

Our business is subject to seasonal fluctuations. Harsh weather conditions can shut-down an entire metropolitan area, resulting in a reduction of sales.  Our systemwide sales are typically higher during the second and third quarters of the fiscal year.  Consequently, results of operations for any single quarter are not necessarily indicative of the results that may be achieved for a full fiscal year.

***Increases in the cost of or interruptions in the supply of food, beverage and other products and services to our or our franchise owners' restaurants could have a material adverse effect on our revenues.***

In order to maintain quality-control standards and consistency among our and our franchise owners' restaurants as well as to provide an additional revenue source, in 2000 we formed a wholly owned and operated food distribution company, American Food Distributors LLC ("**AFD**"). AFD purchases branded and non-branded products from manufacturers and resells such products to unaffiliated distributors which, in turn, sell such products to the franchise owners who are obligated to purchase such products from the distributors pursuant to the franchise agreements. While AFD is not the exclusive supplier of food and other supplies used in our or our franchise owners' restaurants, it is the supplier for substantially all of the ingredients and supplies purchased by the franchise system. AFD does not manufacture food or other products.  AFD generally acts as a middleman between suppliers of products and services to the U.S. and Canada and the distributors of products and services to the franchise owners. To the extent that there are unfavorable variations in price between what AFD pays for ingredients and supplies and what it is able to sell them for, our profitability may be seriously impaired. Prices for certain commodities such as wheat, produce, dairy products, beef, chicken and turkey, and other supply costs, including fuel and utilities costs, are also subject to substantial fluctuations.  While we generally enter into pricing agreements of up to one year with our vendors to mitigate the risks related to commodity price fluctuations, such contracts do not fully mitigate commodity price risk, particularly over the longer term. Our profitability may also be materially adversely affected if the distributors of products and services fail to perform, go bankrupt or otherwise fail to make deliveries to the franchise owners. Many other factors that may be beyond our control, such as inclement weather, unanticipated

Ex. 1 p. 48

demand or quality issues or changes in government regulations, could cause shortages or interruptions in the supply of our ingredients and products and could have a material adverse effect on our operating results.  Such shortages or interruptions in the supply of such food items or other products to our or our franchise owners' restaurants could adversely affect the availability, quality and cost of such items.  Any of these occurrences could lower our revenues, increase operating costs, damage our brand reputation or otherwise harm our business, financial position or results of operations.

***Intense competition in the QSR restaurant segment could lower our revenues.***

The QSR segment of the restaurant industry is intensely competitive with respect to food quality, choice and presentation; affordability and value options; quality and speed of service; the number and location of restaurants; attractiveness of facilities; the effectiveness of advertising, marketing and operational programs; and concept and overall customer experience.  We compete directly against other QSR's, casual dining retailers, convenience and grocery stores, wholesale suppliers and other local, regional and national food service operations, many bearing nationally and globally recognized brand names and having significant customer loyalty. Some of our competitors have substantially greater financial and other resources than we do, which may allow them to react to changes in pricing and consumer preferences more quickly and effectively than we can. Many of our competitors spend significantly more on marketing and promotional activities than we do, which may give them a competitive edge through higher levels of brand recognition among consumers. Competitors may also have lower operating costs, lower debt service requirements and more efficient operations. Furthermore, the restaurant industry has few barriers to entry, and therefore new competitors may emerge at any time. In addition, we compete within the restaurant industry and the QSR segment not only for customers but also for qualified franchise owners, management and hourly employees and for retail real estate locations.  We cannot guarantee the retention of any current franchise owners in the future or that we will have the ability to attract, retain, and motivate sufficient numbers of franchise owners of sufficiently high caliber.  If we are unable to successfully compete in our markets, we could experience lower demand for our products, downward pressure on prices, the loss of market share and the inability to attract or retain qualified franchise owners. Any of these factors could reduce food distribution revenues, franchise fees and royalty income.

***Growth of our business is significantly dependent upon continued restaurant development.***

Our growth relies in part upon new restaurant development by us and by existing and new franchise owners. We and our franchise owners face many challenges in opening and operating new restaurants, many of which are not completely controlled by us or our franchise owners, including:

- selection and availability of suitable restaurant locations;

- availability of acceptable lease and financing terms;

- construction and development costs, particularly in highly competitive markets;

- adverse weather conditions or natural disasters;

- the ability to obtain required domestic or foreign governmental approvals and permits and comply with local, zoning, land use and environmental rules and regulations;

- consumer tastes in new geographic regions and acceptance of our products;

- obstacles to hiring and training of qualified operating personnel; and

- successful operation and execution in new and existing markets.

We intend to partially rely upon the re-opening of previously closed locations as part of our restaurant development growth plans.  These locations failed under their previous owners, and there can be no assurance that a new franchise owner will have success owning and operating these same restaurants.  Therefore, the new franchise

38

owner may not be able to meet his or her obligations under the franchise agreement, including making royalty payments or food purchases on a timely basis, or at all.  We may also be unable to attract new franchise owners or retain existing franchise owners due to these and other factors, which could slow the growth of our business or reduce our revenues. Our failure to add new restaurants would have a material adverse effect on our ability to increase our revenues and operating income.

***If our franchise owners cannot develop or finance new restaurants, build them on suitable sites or open them on schedule, our growth and success may be impeded.***

Our growth depends in large part upon our ability to attract qualified franchise owners. If our franchise owners are unable to locate suitable sites for new restaurants, negotiate acceptable lease or purchase terms, obtain the necessary financial or management resources, meet construction schedules or obtain the necessary permits and government approvals, our growth plans may be negatively affected. We cannot assure you that any of the restaurants our franchise owners open will be profitable.

***We are subject to credit risk associated with one of our affiliates that has historically offered financing for restaurant remodel and acquisition activities.***

One of our affiliates offered financing to qualified franchise owners on a limited basis in 2009, 2010 and 2011. These include loans for renovating and remodeling restaurants, as well as loans to assist franchise owners in the acquisition of restaurants. Interest rates on these loans range from 5.25% to 15.00% per annum, with terms and repayment options of up to five years depending on the loan type.  A default or bankruptcy by a franchise owner borrower could have a substantial negative impact on our ability to collect amounts due under such franchise owner's borrowing arrangement.  In 2010 and 2011, our affiliate made $10.1 million of loans to franchise owners and booked loss reserves of $3.7 million against this loan portfolio in order to reduce its carrying value to the estimated net realizable value as of September 30, 2011.  We currently expect that our affiliate will continue to offer limited financing for certain new franchised restaurants in 2012.

***We have 399 SNOs as of September 30, 2011, and there can be no assurance that all of these agreements will be converted into open restaurant locations.***

Each of the 399 sold but not yet open restaurants ("**SNOs**") as of September 30, 2011 has an executed franchise agreement and has paid any required franchise fee.  The failure of our franchise owners to convert these SNOs to open restaurant locations could have a material adverse effect on our ability to increase our revenues and operating income.  Our SNO franchise agreements typically require that the holder open his or her restaurant within a specified time period. While the franchise agreement generally provides that the franchise fee is not refundable, in some instances we have agreed to refund the franchise fees when we terminated a franchise agreement for failure to open within twelve months among other reasons.  Refunds of these franchise fees may have a negative effect on our liquidity, and in addition, we may not be able to recover costs originally incurred to sell these agreements through the point of termination.

***Franchise owner support of our marketing and advertising programs is critical for our success.***

The support of our franchise owners is critical for the success of our marketing programs and any new strategic initiatives we seek to undertake, and the successful execution of these initiatives will depend on our ability to maintain alignment with our franchise owners. While we can mandate certain strategic initiatives through enforcement of our franchise agreements, we need the active support of our franchise owners if the implementation of these initiatives is to be successful.  In addition, franchise owners of Traditional Restaurants (as defined herein) generally pay a marketing and promotion fee equal to 1% of such franchise owner's Gross Sales, as well as a local advertising fee equal to 3% of such franchise owner's Gross Sales, which amount we reserve the right to increase to 4% under certain circumstances. The Company currently intends to increase the local advertising fee to 4% in the first quarter of 2012 to help fund, among other things, a new marketing message and additional marketing in connection with the 2012 brand re-launch.  Although we believe that our current relationships with our franchise owners are generally good, there can be no assurance that our franchise owners will continue to support our marketing programs and strategic initiatives, or our re-launch strategy and resulting increase in the local advertising fee. The failure of our franchise owners to support our marketing programs and strategic initiatives or our re-launch

Ex. 1 p. 50

strategy could have material adverse effect on our ability to implement our business strategy and could have a material adverse effect on our business, results of operations and financial condition.  Moreover, because franchise owners are required to pay a marketing and promotion fee based on weekly Gross Sales, our advertising expenditures are dependent upon sales volumes at systemwide restaurants. If sales decline, there will be a reduced amount available for our marketing and advertising programs.

***We may not be able to adequately protect our intellectual property, which could harm the value of our brand and have a material adverse effect on our business.***

We regard the Quiznos trademarks, service marks, trade dress, trade secrets and similar intellectual property (collectively, the "**Marks**") as material assets that are essential to our success and our competitive position.  The success of our business strategy depends, in part, on our continued ability to use our intellectual property rights to increase brand awareness and further develop our branded products in both existing and new markets. We rely on a combination of protections provided by contracts, as well as copyright, patent, trademark, trade secret, unfair competition and other laws to protect our intellectual property from infringement, misappropriation or dilution.  We have registered certain Marks and have other registration applications pending in the United States and foreign jurisdictions.  However, not all of the Marks that we currently use have been registered in all of the countries in which we do business, and they may never be registered in all of these countries.  Furthermore, the laws of some foreign countries do not protect intellectual property rights to the same extent as U.S. laws.  There can be no assurance that we will be able to detect unauthorized use of our intellectual property or, if such use is detected, to take appropriate steps to protect or enhance our intellectual property rights. There can also be no assurance that the steps we take to protect our intellectual property rights will be adequate. If we are unable to successfully enforce our intellectual property rights, our business, operating results and financial condition may be materially adversely affected.

We sublicense our intellectual property to our franchise owners and other licensees. Although our franchise agreements and licensee agreements require each franchise owner or other licensee to use the intellectual property in accordance with established or approved quality control guidelines, licensees may refer to our brand improperly in writings or conversation, resulting in the dilution of our intellectual property.  If franchise owners or licensees fail to comply with the terms and conditions of our franchise agreements or licensee agreements, the overall goodwill of our brand may be reduced, whether through the failure to meet health and safety standards, engage in quality control or maintain product consistency, or through participation in improper or objectionable business practices. Moreover, unauthorized third parties may use our intellectual property to trade on the goodwill of our brand, resulting in consumer confusion or dilution.  Any reduction of our brand's goodwill, consumer confusion or dilution is likely to impact sales and reduce our revenues.

In addition, we have not conducted a review of issued patents of third parties to determine whether one or more patents have been issued covering the business methods or other activities in which we engage. There can be no assurance that other parties will not assert infringement, invalidity, non-distinctiveness or unenforceability claims with respect to our intellectual property. Any such claims could harm our business or require us to develop or adopt non-infringing intellectual property or acquire a license to the intellectual property that is the subject of the asserted claim.

***We face risks of litigation that could divert our financial and management resources.***

In the ordinary course of business, we are, from time to time, the subject of complaints or litigation from customers alleging illness, injury or other food-quality, health or operational concerns and from suppliers alleging breach of contract.  We may also be subject to employee claims based on, among other things, workplace and employment matters, discrimination, harassment or wrongful termination.  Moreover, litigation against a franchise owner or its affiliates by third parties, whether or not in the ordinary course of business, may include claims against us by virtue of our relationship with the defendant-franchise owner.  In addition to decreasing the ability of a defendant-franchise owner to make royalty payments and diverting our management resources, negative publicity resulting from such allegations could have a material adverse effect on us and our brand, regardless of whether such allegations are valid.  Additionally, in the ordinary course of business, we will be, from time to time, the subject of complaints or litigation from franchise owners, master franchise owners or area directors, usually related to alleged breaches of contract or wrongful termination under the franchise, master franchise, or area marketing agreements,

40

respectively, as well as statutory claims including, but not limited to, claims arising under the antitrust statutes or the Racketeer Influenced and Corrupt Organizations ("**RICO**") statute (18 U.S.C.A. §§ 1961 et seq.). A substantial judgment against us could have a material adverse effect on our business, financial position or results of operations.

***Information technology system failures or breaches of our network security may interrupt our operations, or have a material adverse effect on our reputation, business, financial position or results of operations.***

Computer, network and information technology systems are integral to our business.  These systems are vulnerable to damage, disability or interruption due to power outages, telecommunications, computer and network failures, computer viruses and other disruptive software, internal and external security breaches and catastrophic events.  Such events could have a material adverse effect on our business, including a disruption in operations, a need for a costly repair, upgrade or replacement of systems, or a decrease in, or in the collection of, royalties paid to us by our franchise owners. In addition, confidential personal information regarding our employees, franchise owners, vendors and consumers, including social security numbers and credit card data, is collected and stored in our information technology systems and transmitted in connection with certain of our business transactions. A security breach, theft, loss or unauthorized disclosure of such personal information could result in substantial fines, penalties, litigation and negative publicity, which could also harm our reputation and financial results.

***Changes in laws and regulations and/or failure to comply with existing or future laws and regulations could have a material adverse effect on our business.***

We are subject to state franchise registration requirements, the rules and regulations of the Federal Trade Commission (the "**FTC**"), various state laws regulating the offer and sale of franchises in the United States through the provision of franchise disclosure documents containing certain mandatory disclosures and certain rules and requirements regulating franchising arrangements in foreign countries.  Noncompliance with any of these rules, regulations or requirements may result in a decrease in systemwide sales. Such a decrease would reduce anticipated royalty payments and food distribution income, which in turn may materially affect our ability to pay interest on the aggregate principal outstanding First Lien Indebtedness or aggregate principal outstanding under the New Second Lien Facility.

We and our franchise owners are subject to various existing U.S. federal, state, local and foreign laws affecting the operation of our and our franchise owners' restaurants, including various health, sanitation, fire and safety standards.  We and our franchise owners may in the future become subject to regulation (or further regulation) seeking to tax or regulate high-fat foods or requiring the display of detailed nutrition information or other menu-labeling, compliance with which would be costly and could result in reduced demand for our products. In connection with the continued operation or remodeling of certain restaurants, we and our franchise owners may be required to expend significant funds to meet applicable regulations.  Difficulties in obtaining, or the failure to obtain, required licenses or approvals could delay or prevent the opening of a new restaurant in a particular area or cause an existing restaurant to cease operations.  All of these situations would decrease Gross Sales of an affected restaurant and, if applicable, reduce royalty payments and food distribution income to us with respect to such restaurant.

We and our franchise owners are also subject to the Fair Labor Standards Act of 1938, as amended (the "**FLSA**"), the Americans with Disabilities Act of 1990, as amended (the "**ADA**"), and various other laws in the United States and in foreign countries governing such matters as minimum-wage requirements, overtime and other working conditions, accessibility and citizenship requirements.  A significant number of our and our franchise owners' food-service employees are paid at rates related to the U.S. federal minimum wage, and any increases in the U.S. federal minimum wage would increase labor costs. The passage of health care reform legislation, the costs and effects of which cannot be determined with any certainty could also have a material adverse effect on us and our franchise owners. Any increases in labor costs could result in inadequately staffed restaurants, which in turn could reduce Gross Sales at such restaurants, decrease royalty and food distribution payments and harm our brand.

Our and our franchise owners' operations and properties are also subject to extensive federal, state and local laws and regulations relating to climate change and environmental, building and zoning requirements.  Our development of properties for leasing or subleasing to franchise owners depends to a significant extent on the selection and acquisition of suitable sites, which are subject to zoning, land use, environmental, traffic and other regulations and requirements.  Failure to comply with applicable legal requirements could result in, among other

41

**Ex. 1 p. 52**

things, revocation of required licenses, administrative enforcement actions, fines and civil and criminal liability.  We and/or our franchise owners may incur investigation, remediation or other costs related to releases of hazardous materials or other environmental conditions at our or our franchise owners' properties, regardless of whether such environmental conditions were created by us, our franchise owners or a third party, such as a prior owner or tenant. If such issues become more expensive to address, or if new issues arise, they could increase our or our franchise owners' expenses, generate negative publicity, or otherwise adversely affect us.

***Changes in tax laws and unanticipated tax liabilities could have a material adverse affect on our financial results.***

We are subject to income taxes and withholding taxes primarily in Canada and also in numerous other foreign jurisdictions. Our effective income tax rate in the future could be adversely affected by a number of factors, including changes in the mix of earnings in jurisdictions with different statutory income tax and withholding tax rates; changes in the valuation of deferred tax assets and liabilities; the ability to utilize net operating losses; repatriation of non-U.S. earnings; changes in tax laws and tax rates; and the outcome of income tax audits in various jurisdictions.

Although we believe our tax estimates to be reasonable, if any tax authority disagrees with the positions we have taken on our tax returns, we could have additional tax liability or tax distributions, including interest and penalties. If material, payment of such additional amounts upon resolution of any disputes could have a material adverse effect on our income tax provision, net income or cash flows in the period or periods for which that determination is made.

***The loss of key senior management personnel or our inability to attract and retain new qualified key personnel could hurt our business and inhibit our ability to operate and grow successfully.***

The success of our business will continue to depend to a significant extent on the continued services of our executive management team and other key personnel who have extensive experience in the franchising and food industries.  If we lose the services of any of these key personnel and fail to manage a smooth transition to, or fail to attract, new personnel, our business could suffer, which would likely decrease our profitability and jeopardize our ability to meet our financial targets.

***Our franchise and master franchise owners' international operations subject us to additional risks and may have a material adverse effect on our profitability.***

As of September 30, 2011, we had 3,113 restaurants located in the U.S., Canada, Puerto Rico and 26 other foreign countries, all of which are operated by franchise owners or master franchise owners.  The international operations of our franchise and master franchise owners may subject us to additional risks, which differ in each country in which our franchise and master franchise owners operate. Some of the factors impacting the international markets in which our or our franchise and master franchise owners' restaurants are located may include:

- differing cultures and consumer preferences;

- recessionary or expansive trends in international markets;

- changes in foreign currency exchange rates and hyperinflation or deflation in the foreign countries in which our franchise and master franchise owners operate;

- the imposition of restrictions on currency conversion or the transfer of funds;

- increases in the taxes paid and other changes in applicable tax laws;

- legal and regulatory requirements and changes, uncertainty regarding the interpretation of laws and regulations, unenforceability of contract and intellectual property rights, and the burdens and costs of

Ex. 1 p. 53

compliance with a variety of legal regimes and laws, including trade restrictions, economic sanctions, tariffs and anti-bribery provisions;

- the inability to procure adequate supplies that meet our quality standards and product specifications, or interruptions in the supply of products; and

- political and economic instability, corruption and anti-American sentiment.

Any or all of these factors may reduce food distribution revenues, royalty payments and/or franchise fees, which could have a material adverse effect on our business, financial condition or results of operations.

**Our business is subject to fluctuations in foreign currency exchange and interest rates.**

We are subject to inherent risks attributed to operating in a global economy.  Most of our revenues, costs and debts are denominated in U.S. dollars.  However, our franchise and master franchise owners operating outside the United States may generate revenues and incur operating expenses denominated in local currencies, which could become less valuable prior to calculation of our royalty payments in U.S. dollars as a result of exchange rate fluctuations.  Our franchise and master franchise owners may also pay royalties to us in currencies other than the local currency in which they operate. Unfavorable currency fluctuations could result in a reduction in our revenues.

Fluctuations in interest rates may also have a material adverse effect on our business. We historically attempted to minimize this risk and lower our overall borrowing costs through the utilization of derivative financial instruments, primarily interest rate swaps. These swaps were entered into with financial institutions and have reset dates and critical terms that match those of our forecasted interest payments.  As a result of entering into these hedging contracts, we may be subject to counterparty nonperformance risk. Should there be a counterparty default, we could be exposed to the net losses on the hedged arrangements or be unable to recover anticipated net gains from the transactions.  In addition, we may not continue to enter into these swaps going forward, and therefore may incur higher interest costs for portions of our debt which are not hedged.

**We are subject to a variety of additional risks associated with our franchise owners.**

*Bankruptcy of Franchise Owners.*  A franchise owner bankruptcy (and attendant application of an automatic stay pursuant to Section 365 under Chapter 11 of the Bankruptcy Code or similar foreign laws and the likely delays and uncertainties related to the assumption or rejection of executory contracts and leases in bankruptcy) could have a substantial negative impact on our ability to collect payments due under such franchise owner's franchise arrangements and, to the extent such franchise owner is a borrower from us pursuant to a financing arrangement, loan payments due under such franchise owner loan.  The franchise owner may also be a sub-lessee pursuant to a lease that we have entered into with a landlord, and as such, we may be liable for the amount we have guaranteed to the landlord in the event of the bankruptcy of a franchise owner.  In a franchise owner bankruptcy, the bankruptcy trustee may reject the relevant franchise arrangements pursuant to Section 362 of the Bankruptcy Code, in which case there would be no further royalty payments, loan payments and/or franchise owner lease payments from such franchise owner, and there can be no assurance as to the proceeds, if any, that we may ultimately recover in connection with a damage claim resulting from such rejection.

*Franchise Owners Are Not Limited Purpose Entities.* Franchise owners may be natural persons or legal entities. Franchise owner entities generally are not "limited purpose entities," and therefore are subject to business, credit, financial and other risks that may be unrelated to the operations of our and our franchise owners' restaurants.  Our franchise owners are independent operators and, therefore, we have limited influence over their ability to invest in other businesses or incur excessive indebtedness. Some of our franchise owners have invested in other businesses, including other restaurant concepts. In some cases, these franchise owners have used the cash generated by their Quiznos restaurants to expand their non Quiznos businesses or to subsidize losses incurred by such businesses. Additionally, as independent operators, franchise owners do not require our consent to incur indebtedness. Consequently, our franchise owners have in the past, and may in the future, experience financial distress as a result of over-leveraging. To the extent that our franchise owners use the cash from their Quiznos restaurants to subsidize their other businesses or experience financial distress, due to over-leverage or otherwise, it could negatively affect

**Ex. 1 p. 54**

(1) our operating results as a result of delayed or reduced payments of royalties, advertising fund contributions and rents for properties we sub-lease to them, (2) our future revenue, earnings and cash flow growth, and (3) our financial condition. In addition, lenders to our franchise owners which were adversely affected by franchise owners who defaulted on their indebtedness may be less likely to provide current or prospective franchise owners necessary financing on favorable terms or at all.

*"Changes in Control" and Natural Person Franchises*.  Our franchise agreements prohibit "changes in control" or transfers of a franchise owner or franchise agreement without our consent. In the event of the death or disability of a franchise owner (if a natural person) or a principal of a franchise owner entity, the executors and representatives of the franchise owner or franchise owner principal, as the case may be, are permitted to transfer the relevant franchise agreement to a successor franchise owner approved by us.  There is, however, no assurance that any such successor would be found or, if found, would be able to perform the former franchise owner's obligations under the franchise agreement or successfully operate the restaurant.  In the event that an acceptable successor franchise owner is not located, the franchise owner would be in default under its franchise agreement and, among other things, the franchise owner's right to operate its restaurant could be terminated.  If a successor franchise owner is not found, or if the successor franchise owner that is found is not successful in operating the restaurant, the Gross Sales of the restaurant, and therefore our royalties and food distribution revenue, could be adversely affected.

*Franchise Owner Insurance*.  Our franchise agreements require each franchise owner to maintain certain insurance types and levels.  Commercial general liability, property, automobile liability and workers compensation (as required by state law) and employer's liability insurance are required on all restaurants, and franchise owners generally are required to maintain insurance coverage that includes bodily injury and property damage (including business interruption/loss of income coverage) in an amount not less than $1 million per occurrence and $2 million general aggregate.  We also require franchise owners to maintain minimum levels of insurance coverage to protect against the risk of product liability and demand strict franchise owner compliance with health and safety regulations. There can be no assurance that the insurance required to be held by franchise owners will be adequate to cover the associated risks, or that, as a restaurant and its associated potential liabilities grows, a franchise owner will be able to secure an increase in its insurance coverage.  In addition, certain extraordinary hazards may not be covered, and insurance may not be available (or may be available only at prohibitively expensive rates) with respect to many other risks.  Moreover, any loss incurred could exceed policy limits and policy payments made to franchise owners may not be made on a timely basis.  Any such loss or delay in payment could have a material adverse effect on a franchise owner's ability to satisfy its obligations under its franchise agreement, including its ability to make royalty payments.

*Franchise Owner Litigation*. Franchise owners are subject to a variety of litigation risks, including, but not limited to, customer claims, personal-injury claims, environmental claims, employee allegations of improper termination and discrimination, claims related to violations of the ADA, the FLSA or the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and intellectual property claims.  Each of these claims may increase costs and limit the funds available to make royalty payments and reduce the execution of new franchise agreements.

*Site Location*.  Generally, an important part of the value of a restaurant is the franchise owner's ability to operate the business at a specified location. In this regard, our franchise agreements are "site" or "location" specific and permit the franchise owner to operate only at a location approved by us. There can be no assurance that a franchise owner will be able to open a restaurant on the intended site or that any such site or location will maximize a franchise owner's success in operating a restaurant. Changes related to a restaurant's location, such as changes in traffic patterns, changes in visibility, deterioration of the surrounding neighborhood or the inability to renew a lease on acceptable terms or at all, could have a material adverse effect on the success of a restaurant, including a decrease in revenues. In such event, the franchise owner may not be able to relocate the restaurant due to lack of funding or an inability to obtain necessary consents or approvals, including our consent. If a franchise owner is unable to relocate its restaurant under these circumstances, the franchise owner may not be able to meet its obligations under its franchise agreement, including making royalty payments on a timely basis or at all.

*Franchise Agreement Termination; Nonrenewal*.  Each franchise agreement is subject to termination by us as the franchisor in the event of a default, generally after expiration of applicable cure periods, although under certain circumstances a franchise agreement may be terminated by us upon notice without an opportunity to cure.  The

default provisions under the franchise agreements are drafted broadly and include, among other things, any failure to meet operating standards and actions that may threaten sublicensed intellectual property.

In addition, certain of the franchise agreements have remaining terms that expire earlier than the maturity date of the Amended First Lien Facility and the New Second Lien Facility.  In such cases, the franchise owners may renew the franchise agreements and receive "successor" franchise agreements for an additional term.  This option, however, is contingent on the franchise owner's execution of the then-current form of franchise agreements (which may include increased royalty payments, advertising fees and other costs), the satisfaction of certain conditions (including modernization of the restaurant and related operations) and the payment of a renewal fee.  If a franchise owner is unable or unwilling to satisfy any of the foregoing conditions, the expiring franchise agreements and the related royalty payments and food distribution revenue will terminate upon expiration of the term of the franchise agreements.

In addition, although franchise owners are prohibited from terminating our franchise agreements due to our financial conditions, and are prohibited from moving to our competitors, any damage to our reputation or the strength of our brand could result in our franchise owners breaching these provisions of our franchise agreements.

*Potential Conflicts with Franchise Owners.*  Although we believe our relationship with our franchise owners is open and strong, the nature of the franchisor-franchise owner relationship can give rise to conflict.  In the United States, our approach is collaborative in that we have established franchise owner advisory councils for our brand.  The councils are comprised of franchise owners who interact with brand employees and executives, and they meet to discuss the strengths, weaknesses, challenges and opportunities facing the brand as well as the rollout of new products, projects and marketing and promotion plans.  Internationally, where our operations are primarily conducted through agreements with master franchise owners, our relationships, other than ordinary course liquidations which are conducted directly with individual franchise owners, are conducted directly with these master franchise owners rather than separate advisory committees.

**Lack of continued financial support for the Marketing Fund Trusts could have a material adverse effect on our advertising and growth in the United States.**

Our growth in the United States depends in large part on national and regional advertising. Each restaurant is obligated to pay 1% of its Gross Sales to the Quiznos National Marketing Fund Trust and 3% of its Gross Sales to the Quiznos Regional Marketing Fund Trust (collectively referred to as the "**Marketing Fund Trusts**"). Although we have voluntarily made significant contributions, loaned money or guaranteed loans to the Marketing Fund Trusts from time to time in the past, we are not legally obligated to make contributions or loan money to either of the Marketing Fund Trusts. A lack of continued financial support for the Marketing Fund Trusts could significantly curtail the advertising budgets of the Marketing Fund Trusts, which may result in diminished growth in the United States and/or lower sales at our or our franchise owners' restaurants.

**The interests of controlling members may conflict with yours.**

Following the Restructuring Transactions, Avenue will control us.  As a result, Avenue will have control over decisions to enter into any corporate transaction and have the ability to prevent any transaction that requires the approval of our shareholders regardless of whether minority shareholders and lenders believe that any such transactions are in their own best interests.  For example, subject to certain limitations as set forth in the Amended First Lien Facility and the New Second Lien Facility, Avenue could cause us to make acquisitions that increase the amount of our indebtedness or to sell assets. So long as Avenue continues to directly or indirectly own a significant amount of our equity, even if such amount is less than 50%, and for so long as Avenue has the right to appoint a majority of Holdings' Board of Managers, as provided for in the Holdings Operating Agreement, Avenue will continue to be able to strongly influence or effectively control decisions we make.

**Risks Related to our Indebtedness**

***We have substantial indebtedness, which could adversely affect our ability to meet our obligations under the Amended First Lien Facility and the New Second Lien Facility and may otherwise restrict our activities.***

As of September 30, 2011, we would have had, on a pro forma basis after giving effect to the Restructuring Transactions, including the First Lien Repayment, the First Lien Amendment, the Exchange Offers and the partial repayment and amendment contemplated under the Vectra Commitment Letter (as defined herein) payment under the Amended Vectra Facility (as defined herein), $608.5 and $591.9 million under the Exchange Offers and Plan of Reorganization, respectively, of principal amount of outstanding indebtedness.  Our inability to generate sufficient cash flow to satisfy our debt obligations, or to refinance our obligations on commercially reasonable terms, would have a material adverse effect on our business, financial condition or results of operations.

Our substantial indebtedness could have important consequences, including:

- making it more difficult for us to satisfy our obligations under our indebtedness, including the Amended First Lien Facility and the New Second Lien Facility;

- limiting our ability to borrow money for our working capital, capital expenditures, debt service requirements or other corporate purposes;

- requiring us to dedicate a substantial portion of our cash flow to payments on our indebtedness, which would reduce the amount of cash flow available to fund working capital, capital expenditures, product development and other corporate requirements;

- increasing our vulnerability to general adverse economic and industry conditions;

- limiting our ability to respond to business opportunities; and

- subjecting us to financial and other restrictive covenants, which, if we fail to comply with these covenants and our failure is not waived or cured, could result in an event of default under our indebtedness.

***Despite our substantial indebtedness, we and our subsidiaries will still be able to incur significant additional amounts of debt, which could further exacerbate the risks associated with our substantial indebtedness.***

Our Amended First Lien Facility and our New Second Lien Facility each will contain restrictions on the incurrence of additional indebtedness.  See "The First Lien Amendment" and "The New Second Lien Facility." However, these restrictions are subject to a number of significant qualifications and exceptions, and, under certain circumstances, the amount of indebtedness that could be incurred in compliance with these restrictions could be substantial.  Accordingly, we and our subsidiaries may be able to incur substantial additional indebtedness in the future.  If new debt is added to our and our subsidiaries' existing debt levels, the related risks that we now face would increase.  In addition, the Amended First Lien Facility and the New Second Lien Facility will not prevent us from incurring obligations that do not constitute indebtedness under those agreements.

***We may not be able to generate sufficient cash to service all of our indebtedness, including the Amended First Lien Facility and the New Second Lien Facility, and may be forced to take other actions to satisfy our obligations under our indebtedness, which may not be successful.***

Our ability to make scheduled payments on or to refinance our debt obligations depends on our financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control.  We may not be able to maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our indebtedness, including the Amended First Lien Facility and the New Second Lien Facility.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay investments and capital expenditures, or to sell assets, seek additional capital or restructure or refinance our indebtedness, including the Amended First Lien Facility and the New Second Lien Facility.  Our ability to restructure or refinance our debt will depend on the condition of the capital markets and our financial condition at such time.  Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, which could further restrict our business operations.  The terms of the Amended First Lien Facility and the New Second Lien Facility or any future debt instruments that we may enter into may restrict us from adopting some of these alternatives.  These alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations.

***Repayment of our debt is dependent on cash flow generated by our subsidiaries.***

Our subsidiaries own a significant portion of our assets and conduct a significant portion of our operations.  Accordingly, repayment of our indebtedness, including the Amended First Lien Facility and the New Second Lien Facility, is dependent, to a significant extent, on the generation of cash flow by our subsidiaries and their ability to make such cash available to us, by distribution, debt repayment or otherwise.  Unless they are guarantors of the indebtedness, our subsidiaries do not have any obligation to pay amounts due under the Amended First Lien Facility or the New Second Lien Facility or to make funds available for that purpose.  Our subsidiaries may not be able to, or may not be permitted to, make distributions to enable us to make payments in respect of our indebtedness.  Each subsidiary is a distinct legal entity and, under certain circumstances, legal and contractual restrictions may limit our ability to obtain cash from our subsidiaries.  While the Amended First Lien Facility and the New Second Lien Facility will limit the ability of our subsidiaries to incur consensual restrictions on their ability to pay dividends or make other intercompany payments to us, these limitations will be subject to certain qualifications and exceptions.  In the event that we do not receive distributions from our subsidiaries, we may be unable to make required principal and interest payments on our indebtedness.

***The terms of the Amended First Lien Facility and the New Second Lien Facility may restrict our current and future operations, particularly our ability to respond to changes in our business or to take certain actions.***

The credit agreement governing the Amended First Lien Facility and the credit agreement governing the New Second Lien Facility will, and any future indebtedness of ours would likely, contain a number of restrictive covenants that will impose significant operating and financial restrictions on us, including restrictions on our ability to, among other things:

- incur or guarantee additional debt or issue certain preferred equity;

- pay dividends on or make distributions in respect of capital stock or shares or make other restricted payments;

- create or incur liens on certain assets to secure debt;

- make certain investments;

- sell or otherwise dispose of certain assets;

- enter into certain transactions with affiliates;

- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets; and

- designate subsidiaries as unrestricted subsidiaries.

In addition, commencing with the fiscal quarter ended June 30, 2013, the Amended First Lien Facility will require us to maintain a maximum first lien secured debt leverage ratio.  As a result of this covenant, we will be limited in the manner in which we conduct our business, and we may be unable to engage in favorable business activities or finance future operations or capital needs.

A failure to comply with the covenants contained in the Amended First Lien Facility or the New Second Lien Facility could result in an event of default under the Amended First Lien Facility or the New Second Lien Facility, which, if not cured or waived, could have a material adverse effect on our business, financial condition or results of operations.  In the event of any default under the Amended First Lien Facility, the lenders thereunder:

- will not be required to lend any additional amounts to us;

- could elect to declare all borrowings outstanding, together with accrued and unpaid interest and fees, to be due and payable;

- may have the ability to require us to apply all of our available cash to repay these borrowings; or

- may prevent us from making debt service payments under the New Second Lien Facility.

If the indebtedness under the Amended First Lien Facility or the New Second Lien Facility were to be accelerated, there can be no assurance that our assets would be sufficient to repay such indebtedness in full.  See "The First Lien Amendment" and "The New Second Lien Facility."

## UNAUDITED PRO FORMA FINANCIAL INFORMATION

**Unaudited Pro Forma Condensed Consolidated Balance Sheet – Exchange Offers**

The following table presents the unaudited pro forma condensed consolidated balance sheet as of September 30, 2011 and is based on and assumes the successful consummation of the Exchange Offers described in other sections of this Offering Memorandum and Disclosure Statement.  The following table also assumes that the Company will qualify for and adopt pushdown accounting.  The general principal underlying pushdown accounting is that if substantially all of an entity's common stock is acquired by a party or parties who collaborate in one or a series of transactions, then the most relevant presentation is for the acquirers' basis in the acquired shares to be used to recognize and measure the acquired entity's assets and liabilities in the acquired entity's own financial statements. In this way, that party's basis is "pushed down" to the financial statements of the acquired entity.  Under pushdown accounting, the acquisition method of accounting is employed whereby the acquired business is recorded at the fair value of the consideration paid and the identifiable assets acquired and the liabilities assumed are recognized and measured at their fair values at the date of acquisition.

**The unaudited pro forma consolidated financial data is based on the estimates and assumptions management believes are reasonable, which are preliminary and have been made solely for the purpose of developing such pro forma information. The unaudited pro forma consolidated financial data is presented for illustrative purposes only and is not necessarily indicative of the financial position that would have been achieved had the consummation of  the Exchanges Offers occurred as of the dates indicated, nor is it indicative of our future financial position. Upon completion of the Restructuring Transactions, whether implemented through the Exchange Offers or through the prepackaged Plan of Reorganization, the Restructuring Transactions will be recorded in accordance with GAAP.  The pro forma information presented may be materially different when recorded in accordance with GAAP. The financial data set forth in the following table should be read in conjunction with the historical financial statements and related notes included in this Offering Memorandum and Disclosure Statement as Appendix F and in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Unaudited Pro Forma Condensed Consolidated Balance Sheet—Plan of Reorganization."**

The first column of the following table sets forth the historical balance sheet representing the financial position of QCE LLC, the predecessor, as of September 30, 2011 but prior to the consummation of any Restructuring Transactions.  The second column represents projected adjustments to such consolidated financial position required to reflect consummation of the Restructuring Transactions on September 30, 2011 implemented through the Exchange Offers.  The adjustments in the second column also assume we will adopt pushdown accounting and account for the Restructuring Transactions using the acquisition method of accounting under the guidelines of the Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 805, *Business Combinations.*  If we qualify for and adopt pushdown accounting we will be required to identify assets and liabilities and measure them at their fair values as the effective date of the Restructuring Transactions.  The difference between the fair values of the identifiable assets and liabilities, and the fair value of the purchase consideration represents an asset called goodwill. Such determinations will be based upon the fair values as of that time, which could be materially higher or lower than the values assumed in the following table, and may be based on a different methodology with respect to the determination of the fair values of the assets acquired and liabilities assumed.  The following table does not present goodwill separate from other intangible assets, which would be required under the guidelines of ASC 805.  When applying pushdown accounting using the acquisition method the successor company is considered to be a new entity, separate from the predecessor for accounting and financial reporting purposes.  The third column in the following table represents the pro forma consolidated balance sheet for QCE Finance LLC and its wholly-owned subsidiary QCE LLC as of September 30, 2011 after the adoption of pushdown accounting.

**Ex. 1 p. 60**

QCE LLC AND SUBSIDIARIES (PREDECESSOR)
QCE FINANCE LLC AND SUBSIDIARIES (SUCCESSOR)
Unaudited Pro Forma Condensed Consolidated Balance Sheet – Exchange Offers

|  |  | As of September 30, 2011 |  |  |  |
|---|---|---|---|---|---|
| ($ in thousands) | Predecessor Historical | Pro Forma Adjustments |  |  | Successor |
| **Assets** |  |  |  |  |  |
| Current assets: |  |  |  |  |  |
| Cash and cash equivalents | $ 30,101 | $ 44,453 | (a) | $ | 74,554 |
| Restricted cash | 555 | 946 | (a) |  | 1,501 |
| Accounts and royalties receivable, net | 5,946 | (359) | (b) |  | 5,587 |
| Current portion of notes receivable, net | 1,941 | — |  |  | 1,941 |
| Inventory held at distribution centers | 11,675 | — |  |  | 11,675 |
| Current portion of deferred financing costs, net | 7,652 | (7,592) | (c) |  | 60 |
| Other current assets | 4,179 | — |  |  | 4,179 |
| Total current assets | 62,049 | 37,448 |  |  | 99,497 |
| Notes receivable, net | 1,488 | — |  |  | 1,488 |
| Property and equipment, net | 12,785 | (4,949) | (d) |  | 7,836 |
| Investments in area marketing and master franchise agreements, net | 17,127 | (17,127) | (b) |  | — |
| Deferred financing costs, net | 1,025 | (747) | (c) |  | 278 |
| Deposits and other assets | 2,588 | (844) | (b) |  | 1,744 |
| Purchase price in excess of amounts allocable to identifiable assets | — | 841,876 | (e) |  | 841,876 |
| Total assets | $ 97,062 | $ 855,657 |  | $ | 952,719 |
| **Liabilities and Member's Deficit** |  |  |  |  |  |
| Current Liabilities: |  |  |  |  |  |
| Lines of credit | $ 85,169 | $ (84,169) | (f) | $ | 1,000 |
| Accounts payable | 12,672 | — |  |  | 12,672 |
| Accrued liabilities | 23,527 | (3,282) | (g) |  | 20,245 |
| Deposits | 9,041 | — |  |  | 9,041 |
| Derivative financial instruments | 1,629 | — |  |  | 1,629 |
| Current portion of deferred compensation | 7,732 | (3,451) | (h) |  | 4,281 |
| Current portion of long-term debt | 803,782 | (800,635) | (i) |  | 3,147 |
| Current portion of new long-term debt | — | 3,395 | (j) |  | 3,395 |
| Current portion of capital lease obligations | 3,072 | — |  |  | 3,072 |
| Current portion of deferred initial franchise fees | 1,953 | — |  |  | 1,953 |
| Current portion of deferred vendor rebates | 2,285 | — |  |  | 2,285 |
| Current portion of other liabilities | 1,452 | (290) | (b) |  | 1,162 |
| Total current liabilities | 952,314 | (888,432) |  |  | 63,882 |
| Deferred compensation, less current portion | 14,366 | (6,865) | (h) |  | 7,501 |
| Deferred initial franchise fees, less current portion | 592 | — |  |  | 592 |
| Deferred vendor rebates, less current portion | 10,388 | — |  |  | 10,388 |
| Other liabilities, less current portion | 9,737 | (3,735) | (k) |  | 6,002 |
| Capital lease obligations, less current portion | 13,393 | — |  |  | 13,393 |
| Long-term debt, less current portion | 1,547 | 11,000 | (l) |  | 12,547 |
| New long-term debt, less current portion | — | 588,414 | (j) |  | 588,414 |
| Total liabilities | 1,002,337 | (299,618) |  |  | 702,719 |
| Member's equity: |  |  |  |  |  |
| Total member's deficit | (905,275) | 905,275 | (b) |  | — |
| Common Shares | — | 250,000 | (e) |  | 250,000 |
| Member's equity (deficit) | (905,275) | 1,115,275 |  |  | 250,000 |
| Total liabilities and member's deficit | $ 97,062 | $ 855,657 |  | $ | 952,719 |

Ex. 1 p. 61

Note: Incorporates estimates of push-down accounting adjustments, actual fair value adjustments could vary materially from those used in the projections.

**THE PRO FORMA FINANCIAL INFORMATION SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "UNAUDITED PRO FORMA CONDENSED CONSOLIDATED BALANCE SHEET – EXCHANGE OFFERS".**

(a) Cash adjustments include:
   (i) The proceeds of the $150,000 investment by Avenue, net of:
   (ii) Payments made at close including first lien principal pay down of $75,000, professional fees of $13,396, new equity commitment fee of $10,000, Marketing Funds Trust credit facility principal pay down of $3,929, amended debt consent fee of $2,187, payment of $946 to a restricted cash account to replace pre-restructure letters of credit and payment of $89 for accrued interest related to the pre-restructure First Lien Facility. Certain professional fees will be paid prior to closing, and therefore the professional fees payment of $13,396 only includes amounts assumed paid at the closing of the Restructuring Transactions.
(b) Represents adjustment for "Push Down Accounting".
(c) Represents the write-off of deferred financing costs related to extinguished debt net of deferred financing costs related to new debt.
(d) Represents write-off of leasehold improvements related to vacating portions of the corporate office lease.  We assumed book value for the other property and equipment approximates fair value.
(e) Represents adjustment to reflect purchase price (approximately $250,000) in excess of amounts allocable to identifiable assets and liabilities.  Amounts may be further allocated when determined through additional valuations.
(f) Represents:

| | |
|---|---|
| $ (69,240) | Extinguishment of the First Lien Facility revolver |
| (11,000) | Reclass of a portion of the Marketing Fund Trusts credit facility from current to non current |
| (3,929) | Principal pay down of Marketing Fund Trusts credit facility |
| $ (84,169) | |

(g) Represents:

| | |
|---|---|
| $ (1,671) | Payments for accrued professional fees |
| (1,522) | Settlement of certain pre-restructure liabilities |
| (89) | Payment of accrued interest |
| $ (3,282) | |

(h) Represents settlement of certain pre-restructure deferred compensation liabilities.
(i) Represents extinguishment of pre-restructure debt.
(j) Represents Amended First Lien Facility and New Second Lien Facility issued in exchange for predecessor debt.
(k) Represents write-off of:

| | |
|---|---|
| $ (443) | Adjustment to pre-restructure lease exit costs as a result of push down accounting |
| (2,312) | Adjustment to pre-restructure deferred rent liability as a result of push down accounting |
| (980) | Adjustment to pre-restructure deferred revenue as a result of push down accounting |
| $ (3,735) | |

(l) Represents the reclass of a portion of the Marketing Fund Trusts credit facility from current to non current.
    The U.S. federal income tax consequences of the Restructuring Transactions are complex and somewhat uncertain.  Therefore, the balance sheet above does not reflect pro forma adjustments to present deferred taxes which would be recorded for the differences between the fair value and the tax bases of the assets and liabilities.

THE FOREGOING ESTIMATES AND ASSUMPTIONS ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE COMPANY. ACCORDINGLY, THE COMPANY CANNOT PROVIDE ASSURANCE THAT THE ESTIMATES, ASSUMPTIONS, AND VALUES REFLECTED IN THE VALUATIONS WILL BE REALIZED, AND ACTUAL RESULTS COULD VARY MATERIALLY, IN ACCORDANCE WITH GAAP.

Ex. 1 p. 62

**Unaudited Pro Forma Condensed Consolidated Balance Sheet – Prepackaged Plan of Reorganization**

The following table presents the unaudited pro forma condensed consolidated balance sheet as of September 30, 2011 and is based on and assumes the successful confirmation and consummation of the prepackaged Plan of Reorganization described in other sections of this Offering Memorandum and Disclosure Statement.  An entity should adopt fresh start reporting upon emergence from Chapter 11 reorganization if certain criteria are met under the guidelines of ASC 852, *Reorganizations*.  The following table assumes that the Company will qualify for and adopt fresh start reporting.  Entities that adopt fresh start reporting should assign the reorganization value of the entity to the fair values of the entity's assets and liabilities in conformity with the guidance provided by FASB ASC 805, *Business Combinations*.

**The unaudited pro forma consolidated financial data is based on the estimates and assumptions management believes are reasonable, which are preliminary and have been made solely for the purpose of developing such pro forma information. The unaudited pro forma consolidated financial data is presented for illustrative purposes only and is not necessarily indicative of the financial position that would have been achieved had the prepackaged Plan of Reorganization occurred as of the dates indicated, nor is it indicative of our future financial position. Upon completion of the Restructuring Transactions, whether implemented through the Exchange Offers or through the prepackaged Plan of Reorganization, the Restructuring Transactions will be recorded in accordance with GAAP.  The pro forma information presented may be materially different when recorded in accordance with GAAP. The financial data set forth in the following table should be read in conjunction with the historical financial statements and related notes included in this Offering Memorandum and Disclosure Statement as Appendix F and in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Unaudited Pro Forma Condensed Consolidated Balance Sheet—Exchange Offerings."**

The first column of the following table sets forth the historical balance sheet representing the financial position of QCE LLC, the predecessor, as of September 30, 2011 but prior to the consummation of any Restructuring Transactions.  The second column represents projected adjustments to such consolidated financial position required to reflect confirmation and the consummation of the Restructuring Transactions implemented through the prepackaged Plan of Reorganization.  The adjustments in the second column also assume we will qualify for and adopt fresh start accounting under the guidelines of ASC 852, *Reorganizations,* and that the Restructuring Transactions which the prepackaged Plan of Reorganization contemplates, are confirmed and consummated as of September 30, 2011.  If we qualify for fresh start accounting we will be required to determine the amount by which our reorganization value as of the effective date exceeds, or is less than, the fair value of its assets as of the effective date.  Such determinations will be based upon the fair values as of that time, which could be materially higher or lower than the values assumed in the following table, and may be based on a different methodology with respect to the determination of the reorganization value.  In all events, such valuation, as well as the determination of the fair value of our assets and our actual liabilities, will be made as of the effective date, and the differences between the amounts as assumed in the following table and the actual amounts thereof as of the effective date may be material.  The following table does not present goodwill separate from other intangible assets, which would be required under the guidelines of ASC 805.  When applying fresh start reporting the successor company is considered to be a new entity, separate from the predecessor for accounting and financial reporting purposes.  The third column in the following table represents the pro forma consolidated balance sheet for QCE Finance LLC and its wholly-owned subsidiary QCE LLC as of September 30, 2011 after the adoption of fresh start reporting.

QCE LLC AND SUBSIDIARIES (PREDECESSOR)
QCE FINANCE LLC AND SUBSIDIARIES (SUCCESSOR)
Unaudited Pro Forma Condensed Consolidated Balance Sheet – Plan of Reorganization

| ($ in thousands) | Predecessor Historical | | Pro Forma Emergence Adjustments | | Successor | |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ | 30,101 | $ | 56,640 (a) | $ | 86,741 |
| Restricted cash | | 555 | | 946 (a) | | 1,501 |
| Accounts and royalties receivable, net | | 5,946 | | (359) (b) | | 5,587 |
| Current portion of notes receivable, net | | 1,941 | | — | | 1,941 |
| Inventory held at distribution centers | | 11,675 | | — | | 11,675 |
| Current portion of deferred financing costs, net | | 7,652 | | (7,592) (c) | | 60 |
| Other current assets | | 4,179 | | — | | 4,179 |
| Total current assets | | 62,049 | | 49,635 | | 111,684 |
| | | | | | | |
| Notes receivable, net | | 1,488 | | — | | 1,488 |
| Property and equipment, net | | 12,785 | | (5,669) (d) | | 7,116 |
| Investments in area marketing and master franchise agreements, net | | 17,127 | | (17,127) (b) | | — |
| Deferred financing costs, net | | 1,025 | | (747) (c) | | 278 |
| Deposits and other assets | | 2,588 | | (844) (b) | | 1,744 |
| Reorganization value in excess of amounts allocable to identifiable assets | | — | | 749,839 (e) | | 749,839 |
| Total assets | $ | 97,062 | $ | 775,087 | $ | 872,149 |
| | | | | | | |
| **Liabilities and Member's Deficit** | | | | | | |
| Current Liabilities: | | | | | | |
| Lines of credit | $ | 85,169 | $ | (84,169) (f) | $ | 1,000 |
| Accounts payable | | 12,672 | | — | | 12,672 |
| Accrued liabilities | | 23,527 | | (3,618) (g) | | 19,909 |
| Deposits | | 9,041 | | — | | 9,041 |
| Derivative financial instruments | | 1,629 | | — | | 1,629 |
| Current portion of deferred compensation | | 7,732 | | (5,298) (h) | | 2,434 |
| Current portion of long-term debt | | 803,782 | | (803,782) (i) | | — |
| Current portion of new long-term debt | | — | | 3,337 (j) | | 3,337 |
| Current portion of capital lease obligations | | 3,072 | | — | | 3,072 |
| Current portion of deferred initial franchise fees | | 1,953 | | — | | 1,953 |
| Current portion of deferred vendor rebates | | 2,285 | | — | | 2,285 |
| Current portion of other liabilities | | 1,452 | | (1,222) | | 230 |
| Total current liabilities | | 952,314 | | (894,752) | | 57,562 |
| | | | | | | |
| Deferred compensation, less current portion | | 14,366 | | (11,822) (h) | | 2,544 |
| Deferred initial franchise fees, less current portion | | 592 | | — | | 592 |
| Deferred vendor rebates, less current portion | | 10,388 | | — | | 10,388 |
| Other liabilities, less current portion | | 9,737 | | (9,605) (k) | | 132 |
| Capital lease obligations, less current portion | | 13,393 | | — | | 13,393 |
| Long-term debt, less current portion | | 1,547 | | 9,453 (l) | | 11,000 |
| New long-term debt, less current portion | | — | | 576,538 (j) | | 576,538 |
| Total liabilities | | 1,002,337 | | (330,188) | | 672,149 |
| | | | | | | |
| Member's equity: | | | | | | |
| Total member's deficit | | (905,275) | | 905,275 (b) | | — |
| Common Shares | | — | | 200,000 (e) | | 200,000 |
| Member's equity (deficit) | | (905,275) | | 1,105,275 | | 200,000 |
| Total liabilities and member's deficit | $ | 97,062 | $ | 775,087 | $ | 872,149 |

Ex. 1 p. 64

Note:  Incorporates estimates of fresh start accounting adjustments, actual fair value adjustments could vary materially from those used in the projections.

**THE PRO FORMA FINANCIAL INFORMATION SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS AND EXPLANATIONS UNDER THE CAPTION "UNAUDITED PRO FORMA CONDENSED CONSOLIDATED BALANCE SHEET – PLAN OF REORGANIZATION".**

(a)  Cash adjustments include:
    (i)   The proceeds of the $150,000 investment by Avenue, net of:
    (ii)  Emergence payments including First Lien Facility principal pay down of $65,000, professional fees of $13,396, new equity commitment fee of $10,000, Marketing Funds Trust credit facility principal pay down of $3,929, payment of $946 to a restricted cash account to replace pre-restructure letters of credit and payment of $89 for accrued interest related to the pre-petition First Lien credit Facility.  Certain professional fees will be paid prior to closing, and therefore the professional fees payment of $13,396 only includes amounts assumed paid at the closing of the Restructuring Transactions.

(b)  Represents adjustments for "Fresh Start Accounting".

(c)  Represents the write-off of deferred financing costs related to extinguished debt net of deferred financing costs related to new debt.

(d)  Represents write-off of leasehold improvements related to vacating the corporate office lease.  We assumed book value for the other property and equipment approximates fair value.

(e)  Represents adjustment to reflect the reorganization value in excess of amounts allocable to identifiable assets and liabilities based on the estimated reorganization equity value (approximately $200,000).  Amounts will be further allocated when determined through additional valuations.

(f)  Represents:

| | |
|---|---|
| $  (69,240) | Extinguishment of the First Lien revolver |
| (11,000) | Reclass of a portion of the Marketing Fund Trusts credit facility from current to non current |
| (3,929) | Principal pay down of Marketing Fund Trusts credit facility |
| $  (84,169) | |

(g)  Represents:

| | |
|---|---|
| $   (1,671) | Payments for accrued professional fees |
| (1,858) | Write-off of pre-petition liabilities |
| (89) | Payment of accrued interest |
| $   (3,618) | |

(h)  Represents settlement of certain pre-petition deferred compensation liabilities.

(i)  Represents extinguishment of pre-petition debt.

(j)  Represents Amended First Lien Facility and New Second Lien Facility issued in exchange for predecessor debt.

(k)  Represents write-off of:

| | |
|---|---|
| $   (4,347) | Adjustment to pre-petition lease exit costs |
| (4,278) | Adjustment to pre-petition deferred rent liability as a result of fresh start reporting |
| (980) | Adjustment to pre-petition deferred revenue as a result of fresh start reporting |
| $   (9,605) | |

(l)  Represents:

| | |
|---|---|
| $   (1,547) | Extinguishment of other non current debt |
| 11,000 | Reclass of a portion of Marketing Fund Trusts credit facility from current to non current |
| $   9,453 | |

The U.S. federal income tax consequences of the Restructuring Transactions are complex and somewhat uncertain.  Therefore, the balance sheet above does not reflect pro forma adjustments to present deferred taxes which would be recorded for the differences between the fair value and the tax bases of the assets and liabilities.

THE FOREGOING ESTIMATES AND ASSUMPTIONS ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE REORGANIZED DEBTORS. ACCORDINGLY, THE REORGANIZED DEBTORS CANNOT PROVIDE ASSURANCE THAT THE ESTIMATES, ASSUMPTIONS, AND VALUES REFLECTED IN THE VALUATIONS WILL BE REALIZED, AND ACTUAL RESULTS COULD VARY MATERIALLY, IN ACCORDANCE WITH GAAP.

**USE OF PROCEEDS**

We will not receive any cash proceeds from the Exchange Offers.  In consideration for receiving Common Shares, the Second Lien Lenders will exchange Second Lien Loans by assigning them to Holdings, who will immediately contribute the Second Lien Loans to the Company for cancellation.

# CAPITALIZATION

The first column of the following table sets forth the historical capitalization of QCE LLC, the predecessor, as of September 30, 2011 but prior to the consummation of any Restructuring Transactions.  The second column in the following table represents the pro forma capitalization for QCE Finance LLC and its wholly-owned subsidiary QCE LLC as of September 30, 2011, after the adoption of pushdown accounting. See the discussion of pushdown accounting under "Unaudited Pro Forma Financial Information—Unaudited Pro Forma Condensed Consolidated Balance Sheet – Exchange Offers."  The third column in the following table represents the pro forma capitalization for QCE Finance LLC and its wholly-owned subsidiary QCE LLC as of September 30, 2011, after the adoption of fresh start reporting.  See the discussion of fresh start reporting under "Unaudited Pro Forma Financial Information—Unaudited Pro Forma Condensed Consolidated Balance Sheet – Prepackaged Plan of Reorganization."

The information in this table should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Unaudited Pro Forma Financial Information," and the consolidated financial statements and related notes thereto included elsewhere in this Offering Memorandum and Disclosure Statement.

## QCE LLC AND SUBSIDIARIES (PREDECESSOR)
## QCE FINANCE LLC AND SUBSIDIARIES (SUCCESSOR)
### Unaudited Pro Forma Capitalization

| ($ in millions) | As of September 30, 2011 | | |
| --- | --- | --- | --- |
| | Predecessor Historical | Successor as Adjusted for the Exchange Offers | Successor as Adjusted for the Plan of Reorganization |
| Cash and cash equivalents | $ 30.1 | $ 74.6 | $ 86.7 |
| Restricted cash | 0.6 | 1.5 | 1.5 |
| | $ 30.7 | $ 76.1 | $ 88.2 |
| Debt | | | |
| Marketing funds trust facility | $ 15.9 | $ 12.0 | $ 12.0 |
| Existing senior secured facility: | | | |
| Existing first lien revolving loan | 69.2 | — | — |
| Existing first lien senior secured term loan | 575.6 | — | — |
| Existing second lien senior secured term loan | 225.0 | — | — |
| New senior secured credit facility: | | | |
| Amended first lien senior secured term loan | — | 452.6 | 445.0 |
| New second lien senior secured term loan | — | 139.2 | 134.9 |
| New first lien revolving facility | — | — | — |
| Other debt | 4.7 | 4.7 | — |
| Total debt | 890.4 | 608.5 | 591.9 |
| Total member's equity (deficit) | (905.3) | 250.0 | 200.0 |
| Total Capitalization | $ (14.9) | $ 858.5 | $ 791.9 |

Ex. 1 p. 68

## DILUTION

Holdings may undertake additional offerings of shares and of securities convertible into shares in the future. After consummation of the Recapitalization, Holdings intends to enter into a Management Incentive Plan to provide for grants of equity to management, managers and employees; provided however, that the aggregate of any such grants shall not exceed 10.0% of the aggregate outstanding Common Shares.  The increase in the number of Common Shares issued and outstanding and the possibility of sales of such Common Shares may depress the price of Common Shares.  In addition, as a result of the issuance of such additional shares, the voting power of existing shareholders may be diluted.

### SELECTED HISTORICAL CONSOLIDATED FINANCIAL INFORMATION

The following table sets forth the selected historical consolidated financial and other data of QCE LLC and subsidiaries as of the dates and for the periods indicated.  The selected historical financial data as of December 31, 2010, 2009 and 2008 and for each of the years then ended presented in this table have been derived from the QCE LLC and subsidiaries audited consolidated financial statements included elsewhere in this Offering Memorandum and Disclosure Statement.

The selected historical financial data as of September 30, 2011 and 2010 and for the nine months ended September 30, 2010 and September 30, 2011 have been derived from the QCE LLC and subsidiaries unaudited consolidated financial statements for such periods, which are included elsewhere in this Offering Memorandum and Disclosure Statement and which have been prepared on the same basis as our audited consolidated financial statements. Historical results are not necessarily indicative of the results to be expected for future periods and operating results for the nine months ended September 30, 2011 are not necessarily indicative of the results that may be expected for the fiscal year ending December 31, 2011.

This selected historical consolidated financial and other data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and the related notes thereto included elsewhere in this Offering Memorandum and Disclosure Statement. In addition, see the Consolidated Financial Statements attached hereto as Appendix F.

The data in the following table related to EBITDA, Adjusted EBITDA, U.S. AUVs, systemwide sales, and number of restaurants are unaudited for all periods presented.

| ($ in thousands, except U.S. AUVs and number of restaurants) | Year Ended December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2010 | 2011 |
| **Income Statement Data:** | | | | | |
| Revenue: | | | | | |
| Franchise operations | $ 154,442 | $ 110,135 | $   84,838 | $   65,082 | $   53,269 |
| Food distribution (1) | 522,229 | 423,762 | 359,163 | 279,376 | 209,623 |
| Company-owned stores | 21,473 | 18,064 | 22,339 | 15,892 | 15,061 |
| Total revenue | 698,144 | 551,961 | 466,340 | 360,350 | 277,953 |
| Cost of revenue: | | | | | |
| Franchise operations | 14,121 | 15,689 | 2,668 | 2,008 | 887 |
| Food distribution | 388,073 | 308,928 | 243,248 | 189,025 | 149,340 |
| Company-owned stores | 11,677 | 9,819 | 12,379 | 8,611 | 7,792 |
| Total cost of revenue | 413,871 | 334,436 | 258,295 | 199,644 | 158,019 |
| Gross margin | 284,273 | 217,525 | 208,045 | 160,706 | 119,934 |
| Operating expenses: | | | | | |
| General and administrative expenses | 101,332 | 68,401 | 77,314 | 59,563 | 45,749 |
| Litigation settlement charges | — | 16,758 | (8,782) | 508 | — |
| Advertising expense | 36,089 | 33,039 | 22,752 | 23,016 | 2,822 |
| Deferred and share-based compensation | 5,077 | 751 | 628 | 471 | 44 |
| Depreciation and amortization | 20,048 | 15,048 | 16,436 | 12,470 | 7,952 |
| Other | 10,134 | 9,274 | 17,754 | 10,460 | 6,806 |
| Total operating expenses (2) | 172,680 | 143,271 | 126,102 | 106,488 | 63,373 |
| Operating profit | 111,593 | 74,254 | 81,943 | 54,218 | 56,561 |

**Ex. 1 p. 70**

| | Year Ended December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2010** | **2011** |
| Other expense (income): | | | | | |
| Interest expense | $ 78,677 | $ 64,136 | $ 62,080 | $ 46,832 | $ 44,246 |
| Interest income | (700) | (173) | (377) | (233) | (555) |
| Gain on debt extinguishment | — | — | — | — | (1,246) |
| Other | (769) | 1,766 | 494 | 496 | 369 |
| Total other expense | 77,208 | 65,729 | 62,197 | 47,095 | 42,814 |
| Income from continuing operations before income tax | 34,385 | 8,525 | 19,746 | 7,123 | 13,747 |
| Income tax expense | 1,656 | 3,043 | 1,787 | 1,341 | 411 |
| Income from continuing operations | 32,729 | 5,482 | 17,959 | 5,782 | 13,336 |
| Income (loss) from discontinued operations (3) | 2,437 | (12,004) | (8,425) | (2,292) | (994) |
| Net income (loss) | 35,166 | (6,522) | 9,534 | 3,490 | 12,342 |
| Net income attributable to noncontrolling interests | 278 | 186 | 183 | 152 | 69 |
| Net income (loss) attributable to QCE LLC | $ 34,888 | $ (6,708) | $ 9,351 | $ 3,338 | $ 12,273 |
| **Balance Sheet Data (at period end):** | | | | | |
| Cash and cash equivalents (4) | $ 2,840 | $ 79,318 | $ 27,365 | $ 56,830 | $ 30,656 |
| Total current assets | 47,421 | 106,111 | 62,509 | 82,811 | 62,049 |
| Working capital (5) | (103,115) | (101,551) | (104,501) | (114,575) | (890,265) |
| Revolving lines of credit | 12,064 | 93,981 | 83,720 | 85,503 | 85,169 |
| Total debt (6) | 864,768 | 854,699 | 811,080 | 812,130 | 805,329 |
| Total member's deficit | (971,621) | (963,101) | (918,777) | (925,472) | (905,275) |
| **Cash Flow and Other Data:** | | | | | |
| Adjusted EBITDA (7) | $ 174,168 | $ 142,511 | $ 118,284 | $ 99,839 | $ 77,527 |
| Capital expenditures | (10,267) | (3,552) | (6,766) | (5,360) | (1,923) |
| Net cash from operating activities (8) | 14,009 | 15,605 | 5,372 | 22,706 | 11,815 |
| Net cash from investing activities (8) | (9,747) | (5,652) | (15,006) | (11,882) | (1,160) |
| Net cash from financing activities | (13,924) | 67,807 | (32,869) | (28,845) | (6,068) |
| U.S. AUVs in dollars (9) | 6,713 | 5,917 | 5,804 | 5,866 | 5,736 |
| Systemwide Sales (10) | $1,812,113 | $1,464,402 | $1,174,638 | $ 906,832 | $ 747,227 |
| Number of restaurants | 4,984 | 4,299 | 3,489 | 3,706 | 3,113 |

_____

(1) We account for operational incentive payments to franchise owners as a reduction of food distribution revenue. We paid franchise owners operational incentive payments of $20.6 million, $11.2 million and $1.9 million for the years ended December 31, 2008, 2009 and 2010, respectively, and $0.3 million and $15.8 million for the nine months ended September 30, 2010 and 2011, respectively.

(2) Fiscal years 2008, 2009 and 2010 include asset impairment charges of $5.0 million, $3.5 million and $3.3 million, respectively. The nine-months ended September, 2010 and 2011 include asset impairment charges of $1.7 million and $1.7 million, respectively.

(3) We sold our equipment distribution business in 2009. Net income for 2008 and 2009 includes income and losses from discontinued operations of $2.4 million and $12.0 million, respectively. Net income for 2010 includes $8.4 million of losses from discontinued operations related to the closure of 57 Company-owned restaurants. An additional 30 restaurants were refranchised during 2010 and 2011, which did not qualify for classification as discontinued operations and therefore losses of $3.4 million and $0.9 million, including $2.0 million and $0.2 million of impairment charges are included in continuing operations for the year ended December 31, 2010 and the nine months ended September 30, 2011, respectively.

(4) Cash and cash equivalents includes restricted cash related to franchising requirements in certain U.S. states.

(5) We define working capital as current assets less current liabilities. As is common in the restaurant industry, we maintain relatively low levels of accounts receivable and inventories and vendors grant trade credit for purchases such as food and supplies. As a result, we typically maintain current liabilities in excess of current

assets, which results in a working capital deficit. We were not in compliance with one of our financial ratio covenants as of September 30, 2011.  As a result of this event of non compliance and since waivers from our lenders had not been obtained, substantially all of our debt and debt issue costs are classified as current as of September 30, 2011.

(6)  We have excluded capital leases from total debt. Our capital leases are arrangements under which we lease certain restaurant equipment located in franchise owner restaurants from vendors. These leases are currently satisfied ratably as our franchise owners ultimately purchase the vendors' products. We have no capital leases which require monthly cash payments at this time.

(7)  The following table includes our EBITDA and Adjusted EBITDA. EBITDA and Adjusted EBITDA are not presentations made in accordance with GAAP and the use of the terms EBITDA and Adjusted EBITDA may differ from similar measures reported by other companies. We believe that EBITDA and Adjusted EBITDA provide investors with useful information in respect to our historical operations and cash flow. EBITDA and Adjusted EBITDA are reconciled from net income determined under GAAP in the following table.

| | Year Ended December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | **2008** | **2009** | **2010** | **2010** | **2011** |
| Income from continuing operations | $ 32,729 | $ 5,482 | $ 17,959 | $ 5,782 | $ 13,336 |
| Interest expense | 78,677 | 64,136 | 62,080 | 46,832 | 44,246 |
| Interest income | (700) | (173) | (377) | (233) | (555) |
| Income tax expense | 1,656 | 3,043 | 1,787 | 1,341 | 411 |
| Depreciation and amortization | 20,048 | 15,048 | 16,436 | 12,470 | 7,952 |
| EBITDA | 132,410 | 87,536 | 97,885 | 66,192 | 65,390 |
| Adjustments: | | | | | |
| Asset impairments (a) | 4,983 | 3,972 | 4,546 | 1,945 | 1,790 |
| Impact of dispositions & acquisitions (b) | 1,540 | 3,592 | 2,926 | 2,238 | 735 |
| Reduction in force and transition costs (c) | 25,368 | 9,338 | 15,950 | 12,537 | 3,073 |
| Exit and other restructuring costs (d) | 3,785 | 4,286 | 626 | 518 | 2,575 |
| Sponsor fees & contributions (e) | 869 | 3,104 | 10,905 | 10,653 | 479 |
| Non-cash adjustments (f) | 5,077 | 751 | 628 | 471 | 44 |
| Non-recurring litigation (g) | (3,758) | 19,722 | (7,611) | 1,565 | 1,281 |
| Other (h) | 1,826 | 989 | 1,715 | 1,748 | 2,331 |
| Deconsolidation adjustments (i) | 2,068 | 9,221 | (9,286) | 1,972 | (171) |
| **Adjusted EBITDA** | $ 174,168 | $ 142,511 | $ 118,284 | $ 99,839 | $ 77,527 |

(a)  Represents all non-cash impairment charges related to property and equipment, intangibles and investment in area directorships.

(b)  Represents pro forma impact of disposition of equipment business, refranchising of Company-owned restaurants and reacquisition of area director and master franchise rights.

(c)  Represents trailing twelve and nine month impact and actual costs associated with significant reductions in force and related management transitions.

(d)  Represents trailing twelve and nine month impact and actual costs associated with exit activities, primarily contract termination costs and exit of leased corporate facilities.

(e)  Represents management fees paid to our sponsors and contributions received from our sponsors that are earmarked for advertising activity.

(f)  Represents non-cash adjustments, primarily deferred and share-based compensation.

(g)  Represents costs to defend and settle class-wide litigation, net of insurance recoveries which are not expected to recur in future periods.

(h)  Represents the net impact of other non-recurring and individually insignificant adjustments, including deductions for income allocable to noncontrolling interests and gains on extinguishment of notes payable.

(i)  Represents the net impact of the deconsolidation of the Marketing Fund Trusts and any unrestricted subsidiary excluded from net income on a combined basis.  In accordance with the First Lien Facility, our Adjusted EBITDA calculations are prepared on combined basis and therefore exclude the Marketing Fund Trusts and any unrestricted subsidiary.

(8)  Net cash from operating and investing activities excludes cash flows from discontinued operations.

(9)   AUVs represent the average weekly sales volume per restaurant in dollars. AUVs are calculated by dividing the sum of the week's reported Gross Sales for all open and operating restaurants by the number of open and operating restaurants.

(10) Systemwide sales include restaurant-level sales at both franchised and Company-owned restaurants. Franchise restaurant sales are not included in our consolidated results; however, franchise restaurant sales result in royalties, which are included in our franchise operations revenue and generate food distribution revenue and gross profit.

## PRICE RANGE OF COMMON SHARES AND DIVIDEND POLICY

There has been no established public trading market for Holdings' Common Shares.  As a result, current reliable prices are not available.  We currently expect to retain all our future earnings for use in the operation and expansion of our business and do not anticipate paying any cash distributions for the foreseeable future following the Exchange Offers or the Plan of Reorganization. The declaration and payment of future distributions to holders of Common Shares will be at the discretion of Holdings' Board of Managers and will depend upon many factors, including our financial condition, earnings, legal requirements, restrictions in our debt agreements, including the Amended First Lien Facility, the New Second Lien Facility and other factors deemed relevant by the Board of Managers. See "The First Lien Amendment" and "The New Second Lien Facility" for more information on the restrictions the Amended First Lien Facility and the New Second Lien Facility will impose on our ability to declare and pay cash distributions. As a holding company, Holdings' ability to pay distributions depends on its receipt of cash from its operating subsidiaries, which may further restrict its ability to pay distributions as a result of the laws of their respective jurisdictions of organization, agreements of our subsidiaries or covenants under future indebtedness that we or they may incur. See "Risk Factors—Risks to Holders of Equity—QCE Parent does not presently intend to make cash distributions," and for a discussion of taxation of any distributions, see "Certain U.S. Federal Income Tax Considerations."

## THE EXCHANGE OFFERS

**First Lien Exchange Offer**

On the terms described in this Offering Memorandum and Disclosure Statement, the Company is offering the First Lien Lenders the option to assign or settle all or any portion of their First Lien Indebtedness under the First Lien Facility (subject to the New Second Lien Cap) in exchange for an equal principal amount of New Second Lien Loans under the New Second Lien Facility. The assignment of First Lien Indebtedness in exchange for New Second Lien Loans would result in the Exchanging Lenders holding the New Second Lien Loans. Any First Lien Indebtedness exchanged will be deemed paid in full and cancelled by the Company. At least $150.0 million of the First Lien Indebtedness must be exchanged for New Second Lien Loans, and no more than $200.0 million of First Lien Indebtedness may be exchanged for New Second Lien Loans.

All Exchanging Lenders that exchange First Lien Indebtedness for New Second Lien Loans will also receive their pro rata portion of a 5.0% First Lien Exchange Fee on the amount of First Lien Indebtedness so exchanged, payable in additional New Second Lien Loans. The remaining First Lien Indebtedness that is not exchanged for New Second Lien Loans will remain outstanding under the First Lien Facility as amended and modified under the Amended First Lien Facility on the terms and conditions substantially set forth under the caption entitled "The First Lien Amendment." All Exchanging Lenders that exchange First Lien Indebtedness for New Second Lien Loans will also be deemed to have consented to the First Lien Amendment.

The First Lien Lenders holding either revolving loans under the First Lien Facility (the "**First Lien Revolving Loans**") or both First Lien Revolving Loans and term loans under the First Lien Facility (the "**First Lien Term Loans**") shall be subject to the Special Allocation Terms (as defined herein).

In the event of an oversubscription with respect to the exchange of the First Lien Indebtedness for New Second Lien Loans, First Lien Indebtedness of Exchanging Lenders will be allocated in accordance with the following:

- Each Exchanging Lender will exchange a portion of its First Lien Indebtedness equal to the lesser of (i) the product of (a) the New Second Lien Cap and (b) a fraction, the numerator of which is the aggregate First Lien Indebtedness held by such Exchanging Lender and the denominator of which is the aggregate First Lien Indebtedness outstanding after taking into account the Exchange Offer Repayment and (ii) the amount it elects to exchange.

- Each Exchanging Lender that has elected to exchange more than its Exchange Portion (as defined herein) will convert an additional portion of its First Lien Indebtedness equal to the lesser of (i) the product of (a) the New Second Lien Cap minus the aggregate First Lien Indebtedness exchanged pursuant to the immediately preceding bullet point and (b) a fraction, the numerator of which is the First Lien Indebtedness that such Exchanging Lender elects to be exchanged in excess of its Exchange Portion and the denominator of which is the aggregate First Lien Indebtedness that all Exchanging Lenders elect to be converted in excess of their aggregate Exchange Portion and (ii) the difference between the amount the Exchanging Lender elects to exchange and the amount it exchanges pursuant to the immediately preceding bullet point. The "**Exchange Portion**" for any Exchanging Lender is the product of its total First Lien Indebtedness and a fraction, the numerator of which is the New Second Lien Cap and the denominator of which is the total aggregate amount of First Lien Indebtedness outstanding, after taking into account the Exchange Offer Repayment.

Each of Avenue and Fortress has agreed in the Restructuring Support Agreement described under the caption "The Restructuring Support Agreement," and each has agreed to use commercially reasonable efforts to cause its affiliates to agree, to elect to exchange the First Lien Indebtedness owned by them (after taking into account the First Lien Repayment), in an amount equal to the $150.0 million Minimum Exchange Amount.

"**Special Allocation Terms**" means (a) with respect to any Exchanging Lender holding First Lien Revolving Loans and seeking to participate in the First Lien Exchange Offer, that such Exchanging Lender shall also assign to the Company, for no additional consideration, its participation in the Letters of Credit issued under the First Lien

Facility (its "**L/C Exposure**") in an amount equal to the product of (i) such Exchanging Lender's L/C Exposure immediately after the consummation of the First Lien Repayment and immediately prior to the First Lien Exchange Offer and (ii) the ratio obtained by dividing (x) the principal amount of such Exchanging Lender's First Lien Revolving Loans accepted in the First Lien Exchange Offer and (y) the aggregate principal amount of all of such Exchanging Lender's First Lien Revolving Loans immediately after the consummation of the First Lien Repayment and immediately prior to consummation of the First Lien Exchange Offer; and (b) with respect to any Exchanging Lender holding both First Lien Revolving Loans and First Lien Term Loans and seeking to participate in the First Lien Exchange Offer that (in addition to the requirements of clause (a) above) the aggregate principal amount of all First Lien Revolving Loans and First Lien Term Loans (calculated on the face amount thereof) exchanged for New Second Lien Loans by such Exchanging Lender shall be exchanged ratably between such Exchanging Lender's First Lien Revolving Loans and First Lien Term Loans.

**Second Lien Exchange Offer**

On the terms described in this Offering Memorandum and Disclosure Statement, the Company is offering the Second Lien Lenders the option to assign or settle all of their Second Lien Loans (including accrued interest and fees thereon) under the Second Lien Facility in exchange for 100% of the Common Shares, with such Common Shares of Holdings being simultaneously assigned by the Second Lien Lenders to QCE Parent in exchange for 100% of the Parent Common Shares which, after effecting the Recapitalization will represent 40.0% of the aggregate outstanding Common Shares, before potential dilution from equity to be issued in connection with the Management Incentive Plan.  The Second Lien Loans assigned to Holdings shall then be deemed automatically contributed to the Company and then automatically cancelled.

Each eligible Exchanging Lender will be deemed to have represented and agreed as follows in addition to the representations and agreements contained in the Subscription Agreement between such Second Lien Lenders and the Company in substantially the form attached hereto as Appendix D (the "**Subscription Agreement**"), which representations include the following: (a) it (or its designated holder of the Common Shares) is an "accredited investor" as such term is defined under Regulation D under the Securities Act; (b) it has made its own appraisal and decision with respect to its participation in the Second Lien Exchange Offer, the financial condition creditworthiness and affairs of Holdings and the Company, and the value of the Common Shares; (c) its investment in the Common Shares entails a high degree of risk, that the undersigned or its designee's acquisition of such Common Shares will be a highly speculative investment and, without impairing its financial condition, it is able to hold such Common Shares for an indefinite period of time and to suffer a complete loss of its investment; and (d) the Common Shares to be acquired by such Second Lien Lender or its designee pursuant to the Second Lien Exchange Offer is to be acquired for such person's own account solely for investment, not as agent or nominee, and not with a view to, or for resale in connection with, any distribution of, or with any present intention of distributing or selling in connection with any distribution, all or any portion thereof within the meaning of the Securities Act.

**Important Dates**

The Exchange Offers will expire immediately after 5:00 p.m., prevailing Pacific Time, on January 9, 2012 (the "**Voting Deadline**"), unless extended by us with respect to either or both of the Exchange Offers.  We, with the consent of the Requisite Participating Lenders, may extend the Exchange Offers for any purpose, including in order to permit the satisfaction or waiver, to the extent waivable, of any or all conditions to the Exchange Offers (as extended, the "**Extended Voting Deadline**").

The "**Settlement Date**" of the Exchange Offers will be as soon as practicable following the Original Expiration Date or the Extended Expiration Date, as applicable.

**Conditions to the Exchange Offers**

To effect the Restructuring Transactions, certain conditions must be met including:

- holders of First Lien Indebtedness shall have agreed to exchange the Minimum Exchange Amount of at least $150.0 million of such First Lien Indebtedness (before giving effect to the First Lien Repayment) for New Second Lien Loans, which Minimum Exchange Amount is expected to be satisfied by commitments of certain lenders pursuant to the Restructuring Support Agreement;

- eligible holders of 100% of the indebtedness under the Second Lien Facility shall have agreed to exchange all of their Second Lien Loans for 100% of the Common Shares, with such Common Shares of Holdings being simultaneously assigned by the Second Lien Lenders to QCE Parent in exchange for 100% of the Parent Common Shares;

- the Recapitalization shall have been completed concurrently, and all parties receiving Parent Common Shares shall have entered into the Subscription Agreement and the Holdings Operating Agreement;

- the Private Placement of $150.0 million of Parent Common Shares to Avenue, including the use of proceeds therefrom as described herein, shall have been completed;

- the Company shall have received the consents of First Lien Lenders in respect of 100% of the First Lien Indebtedness to approve the First Lien Amendment; and

- pursuant to the Vectra Commitment Letter, the Marketing Fund Trust Credit Facility shall remain outstanding with an extended maturity date, among other amended terms, and the line of credit available under the Marketing Fund Trust Credit Facility will be reduced to $12.0 million from $20.0 million.

If the conditions to the Exchange Offers are not satisfied or waived, to the extent waivable, by the Original Expiration Date, the Company may pursue the prepackaged Plan of Reorganization if approved by sufficient number of offerees. Even if such conditions to the Exchange Offers are satisfied, the Company may seek to pursue the Plan of Reorganization. Although the Company would seek authority from the Bankruptcy Court on the petition date to allow the Company to continue operating in the ordinary course of business, there can be no assurance that the chapter 11 case would not disrupt operations or cause the Company to lose revenue. As of the date hereof, no decision has been made by the board of managers to file petitions for relief under chapter 11 of the Bankruptcy Code.

**Corporate Governance and Management of Holdings and the Company**

Immediately following the Recapitalization, the Board of Managers of Holdings will be comprised of nine members, one of whom will be our Chief Executive Officer, seven of whom will be appointed by Avenue and one of whom will be appointed by Fortress. If the Avenue Members or the Fortress Members (or their transferees who then hold the right to designate one or more manager) transfer Shares equal to more than 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan), the such Member may also transfer its right to designate one manager with respect to each 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) transferred. If either the Avenue Members or the Fortress Members (or their transferees who then hold the right to designate one or more manager) transfer Shares equal to more than 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) without also transferring the right to designate a manager, then such Member shall forfeit the right to designate one manager for each 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) transferred, and if any such Member (together with its Affiliates and certain Permitted Transferees) ceases to hold an aggregate of at least 5% of all then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan), then such Member shall forfeit the right to designate any managers. The vacancies created by any such forfeitures shall be filled by the majority vote of all of the Members holding Common Shares, including Avenue and Fortress, voting together as a single class; provided that in no event shall the Members holding Common Shares be entitled to elect more than three managers

as a result of such forfeitures.  The size of the Board of Managers shall be reduced automatically to reflect any such changes to the designations of managers.  Avenue and Fortress have board observer rights as well.

All parties receiving Parent Common Shares (and all persons to whom any such parties may sell their equity in the future and all persons who purchase or acquire equity from Holdings in future transactions) will be required to enter into the Holdings Operating Agreement; which provides, among other things: (i) the number of managers, (ii) the ability to designate managers; (iii) preemptive rights, (iv) transfer restrictions, (v) right of first offer, (vi) co-sale rights and (vii) drag-along rights.

See "Description of Equity Securities" for more information regarding the Holdings Operating Agreement and corporate governance of Holdings, generally.

**Management Incentive Plan**

Upon consummation of the Exchange Offers and related Restructuring Transactions, Holdings intends to adopt a new management incentive plan (the "**Management Incentive Plan**"), which may provide for grants of options and/or restricted shares/equity reserved for management, managers and employees.  The amount, form, exercise price, allocation and vesting of such equity-based awards, and any limitations thereon, shall be determined and approved by Holdings' Board of Managers.  The aggregate of any such grants shall not exceed 10.0% of the aggregate outstanding Common Shares.

**Common Shares**

The Common Shares outstanding after the Exchange Offers shall be 10.0 million shares.  We do not intend to list the Common Shares on any exchange.

See "Description of Equity Securities" for information regarding the Common Shares, in addition to information regarding pre-emptive rights, right of first offer, transfer restrictions and co-sale rights.

**Additional Terms**

Concurrently with the consummation of the Exchange Offers, (i) each First Lien Lender shall execute and deliver the First Lien Amendment, (ii) each Exchanging Lender shall execute the New Second Lien Facility, and (iii) each Second Lien Lender shall execute and deliver the Subscription Agreement and the Holdings Operating Agreement.

Concurrently with the consummation of the Exchange Offers, all First Lien Lenders consenting to the First Lien Amendment will receive their pro rata portion of the 0.5% First Lien Cash Consent Fee on the remaining outstanding indebtedness under the Amended First Lien Facility and the 3.5% First Lien PIK Consent Fee on the remaining outstanding Amended First Lien Facility indebtedness, payable in additional Amended First Lien Facility indebtedness.

Upon consummation of the Exchange Offers, the Second Lien Loan obligations assigned to Holdings shall be promptly contributed to the Company, and the Company shall cancel, retire and extinguish such obligations, as well First Lien Indebtedness assigned to the Company, and deliver to the applicable administrative agent a cancellation certificate evidencing the same.  Immediately upon such cancellation, all Revolving Facility Commitments and Swingline Commitments (each as defined in the First Lien Facility) shall be terminated, and any amounts repaid after consummation of the Exchange Offers with respect to the outstanding First Lien Revolving Loans held by First Lien Lenders under the Amended First Lien Facility shall not be subject to reborrowing.  In addition, an amount of cash or cash equivalent investments equal to 105% of the L/C Exposure (as defined in the First Lien Facility) related to the Revolving Credit Commitments assigned to the Company shall be promptly deposited by the Company under the Amended First Lien Facility in a collateral account controlled by the First Lien Collateral Agent.

In connection with the Restructuring Support Transactions the Company is also modifying or terminating a number of its arrangements with Related Parties.  For a discussion of these arrangements, see "Certain Relationships and Related Party Transactions."

For a discussion of tax consequences of the Exchange Offers, see "Certain U.S. Federal Income Tax Considerations—The Exchange Offers."

**Releases**

To the fullest extent permitted by applicable law, on the closing date of the Out-of-Court Restructuring, QCE Holding LLC, QCE Incentive LLC, QCE LLC, the Existing Equity Holders, the Existing Lenders, and with respect to each of the foregoing Persons, such Person's all current and former direct and indirect equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives), shall be deemed to and shall unconditionally and irrevocably each release each other, individually and collectively, from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon actions taken in their respective capacities described above or any omission, transaction, event or other occurrence taking place or arising on or prior to the Effective Date, except for any claims and causes of action for unlawful acts.  The Existing Equity Holders shall also exchange a full release as to any claims that may exist between the Existing Equity Holders.

\* \* \* \* \*

**For a description of certain considerations that should be taken into account in connection with the Exchange Offers, the New Second Lien Facility and the Common Shares, see "Risk Factors."**

## THE RESTRUCTURING SUPPORT AGREEMENT

We entered into the Restructuring Support Agreement on December 23, 2011 (the "**Restructuring Support Agreement**") with the Participating Lenders, pursuant to which First Lien Lenders and Second Lien Lenders holding not less than two-thirds of the First Lien Indebtedness and not less than two-thirds of the Second Lien Loans, respectively, at the time the Restructuring Support Agreement was executed, agreed to support the Restructuring Transactions.  The summary below is qualified in its entirety by reference to the Restructuring Support Agreement, a copy of which is included as Appendix C hereto.

**Agreement of the Participating Lenders**

Subject to the terms and conditions of the Restructuring Support Agreement, each Participating Lender agreed to, among other things:

- validly and timely assign and not withdraw its holdings of First Lien Indebtedness and Second Lien Loans, as applicable, in the Exchange Offers, deliver and not withdraw the requisite consents and vote its holdings of First Lien Indebtedness and Second Lien Loans, as applicable, in favor of the Plan of Reorganization, deliver and not withdraw the requisite consents and vote of its holdings of First Lien Indebtedness under the First Lien Facility in favor of the First Lien Amendment, consent to the terms of the DIP Facility as set forth in the DIP Financing Term Sheet, including the priming liens to be granted to secure the DIP Financing obligations, and not change or withdraw such assignment, agreement or vote (or cause or direct such assignment, agreement or vote to be changed or withdrawn);

- not object to, or vote any of its holdings of First Lien Indebtedness and Second Lien Loans, as applicable, to reject or impede the Restructuring Transactions, including the Plan of Reorganization, not support directly or indirectly any such objection or impediment or otherwise take any action or commence any proceeding to oppose or to seek any modification of the Restructuring Transactions, including the Plan of Reorganization, or any documents prepared in connection with consummation of the Restructuring Transactions, including the Plan of Reorganization;

- to the full extent permitted by applicable law, grant a full release from liability in favor of QCE Holding LLc, QCE Incentive LLC, the Company, the Existing Equity Holders, the Existing Lenders, and all and all current and former direct and indirect equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives) of QCE Holding LLC, QCE Incentive LLC, the Company, the Existing Equity Holders and the Existing Lenders from any claims and causes of action related to or arising on or prior to the Effective Date, except for any claims and causes of action for unlawful acts;

- use commercially reasonable efforts to support and complete the Restructuring Transactions and all other actions contemplated in connection therewith and promptly notify the Company upon receipt of any alternative proposals or any other actions inconsistent with the Restructuring Transactions, take any and all necessary and appropriate actions in furtherance of the Restructuring Transactions, and not take any actions inconsistent with the Restructuring Support Agreement, and any other related documents;

- not, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to, or enter into any agreements relating to any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of the Company, other than the Restructuring Transactions, including the Plan of Reorganization; and

- so long as the Restructuring Support Agreement has not been terminated, forbear from exercising any rights, remedies or claims against the Company or the guarantors under the applicable credit facilities or initiate, any litigation or proceeding of any kind with respect to the obligations thereunder.

**Participating Lenders' Representations**

Each of the Participating Lenders represented under the Restructuring Support Agreement that:

- it is (i) either the sole legal and beneficial owner of its holdings of First Lien Indebtedness and Second Lien Loans, as applicable, or has investment and voting discretion with respect to such holdings of First Lien Indebtedness and Second Lien Loans, as applicable, in respect to matters relating to the Restructuring Transactions and has the power and authority to bind the beneficial owner(s) of such holdings of First Lien Indebtedness and Second Lien Loans, as applicable, to the terms of the Restructuring Support Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such holdings of First Lien Indebtedness and Second Lien Loans, as applicable, in respect to matters relating to the Restructuring Transactions and dispose of, exchange, assign and transfer such holdings of First Lien Indebtedness and Second Lien Loans, as applicable; and

- it has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into the Restructuring Support Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this Agreement and is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended).

**Agreement by the Company**

Subject to the terms and conditions of the Restructuring Support Agreement, the Company has agreed to use commercially reasonable efforts to (1) support and complete the Restructuring Transactions and all other actions contemplated in connection therewith and under the related documents and Plan of Restructuring Transactions, (2) take any and all necessary and appropriate actions in furtherance of the Restructuring Transactions and the related documents, (3) obtain any and all required regulatory approvals and third-party approvals for the Restructuring Transactions, and (4) not take any actions inconsistent with the Restructuring Support Agreement or the related documents.

**Termination of the Restructuring Support Agreement**

The Restructuring Support Agreement may be terminated upon the occurrence of certain events, including:

- by the mutual written consent of the Company and lenders which collectively hold at least 25% of the First Lien Facility and two-thirds of the Second Lien Facility (the "**Requisite Participating Lenders**");

- in the event of filing of the Plan of Reorganization, upon the Company determining in good faith that continued performance under the Restructuring Support Agreement would be inconsistent with the exercise of applicable duties imposed on the Company's Board of Managers by law, provided, that the Company shall provide notice thereof to the Requisite Participating Lenders;

- upon the material breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth in the Restructuring Support Agreement that would have a material adverse effect on the lenders or the consummation of the Restructuring Transactions, which breach remains uncured for a period of three (3) business days after the receipt by the Company of written notice of such breach from the Requisite Participating Lenders unless waived by the Requisite Participating Lenders;

- upon the material breach by any of the lenders of any of the undertakings, representations, warranties or covenants of such lender(s) set forth in the Restructuring Support Agreement that would have a material

Ex. 1 p. 81

adverse effect on the Company or the consummation of the Restructuring Transactions, which breach remains uncured for a period of three (3) business days after the receipt by the Participating Lender(s) of notice of such breach from the Company;

- upon the occurrence of any of the following, unless such termination event is waived or extended by the Company and the Requisite Participating Lenders (and the Approving Lenders (as such term is defined in the Restructuring Support Agreement) where applicable, as specified in the Restructuring Support Agreement):

  – at 5:00 P.M. prevailing Eastern Time on December 28, 2011 unless the Company has commenced the Exchange Offers (the "**Solicitation Commencement Date**");

  – if the out-of-court restructuring has not been consummated within 20 business days after the Solicitation Commencement Date (the "**Solicitation Termination Date**");

- if an out-of-court restructuring has not been consummated by the Solicitation Termination Date, then:

  – at 5:00 p.m. prevailing Eastern Time on the date that is five (5) business days after the Solicitation Termination Date unless the Company shall have commenced the chapter 11 cases (the date that the chapter 11 cases are commenced is referred to herein as the "**Commencement Date**") and the Company has filed, and is pursuing confirmation of, the Plan of Reorganization and related motions;

  – at 5:00 p.m. prevailing Eastern Time on the date that is 120 calendar days after the Commencement Date, unless the Bankruptcy Court shall have approved the Offering Memorandum and Disclosure Statement and confirmed the Plan of Reorganization;

  – at 5:00 p.m. prevailing Eastern Time on the date that is 30 calendar days following entry by the Bankruptcy Court of an order confirming the Plan of Reorganization if there has not occurred substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan of Reorganization on or before such date;

  – upon the filing by the Company of any motion or other request for relief seeking to (1) dismiss any of the chapter 11 cases, (2) convert any of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, or (3) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the chapter 11 cases, unless such motion or other request for relief is withdrawn prior to the earlier of (x) three (3) business days after filing such motion or other request for relief with the Bankruptcy Court and (y) entry of an order by the Bankruptcy Court approving the requested relief;

  – upon the entry of an order by the Bankruptcy Court (1) dismissing any of the chapter 11 cases, (2) converting any of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (3) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the chapter 11 cases, or (4) making a finding of fraud, dishonesty or misconduct by any officer or director of the Company, regarding or relating to the Company;

  – upon the withdrawal, amendment or modification by the Company or any other party of the Plan of the Reorganization or related documents, or the filing of a pleading seeking to amend or modify the Plan of Reorganization or related documents, which withdrawal, amendment, modification or filing is materially inconsistent with the Plan of Reorganization or is materially adverse to the lenders, or, if the Company files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with the Restructuring Support Agreement or the Plan of Reorganization or any of the related documents and such motion or pleading has not been withdrawn prior to the earlier of (i) three (3) business days after the Company receives written notice from the Requisite Participating Lenders that such motion or pleading is inconsistent with

the Restructuring Support Agreement or the Plan of Reorganization or related documents, as applicable, and (ii) the entry of an order of the Bankruptcy Court approving such motion;

– the Bankruptcy Court grants relief that is inconsistent with the Restructuring Support Agreement or the Plan of Reorganization in any material respect (in each case with such amendments and modifications as have been effected in accordance with the terms hereof);

– the Company files, proposes or otherwise supports any other plan of reorganization other than the Plan of Reorganization; and

– at 5:00 P.M. prevailing Eastern Time on the date that is 60 business days after the Solicitation Commencement Date if a Qualified Out-of-Court Transaction has not been consummated or if the Company has not commenced the Chapter 11 Cases, unless extended by the Company and the Approving Lenders (as defined therein).

• the issuance by any governmental authority, or any other regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring Transactions;

• the entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the claims and liens of the Lenders for principal and interest under the First Lien Facility and claims and liens of the Lenders for principal under the Second Lien Facility, other than an order approving the transactions as contemplated by the Support Agreement and Plan of Reorganization;

• any material breach of or default under the First Lien Facility or Second Lien Facility (other than as contemplated by the Recapitalization transactions, including any of the defaults or events of defaults set forth on Schedule 1 attached to the Restructuring Support Agreement);

• if an involuntary proceeding against the Company is commenced or an involuntary petition is filed seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of the Company or their debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership or similar law now or hereafter in effect, provided that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof, or if any court order grants the relief sought in such involuntary proceeding;

• if the Company (A) voluntarily commences any proceeding or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except as provided for in the Restructuring Support Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official for the Company or for a substantial part of its assets, (D) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) makes a general assignment or arrangement for the benefit of creditors or (F) takes any corporate action for the purpose of authorizing any of the foregoing.

In the event the Restructuring Support Agreement is terminated, each party thereto shall be released from its commitments, undertakings and agreements under or related to the Restructuring Support Agreement and there shall be no liability or obligation on the part of any party thereto except for obligations which by their terms expressly survive any such termination.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion should be read in conjunction with the audited consolidated financial statements and related notes that appear elsewhere in this Offering Memorandum and Disclosure Statement. The following discussion includes forward-looking statements that are not historical facts but reflect our current expectation regarding future results. Actual results may differ materially from the results discussed in the forward-looking statements because of a number of risks and uncertainties.  Please refer to "Risk Factors" included elsewhere in this report for a further description of risks and uncertainties affecting our business and financial results. Historical trends should not be taken as indicative of future operations and financial results.

### Introduction and Overview

We are one of the world's largest franchisors of restaurants offering sandwiches, salads, soups, beverages, as well as catering services and other related products within the QSR segment of the restaurant industry. As of September 30, 2011 the Company had 3,109 franchised restaurants in 28 countries and Puerto Rico, which represented 99.9% of all of our restaurants, and 399 SNOs, where a franchise owner has paid an initial franchise fee in anticipation of opening a Quiznos restaurant.  Changes in systemwide sales are driven by changes in AUVs and changes in the number of restaurants and are ultimately driven by customer demand.  AUVs are calculated by dividing the sum of the week's reported Gross Sales for all open and operating restaurants by the number of open and operating restaurants.  Our financial results are driven largely by changes in systemwide sales, which include restaurant-level sales at both franchise and Company-owned restaurants.  We believe systemwide sales and AUVs provide meaningful information to investors concerning the size of our system, the overall health and financial performance of the system, and the strength of our brand and franchise owner base, which ultimately impacts our consolidated and segmented financial performance. Franchise restaurant sales are not included in our consolidated results; however, franchise restaurant sales result in royalties, which are included in our franchise operations revenues, and also generate food distribution revenue and gross profit.

We prepare our financial statements in accordance with GAAP. However this Management's Discussion and Analysis of Financial Condition and Results of Operations also contains certain non-GAAP financial measures to assist readers in understanding our performance. Non-GAAP financial measures are measures that either exclude or include amounts that are not excluded or included in the most directly comparable measure calculated and presented in accordance with GAAP. Where non-GAAP financial measures are used, we have provided the most directly comparable measures calculated and presented in accordance with GAAP and reconciliation to GAAP measures.

We are organized into three operating groups: franchise operations, food distribution and Company-owned restaurant operations. We primarily franchise Quiznos restaurants in the United States and Canada, and have additional restaurants in 26 other countries and Puerto Rico. We manage and review financial results from the United States and our international locations, including Canada, separately.

The following is a summary of our annual percentage sales and net long-lived assets by geographic area.

| | 2008 | 2009 | 2010 |
|---|---|---|---|
| Sales: | | | |
| United States | 89.1% | 87.0% | 83.0% |
| Canada | 10.5% | 12.5% | 16.5% |
| Other international | 0.4% | 0.5% | 0.5% |
| Total Sales | 100.0% | 100.0% | 100.0% |
| | | | |
| Long-lived assets, net: (1) | | | |
| United States | 96.0% | 97.0% | 96.6% |
| Canada | 4.0% | 3.0% | 3.4% |
| Other international | 0.0% | 0.0% | 0.0% |
| Total long-lived assets, net | 100.0% | 100.0% | 100.0% |

(1)   Long-lived assets, net exclude actual and pro forma deferred financing costs.

For the nine months ended September 30, 2011, approximately 75.4% of our revenue was earned through food distribution and approximately 19.2% of our revenue was derived from franchise operations.  The remainder of our revenue, or approximately 5.4%, was generated from sales in our Company-owned restaurants.

In franchise operations, revenue is principally derived from royalty fees, initial franchise fees and other income. Franchise owners are required to pay us royalties based on a percentage of restaurant sales, net of discounts, ranging from 0% to 8%, with the average royalty rate being 6.8% as of September 30, 2011. Royalty fees increase and decrease in conjunction with the number of open franchised restaurants, and increase or decrease as restaurant sales, net of discounts, increase or decrease.  We have no immediate plans to increase or decrease the royalty rates.

Initial franchise fees paid by franchise owners are recognized as revenue upon substantial completion of the service required of us as stated in our franchise agreements, which is generally the earlier of when the restaurant commences operations or upon termination of the franchise agreement.  Initial franchise fees are typically $5,000, but currently range from $0 to $12,500, depending on the type of franchise sold. The current franchise fee for a Traditional Restaurant is $5,000.

Other franchise operations revenue is primarily derived from transfer fees, lease review fees, and gift card breakage.

In food distribution, our revenue is derived from providing food, restaurant supplies, and restaurant equipment procurement and logistical services from third party vendors to our franchise owners through third party distribution centers.

Company-owned restaurants revenue was generated from our 62 restaurants that we operated as of December 31, 2010, and 2 non-branded restaurants that we operate within the Denver International Airport. In the first four months of 2011, we closed or refranchised the majority of these Quiznos restaurants, with the exception of our four flagship locations located at the Denver International Airport and in the Denver metro area.

We have created Marketing Fund Trusts in the United States and advertising funds in Canada (the "**Canadian Advertising Fund**") to collect and administer advertising fees from our franchise owners in the United States and Canada. Our franchise owners fund the majority of the advertising that supports our brand. We have historically made discretionary contributions to the Marketing Fund Trusts, and we administer the Marketing Fund Trusts' assets.  Therefore, the Marketing Fund Trusts are consolidated into our financial statements as variable interest entities.  The Canadian Advertising Fund is one of our subsidiaries. We do not reflect franchise owner contributions to either the Marketing Fund Trusts or the Canadian Advertising Fund as revenue, but rather as an offset to reported advertising expenses. For fiscal year 2010, franchise owner contributions were $40.4 million and our contributions were $33.0 million. For the nine months ended September 30, 2011, franchise owner contributions were $23.3 million and our contributions were $3.5 million. We have no rights to the Marketing Fund Trusts' assets, nor any obligations with respect to their liabilities, with the exception of their line of credit, which we have guaranteed.  The outstanding amount of the line of credit was $15.9 million as of September 30, 2011.

**Critical Accounting Policies**

Our significant accounting policies are more fully described under the heading "Summary of Significant Accounting Policies" in note 2 of the Notes to the consolidated financial statements. However, we believe the accounting policies described below are significant to the portrayal and understanding of our business, financial position and results of operations and require application of judgment by our management.  In applying these policies, management uses its judgment in making certain assumptions and estimates that affect amounts reported in our consolidated financial statements and accompanying notes. Management adjusts such estimates and assumptions that affect the amounts reported in the consolidated financial statements when facts and circumstances dictate. As future events and their effects cannot be determined with precision, actual results could differ significantly from these estimates.  The following is a description of what we consider to be our most significant critical accounting policies.

*Revenue Recognition*

Initial franchise fees paid by franchise owners are recognized as revenue upon substantial completion of services required of us as stated in the franchise agreement, which is generally the earlier of when the restaurant commences operations or upon termination of the franchise agreement.  Royalties are based on a percentage of gross restaurant sales less restaurant-level discounts and are recorded when earned.  Company-operated store revenues are recognized when payment is tendered at the point of sale.

Generally, when we are the primary obligor in food and food product sales, where we are subject to inventory risk, have latitude in establishing prices and selecting suppliers, influence product or service specifications, or have several but not all of these indicators, we record revenue on a gross basis when the sale inventory by distribution centers is made to franchise owners. If we are not the primary obligor and do not possess other indicators of gross reporting as noted above, we record the net amounts as commissions earned, which are reflected in net food distribution sales.

We account for incentive payments to franchise owners as a reduction of revenue.

*Allowances for Accounts, Royalties and Note Receivables, and Franchise Guarantees*

During 2009, 2010 and 2011, we granted and serviced loans to franchise owners in certain limited instances. These include loans for renovating and remodeling restaurants, as well as loans to assist franchise owners in the acquisition of restaurants, and such loans are generally collected on a weekly basis.  Our allowances for doubtful accounts, notes and royalties receivable are reviewed periodically and the carrying values of such balances are adjusted to the amount that we estimate to be the net realizable value. We evaluate the collectability of our accounts and royalties receivable based on a combination of factors, including length of time the receivables are past due and historical performance.

In certain cases, we have guaranteed lease payments of franchise owners arising from leases assigned to franchise owners by remaining secondarily liable under assigned leases for rental fees for restricted time periods in most cases, generally six months. In the event of default by the franchise owners, we have typically retained the right to acquire possession of the related restaurants, in some circumstances subject to landlord consent. These leases have varying terms, the longest of which expires in 2020.

*Inventory Held at Distribution Centers*

We maintain general inventory risk after our sale of certain food products to third party food distribution centers. Since the risks and rewards of inventory ownership have not been transferred when title passes from us to the distribution centers, we record the inventory held at distribution centers on our consolidated balance sheets and defer recognition of the related revenue until the sale of such inventory by the distribution centers to the franchise owners.

*Investment in Area Marketing and Master Franchise Agreements*

Investment in area marketing and master franchise agreements includes the costs associated with reacquiring area marketing or master franchise agreements. The acquisition costs are allocated at the time of reacquisition to the existing franchise agreements, including the agreements for SNOs in the area director or master franchise owner territory. The costs are amortized on a straight-line basis over the remaining term of the individual underlying franchise agreements. Franchise agreements typically have a term of 15 years. If the franchised restaurant closes or an agreement is terminated, the remaining unamortized balance related to that specific unit is expensed in the current period.

*Advertising Expense*

We act as the trustee to administer the Marketing Fund Trusts' advertising programs in the U.S.  Our Canadian advertising programs are conducted by Quiznos Canada Advertising Fund Inc.  Our advertising funds are

Ex. 1 p. 86

consolidated in our financial statements and contributions from franchise owners for advertising fees are recorded as offsets to our advertising expense. We expense advertising costs as they are incurred.

### Loss Contingencies

We assess each loss contingency to determine the degree of probability and range of loss. Those contingencies that are deemed probable and where the amount of loss can be reasonably estimated are accrued in the consolidated financial statements. Please refer to "Legal Proceedings" included elsewhere in this report for a further description of litigation against us.

### Systemwide Sales and AUVs

While we do not record sales by franchise owners as revenue, we believe this information is important in obtaining an understanding of our business, financial position and results of operations. Franchise restaurant-level sales result in royalties, which are included in our franchise operations revenue, and also generate food distribution revenue and gross profit.

We believe information on systemwide sales and AUVs is useful for understanding how we derive royalty revenue, assists readers in evaluating our performance relative to competitors, and indicates the strength of our brand.

### Nine Months ended September 30, 2011 (unaudited) compared to the Nine Months ended September 30, 2010 (unaudited)

| ($ in thousands) | Nine Months Ended | | | | Change | |
| --- | --- | --- | --- | --- | --- | --- |
| | September 30, 2010 | | September 30, 2011 | | $ | % |
| Systemwide Sales | | | | | | |
| Quiznos U.S. franchised restaurants | $ | 732,753 | $ | 573,319 | $ (159,434) | -22% |
| Quiznos International franchised restaurants | | 174,079 | | 173,908 | (171) | -0% |
| Total | $ | 906,832 | $ | 747,227 | $ (159,605) | -18% |
| | | | | | | |
| Average Unit Volume (AUV) | | | | | | |
| Quiznos U.S. franchised restaurants | $ | 5,866 | $ | 5,736 | $ (130) | -2% |
| Quiznos International franchised restaurants | | 6,619 | | 6,869 | 250 | 4% |

The change in U.S. systemwide sales is primarily the result of reductions in our restaurant base, in addition to a slight decrease in the average unit volume of U.S. franchised restaurants of $130 or 2%. Our total restaurants in the U.S decreased approximately 19% from 3,026 at September 30, 2010 to 2,446 at September 30, 2011.

The change in international franchised restaurants' systemwide sales of $0.2 million is the result of a decrease in systemwide sales for Canada of approximately $7.2 million, offset by an increase in systemwide sales for our international locations, excluding Canada, of approximately $7.0 million. The increase in international locations, excluding Canada, was primarily driven by new store development, as well as economic conditions improving at a faster pace outside of the United States, and our brand being well received in a wide range of geographic locations. Canada was the largest contributor to our international systemwide sales at $0.1 billion for both the nine months ended September 30, 2010 and 2011.

### Fiscal Year 2010 compared to Fiscal Year 2009

| ($ in thousands) | Year Ended December 31, | | | | Change | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2009 | | 2010 | | $ | % |
| Systemwide Sales | | | | | | |
| Quiznos U.S. franchised restaurants | $ | 1,231,715 | $ | 943,930 | $ (287,785) | -23% |
| Quiznos International franchised restaurants | | 232,687 | | 230,708 | (1,979) | -1% |
| Total | $ | 1,464,402 | $ | 1,174,638 | $ (289,764) | -20% |
| | | | | | | |
| Average Unit Volume | | | | | | |
| Quiznos U.S. franchised restaurants | $ | 5,917 | $ | 5,804 | $ (113) | -2% |
| Quiznos International franchised restaurants | | 6,950 | | 6,636 | (314) | -5% |

We experienced an overall decline in systemwide sales for our U.S. restaurants for the year ended December 31, 2010 as compared to the same period in 2009, driven by a decline in AUVs and a reduced restaurant base. We believe AUVs were impacted by the economic downturn, as well as poor locations and restaurant-level operational issues. As a result, among other things, we renewed our focus on in-restaurant operations and marketing programs, as well as made efforts to increase the quality of product offerings in order to address these issues.

The decline in international franchised restaurants' systemwide sales can be attributed to both a decrease in international AUVs and restaurant base, both of which we believe were the result of the global economic downturn. Canada was the largest contributor to our international systemwide sales at $0.2 billion for both fiscal years 2009 and 2010.

### Fiscal Year 2009 compared to Fiscal Year 2008

($ in thousands)

| | Year Ended December 31, | | Change | |
| | 2008 | 2009 | $ | % |
|---|---|---|---|---|
| Systemwide Sales | | | | |
| Quiznos U.S. franchised restaurants | $ 1,564,599 | $ 1,231,715 | $ (332,884) | -21% |
| Quiznos International franchised restaurants | 247,514 | 232,687 | (14,827) | -6% |
| Total | $ 1,812,113 | $ 1,464,402 | $ (347,711) | -19% |
| | | | | |
| Average Unit Volume | | | | |
| Quiznos U.S. franchised restaurants | $ 6,713 | $ 5,917 | $ (796) | -12% |
| Quiznos International franchised restaurants | 7,573 | 6,950 | (623) | -8% |

We experienced an overall decline in systemwide sales for our U.S. franchised restaurants for the year ended December 31, 2009 as compared to the same period in 2008, driven by a decline in AUVs and a reduced restaurant base.  Both of these factors were largely due to the global economic downturn experienced during 2008, as well as restaurant-level operational issues.  As a result, we took numerous steps to address these issues and refocus on in-restaurant operations during 2009 including, among other things, renewing our focus on in-restaurant operations and marketing programs.

The decline in international franchised restaurants' systemwide sales can be attributed to both a decrease in international AUVs and restaurant base, both of which we believe were the result of the global economic downturn. Canada was the largest contributor to our international systemwide sales at $0.2 billion for both fiscal years 2009 and 2008.

### Results of Operations for Nine Months ended September 30, 2011 compared to the Nine Months ended September 30, 2010

### Revenues

($ in thousands)

| | Nine Months Ended | | Change | |
| | September 30, 2010 | September 30, 2011 | $ | % |
|---|---|---|---|---|
| Revenue: | | | | |
| Franchise operations | $ 65,082 | $ 53,269 | $ (11,813) | -18% |
| Food distribution | 279,376 | 209,623 | (69,753) | -25% |
| Company-owned stores | 15,892 | 15,061 | (831) | -5% |
| Total revenue | $ 360,350 | $ 277,953 | $ (82,397) | -23% |

The decrease in both franchise operations revenue and food distribution revenue for the nine months ended September 30, 2010 and 2011 can primarily be attributed to a reduced restaurant base, and a decrease in U.S. AUVs, which were 2% lower in comparison to the same period in the prior year.  Franchise operations revenue primarily consists of royalty fees, which decreased approximately $11.2 million, or 19%. Royalty fees were $60.0 million and $48.8 million for the nine months ended September 30, 2010 and September 30, 2011, respectively.  Franchise operations revenue also consists of initial and transfer fees, which decreased as a result of fewer restaurant openings in comparison to the prior year. Initial and transfer fees decreased approximately $1.0 million, or 38%, and $0.1 million, or 13%, respectively, during the nine months ended September 30, 2011 in comparison to the same period in the prior year.  Food distribution revenue fluctuations were primarily the result of a decline in our restaurant base

Ex. 1 p. 88

and our expansion of the franchise owner incentive program.  We paid franchise owners incentive payments, recorded as a reduction of food distribution revenues, $0.3 million and $15.8 million for the nine months ended September 30, 2010 and 2011, respectively.   The decrease in revenue from our Company-owned restaurants was driven by fewer Company-owned restaurants open and operating during the nine months ended September 30, 2011 in comparison to the same period in prior year.  During the fourth quarter of 2010 and through the first quarter of 2011, we closed or refranchised 89 Company-operated restaurants, retaining only our four flagship Quiznos locations located at the Denver International Airport and in the Denver metro area, plus two non-branded locations at Denver International Airport.

### Cost of Revenue

| ($ in thousands) | Nine Months Ended | | Change | |
|---|---|---|---|---|
| | September 30, 2010 | September 30, 2011 | $ | % |
| Cost of revenue: | | | | |
| Franchise operations | $          2,008 | $             887 | $        (1,121) | -56% |
| Food distribution | 189,025 | 149,340 | (39,685) | -21% |
| Company-owned stores | 8,611 | 7,792 | (819) | -10% |
| Total cost of revenue | 199,644 | 158,019 | (41,625) | -21% |
| Gross margin | $      160,706 | $      119,934 | $      (40,772) | -25% |

The overall decrease in franchise operations cost of revenue is primarily due to the reacquisition of area directorships, as well as the same reduced restaurant base that impacted the related revenues. Franchise royalty commissions paid to area directors were reduced by $2.1 million for the nine months ended September 30, 2011 compared to the nine months ended September 30, 2010, representing a 73% decrease. The primary drivers in the decrease of food distribution cost of revenue is the same reduced restaurant base that impacted the related revenues. Through renegotiation of pricing with our key food and food product suppliers, we were able to further reduce our cost of food and food products. The decrease in cost of revenue related to our Company-owned restaurants can be attributed to fewer Company-owned restaurants open and operating during the nine months ended September 30, 2011 in comparison to the same period in prior year.

### Operating Expenses

| ($ in thousands) | Nine Months Ended | | Change | |
|---|---|---|---|---|
| | September 30, 2010 | September 30, 2011 | $ | % |
| Operating expenses: | | | | |
| General and administrative expenses | $        59,563 | $        45,749 | $      (13,814) | -23% |
| Litigation settlement charges | 508 | — | (508) | -100% |
| Advertising expense | 23,016 | 2,822 | (20,194) | -88% |
| Deferred and share-based compensation | 471 | 44 | (427) | -91% |
| Depreciation and amortization | 12,470 | 7,952 | (4,518) | -36% |
| Other | 10,460 | 6,806 | (3,654) | -35% |
| Total operating expenses | 106,488 | 63,373 | (43, 115) | -41% |
| Operating profit | $        54,218 | $        56,561 | $          2,343 | 4% |

We completed a restructuring of our operations, primarily with our general and administrative functions, early in the first quarter of 2011. As a result, we recognized severance and other exit charges of approximately $5.4 million during the nine months ended September 30, 2011. These incremental charges were offset by other cost reductions, including but not limited to, decreases in active employee related costs, which include compensation, benefits and travel, of approximately $10.3 million, third-party service fees of approximately $5.7 million and employee bonuses of $2.5 million in comparison to the same period last year.

The decline in overall advertising expenditures of $20.2 million, or 88% can primarily be attributed to additional advertising expenditures in the nine months ended September 30, 2010 as a result of us making a discretionary contribution to our advertising funds for the purpose of local store marketing programs in that period.

Ex. 1 p. 89

Deferred and share-based compensation represents only share-based compensation for the nine months ended September 30, 2010 and 2011. We amended our unit option plan in the fourth quarter of 2010 which resulted in the cancellation of all unvested share-based awards. The minimal amount of share-based compensation expense in the nine months ended September 30, 2011 is the result of the unrecognized compensation expense related to the original awards being recognized over their remaining term.  Compensation cost for the new awards will not be recognized until achievement of their performance requirements is deemed probable.

The net decrease in depreciation and amortization is primarily the result of decreases in amortization expense of approximately $3.7 million, or 42%.  Since we fully expense any unamortized costs allocated to the underlying restaurants in a reacquired area directorship territory upon the restaurants' closures, the decrease in amortization expense is the result of lower closures during the nine months ended September 30, 2011 in comparison to the nine months ended September 30, 2010. The decrease in depreciation expense of $0.8 million, or 22%, resulted from a reduced number of in-service assets in comparison to the same period in the prior year.

The majority of other operating expenses are allowances for doubtful accounts, non-cash impairment charges and Company-owned restaurant pre-opening and occupancy charges. The decrease in other operating expenses was primarily driven by a decrease in bad debt expense of $2.9 million, or 64%.  During the nine months ended September 30, 2010, we fully allowed for the outstanding principal and accrued interest balance of $2.2 million on a specific note receivable with a food vendor.

### Other Expense (Income)

| ($ in thousands) | Nine Months Ended | | Change | |
| | September 30, 2010 | September 30, 2011 | $ | % |
|---|---|---|---|---|
| Other expense (income): | | | | |
| Interest expense ................................................ | $ 46,832 | $ 44,246 | $ (2,586) | -6% |
| Interest income ................................................ | (233) | (555) | (322) | -138% |
| Gain on debt extinguishment ............................ | — | (1,246) | (1,246) | -100% |
| Other ................................................................ | 496 | 369 | (127) | -26% |
| Total other expense ......................................... | $ 47,095 | $ 42,814 | $ (4,281) | -9% |

The decrease in interest expense is the result of the maturity of unfavorable interest rate swap and interest rate collar agreements in June 2010, partially offset by increases in our interest rate margins on our variable rate first lien debt and revolving lines of credit. We increased our lending activities with franchise owners throughout 2010, which was the primary driver in the increase in interest income in comparison to the same period in prior year. In the nine months ended September 30, 2011, we terminated an area marketing agreement for default which resulted in the reduction of a related note payable.  As a result, we recognized a gain on extinguishment of debt of $1.2 million.

### Income Taxes

| ($ in thousands) | Nine Months Ended | | Change | |
| | September 30, 2010 | September 30, 2011 | $ | % |
|---|---|---|---|---|
| Income tax expense: | | | | |
| Income tax expense ........................................ | $ 1,341 | $ 411 | $ (930) | -69% |

We have no provision for U.S. federal income taxes as, with the exception of certain Canadian entities, we are treated as a pass through entity for U.S. federal income tax purposes. Income tax expense stems primarily from the Canadian operations. Additionally, we receive royalties and franchise fees from outside the United States that are subject to foreign withholding taxes, which are included in income tax expense.

### Income Attributable to Noncontrolling Interests

| ($ in thousands) | Nine Months Ended | | Change | |
| | September 30, 2010 | September 30, 2011 | $ | % |
|---|---|---|---|---|
| Net income attributable to noncontrolling interests: | | | | |
| Net income attributable to noncontrolling interests....... | $ 152 | $ 69 | $ (83) | -55% |

Ex. 1 p. 90

We consolidate two entities for which third parties own a noncontrolling interest. Both entities operate or formerly operated area directorships in certain regions of the United States.

**Results of Operations for Year Ended December 31, 2010 Compared to Year Ended December 31, 2009**

### *Revenues*

| ($ in thousands) | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | **2009** | **2010** | **$** | **%** |
| Revenue: | | | | |
| Franchise operations | $ 110,135 | $ 84,838 | $ (25,297) | -23% |
| Food distribution | 423,762 | 359,163 | (64,599) | -15% |
| Company-owned restaurants | 18,064 | 22,339 | 4,275 | 24% |
| Total revenue | $ 551,961 | $ 466,340 | $ (85,621) | -15% |

The decrease in both franchise operations revenue and food distribution revenue for the year ended December 31, 2010 can be attributed primarily to a decline in AUVs and a reduced restaurant base.  Royalty fees and initial and transfer franchise fees decreased approximately $20.8 million, or 21% and $0.8 million, or 12%, respectively. Initial and transfer fees decreased as a result of fewer new restaurant openings and fewer restaurant transfers in comparison to the prior year. Other franchise related income decreased $3.8 million or 68% primarily due to $1.7 million lower gift card breakage revenue in 2010 compared to 2009. In 2009, we recorded the initial recognition of gift card breakage whereas we had not previously recognized any revenue due to, among other things, the lack of sufficient history to estimate non-redemptions. Food distribution revenue fluctuations were primarily the result of a decline in AUVs and restaurant base, offset by changes in our franchise owner rebate program.  We paid franchise owners rebates, recorded as a reduction of food distribution revenues, of $11.2 million and $1.9 million for the years ended December 2009 and 2010, respectively.   The increase in revenue from our Company-owned restaurants was driven by additional Company-owned restaurants in 2010 as we increased the number during the year.

### *Cost of Revenue*

| ($ in thousands) | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | **2009** | **2010** | **$** | **%** |
| Cost of revenue: | | | | |
| Franchise operations | $ 15,689 | $ 2,668 | $ (13,021) | -83% |
| Food distribution | 308,928 | 243,248 | (65,680) | -21% |
| Company-owned restaurants | 9,819 | 12,379 | 2,560 | 26% |
| Total cost of revenue | 334,436 | 258,295 | (76,141) | -78% |
| Gross margin | $ 217,525 | $ 208,045 | $ (9,480) | -4% |

The overall decrease in franchise operations cost of revenue is the result of the same decline in AUVs and reduced restaurant base which impacted the related revenues, offset by the implementation of significant cost reductions. We reduced franchise royalty commissions by $6.8 million in 2010 compared to 2009, or 78%, through reacquisition of area directorships and master franchise rights. We moved from an external commissions-based field team to a corporate field team in late 2009, causing the underlying costs to move from cost of revenue to general and administrative expense.  Our field team costs for 2010 were approximately $5.0 million and included entirely in general and administrative. In 2009, the comparable field team costs were approximately $6.6 million and included in franchise operations cost of revenue.  The primary drivers in the decrease of food distribution cost of revenue is the same decline in AUVs and reduced restaurant base which impacted the related revenues. Through renegotiation of pricing with our key food and food product suppliers, we were able to further reduce our cost of food and food products. The increase in cost of revenue related to our Company-owned restaurants can be attributed to additional restaurants in 2010.

**Ex. 1 p. 91**

*Operating Expenses*

| ($ in thousands) | Year Ended December 31, | | Change | |
| | 2009 | 2010 | $ | % |
|---|---|---|---|---|
| Operating expenses: | | | | |
| General and administrative expenses | $ 68,401 | $ 77,314 | $ 8,913 | 13% |
| Litigation settlement charges | 16,758 | (8,782) | (25,540) | -152% |
| Advertising expense | 33,039 | 22,752 | (10,287) | -31% |
| Deferred and share-based compensation | 751 | 628 | (123) | -16% |
| Depreciation and amortization | 15,048 | 16,436 | 1,388 | 9% |
| Other | 9,274 | 17,754 | 8,480 | 91% |
| Total operating expenses | 143,271 | 126,102 | (17,169) | -12% |
| Operating profit | $ 74,254 | $ 81,943 | $ 7,689 | 10% |

Employee related costs, including compensation, benefits and travel increased over the prior year by approximately $9.8 million.  As noted above, in late 2009 we moved from an external commissions based field team to a corporate field team resulting in an increase in general and administrative expense of approximately $5.0 million for fiscal year 2010. During the first quarter of 2011, we implemented a reduction in force that eliminated a significant number of full-time positions in our corporate and Canadian headquarters. As a result, we do not expect the same level of employee related costs to occur in future periods. Also contributing to the increase in general and administration expense, third party service costs increased due to an increase in quality assurance site visits of our franchised restaurant locations. The noted increases were partially offset by overall cost reductions implemented during the year, including reduced legal fees and certain supplies provided to franchise owners.

Litigation settlement charges related to the costs incurred to settle certain class action complaints that were filed against us and the subsequent recovery from one of our insurance carriers of $9.8 million. These costs and the related recoveries are not expected to recur in future periods.

The negative change in AUVs and reduced restaurant base resulted in a decrease in advertising contributions received from franchise owners.  Lower overall advertising expenditures were due to increased efficiencies in our advertising and marketing.

Deferred and share-based compensation represents only share-based compensation for the years ended December 31, 2009 and 2010.  The slight decrease of $0.1 million, or 16%, in comparison to 2009 was the result of forfeitures of share-based compensation by exiting employees.

The net increase of $1.4 million, or 9% in depreciation and amortization, is the result of a decrease in depreciation expense of $1.5 million, offset by an increase in amortization expense of $2.9 million. The decrease in depreciation resulted from a reduced number of in-service assets throughout 2010. The primary driver of the increase in amortization expense was the reacquisition of investment in area directorship rights during 2010 and the subsequent amortization of these rights.

The majority of other operating expenses are allowances for doubtful accounts, non-cash impairment charges and Company-owned restaurant pre-opening and occupancy charges.  The increase in other operating expenses was primarily caused by the additional Company-owned restaurants opened during 2010. These additional restaurants generated approximately $3.5 million of additional other operating expenses during 2010, including $2.0 million of non-cash impairment charges related to their refranchising in early 2011. We recorded additional non-cash impairment charges on our restaurant equipment located in franchised restaurants that closed during the year of $2.2 million.  The remainder of the increase in other operating expenses can be attributed to increases in our allowance for doubtful accounts for royalties and notes receivables, other impairment charges and corporate restaurant occupancy costs.

### Non-operating Income and Expense

| ($ in thousands) | Year Ended December 31, | | | Change | | |
|---|---|---|---|---|---|---|
| | **2009** | | **2010** | | **$** | **%** |
| Non-operating expenses: | | | | | | |
| Interest expense........................................ | $ | 64,136 | $ | 62,080 | $ (2,056) | -3% |
| Interest income......................................... | | (173) | | (377) | (204) | 118% |
| Other............................................................ | | 1,766 | | 494 | (1,272) | -72% |
| Total non-operating expenses .................. | $ | 65,729 | $ | 62,197 | $ (3,532) | -5% |

Interest expense decreased as the result of an overall decline in our hedging costs as we had several swap and collar instruments that matured in June 2010, and $59.4 million total pay down of our revolving lines of credit and long-term debt.  This was offset by the increase in the interest rate margins as a result of the amendment of our first lien revolving credit facility in the second quarter of 2010. We increased our lending activities with franchise owners during 2010, which was the primary driver in the slight increase in interest income in comparison to 2009. The fluctuation in other non-operating expense resulted from net foreign exchange losses, primarily the result of our food distribution business in Canada.

### Income Taxes

| ($ in thousands) | Year Ended December 31, | | | Change | | |
|---|---|---|---|---|---|---|
| | **2009** | | **2010** | | **$** | **%** |
| Income tax expense: | | | | | | |
| Income tax expense........................................ | $ | 3,043 | $ | 1,787 | $ (1,256) | -41% |

We have no provision for U.S. federal income taxes as, with the exception of certain Canadian entities, we are treated as a pass through entity for U.S. federal income tax purposes. Income tax expense stems primarily from the Canadian operations. Additionally, we receive royalties and franchise fees from outside the United States that are subject to foreign withholding taxes, which are included in income tax expense.  The decline in income tax expense in comparison to 2009 is due to the accrual for withholding tax on a cross-border distribution from one of our Canadian subsidiaries to the United States during 2009.

### Income Attributable to Noncontrolling Interests

| ($ in thousands) | Year Ended December 31, | | | Change | | |
|---|---|---|---|---|---|---|
| | **2009** | | **2010** | | **$** | **%** |
| Net income attributable to noncontrolling interests: | | | | | | |
| Net income attributable to noncontrolling interests............ | $ | 186 | $ | 183 | $ (3) | -2% |

We consolidate two entities for which third parties own a noncontrolling interest. Both entities operate area directorships in certain regions of the United States.

### Results of Operations for Year ended December 31, 2009 compared to year ended December 31, 2008

### Revenue

| ($ in thousands) | Year Ended December 31, | | | Change | | |
|---|---|---|---|---|---|---|
| | **2008** | | **2009** | | **$** | **%** |
| Revenue: | | | | | | |
| Franchise operations ................................ | $ | 154,442 | $ | 110,135 | $ (44,307) | -29 |
| Food distribution........................................ | | 522,229 | | 423,762 | (98,467) | -19 |
| Company-owned restaurants ..................... | | 21,473 | | 18,064 | (3,409) | -16% |
| Total revenue ......................................... | $ | 698,144 | $ | 551,961 | $ (146,183) | -63% |

We believe the global economic downturn caused the negative fluctuations in AUVs and our restaurant base in 2009 compared to 2008.  As a result, we saw declines in both franchise operations revenue and food distribution revenue for the year ended December 31, 2009.  The 20%, or $24.4 million, decrease in royalty fees is a direct result of lower AUVs and a smaller restaurant base.  We had fewer restaurant openings and transfers which resulted in a 55% or $5.6 million decrease in initial and transfer franchise fees revenue. Additionally, we had approximately $14.5 million in additional revenue as a result of terminations of franchise agreements in 2008 in comparison to

**Ex. 1 p. 93**

2009.  Offsetting the declines, we recognized other franchise operations revenue of $5.6 million, including $2.3 million of initial gift card breakage recognition during 2009. We had not previously recognized any gift card breakage revenue due to, among other things, the lack of sufficient history to estimate non-redemptions.  The decline in food distribution revenues was primarily caused by the decrease in AUVs and restaurant base, offset by changes in our franchise owner rebate program.  We paid franchise owners rebates, recorded as a reduction of food distribution revenue, of $20.6 million and $11.2 million for the years ended December 2008 and 2009, respectively. We closed one of our non-branded restaurants in the Denver International Airport in the fall of 2008, which contributed to the decline in revenue for our Company-owned restaurant locations.

### Cost of Revenues

| ($ in thousands) | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2008 | 2009 | $ | % |
| Cost of revenue: | | | | |
| Franchise operations | $ 14,121 | $ 15,689 | $ 1,568 | 11% |
| Food distribution | 388,073 | 308,928 | (79,145) | -20% |
| Company-owned restaurants | 11,677 | 9,819 | (1,858) | -16% |
| Total cost of revenue | 413,871 | 334,436 | (79,435) | -25% |
| Gross margin | $ 284,273 | $ 217,525 | $ (66,748) | -23% |

Franchise royalty commissions increased in comparison to 2008 as a result of the movement to an external commissions-based field team from a corporate field team in early 2009, offset by an approximate decrease of $4.5 million in royalties and openings commission expense due to the reacquisition of area directorships and master franchise rights in 2009. Our field team costs, included in cost of revenues for 2009, were approximately $6.6 million, with the comparable 2008 field team costs of $5.8 million being recorded as general and administrative expense.  The overall decrease in food distribution cost of revenue is the result of the same decline in AUVs and a reduced restaurant base which impacted the related revenue.  The closure of one of our non-branded restaurants in the Denver International Airport, which caused the decrease in the related revenue, is also the primary driver of the decline in our Company-owned restaurants cost of revenue.

### Operating Expenses

| ($ in thousands) | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2008 | 2009 | $ | % |
| Operating expenses: | | | | |
| General and administrative expenses | $ 101,332 | $ 68,401 | $ (32,931) | -32% |
| Litigation settlement charges | — | 16,758 | 16,758 | 100% |
| Advertising expense | 36,089 | 33,039 | (3,050) | -8% |
| Deferred and share-based compensation | 5,077 | 751 | (4,326) | -85% |
| Depreciation and amortization | 20,048 | 15,048 | (5,000) | -25% |
| Other | 10,134 | 9,274 | (860) | -8% |
| Total operating expenses | 172,680 | 143,271 | (29,409) | -17% |
| Operating profit | $ 111,593 | $ 74,254 | $ (37,339) | -33% |

The major driver in the decrease in general and administrative expense in comparison to 2008 was a significant reduction in force in the fall of 2008.  As a result, employee related costs, including compensation, benefits and travel decreased during 2008 by more than $36 million.  In addition, as previously noted, our field team costs of $6.6 million were included cost of revenues for 2009, with the comparable 2008 field team costs of $5.8 million being recorded as general and administrative expense.  Offsetting these decreases was the recording of a $3.7 million exit charge related to the decision to cease use of certain space under our corporate facility lease in 2009.

Litigation settlement charges related to our estimated losses as a result of certain class action complaints that were filed against us.  We estimated these charges based on the terms of the settlement agreement, originally agreed upon during 2009.

The negative change in AUVs and reduced restaurant base resulted in a decrease in advertising contributions received from franchise owners.  Lower overall advertising expenditures were due to increased efficiencies in our advertising and marketing.

Ex. 1 p. 94

Share-based compensation expense was $3.5 million and $0.8 million for the years ended December 31, 2008 and 2009, respectively. The compensation expense is recognized over the requisite service periods for each type of share-based compensation, and therefore resulted in additional expense being recognized in 2008 since certain service periods were completed in 2008.  As of December 31, 2008, participation in our deferred compensation plans was frozen to new entrants and all plans were fully vested. Since some vesting occurred during 2008, we incurred approximately $1.6 million of compensation expense related to the plans.

The net decrease of $5.0 million, or 25%, in depreciation and amortization is the result of a decrease in depreciation expense of $3.5 million and in amortization expense of $1.5 million.  The decrease in depreciation was the result of more assets in service during 2008 including our corporate airplane and restaurant equipment leased by us and located in franchise restaurants.  The corporate airplane was sold in early 2009.

The majority of other operating expenses are allowances for doubtful accounts, non-cash impairment charges and Company-owned restaurant pre-opening and occupancy charges.

### Non-operating Income and Expense

| ($ in thousands) | Year Ended December 31, | | Change | |
| | 2008 | 2009 | $ | % |
|---|---|---|---|---|
| Non-operating expenses: | | | | |
| Interest expense | $ 78,677 | $ 64,136 | $ (14,541) | -18% |
| Interest income | (700) | (173) | 527 | -75% |
| Other | (769) | 1,766 | 2,535 | -330% |
| Total non-operating expenses | $ 77,208 | $ 65,729 | $ (11,479) | -15% |

Interest expense decreased as the result of an overall decline in the interest rates as our long term debt under our first lien term loan and second lien term loan is based upon a spread over LIBOR. Interest income decreased due to an overall decrease in interest rates earned on our cash balances. The fluctuation in other non-operating expense resulted from net foreign exchange gains in 2008 and losses in 2009, primarily the result of our food distribution business in Canada.

### Income Taxes

| ($ in thousands) | Year Ended December 31, | | Change | |
| | 2008 | 2009 | $ | % |
|---|---|---|---|---|
| Income tax expense: | | | | |
| Income tax expense | $ 1,656 | $ 3,043 | $ 1,387 | 84% |

We have no provision for U.S. federal income taxes as, with the exception of certain Canadian entities, we have elected to be treated as a pass through entity for U.S. federal income tax purposes. Income tax expense stems primarily from the Canadian operations. Additionally, we received royalties and franchise fees from outside the United States that are subject to foreign withholding taxes, which are included in income tax expense.  The increase in income tax expense in comparison to 2008 was the result of the accrual for withholding taxes on a cross-border cash distribution from one of our Canadian subsidiaries to the United States.

### Income Attributable to Noncontrolling Interests

| ($ in thousands) | Year Ended December 31, | | Change | |
| | 2008 | 2009 | $ | % |
|---|---|---|---|---|
| Net income attributable to noncontrolling interests: | | | | |
| Net income attributable to noncontrolling interests | $ 278 | $ 186 | $ (92) | -33% |

We consolidated two entities for which third parties own a noncontrolling interest. Both entities operate area directorships in certain regions of the United States.

84

Ex. 1 p. 95

**Liquidity and Capital Resources**

During 2008, 2009, 2010, net cash provided by operating activities of continuing operations was $14.0 million, $15.6 million and $5.4 million, respectively.  Net cash provided by operating activities of continuing operations was $22.7 million and $11.8 million, for the nine months ended September 30, 2010 and 2011, respectively.

During fiscal year 2008, we invested approximately $8.5 million in capital spending, which primarily included upgrades to information technology systems and costs to relocate and build out our new corporate facility. We incurred lower capital spending of approximately $1.7 million and $5.3 million during fiscal years 2009 and 2010, respectively. During the nine months ended September 30, 2010, we invested $5.4 million in capital spending, primarily related to the increase in the number of Company-owned locations, excluding the amounts reported as discontinued operations. We invested approximately $0.7 million in capital spending during the nine months ended September 30, 2011, the majority of which was related to leasehold improvements within our corporate headquarters required to consolidate our leased space in connection with our first quarter restructuring activities.

Net cash provided by operating activities of continuing operations was $11.8 million for the nine months ended September 30, 2011, driven primarily by the receipt of insurance recoveries of $9.8 million. The other $2.0 million of cash provided by operating activities was the result of net income from continuing operations of $13.3 million and net non-cash adjustments of $12.6 million, offset by deferred compensation payments of $10.8 million and other working capital changes of $13.1 million.  During the nine months ended September 30, 2011, we invested $0.7 million in total capital additions, $1.2 million in the reacquisition of area director territories, and $1.5 million through the issuance of notes under our franchise owner lending program, offset by principal payments received on notes totaling $2.0 million.  We had net cash outflows for financing activities of $6.1 million, primarily due to payments on long-term debt of $7.1 million, offset by net borrowings on lines of credit of $1.4 million. Net cash used in operating activities by discontinued operations was $1.3 million.

Net cash provided by operating activities of continuing operations was $22.7 million for the nine months ended September 30, 2010.  Net cash provided by operating activities was primarily the result of net income from continuing operations of $5.8 million and net non-cash adjustments of $22.3 million, which was primarily composed of depreciation and amortization of $12.5 million and bad debt expense on accounts and note receivable of $5.0 million.  These amounts were offset by payments on deferred compensation of $10.1 million.  We invested $5.4 million in capital additions and $7.3 million through the issuance of notes receivables under our franchise owner lending program, offset by $0.8 million in principal received on the notes during the nine months ended September 30, 2010.  During the nine months ended September 30, 2010, we used $28.8 million in financing activities, the majority of which related to $47.1 million of payments on long-term debt and $8.5 million of net payments on our revolving lines of credit, offset by the receipt of $29.6 million in capital contributions. For the nine months ended September 30, 2010, net cash used in operating and investing activities of discontinued operations was $2.7 million and $1.7 million, respectively.

Net cash provided by operating activities of continuing operations was $5.4 million during the year ended December 31, 2010. This was driven primarily by net income from continuing operations of $18.0 million and increased by depreciation and amortization of $16.4 million and other net non-cash adjustments of $16.2 million, offset by payments on deferred compensation plans of $10.1 million, accrual for insurance recoveries of $9.8 million and other working capital changes of $25.3 million primarily due to the $16.8 million of payments resulting from a class action litigation settlement entered into in 2009.  During 2010, we invested $5.3 million in capital additions to property and equipment, $1.5 million in area directorship rights and made loans under our franchise owner lending program of $9.6 million. Net cash used in financing activities of continuing operations was $32.9 million, driven by the paydown of our first lien debt and other debt payments totaling $49.1 million, offset by contributions of $29.6 million from JPMP and Consumer Capital Partners ("**CCP**"). We also had net payments on our lines of credit of $10.3 million. Net cash used in operating activities and investing activities by discontinued operations was $6.1 million and $3.1 million, respectively.

Net cash provided by operating activities of continuing operations was $15.6 million during 2009, driven primarily by net income of $5.5 million, increased by depreciation and amortization of $15.1 million and other net non-cash adjustments of $11.5 million, other working capital increases of $5.8 million offset by payments on deferred compensation of $22.2 million.  During 2009, we invested $1.7 million in capital additions to property and

equipment, $1.8 million in area directorship rights and made loans of $2.8 million, with a majority of the loans made to a vendor.  Net cash provided from financing activities of continuing operations was $67.8 million, driven by net borrowings on our lines of credit of $81.9 million, and offset by principal payments on debt of $12.8 million. Net cash used in operating activities and investing activities by discontinued operations was $2.4 million and $0.0 million, respectively.

**Off Balance Sheet Obligations**

In certain cases, we have guaranteed certain lease payments of franchise owners, arising from leases assigned to franchise owners, by remaining secondarily liable under assigned leases for rental fees for restricted time periods, generally six months. In the event of default by the franchise owners, we have typically retained the right to acquire possession of the related restaurants, subject to landlord consent. These leases have varying terms, the longest of which expires in 2021.  We periodically update and revise, using currently available information, our assumptions surrounding the estimate of potential amounts we expect to pay in the event of nonpayment by the franchise owners, and as of September 30, 2011, the estimated potential amount of aggregate undiscounted payments that we would be required to make in the event of nonpayment by the franchise owners was approximately $9.7 million. We have recorded an aggregate liability of approximately $1.8 million at September 30, 2011, which includes the estimated fair value of these lease guarantees, at inception, net of any subsequent adjustments ($0.5 million), and estimated amounts to settle leases in default by the franchise owners ($1.3 million).

We do not have any other material off balance sheet obligations.

**Inflation**

Historically, inflation and changing prices have not had a material impact on our net sales and revenues or on our income from continuing operations.

**Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to the impact of interest rate changes, foreign currency fluctuations and changes in commodity prices. In the normal course of business, we may employ policies and procedures to manage our exposure to these changes.

**Foreign Exchange Risk**

Our objective in managing our exposure to foreign currency fluctuations is to limit the impact of such fluctuations on earnings and cash flows. Our business is primarily transacted in U.S. dollars. Exposure outside of the U.S. relates primarily to the effect of foreign currency rate fluctuations on food purchases and sales by our food distribution business and royalties paid to us by our international franchise owners. In addition, we are exposed to foreign exchange fluctuations when we translate our Canadian operating results into U.S. dollars for reporting purposes. While these fluctuations are not significant to the consolidated operating results, the fluctuations in exchange rates do impact our U.S. segment operating results, and can affect the comparability between quarters and year-to-year.  As of September 30, 2011, our most significant exposure related to the Canadian Dollar.  At the current level of annual operating income generated from our Canadian operations and current Canadian dollar cash flow exposures, if the Canadian currency rate changes by 10% the entire year, the annual impact on our net income and annual cash flows would not be material.

**Interest Rate Risk**

We are subject to interest rate risk in connection with our long-term debt and revolving credit facilities. Immediately following the restructuring transactions, our principal interest rate exposure will relate to the senior secured term loan outstanding and revolving credit facility under our new senior credit facility.  After giving effect to the Restructuring Transactions, we will have a $400.0 to $452.6 million first lien term loan facility and a $134.9 to $185.6 million second lien term loan facility, each bearing interest at variable rates subject to agreed floors. Each eighth of a percentage point change in interest rates (when such rate is above the applicable floor) would result in a

**Ex. 1 p. 97**

$0.5 to $0.6 million change in annual interest expense on our Amended First Lien Facility and a $0.2 million change in annual interest expense on our New Second Lien Facility.

In connection with consummation of the transactions, we will be required to enter into interest rate hedges to limit our interest rate exposure associated with our outstanding variable rate debt.

**Commodity Risk**

Even though we do not manufacture food or other products, we supply substantially all of the ingredients and supplies used in our and our franchise owners' restaurants and therefore we are exposed to commodity price risk in the normal course of business.  To the extent that there are unfavorable variations in price between what we pay for ingredients and supplies and what we are able to sell them for, our profitability may be seriously impaired.  Prices for certain commodities such as wheat, produce, dairy products, beef, chicken and turkey, and other supply costs, including fuel and utilities costs, are also subject to substantial fluctuations.  While we generally enter into pricing agreements of up to one year with our vendors to mitigate the risks related to commodity price fluctuations, such contracts do not fully mitigate commodity price risk, particularly over the longer term.  Increases and decreases in commodity costs are largely passed through to our franchise owners, resulting in higher or lower revenues and higher or lower costs of sales from our food distribution operations. These changes may impact margins as many of these products are typically priced based on a fixed-dollar mark-up.  These cost and pricing changes can impact revenues, costs and margins, and can create volatility year-over-year. See "Risk Factors—Risks Related to Our Business—Increases in the cost of or interruptions in the supply of food, beverage and other products and services to our or our franchise owners' restaurants could have a material adverse effect on our revenues."

**Contractual Obligations**

In the table below, we set forth our enforceable and legally binding obligations as of September 30, 2011.  Some of the figures we include in this table are based on management's estimates and assumptions about these obligations, including their duration, anticipated actions by third parties, and other factors.  Because these estimates and assumptions are necessarily subjective, the enforceable and legally binding obligations we will pay in future periods may vary from those reflected in the table.  Further, the figures in this table do not reflect adjustments that would result from the consummation of the Restructuring Transactions:

| ($ in thousands) | Total | | Less than 1 year | | 1 - 3 years | | 3 - 5 years | | More than 5 years | |
|---|---|---|---|---|---|---|---|---|---|---|
| Long-Term Debt Obligations (1) | $ | 950,836 | $ | 132,415 | $ | 818,421 | $ | — | $ | — |
| Other Long-Term Debt (2) | | 4,994 | | 3,327 | | 1,149 | | 332 | | 186 |
| Capital Lease Obligations (3) | | 22,949 | | 3,249 | | 5,344 | | 5,039 | | 9,317 |
| Operating Lease Obligations (4) | | 25,260 | | 4,290 | | 6,598 | | 6,204 | | 8,168 |
| Operating Lease Obligations, subject to sublease (5) | | 31,405 | | 6,731 | | 11,541 | | 6,749 | | 6,384 |
| Short and Long Term Obligations (6) | | 22,847 | | 8,482 | | 6,810 | | 994 | | 6,561 |
| **Total** | $ | **1,058,291** | $ | **158,494** | $ | **849,863** | $ | **19,318** | $ | **30,616** |

(1)   Long-term debt obligations represent borrowings under our credit agreements, including our line of credit and Marketing Fund Trusts credit facility.  These amounts include interest of $65.0 million based on current rates as of September 30, 2011.  We were not in compliance with one of our financial covenants at September 30, 2011 and as a result the lenders have the right to accelerate the payment of $869.9 million of principal.  The lenders have not exercised that right and therefore and only for purposes of this schedule payment amounts are presented based on contractual payment periods.

(2)   Other long-term debt represents notes payable related to the reacquisition of area marketing agreements.  These amounts include interest of $0.3 million based on current rates as of September 30, 2011.  Subsequent to September 30, 2011, we settled claims with a former area director for $0.9 million payable in cash of $0.75 million and a promissory note of $0.15 million.  The promissory note is included as part of other long-term debt and the cash portion is included as part of short and long-term obligations.

(3)   Capital lease obligations include interest of $6.5 million and are currently satisfied ratably as our franchise owners purchase certain vendors' products.  These do not require cash payments at this time.

(4)   Includes operating lease obligations for our corporate facilities, including company-owned restaurant locations.

(5)   Operating lease obligations subject to sublease represent leases which we have assigned or sublet to our franchise owners. The amounts have not been reduced by minimum sublease rentals of $25.3 million, which are paid directly to the lessors and are due in the future under these noncancelable subleases.

**Ex. 1 p. 98**

(6)   Short and long-term obligations primarily includes obligations under deferred compensation plans to former employees, directors, advisors and related parties.  Forecasted amounts of $6.6 million included in the more than 5 years category represent obligations to participants who are currently ineligible for payments as of September 30, 2011.  These participants will become eligible for payments upon the occurrence of certain qualifying events such as a separation of services from the Company or a change in control of the Company as defined in the deferred compensation plans.

Ex. 1 p. 99

# BUSINESS

## General

We are one of the world's largest franchisors of restaurants offering sandwiches, salads, soups, and beverages, as well as catering services within the QSR segment of the restaurant industry.  Quiznos is a well recognized brand with distinct consumer positioning in its core markets, generating global systemwide sales (comprised of retail sales at our franchise- and company-owned points of distribution) of $1.2 billion in 2010.

Quiznos is a leading franchisor in the QSR segment of the restaurant industry with a global system of 3,113 locations located in every U.S. state, Puerto Rico, Canada and 26 other countries as of September 30, 2011. Of these open restaurants, 2,446, or 79%, were located in the United States and 667, or 21%, were located in international markets.  As of September 30, 2011, we have sold a total of 399 franchise agreements for which the restaurants have not yet opened.  Of these SNOs, 316, or 79%, were located in the United States and 83, or 21%, were located in international markets.

## History

We were established in 1981 with the opening of the first Quiznos restaurant in Denver, Colorado. In 1991, the Schaden family purchased certain assets of Quizno's America, Inc. and formed what later became known as The Quizno's Corporation ("**TQC**"). In 1994, TQC completed an initial public offering and became a NASDAQ listed company. In December 2001, TQC commenced a going private transaction and contributed all of its franchise agreements to The Quizno's Franchise Company ("**TQFC**"). In 2005, as part of a securitization financing transaction, numerous steps occurred simultaneously that resulted in a restructuring among affiliated companies of the Quiznos organization.  As a result of such transaction, QFA Royalties LLC (the "**Franchisor**") assumed all Quiznos franchise agreements and area marketing agreements that were effective as of February 5, 2005.  In addition, all of the "Quiznos" Marks, copyrights, confidential information and other intellectual property (referred to collectively as the "**Quiznos IP**") was transferred to QIP Holder LLC ("**QIP**").  QCE Holdings LLC is currently the ultimate parent of the Franchisor, QIP and the Company.

Under a Franchise Servicing Agreement (the "**Franchise Servicing Agreement**") between the Franchisor and our affiliate TQSC II LLC (the "**Franchise Servicer**"), on the Franchisor's behalf and at the Franchisor's direction, the Franchise Servicer is responsible for pre- and post-opening obligations under the franchise agreements for Quiznos restaurants located in the United States, including managing the entities operating under the Franchisor's authority; marketing and offering new and successor franchise agreements; assisting those franchise owners operating in the United States; implementing quality assurance programs; and otherwise fulfilling the Franchisor's duties under the franchise agreements. The Franchise Servicer is paid by the Franchisor to perform such services and may subcontract with its affiliates to provide such services.  The Franchise Servicer also acts as the Franchisor's sales agent.

Under a Products License Agreement between the Franchisor and AFD (the "**Products License Agreement**"), AFD or certain designated affiliates have the right to select the suppliers, manufacturers and distributors of food and non-food products to our franchise owners in the United States and Canada under the franchise agreements. Under the Products License Agreement, AFD also has a sublicense to use the Quiznos Marks in connection with the purchase and sale of proprietary products. AFD pays the Franchisor a product license fee in connection with the grant of this sublicense. AFD also leases fountain equipment for carbonated beverages to franchise owners.

Besides those parent companies and affiliated predecessors described above, other affiliates of the Company include The Quizno's Realty Company LLC and Restaurant Realty LLC, which are parties to a limited number of leases and subleases for Quiznos restaurants; QCE Gift Card LLC, which provides stored value card services to franchise owners; Quizmark LLC (an unrestricted subsidiary), which offers certain financing to franchise owners; Quiznos Canada Holding LLC, which through its subsidiary Quiz-Can LLC, owns 100% of Quizno's Canada Restaurant Corporation ("**QCRC**") and operates the master franchise for Canada through a management agreement with QCRC; QCRC, which is the master franchise in Canada; and QAFT, Inc., which serves as the trustee of the Marketing Fund Trusts.

Ex. 1 p. 100

**Restaurants**

Our traditional restaurants ("**Traditional Restaurants**"), which we define as those restaurants located primarily in central business districts and retail strip malls, are typically located in 1,200 to 1,600-square-foot spaces, while our non-Traditional Restaurants are generally smaller and designed for their respective environment.  Almost all Quiznos restaurants lease their space. As of September 30, 2011, there were 2,456 open Traditional Restaurants and 444 open non-Traditional Restaurants in the United States and Canada.

**Overview of Franchising**

We strategically seek to have franchise owners who are owner-operators. As of September 30, 2011, more than 86% of the restaurants in the United States were owned by franchise owners who owned no more than two restaurants. As of September 30, 2011, excluding the four Quiznos and two non-Quiznos restaurants we owned, all of the restaurants in the United States were owned by franchise owners.

We have established certain credit scores and net worth standards for prospective franchise owners. The maximum amount of debt that we allow prospective franchise owners to service is typically 70% of the estimated total initial investment required, although we may consider higher limits in certain metropolitan markets in which construction costs are higher.

As an integrated franchising company, we generate cash flow from multiple sources and have a low fixed cost operating platform that, among other things: (i) sells franchises; (ii) assists franchise owners in the opening of restaurants; (iii) delivers products and promotions to our and our franchise owners' restaurants; (iv) assures consistency and quality across our and our franchise owners' restaurants; (v) collects royalties and other payments from franchise owners; and (vi) manages our brand. As a franchisor, we have an established infrastructure to serve thousands of prospective and current franchise owners. We identify sales leads through targeted mailings, maintaining a presence at industry trade shows and conventions, existing customer and supplier contacts and regularly placed advertisements in trade and other publications as well as in the restaurants. The most effective means of attracting applicants is through well-attended sales events, which we host frequently throughout the United States. Prospective franchise owners typically attend such events, meet Quiznos staff and complete an application for a franchise.

The initial franchise fee payable by a new franchise owner for his or her first Traditional Restaurant unit is currently $5,000. Pursuant to the franchise agreement, the Franchisor is obligated to provide certain pre-opening and post-opening services to a franchise owner. Franchise owners are required to operate restaurants under uniform operating standards and specifications relating to the selection, quality and preparation of menu items, signage, decor, equipment, uniforms, suppliers, maintenance and cleanliness of premises and customer service.

As of September 30, 2011, the weighted average royalty fee rate for the United States was 6.8%. A royalty fee rate is calculated as a percentage of sales net of discounts required of franchise owners to remit to us on a weekly basis. "**Gross Sales**" are defined as sales of any kind for all services or products from or through a Quiznos restaurant, including any sales made for cash or upon credit, or partly for cash and partly for credit, regardless of collection of charges for which credit is given, regardless of whether sales are conducted in compliance with or in violation of the terms of the applicable franchise agreement, and regardless of whether sales occur at the site of the restaurant or off-site, but excluding discounts, sales taxes, or other similar taxes and credits. Gross Sales also include (i) the fair market value of any services or products a franchise owner receives in barter or exchange for services and products and all insurance proceeds that a franchise owner receives for loss of business due to a casualty to or similar event at the restaurant and (ii) the gross amount of any gift card redemptions at a Quiznos restaurant.

Since April 1998, the form of franchise agreement governing Traditional Restaurants has required a 7% of Gross Sales royalty fee rate.  However, during 2010, the form of franchise agreement governing approximately 50 Traditional Restaurants required an 8% of Gross Sales royalty fee rate.  Prior to April 1998, the royalty fee rate for the United States generally ranged from 5% to 6%. The royalty fee rate for non-Traditional Restaurants generally ranges from 4% to 8%.

90

**Ex. 1 p. 101**

**Franchise Agreement Terms**

From 1991 through October 2000, TQC was the franchisor of the Quiznos franchise system.  In October 2000, TQFC assumed the role of franchisor on a going-forward basis. Both TQC and TQFC utilized one or more forms of franchise agreement.  Such forms of franchise agreements are currently still in place for franchises established between 1991 and 2002, unless renewals have been exercised since that time. In July 2002, Quizno's Franchising LLC ("**QF**") became the franchisor for the United States and used one or more forms of franchise agreement from July 2002 until the Franchisor assumed all franchise agreements in February 2005. In February 2005, Quizno's Franchising II, LLC ("**QFII**") was formed to grant new Quiznos franchises and area director rights and did so until March 27, 2008. At that time, QFII distributed substantially all of its assets, including its franchise agreements and area marketing agreements to the Franchisor, which now grants all franchises and area director rights.

The following summary describes the form of franchise agreement currently used by the Franchisor when franchising new or additional Traditional Restaurants, including upon the sale, transfer or assignment of an existing franchise agreement and when renewing existing franchise agreements that are about to expire.  Except as set forth in this Offering Memorandum and Disclosure Statement, the terms of the form of franchise agreements for Traditional Restaurants used by TQFC, QF, QFII and the Franchisor from October 2000 to the date of this Offering Memorandum and Disclosure Statement are substantially similar to the terms described below. Subject to the restrictions in the Franchise Servicing Agreements, the Franchise Servicer may make changes from time to time to the form of franchise agreement applicable to Traditional or non-Traditional Restaurants that the Franchisor uses when franchising new or additional restaurants.

*Overview*

The franchise agreement grants to a franchise owner the right, so long as the franchise agreement remains in effect, to operate a restaurant business (a "**Licensed Business**") at a specific location (a "**Licensed Premises**") and to use the trade name Quiznos and such related Marks as may be presently or subsequently listed in the Quiznos operations manual (the "**Operations Manual**"), but only in the manner and at such times as are specified in the Operations Manual and/or the franchise agreement.

Each franchise owner is authorized to operate a Licensed Business in (i) a Licensed Premises with a specific numbered street address or (ii) a Licensed Premises with a specific mall or other specialized venue address. The franchise owner has 12 months from the time of signing the franchise agreement to execute a lease and perform all other pre-opening obligations and commence operation of the restaurant. If this does not occur within that 12 month period, the Franchisor can make the determination as to whether the franchise owner is making reasonable and continuing efforts to diligently perform these tasks and is expected to complete the process within 24 months of signing the franchise agreement. If the Franchisor does not make this determination, the Franchisor can terminate the franchise agreement at any time after the expiration of the first 12-month period.

Pursuant to the franchise agreement, a franchise owner is authorized to use the Marks in a Licensed Business only on or in connection with the sale of those food and beverage products (the "**Licensed Products**") designated in the Operations Manual as being included in Quiznos standard menu and meeting the specifications and quality standards set forth in the Operations Manual. Under the franchise agreement, a franchise owner is further authorized to use certain trade secrets and proprietary information of Quiznos relating to, among other things, the manner of preparing and serving the Licensed Products and the method of operating a Licensed Business (the "**Licensed Methods**").

*Term*

The typical term of a franchise agreement is 15 years from the date of signing the franchise agreement. The franchise agreement may be terminated earlier for cause.

*Initial Franchise Fee*

An initial franchise fee is due when a potential franchise owner signs a franchise agreement for a Traditional Restaurant. Each franchise owner acknowledges and agrees that the initial franchise fee represents payment for the initial grant of the right to use the Marks and Licensed Methods, and that the Franchisor has earned the initial franchise fee upon acceptance and execution of the franchise agreement by Franchisor. The initial franchise fee is refundable if the franchise owner signs a site specific addendum and does not receive final approval from the Franchisor for the site.  Otherwise, the franchise owner is generally not entitled to a refund of the initial franchise fee.

*Franchise Royalty Fee*

Under the standard terms of the franchise agreement for Traditional Restaurants, a franchise owner is obligated to pay to the Franchisor a weekly royalty fee (the "**Franchise Royalty Fee**"), equal to a percentage of the total amount of its Gross Sales generated from or through the restaurant. The fees are generally paid weekly through an electronic transfer of funds.  If the required funds are insufficiently available or if the franchise owner fails to pay the royalties on the due date, the franchise agreement provides that overdue payments will bear interest from their due dates at 2% per month, and franchise owners may be charged an additional late fee.

Quiznos has a revenue assurance program for the United States and Canada designed to ensure that franchise owners are reporting their sales correctly, paying the required amounts of royalty fees, and purchasing substantially all their food and operating supplies from designated suppliers.  Quiznos uses this program to monitor trends at each restaurant and statistically relevant changes in trends that may trigger further research. Such research includes an audit of purchase records for food and operating supplies from AFD's suppliers, as our third party distribution center partners provide franchise owner purchase data to us on a regular basis. Accordingly, Quiznos is able to estimate the Gross Sales of specific restaurants based on their food purchase records.  Restaurants with discrepancies between estimated and reported sales may be subject to an audit by Quiznos of its books, records and other information relating to the restaurant and will not be eligible for the weekly franchise cash incentive program if they do not comply with such an audit request.

*Advertising and Marketing Fees*

Under the franchise agreement for Traditional Restaurants, except in very limited circumstances, each franchise owner operating a Traditional Restaurant must pay to the Marketing Fund Trusts a marketing and promotion fee (the "**Advertising Fee**") of a percentage of the franchise owner's Gross Sales and also must spend no less than a certain percentage of Gross Sales on local advertising. The Franchisor currently collects all of the local advertising fees for contribution to regional advertising and promotion campaigns. So long as this practice occurs, franchise owners are required to participate in the regional advertising and the Franchisor reserves the right to increase the percentage of Gross Sales required. Franchise owner payments contributed by the Franchisor to a regional advertising program count toward the minimum local advertising required expenditure. The Franchisor may also establish local advertising cooperatives, which franchise owners may participate in at their option. Any contributions made to a local advertising cooperative are in addition to, and not in lieu of, the Advertising Fee obligations described above.

All Advertising Fees collected from franchise owners are deposited directly into the accounts of the Marketing Fund Trusts. The fees collected from franchise owners are subject to the same late charges as the royalty fees, and the franchise owner must tender his or her Advertising Fee payments to the Franchise Servicer at the same time and in the same manner as the payment of the Franchise Royalty Fee. The Marketing Fund Trusts fund the majority of advertising and marketing services for the United States. The Marketing Fund Trusts are administered by the Franchisor or any of its designated representatives, which may be reimbursed for administrative costs, independent audits, accounting and other reasonable expenses related to administering and operating the Marketing Fund Trusts. The Advertising Fees are used to (i) produce and place media advertising, brochures, collateral advertising materials and other advertising or public relations materials; (ii) undertake market research; (iii) pay the commissions, fees and expenses of advertising and marketing agencies and consultants; (iv) create, produce and implement websites; (v) provide other marketing-related services; and (vi) pay all fees and expenses incurred in connection with the foregoing.

Ex. 1 p. 103

Under our franchise agreements in Canada, our Canadian franchise owners must pay marketing and promotion fees in the same manner, at the same percentages, and under essentially the same terms and conditions as our U.S. franchise owners set forth above.  All fees collected from Canadian franchise owners are deposited into the accounts of the Canadian Advertising Fund, and the Canadian Advertising Fund is administered by QCRC or any of its designated representatives.  QCRC and its designated representative may be reimbursed from the Canadian Advertising Fund in essentially the same manner as set forth above for the Marketing Fund Trusts.

### *Franchise Owner's Territory*

Franchise owners hold nonexclusive franchise rights and generally have no territorial protection granted by the Franchisor. The Franchisor and its affiliates retain the right to: (i) use, and to license others to use, the Marks and Licensed Methods for the operation of Quiznos restaurants at any other location other than the particular location of a franchise owner's restaurant; (ii) use the Marks and Licensed Methods in connection with services and products, promotional and marketing efforts or related items, or in alternative channels of distribution, without regard to location; (iii) use and license the use of alternative proprietary marks or methods in connection with the operation of restaurants or other businesses under names which are not the same or confusingly similar to the Marks, which businesses may be the same as, or similar to, or different from Quiznos restaurants; and (iv) engage in any other activities not expressly prohibited in the franchise agreement.

### *Renewal*

Under the franchise agreement, each franchise owner is entitled, upon the expiration of his or her franchise agreement, to renew the franchise agreement by entering into the Franchisor's then-current form of franchise agreement as long as certain conditions are met.

### *Requirements and Restrictions Pertaining to the Conduct of Restaurants*

The franchise agreement vests in the Franchisor certain rights, and imposes upon a franchise owner certain duties and obligations, with respect to the conduct of a Licensed Business.

Specifically, and without limitation, a franchise owner is obligated under the franchise agreement to commence operation of a Licensed Business within a specified period of time following execution of the franchise agreement, or such extended period as may be granted by the Franchisor in writing. Further, the franchise agreement obligates a franchise owner to operate a Licensed Business strictly in conformance with the Operations Manual promulgated by the Franchisor, including with respect to the cleanliness of the establishment, employment decisions and obtaining required licenses, among other requirements, and reserves to the Franchisor the right to modify the Operations Manual from time to time.

In addition, the Franchisor possesses the exclusive right to specify (i) which Licensed Products may be offered and sold by a Licensed Business and (ii) the suppliers of all components, ingredients or equipment and signs to be used in or by a Licensed Business.  The current form of franchise agreement also provides that the Franchisor has the right to specify the maximum and/or minimum prices that the franchise owner may charge customers for products and services sold by the restaurant, a provision not found in earlier forms of the franchise agreement. The franchise agreement also vests in the Franchisor the right to approve, in its sole discretion, any other food products or beverages to be offered or sold by a Licensed Business.

The franchise agreement vests in the Franchisor the right to interview customers of the restaurant and inspect a Licensed Business, including books and records, building, equipment and operations and to test all Licensed Products offered for sale by a franchise owner. Similarly, the franchise agreement vests in the Franchisor the right to require a franchise owner to promptly repair, remodel, refurbish or replace any equipment, signage or building not in compliance with the operating standards and conditions set forth in the Operations Manual and to approve, prior to the commencement of any repairs or remodeling, any of a franchise owner's proposed plans and specifications related thereto.

Ex. 1 p. 104

The franchise agreement also requires a franchise owner not to use any other name or mark, alone or in connection with any Mark, in connection with the operation of a Licensed Business without the Franchisor's consent, and not to permit the name "Quiznos," "Quiznos Sub" or any other Marks to be used by others or in any manner detrimental to our good name and reputation. Under the franchise agreement, a franchise owner is obligated to notify the Franchisor of any infringement of any Marks which come to the franchise owner's attention. The right of a franchise owner to use the name "Quiznos," "Quiznos Sub" or any of the other Quiznos Marks terminates immediately upon the termination of the franchise agreement.

### Indemnification/Insurance

Under the franchise agreement, a franchise owner is obligated to defend, indemnify and hold harmless the Franchisor and its affiliates against, and to reimburse the Franchisor for, any and all costs, claims, obligations, and damages of every kind and nature, including attorneys' fees, arising from franchise owner's third party obligations, arising or resulting directly or indirectly from the franchise owner's operation of a Licensed Business, arising out of the use of the Marks and Licensed Methods in any manner, or the lease for the franchise owner's location.

A franchise owner is also obligated to obtain and maintain, at his or her expense, insurance of the types, in the minimum amounts and with the minimum terms and conditions as the Franchisor determines in the Operations Manual.

### Covenants against Competition/Disclosure

The franchise agreement imposes upon a franchise owner a covenant not to compete during the term thereof and for a period of two years following the termination or expiration of the franchise agreement. Under these covenants not to compete, neither the franchise owner nor any officer, director, partner, member, shareholder or other owner of the franchise owner (nor the spouse or other immediate family member of those individuals) may have any direct or indirect ownership interest in, or perform services in any capacity for, a business operating, or granting franchises for the operation of, a restaurant or other food service business deriving more than 10% of the gross receipts from the sale of sandwiches (a "**Competitive Business**"). Franchise owners and the other persons and individuals described in the immediately preceding sentence, may not divert or attempt to divert any business related to Quiznos by direct inducement or otherwise, and may not divert or attempt to divert the employment of any employee to any Competitive Business. During the term of the franchise agreement, this covenant applies without regard to the location of the prohibited business. For a period of two years after termination or expiration of the franchise agreement, these covenants regarding Competitive Businesses apply within five miles of a Licensed Premises or any other Quiznos restaurant.

Further, the franchise agreement contains a covenant against disclosure prohibiting a franchise owner from divulging, disclosing or otherwise communicating, either directly or indirectly, to any other person or entity, any confidential information or knowledge concerning the Licensed Methods or any matter set forth in the Operations Manual.

### Sale, Assignment and Transfer of Franchise Agreements/Franchised Businesses

Under the franchise agreement, a franchise owner is prohibited from transferring the franchise agreement, any interest in the franchise agreement, any part or all of his or her assets, or ownership of a Licensed Business without the prior written approval of the Franchisor, which approval may not be unreasonably withheld if all applicable requirements set forth in the franchise agreement are satisfied.

### Remedies Available to the Franchisor upon Occurrence of a Default by Franchise Owner; Termination

In addition to the specific remedies afforded to the Franchisor under the franchise agreement for a default by the franchise owner, as described below, the Franchisor possesses all rights and remedies afforded by common law for such defaults and breaches. These rights and remedies include, without limitation, actions at law to recover damages or to secure specific performance of the franchise agreement and actions in equity to secure preliminary and permanent injunctive relief.

The Franchisor's contractual right to terminate a franchise agreement may be modified by state "franchise relationship" statutes. These statutes may not allow the Franchisor to terminate a franchise agreement immediately and may require a different cure period than that provided under the terms of the agreement.

In addition, under the current form of franchise agreement, the Franchisor has the right to immediately terminate a franchise agreement, effective upon giving notice to a franchise owner, if: (i) the franchise owner's right of possession of a Licensed Premises is terminated because of the franchise owner's default; (ii) the franchise owner (or any officer, director or owner) is convicted of any felony or other crime likely to adversely affect the Quiznos Marks; (iii) the franchise owner discloses any confidential information; (iv) the franchise owner begins operating a Licensed Business without the Franchisor's consent; (v) the franchise owner commits fraud; (vi) in the Franchisor's reasonable judgment, the continued operation of a Licensed Business by the franchise owner will endanger public health or safety; (vii) the franchise owner fails to complete training or to commence operating within the required time period; (viii) the franchise owner intentionally or negligently understates Gross Sales by 5% or more; (ix) the franchise owner commits an uncured default under any loan or equipment lease; (x) any other franchise agreement between the Franchisor and the franchise owner (or their respective affiliates) is terminated; (xi) the franchise owner receives three notices of default in any 12 month period for any reason, even if cured; (xii) the franchise owner fails to pay amounts due to the Franchisor or its affiliates within 10 days after delivery of notice that fees are overdue; or (xiii) the franchise owner misuses or fails to follow Franchisor's directions and guidelines concerning the use of Marks and fails to correct the violation within 10 days after notice.

Moreover, the Franchisor may terminate a franchise agreement upon giving notice to a franchise owner and affording a 30-day opportunity to cure the subject default (ten days if the default relates to misuse of the Marks or non-payment of royalties or any other monies due to the Franchisor or its affiliates), should the franchise owner fail at any time to fully comply with any clause of the franchise agreement or fail to operate a Licensed Business strictly in accordance with the Operations Manual.

The franchise agreement reserves to the Franchisor all of the other rights and remedies at law and in equity in the event of a franchise owner's breach or default. In any such action to enforce its rights, the Franchisor is contractually entitled, if it is the prevailing party, to obtain reimbursement from the franchise owner of its costs and expenses, including reasonable attorneys' fees.

Following the termination of a franchise agreement, all of a franchise owner's rights and privileges thereunder will cease immediately and the franchise owner must, among other things, immediately cease operating or using anywhere, in any manner, directly or indirectly: (i) the Marks; (ii) all advertising and promotional materials and programs, menu boards or other items bearing the Marks; (iii) the Licensed Methods; (iv) any website or online presence related to the restaurant or the Marks; and (v) the Operations Manual. Moreover, upon such termination, such franchise owner is required to return the Operations Manual to the Franchisor, pay all owed royalties and fees, and immediately remove all signs and distinctive designs of the Franchisor so that a Licensed Premises does not resemble any of our restaurants.

### *Personal Guaranties*

The franchise agreement requires that all owners of a franchise owner that is an entity execute a personal guaranty thereby agreeing to be personally bound by the terms of the franchise agreement and agreeing to enforcement thereof by injunctive relief in addition to any other relief to which the Franchisor may be entitled to at law or in equity. All spouses whose consent is necessary to bind the guarantor's marital assets must acknowledge his or her spouse's execution of the guaranty. The personal guaranty provides that the Franchisor may require such signatories immediately to make each payment required of a franchise owner under the franchise agreement without exhaustion of remedies against the franchise owner first.

### Area Directors in the United States

Area directors are independent contractors who act as sales representatives within a defined geographic area within the United States, solicit and identify prospective franchise owners and provide additional support to franchise owners before, during and after a restaurant opens, including, without limitation, providing assistance in locating and securing sites for restaurants within their respective geographic areas or territories.  During the early

years of our development, we believed it was a prudent business decision to enter into area director marketing agreements with entrepreneurs who understood local real estate markets and were capable of launching Quiznos in new markets.

As Quiznos grew, the business justification for area director marketing agreements dissipated, and the Company terminated and/or reacquired substantially all of the agreements.  As of the date hereof, there was one third party area directorship and one area directorship owned by the Company or its affiliates operating.

**International Operations**

In Canada, we had 454 open restaurants and 57 SNOs as of September 30, 2011. In addition, AFD provides services in Canada similar to the services provided by AFD in the United States. Quiznos has full-time management and staff dedicated to all aspects of the Canadian Operations; however, legal, accounting, human resources, and information technology services are provided out of our corporate headquarters in Denver, Colorado. The terms of the current form of franchise agreement for Canada are substantially the same as the terms described above. However, the Franchisor does not retain the right to set minimum prices in Canada.

In other international markets, Quiznos generally markets franchise agreements through a master franchise owner from whom Quiznos receives a one-time master franchise fee, negotiated on a case-by-case basis. The master franchise owner receives the right to sell franchises and area directorships in a defined international market on an exclusive basis. Quiznos is paid either a fixed percentage of the restaurants' Gross Sales or a portion, typically 30%, of all initial franchise fees, royalty fees and area director fees collected by the master franchise owner.

As for September 30, 2011, franchised restaurants are currently located in the following 28 countries and Puerto Rico: Aruba, Bahamas, Bahrain, Canada, Cayman Islands, Costa Rica, Curacao, Dominican Republic, Ecuador, El Salvador, Guatemala, Honduras, Iceland, India, Ireland, Kuwait, Nicaragua, Oman, Panama, Qatar, St. Maarten, Saudi Arabia, Singapore, South Korea, United Arab Emirates, United Kingdom, United States of America and Venezuela.

**Quality Assurance**

We have a quality assurance program designed to maintain standards and uniformity of our and our franchise owners' restaurants throughout the United States and Canada. Currently, a third party expert engaged by us conducts twice per year unannounced quality assurance inspections of every restaurant to ensure that our company policies, practices and procedures are being followed and our Regional Operating Managers also conduct periodic store inspections. We also occasionally conduct mystery shops and unannounced product checks. In addition, we host market meetings approximately four to six times a year and require periodic online manager testing in order to provide continuing education to our franchise owners and their certified managers.

**Sales and Marketing**

Quiznos employees develop advertising campaigns for use in the United States and Canada to support consumer sales in the restaurants. As of December 31, 2010, most U.S. restaurants paid 1% of their Gross Sales to the Quiznos National Marketing Fund Trust and 3% of their Gross Sales to the Regional Marketing Fund Trust, and each Canadian restaurant contributed 4% of its Gross Sales to the Canadian Advertising Fund. The Company-owned restaurants must pay the advertising fees on the same basis. Quiznos uses the advertising fees on behalf of the franchise owners:

- to create, produce and place advertising, in-store signs, in-store promotions and television and radio commercials;

- to pay agency costs and commissions;

- to create and produce video, audio and written advertisements;

- to administer regional advertising programs, including direct mail and other media advertising; and

- to support public relations, market research and other advertising and marketing activities.

Quiznos has made voluntary contributions, loans and guarantees to the Marketing Fund Trusts and Canadian Advertising Fund from time to time. For fiscal year 2010, franchise owner contributions were $40.4 million and our contributions were $33.0 million.

## Suppliers

### Food Distribution

AFD arranges the procurement of proprietary products by unaffiliated manufacturers and, in some cases, wholesales such products to distributors who then will sell such products to franchise owners. AFD currently has relationships with several manufacturers and suppliers of food products. It also contracts with independent trucking companies to pick up deliveries at suppliers' warehouses and deliver products directly to third party distributors who sell the products to franchise owners. AFD utilizes a diversified set of distribution relationships to reduce dependence on a single distributor.

### Key Suppliers and Distributors

Our supply and distribution operations in the United States and Canada are integrated to provide various products and services to restaurants. As such, Quiznos requires franchise owners to purchase from suppliers designated by AFD under the franchise agreements. For the period ended December 31, 2010, AFD's top ten suppliers for food products represented approximately 46% of total purchases by franchise owners, with only one supplier representing more than 7% of total purchases by franchise owners. AFD's supplier contracts have various terms. For the period ended December 31, 2010, AFD distributed food through ten distributors who operate out of twenty-three distribution centers throughout the United States and Canada. One of the top ten distributors accounted for 20.5% of food products distributed within the United States and Canada.

## Seasonality

Our business is subject to seasonal fluctuations. Harsh weather conditions can shut-down an entire metropolitan area, resulting in a reduction of sales. Our systemwide sales are typically higher during the second and third quarters of the fiscal year.  Consequently, results of operations for any single quarter are not necessarily indicative of the results that may be achieved for a full fiscal year.

## Quiznos IP/Licensing

QIP owns many registered Marks in the United States, and TQM primarily owns our international intellectual property.  We believe that our names and logos, in particular, have significant value and are important in our business.  Our policy is to pursue registration of our Marks in the United States and selected international jurisdictions, monitor our Marks portfolio both internally and externally through external search agents and vigorously oppose the infringement of any of our Marks. We and our affiliates claim copyrights in the Operations Manual, advertising and marketing materials, and similar items used in operating the franchise.  We and our affiliates have not registered these copyrights with the United States Registrar of Copyright and instead generally rely on common law protection for our copyrighted works.  The copyrighted materials are material to the operation of our business.

In 2008, QIP and the Franchisor entered into an amended and restated IP License Agreement (the "**IP License Agreement**") pursuant to which QIP grants the Franchisor an exclusive license throughout the United States (the "**Licensed Territory**") to use the Quiznos IP in connection with its rights and obligations under the franchise agreements and the area marketing agreements. The term of the IP License Agreement is 99 years.  The Franchisor is permitted to sublicense the Quiznos IP in the Licensed Territory to a sublicensee that is party to a franchise agreement or an area marketing agreement with the Franchisor pursuant to which such sublicensee is licensed to

operate a Quiznos restaurant or be an area director, as the case may be, provided that such franchise agreement or area marketing agreement governing such sublicense does not contain provisions that contravene the applicable IP License Agreement. Each such franchise agreement or area marketing agreement will be required to contain certain provisions that are intended to preserve the value of the Quiznos IP. In addition, the Franchisor sublicenses the Quiznos IP in connection with the purchase and sale of proprietary products to AFD for the United States.

## Regulatory Matters

The Company is subject to FTC regulations which regulate the offer and sale of franchises in the United States and a number of state laws which regulate the offer and sale of franchises. The Company is also subject to a number of state laws which regulate substantive aspects of the franchisor-franchise owner relationship. The FTC's Trade Regulation Rule on Franchising (the "**FTC Rule**"), as well as a number of state laws, require the Company to furnish to prospective franchise owners a uniform franchise disclosure document containing information prescribed by the FTC Rule and the applicable state law.

State laws that regulate the offer and sale of franchises and the franchisor-franchise owner relationship presently exist in a substantial number of states. Most state laws that regulate the offer and sale of franchises require registration of the franchise offering with state authorities. A few require the Company to submit a notification filing of the Company's intent to offer franchises in the state. Those states that regulate the franchise relationship generally require that the franchisor deal with its franchise owners in good faith, prohibit interference with the right of free association among franchise owners, limit the imposition of unreasonable standards of performance on a franchise owner and regulate discrimination against franchise owners with respect to charges, royalty fees or other fees. Although such laws may restrict a franchisor in the termination of a franchise agreement by, for example, requiring "good cause" to exist as a basis for the termination, advance notice to the franchise owner of the termination, an opportunity to cure a default and a repurchase of inventory or other compensation, these provisions have not had a significant effect on the Company's franchise operations.

Each restaurant is subject to licensing and regulation by a number of governmental authorities, which may include health, sanitation, safety, fire, building and other agencies in the state or municipality in which the restaurant is located. Difficulties in obtaining, or failure to obtain, the required licenses or approvals could delay or prevent the development of a new restaurant in a particular area. The Company is subject to federal and state environmental regulations, but these have not had a material effect on restaurant or Company operations. More stringent and varied requirements of local governmental bodies with respect to zoning, land use and environmental factors could delay or prevent the development of a new restaurant in a particular area.

The Company is also subject to state and federal labor laws that govern its relationship with its employees, such as minimum wage requirements, overtime, working conditions and citizenship requirements, or customers, such as the Americans with Disability Act. Significant numbers of food service and preparation personnel are paid at rates governed by the federal minimum wage. Accordingly, increases in the benefits under any of these laws would increase labor costs to the franchise owners.

## Environmental

Our operations, including the selection and development of the properties we lease and sublease to our franchise owners, and any construction or improvements made at those locations, are subject to a variety of federal, state and local laws and resolutions, including environmental, zoning and land use requirements. Our properties are sometimes located in developed commercial areas, and might previously have been occupied by more environmentally significant operations, such as gasoline stations and dry cleaners. Environmental laws sometimes require owners or operators of contaminated property to remediate the property, regardless of fault. As of the date of this Offering Memorandum and Disclosure Statement, the Company is not aware of any federal, state or local environmental laws or regulations that will materially affect the Company's revenue, cash flow or competitive position, or result in any material capital expenditures. The Company, however, cannot predict the effect of possible future environmental legislation or regulations.

Ex. 1 p. 109

**Employees**

As of September 30, 2011, we employed 452 people, 430 of whom are based in the United States and 22 of whom are based in Canada.  Of our U.S. employees, 61 worked in the field and 129 worked at our corporate headquarters in Denver, Colorado. In addition, our company-owned restaurants employed 240 people as of September 30, 2011.  None of our employees are represented by a labor union, and we believe our relationship with our employees is healthy.

Our franchise owners are independent business owners, and they and their employees are not included in our employee head count.

**Properties**

Our corporate headquarters utilize approximately 33,000 square feet of space and is located in Denver, Colorado.  It houses employees who provide our primary franchise owner support functions, as well as corporate support functions including, legal, marketing, technology, human resources, financial and development. Our Canadian facility, located in Toronto, Ontario, houses employees who provide franchise owner support services for our Canadian franchise owners.

As of September 30, 2011, we leased 204 locations across the United States and Canada, the majority of which we subleased or assigned to franchise owners.  The remaining balance of franchise owners are situated on real property leased directly by the franchise owners from third-party landlords.  All international restaurants (excluding 80 located in Canada) are leased by franchise owners directly from a third party landlord.

**Legal Proceedings**

Aside from non-material litigation described below, there are five cases or classes of cases, that may be significant against the Company described as follows:

***Quiznos Canada Restaurant Corporation Class Action Case (Q2)***

On May 12, 2006, plaintiffs, who are current Quiznos franchise owners, filed a putative class action claim in the Ontario Superior Court of Justice against Quiznos Canada Restaurant Corporation, affiliates of the Company and others, asserting claims for violation of section 61(1) of the Competition Act, conspiracy regarding price fixing and price maintenance, breach of contract, and violation of a duty of fair dealing under section 3 of the Wishart Act. The claim seeks an unspecified amount of damages and interest.  On July 28, 2006, plaintiffs filed their certification motion materials.  On November 3, 2006, plaintiffs amended their claim, adding a claim for violation of section 7 of the Franchises Act, and seeking costs. On March 5, 2008, plaintiffs' motion for class certification was denied. Plaintiffs' appeal of the denial of its motion for class certification was granted on April 27, 2009.  Our appeal was denied June 24, 2010 and our application for leave to appeal to the Supreme Court of Canada was denied on February 3, 2011.

Since March 26, 2008, certain members of the putative class have entered into a settlement and release agreement with us (each a "**Settlement Franchisee**"), whereby, in consideration of a release of all of a Settlement Franchisee's claims against us relating to food pricing and distribution, we agree to:  (i) supply the Settlement Franchisee with Coca-Cola products at a set price until December 31, 2014 (subject to yearly producer price index adjustments); (ii) undertake a low cost food pledge ("**Low Cost Food Pledge**"), whereby we agree that the cost paid by the Settlement Franchisee to us (or our designated supplier) for specified products will be less than the cost charged by certain wholesalers for the same products; and (iii) engage the services of an independent audit firm to review annually the total cost of the products charged by us to the Settlement Franchisee to determine whether we have satisfied the Low Cost Food Pledge.  If the independent audit firm finds that we do not meet the Low Cost Food Pledge, we will, for the balance of the year, reduce the cost of the specified products sold to the Settlement Franchisee to make up for the difference between our cost and wholesalers' cost for the products in the previous year.  As of the date of this Offering Memorandum and Disclosure Statement, approximately 180 members of the putative class have signed the settlement and release agreement.  We intend to continue to vigorously defend this

99

**Ex. 1 p. 110**

action.  We have not recorded any loss associated with this case as we do not believe we can accurately estimate any loss at this time.  While we do not believe that the ultimate resolution of this action will have a material adverse effect on our business, financial position or results of operations, such adverse effect could result if we are not able to settle with the remaining members of the putative class or the case results in an adverse judgment.

*Martrano Case*

On July 3, 2008, seven plaintiff parties, who are current and former Quiznos franchise owners, filed a putative class action complaint in the United States District Court for the Western District of Pennsylvania against the Company and certain affiliates and other entities, the Schadens, and certain former Quiznos employees, asserting claims for violation of the RICO statute, Section 1 of the Sherman Act, the Pennsylvania Statute (Title 18 Chapter 39 § 3921, 3922, and 3926 and Title 18 Chapter 41 § 4104, 4107, and 4108), and for fraud in the inducement, breach of contract, and for breach of the covenant of good faith and fair dealing, all allegedly arising out of the sale of franchises and the subsequent sale to franchise owners of certain products or services.  The complaint seeks unspecified preliminary and permanent injunctive relief, and an unspecified general, multiple, and treble amount of damages.  We filed counterclaims against the plaintiffs for breach of contract on July 14, 2009.  All Sherman Act claims were dismissed on June 15, 2009.  On June 8, 2010, plaintiffs filed a motion to withdraw class certification, which motion was granted on June 9, 2010.  We filed amended counterclaims against plaintiffs on December 31, 2010.  On February 23, 2011, the parties stipulated to the dismissal of 1 of the 13 plaintiff parties.  On June 3, 2011, we filed motions for summary judgment against each of the 12 remaining plaintiff parties on all their claims, and the plaintiff parties filed a motion for summary judgment on our counterclaims.  On August 30, 2011, the plaintiff parties filed oppositions to our summary judgment motions, and on September 23, 2011, we file our replies to plaintiff parties' opposition motions.  Plaintiff parties' sought permission to file sur-replies and their motion was granted.  On October 20, 2011, plaintiffs filed individual sur-replies, and on October 21, 2011 plaintiffs filed a general sur-reply and proposed order for extension of time to submit exhibits.  We filed our motion to strike plaintiff parties' sur-replies and exhibits on November 17, 2011.

On December 13, 2011, we agreed in principle with the plaintiff parties, subject to final documentation, to pay $500,000 for full and complete resolution of all claims and disputes in the Martrano action described above.

*Quizno's Canada Restaurant Corporation AD Case (Kileel)*

On November 13, 2006, Quiznos Canada Restaurant Corporation filed a claim against the defendants, a former Quiznos Canada Restaurant Corporation area director and certain of its employees, asserting claims for breach of contract, inducing breach of contract, unlawful interference with economic relations and intentional interference with contractual relations.  The claim seeks damages, a declaration that the area director marketing agreement is terminated, injunctive relief requiring defendants from acting as a Quiznos Canada Restaurant Corporation area director, and an order compelling defendants to comply with the post termination obligations under the agreement.  In December 2006, defendants filed a counterclaim against Quiznos Canada Restaurant Corporation, affiliates of the Company and Greg MacDonald, our Chief Executive Officer and President, asserting claims for breach of contract, negligent misrepresentation, intentional interference with economic relations and defamation.  The counterclaim seeks an unspecified amount of damages, interest, and costs.  On or about December 2, 2008, we amended our complaint to add an additional claim for relief against defendants for breach of contract in connection with defendants' abandonment of two Quiznos restaurants.  In response, defendants added a counterclaim against us for breach of defendants' three remaining franchise agreements.  On February 8, 2011, the court stayed defendants' counterclaims that alleged excessive food costs.  We intend to vigorously prosecute our claims against defendants and we intend to vigorously defend the counterclaim against them.  While we do not believe that the ultimate resolution of this action will have a material adverse effect on our business, financial position or results of operations, such adverse effect could result if we are not able to settle the case or if it results in an adverse judgment.

*National Class Action Opt-Out Cases*

*Colorado Opt-Out Cases.*

Between May 7, 2010 and October 12, 2010, 18 separate complaints were filed in the United States District Court for the District of Colorado by current and former Quiznos franchise owners against QFA, certain of its

affiliates, and certain current and former Quiznos officers, managers and employees.  In each of the 18 lawsuits, at least one party in the plaintiff group has claimed to have opted out of the *Siemer v. The Quizno's Franchise Company LLC* national class action settlement agreement that was granted final approval by the United States District Court for the Northern District of Illinois on August 13, 2010.

All of the 18 lawsuits allege a number of claims, including violations of the Colorado Organized Crime Control Act, C.R.S. 18-17-101 et seq., violation of the Colorado Consumer Protection Act, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, fraud in the inducement, promissory fraud, illusory contract, breach of fiduciary duty, declaratory judgment, and violation of Colorado's Civil Theft Act.  All 18 lawsuits seek preliminary and permanent injunction relief, an order declaring certain provisions of the plaintiffs' franchise agreements unconscionable and therefore unenforceable, an order declaring the plaintiffs' franchise agreements illusory, compensatory, consequential and statutory damages, disgorgement of defendants illegally-obtained profits, attorneys' fees, and rescission of plaintiffs' franchise agreements.

In accordance with the court's orders on September 13, 2010 and November 29, 2010, the above 18 lawsuits have been consolidated for pre-trial purposes only.  On February 28, 2011, a lawsuit by a former franchise owner was transferred and consolidated with the above lawsuits.  On March 23, 2011 the court denied our motion to dismiss this lawsuit.  On April 6, 2011, we filed a counterclaim against plaintiff and certain additional parties who acted as guarantors for breach of contract arising out of the closure of plaintiff's restaurant.  On June 30, 2011 the court ordered that all 19 lawsuits be consolidated for trial purposes.  Trial is set for September 2012.

*New Jersey Opt-Out Case.*

On May 13, 2011, a former franchise owner filed a complaint against QFA, certain of its affiliates, and certain current and former Quiznos officers, managers and employees and others in the Superior Court of New Jersey asserting claims for violation of the New Jersey Consumer Fraud Act, breach of contract, breach of the implied covenant of good faith and fair dealing, intentional misrepresentation, promissory fraud, illusory contract, declaratory judgment, and violation of the New Jersey Franchise Practices Act.  The complaint seeks an order declaring certain provisions of plaintiffs' franchise agreement unconscionable and therefore unenforceable, an order declaring the plaintiffs' franchise agreement illusory, compensatory, consequential and statutory damages, disgorgement of defendants' illegally-obtained profits, exemplary and punitive damages, attorneys' fees and costs, rescission of plaintiffs' franchise agreement, and such other relief as the court finds just and proper.  On August 4, 2011, we filed a motion to dismiss.  On September 20, 2011, we filed a motion to disqualify plaintiffs' counsel.  On November 4, 2011, a hearing on our motion to disqualify was heard, and ruled in favor of plaintiffs.  On November 30, 2011, we filed a notice and motion to stay proceedings (motion to dismiss).  On December 5, 2011, we filed a motion for leave to appeal the order on the motion to disqualify.  We intend to vigorously defend this action.

*New York Opt-Out Case.*

On October 7, 2011, an operator opt out case, Horowitz, was filed in the USDC Southern District of NY asserting for fraudulent scheme to sell franchise agreements, fraud in the inducement of a contract, fraud, breach of contract, breach of the covenants of good faith and fair dealing, negligent misrepresentation, violation of the New York Franchise Act and violation of NY GBL § 349.  On December 2, 2011, we filed a Motion to Dismiss the Complaint.  We intend to vigorously defend this action.

We have not recorded any loss associated with these cases as we do not believe we can accurately estimate any loss at this time.  While we do not believe that the ultimate resolution of these actions will have a material adverse effect on our business, financial position or results of operations, such adverse effect could result if we are not able to settle with the remaining members of the putative class or the case results in an adverse judgment.

**Leasing Cases**

During 2010, Restaurant Realty LLC ("**RRL**") entered into approximately 300 leases for Quiznos restaurants.  Most RRL leases were subsequently subleased and RRL's rent liability limited to six (6) months.  However, certain leases were not subleased, and RRL remains liable for all obligations under the lease.  In addition, in Canada, our

affiliate Quiznos Canada Real Estate Corporation ("**QCREC**"), enters into certain leases and/or lease guarantees for certain Quiznos restaurants.  From time to time, claims are pursued against RRL or QCREC in connection with these leases and guarantees, including allegations that RRL or QCREC, as applicable, has defaulted on its obligations under such leases or guarantees.   The number of active cases varies from time-to-time and cases arise in the ordinary course of business when the applicable restaurants close or default on their lease obligations.  We typically negotiate settlements and lease terminations as these matters arise and the settlements involve payments from RRL or QCREC to the landlord.

While we do not believe that the ultimate resolution of these leases and related actions will have a material adverse effect on our business, financial position or results of operations, such adverse effect could result in the event there is a significant increase in the number of these claims or one or more of the claims causes us to incur greater liabilities than we currently anticipate.

### Area Director and Other Cases

From time to time, in the ordinary course of business, Quiznos is the subject of complaints or litigation from its area directors, usually related to alleged breaches of contract, defaults or wrongful termination under the area marketing agreements.

In addition, in the ordinary course of business, we are, from time to time, the subject of complaints or litigation from customers alleging illness, injury or other food-quality, health or operational concerns and from suppliers alleging breach of contract.  We are also occasionally the subject of complaints or litigation from franchise owners, usually related to alleged breaches of contract, defaults or wrongful termination under the franchise arrangements. We are also subject to employee claims based on, among other things, workplace and employment matters, discrimination, harassment or wrongful termination.  Moreover, litigation against a franchise owner or his or her affiliates by third parties, whether or not in the ordinary course of business, may include claims against us by virtue of our relationship with the defendant-franchise owner.

We have not recorded any loss associated with these cases as we do not believe we can accurately estimate any loss at this time.  While we do not believe that the ultimate resolution of these cases will, in the aggregate, have a material adverse effect on our business, financial position or results of operations, such adverse effect could result if we one or more of these cases results in a substantial judgment against us.

Ex. 1 p. 113

## MANAGEMENT

Following the Restructuring Transactions, Holdings will be the ultimate parent of Quiznos. Set forth below are the names, ages (as of September 30, 2011) and positions of the individuals who serve as the executive officers and other senior officers of Holdings, the Company or their affiliates as of the date of this Offering Memorandum and Disclosure Statement.

### Board of Managers of Holdings

Immediately following the Restructuring Transactions, the Board of Managers of Holdings will be comprised of nine members, one of whom will be our Chief Executive Officer, one of whom will be designated by Fortress and seven of whom will be designated by Avenue.  As of the date of this Offering Memorandum and Disclosure Statement, we do not know who will be designated to Holdings' Board of Managers, other than our Chief Executive Officer.

### Executive and Senior Officers of the Company and their Affiliates

| Name | Age | Position |
|------|-----|----------|
| Greg MacDonald | 42 | Chief Executive Officer and President |
| Michael Roper | 47 | Chief Operating Officer |
| Dennis Smythe | 37 | Chief Financial Officer |
| Brett Fearrin | 44 | Chief Accounting Officer |
| Courtney L. Seely | 34 | Executive Vice President, General Counsel and Secretary |
| Brian Belmont | 42 | Executive Vice President, Brand Expansion and President of Restaurant Realty |
| Jason Robson | 35 | Executive Vice President, Marketing |
| Lee Vala | 50 | Chief Development Officer, International |
| George Jeffrey | 43 | Chief Operating Officer, Canada |

### Biographies

#### *Greg MacDonald*

Greg MacDonald has been Chief Executive Officer since October 2010 and President since July 2009. He was the President of Quiznos Canada from January 2007 to October 2010. From October 2005 to January 2007, he served as Quiznos Canada's Chief Operating Officer. He served as Quiznos Canada's Chief Marketing Officer from January 2005 to October 2005 and Vice President of Marketing from February 1999 to January 2005. Prior to Quiznos, Mr. MacDonald served in a variety of marketing positions at Maple Leaf Foods and Nestle (Canada).

#### *Michael Roper*

Michael Roper has been Chief Operating Officer since October 2010. From April 2010 to October 2010, he was Executive Vice President of Restaurant Operations. He was Senior Vice President of Restaurant Operations from January 2010 to March 2010. He was Vice President – Delivery Sales from March 2008 to December 2009. From January 2006 to February 2008 he was Vice President – Platform Operations. He also served as Vice President – Restaurant Profitability from August 2003 to December 2005. Mr. Roper began with Quiznos as a franchise owner in 2000 and joined the corporate team in 2003. Owning four Quiznos restaurants in Chicago until 2007, Mr. Roper was voted Franchise Owner of the Year and owned the restaurant with the highest sales volume in Chicago.

#### *Dennis Smythe*

Dennis Smythe has been Chief Financial Officer since October 2010, and served as Executive Vice President – Finance and Accounting from October 2009 to October 2010. He was previously at CCP since 2004. Prior to CCP, he was with two investment management firms working as an analyst, as well as a Big Four accounting firm in audit and transaction services.

Ex. 1 p. 114

*Brett Fearrin*

Brett Fearrin joined Quiznos in June 2011 as Chief Accounting Officer. Previously, he was an audit partner at Anton Collins Mitchell LLP, an independent member of the BDO Seidman Alliance, since December 2006. From October 2003 to December 2006, Brett served as Vice President of Finance for Navigant International Inc., a publicly-held travel management company based in Denver, Colorado.  Prior to Navigant International, he spent thirteen years in the audit services group of a Big Four accounting firm.

*Courtney L. Seely*

Courtney L. Seely has been Executive Vice President, General Counsel and Secretary since May 2011.  From August 2010 to May 2011, she served as Senior Vice President and Associate General Counsel.  From April 2008 to August 2010, she served as Assistant General Counsel, Sports and Entertainment Group for ARAMARK Corporation located in Philadelphia, Pennsylvania.  From October 2006 to April 2008, she served as Assistant General Counsel, Supply Chain Management and Business & Industry Group for ARAMARK Corporation.  Prior to ARAMARK Corporation, she served as an Associate in the corporate and securities group of Dechert LLP located in Philadelphia, Pennsylvania.

*Brian Belmont*

Brian Belmont has been Executive Vice President of Development since October 2010, and was President of the Company's real estate operations from November 2009 until September, 2010. From May 2009 to October 2009, he was the Chief Operating Officer for Triple Crown Investments, Inc. From June 2008 to April 2009, he was the Chief Operating Officer for DOG Enterprises-Camp Bow Wow. He served in various senior positions in the Company's real estate, development, and operations functions from March 2001 until May 2008.  Prior to Quiznos, Mr. Belmont served as a plant manager for Cintas, as well as a Captain in the United States Marine Corps.

*Jason Robson*

Jason Robson has been Executive Vice President of Marketing since May 2010. He was Senior Vice President – Brand Strategy from January 2010 to April 2010. He has been with Quiznos for over 7 years and has held a multitude of senior positions in Quiznos Canada with a focus on the brand strategy and customer experience side of the business. Prior to Quiznos he was a Senior Account Director with Saatchi & Saatchi Advertising.

*Lee Vala*

Lee Vala has been Chief Development Officer - International since May 2010. From June 2009 to April 2010, he was the owner of Valainteractive d/b/a ValaInternational, a franchise consulting company. From June 2007 to May 2009, he served as Senior Vice President, Global Development for The Alternative Board. He served as Senior Vice President of International Development at Quiznos from October 2000 to May 2007, and Vice President of International Operations from November 1998 to July 2000. Before joining Quiznos, he was the Manager of Franchise Services for Little Caesar's Pizza for over 11 years.

*George Jeffrey*

George Jeffrey has been Chief Operating Officer of Quiznos Canada since January 2010.  He is responsible for the growth and development of the Quiznos brand in Canada.  He was Senior Vice President of Brand Experience at Quiznos Canada from August 2009 to December 2009.  Prior to Quiznos, he held senior positions at Pizza Pizza Ltd. and Ault Foods Ltd.

**Ex. 1 p. 115**

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

Holdings, QCE LLC and its subsidiaries engage in a variety of transactions between or among each other in the ordinary course of their respective businesses.

### Holdings Operating Agreement

Immediately following the Recapitalization, the Board of Managers of Holdings will be comprised of nine members, one of whom will be our Chief Executive Officer, seven of whom will be appointed by Avenue and one of whom will be appointed by Fortress. If Avenue or Fortress (or their transferees who then hold the right to designate one or more managers) transfer Common Shares equal to more than 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan), then Avenue or Fortress, as the case may be, may also transfer its right to designate one manager with respect to each 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) transferred.  If either Avenue or Fortress (or their transferees who then hold the right to designate one or more manager) transfer Common Shares equal to more than 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) without also transferring the right to designate a manager, then Avenue or Fortress, as the case may be, shall forfeit the right to designate one manager for each 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) transferred, and if Avenue or Fortress (together with its Affiliates and certain Permitted Transferees) cease to hold an aggregate of at least 5% of all then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan), then Avenue or Fortress, as the case may be, shall forfeit the right to designate any managers.  The vacancies created by any such forfeitures shall be filled by the majority vote of all of the Members holding Common Shares, including Avenue and Fortress, voting together as a single class; provided that in no event shall the Members holding Common Shares be entitled to elect more than three managers as a result of such forfeitures.  The size of the Board of Managers shall be reduced automatically to reflect any forfeitures in excess of three.

All parties holding Common Shares (and all persons to whom any such parties may sell their equity in the future and all persons who purchase or acquire equity from Holdings in future transactions) will be required to enter into the Holdings Operating Agreement; which provides, among other things: (i) the number of managers, (ii) the ability to designate managers; (iii) preemptive rights, (iv) transfer restrictions, (v) right of first offer, (vi) co-sale rights and (vii) drag-along rights.

See "Description of Equity Securities" for more information regarding the Holdings Operating Agreement and corporate governance of Holdings, generally.

### Management Agreement

We entered into management agreements with CCP pursuant to which it provides us with certain management services.  In exchange for these services, we paid CCP $1.0 million, $3.0 million and $1.3 million for the years ended December 31, 2008, 2009 and 2010, respectively.  The Management Agreement will terminate on December 31, 2011.

### Area Directorships

Chicago Franchise Support Services LLC ("**CFSS**") is an area director affiliated with us. Rockford Manager LLC ("**Rockford**") is also affiliated with us, operating in certain territories pursuant to the terms of a management agreement.  The agreements described below will be terminated upon consummation of the Recapitalization.

### *Chicago Franchise Support Services LLC*

Pursuant to an Area Director Marketing Agreement dated September 17, 2009, as amended, CFSS is responsible for operating and managing the Chicago, Illinois territory. The Quizno's Master LLC owns 49% of the voting interest and 50% of the economic interest in CFSS and is the manager of CFSS. Illinois Food Management, Inc. ("**IFM**") owns 51% of the voting interest and 50% of the economic interest in CFSS. Certain members of the

Ex. 1 p. 116

board and former management of the Company own (directly and indirectly) in the aggregate more than 70% of the outstanding shares of IFM. In connection with the Restructuring Transactions, we will terminate the CFSS area director agreement.

### *Rockford Manager LLC*

Pursuant to a Management Agreement effective January 16, 2004, Rockford is responsible for operating and managing the Rockford, Illinois and Madison, Wisconsin territories. The Managing Member of Rockford is FHS LLC ("**FHS**"), an entity owned 100% by Frederick Schaden. FHS and TQM own equal interests in Rockford.  In connection with the Restructuring Transactions, we will terminate the Rockford area director agreement.

### Other Related Party Transactions

As described under "Business" and elsewhere in this Offering Memorandum and Disclosure Statement, the Franchise Servicer will subcontract to certain of its affiliates various services that the Franchise Servicer is required to perform under the Franchise Servicing Agreements and the IP Servicing Agreement.

From time to time, AFD has made, and may continue to make, contributions to the Marketing Fund Trusts, as more fully described in our combined financial statements, including the related notes, included with this Offering Memorandum and Disclosure Statement.

QCE Incentive LLC, the direct parent of Holdings, is currently party to a QCE Incentive LLC Unit Option Plan, dated as of October 5, 2010.  In connection with the Restructuring Transactions, QCE Incentive will terminate the unit option plan listed above and will cancel all of the equity shares of QCE Incentive LLC.

We entered into an employment agreement with Richard E. Schaden, the current chairman of the QCE Holding LLC board of managers, on May 5, 2006, which agreement was amended on January 1, 2009, December 31, 2009 and June 30, 2010. In connection with the Restructuring Transactions, we anticipate terminating the employment agreement with Mr. Schaden.

Prior to consummation of the Recapitalization, the Company's payment obligations to counterparties, including related parties, under the Company's deferred compensation plans and AD Notes shall have been reduced by $15 million in the aggregate.

## THE FIRST LIEN AMENDMENT

**Overview**

In connection with the Restructuring Transactions, the Company, Holdings and the First Lien Lenders will enter into an amendment to the First Lien Facility. The First Lien Amendment, subject to the satisfaction of certain conditions precedent (including, among other things, consummation of the First Lien Repayment, the Exchange Offers and the Private Placement), amends and restates the First Lien Facility and provides for certain other amendments to the schedules and exhibits to the First Lien Facility. The key terms of the Amended First Lien Facility are described below. Such description is not complete and is qualified in its entirety by reference to the complete text of the Amended First Lien Facility and related agreements.

Following the consummation of the First Lien Repayment, the Exchange Offers and the conversion of all outstanding First Lien Revolving Loans to First Lien Term Loans pursuant to the terms of the Amended First Lien Facility, the Amended First Lien Facility is expected to consist of (1) an aggregate outstanding principal balance of between $400.0 and $452.6 million of First Lien Term Loans, (such amount depending on the level of participation by the First Lien Lenders in the First Lien Exchange Offer and whether the Restructuring Transactions are effected through the Exchange Offers or the Plan of Reorganization), and (2) subject to obtaining appropriate commitments, a $5.0 million letter of credit and revolving credit facility (the "**New First Lien Revolving Facility**"). The First Lien Lenders will not be under any obligation to provide commitments for the New First Lien Revolving Facility.

The Company does not expect to have obtained commitments under the New First Lien Revolving Facility at the closing of the Amended First Lien Facility. Upon obtaining such commitments, the New First Lien Revolving Facility will be fully available for letters of credit and will only be available for revolving loans to the extent required to reimburse the issuing bank for draws under such letters of credit.

**Interest Rate and Fees**

Borrowings under the Amended First Lien Facility will bear interest at a rate per annum equal to an applicable margin *plus*, at the Company's option, either (1) an adjusted base rate determined by reference to the greatest of (a) the prime rate of Deutsche Bank Trust Company Americas, (b) the Federal funds effective rate *plus* 1/2 of 1% and (c) 2.50% or (2) the greater of (a) an adjusted LIBO rate determined by reference to the costs of funds for U.S. dollar deposits for the interest period relevant to such borrowing adjusted for certain additional costs and (b) 1.50%. The applicable margin for First Lien Term Loans shall be 7.50% per annum for adjusted LIBO rate loans and 6.50% per annum for adjusted base rate loans. The applicable margin for revolving loans under the New First Lien Revolving Facility will be set forth in a supplement to the Amended First Lien Facility executed by the revolving lender, the issuing bank and the Borrower (an "**L/C Supplement**").

In addition to interest on outstanding principal under the Amended First Lien Facility, if the Restructuring Transactions are effected through the Exchange Offers, the First Lien Lenders will receive the 0.5% First Lien Cash Consent Fee and the 3.5% First Lien PIK Consent Fee. Customary agency fees will also be paid, as well as those letter of credit and other fees agreed to in any L/C Supplement.

**Mandatory Repayments**

The Amended First Lien Facility will require the Company to prepay outstanding term loans, subject to certain exceptions, with: (1) 100% of the net cash proceeds of non-ordinary course asset sales or other dispositions of assets (including casualty events) by Holdings, the Company or their restricted subsidiaries, subject to reinvestment rights and certain other exceptions, (2) 100% of the net cash proceeds of any incurrence of indebtedness by the Company or its restricted subsidiaries other than indebtedness permitted under the Amended First Lien Facility, and (3) commencing with the fiscal year ended December 31, 2012, 75% (which percentage will be reduced to 50% if the Company's first lien secured debt leverage ratio is less than a specified ratio) of the annual excess cash flow (as defined in the Amended First Lien Facility) of the Company and its restricted subsidiaries; provided, however, that such excess cash flow prepayment shall not be required to the extent it would reduce the unrestricted cash of the Company and its subsidiaries below $35.0 million.

**Voluntary Repayments**

The Company may voluntarily repay outstanding loans under the Amended First Lien Facility at any time, together with accrued interest thereon (without premium or penalty, subject to customary "breakage" costs with respect to LIBO rate loans).

**Amortization and Final Maturity**

The First Lien Term Loans will amortize each year in an amount equal to 1% per annum in equal quarterly installments beginning March 31, 2012 with the balance payable on the fifth anniversary of the closing of the Amended First Lien Facility. The principal amount outstanding of the loans under the New First Lien Revolving Facility, if any, will be due and payable on the fifth anniversary of the closing of the Amended First Lien Facility.

**Guarantees and Security**

The Amended First Lien Facility will be guaranteed by Holdings and certain of the Company's direct and indirect domestic subsidiaries (excluding certain immaterial subsidiaries and subject to certain other exceptions) and will be required to be guaranteed by certain of our future domestic wholly owned subsidiaries.

All obligations under the Amended First Lien Facility, and the guarantees of those obligations, will be secured by substantially all of the Company's assets and substantially all of the assets of Holdings and the subsidiary guarantors, subject to certain exceptions, including that mortgages will be limited to owned real property with a fair market value above a specified threshold, and including:

- a first-priority pledge of 100% of the Company's capital stock and, subject to certain exceptions, 100% of the capital stock or equity interests of domestic subsidiaries held by the Company and the subsidiary guarantors (which pledge, in the case of the stock of any first-tier foreign subsidiary (each such entity, a "**Pledged Foreign Sub**") (with certain agreed-upon exceptions) is limited to 65% of the stock or equity interests of such Pledged Foreign Sub); and

- a first-priority security interest in substantially all other tangible and intangible assets of Holdings, the Company and each subsidiary guarantor, subject to certain exclusions and materiality thresholds.

**Certain Covenants and Events of Default**

Our Amended First Lien Facility will contain a number of covenants that, among other things and subject to certain exceptions, will restrict Holdings' and the Company's ability and the ability of their restricted subsidiaries:

- to incur additional indebtedness;

- to incur certain liens;

- to enter into certain sale and leaseback transactions;

- to make investments, loans and advances;

- to consolidate or merge, sell assets, including capital stock of our subsidiaries or make acquisitions;

- to pay dividends or make other distributions on our equity interests or redeem, repurchase or retire our equity interests;

- to engage in transactions with affiliates;

- to alter the business we conduct;

- to enter into agreements restricting our restricted subsidiaries' ability to pay dividends or make distributions; and

- to make payments of principal or interest on certain indebtedness, including the New Second Lien Loans, subject to certain exceptions, including that, subsequent to the second anniversary of the closing date of the Amended First Lien Facility, payments of full cash interest on the New Second Lien Loans shall be permitted to the extent that the Company's pro forma interest coverage ratio is above a certain ratio.

In addition, the Amended First Lien Facility will require the Company to comply on a quarterly basis with a maximum first lien secured debt leverage ratio beginning on June 30, 2013.

The Amended First Lien Facility will also contain certain customary affirmative covenants and events of default.

109

## THE NEW SECOND LIEN FACILITY

**Overview**

In connection with the Restructuring Transactions, the Company, Holdings and the Exchanging Lenders will enter into the New Second Lien Facility. The New Second Lien Facility is expected to consist of an aggregate outstanding principal balance of between $134.9 and $185.6 million of New Second Lien Loans (such amount depending on the level of participation by the First Lien Lenders in the First Lien Exchange Offer and whether the Restructuring Transactions are effected through the Exchange Offers or the Plan of Reorganization). The key terms of the New Second Lien Facility are described below. Such description is not complete and is qualified in its entirety by reference to the complete text of the New Second Lien Facility and related agreements.

**Interest Rate and Fees**

Borrowings under the New Second Lien Facility will bear interest at a rate per annum equal to an applicable margin plus the greater of (a) an adjusted LIBO rate determined by reference to the costs of funds for U.S. dollar deposits for the interest period relevant to such borrowing adjusted for certain additional costs (the "**Adjusted LIBO Rate**") and (b) 5.00%. For each quarterly interest payment date, the Company may elect to pay interest on all or a portion of the New Second Lien Loans (i) solely in cash (a "**Cash Election**") or (ii) in an amount equal to the Adjusted LIBO Rate plus 1.00% in cash and the remainder in additional New Second Lien Loans (a "**PIK Election**"), provided that for interest payment dates occurring on or prior to the second anniversary of the Closing Date, all of the New Second Lien Loans shall be subject to a PIK Election. The applicable margin for New Second Lien Loans shall be 7.50% per annum for the portion of New Second Lien Loans for which a PIK Election is made and 6.00% per annum for the portion of New Second Lien Loans for which a Cash Election is made.

If the Restructuring Transactions are effected through the Exchange Offers, all Exchanging Lenders will also receive their pro rata portion of the 5.0% First Lien Exchange Fee, payable in additional New Second Lien Loans. Customary agency fees will also be paid.

**Mandatory Repayments**

The New Second Lien Facility will require the Company to prepay outstanding loans, subject to certain exceptions and to the extent not required to prepay loans under the Amended First Lien Facility, with: (1) 100% of the net cash proceeds of non-ordinary course asset sales or other dispositions of assets (including casualty events) by Holdings, the Company or their restricted subsidiaries, subject to reinvestment rights and certain other exceptions, (2) 100% of the net cash proceeds of any incurrence of indebtedness by the Company or its restricted subsidiaries other than indebtedness permitted under the New Second Lien Facility, and (3) commencing with the fiscal year ended December 31, 2012, 75% (which percentage will be reduced to 50% if the Company's leverage ratio is less than a specified ratio) of the annual excess cash flow (as defined in the New Second Lien Facility) of the Company and its restricted subsidiaries; provided, however, that such excess cash flow prepayment shall not be required to the extent it would reduce the unrestricted cash of the Company and its subsidiaries below $35.0 million.

**Voluntary Repayments**

The Company may voluntarily repay outstanding loans under the New Second Lien Facility at any time, together with accrued interest thereon, without premium or penalty, subject to customary "breakage" costs.

**Amortization and Final Maturity**

The New Second Lien Facility does not amortize and is payable in full on a date that is approximately five years and three months after the closing of the New Second Lien Facility.

**Guarantees and Security**

The New Second Lien Facility will be guaranteed by Holdings and certain of the Company's direct and indirect domestic subsidiaries (excluding certain immaterial subsidiaries and subject to certain other exceptions) and will be required to be guaranteed by certain of our future domestic wholly owned subsidiaries.

All obligations under the New Second Lien Facility, and the guarantees of those obligations, will be secured by substantially all of the Company's assets and substantially all of the assets of Holdings and the subsidiary guarantors, subject to certain exceptions, including that mortgages will be limited to owned real property with a fair market value above a specified threshold, and including:

- a second-priority pledge of 100% of the Company's capital stock and, subject to certain exceptions, 100% of the capital stock or equity interests of domestic subsidiaries by the Company and the subsidiary guarantors (which pledge, in the case of the stock of any Pledged Foreign Sub (with certain agreed-upon exceptions) is limited to 65% of the stock or equity interests of such Pledged Foreign Sub); and

- a second-priority security interest in substantially all other tangible and intangible assets of Holdings, the Company and each subsidiary guarantor, subject to certain exclusions and materiality thresholds.

**Certain Covenants and Events of Default**

The New Second Lien Facility will contain a number of covenants that, among other things and subject to certain exceptions, will restrict Holdings' and the Company's ability, and the ability of their restricted subsidiaries:

- to incur additional indebtedness;

- to incur certain liens;

- to enter into certain sale and leaseback transactions;

- to make investments, loans and advances;

- to consolidate or merge, sell assets, including capital stock of our subsidiaries or make acquisitions;

- to pay dividends or make other distributions on our equity interests or redeem, repurchase or retire our equity interests;

- to engage in transactions with affiliates;

- to alter the business we conduct;

- to enter into agreements restricting our restricted subsidiaries' ability to pay dividends or make distributions; and

- to make payments of principal or interest on certain indebtedness, subject to certain exceptions.

The New Second Lien Facility will also contain certain customary affirmative covenants and events of default.

Ex. 1 p. 122

## DESCRIPTION OF OTHER MATERIAL INDEBTEDNESS

The following is a description of our material indebtedness, excluding the Amended First Lien Facility and the New Second Lien Facility, following the consummation of the Restructuring Transactions.

**Marketing Fund Trust Credit Facility**

In September 2007, the Marketing Fund Trusts entered into the Marketing Fund Trust Credit Facility with Vectra Bank Colorado, National Association ("**Vectra**").  The Marketing Fund Trust Credit Facility bears interest at the greater of (i) 4.0% or (ii) the prime rate plus 0.50% (4.00% at December 31, 2010).  There is an unused line fee equal to 0.50% of the commitments, payable monthly.  Also, there is a 0.375% annual loan fee, payable each May 28, June 28 and July 28.  The maximum amount available under the Marketing Fund Trust Credit Facility is the lesser of $20.0 million and a borrowing base equal to 75.0% of the aggregate National and Regional Advertising Fees for the most recent nine calendar month period.  The Marketing Fund Trust Credit Facility matures on May 28, 2012.  The Marketing Fund Trust Credit Facility is guaranteed by the Company.  The line requires certain reporting and financial covenants be maintained, and substantially all the assets of the Marketing Fund Trusts collateralize the line.  The Marketing Fund Trusts Credit Facility contains certain covenants including, but not limited to: (i) restrictions on incurring indebtedness, (ii) restrictions on making loans and guarantees, (iii) restrictions on the use and permanent location of the collateral, (iv) a requirement to "rest" the line for 30 consecutive or non-consecutive days in each calendar year and (v) a requirement that at each quarter end, the aggregate National and Regional Advertising Fees recognized on the Marketing Fund Trusts' financial statements for such quarter are greater than or equal to $6.5 million.

As of December 2011 the Marketing Fund Trusts were out of compliance with their obligation to repay in full the Marketing Fund Trust Credit Facility line for 30 consecutive or non-consecutive days in each calendar year.  On December 15, 2011, Vectra provided a temporary waiver in respect of this non-compliance subject to certain conditions, including (i) the closing of a consensual restructuring of the First Lien Facility and the Second Lien Facility on or before March 1, 2012 and (ii) there being no petition filed by or against, or any case commenced involving as a debtor, the Marketing Fund Trusts or the Company under the Bankruptcy Code on or before March 1, 2012.  In any case, this temporary waiver expires on March 1, 2012.

On December 15, 2011, Vectra provided the Vectra Commitment Letter to the Marketing Fund Trusts for the amendment and extension of the Marketing Fund Trust Credit Facility (the "**Amended Vectra Facility**").  The maximum commitment under the Amended Vectra Facility will be the lesser of (i) $12 million, with commitment reductions of $250,000 for each quarter beginning with the quarter ended March 31, 2012 and (ii) a borrowing base equal to 100.0% of the aggregate National and Regional Advertising Fees for the most recent six calendar month period commencing six months after the closing date.  The Amended Vectra Facility will mature on December 31, 2013.  The Amended Vectra Facility will bear interest at the greater of (i) 4.50% or (ii) the prime rate plus 1.00%.  There will be an unused line fee equal to 0.375% of the commitments, payable monthly.  The Amended Vectra Facility will otherwise be substantially the same as the Marketing Fund Trust Credit Agreement except that: (i) the requirement to "rest" the line for 30 consecutive or non-consecutive days in each calendar year will be removed, (ii) the Amended Vectra Facility will cross-default to the Amended First Lien Facility and New Second Lien Facility and (iii) there will be a requirement that for each three-month period, the aggregate National and Regional Advertising Fees recognized on the Marketing Fund Trusts' financial statements for such three-month period will be greater than or equal to $4.5 million during 2012 and $5 million during 2013.

The Vectra Commitment Letter is conditioned upon, among other things, (i) Vectra not becoming aware of new information inconsistent with the representations currently contained in the Marketing Fund Trust Credit Facility, (ii) no material adverse change in or affecting the business, operations, property, condition (financial or otherwise) or prospects of the Marketing Fund Trusts or the Company, (iii) no material disruption or material adverse change in financial, banking or capital markets conditions, (iv) satisfactory completion of due diligence and (v) closing of a consensual restructuring of the First Lien Facility and the Second Lien Facility in a manner satisfactory to Vectra.  The Vectra Commitment Letter terminates on March 1, 2012.

## DESCRIPTION OF EQUITY SECURITIES

The following is a summary of certain provisions of the Holdings Operating Agreement, intended to be entered into in connection with the consummation of the Restructuring Transactions, which will govern the terms of the Common Shares, and does not purport to be complete and is subject to, and qualified in its entirety by reference to, the form of Holdings Operating Agreement, attached hereto as Appendix E. The Holdings Operating Agreement will be substantially similar to the Holdings Operating Agreement. After the merger of QCE Parent and Holdings, the Holdings Operating Agreement will be the Agreement that governs the Common Shares.

**Ownership Interests**

The ownership interests in Holdings (the "**Shares**") will be evidenced by one class of Shares, the Common Shares. In connection with the Restructuring Transactions, Holdings' sole member immediately prior to the Restructuring Transactions, QCE Incentive LLC, will withdraw. Immediately following the consummation of the Restructuring Transactions, 10.0 million Common Shares will be issued and outstanding prior to any Shares being issued under the Management Incentive Plan. In addition, under the Management Incentive Plan, Holdings may issue an aggregate number of Common Shares equal to up to 10% of the issued and outstanding Common Shares immediately following the consummation of the Restructuring.

**Common Shares**

*Voting*. Each Common Share entitles the holder to one vote with respect to each matter presented to the members of Holdings (the "**Members**") on which the Members are entitled to vote. The Members are not entitled to cumulate their votes in any circumstance. Except as otherwise provided in the Holdings' Operating Agreement or required by law, all matters to be voted on by the Members must be approved by a majority in voting power of the Shares entitled to be present in person or represented by proxy at a Members meeting at which a quorum is present.

*Appointment of Managers*. The Holdings Operating Agreement provides that the board of managers of Holdings shall consist of nine members, subject to reduction as described below.

The Holdings Operating Agreement provides that seven of such managers shall be designated initially by the majority vote of the Avenue Members, one of such managers shall be designated initially by the majority vote of the Fortress Members, and the other manager shall be the Chief Executive Officer of Holdings. If the Avenue Members or the Fortress Members (or their transferees who then hold the right to designate one or more manager) transfer Shares equal to more than 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan), the such Member may also transfer its right to designate one manager with respect to each 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) transferred. If either the Avenue Members or the Fortress Members (or their transferees who then hold the right to designate one or more managers) transfer Shares equal to more than 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) without also transferring the right to designate a manager, then such Member shall forfeit the right to designate one manager for each 10% of the then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan) transferred, and if any such Member (together with its Affiliates and certain Permitted Transferees) ceases to hold an aggregate of at least 5% of all then outstanding Common Shares (excluding equity issued pursuant to the Management Incentive Plan), then such Member shall forfeit the right to designate any managers. The vacancies created by any such forfeitures shall be filled by the majority vote of all of the Members holding Common Shares, including Avenue and Fortress, voting together as a single class; provided that in no event shall the Members holding Common Shares be entitled to elect more than three managers as a result of such forfeitures. The size of the Board of Managers shall be reduced automatically to reflect any such changes to the designations of managers. Avenue and Fortress have board observer rights as well.

*Distribution Rights*. Holders of Common Shares will share equally on a pro rata basis in any distribution declared by the Board of Managers or in any assets available for distribution to Members upon Holdings' liquidation, dissolution or winding up.

The Amended First Lien Facility and the New Second Lien Facility impose restrictions on Holdings' ability to make distributions with respect to the Common Shares. Accordingly, Holdings does not intend to pay cash

distributions on the Common Shares for the foreseeable future.  See "Price Range of Common Shares and Dividend Policy."

*Preemptive Rights.*  The Holdings Operating Agreement provides that holders of at least 5% of the then outstanding Common Shares who are also accredited investors will be entitled to participate, pro rata, in any future issuance and sale of Shares or securities convertible into or exchangeable for Shares, subject to certain restrictions.

*Ownership and Transfer Restrictions*.  The Common Shares issued pursuant to the Restructuring Transaction will not have been registered under the Securities Act and will not be registered under the Securities Act in the future, unless required pursuant to the terms of the Holdings Operating Agreement.  In the event that the conditions to the Exchange Offers are satisfied and we consummate the Second Lien Exchange Offer, the Common Shares will be "restricted securities" as defined in Rule 144 promulgated under the Securities Act and may not be reoffered, resold or pledged or otherwise transferred, except pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements of the Securities Act. In the event that we complete a restructuring pursuant to the Plan of Reorganization, we will rely on Section 1145 of the Bankruptcy Code, to the extent it is applicable, to exempt the Common Shares from the registration requirements of the Securities Act (and of any state securities or "blue sky" laws).  In reliance upon this exemption, the Common Shares generally will be exempt from the registration requirements of the Securities Act, and recipients will be able to resell the Common Shares without registration under the Securities Act or other federal securities laws, unless the recipient is an "underwriter" with respect to such securities, within the meaning of Section 1145(b) of the Bankruptcy Code.  See "Securities Law Matters" for additional information.  The Common Shares are subject to additional transfer restrictions under the Holdings Operating Agreement, as described below under "—Transfer Restrictions."  The certificates evidencing the Common Shares, if any, will bear a legend describing restrictions on transfer of the Common Shares.

Prior to investing in the Common Shares or conducting any transactions in the Common Shares, investors are advised to consult professional advisers regarding the restrictions on transfer in the Common Shares and other restrictions referred to in this Offering Memorandum and Disclosure Statement.

Common Shares may, in the discretion of the Board of Managers, be issued in certificated form.  At this time, Holdings does not intend to issue certificated Common Shares.

Prior to registering the transfer of any Common Shares or paying any distribution on any such transferred shares, Holdings may require that the proposed transferor and transferee or payee provide Holdings certain information with respect to the direct or indirect ownership interest in such shares.  Any transferee, other than with respect to a drag-along sale, as described below, will be required to become a party to the Holdings Operating Agreement.

*Other Matters*.  Except as provided in the Holdings Operating Agreement, Members have no preemptive or other rights to subscribe for additional Shares.  There are no redemption or sinking fund provisions applicable to the Common Shares.

## Other Classes of Shares

The Holdings Operating Agreement provides that Shares may be issued from time to time in one or more classes and/or series.  The Board of Managers is authorized to fix the number of Shares constituting such classes and/or series and the designation of such class and/or series, the voting rights, if any, of Shares of such class and/or series, and the designations, preferences and the relative, participating, optional or other special rights and any qualifications, limitations and restrictions thereof, applicable to the Shares of each class and/or series.  The Board of Managers is able to, without Member approval, issue Shares with voting and other rights that could adversely affect the voting power and other rights of the holders of Common Shares and could have anti-takeover effects.  The ability of the Board of Managers to issue Shares without Member approval could have the effect of delaying, deferring or preventing a change of control of Holdings or the removal of existing management by diluting the Share ownership or voting rights of a person seeking to obtain control of Holdings or remove existing management.  Although Holdings does not currently intend to issue any Shares other than the equity issued under the Management Incentive

Plan, Holdings cannot assure you that it will not do so in the future. No Shares other than Common Shares are being issued pursuant to the Restructuring.

**Transfer Restrictions**

*Permitted Transfers.* The Holdings Operating Agreement provides that, without complying with the right of first offer and tag-along provisions described below, (i) a Member may transfer its Shares to any direct or indirect stockholder, member, partner or Affiliate of such Member; (ii) a Member may transfer his or her Shares to a family member, a company, partnership or a trust established for the benefit of a family member or any personal representative, estate or executor under any will of such Member or pursuant to the laws of intestate succession; or (iii) a Member may Transfer its Shares pursuant to or following a registered public offering (each, a "**Permitted Transfer**").

*Right of First Offer.* The Holdings Operating Agreement provides that the Members holding (together with their Affiliates and Permitted Transferees) 5% or more of the then outstanding Common Shares have a *pro rata* right of first offer on any sale of Common Shares by any Member to an unaffiliated third-party. In the event an initial public offering is not completed within 60 months of the date of the Holdings Operating Agreement, the right of first offer shall no longer apply to the Fortress Members.

*Tag-Along Right.* The Holdings Operating Agreement provides that the Members have the right to participate in any sale transaction involving 25% or more of the outstanding Common Shares by any other Member (other than a Permitted Transfer) on a *pro rata* basis, on the same price and the same terms as the transferor proposed to accept.

*Drag-Along Right.* The Holdings Operating Agreement provides that if (i) a Member or a group of Members representing 50% or more of the Common Shares then outstanding agree to sell their shares in certain transactions, or (ii) the board of managers approves the sale of all or substantially all of the assets of Holdings to, or a merger or consolidation of Holdings with, a person not affiliated with Holdings, and the distributions of consideration to Members are made in accordance with the Holdings Operating Agreement, then all other Members shall be subject to certain customary drag provisions. Until the earlier of (1) an initial public offering by Holdings, or (2) the Fortress Members (together with their Affiliates) no longer hold at least an aggregate of 10% of the Common Shares then outstanding, no such transaction shall be consummated unless (A) a majority-in-interest of the Fortress Members consent in writing to such transaction, or (B) the Company obtains an opinion from an investment banking firm that the consideration to be received by the Members from such transaction is at least 80% of the fair market value of Holdings; provided that if such transaction involves less than all of the assets or equity securities of Holdings, then the minimum consideration shall be 80% of the fair market value multiplied by the percentage of Holdings subject to such transaction.

No dragged Member will be required to (i) make any representations or warranties except that it has the authority to transfer its Shares, is the sole owner of such Shares and has good and valid title to such Shares, and that the transfer of such Shares does not violate any agreement to which it is a party or by which it is bound, or (ii) be subject to any post-closing covenants, including any non-competition or non-solicitation covenants, in connection with such transfer, other than confidentiality covenants with respect to information about the Company and its subsidiaries. The agreement effecting any proposed drag-along transaction shall provide that a dragged Member shall have no individual liability, including with respect to any indemnification provided by the Members (other than to the extent covered by a post-closing indemnity escrow), other than in connection with any breach of any representations or warranties that may be delivered as set forth in clause (i) of the preceding sentence, in which case liability resulting from a breach of such representations or warranties may not exceed the lesser of (x) such Member's pro rata share of the aggregate consideration received and (y) the net proceeds actually received by such Member pursuant to such transfer, and in the case of indemnification shall be on a several, not joint, basis.

*Certain Transfers.* The Holdings Operating Agreement provides that each Member that is an entity that was formed for the sole purpose of directly or indirectly acquiring Shares or that has no substantial assets other than Shares or direct or indirect interests in Shares (any such Member, a "**Share Holding Company**") agrees that (i) certificates for shares of its common stock or other instruments reflecting equity interests in such entity (and the certificates for shares of common stock or other equity interests in any similar entities controlling such entity) will note the restrictions contained in the Holdings Operating Agreement on the restrictions on transfer of shares as if

Ex. 1 p. 126

such common stock or other equity interests were Shares, (ii) no shares of such common stock or other equity interests may be transferred to any person other than in accordance with the terms and provisions of the Holdings Operating Agreement as if such common stock or other equity interests were Shares and (iii) any transfer of such common stock or other equity interests shall be deemed to be a transfer of the proportionate percentage number of Common Shares under the Holdings Operating Agreement (calculated proportionately by assuming for such calculation that Common Shares were actually held directly by the owners of the shares of the common stock or other equity interests of the Share Holding Company).

**Certain Provisions of the Holdings Operating Agreement and Delaware Law**

*Member Action by Written Consent; Annual and Special Meeting of Members*.  The Holdings Operating Agreement provides that any action required or permitted to be taken at any meeting of the Members may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, is signed by the holders of Common Shares having not less than the minimum number of votes that would be necessary to approve such action.  The Holdings Operating Agreement further provides that any such action by written consent shall not become effective until four (4) business days after notice thereof has been sent to the Fortress Members.  Meetings of the Members will be held at least annually.  In addition, special Member meetings may be called by the board of managers.

*Related Party Transactions*.  The Holdings Operating Agreement provides that transactions involving (i) Holdings or any of its Subsidiaries and (ii) the Avenue Members or their Affiliates must be on an arm's-length basis containing terms that, in the aggregate, are not less favorable to Holdings or its Subsidiaries than would be the case with an unrelated third party.  If any such transaction(or series of transactions) involves the payment from, or receipt by, the Company or its Subsidiaries of greater than $2.5 million, then the Company (or its Subsidiaries) shall not consummate such transaction unless the Company obtains either, at the Company's option, (1) a fairness opinion from an investment banking firm regarding such transaction, or (2) as long as the Fortress Members (together with their Affiliates) hold at least an aggregate of 10% of the Common Shares then outstanding, the written consent of a majority-in-interest of the Fortress Members.

*Company Opportunity*.  The Holdings Operating Agreement contains provisions waiving Holdings' interest and expectation with respect to certain acquisition or investment opportunities that may be presented to the Members, the non-employee/officer managers or their respective affiliates.

*Information Rights*.  The Holdings Operating Agreement provides that the Fortress Members have the right to inspect the books and other records of Holdings at reasonable times and upon reasonable notice and subject to certain limitations.  In addition, each of the Members, subject to certain limitations, is entitled to receive annual and quarterly consolidated financial statements of Holdings.  All such information shall be subject to a customary confidentiality obligation.

*Registration Rights*.  The Holdings Operating Agreement provides for certain customary registration rights, including but not limited to, Members (together with their Affiliates and Permitted Transferees) holding at least an aggregate of 5% of the then outstanding Common Shares having demand rights, following Holdings' initial public offering, to require Holdings to use reasonable best efforts to register their Common Shares with the SEC for resale, subject to certain exceptions.  Upon Holdings becoming eligible for use of Form S-3, any Member has unlimited demand rights to require Holdings to use reasonable best efforts to register its Common Shares on Form S-3 with the SEC for resale, subject to certain exceptions.  All Members have piggyback registration rights, subject to certain limitations.

**Limitation of Liability of Officers, Managers and Members; Indemnification**

The Holdings Operating Agreement limits the liability of managers, officers and Members.  To the fullest extent permitted by Section 18-1101 of the Delaware Limited Liability Company Act, none of the Members, managers, any of their respective Affiliates, nor any of their respective officers, directors, employees, partners, members or shareholders (each, a "**Protected Person**") will be liable to Holdings or any Member for any loss or damage unless it is incurred as a result of such Protected Person's acts or omissions that constitute a bad faith violation of the implied contractual covenant of good faith and fair dealing.  None of the officers of Holdings will be liable to

Holdings or any Member for any loss or damage unless it is incurred as a result of such officer's gross negligence, willful misconduct or willful breach of the Holdings Operating Agreement.

To the fullest extent permitted by Section 18-1101 of the Delaware Limited Liability Company Act, fiduciary and other duties imposed under Delaware law (including the duty of loyalty and the duty of care) on the managers of Holdings are eliminated under the Holdings Operating Agreement. Any duties (including fiduciary duties) of a Member that would otherwise apply at law or in equity (including the duty of loyalty and the duty of care) are eliminated by the Holdings Operating Agreement to the fullest extent permitted by applicable law. The officers of Holdings owe the same duties (including fiduciary duties) to Holdings and the Members as the duties of officers of a Delaware corporation owe to such corporation and its stockholders.

The Delaware Limited Liability Company Act provides that, subject to its operating agreement, a limited liability company may indemnify and hold harmless any member, manager or other person from and against any and all claims and demands whatsoever. The Holdings Operating Agreement provides that Holdings shall indemnify its Members, managers, and Protected Persons to the fullest extent permitted by law, so long as such indemnitee acted in good faith and in a manner such indemnitee reasonably believed to be in or not opposed to the best interests of Holdings and, with respect to any criminal proceeding, had no reasonable cause to believe such indemnitee's conduct was unlawful. The Holdings Operating Agreement provides that Holdings shall indemnify its officers to the fullest extent permitted by law, so long as such indemnitee's acts and omissions did not constitute gross negligence, willful misconduct or willful breach of the Holdings Operating Agreement. The Holdings Operating Agreement also requires Holdings to obtain insurance on behalf of any officer, manager, employee or other agent for any expense, liability or loss, whether or not Holdings would have the power to indemnify such a person under the Holdings Operating Agreement.

Holdings currently maintains liability insurance for its managers and officers.

Ex. 1 p. 128

## PLAN OF REORGANIZATION

The following summary describes the Plan attached hereto as Appendix A.  Terms used in this section "Plan of Reorganization" shall have the meanings ascribed to those terms in the Plan attached hereto as Appendix A.

### Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a Plan is the principal objective of a chapter 11 case.  A Plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a Plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN), WHICH IS ANNEXED TO THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT AS APPENDIX A.

THE STATEMENTS CONTAINED IN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### Overall Structure of the Plan

The Plan described herein provides for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to holders of claims against and interests in the Debtors.  In particular, the Plan contemplates Holders of First Lien Claims will receive (i) their pro rata portion of the First Lien Repayment, and (ii) either, at

each Holder's election, their pro rata portion of (x) the Amended First Lien Credit Facility or (y) the New Second Lien Credit Facility.  To the extent that First Lien Lenders elect to exchange their First Lien Facility Claims for their pro rata portion of the New Second Lien Credit Facility such that the New Second Lien Credit Facility would otherwise exceed $200 million (as adjusted to take into account the First Lien Repayment), such exchanging lenders shall be cut back on a pro rata basis, based upon the relative amounts elected to be exchanged and receive their pro rata portion of the Amended First Lien Facility in respect of such cutback.

The Plan further contemplates that each Holder of Second Lien Claims, in full and complete satisfaction, discharge and release of such Claims, shall receive its Pro Rata portion of 25% of the New Common Shares of the Reorganized Holdco issued and outstanding on the Effective Date subject to potential dilution by any New Common Shares issued under the Management Equity Incentive Plan.

Holders of other secured claims, administrative expense claims, and priority tax claims, will be satisfied in full, or otherwise rendered unimpaired (including by reinstatement) under the Plan in accordance with the Bankruptcy Code. General Unsecured Trade Claims, which are those general unsecured claims directly related to and arising from the receipt of goods and services by the Debtors held by Persons with whom the Debtors are conducting, and will continue to conduct, business as of the Effective Date of the Plan, will also be satisfied in full, or otherwise rendered unimpaired or reinstated.  The Plan provides no recoveries for any other general unsecured claims or equity interests held by non-Debtors.[3]

The Plan also contemplates a New Equity Investment of $150 million in New Common Shares by the Plan Sponsor, representing 75% of the New Common Shares of the Reorganized Holdco issued and outstanding on the Effective Date subject to potential dilution by any New Common Shares issued under the Management Equity Incentive Plan.

The Debtors believe that (i) through the Plan, holders of Allowed Claims will obtain a substantially greater recovery from the Debtors' Estates than the recovery they would receive if (a) the Debtors filed chapter 11 petitions without prior acceptance of the Plan by the requisite amount and number of their creditors for it to be approved by the Bankruptcy Court or (b) the Debtors filed for liquidation relief under chapter 7 of the Bankruptcy Code, and (ii) the Plan will afford the Debtors the opportunity and ability to continue their business as viable going concerns and preserve ongoing employment for the Debtors' employees.  The Classes of Claims against and Equity Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and distributions, if any, to be made under the Plan are described below.

**Adequate Information; Creditors Entitled to Vote on the Plan**

As more fully described below, the Plan designates separate classes of Claims against and Equity Interests in the Debtors (other than Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims).  Holders of Class 1 Claims (First Lien Claims) and Class 2 Claims (Second Lien Claims) would be Impaired under the Plan and only the votes of such Classes would be solicited.  In addition to holders of Administrative Expense Claims, DIP Facility Claims and Priority Tax Claims (which are not classified under the Plan and thus, not entitled to vote), holders of Class 3 (Priority Non-Tax Claims), and Class 5(a) (Unsecured Trade Claims) are Unimpaired by the Plan, would be deemed to have accepted the Plan, and accordingly would not be entitled to vote to accept or reject the Plan.  Finally, Holders of Claims and Interests, as applicable, in Class 5(b) (Unsecured Claims) and Class 7(a) (Interests in QCE Holding LLC, QCE Incentive LLC and Holdco) will not receive any distributions under the Plan, are deemed to reject the Plan, and accordingly, would not be entitled to vote to accept or reject the Plan.

Bankruptcy Rule 3018(b) prescribes the conditions that must be satisfied to count the ballots solicited with respect to a Plan prior to the commencement of a chapter 11 case. Bankruptcy Rule 3018(b) requires that (i) the chapter 11 Plan must have been disseminated to substantially all impaired creditors and equity security holders in the class(es) entitled to vote, (ii) the time prescribed for voting on the Plan must be sufficient and (iii) the solicitation

---

[3]  Equity interests held by one Debtor in another Debtor will be reinstated post-emergence to preserve the corporate structure of the Debtors post-emergence.  The Debtors may elect, with the consent of the Plan Sponsor, to dissolve certain entities within the corporate group prior to emergence to rationalize their corporate structure.

must have been conducted in accordance with section 1126(b) of the Bankruptcy Code, which requires compliance with all applicable non-bankruptcy laws, rules, or regulations or, if there are no such applicable laws, rules or regulations, that the disclosure with respect to the Plan contains "adequate information" as defined in section 1125(a) of the Bankruptcy Code.  Section 1125(a)(1) defines "adequate information" as information of a kind and in sufficient detail as far as is reasonably practicable in light of the nature and history of a company and the condition of such company's books and records, as would enable a hypothetical reasonable investor typical of holders of claims or equity interests of the relevant class to make an informed judgment about the Plan.

We believe that all of the requirements of Bankruptcy Rule 3018(b) would be satisfied in the event that we sought confirmation of the Plan. This Offering Memorandum and Disclosure Statement and the Plan, together with all of the accompanying materials, are being transmitted to holders of Class 1 and Class 2 Claims. We believe that this Offering Memorandum and Disclosure Statement contains adequate information (within the meaning of section 1125(a)(1) of the Bankruptcy Code) for all holders of such Claims.

**Certain Matters Regarding Classification and Treatment of Claims and Equity interests**

Section 1123 of the Bankruptcy Code provides that a Plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123, the Plan divides Claims and Equity Interests into Classes and sets forth the treatment for each Class (other than Administrative Expense Claims, DIP Facility Claims and Priority Tax Claims which, pursuant to section 1123(a)(1), need not and have not been classified).

The Debtors are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Equity Interests in the Debtors into Classes, each of which contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in such Class.  We believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of section 1122, but if Chapter 11 Cases were to be commenced, it is possible that a holder of a Claim or Equity Interest may challenge our classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, we would intend, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications to the classifications through the Plan to permit confirmation and to use the acceptances of the Plan that are marked on the Ballots received in this Solicitation Package for purpose of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately would be deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class in the Plan, by changing the composition of such class and the vote required of that Class for approval of the Plan.  Furthermore, a reclassification of a Claim or Equity Interest after approval of the Plan could necessitate a resolicitation of acceptances of the Plan.

The classification of Claims and Equity Interests and the nature of distributions to members of each Class are summarized below. We believe that the consideration, if any, that would be provided through the Plan to holders of Claims and Equity Interests would reflect an appropriate resolution of their Claims and Equity Interests, and would take into account the differing nature and priority (including applicable contractual subordination) of such Claims and Equity Interests. The Bankruptcy Court would be required to find, however, that a number of statutory tests are met before it could confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims or Equity Interests who would not be entitled to vote on the Plan, or would not vote to accept the Plan, but who would be bound by the provisions of the Plan if it were confirmed by the Bankruptcy Court. The "cramdown" provisions of section 1129(b) of the Bankruptcy Code, for example, permit confirmation of the Plan in certain circumstances even if the Plan has not been accepted by all Impaired Classes of Claims and Equity Interests.  Although we believe that the Plan could be confirmed under section 1129(b), there can be no assurance that the requirements of such section would be satisfied.

The Plan does not provide for substantive consolidation of the Estates.  Claims that are asserted against multiple Debtors shall be treated as separate Claims against each applicable Debtor.  Therefore, except as expressly specified in the Plan and only to the extent applicable with respect to any Class, the classification set forth in the Plan shall be deemed to apply separately with respect to each Plan proposed for each of the Debtors.   In no event shall (a) an Allowed Claim receive distributions under the Plan in excess of the Allowed amount of such Claim, including distributions received from all sources (including distributions under the Plan from multiple Debtors), or (b) an Allowed Claim based on a theory of secondary liability by reason of a guarantee, indemnity agreement, joint and

several obligations or otherwise, receive distributions under the Plan that combined with the distributions provided on the corresponding primary Claim(s), exceed the Allowed amount of the primary Claim.

**Material Terms of the Plan**

The classification of Claims and Equity Interests and the nature of distributions to members of each Class are summarized below. We believe that the consideration, if any, that would be provided through the Plan to holders of Claims and Equity Interests would reflect an appropriate resolution of their Claims and Equity Interests, and would take into account the differing nature and priority (including applicable contractual subordination) of such Claims and Equity Interest

***Treatment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims***

In accordance with section 1123(a)(l) of the Bankruptcy Code, the Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims are not classified and holders of such Claims are not entitled to vote on the Plan.

### Administrative Expense Claims

Subject to the provisions of Article 2.3(b) of the Plan , and unless otherwise agreed to by the Holder of an Allowed Administrative Expense Claim (in which event such other agreement shall govern), each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash (i) at the option of the Debtors (before the Effective Date), with the consent of the Plan Sponsor, or the Reorganized Debtors (on or after the Effective Date), (a) in the ordinary course of business as the Claim becomes due and owing or (b) on the Distribution Date, or (ii) on such other date as the Bankruptcy Court may order.

### Priority Tax Claims

Unless otherwise agreed to by the Holder of an Allowed Priority Tax Claim (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, but no later than thirty (30) days after the Effective Date, or (b) through equal annual installment payments in Cash (i) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim together with interest accrued thereon at the applicable non-bankruptcy rate; (ii) over a period ending not later than five (5) years after the Petition Date, at a rate specified by the Reorganized Debtors unless objected to by applicable taxing authorities; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan.  All Allowed Priority Tax Claims against any of the Debtors that are not due and payable on the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the applicable non-bankruptcy law governing such Claims.

### DIP Facility Claims

On the Effective Date, if not previously repaid in full, all DIP Facility Claims shall be paid in full in Cash, or otherwise satisfied in a manner acceptable to the DIP Agent and each DIP Lender.

***Treatment of Claims and Equity Interests***

### Class 1 – First Lien Claims

Class 1 Claims shall be Allowed Claims pursuant to the Plan (1) in the aggregate amount of $644.9 million (including reimbursement obligations for Letters of Credit) under the First Lien Credit Facility as of the Petition Date, and (2) interest, fees and other amounts outstanding under the First Lien Credit Facility through the Effective Date, <u>other</u> <u>than</u> any amounts that will be paid in Cash pursuant to section 10.11 of the Plan.

Ex. 1 p. 132

Holders of Class 1 Claims, in full and complete satisfaction, discharge and release of such Claims (other than Claims in respect of Letters of Credit), shall receive (i) their pro rata portion of the First Lien Repayment, and (ii) either, at each Holder's election, their pro rata portion of (x) the Amended First Lien Credit Facility or (y) the New Second Lien Credit Facility.  To the extent that First Lien Lenders elect to exchange their First Lien Facility Claims for their pro rata portion of the New Second Lien Credit Facility such that the New Second Lien Credit Facility would otherwise exceed $200 million (as adjusted to take into account the First Lien Repayment), such exchanging lenders shall be cut back on a pro rata basis, based upon the relative amounts elected to be exchanged and receive their pro rata portion of the Amended First Lien Facility in respect of such cutback.

Avenue Capital Group and Fortress Investment Group, LLC and each affiliate of the foregoing that holds First Lien Claims, in each case solely to the extent that such affiliate can be directed by Avenue Capital Group or Fortress Investment Group, LLC, as applicable, shall be deemed to have elected to receive their pro rata portion of the New Second Lien Facility pursuant to section 2.7(c) of the Plan.

In addition, in full and complete satisfaction, discharge and release of Claims in respect of Letters of Credit, Holders of Class 1 Claims shall receive on, or as soon as practicable after, the Effective Date, the return of the original letters of credit marked "cancelled", or "back up" letters of credit, or treatment on such other terms as the Debtors and Holders of such Claims may agree; provided, however, that any "back up" letters of credit provided under the Plan must be cash collateralized and issued by financial institutions that are satisfactory to the Debtors, with the consent of the Plan Sponsor,  or Reorganized Debtors, and the First Lien Agent; provided further, however, that in no event shall the  treatment of Letters of Credit hereunder permit the aggregate amount of Letters of Credit and letters of credit under the Amended First Lien Credit Facility to exceed $5 million.

**Class 2 – Second Lien Claims**

Class 2 Claims shall be Allowed Claims pursuant to the Plan in the aggregate principal amount of $225.0 million plus (and including) all other amounts which may be outstanding under the Second Lien Credit Facility as of the Petition Date, other than any amounts that will be paid in Cash pursuant to section 10.11 of the Plan.

Each Holder of Class 2 Claims, in full and complete satisfaction, discharge and release of such Claims shall receive its Pro Rata portion of 100% of the equity interests of Reorganized Holdco, with such equity interests of Reorganized Holdco being simultaneously assigned by such Holders (and issued) to QCE Parent in exchange for 25% of the New Common Shares issued and outstanding on the Effective Date subject to dilution by any New Common Shares issued under the Management Equity Incentive Plan.

Class 2 Claims are impaired and the Holders thereof are entitled to vote on the Plan.

**Class 3 – Priority Non-Tax Claims**

Unless otherwise agreed to by the Debtors, with the consent of the Plan Sponsor before the Effective Date, or the Reorganized Debtor and each Holder of an Allowed Priority Non-Tax Claim (in which event such agreement shall govern), each Holder of an Allowed Class 3 Claim, in full and complete satisfaction, discharge and release of such Claim, shall be paid in full in Cash on the later of the Distribution Date and a date that is as soon as practicable after the date upon which such Claim becomes an Allowed Priority Non-Tax Claim.

**Class 4 – Other Secured Claims**

Class 4 Claims shall be allowed or disallowed to the extent permitted by section 506 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code and Bankruptcy Rules in accordance with the Plan.

Each Holder of an Allowed Class 4 Claim, in full and complete satisfaction, discharge and release of such Claim shall at the option of the Debtors, with the consent of the Plan Sponsor, be (i) paid in full in Cash on the Distribution Date, (ii) unimpaired within the meaning of section 1124 of the Bankruptcy Code, (iii) paid on such other terms as the Debtors, with the consent of the Plan Sponsor, and the Holder of such Claim may agree, or (iv)

**Ex. 1 p. 133**

with the consent of the Plan Sponsor, satisfied through the surrender by the applicable Debtors of the collateral securing the Claim to the Holder thereof.

**Class 5(a) – Unsecured Trade Claims.**

Class 5(a) consists of all Unsecured Trade Claims.  Class 5(a) Claims shall be Allowed or disallowed to the extent permitted by section 502 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code and Bankruptcy Rules in accordance with the Plan.

Each Holder of an Allowed Unsecured Trade Claim shall receive payment in full in Cash of the unpaid portion of such Allowed Unsecured Trade Claim on the latest of (i) the Effective Date (or as soon thereafter as reasonably practicable), (ii) the date on which such claim becomes payable, in the ordinary course of the Debtors' or the Reorganized Debtors' businesses, and (iii) as is otherwise agreed to by the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as the case may be, and the Holder of such Allowed Unsecured Trade Claim.

Class 5(a) Claims are Unimpaired and deemed to accept the Plan, and the Holders thereof are not entitled to vote on the Plan.

**Class 5(b) – Unsecured Claims**

Class 5(b) consists of all Unsecured Claims. Class 5(b) Claims shall be Allowed or disallowed to the extent permitted by section 502 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code and Bankruptcy Rules in accordance with the Plan.

Holders of Class 5(b) Claims shall not receive or retain any property on account of such Class 5(b) Claims and all such Claims shall be cancelled and discharged. Class (b) Claims are Impaired and deemed to reject the Plan, and the Holders thereof are not entitled to vote on the Plan.

**Class 6 – Intercompany Claims**

Class 6 consists of all Intercompany Claims.  On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors or between one or more Debtors and any Non-Debtor Affiliates, at the election of the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, be Allowed and (a) Reinstated, (b) released, waived, and discharged, or (c) contributed to, or dividended to, the capital of the obligor, provided, provided, however, that any Intercompany Claim less than $100,000 owed by a Debtor to a Non-Debtor Affiliate may be Reinstated without the Plan Sponsor's consent, provided, further that no Plan Sponsor consent shall be required for any Intercompany Claims owed by a Non-Debtor Affiliate to a Debtor unless such Intercompany Claims are being cancelled.  Class 6 Claims are Unimpaired and the Holders thereof are not entitled to vote on the Plan.

**Class 7(a) – Claims and Interests in QCE Holding LLC, QCE Incentive LLC and Holdco**

Class 7(a) consists of any and all Interests in QCE Holding LLC, QCE Incentive LLC and Holdco, and all Claims arising from or related to Interests in QCE Holding LLC, QCE Incentive LLC and Holdco that are subject to subordination under section 510 of the Bankruptcy Code.

Holders of Class 7(a) Claims and Interests shall not receive or retain any property on account of such Class 7(a) Claims and Interests and all such Claims and Interests shall be cancelled and discharged.  Class 7(a) Claims and Interests are impaired and are deemed to reject the Plan and the Holders thereof are not entitled to vote to accept or reject the Plan.

Ex. 1 p. 134

**Class 7(b) – Intercompany Interests**

Class 7(b) Interests consists of any and all Intercompany Interests. Class 7(b) Interests shall be Unimpaired on the Effective Date. Class 7(b) Claims are Unimpaired and the Holders thereof are not entitled to vote on the Plan.

**Provision Regarding Survival of Indemnification**

Any and all respective obligations, whether pursuant to certificates of incorporation, codes of regulation, by-laws, limited liability company agreements, operating agreements, limited liability partnership agreements, board resolutions, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, of the Debtors and Reorganized Debtors to indemnify and reimburse persons who are current or former directors, officers, members, managers, managing members, employees or agents of any of the Debtors (collectively, the "**Indemnity Obligations**") shall survive confirmation of the Plan  and are Reinstated or shall be treated as if they are executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan  as of the Effective Date, and such obligations shall survive confirmation of the Plan, shall remain unaffected by the Plan, and shall not be discharged or impaired by the Plan, irrespective of whether the indemnification or reimbursement obligation is owed in connection with any event occurring before, on or after the Petition Date, it being understood that all indemnification provisions in place on and prior to the Effective Date for directors, officers, members, managers or employees and agents of the Debtors shall survive the effectiveness of the Plan  for claims related to or in connection with any actions, omissions or transactions prior to the Effective Date (including prior to the Petition Date).  In addition, effective upon the Effective Date, Reorganized Opco shall assume all Indemnity Obligations of QCE Holding LLC and QCE Incentive LLC (the "**Holding's Indemnity Obligations**"), and all such assumed Holding's Indemnity Obligations shall survive confirmation of the Plan  as obligations of Reorganized Opco, and shall not be discharged or otherwise impaired by the Plan.  Additionally, the Debtors or Reorganized Debtors, as the case may be, and QCE Parent shall obtain and maintain directors', managing members' and officers' insurance, acceptable to the Plan Sponsor, providing coverage for those indemnitees currently covered by such policies (collectively, the "**E&O and D&O Insureds**") for the remaining term of such policy and shall maintain tail coverage under policies in existence as of the Effective Date for a period of at least three years after the Effective Date, and obtain renewal or new coverage on terms acceptable to the Plan Sponsor (including any self-insurance or renewal of any existing policy/(ies), the "**Insurance Coverage**"), and consistent with historical practice, hereby further additionally indemnify the E&O and D&O Insureds solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy.

**Implementation of the Plan**

*Restructuring Transactions*

The Plan contemplates, among other things, (i) an exchange offer for existing Holders of the First Lien Facility Claims into the New Second Lien Credit Facility in accordance with and pursuant to the terms of the First Lien Exchange Offer, (ii) the First Lien Repayment to Holders of First Lien Facility Claims, (iii) an amendment and restatement of the First Lien Credit Facility by the Amended First Lien Credit Facility, (iv) conversion of the Second Lien Facility Claims into New Common Shares, and (v) the New Equity Investment.  The restructuring transactions will occur in a three-step process.  In Step 1, the Holders of Class 2 Claims will exchange such claims for 100% of the membership interests of Reorganized Holdco, which will be treated for tax purposes as a foreclosure on the assets of Holdco in exchange for 100% of the Second Lien Credit Facility.  In Step 2, the equity interests in Reorganized Holdco are assigned and to be issued to QCE Parent (and not to the Holders of Second Lien Facility Claims) with the Holders of Second Lien Facility Claims being issued 100% of the New Common Shares.  In Step 3, New Common Shares will be issued to the Plan Sponsor in exchange for the New Equity Investment, which will dilute the Holders of Second Lien Facility Claims to 25% of outstanding New Common Shares, subject to further dilution for the Management Equity Incentive Plan.  All three steps are pursuant to a single plan and will occur immediately after the preceding step.  Promptly after the Closing, Reorganized Holdco will merge with and into QCE Parent with QCE Parent being the surviving entity in the merger.  QCE Parent will change its name to QCE Finance LLC in connection with the merger.

*New Securities*

On the Effective Date, QCE Parent shall issue 2,500,000 of New Common Shares to the Holders of Second Lien Facility Claims on a Pro Rata basis in accordance with section 2.7(c) of the Plan and 7,500,000 of New Common Shares to the Plan Sponsor in accordance with the terms and conditions of the New Equity Investment, in each case, subject to potential dilution from New Common Shares issued pursuant to the Management Equity Incentive Plan.  Distribution of such New Common Shares hereunder shall together constitute the issuance of 100% of the New Common Shares and shall be deemed issued on the Effective Date.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any securities pursuant to the Plan , including pursuant to the Management Equity Incentive Plan, and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of securities.  In addition, except as otherwise provided in this Plan, to the maximum extent provided under section 1145 of the Bankruptcy Code, any and all New Common Shares contemplated by this Plan and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to: (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) applicable regulatory approval.

*Plan Funding*

On the Effective Date, the Reorganized Debtors will enter into the Amended First Lien Credit Agreement, in form and substance as set forth in exhibit D of the Restructuring Support Agreement, and the final form and substance of which shall be acceptable to the Reorganized Debtors and Approving Lenders, with respect to the Amended First Lien Credit Facility in an aggregate amount up to (i) a $455 million term loan commitment and (ii) a $5 million revolver solely to permit the issuance of letters of credit.

On the Effective Date, the Reorganized Debtors will enter into the New Second Lien Credit Agreement, in form and substance as set forth in exhibit C of the Restructuring Support Agreement, and the final form and substance of which shall be acceptable to the Reorganized Debtors and Approving Lenders, with respect to the New Second Lien Credit Facility in an aggregate amount of at least $150 million but not more than $200 million.

On the Effective Date, the Plan Sponsor shall pay to QCE Parent $150 million in accordance with the terms of the New Equity Investment.  The New Equity Investment shall be used by QCE Parent and the Reorganized Debtors for (a) repayment in full of the DIP Facility and all DIP Facility Claims, (b) the First Lien Repayment, (c) payment of fees and expenses incurred in connection with the Chapter 11 Cases, and (d) working capital and other general corporate purposes.

Other than as set forth above, all Cash necessary for the Reorganized Debtors to make payments required by the Plan shall be obtained from the Debtors' Cash balances then on hand, after giving effect to the transactions contemplated herein.

*Corporate Governance, Managers, Officers and Corporate Action*

As of the Effective Date, the current certificates of formation, bylaws, and operating agreements of the Debtors (including those of Opco) and other similar formation documents as applicable, shall be amended as necessary to satisfy the provisions of the Plan  and the Bankruptcy Code, including, without limitation, the prohibition against the issuance of non-voting equity securities set forth in section 1123(a)(6) of the Bankruptcy Code (collectively, the "**Amended Certificates of Formation and Operating Agreements**").  The forms of Amended Certificates of Formation and Operating Agreements contained in the Plan Supplement shall become effective as of the Effective Date.  After the Effective Date, the Amended Certificates of Formation and Operating Agreements shall be subject

to such further amendments or modifications as may be made by law, or pursuant to such Amended Certificates of Formation and Operating Agreements.

Managers and Officers of QCE Parent, Reorganized Holdco and Reorganized Opco.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the New Board of Managers and officers of QCE Parent, Reorganized Holdco and the officers of Reorganized Opco shall be the persons identified in the Plan Supplement.  QCE Parent shall be the sole member of Reorganized Holdco (prior to the merger of Reorganized Holdco into QCE Parent) and Reorganized Holdco shall be the sole member of Reorganized Opco.  The Operating Agreement provides that the New Board of Managers will be chosen as follows:  seven managers will be appointed by the Plan Sponsor, one manager will be appointed by Fortress Investment Group, LLC and the remaining manager will be the Chief Executive Officer.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors shall disclose the extent any of the initial New Board Members are insiders other than by virtue of being a member or New Board Member of QCE Parent, and the nature of any compensation for such person.  Each New Board Member shall serve until his or her term expires as provided in the Certificate of Formation (or until such New Board Member is removed and replaced in accordance with the Operating Agreement), and thereafter managing members shall be nominated and serve in accordance with the terms of the Certificate of Formation, the other constituent documents of QCE Parent, and applicable law.

Directors, Managers and Officers of the Reorganized Debtors.  Unless otherwise determined by the Debtors, with the consent of the Plan Sponsor, the directors, officers and managers (if any) of each of the Debtors other than Holdco and Opco shall continue to serve in such capacities with respect to the Reorganized Debtors after the Effective Date.

Pre-Effective Date Management.  After the Petition Date and until their termination, if applicable, unless otherwise determined by the Debtors, with the consent of the Plan Sponsor, on the Effective Date, the current managers, directors and executive officers of each Debtor shall continue to serve in such capacities, subject to such changes as may be determined by the board of directors or managers of a Debtor, with the consent of the Plan Sponsor, in accordance with the current bylaws, operating agreements and certificates of formation of such Debtor.

Management Equity Incentive Plan.  Except as provided under the Plan, on or as soon as practicable after the Effective Date, QCE Parent shall adopt and implement (as applicable) the Management Equity Incentive Plan.

Employee Compensation and Benefit Programs.  The Debtors' ordinary course employee benefit programs, including, without limitation, its savings plans, retirement plans, healthcare plans, disability plans, severance obligations, incentive plans, and life, accidental death and dismemberment insurance plans (collectively, the "**Employee Benefits Programs**"), entered into before the Petition Date and not since terminated, shall survive confirmation of the Plan and will be fulfilled in the ordinary course of business.  For the avoidance of doubt, the Deferred Compensation Plans are not Employee Benefit Programs hereunder.

*Litigation Cooperation.*

In connection with any pending or future litigation that names any current or former director, officer, manager, member, employee and agent of the Debtors, the Reorganized Debtors and/or current and former members of the Board of Managers of Holdco as a party (each a "**Non-Company Litigation Party**"), the Reorganized Debtors shall cooperate in good faith with each Non-Company Litigation Party in the defense of such litigation and the Reorganized Debtors shall not settle any such pending or future litigation without the written consent of each Non-Company Litigation Party named therein; provided that no such consent shall be necessary (i) if such settlement, or the portion thereof as it relates to a named Non-Company Litigation Party, involves only the payment of money and such payment is made by the Reorganized Debtors and/or the Debtors' or Reorganized Debtors' insurers and the Non-Company Litigation Party is released as part of the settlement or (ii) if such settlement does not relate to a named Non-Company Litigation Party or such Non-Company Litigation Party is either not eligible for indemnification by the Reorganized Debtors or not covered by the Debtors' or Reorganized Debtors' insurance with respect to such litigation; provided further, that if such Non-Company Litigation Party is not entitled to indemnification from the Debtors or Reorganized Debtors, then the Reorganized Debtors shall not and shall have no obligation to settle such claim on behalf of such Non-Company Litigation Party.

**Executory Contracts and Unexpired Leases**

*Assumption of Executory Contracts and Unexpired Leases*

Except as otherwise set forth herein, all executory contracts of the Debtors or unexpired leases of the Debtors, including without limitation, all Franchise Agreements, executory contracts with counterparties who are holders of Unsecured Trade Claims, Holding's Indemnity Obligations, the AD Settlement Agreements, and the SARs Settlement Agreements, shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such executory contract or unexpired lease:

- was previously rejected by the Debtors by Final Order of the Bankruptcy Court;
- was rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date;
- is the subject of a motion to reject filed by the Debtors under section 365 of the Bankruptcy Code pending as of the Effective Date; or
- is listed on the Schedule of rejected Executory Contracts and Unexpired Leases, set forth in the Plan Supplement.

An executory contract or unexpired lease that is deemed to be assumed pursuant to the foregoing sentence shall be referred to as an "Assumed Contract." Except as otherwise provided in the following sentence, Assumed Contracts will be cured by being Reinstated. In the event of a dispute, cure payments required by section 365(b)(1) of the Bankruptcy Code shall be paid upon entry of a Final Order resolving such dispute; *provided*, *however*, if an objection to cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors, in their sole discretion, may elect to reject such executory contract or unexpired lease in lieu of assuming it. Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (i) the Reorganized Debtors have properly provided for the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code, (ii) each assumption is in the best interest of the Debtors, their estates, and all parties in interest in the Chapter 11 Cases, and (iii) the requirements for assumption of any executory contract or unexpired lease to be assumed have been satisfied.

To the extent applicable, any executory contracts or unexpired leases, including related instruments and agreements, assumed or deemed assumed during the Chapter 11 Cases, including those assumed pursuant to this Article 5, shall be deemed modified such that the transactions contemplated by the Plan shall not constitute a "change of control" (or terms with similar effect) under the applicable executory contract or unexpired lease, regardless of how such term may be defined herein, and any consent or advance notice required under such executory contract or unexpired lease shall be deemed satisfied by Confirmation of the Plan.

**Rejection of Executory Contracts and Unexpired Leases.**

The executory contracts and unexpired leases set forth in the Plan Supplement shall be deemed rejected as of the corresponding date set forth therein. The Area Director Marketing Agreement dated September 17, 2009 with Chicago Franchise Support Services LLC, and the Management Agreement dated January 16, 2004 with Rockford Manager LLC, each as may have been amended from time to time, shall each be rejected and terminated pursuant to section 365 of the Bankruptcy Code effective as of the last day of the month in which the Effective Date occurs. The employment agreement entered into with Richard E. Schaden on May 5, 2006, which agreement was amended on January 1, 2009, December 31, 2009 and June 30, 2010, shall be rejected and terminated pursuant to section 365 of the Bankruptcy Code effective as of the Petition Date. The Debtors reserve the right, with the consent of the Plan Sponsor, at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, to remove any executory contract or unexpired lease from the Plan Supplement or to seek to reject any executory contract or unexpired lease to which a Debtor is a party and to file a motion requesting authorization for the rejection of any such executory contract or unexpired lease. Any personal property left by the Debtors on the premises related to unexpired leases rejected pursuant to the Plan or orders of the Bankruptcy Court shall be deemed abandoned pursuant to section 554 of the Bankruptcy Code. Non-Debtor counterparties to unexpired leases rejected pursuant to

the Plan or orders of the Bankruptcy Court may dispose of any such personal property in their sole and absolute discretion without liability to the Debtors.

*Rejection Damages Bar Date for Rejections Pursuant to Plan*

If the rejection of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtors or Reorganized Debtors or their properties, or any of their interests in properties as agent, successor or assign, unless a Proof of Claim is filed with the Claims and Noticing Agent and served upon counsel to the Reorganized Debtors within thirty (30) days after the later of (i) entry of the Confirmation Order, or (ii) the effective date of rejection of the executory contract or unexpired lease. The Debtors shall give notice of the bar date established by this section to the non-Debtor counterparties to the executory contracts and unexpired leases identified in the Plan Supplement by service of the Plan , the Confirmation Order or otherwise. Unless otherwise provided herein, the Reorganized Debtors shall object to such Claims within sixty (60) days of the filing of such Proofs of Claim.

*Limited Extension of Time to Assume or Reject*

In the event of a dispute as to whether a contract or lease is executory or unexpired, the right of the Debtors or Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired. The deemed assumptions and rejections provided for in this Article VI of the Plan shall not apply to such contract or lease.

### Disputed Administrative Expense Claims and Disputed Claims

After the Effective Date, only the Reorganized Debtors may object to the allowance of any Claim or Administrative Expense Claim. After the Effective Date, the Reorganized Debtors shall have the sole power and authority to object to, allow or settle and compromise any Claim without notice to any other party, or approval of, or notice to the Bankruptcy Court. In addition, the Debtors, the Plan Sponsor, or the Reorganized Debtors may at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party has previously objected to such Claim.

Objections to any Claim filed by any party other than the Debtors must be filed no later than 20 days after the Confirmation Date. The Debtors and Reorganized Debtors shall file objections on or before the Claims Objection Deadline to any Claim that is not an Allowed Claim as of the Effective Date.

### Bar Date for Certain Administrative Expense Claims

All applications for final allowance of Professional Fee Claims, and all other requests for the payment of Administrative Expense Claims (other than Ordinary Course Administrative Expense Claims), must be filed with the Bankruptcy Court and served on the Reorganized Debtors, the Plan Sponsor and their respective counsel at the addresses set forth in section 10.14 of the Plan not later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Any request for the payment of an Administrative Expense Claim that is not timely filed and served shall be discharged and forever barred and the Holder of such Administrative Expense Claim shall be enjoined from commencing or continuing any action, process, or act to collect, offset or recover such Claim. The Debtors, the Plan Sponsor and the Reorganized Debtors shall have sole responsibility for filing objections to and resolving all requests for the allowance of Administrative Expense Claims. All Professional Fee Claims must be denominated in U.S. dollars and must be converted into U.S. dollars using the foreign currency exchange rate applicable as of the Petition Date.

### Reserve for Disputed Administrative Expense Claims, Disputed Claims and Bonding Requirements

On the Effective Date of the Plan, the Reorganized Debtors shall maintain Cash (the "**Distribution Reserve**") equal to (a) one hundred percent (100%) of the amount that the Holders of Disputed Claims would be entitled to receive under the Plan if such Disputed Claims were Allowed Claims in the full amount asserted by the Holders of

**Ex. 1 p. 139**

such Claims, or with respect to any particular Disputed Claim, such other amount agreed to by the Debtors and the Holder of such Disputed Claim, and (b) an appropriate estimate for Administrative Expenses that have not been Allowed as of the Effective Date.  For the avoidance of doubt, in no event shall the Reorganized Debtors maintain a Distribution Reserve for Holders of Claims in Class 5(b), and Class 7(a), or for any other Class or Claim that is not entitled to any distributions under the Plan.  The Distribution Reserve shall be held in a segregated account by the Reorganized Debtors for the benefit of Holders of such Disputed Claims and Administrative Expenses, pending determination of entitlement thereto.  Upon the request of the Reorganized Debtors at any time, the Bankruptcy Court may estimate and determine the estimated amount (the "**Estimated Amount**") of any Disputed Claim as of the Effective Date and such Estimated Amount shall be the amount reserved for such Disputed Claim.  Any claimant holding a Disputed Claim so estimated will receive no more than the Estimated Amount from the Distribution Reserve and will not have recourse to the Debtors, the Reorganized Debtors, or other property transferred pursuant to the Plan should the Allowed Claim of such claimant exceed such Estimated Amount.

### Disposition of Distribution Reserve

Cash held in the Distribution Reserve shall be distributed by the Reorganized Debtors to a Holder of a Disputed Claim or Administrative Expense Claim when, and to the extent that, such Disputed Claim or Administrative Expense Claim becomes Allowed pursuant to a Final Order.  Such distribution shall be made to the Holder of such Disputed Claim or Administrative Expense Claim in an amount equal to the amount in which such Disputed Claim or Administrative Expense Claim becomes Allowed as set forth in Article II hereof, without interest thereon.  If a Disputed Claim is disallowed or Allowed by Final Order in an amount that is less than the amount of the Disputed Claim, the resulting surplus shall be released from the Distribution Reserve and shall be released to the Reorganized Debtors.

### Manner of Payment and Distributions under the Plan

All distributions under the Plan shall be made by the Reorganized Debtors or a distribution agent selected by the Reorganized Debtors.  The Reorganized Debtors or such distribution agent will make distributions on Allowed Claims as of the Effective Date as soon as reasonably practicable after the Effective Date (the "**Distribution Date**").  The Reorganized Debtors or such distribution agent will make subsequent distributions to a Holder of an Allowed Claim within a reasonable period of time after such Claim becomes Allowed.  Payments of Cash by the Reorganized Debtors pursuant to the Plan may be by check drawn on a domestic bank and shall be made to the address of the Holder of such Allowed Claim as most recently indicated on or prior to the Effective Date on the Debtors' records.  At the option of the Reorganized Debtors, payments may be made by wire transfer from a bank.

### Interest and Penalties on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable bankruptcy law or necessary to render a Claim unimpaired, postpetition interest and penalties shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of the Plan.

### Record Date for Distributions

Under the terms of the Plan, the Distribution Record Date shall be the Confirmation Date.  Neither the Debtors nor Reorganized Debtors will have any obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims that are Holders of such Claims as of the close of business on the Distribution Record Date.  The Debtors and Reorganized Debtors shall be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.

**Ex. 1 p. 140**

**Withholding and Reporting Requirements**

In connection with the Plan and all distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All such amounts withheld and paid to the appropriate taxing authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such Holder for all purposes of the Plan.  Reorganized Debtors have the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding Tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such Holder's distribution, and is later held liable for the amount of such withholding, the Holder shall reimburse such party.

**Setoffs**

Except as provided under the Plan , the Debtors and/or Reorganized Debtors may, but shall not be required to, set off against any Claim and the payments to be made pursuant to the Plan  in respect of such Claim, any claims of any nature whatsoever that the Debtors may have against the Claim Holder, but neither the Debtors' failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim the Debtors may have against such Claim Holder.  Notwithstanding anything contained in the Plan to the contrary, neither the Debtors nor the Reorganized Debtors shall be permitted to setoff against any DIP Facility Claim, First Lien Facility Claims or Second Lien Facility Claims any claims of any nature that the Debtors may have against any Holder of a DIP Facility Claim, First Lien Facility Claim or Second Lien Facility Claim.

**Surrender of Collateral, Surrender and Cancellation of Instruments**

Notwithstanding any other provision of the Plan, no Holder of a Claim based on an instrument shall be entitled to any distribution under the Plan  until such Holder shall have first surrendered or caused to be surrendered to the Reorganized Debtors such instrument or, alternatively, documents reasonably satisfactory to the Reorganized Debtors evidencing (a) succession of title to such Holder, or (b) an affidavit of loss and indemnity with respect to such instrument in a form customarily utilized for such purposes together with, if the Reorganized Debtors so request, a bond in form and substance (including as to amount) reasonably satisfactory to the Reorganized Debtors.

**Undeliverable or Returned Distributions**

If any Allowed Claim distribution is returned to the Reorganized Debtors as undeliverable, the Reorganized Debtors shall use reasonable efforts to determine the correct address of the Claim Holder.  If such reasonable efforts are unsuccessful, no further distributions shall be made to such Claim Holder unless and until the Reorganized Debtors are notified in writing of such Holder's then current address.  Upon receipt by the Reorganized Debtors, returned Cash shall not earn any interest or be entitled to any dividends or other accruals of any kind.  Any Holder of an Allowed Claim that does not assert a claim or interest pursuant to section 7.7 of the Plan for a returned distribution within one (1) year after the Effective Date shall be forever barred from asserting any such claim or interest against the Debtors or their property, the Reorganized Debtors or their property or other property transferred pursuant to the Plan.  In such cases, any Cash held for distribution on account of such Allowed Claim or Interest shall re-vest in Reorganized Debtors to be distributed in accordance with the Plan.  Except as provided therein, nothing contained in the Plan shall require the Debtors or the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim or Interest.

**Fractional Membership Interests**

No fractional interests of New Common Shares shall be distributed.  Where a fractional interest would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole interest of New Common Shares or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole interest of New Common Shares.

**Distributions to Secured Funded Debt Claims**

Distributions under the Plan to Holders of First Lien Facility Claims and Second Lien Facility Claims in Classes 1 and 2 respectively shall be made to the First Lien Agent and Second Lien Agent respectively, in accordance with the terms of the applicable secured funded debt agreements.

**Miscellaneous Distribution Provisions**

Foreign Currency Exchange Rate.  Except as specifically provided for in the Plan or an order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using Bank of America's noon spot rate as of the Petition Date for all purposes under the Plan, including voting, allowance and distribution.

Fractional Cents.  Any other provision of the Plan notwithstanding, no payment of fractional cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

Distributions on Non-Business Days.  Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

Partial Distributions on Disputed Claims.  The Debtors or the Reorganized Debtors as applicable may, but are not required to, make partial distributions to Holders of Disputed Claims for the amount of the undisputed portion of such Holder's Disputed Claim.

Disputed Payments.  If any dispute arises as to the identity of the Holder of an Allowed Claim entitled to receive any distribution under the Plan, the Reorganized Debtors may retain such distribution until its disposition is determined by a Final Order or written agreement among the interested parties to such dispute.

Post-Consummation Effect of Evidence of Claims or Interests.  Notes, stock certificates, membership certificates, unit certificates, and other evidence of Claims against or Interests in the Debtors shall, effective on the Effective Date, represent only the right to participate in the distributions contemplated by the Plan and shall not be valid or effective for any other purpose.

Disgorgement.  To the extent any property including Cash is distributed to a Person on account of a Claim that is not an Allowed Claim, such property shall be held in trust for and shall promptly be returned to the Reorganized Debtors.

## Conditions Precedent to Confirmation and Effectiveness of the Plan

### *Conditions to Confirmation*

Confirmation of the Plan is subject to the condition that the Confirmation Order confirming the Plan, as such Plan may have been modified, shall have been entered by the Bankruptcy Court in form and substance satisfactory to the Debtors and the Approving Lenders.

### *Conditions to the Effective Date*

Consummation of the Plan and the occurrence of the Effective Date are subject to satisfaction of the following conditions:

- The Confirmation Order, in form and substance acceptable to the Debtors and the Approving Lenders, shall have become a Final Order.

- The Distribution Reserve shall have been established.

Ex. 1 p. 142

- The Restructuring Support Agreement has not been terminated.

- The Amended First Lien Credit Agreement, in form and substance as that attached as exhibit D to the Restructuring Support Agreement, and all related documents provided for therein or contemplated thereby, in each case, the final form and substance of which shall be acceptable to the Reorganized Debtors and Approving Lenders, shall have been executed and delivered by all parties thereto, and all conditions precedent thereto shall have been satisfied.

- The New Second Lien Credit Agreement, in form and substance as that attached as Exhibit C to the Restructuring Support Agreement, and all related documents provided for therein or contemplated thereby, in each case, the final form and substance of which shall be acceptable to the Reorganized Debtors and Approving Lenders, shall have been executed and delivered by all parties thereto, and all conditions precedent thereto shall have been satisfied.

- The Marketing Fund Trusts Credit Facility and all related documents provided for therein or contemplated thereby, in each case, in form and substance acceptable to the Debtors and the Requisite Participating Lenders, shall have been amended and extended and delivered by all parties thereto, and all conditions precedent thereto shall have been satisfied, on the terms and conditions set forth in the Vectra Commitment Letter.

- Insurance coverage acceptable to the Plan Sponsor shall have been obtained.

- The New Equity Investment shall have been consummated in accordance with the Subscription Agreement, and all applicable fees paid in accordance therewith.

- The Certificate of Formation, the other constituent documents of the Reorganized Debtors, and the Operating Agreement, as necessary and applicable, in form and substance reasonably acceptable to the Debtors and the Requisite Participating Lenders, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdictions' corporation or limited liability company laws.

- All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors.

- In accordance with section 4.5(b) of the Plan, the New Board of Managers of QCE Parent shall have been selected and shall have agreed to serve in such capacity.

- All other documents and agreements necessary to implement the Plan on the Effective Date, in form and substance acceptable to the Debtors and the Requisite Participating Lenders and Approving Lenders, to the extent required herein or in the Restructuring Support Agreement, shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

- All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

- Subject to section 10.12 of the Plan, the Existing Equity Holder Fee Claims that remain unpaid as of the Effective Date, subject in all respects to the caps set forth in section 10.12 of the Plan, shall have been paid.

- Subject to section 10.11 of the Plan, the Lender Advisor Fee Claims that remain unpaid as of the Effective Date shall have been paid.

Ex. 1 p. 143

***Waiver of Condition.***

The conditions set forth in section 8.2 of the Plan  other than section 8.2(a) may be waived in whole or in part by the Debtors and Requisite Participating Lenders (provided, that Approving Lender consent shall be required to waive any conditions in sections 8.2(c), (e), (g), (i), (k) or (n) and reasonable consent of each Existing Equity Holder shall be required to waive any conditions in section 8.2(n)), in each case, after notice to the Bankruptcy Court and parties in interest but without the need for a hearing.

***Notice of Effective Date.***

The Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in section 8.2 of the Plan have been satisfied or waived pursuant to section 8.3 of the Plan.

***Order Denying Confirmation.***

If an Order denying confirmation of the Plan  is entered by the Bankruptcy Court and such Plan is not consummated, then nothing contained in the Plan  shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors, (b) prejudice in any manner the rights of the Holder of any Claim against, or Interest in, the Debtors, (c) prejudice in any manner any right, remedy or Claim of the Debtors, (d) be deemed an admission against interest by the Debtors, or (e) constitute a settlement, implicit or otherwise, of any kind whatsoever.

## Effect of the Plan on Assets, Claims and Interests

***Revesting of Assets.***

Except as provided in the Plan , on the Effective Date, all property of the Estates, to the fullest extent provided by section 541 of the Bankruptcy Code, and any and all other rights and assets of the Debtors of every kind and nature shall revest in the Reorganized Debtors free and clear of all Liens, Claims and Interests other than (a) those Liens, Claims and Interests retained or created pursuant to the Plan  or any document entered into in connection with the transactions described in the Plan  and (b) Liens that have arisen subsequent to the Petition Date on account of taxes that arose subsequent to the Petition Date.

***Discharge of Claims and Termination of Interests.***

As of the Effective Date, except as otherwise provided in the Plan  or the Confirmation Order, the rights afforded under the Plan  and the treatment of Claims and Interests under the Plan  shall be in exchange for and in complete satisfaction, discharge and release of all Claims and satisfaction or termination of all Interests, including any Claims arising under the First Lien Credit Facility to the extent not reduced and modified by the Amended First Lien Credit Facility, the Second Lien Credit Facility, the DIP Facility, and the DIP Facility Order.  Except as otherwise provided in the Plan  or the Confirmation Order, Confirmation shall, as of the Effective Date: (i) discharge the Debtors from all Claims or other debts that arose before the Effective Date, including all Claims of or asserted on behalf of any of the Debtors' franchisees, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not (w) a Proof of Claim is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (x) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, (y) the Holder of a Claim based on such debt has accepted the Plan  or (z) such Claim is listed in the Schedules; and (ii) satisfy, terminate or cancel all Interests and other rights of equity security holders in the Debtors other than Intercompany Interests.

As of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, or their respective successors or property, any other or further Claims, demands, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan  or the Confirmation Order, the Confirmation Order

Ex. 1 p. 144

will be a judicial determination, as of the Effective Date, of discharge of all such Claims and other debts and liabilities against the Debtors and satisfaction, termination or cancellation of all Interests and other rights of equity security holders in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

*Cancellation of Liens*.

Except as otherwise provided in the Plan, on the Effective Date, (a) all Liens, Administrative Expense Claims and rights related to any Claim or Interest, including, without limitation, those existing under the First Lien Credit Facility to the extent not modified by the Amended First Lien Credit Facility, the Second Lien Credit Facility, the DIP Facility, and the DIP Facility Order shall be deemed released, terminated, null and void and of no effect, and (b) any Lien securing any Other Secured Claim (other than a Lien securing an Other Secured Claim that is Reinstated pursuant to the Plan) shall be deemed released, terminated, null and void and of no effect.  Each Holder of a Claim (other than a Holder of any Other Secured Claim that is Reinstated pursuant to the Plan) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such release documents as may be reasonably requested by the Debtors (or the Reorganized Debtors, as the case may be) and the Debtors (or the Reorganized Debtors, as the case may be) are hereby authorized to take any actions on or after the Effective Date as required to effectuate the release of collateral or other property of any Debtor or any subsidiary of a Debtor (including, without limitation, filing of appropriate termination statements and directing third parties holding collateral or other property of any Debtor to promptly remit such collateral or property without further consent of any other party).  All Claims, Liens, guarantees and rights arising under the First Lien Credit Facility shall be modified pursuant to the Amended First Lien Credit Facility and this Plan and except as so modified, shall continue and shall not be released or terminated.

*Injunctions*.

Except as otherwise provided in the Plan  or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan  are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities or terminated Interests or rights:  (i) commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtors or their respective property; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors or the Reorganized Debtors or their respective property; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtors or the Reorganized Debtors or their respective property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors or their respective property; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

Except as otherwise provided in the Plan  or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim, demand, debt, right, cause of action or liability that is released pursuant to the Plan  are permanently enjoined from taking any of the following actions on account of such released Claims, demands, debts, rights, causes of action or liabilities:  (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released Person; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

In exchange for the distributions pursuant to the Plan, each Holder of an Allowed Claim receiving such distribution pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in this section 9.4.

**Ex. 1 p. 145**

***Releases***.

    <u>Mutual Releases</u>.  On the Effective Date, (i) the Debtors, QCE Parent and the Reorganized Debtors, on behalf of themselves and their Estates, any Person seeking to exercise any rights of the Debtors, the Reorganized Debtors or their Estates, including any successor to QCE Parent, the Debtors or the Reorganized Debtors or any estate representative appointed or selected pursuant to section 1123 of the Bankruptcy Code, and all of their respective current and former, direct and indirect equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives, collectively, the "**Debtor Releasing Parties**"); (ii) the Existing Equity Holders and all of their respective current and former, direct and indirect equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives); and (iii) the Plan Support Parties and all of their current and former, direct and indirect equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (collectively, clauses (i), (ii) and (iii) being the "**Released Parties**," and each a "**Released Party**"), shall be deemed to and shall unconditionally and irrevocably each release each other, individually and collectively, from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon actions taken in their respective capacities described above or any omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, and this Plan or the Disclosure Statement, except that (i) no individual shall be released from any act or omission that constitutes gross negligence or willful misconduct, (ii) QCE Parent and the Reorganized Debtors shall not relinquish or waive the right to assert any of the foregoing as a legal or equitable defense or right of setoff or recoupment against any Claims of any such Persons asserted against QCE Parent, the Debtors or the Reorganized Debtors, and (iii) the foregoing releases shall not apply to any express contractual or financial obligations owed to QCE Parent, the Debtors or Reorganized Debtors or any obligation arising under this Plan or an agreement entered into pursuant to, or contemplated by, the Plan.

    <u>Releases By Non-Debtors</u>.  On and as of the Effective Date, all Persons, including any Existing Lender who did not grant a release pursuant to section 9.5(a) of this Plan, who (a) directly or indirectly have held, hold, or may hold Claims or Interests, (b) vote to accept this Plan as set forth on the relevant Ballot, and (c) do not mark their Ballot to indicate their refusal to grant the releases described in the Plan, shall be deemed, by virtue of their receipt of distributions and/or other treatment contemplated under the Plan, to have absolutely, unconditionally, irrevocably, and forever released and covenanted with QCE Parent, the Reorganized Debtors and the other Released Parties not to (y) sue or otherwise seek recovery from any of the Reorganized Debtors or any other Released Party on account of any Claim or Interest, including but not limited to any Claim based upon tort, breach of contract, violations of federal or state securities laws or otherwise, based upon any act, occurrence, or failure to act from the beginning of time through the Effective Date in any way relating to the Debtors or their business and affairs or (z) assert against QCE Parent or any of the Reorganized Debtors or any other Released Party any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities whatsoever, that any Holder of a Claim or Interest may be entitled to assert, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part on any act or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or this Plan or the Disclosure Statement; provided, however, that (i) none of the Released Parties shall be released from any claim based on any act or omission that constitutes gross negligence or willful misconduct, (ii) such release shall not apply to Ordinary Course Administrative Expense

Claims and Professional Fee Claims or obligations arising under the Plan, and (iii) such release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan.

*Exculpation and Limitation of Liability.*

QCE Parent, the Debtors, the Reorganized Debtors and the other Released Parties (a) shall have no liability whatsoever to one another or any Holder or purported Holder of a Claim or Equity Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, professionals or affiliates, or any of their successors or assigns, for any act or omission in connection with, or arising out of, the Plan, the Disclosure Statement, the settlement of Claims or renegotiation of executory contracts and leases, the negotiation of the Plan, the New Second Lien Credit Facility, the negotiation of the Plan Supplement, the New First Lien Credit Facility, the New Equity Investment, the pursuit of approval of the Disclosure Statement or the Plan, or the solicitation of votes for confirmation of the Plan, the Chapter 11 Cases, the consummation of the Plan, the administration of the Plan  or the property to be distributed under the Plan, or any transaction contemplated by the Plan  or Disclosure Statement, or in furtherance thereof, or any obligations that they have under or in connection with the Plan  or the transactions contemplated by the Plan  (collectively, the "**Exculpated Claims**"), except for any act or omission that constitutes willful misconduct or gross negligence as determined by a Final Order, and (b) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  No Holder of any Claim or Interest, or other party-in-interest, none of their respective agents, employees, representatives, financial advisors, attorneys, professionals or Affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Released Parties with respect to the Exculpated Claims.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Released Parties from liability.

*Retention and Enforcement and Release of Causes of Action.*

Except as otherwise provided in the Plan, the Confirmation Order, prior court orders, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors and their Estates shall retain the Causes of Action including, without limitation, the Causes of Action identified in the Plan Supplement (the "**Retained Causes of Action**").  The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action.  The Debtors or the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

**Miscellaneous Provisions**

*Retention of Jurisdiction.*

Following the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising from or relating to the Chapter 11 Cases to the fullest extent of applicable law, including, without limitation: To determine the validity under any applicable law, allowability, classification and priority of Claims and Interests upon objection, or to estimate, pursuant to section 502(c) of the Bankruptcy Code, the amount of any Claim that is or is anticipated to be contingent or unliquidated as of the Effective Date;

- To construe and to take any action authorized by the Bankruptcy Code and requested by the Reorganized Debtors or any other party in interest to enforce the Plan  and the documents and agreements filed in connection with the Plan , issue such orders as may be necessary for the implementation, execution and consummation of the Plan , without limiting the generality of the foregoing, orders to expedite regulatory decisions for the implementation of the Plan  and to ensure conformity with the terms and conditions of the Plan , such documents and agreements and other orders of the Bankruptcy Court, notwithstanding any otherwise applicable non-bankruptcy law;

Ex. 1 p. 147

- To determine any and all applications for allowance of Professional Fee Claims, and to determine any other request for payment of Administrative Expense Claims;

- To determine all matters that may be pending before the Bankruptcy Court on or before the Effective Date;

- To resolve any dispute regarding the implementation or interpretation of the Plan , or any related agreement or document that arises at any time before the Chapter 11 Cases are closed, including the determination, to the extent a dispute arises, of the entities entitled to a distribution within any particular Class of Claims and of the scope and nature of the Reorganized Debtors' obligations to cure defaults under assumed contracts, leases, Franchise Agreements and franchises, and permits;

- To determine any and all matters relating to the rejection, assumption or assignment of executory contracts or unexpired leases entered into prior to the Petition Date, the nature and amount of any Cure required for the assumption of any executory contract or unexpired lease, and the allowance of any Claim resulting therefrom;

- To determine all applications, adversary proceedings, contested matters and other litigated matters that were brought or that could have been brought in the Bankruptcy Court on or before the Effective Date over which this Bankruptcy Court otherwise has jurisdiction;

- To determine matters concerning local, state and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, and to determine any tax claims that may arise against the Debtors or the Reorganized Debtors as a result of the transactions contemplated by the Plan ; and

- To modify the Plan  pursuant to section 1127 of the Bankruptcy Code or to remedy any apparent nonmaterial defect or omission in the Plan , or to reconcile any nonmaterial inconsistency in the Plan  so as to carry out its intent and purposes.

From the Confirmation Date through the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date.  Nothing contained herein shall be construed to increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the Bankruptcy Court.

*Terms Binding.*

Upon the occurrence of the Effective Date, all provisions of the Plan, including all agreements, instruments and other documents filed in connection with the Plan and executed by the Debtors or the Reorganized Debtors in connection with the Plan, shall be binding upon the Debtors, the Reorganized Debtors, all Claim and Interest Holders and all other Persons that are affected in any manner by the Plan.  All agreements, instruments and other documents filed in connection with the Plan shall have full force and effect, and shall bind all parties thereto as of the entry of the Confirmation Order, whether or not such exhibits actually shall be executed by parties other than the Debtors or the Reorganized Debtors, or shall be issued, delivered or recorded on the Effective Date or thereafter. The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

*Governing Law.*

Except to the extent that the Bankruptcy Code or any other federal law is applicable or to the extent the law of a different jurisdiction is validly elected by the Debtors, the rights, duties and obligations arising under the Plan shall be governed in accordance with the substantive laws of the United States of America and, to the extent federal law is not applicable, the laws of the State of Delaware.

**Ex. 1 p. 148**

***Severability.***

     If the Bankruptcy Court determines at the Confirmation Hearing that any material provision of the Plan is invalid or unenforceable, such provision, subject to section 1127 of the Bankruptcy Code, shall be severable from the Plan and shall be null and void, and, in such event, such determination shall in no way limit or affect the enforceability or operative effect of any or all other portions of the Plan.

***Confirmation Order and Plan Control.***

     Except as otherwise provided in the Plan, in the event of any inconsistency between the Plan and the Disclosure Statement, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the Plan shall control.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

***Modifications to the Plan.***

     The Debtors, with the consent of the Approving Lenders, may amend or modify the Plan, and any schedule or Supplement to the Plan, at any time prior to the Effective Date in accordance with the Bankruptcy Code, Bankruptcy Rules and any applicable court order, provided, however, that the Debtors may make technical amendments or modifications upon two (2) days advance notice to the Approving Lenders.  A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claim or Interest of such Holder.

***Revocation, Withdrawal or Non-Consummation.***

     The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date.  If the Debtors revoke or withdraw the Plan  prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan , any settlement or compromise embodied in the Plan  (including the fixing or limiting to an amount certain any Claim or Class of Claims), the assumption or rejection of executory contracts or leases effected by the Plan , and any document or agreement executed pursuant to the Plan , shall be null and void; provided, however, that all orders of the Bankruptcy Court and all documents executed pursuant thereto, except the Confirmation Order, shall remain in full force and effect.  In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against any of the Debtors or any other Person, to prejudice in any manner the rights of any of the Debtors or any Person in any further proceedings or to constitute an admission of any sort by any of the Debtors or any other Person.

     ***Payment of Certain Lender Professional Fees and Expenses.***

     On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as the case may be, shall pay in Cash, without the need for the filing of any fee or retention applications in the Chapter 11 Cases, all unpaid and reasonable and documented fees and expenses incurred through the Effective Date of (a) Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**"),  Lazard Freres & Co., Willkie Farr & Gallagher LLP ("**WF&G**"), Blackstone Advisory Partners L.P., Skadden, Arps, Slate, Meagher & Flom LLP & affiliates, and Milbank, Tweed, Hadley & McCloy LLP, and local counsel for Akin Gump and WF&G for in each case incurred in connection with the Chapter 11 Cases (collectively, the "**Lender Advisor Fee Claims**"), and (b) the fees and expenses of the First Lien Agent and the Second Lien Agent, including, in both cases, any professional fees (collectively, the "**Lender Agent Fee Claims**").  The Lender Advisor Fee Claims and the Lender Agent Fee Claims must be supported by reasonably detailed fee invoices provided to the Debtors or Reorganized Debtors as a condition of payment hereunder (subject to redaction to preserve attorney-client privilege).  Notwithstanding the foregoing, the Debtors, the Plan Sponsor, and Reorganized Debtors may dispute any portion of the Lender Advisor Fee Claims or the Lender Agent Fee Claims  (a "**Disputed Lender Fee Claim**"), in which case (a) the Debtors or Reorganized Debtors shall pay the portion of the Disputed Lender Fee Claim that is not specifically disputed, and (b) in the absence of a consensual resolution of the Disputed Lender Fee Claim, the Debtors, the Plan Sponsor, the

Reorganized Debtors or the applicable professional shall submit the Disputed Lender Fee Claim to the Bankruptcy Court for adjudication.

**Payment of Statutory Fees.**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date, and as appropriate, thereafter.

**Notice.**

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors or to the Reorganized Debtors, or to any one of them:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
<u>Attention</u>:  Alan W. Kornberg, Esq.
          Elizabeth R. McColm, Esq.
Facsimile:  (212) 757-3990

 and

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
<u>Attention</u>:  Pauline K. Morgan
          Sean T. Greecher
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253

If to the Plan Sponsor:

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036-6745
<u>Attention</u>:  Ira S. Dizengoff
          Philip C. Dublin
Telephone: (212) 872-1000
Facsimile:  (212) 872-1002

**Reservation of Rights.**

The filing of the Plan, the Disclosure Statement, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors with respect to any Holders of Claims against or Interests in the Debtors.

**Payment of Certain Additional Professional Fees and Expenses.**

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as the case may be, shall pay in Cash, without the need for the filing of any fee or retention applications in the Chapter

Ex. 1 p. 150

11 Cases, all reasonable and documented fees and expenses, in an aggregate amount not to exceed $1 million, of any professionals retained by the Existing Equity Holders in connection with the Chapter 11 Cases, in an amount not to exceed (x) in the case of the Existing CCP Holders, $500,000  in the aggregate, and (y) in the case of the Existing JPMP Holders, $500,000 in the aggregate (collectively, the "**Existing Equity Holders Fee Claims**"). The Existing Equity Holders Fee Claims must be supported by reasonably detailed fee invoices provided to the Debtors, the Plan Sponsor and Reorganized Debtors as a condition of payment hereunder (subject to redaction to preserve attorney-client privilege).  Notwithstanding the foregoing, the Debtors, the Plan Sponsor and Reorganized Debtors may dispute any portion of the Existing Equity Holders Fee Claims (a "**Disputed Existing Equity Holder Fee Claim**"), in which case (a) the Debtors or Reorganized Debtors shall pay the portion of the Disputed Existing Equity Holder Fee Claim that is not specifically disputed, and (b) in the absence of a consensual resolution of the Disputed Existing Equity Holder Fee Claim, the Debtors, the Plan Sponsor, the Reorganized Debtors or the applicable professional shall submit the Disputed Existing Equity Holder Fee Claim to the Bankruptcy Court for adjudication.

## PROCEDURES FOR VOTING

**Notice to First Lien Lenders and Second Lien Lenders**

This Offering Memorandum and Disclosure Statement is being transmitted to First Lien Lenders and Second Lien Lenders. All other creditors of, and equity holders in, the Company and Holdings will either be paid in full under the Restructuring Transactions or their claims or interests will be impaired. Therefore, unless you are a First Lien Lender or a Second Lien Lender, you do not need to take any action hereunder. Accordingly, First Lien Lenders and Second Lien Lenders will be the only holders of claims that will vote on the Plan of Reorganization. The purpose of this Offering Memorandum and Disclosure Statement is to provide adequate information to enable First Lien Lenders and Second Lien Lenders to make a reasonably informed decision with respect to the Exchange Offers and the Plan of Reorganization prior to exercising their right to vote to accept or reject the Exchange Offers or the Plan of Reorganization. Any capitalized terms used in this section and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan of Reorganization.

ALL FIRST LIEN LENDERS AND SECOND LIEN LENDERS ARE ENCOURAGED TO READ THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE EXCHANGE OFFERS OR THE PLAN OF REORGANIZATION. This Offering Memorandum and Disclosure Statement contains important information about the Exchange Offers and the Plan of Reorganization and considerations pertinent to acceptance or rejection of the Exchange Offers and/or the Plan of Reorganization.

THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OF THE EXCHANGE OFFERS OR VOTES ON THE PLAN OF REORGANIZATION. No solicitation of votes may be made except after distribution of this Offering Memorandum and Disclosure Statement, and no person has been authorized to distribute any information concerning the Company other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. Except with respect to the Projections (as defined herein) and except as otherwise specifically and expressly stated herein, this Offering Memorandum and Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Offering Memorandum and Disclosure Statement. The Company does not intend to update the Projections; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Company does not anticipate that any amendments or supplements to this Offering Memorandum and Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Offering Memorandum and Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY AN INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

**Solicitation Package**

In soliciting acceptances of the Exchange Offers and votes for the Plan of Reorganization pursuant to this Offering Memorandum and Disclosure Statement from the First Lien Lenders and Second Lien Lenders, the Company is also sending copies of the Plan of Reorganization and a ballot (a "**Ballot**") (together with the Offering Memorandum and Disclosure Statement, the "**Solicitation Package**") to such holders.

Ex. 1 p. 152

**Voting Procedures and Ballots and Voting Deadline**

The deadline for receipt of the Ballots by the Voting and Exchange Agents is currently January 9, 2012 at 5 p.m. prevailing Pacific Time (the "**Voting Deadline**").  The Voting Deadline can be extended by the Company. The "**Voting Record Date**" for purposes of determining claimants that are eligible to vote on the Exchange Offers and the Plan of Reorganization shall be three (3) Business Days prior to the Voting Deadline.

The voting options for First Lien Lenders and Second Lien Lenders in connection with the Exchange Offers and Plan of Reorganization are outlined in greater detail below. The Ballot was designed to assist First Lien Lenders and Second Lien Lenders to understand the voting process. First Lien Lenders and Second Lien Lenders should return the Ballot to the Voting Agent in accordance with instructions set forth therein to cast their vote.

First Lien Lenders have three voting options in connection with the Exchange Offers, as follows:

OPTION 1– VOTE YES: CONSENT to receive the partial cash paydown and to the First Lien Amendment; GRANT the releases for Out-of-Court Restructuring set forth below in the Ballot; and vote to ACCEPT the Plan of Reorganization (See Item 3B of the Ballot for Plan of Reorganization releases).

IF YES, please choose one of the following:

OPTION 1(A):  Receive New First Lien Loans pursuant to the First Lien Amendment for 100% of your First Lien Indebtedness; OR

OPTION 1(B):  EXCHANGE _____% of your First Lien Indebtedness for New Second Lien Loans pursuant to the First Lien Exchange Offer (if completed, the "**Offered Percentage**"), subject to the New Second Lien Cap. *If Option 1(B) box is checked and no percentage is indicated above, election shall be deemed to be for 100% of your First Lien Indebtedness.*

OPTION 2 – VOTE NO.  NOT CONSENT to the First Lien Amendment; NOT PARTICIPATE  in the First Lien Exchange Offer; and NOT GRANT the releases for Out-of-Court Restructuring set forth in the Ballot; REJECT the Plan of Reorganization  (See Item 3B of the Ballot for Plan of Reorganization releases).

A vote by any First Lien Lender in favor of participating in the First Lien Exchange Offer binds such First Lien Lender to:  (i) receive a partial pay down and to agree to the First Lien Amendment and to execute and deliver the First Lien Amendment; and (ii) either, at its option: (a) amend and modify its First Lien Claims pursuant to the terms and conditions set forth in the First Lien Amendment; or (b) exchange all (or any portion) of its First Lien Claims for an equal principal amount of New Second Lien Loans under the New Second Lien Facility (subject to the New Second Lien Cap).

In addition, pursuant to Item 3B of the Ballot, the First Lien Lenders are given an option, in the event the Company files the Chapter 11 cases, to elect not to grant the releases, injunction and exculpation contained in Article IX of the Plan of Reorganization.

First Lien Lenders that vote to reject the Plan of Reorganization, take no action, or fail to provide or timely cast their Ballot, may nevertheless be bound by the terms of the Plan of Reorganization and have the relevant treatment applied to their holdings of First Lien Indebtedness if the Plan of Reorganization is consummated.

In addition to the voting options set forth above, the First Lien Lenders must identify themselves as an "Accredited Investor" (as defined in the Ballot) and must be able to make the representations and warranties set forth in the Offering Memorandum and Disclosure Statement. Furthermore, if they have voted to participate in the Exchange Offers, the First Lien Lenders receiving New Second Lien Loans and/or Amended First Lien Facility Loans pursuant to the Exchange Offers are asked to identify on the Ballot a registered holder for such loans.

**Ex. 1 p. 153**

Second Lien Lenders have two voting options in connection with the Exchange Offers, as follows:

OPTION (1). PARTICIPATE in the Second Lien Exchange Offer and GRANT the releases for Out-of-Court Restructuring (as defined in the Ballot); vote to ACCEPT the Plan of Reorganization (See Item 3B of the Ballot for Plan of Reorganization releases).

OPTION (2). NOT PARTICIPATE in the Second Lien Exchange Offer and NOT GRANT the releases for Out-of-Court Restructuring (as defined in the Ballot); vote to REJECT the Plan of Reorganization (See Item 3B of the Ballot for Plan of Reorganization releases).

In order to receive Common Shares, Second Lien Lenders must select OPTION (1). If you select OPTION (2), you will not receive any Common Shares.

In addition, pursuant to Item 3B of the Ballot, the Second Lien Lenders are given an option, in the event the Company files the Chapter 11 cases, to elect not to grant the releases, injunction and exculpation contained in Article IX of the Plan of Reorganization.

Second Lien Lenders that vote to reject the Plan of Reorganization, take no action, or fail to provide or timely cast their Ballot, may nevertheless be bound by the terms of the Plan of Reorganization and have the relevant treatment applied to their holdings of Second Lien Loans if the Plan of Reorganization is consummated.

In addition to the voting options set forth above, the Second Lien Lenders must identify themselves as an "Accredited Investor" (as defined in the Ballot) and must be able to make the representations and warranties set forth in the Subscription Agreement substantially in the form attached hereto as Appendix D.  Furthermore, if they have voted to participate in the Exchange Offers, the Second Lien Lenders are asked to identify on the Ballot a registered holder for the Common Shares.

**Parties in Interest Entitled to Vote on the Plan of Reorganization**

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a Plan of Reorganization unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events related to bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a Plan of Reorganization if (i) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (ii) the claim or interest is impaired by the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan. Claims in Classes 3, 4, 5(a), 6 and 7(b) are unimpaired under the Plan of Reorganization, and holders of such Claims are therefore not entitled to vote. Claims in Classes 1 and 2 are impaired under the Plan of Reorganization, and holders of such Claims and Equity Interests are therefore entitled to vote.  Claims in Classes 5(b) and 7(a) shall not receive or retain any property on account of such claims, and holders of such Claims and Equity Interests are therefore deemed to reject the Plan of Reorganization.  Accordingly, only holders of Claims in Classes 1 and 2 are entitled to vote on the Plan of Reorganization.

By executing a Ballot, each First Lien Lender and Second Lien Lender will be confirming that (i) such holder and/or legal and financial advisors acting on its behalf has had the opportunity to ask questions of, and receive answers from, the Company concerning the terms of the Plan of Reorganization, the Exchange Offers, the First Lien Amendment, the business of the Company and other related matters, (ii) the Company has made available to such holder or its agents all documents and information relating to the Plan of Reorganization, the Exchange Offers, the First Lien Amendment and related matters reasonably requested by or on behalf of such holder and (iii) except for information provided by the Company in writing, and by their own agents, such holder has not relied on any statements made or other information received from any person with respect to the Plan of Reorganization, the Exchange Offers, the First Lien Amendment.

By executing a Ballot each First Lien Lender and Second Lien Lender also acknowledges that the interests being offered pursuant to the Exchange Offers or the Plan of Reorganization are not being offered pursuant to a registration statement filed with the SEC and represents that any such securities will be acquired for its own account solely for investment, not as agent or nominee, and not with a view to, or for resale in connection with, any distribution of, or with any present intention of distributing or selling in connection with any distribution, all or any portion thereof within the meaning of the Securities Act.

By electing to participate in the Exchange Offers, each Second Lien Lender also acknowledges that it has reviewed the representations and warranties set forth in the Subscription Agreement in substantially the form as attached hereto as Appendix D, and that it shall be able to make the required representations and warranties set forth in such agreement. It also acknowledges that the Company's obligation to consummate the Exchange Offers is expressly conditioned upon the satisfaction of certain closing conditions.

**Withdrawal of Ballots; Revocation**

Withdrawals of Ballots are not permitted after the Voting Deadline without Company's prior written consent. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by the Voting Exchange Agent in a timely manner at the address set forth on the Ballot. The Company will determine whether any withdrawals of Ballots were valid and expressly reserves the absolute right to contest the validity of any such withdrawals of Ballots.

**Miscellaneous**

The Exchange Offers are not subject to Section 13(e) of, or Rule 13e-3 or 13e-4 or Regulation 14D promulgated under the Securities Exchange Act of 1934. Other than with respect to the Information and Exchange Agent and the Voting Exchange Agent, neither we nor any of our affiliates has engaged, or made any arrangements for, and has no contract, arrangement or understanding with, any broker, dealer, agent or other person, except the financial advisor, regarding the exchange of First Lien Indebtedness or Second Lien Loans hereunder and no person, other than the financial advisor, has been authorized by us or any of our affiliates to provide any information or to make any representations in connection with the Exchange Offers and Solicitation of Acceptances, other than those expressly set forth in this Offering Memorandum and Disclosure Statement, and, if so provided or made, such other information or representations must not be relied upon as having been authorized by us or any of our affiliates. The delivery of this Offering Memorandum and Disclosure Statement shall not, under any circumstances, create any implication that the information set forth herein is correct as of any time subsequent to the date hereof.

We are not aware of any jurisdiction in which the Exchange Offers are not in compliance with applicable law. If we become aware of any jurisdiction in which the Exchange Offers would not be in compliance with applicable law, we will make a good faith effort to comply with any such law. If, after such good faith effort, we cannot comply with any such law, the Exchange Offers will not be made to the eligible holders residing in such jurisdiction, as applicable.

**NON-ELIGIBLE HOLDERS OF SECOND LIEN LOANS RECEIVING THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT MAY NOT PARTICIPATE IN THE SECOND LIEN EXCHANGE OFFERS, AND NO OFFER OF SECURITIES IS BEING MADE TO SUCH HOLDERS. SUCH HOLDERS ARE BEING SENT THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT SOLELY TO CONSIDER WHETHER TO VOTE IN FAVOR OF THE PLAN OF REORGANIZATION. NON-ELIGIBLE HOLDERS OF SECOND LIEN LOANS WISHING TO VOTE IN FAVOR OF THE PLAN OF REORGANIZATION MUST PROPERLY SUBMIT A BALLOT TO THE VOTING EXCHANGE AGENT AT OR PRIOR TO THE EXPIRATION TIME. SEE ''PROCEDURES FOR VOTING.''**

**Voting Agent, Exchange Agent and Financial Advisors**

In connection with the Exchange Offers, the Company retained Kurtzman Carson Consultants LLC ("**KCC**") to act as the Voting Exchange Agent and exchange agent (the "**Voting Exchange Agent**"), and Moelis & Company LLC ("**Moelis**"), as financial advisors (together the "**Agents**") , each of which will receive customary fees for their services. The Company has agreed to reimburse each of the Agents' respective out-of-pocket expenses and to indemnify each Agent against certain liabilities, including liabilities under federal securities laws and to contribute to payments that such Agent may be required to make in respect thereof.  The Company has also agreed to pay the customary fees of Lazard, the financial advisors to the Steering Committee, and Blackstone, the financial advisors to the First Lien Lender Committee, in connection with their services.  No fees or commissions have been or will be paid by the Company to any broker, dealer or other person, other than the Agents and fees paid to Lazard and Blackstone, in connection with the Exchange Offers or the solicitation of acceptances of the Plan of Reorganization.

Questions and requests for assistance or additional copies of this Offering Memorandum and Disclosure Statement or the related Ballot may be directed to the Voting Exchange Agent.

Ballots and all correspondence in connection with the Exchange Offers should be sent or delivered to the Voting Exchange Agent in accordance with the instructions contained in the Ballot. Any First Lien Lender or Second Lien Lender that has questions concerning the Exchange Offers, the First Lien Amendment or the Plan of Reorganization should contact the Voting Exchange Agent at telephone numbers set forth on the Ballot.

None of the Agents assumes any responsibility for the accuracy or completeness of the information concerning the Company contained or incorporated by reference in this Offering Memorandum and Disclosure Statement or for any failure by the Company to disclose events that may have occurred and may affect the significance or accuracy of such information.

**Further Information; Additional Copies**

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, please contact the Voting Exchange Agent, whose contact information is set forth on the Ballot. If you wish to obtain an additional copy of the Plan of Reorganization, the Offering Memorandum and Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 301 7(d)), please contact the Voting Exchange Agent, whose contact information is set forth on the Ballot.

## PROJECTIONS OF CERTAIN FINANCIAL DATA FOLLOWING
## CONSUMMATION OF THE PLAN OF REORGANIZATION

**Projection Assumptions**

The Company, with the assistance of their financial advisors Moelis, have prepared the following table "Summary Financial Projections" to assist the Bankruptcy Court in determining whether the Plan of Reorganization meets the "feasibility" requirements of section 1129(a)(11) of the Bankruptcy Code. The Company, with the assistance of Moelis, prepared the Summary Financial Projections for the year ended December 31, 2011 (including unaudited interim actual results through November 30, 2011) and the five years ending December 31 of 2012, 2013, 2014, 2015 and 2016, respectively (the "**Projection Period**"). The Summary Financial Projections are based on a number of assumptions, and while the Company has prepared the Summary Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Company can provide no assurance that such assumptions will ultimately be realized. The Summary Financial Projections and the related notes should be read in conjunction with the assumptions and qualifications contained herein, the risk factors beginning on page 24 of the Offering Memorandum and Disclosure Statement and the historical financial statements prepared by the Company.  The "Key Assumptions" section below herein summarizes the underlying key assumptions upon which the Summary Financial Projections are based.

The Summary Financial Projections take into account the Company's contemplated operational initiatives and existing competitive conditions in the Company's industry. In addition, the Summary Financial Projections assume a January 1, 2012 bankruptcy filing date and that the Plan of Reorganization will be confirmed as contemplated in the Plan of Reorganization and described in the Offering Memorandum and Disclosure Statement and will become effective (the "**Effective Date**") on April 30, 2012.

The Summary Financial Projections as presented assume a Plan of Reorganization and therefore Bankruptcy filing.  The Company believes that the performance of the business will be negatively impacted while the Company operates as Debtors-in-Possession.  In particular, the Company expects to realize lower franchise store openings, higher store closures, and higher costs of goods sold relative to the performance the Company would expect if the Company was not operating in Bankruptcy as Debtors-in-Possession.

**Accounting Policies**

The Summary Financial Projections have been prepared by the Company's management with the assistance of Moelis. The Summary Financial Projections were not prepared to comply with the Guidelines for Prospective Financial Statements published by the American Institute of Certified Public Accountants or the rules and regulations of the SEC and by their nature are not financial statements prepared in accordance with GAAP.  The Summary Financial Projections are prepared on a combined basis, which conforms to the Company's existing and prospective presentation methodology under the First Lien Facility, and do not conform to GAAP.  The combined basis according to the First Lien Facility requires that financial statements exclude the Marketing Fund Trusts and any of our subsidiaries that are unrestricted under the First Lien Facility.

In addition, the Summary Financial Projections do not reflect the impact of fresh start reporting in accordance with ASC 852, Reorganizations. The impact of fresh start reporting, when reflected at the Effective Date, may have a material impact on the Company's consolidated balance sheets and prospective results of operations.  The Summary Financial Projections therefore do not include any asset revaluation, including intangible asset revaluation or related depreciation or amortization for GAAP or tax purposes, nor do they include the potential impact from any cancellation of debt income for GAAP or tax purposes.  Nonetheless, the Company believes that these operating metrics in the Summary Financial Projections and related notes are useful for lenders and the Court in connection with voting on and confirmation of the Plan of Reorganization.

By their nature, the Summary Financial Projections contain certain statements that are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements are subject to a number of assumptions, risks and uncertainties, many of which are beyond the control of the Company and Holdings, including the confirmation of the Plan of Reorganization on the presumed Effective Date, the continuing availability of sufficient borrowing capacity or other financing to fund operations, achieving operating

efficiencies, cost and availability of raw materials and energy, terms and conditions of new credit facilities (if any), maintaining good employee relations, existing and future governmental regulations and actions of governmental bodies, general economic conditions in which the markets in which the Company operates, industry-specific risk factors (including as detailed in the Offering Memorandum and Disclosure Statement) and other market and competitive conditions. Holders of claims and interests are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements, and the Company undertakes no obligation to update any such statements.

Forward-looking statements are based on beliefs and assumptions of the Company's management and on information currently available to such management. Forward looking statements speak only as of the date they are made, and the Company undertakes no obligation to update any of them in light of new information or future events. Undue reliance should not be placed on such forward-looking statements, which are based on current expectations. Forward-looking statements are not guarantees of performance. For additional information about the Company, our operating and financial condition, and relevant risk factors, reference is made to the Company's audited and unaudited consolidated financial statements included herein.

The Summary Financial Projections are based on assumptions that are inherently uncertain and unpredictable. The operating and financial information contained in the Company's projected financial data have been prepared by management and reflect management's current estimates of the Company's future performance. The projected results are based on assumptions and events over which, in many cases, the Company will have only partial or no control. The selection of assumptions underlying such projected information require the exercise of judgment, and the projections are subject to uncertainty due to the effects that economic, business, competitive, legislative, political or other changes may have on future events. Changes in the facts or circumstances underlying such assumptions could materially affect the Summary Financial Projections. To the extent that assumed events do not materialize, actual results may vary substantially from the projected results. As a result, no assurance can be made that the Company will achieve the operating or financial results set forth in the Summary Financial Projections, nor can there be any assurance that results will not vary, perhaps materially and/or adversely.

Any statements included in the Offering Memorandum and Disclosure Statement regarding plans, objectives, goals, strategies, future events or performance of the Company, including the following Summary Financial Projections, are based on various assumptions, many of which in turn are based on other assumptions that management believes to be reasonable but which are inherently uncertain and unpredictable. The assumptions underlying projections may be incomplete and inaccurate, and unanticipated events and circumstances are likely to occur. For these reasons, actual results achieved during periods covered may vary from the Summary Financial Projections, and such variations may be material or adverse. The Summary Financial Projections are included solely to provide information concerning estimates of future operating results based on the assumptions, and no representation is intended that such results will be achieved. The Company makes no representation or warranty as to the accuracy or completeness of any of the following information.

THE COMPANY'S INDEPENDENT AUDITORS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING SUMMARY FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE SUMMARY FINANCIAL PROJECTIONS, DO NOT ASSUME RESPONSIBILITY FOR THE SUMMARY FINANCIAL PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE SUMMARY FINANCIAL PROJECTIONS.

## Key Assumptions

The Summary Financial Projections contemplate a Quiznos brand re-launch commencing in June, 2012. This will consist of a national advertising campaign, a new "Better Than Ever" menu consisting of new menu items, enhanced store customer experience, and re-trained store employees. This campaign aims to present the consumer with a new image of the brand, demonstrating Quiznos' high quality and differentiated experience. The Summary Financial Projections assume approximately $40.2 million will be spent on this effort in 2012 and $10.6 million in 2013, the majority of which will be on advertising and store level enhancements. The Company expects a positive impact to overall AUVs and other key operating metrics as a result.

Ex. 1 p. 158

*General Economic Conditions*

The Summary Financial Projections were prepared based on assumptions that the overall economy will grow throughout the Projection Period and that there will be no significant change in the markets in which the Company operates.

*Key Operating Metrics*

- Total Store Openings: Consist of franchise store openings in the U.S., Canada, and other countries.  These are projected to decrease in 2012 and then increase each year thereafter.

- Total Store Closures: Projected to decrease each year due to increased AUVs and in the early Summary Financial Projections years due to a smaller store base.

- Ending Store Count: This is a function of Total Store Openings and Total Store Closures.

- Average U.S. Weekly AUV: Projected to increase 4.0% in 2012 primarily as a result of the brand re-launch, 3.5% in 2013, 2.0% in 2014, and 3.0% in 2015 and 2016.

*The Company's Projected Combined Statement Of Operations*

Revenue: Projected revenues are the aggregation of five items – Royalties, Other Franchise Revenue, Food Distribution – Gross Revenue, Food Distribution – Franchise Owner Rebates, and Company Stores.

- Royalties: The change in royalties from franchise owners is driven by changes in systemwide sales, which are driven by store openings, store closures, and AUVs at store level.  Following declines in overall store count since 2008, the decline in store count is expected to trough in 2012 and is expected to rise during the remainder of the Projection Period.  AUVs are expected to begin to grow each year throughout the Projection Period.

- Other Franchise Revenue: Represents initial franchise fees and other revenue.  Initial franchise fees are generally collected upon the time of sale of the franchise agreement, and recognized upon earlier of the store opening or termination of the franchise agreement. Other revenue also consists of gift card breakage, store transfer fees, and other items, and is projected to increase primarily as a result of store count after the trough at the end of 2012.

- Food Distribution – Gross Revenue: Expected to decline in 2012 and 2013, as a result of (i) lower systemwide sales, (ii) and a lower store count. For the period from 2014 through 2016, food distribution revenue will increase as a result of (i) an increase in systemwide sales, and (ii) a higher store count.

- Food Distribution – "FO Rebates": Consist of rebates paid to franchise owners based upon AUV levels and compliance with franchise agreement and brand requirements.  These are accounted for as contra revenue. The overall rebate amount is expected to decrease in 2013 as rebates are assumed to decrease 40% per store in mid 2013, and then increase each year thereafter as systemwide sales increase.

- Company stores: Company store revenue is driven by individual store AUVs and the number of company stores operated by Quiznos.  After declining in 2012 from 2011 due to the forecasted closing of one store, Company Store revenue is expected to stay relatively flat throughout the Projection Period.

***The Company's Projected Combined Statement of Operations***

Costs and Expenses:

- Costs of Revenue: Consists of certain franchise field-level store commissions, food distribution costs, and company store food and labor costs.   In the ordinary course of business Quiznos sells bread, proteins, paper products, equipment and other commodities to its franchise owners.  Quiznos expects that as a result of the assumed Plan of Reorganization it would experience an increase in pricing from its vendors relative to its 2011 level.  These increased costs have been incorporated only in 2012 and are expected to revert to more historic levels after the Company emerges, with constant food distribution margins in 2013 through 2016.

- General and Administrative: General and Administrative includes expenses related to corporate payroll, outside legal expenses, headquarters facility charges, store level quality assurance inspections, and field travel.  It also includes corporate bonus projections and certain franchise owner store level improvement expenses.  General and Administrative expenses are reduced approximately $1.2 million per year starting in July 2012 as the Summary Financial Projections assume the Company rejects the lease at its headquarters in Denver, Colorado and moves to a less expensive location.

- Contributions to the U.S. Advertising Fund: The Company has historically made voluntary contributions to supplement franchise owner fees paid into the Marketing Fund Trusts (the "U.S. Advertising Fund").  Contributions are expected to increase in 2012 as Quiznos implements its planned brand re-launch initiatives.  In 2013 and beyond the corporate contributions to the U.S. Advertising Fund are reduced due to the assumed increases in franchise owners' contributions to it, thereby decreasing the need for additional corporate contributions.

- Other Operating Expenses: Other Operating Expenses has six primary components – (i) corporate store operating expenses, (ii) food distribution non-cash equipment impairments, (iii) franchise operations impairments on the value of our lending subsidiary, (iv) franchise operations bad debt expenses, (v) non cash expenses related to a stock option program, and (vi) net expense related to the Canadian advertising fund.

- Other Expenses: Primarily consists of foreign exchange gains and losses related to the Company's Canadian operations.

EBITDA Add-Backs: The 2012-2016 Projection Period add backs related to (1) non cash deferred compensation expense, (2) expenses related to the re-launch of the brand in 2012 and 2013, and (3) non cash asset impairment expenses related to the impairment of store level equipment.

Depreciation and Amortization:  Relates to depreciation of fixed assets and amortization of intangible assets.

Interest Income:  Relates to interest income on cash held at banks and certain notes receivable.

Interest Expense:  Includes interest on pre-petition debt through the petition date and interest pursuant to the DIP credit agreement through emergence.  Interest Expense includes post-emergence interest related to the post-emergence capital structure as set forth in the Plan of Reorganization described in this Offering Memorandum and Disclosure Statement.  The forward LIBOR curve was utilized in calculating projected interest expense.

Income Tax Expense:  Income Tax Expense is projected based on the Company's best estimate of the amount and timing of federal, state and Canadian income and withholding tax expense.  The Company is expected to be incorporated as an LLC treated as a C Corporation post reorganization, but due to tax operating losses early in the Projection Period the Company does not expect to have significant income tax expense or payments until 2016.  Any material net operating loss or deferred tax assets created from the tax operating losses are not reflected in the projected balance sheets and therefore are considered fully reserved in the Summary Financial Projections.

Ex. 1 p. 160

***The Company's Projected Combined Balance Sheet***

In order to forecast the balance sheet, the Company used assumptions that are consistent with historical trends.

- Cash and Equivalents: The cash balances are projected based on the annual cash inflows and outflows utilizing an actual November 30, 2011 starting balance.

- Restricted Cash: The cash balances are projected to be equal to the balance as of November 30, 2011, plus an additional $0.9 million related to the projected need to replace the Debtor's current letter of credits outstanding with cash collateralized letters of credit.

- Accounts Receivable: Accounts receivables are projected based on an average of the prior six months days sales outstanding.

- Inventory: Consists primarily of food, beverages and paper supplies and are projected based on a percentage of food distribution cost of goods sold.

- Other Current Assets: Primarily consists of prepaid expenses as well as certain loans to franchise owners for acquiring stores that are expected to remain constant over the Projection Period.

- Net Fixed Assets: Consists of furniture, fixtures, equipment and leasehold improvements and is increased each year for additional capital expenditures and decreased for depreciation.

- Deferred Financing Costs: Includes financing and advisor costs which are associated with the current Plan of Reorganization.  Decreases as these amounts are amortized as expense over the Projection Period.

- Investment in Area Marketing and Master Franchise Agreements, net: Consists of reacquired area marketing territories and master franchise agreements.  Decreases as these amounts are amortized as expense over the life of the agreements.

- Other Assets: Primarily consists of certain vendor deposits, deferred tax assets associated with Canadian income taxes, certain intangible assets and an investment in financing affiliate, Quizmark LLC.

- Line of Credit: Consists of the pre-petition revolving credit facility which is expected to be restructured as set forth in this Offering Memorandum and Disclosure Statement.

- Accounts Payable: Includes post-petition accounts payable that is projected based on a constant days payable in 2012.  During 2013 through 2016, days payables are expected to increase.

- Accrued Liabilities: Consist of accrued trade payables, legal contingencies, food rebates, advertising and media expenses, gift card liabilities, severance, wages, bonus, state tax accruals, rent and other. Projected professional fees resulting from the Plan of Reorganization outstanding at emergence will be paid in the near term after emergence and have not been included as accrued expenses.

- Deferred Compensation: Reflects the post-reorganization deferred compensation liability based upon the proposed Plan of Reorganization.  Decreases as the liability is paid down each year.

- Capital Lease Obligations: Includes capital lease obligations associated with equipment provided by vendors.  Projected to grow as additional stores are opened and are reduced based on projected growth in food distribution revenue.

- Deferred Vendor Rebates: Reflects amounts received from vendors that have not yet been recognized as income. Projected to grow as additional rebates are paid be vendors, and are reduced based on projected growth in food distribution revenue.

- Other Current Liabilities and Other Non-Current Liabilities:  Consist of deferred rent, lease exit costs, and tenant improvement allowances, cash received for inventory purchases held at food distribution centers, and initial franchise fee revenue which has been received but not yet earned. At December 31, 2011 balances also include a liability related to certain LIBOR based interest rate swap agreements that expire in April 2012.

- Amended First Lien Facility and New Second Lien Facility:  Reflect post-reorganization debt based upon the proposed Plan of Reorganization.  The $25.0 million delayed draw from the term loan DIP facility has an all-in interest rate of 9.0%.  The Amended First Lien Facility has an all-in interest rate of LIBOR plus 7.50%, with a LIBOR floor of 1.50%.  The New Second Lien Facility has the option to pay either cash interest or payment-in- Kind ("**PIK**") subject to a test starting two years after emergence.  The projections assume that the loan PIKs interest has an all-in interest rate of LIBOR plus 7.50%, with a LIBOR floor of 5.00% and pays 1.0% cash interest, from emergence through June 2014.  After June 2014, the projections assume that the New Second Lien Facility pays interest at an all-in interest rate of LIBOR plus 6.00% with a LIBOR floor of 5.00%.  The Summary Financial Projections assume that all other notes payable are reduced to $0 as a result of the successful confirmation and consummation of the Plan of Reorganization.

- Members' Deficit: Includes existing paid-in capital, historical distributions, retained earnings, and new equity based upon the Plan of Reorganization.  Members' Deficit changes each year by the amount of projected net income.

### *The Company's Projected Cash Flow Statement*

Operating Cash Flow: Projected starting with EBITDA and deducting capital expenditures, adding non-cash charges such as the provision for loss on receivables, deducting non-cash revenue in vendor equipment rebates, and adding or subtracting the change in working capital. Capital expenditures are comprised primarily of furniture, fixtures, computer equipment, software, and leasehold improvements.  The Summary Financial Projections assume an additional $2.0 million of capital expenditures in 2012 based upon the assumption that the Company will reject its headquarters office space lease and move to a less expensive location, thus incurring moving and buildout costs.

Other Investing / Financing: Includes cash from the Restructuring Transactions implemented through the Plan of Reorganization and DIP financing, cash interest expense, cash taxes paid, the amortization of debt, other debt paydowns, and other investing/financing activities.

Cash Interest Expense: Excludes PIK interest of LIBOR plus 6.00% on the New Second Lien Facility.  The Amended First Lien Facility contemplates an excess cash flow payment, which is subject to a leverage test that is to be determined.  The projections currently assume an annual 75% excess cash flow payment, based upon cash in excess of $35 million at the time of the payment.  The final negotiations of this provision may affect the rate of debt repayment and thus impact the net financing activities of the Company.

The Company's cash balance, excluding restricted cash, is projected to increase from $16.6 million at the end of 2011 to $35.3 million at the end of 2012, with positive $14.6 million Operating Cash Flow offset by $40.5 million of cash interest expense and $44.6 million of other investing and financing cash inflows usages, primarily related to the Restructuring Transactions implemented through the Plan of Reorganization.  In 2013 the Company is forecasted to increase cash by $1.1 million, which is the result of $49.4 million of Operating Cash Flow offset by $48.3 million of investing and financing activities, including $42.0 million of cash interest expense.

Ex. 1 p. 162

**Summary Financial Projections**

*Projected Combined Statement of Operations*

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| | | | For the Year Ended December 31, | | | |
| Key Operating Metrics | | | | | | |
| Total Store Openings | 262 | 210 | 356 | 482 | 542 | 602 |
| Total Store Closures | (737) | (572) | (309) | (224) | (238) | (258) |
| Ending Store Count | 3,014 | 2,652 | 2,699 | 2,957 | 3,261 | 3,605 |
| Average U.S. Weekly AUV | $ 5,608 | $ 5,832 | $ 6,037 | $ 6,157 | $ 6,342 | $ 6,532 |
| *YoY Growth* | *-3.4%* | *4.0%* | *3.5%* | *2.0%* | *3.0%* | *3.0%* |
| Revenues: | | | | | | |
| Royalties | $ 62,917 | $ 56,775 | $ 53,533 | $ 57,234 | $ 63,706 | $ 71,352 |
| Other Franchise Revenue | 5,054 | 2,263 | 3,400 | 3,926 | 4,201 | 4,528 |
| Food Distribution - Gross Revenue | 290,032 | 266,551 | 249,829 | 260,000 | 286,350 | 317,301 |
| Food Distribution - FO Rebates | (21,228) | (20,172) | (13,306) | (9,908) | (10,432) | (11,083) |
| Company Stores | 19,680 | 16,599 | 16,721 | 16,740 | 16,771 | 16,802 |
| Total Revenue | 356,455 | 322,016 | 310,177 | 327,992 | 360,596 | 398,900 |
| Costs and Expenses: | | | | | | |
| Costs of Revenue | 204,870 | 190,564 | 174,885 | 181,617 | 199,023 | 219,454 |
| General and Administrative | 57,321 | 57,938 | 46,348 | 47,848 | 49,283 | 50,762 |
| Contributions to the U.S. Advertising Fund | 8,193 | 36,365 | 22,665 | 11,654 | 8,417 | 4,561 |
| Other Operating Expenses | 6,670 | 11,681 | 6,265 | 5,401 | 5,068 | 4,723 |
| Other Expenses (income) | 729 | 446 | 439 | 438 | 439 | 439 |
| Total Costs and Expenses | 277,783 | 296,994 | 250,602 | 246,958 | 262,230 | 279,939 |
| *% of total revenues* | *78%* | *92%* | *81%* | *75%* | *73%* | *70%* |
| EBITDA | 78,672 | 25,022 | 59,575 | 81,034 | 98,366 | 118,961 |
| EBITDA Add Backs | 16,098 | 41,728 | 11,341 | 542 | 570 | 605 |
| Adjusted EBITDA | 94,770 | 66,750 | 70,916 | 81,576 | 98,936 | 119,566 |
| Depreciation and Amortization | 10,342 | 10,702 | 7,987 | 4,958 | 1,800 | 1,800 |
| EBIT | 68,330 | 14,320 | 51,588 | 76,076 | 96,566 | 117,161 |
| Interest Income | (186) | (201) | (157) | (235) | (685) | (1,353) |
| Interest Expense | 57,885 | 57,575 | 66,203 | 65,692 | 64,616 | 63,924 |
| Pre-tax Income | 10,631 | (43,054) | (14,458) | 10,619 | 32,635 | 54,590 |
| Income Tax Expense | 898 | 1,982 | 2,059 | 2,157 | 2,280 | 20,948 |
| Net Income | $ 9,733 | $(45,036) | $(16,517) | $ 8,462 | $ 30,355 | $ 33,642 |

**Ex. 1 p. 163**

*Projected Combined Balance Sheet*

|  | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| **Assets** | | | | | | |
| Current Assets: | | | | | | |
| Cash and Equivalents | $ 16,601 | $ 35,331 | $ 36,396 | $ 54,365 | $ 77,352 | $ 91,617 |
| Restricted Cash | 528 | 1,474 | 1,474 | 1,474 | 1,474 | 1,474 |
| Accounts Receivable | 4,846 | 4,645 | 4,846 | 5,266 | 5,795 | 6,399 |
| Inventory | 10,969 | 9,569 | 9,297 | 9,975 | 10,986 | 12,119 |
| Other Current Assets | 4,511 | 4,511 | 4,511 | 4,511 | 4,511 | 4,511 |
| Total Current Assets | 37,455 | 55,530 | 56,524 | 75,591 | 100,118 | 116,120 |
| Noncurrent Assets: | | | | | | |
| Net Fixed Assets | 12,320 | 10,879 | 10,151 | 9,668 | 9,158 | 8,611 |
| Deferred Financing Costs | 13,141 | 28,605 | 21,301 | 13,998 | 6,695 | 0 |
| Investment in Area Marketing and Master Franchise Agreements, net | 15,548 | 9,346 | 3,158 | 0 | 0 | 0 |
| Other Assets | 8,372 | 7,414 | 6,939 | 6,622 | 6,287 | 5,930 |
| Total Assets | $ 86,836 | $111,774 | $ 98,073 | $105,879 | $122,258 | $130,661 |
| **Liabilities** | | | | | | |
| Current Liabilities: | | | | | | |
| Line of Credit | $ 69,240 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Accounts Payable | 10,680 | 9,825 | 8,406 | 9,027 | 10,118 | 11,362 |
| Accrued Liabilities | 17,725 | 16,953 | 13,287 | 13,722 | 14,146 | 14,593 |
| Deferred Compensation | 2,434 | 1,622 | 722 | 101 | 101 | 0 |
| Capital lease obligations | 2,072 | 1,882 | 1,951 | 2,174 | 2,439 | 2,334 |
| Deferred vendor rebates | 2,044 | 2,044 | 2,044 | 2,044 | 2,044 | 2,044 |
| Other Current Liabilities | 18,243 | 15,648 | 16,014 | 16,251 | 16,544 | 18,463 |
| Total Current Liabilities: | 122,438 | 47,974 | 42,424 | 43,319 | 45,392 | 48,796 |
| Noncurrent Liabilities: | | | | | | |
| Deferred Compensation | 19,918 | 923 | 201 | 101 | 0 | 0 |
| Capital Lease Obligations | 13,922 | 12,275 | 10,824 | 9,500 | 8,011 | 6,826 |
| Deferred Vendor Rebates | 10,731 | 7,570 | 5,574 | 4,898 | 4,762 | 5,192 |
| Amended First Lien Facility | 575,629 | 441,651 | 437,201 | 431,728 | 417,347 | 389,399 |
| New Second Lien Facility | 225,000 | 145,182 | 162,107 | 168,071 | 168,071 | 168,071 |
| Other Debt | 3,746 | 0 | 0 | 0 | 0 | 0 |
| Other Non-Current Liabilities | 3,860 | 5,459 | 5,460 | 5,459 | 5,458 | 5,460 |
| **Total Liabilities** | 975,244 | 661,034 | 663,791 | 663,076 | 649,041 | 623,744 |
| **Members' Deficit** | (888,408) | (549,260) | (565,718) | (557,197) | (526,783) | (493,083) |
| **Total Liabilities and Shareholders' Equity** | $ 86,836 | $111,774 | $ 98,073 | $105,879 | $122,258 | $130,661 |

Ex. 1 p. 164

*Projected Cash Flow Statement*

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** |
| Net Income ............................................. | $  9,733 | $ (45,036) | $ (16,517) | $  8,462 | $ 30,355 | $ 33,642 |
| Interest Expense, net ............................. | 57,699 | 57,374 | 66,046 | 65,457 | 63,931 | 62,571 |
| Depreciation & Amortization.............................. | 10,342 | 10,702 | 7,987 | 4,958 | 1,800 | 1,800 |
| Income Tax Expenses ......................................... | 898 | 1,982 | 2,059 | 2,157 | 2,280 | 20,948 |
| EBITDA ............................................. | 78,672 | 25,022 | 59,575 | 81,034 | 98,366 | 118,961 |
| | | | | | | |
| Purchases of Property and Equipment .............. | (1,340) | (4,500) | (1,800) | (1,800) | (1,800) | (1,800) |
| Provision for Loss on Receivables..................... | 738 | 989 | 499 | 332 | 350 | 375 |
| Deferred Compensation Provision...................... | 54 | 59 | 59 | 59 | 59 | 59 |
| Loss on Disposal of Equipment / Impairment of Assets ............................................. | 3,278 | 2,385 | 1,204 | 799 | 845 | 904 |
| Vendor Equipment Rebates................................. | (3,517) | (1,837) | (1,382) | (1,101) | (1,224) | (1,289) |
| Minority Interest in Subsidiaries Net Income..... | 79 | 8 | 0 | 0 | 0 | 0 |
| Changes in Working Capital ............................... | (21,962) | (7,492) | (8,764) | (1,534) | (320) | 1,827 |
| Operating Cash Flow............................................. | 56,002 | 14,634 | 49,391 | 77,789 | 96,276 | 119,037 |
| | | | | | | |
| Cash from New Money Investment & DIP Financing ............................................. | 0 | 175,000 | 0 | 0 | 0 | 0 |
| Cash Interest Expense ......................................... | (51,134) | (40,477) | (41,974) | (52,424) | (57,312) | (57,230) |
| Cash Taxes Paid ............................................. | (898) | (1,982) | (2,059) | (2,157) | (2,280) | (20,948) |
| Amortization of Debt ......................................... | (8,190) | (3,337) | (4,450) | (4,450) | (4,450) | (4,450) |
| Other Debt Paydowns ......................................... | 0 | (69,240) | 0 | (1,023) | (9,932) | (23,498) |
| Other Investing / Financing............................... | (4,617) | (55,868) | 157 | 234 | 685 | 1,354 |
| | | | | | | |
| **Beginning Cash Balance** ............................... | 25,438 | 16,601 | 35,331 | 36,396 | 54,365 | 77,352 |
| Cash Flow............................................. | (8,837) | 18,730 | 1,065 | 17,969 | 22,987 | 14,265 |
| **Ending Cash Balance** ............................... | $ 16,601 | $ 35,331 | $ 36,396 | $ 54,365 | $ 77,352 | $ 91,617 |

154

Ex. 1 p. 165

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

A summary description of certain U.S. federal income tax consequences to holders of the First Lien Indebtedness and the Second Lien Loans (the "**Debt**") as a result of the implementation of the Restructuring Transactions is provided below. This description is for informational purposes only and, due to a lack of certain facts and of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Restructuring Transactions, as discussed herein. Only the principal consequences of the Restructuring Transactions to the holders of the Debt (such holders, the "**Holders**") are described below.

The following discussion is based upon the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), U.S. judicial decisions, administrative pronouncements and existing and proposed Treasury Regulations, all as in effect as of the date hereof. All of the preceding authorities are subject to change, possibly with retroactive effect, which may result in U.S. federal income tax consequences different from those discussed below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Restructuring Transactions. No rulings or determinations of the U.S. Internal Revenue Service (the "**IRS**") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Restructuring Transactions, and the discussion below is not binding on the IRS or such other authorities. In addition, a significant amount of time may elapse between the date of this Offering Memorandum and Disclosure Statement and the consummation of the Restructuring Transactions. Events occurring after the date of the Offering Memorandum and Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Restructuring Transactions. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Restructuring Transactions to the Company or any Holder. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

Except as otherwise specifically stated herein, this summary does not address any estate, gift, state, local, or foreign law tax consequences of the Restructuring Transactions. Furthermore, this discussion does not address all tax considerations that might be relevant to particular Holders in light of their personal circumstances or to persons that are subject to special tax rules. In addition, this description of the material U.S. federal income tax consequences does not address the tax treatment of special classes of Holders, such as financial institutions, regulated investment companies, real estate investment trusts, tax-exempt entities, insurance companies, persons holding Debt as part of a hedging, integrated or conversion transaction, constructive sale or "straddle," U.S. expatriates, persons subject to the alternative minimum tax, and dealers or traders in securities or currencies.

For purposes of this discussion, a "**U.S. Holder**" is a Holder that is: (1) an individual citizen or resident of the U.S. for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S. or any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (4) a trust (A) if a court within the U.S. is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

For purposes of this discussion, a "**Non-U.S. Holder**" is a Holder other than a U.S. Holder or that is a nonresident alien individual.

If a partnership or other pass-through entity is a Holder, the tax treatment of a partner or other owner generally will depend upon the status of the partner (or other owner) and the activities of the entity. Partners (or other owners) of pass-through entities that are Holders should consult their own tax advisors regarding the tax consequences of the Restructuring Transactions.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE RESTRUCTURING TRANSACTIONS ARE COMPLEX. THE FOLLOWING DISCUSSION IS FOR GENERAL INFORMATION PURPOSES ONLY, DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION, AND IS NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED TO BE, LEGAL OR TAX

ADVICE TO ANY HOLDER. NO OPINION OR REPRESENTATION WITH RESPECT TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO ANY SUCH HOLDER IS MADE. EACH HOLDER IS URGED TO CONSULT THE HOLDER'S OWN TAX ADVISOR REGARDING THE PARTICULAR TAX CONSEQUENCES TO IT OF THE RESTRUCTURING TRANSACTIONS, INCLUDING THE APPLICATION OF U.S. FEDERAL, STATE AND LOCAL TAX LAWS, AS WELL AS ANY APPLICABLE FOREIGN TAX LAWS, TO A HOLDER'S PARTICULAR SITUATION, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

TREASURY DEPARTMENT CIRCULAR 230. TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF TAX ISSUES HEREIN IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY A HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON SUCH HOLDER UNDER APPLICABLE TAX LAW; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) OF THE TRANSACTIONS DESCRIBED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT ADVISOR.

**U.S. Federal Income Tax Consequences of the Restructuring Transactions to U.S. Holders**

The following discussion describes certain U.S. federal income tax consequences of the Restructuring Transactions to U.S. Holders. U.S. Holders should consult their own tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences of the Restructuring Transactions.

The U.S. federal income tax consequences to a U.S. Holder (including the character, timing and amount of income, gain or loss recognized) will depend on, among other factors:  (a) the manner in which the Holder acquired the Debt; (b) the length of time the Holder has held the Debt; (c) whether the Holder acquired the Debt at a discount; (d) whether the Holder has taken a bad debt deduction with respect to the Debt (or any portion thereof) in current or prior years; (e) whether the Holder has previously included in taxable income accrued but unpaid interest with respect to the Debt; and (f) the Holder's method of accounting.

*The Exchange Offers*

1.   Consequences of the First Lien Exchange Offer

   *(a)*   *Exchanging Lenders*

Each Exchanging Lender should be treated, for U.S. federal income tax purposes, as exchanging a portion of its First Lien Indebtedness for New Second Lien Loans.  An Exchanging Lender should recognize gain or loss on the exchange equal to the difference between (a) the Exchanging Lender's tax basis in the First Lien Indebtedness surrendered by the Exchanging Lender in such exchange and (b) the amount realized by the Exchanging Lender (other than amounts attributable to accrued and unpaid interest, if and to the extent not previously included in the Exchanging Lender's gross income, which will be treated as interest income as described below). The amount realized will be the sum of the issue price of (i) the New Second Lien Loans (determined as described in Section 1(f)(i) below "Issue Price of the Amended First Lien Indebtedness and New Second Lien Loans") and (ii) subject to the discussion below in Section 1(a)(i) "First Lien Exchange Fee", the First Lien Exchange Fee received by the Exchanging Lender at the time of the exchange, in each case that is not allocable to accrued and unpaid interest.

Any such gain or loss described above should be capital in nature (subject to the "accrued interest" and "market discount" rules described below) and should be long term capital gain or loss if the First Lien Indebtedness was held for more than one year by the Exchanging Lender.  Subject to the discussion below in Section 1(a)(i) "First Lien Exchange Fee", an Exchanging Lender's tax basis in the New Second Lien Loans should equal the issue price of the New Second Lien Loans.  An Exchanging Lender's holding period for the New Second Lien Loans, as applicable, should begin on the day following the consummation of the Restructuring Transactions.

**Ex. 1 p. 167**

*(i)  First Lien Exchange Fee*

The tax treatment of the receipt of the First Lien Exchange Fee by a U.S. Holder is subject to uncertainty. Receipt of the First Lien Exchange Fee may be treated as (i) a separate fee for electing to exchange First Lien Indebtedness pursuant to the First Lien Exchange Offer, which would generally be taxable as ordinary income in accordance with such U.S. Holder's method of accounting for U.S. federal income tax purposes, or (ii) a payment under the First Lien Indebtedness, which may be treated first as a payment of accrued and unpaid interest on such First Lien Indebtedness and then as a payment of principal on such First Lien Indebtedness.  In the case of a U.S. Holder, the Company intends to take the position that the First Lien Exchange Fee is part of the consideration received for the First Lien Indebtedness. However, if the First Lien Exchange Fee were to be treated as separate consideration for acceptance of the First Lien Exchange Offer, then such payment would constitute ordinary income to the U.S. Holder rather than sale proceeds. Each Exchanging Lender is urged to consult its tax advisor regarding the tax consequences of the receipt of the First Lien Exchange Fee.

*(b)  First Lien Amendment*

*(i)  Significant Modification*

If the parties to a debt instrument modify its terms, the modifications may be considered so meaningful for U.S. federal income tax purposes that the debt instrument (the "**Original Debt Instrument**") will be treated as retired in exchange for the issuance of a new, modified debt instrument (the "**New Debt Instrument**"). This deemed retirement of the Original Debt Instrument and issuance of the New Debt Instrument (such deemed retirement, a "deemed reissuance") occurs if the modifications to the Original Debt Instrument are "significant" as set forth in Treasury Regulations under Section 1001 of the Code (the "**Debt Modification Regulations**"). Under the Debt Modification Regulations, the modification of a debt instrument generally is "significant" if, based on all the facts and circumstances, and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are economically significant, or certain specified changes to the yield, timing of payments, the obligor or the security, or the character of the security are made. The Company intends to treat the First Lien Amendment as a significant modification of the First Lien Indebtedness, resulting in a "deemed reissuance."

Each First Lien Lender that consents to the First Lien Amendment (other than any  Exchanging Lender that exchanges all of its First Lien Indebtedness for New Second Lien Loans pursuant to the First Lien Exchange Offer) and each Exchanging Lender that, as a result of the Second Lien Cap, retains an amount of amended First Lien Indebtedness, should be treated, for U.S. federal income tax purposes, as exchanging a portion of their First Lien Indebtedness for the amended First Lien Indebtedness in a fully taxable exchange.  Such lenders should recognize gain or loss on this deemed exchange equal to the difference between (a) the lender's tax basis in the First Lien Indebtedness deemed to be surrendered in such exchange and (b) the amount realized (other than amounts attributable to accrued and unpaid interest not previously included in income, which will be taxed as ordinary interest income). The amount realized will be the sum of (i) the issue price of the amended First Lien Indebtedness (determined as described in Section 1(f)(i) below "Issue Price of the Amended First Lien Indebtedness and New Second Lien Loans") and (ii) subject to the discussion below in Section 1(b)(ii) "First Lien Cash Consent Fee and First Lien PIK Consent Fee" the sum of (x) the issue price of the First Lien PIK Consent Fee and (y) the First Lien Cash Consent Fee, in each case deemed received by lenders at the time of the deemed exchange to the extent not allocable to accrued and unpaid interest.

Any such gain or loss described above should be capital in nature (subject to the "accrued interest" and "market discount" rules described above) and should be long term capital gain or loss if the First Lien Indebtedness was held for more than one year by the lender.  Subject to the discussion below in Section 1(b)(ii) "First Lien Cash Consent Fee and First Lien PIK Consent Fee", a U.S. Holder's tax basis in the amended First Lien Indebtedness should be the issue price of the amended First Lien Indebtedness discussed above.  A U.S. Holder's holding period for the amended First Lien Indebtedness should begin on the day following the consummation of the Restructuring Transactions.

Ex. 1 p. 168

*(ii) First Lien Cash Consent Fee and First Lien PIK Consent Fee*

The tax treatment of the receipt of the First Lien Cash Consent Fee and First Lien PIK Consent Fee by a U.S. Holder is subject to uncertainty. Receipt of the First Lien Cash Consent Fee and First Lien PIK Consent Fee may be treated as (i) separate fees for consenting to the First Lien Amendment, which would generally be taxable as ordinary income in accordance with such U.S. Holder's method of accounting for U.S. federal income tax purposes, or (ii) payments under the First Lien Indebtedness, which may be treated first as payment of accrued and unpaid interest on such First Lien Indebtedness and then as payment of principal on such First Lien Indebtedness. In the case of a U.S. Holder, the Company intends to take the position that the First Lien Cash Consent Fee and First Lien PIK Consent Fee are part of the consideration received for the First Lien Indebtedness in the deemed exchange. However, if the First Lien Cash Consent Fee and First Lien PIK Consent Fee were to be treated as separate consideration for acceptance of the First Lien Amendment, then such payment would constitute ordinary income to the U.S. Holder rather than sale proceeds. Each consenting First Lien Lender and each Exchanging Lender, as applicable, is urged to consult its tax advisor regarding the tax consequences of the receipt of the First Lien Cash Consent Fee and First Lien PIK Consent Fee.

*(c) First Lien Repayment*

Each U.S. Holder should be treated, for U.S. federal income tax purposes, as exchanging a portion of its First Lien Indebtedness for the First Lien Repayment. A U.S. Holder should recognize gain or loss on the exchange equal to the difference between (a) the U.S. Holder's tax basis in the First Lien Indebtedness surrendered by the U.S. Holder in such exchange and (b) the amount realized. The amount realized will be the amount of the First Lien Repayment received by the U.S. Holder at the time of the exchange that is not allocable to accrued and unpaid interest (which will be treated as interest income as described below).

*(d) Accrued Interest*

A portion of the consideration (whether debt or other consideration) received by U.S. Holders pursuant to the Restructuring Transactions may be attributable to accrued but unpaid interest on the Debt. Such amount should be taxable to a U.S. Holder as ordinary interest income if the accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, a U.S. Holder generally recognizes a deductible loss to the extent that any accrued interest was previously included in income and is not paid in full. If the fair value of the consideration received by U.S. Holders is not sufficient to satisfy fully all principal and interest on the Debt, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.

The Company will allocate for U.S. federal income tax purposes all payments in respect of any Debt first to the principal amount of such Debt, and thereafter to accrued but unpaid interest, pursuant to the Restructuring Transactions. Certain legislative history indicates that an allocation of consideration between principal and interest provided for in a bankruptcy plan of reorganization is binding for U.S. federal income tax purposes. However, no assurance can be given that the IRS will not challenge such allocation. If a distribution, with respect to any Debt, is allocated entirely to the principal amount of such Debt, a U.S. Holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Debt that was previously included in the U.S. Holder's gross income. U.S. Holders should consult their tax advisors regarding the proper allocation of the consideration received pursuant to the Restructuring Transactions, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

*(e) Market Discount*

The market discount provisions of the Code may apply to certain U.S. Holders. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a U.S. Holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that U.S. Holder if its stated redemption price at maturity (or, in the case of a debt obligation having OID, its revised issue price) exceeds the U.S. Holder's adjusted tax basis in the debt obligation immediately after such U.S. Holder's acquisition of the debt obligation by more than a statutory de minimis amount. Gain recognized by a U.S. Holder upon a disposition of a "market discount bond" generally will be treated as ordinary interest income to the extent of the market discount accrued on such bond during the U.S. Holder's period of ownership, unless the U.S. Holder

elected to include accrued market discount in taxable income currently. Absent such an election, a U.S. Holder of a market discount bond is required, under the market discount rules of the Code, to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond. In such circumstances, the U.S. Holder will be allowed to deduct such interest, in whole or in part, on the disposition of such bond.

*(f)   Ownership and Disposition of the Amended First Lien Indebtedness and New Second Lien Loans*

*(i)   Issue Price of the Amended First Lien Indebtedness and New Second Lien Loans*

For U.S. federal income tax purposes, the "issue price" of the amended First Lien Indebtedness and New Second Lien Loans depends on whether the amended First Lien Indebtedness or New Second Lien Loans, or the First Lien Indebtedness for which they are exchanged (or are deemed to be exchanged for U.S. federal income tax purposes) are deemed to be "publicly traded" within the meaning of applicable Treasury Regulations. The amended First Lien Indebtedness or New Second Lien Loans will be treated as "traded on an established market" if, at any time during the 60-day period ending 30 days after their respective issue date, such amended First Lien Indebtedness or New Second Lien Loans, respectively, are traded or listed on a national securities exchange, interdealer quotation system, certain foreign exchanges, or price quotations are readily available from dealers, brokers or traders. If the amended First Lien Indebtedness or New Second Lien Loans are traded on an established market, their respective issue prices would equal their fair market value on the first date on which a substantial amount of the amended First Lien Indebtedness or New Second Lien Loans, as applicable, are issued. If the amended First Lien Indebtedness or New Second Lien Loans are not traded on an established market, but the First Lien Indebtedness for which they are each exchanged (or are deemed to be exchanged for U.S. federal income tax purposes) is traded on an established market, then the issue price of the amended First Lien Indebtedness or New Second Lien Loans, as applicable, would equal the fair market value of the First Lien Indebtedness, for which each is exchanged (or deemed exchanged), on the first date in which a substantial amount of the amended First Lien Indebtedness or New Second Lien Loans, as applicable, is issued (or deemed issued) for the First Lien Indebtedness. If neither the amended First Lien Indebtedness nor New Second Lien Loans, as applicable, nor the First Lien Indebtedness are traded on an established market, then the amended First Lien Indebtedness and New Second Lien Loans, as applicable, will have an issue price equal to their respective stated principal amount so long as there is "adequate stated interest" within the meaning of Section 1274(c)(2) of the Tax Code. A debt instrument will have adequate stated interest if the stated principal amount is less than or equal to the sum of the present values of all payments due thereunder by using a discount rate equal to the applicable federal rate, compounded semi-annually, as published by the IRS.

In January 2011, the IRS proposed new Treasury Regulations to determine when property is considered to be traded on an established securities market. Under these proposed regulations, the 60-day testing period is reduced to 31 days, but otherwise generally it is significantly more likely that property will be treated as traded on an established securities market than under the currently applicable Treasury Regulations. If promulgated, the new regulations would be effective for debt instruments issued on or after the date that final regulations are promulgated. It is uncertain whether these proposed regulations will be finalized before the date of the exchange and what changes, if any, may be made in the final regulations.

*(ii) Payments of Interest on the Amended First Lien Indebtedness and New Second Lien Loans*

Each payment of qualified stated interest (as defined herein) on the amended First Lien Indebtedness or New Second Lien Loans (including any amount withheld as backup withholding tax) will be taxable to a U.S. Holder as ordinary interest income at the time it accrues or is received, in accordance with such U.S. Holder's method of accounting for U.S. federal income tax purposes.

*(iii) Original Issue Discount*

A note with a term that exceeds one year will constitute a discount note issued with OID if the stated redemption price at maturity of the note exceeds its issue price by more than the de minimis amount of ¼ of 1 percent of the "stated redemption price at maturity" multiplied by the number of complete years from the issue date of the note to its maturity. The "stated redemption price at maturity" of each of the amended First Lien Indebtedness or New Second Lien Loans is the total of all payments provided for under each of the amended First Lien Indebtedness or New Second Lien Loans, respectively, that are not payments of "qualified stated interest."

159

Generally, an interest payment on a note is "qualified stated interest" if it is one of a series of stated interest payments on a note that are unconditionally payable at least annually at a single fixed rate (with certain exceptions for lower rates paid during certain periods), which rate is applied to the outstanding principal amount of the note. Generally, a holder of a debt instrument issued with OID must accrue such OID into income on an annual basis (as described in more detail below), regardless of the holder's general method of accounting.

If the First Lien Indebtedness and the amended First Lien Indebtedness are not "publicly traded" for U.S. federal income tax purposes for the applicable period surrounding the Restructuring Transactions, the amended First Lien Indebtedness that a Holder retains after the Restructuring Transactions generally should not be issued with OID. If either the First Lien Indebtedness or the amended First Lien Indebtedness were to be "publicly traded" for U.S. federal income tax purposes for the applicable period surrounding the Restructuring Transactions, the amended First Lien Indebtedness will be issued with OID if it is traded at a discount to its stated principal amount. Because a portion of the interest payable on the New Second Lien Loans may be paid in kind, the New Second Lien Loans will be issued with OID. The amount of any such OID may be increased as a result of the determination of the issue price of the New Second Lien Loans.

If the applicable debt has OID, regardless of a holder's regular method of accounting for U.S. federal income tax purposes, a holder would be required to include in taxable income for each taxable year the daily portion of OID, if any, that accrues on the amended First Lien Indebtedness or New Second Lien Loans, as applicable, for each day in such taxable year in which the holder owns the amended First Lien Indebtedness or New Second Lien Loans.

Thus, a holder would be required to include OID in income in advance of the receipt of the cash to which such OID is attributable. The daily portion of OID is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period. The amount of OID that would accrue during an accrual period is the product of the "adjusted issue price" of the amended First Lien Indebtedness or New Second Lien Loans at the beginning of the accrual period multiplied by the "yield-to-maturity" of the amended First Lien Indebtedness or New Second Lien Loans, respectively, less the amount of any qualified stated interest allocable to such accrual period. The "adjusted issue price" of the amended First Lien Indebtedness or New Second Lien Loans at the beginning of an accrual period would equal its respective issue price, increased by the aggregate amount of OID that has accrued on the amended First Lien Indebtedness or New Second Lien Loans, respectively, in all prior accrual periods, and decreased by any payments made during all prior accrual periods of amounts included in the stated redemption price at maturity of the amended First Lien Indebtedness or New Second Lien Loans, respectively.

> *(iv) Sale, Exchange, Retirement or Other Disposition of the Amended First Lien Indebtedness and New Second Lien Loans*

Upon the sale, exchange, retirement, or other taxable disposition of the amended First Lien Indebtedness or New Second Lien Loans, a U.S. Holder generally will recognize gain or loss in an amount equal to the difference between the sum of cash plus the fair market value of any property received (other than any amount received that is attributable to accrued but unpaid interest not previously included in income, which will be taxable as ordinary interest income) and the U.S. Holder's adjusted tax basis in the amended First Lien Indebtedness or New Second Lien Loans, as applicable. A U.S. Holder generally will recognize capital gain or loss if the U.S. Holder disposes of the amended First Lien Indebtedness or New Second Lien Loans in a sale, exchange, redemption, or other taxable disposition, unless the amended First Lien Indebtedness or New Second Lien Loans, as applicable, have accrued market discount at the time of such disposition, in which case all or a portion of the gain could be ordinary income. Any capital gain or loss will be long-term capital gain or loss if at the time of the sale, exchange, retirement, or other taxable disposition of the amended First Lien Indebtedness or New Second Lien Loans, the U.S. Holder held the amended First Lien Indebtedness or New Second Lien Loans, as applicable, for more than one year. Long-term capital gains of an individual taxpayer are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

> *(v)   Impact of New Legislation on Ownership and Disposition of the Amended First Lien Indebtedness and New Second Lien Loans*

Recently enacted legislation requires certain U.S. Holders who are individuals, estates or trusts to pay an additional 3.8% tax on, among other things, interest on and capital gains from the sale or other disposition of certain assets for taxable years beginning after December 31, 2012.  U.S. Holders should consult their tax advisors regarding the effect, if any, of this legislation on their ownership and disposition of the amended First Lien Indebtedness or New Second Lien Loans.

2.   Consequences of the Second Lien Exchange Offer

> *(a)   Exchange of Second Lien Indebtedness for Common Shares*

Although it is not free from doubt, because the Company is treated as a disregarded entity for U.S. federal income tax purposes, the consummation of the Second Lien Exchange Offer should be treated for U.S. federal income tax purposes as (i) an exchange of the Second Lien Loans for the undivided interests in all of the underlying assets of the Company, and (ii) the contribution of such interests in the assets to Holdings in exchange for Holdings Common Shares, and (iii) the contribution of the Holdings Common Shares to QCE Parent for Parent Common Shares. Accordingly, each Second Lien Lender generally should recognize gain or loss in connection with its receipt, for U.S. federal income tax purposes, of an undivided interest in the underlying assets of the Company in an amount equal to the difference between (a) the fair market value of the interest received in satisfaction of its Second Lien Loan (other than any amounts received in respect of accrued but unpaid interest not previously included in income, which will be taxable as ordinary interest income) and (b) the holder's adjusted tax basis in its Second Lien Loan (other than any basis attributable to accrued but unpaid interest).  For a discussion of the tax consequences of any claim for accrued but unpaid interest, see Section 1(d) above "Accrued Interest".

The deemed contribution of the undivided interests in all of the underlying assets of the Company by the Holders of Second Lien Loans is in exchange for Holdings Common Shares, but all of the Holdings Common Shares will be issued directly to QCE Parent under the Plan, with the Holders of Second Lien Loans being issued Parent Common Shares in connection with such deemed contribution.  These deemed contributions of the assets of the Company to Holdings and of the Holdings Common Shares should not result in any additional gain or loss being recognized by the Second Lien Lenders.

A U.S. Holder's initial tax basis in the Parent Common Shares received should equal the fair market value of the Parent Common Shares (as such value should be equal to the fair market value of the U.S. Holder's undivided interest in the underlying assets of the Company treated as contributed to Holdings therefor), increased for the portion of Holdings' liabilities that was allocated to the U.S. Holder.  A U.S. Holder's holding period for any Common Shares generally should begin the day following the consummation of the Restructuring Transactions.

> *(b)   Ownership and Disposition of Common Shares*

QCE Parent will be treated as a corporation for U.S. federal income tax purposes.  Opco and Holdings (until Holdings is merged into QCE Parent), as well as most of their subsidiaries, will be treated as disregarded entities and their assets, income, loss and tax attributes will be treated as part of QCE Parent.  Any U.S. subsidiaries are expected to join in the filing of a consolidated return with QCE Parent.

Any distributions made on the Common Shares will constitute dividends for U.S. federal income tax purposes to the extent of QCE Parent's current or accumulated earnings and profits as determined under U.S. federal income tax principles.

To the extent that a holder receives distributions in excess of QCE Parent's current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the holder's basis in its stock.  Any such distributions in excess of the holder's basis in its stock (determined on a share-by-share basis) generally will be treated as capital gain.  Subject to certain exceptions, dividends received by non-corporate holders prior to 2013 will be taxed under current law at a maximum rate of 15%, provided that certain holding period

requirements and other requirements are met.  Under current law, any such dividend received after 2012 will be taxed at the rate applicable to ordinary income.  Dividends paid to holders that are corporations generally will be eligible for the dividend-received deduction so long as QCE Parent has sufficient earnings and profits. However, the dividend-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividend-received deduction may be disallowed.

The benefit of the dividend-received deduction to a corporate shareholder may be effectively reduced or eliminated by operation of the "extraordinary dividend" provisions of Section 1059 of the IRC, which may require the corporate recipient to reduce its adjusted tax basis in its stock by the amount excluded from income as a result of the dividend-received deduction. The excess of the excluded amount over adjusted tax basis may be treated as gain. A dividend may be treated as "extraordinary" if (1) it equals or exceeds 10% of the holder's adjusted tax basis in the stock (reduced for this purpose by the non-taxed portion of any prior extraordinary dividend), treating all dividends having ex-dividend dates within an 85-day period as one dividend, or (2) it exceeds 20% of the holder's adjusted tax basis in the stock, treating all dividends having ex-dividend dates within a 365-day period as one dividend.

Upon the sale, exchange or other taxable disposition of Common Shares, a holder generally will recognize gain or loss in an amount equal to the difference between the sum of cash plus the fair market value of any property received and such holder's adjusted tax basis in such Common Shares.  Such gain or loss will generally constitute capital gain or loss, and will be long-term capital gain or loss if at the time of the sale, exchange or other taxable disposition, such holder held the Common Shares for more than one year. Gain recognized by a holder upon a taxable disposition of any Common Shares received in respect of a Claim against the Debtors (or any stock or property received for such stock in a later tax-free exchange)  may be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Second Lien Loan for which stock was received and any ordinary loss deducted upon satisfaction of the Second Lien Loan, less any income (other than interest income) recognized by the holder upon satisfaction of the claim, and (ii) with respect to a cash-basis holder, also any amounts which would have been included in its gross income if the holder's claim had been satisfied in full but which was not included by reason of the cash method of accounting.

Each U.S. Holder of a Second Lien Loan is urged to consult its tax advisor regarding the tax consequences of owning and disposing of Common Shares.

(c)   *Impact of New Legislation on Ownership and Disposition of Common Shares*

Recently enacted legislation requires certain U.S. Holders who are individuals, estates or trusts to pay an additional 3.8% tax on, among other things, capital gains from the sale or other disposition of partnership interests for taxable years beginning after December 31, 2012.  U.S. Holders should consult their tax advisors regarding the effect, if any, of this legislation on their ownership and disposition of the Common Shares.

**Plan of Reorganization**

Except with respect to the receipt of the First Lien Exchange Fee, First Lien Cash Consent Fee and First Lien PIK Consent Fee, as applicable, the U.S. federal income tax consequences for First Lien Lenders and Second Lien Lenders as a result of the consummation of the Plan of Reorganization will generally be the same as those described above in Section 1(a) "The Exchange Offers".

**Information Reporting and Backup Withholding**

Certain payments ("reportable payments") generally are subject to information reporting by the payor to the IRS. Moreover, reportable payments are subject to backup withholding (currently at a rate of 28%, but increasing to 31% for payments received after 2012) under certain circumstances. Under the backup withholding rules set forth in

162

the Code, a Holder receiving a payment or distribution of cash or other property pursuant to the Restructuring Transactions, or pursuant to the amended First Lien Indebtedness or the New Second Lien Loans may be subject to backup withholding with respect to such payment or distribution unless it: (i) is an exempt recipient, such as a corporation, and when required, demonstrates this exemption, or (ii) timely provides a correct U.S. taxpayer identification number and makes certain certifications under penalties of perjury.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against the Holder's U.S. federal income tax liability, and it may obtain a refund of excess amounts withheld under the backup withholding tax rules by timely filing an appropriate claim for refund with the IRS.  A U.S. Holder should consult its tax advisors regarding the application of information reporting and backup withholding rules in their particular situations, the availability of an exemption therefrom, and the procedure for obtaining such an exemption, if applicable.

### U.S. Federal Income Tax Consequences of the Restructuring Transactions to Non-U.S. Holders

This subsection applies to a Holder who is a Non-U.S. Holder.  The rules governing U.S. federal income taxation of Non-U.S. Holders are complex.  Each Non-U.S. Holder should consult with its own tax advisor to determine the effect of U.S. federal, state, local and foreign income tax laws, as well as treaties, with regard to its participation in the Restructuring Transactions.

### *Restructuring Transactions*

Subject to the discussion below in "Information Reporting and Backup Withholding" below, any gain or loss realized by a Non-U.S. Holder pursuant to the Restructuring Transactions that is not effectively connected with the conduct of a U.S. trade or business should not be subject to U.S. federal income tax, except to the extent the amended First Lien Indebtedness, New Second Lien Loans, First Lien Repayment, Common Shares or, subject to the discussion below in "Exchange and Consent Fees" below, the First Lien Exchange Fee, First Lien Cash Consent Fee or First Lien PIK Consent Fee, as applicable, are received in respect of any accrued and unpaid interest on the First Lien Indebtedness or Second Lien Loans.  With respect to any portion of the amounts received in respect of such accrued and unpaid interest, a Non-U.S. Holder will not be subject to U.S. federal income tax if:

- the Non-U.S. Holder did not own, actually or constructively, for U.S. federal income tax purposes, 10% or more of the total combined voting power of all classes of the Company's voting interests;

- the Non-U.S. Holder is not, for U.S. federal income tax purposes, a controlled foreign corporation related, directly or indirectly, to the Company through stock ownership under applicable rules of the Code;

- the Non-U.S. Holder is not a bank receiving interest described in Section 881(c)(3)(A) of the Code; and

- the certification requirement, as described below, is fulfilled with respect to the beneficial owner of the First Lien Indebtedness or Second Lien Loans, as applicable.

The certification requirement described above will be fulfilled if either (A) a Non-U.S. Holder provides to the Company or its paying agent an IRS Form W-8BEN (or successor form), signed under penalties of perjury, that includes such holder's name and address and a certification as to such holder's Non-U.S. status, or (B) a securities clearing organization, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business holds the First Lien Indebtedness or Second Lien Loans on behalf of the beneficial owner and provides a statement to the Company or its paying agent, signed under penalties of perjury, in which the organization, bank or financial institution certifies that it has received an IRS Form W-8BEN (or successor form) from the Non-U.S. beneficial owner or from another financial institution acting on behalf of such beneficial owner and furnishes the Company or its paying agent with a copy thereof and otherwise complies with the applicable IRS requirements.  Other methods might be available to satisfy the certification requirements described above, depending on a holder's particular circumstances.

The gross amount of payments of interest that do not qualify for the exception from withholding described above (the "**portfolio interest exemption**") will be subject to United States withholding tax at a rate of thirty percent (30%) unless (A) a Non-U.S. Holder provides a properly completed IRS Form W-8BEN (or successor form) claiming an exemption from or reduction in withholding under an applicable tax treaty, or (B) such interest is effectively connected with such Non U.S. Holder's conduct of a United States trade or business and such holder provides a properly completed IRS Form W-8ECI (or successor form).

### Exchange and Consent Fees

As discussed above in "First Lien Exchange Fee" and "First Lien Cash Consent Fee and First Lien PIK Consent Fee", under current U.S. federal income tax law, there is uncertainty regarding whether the First Lien Exchange Fee, First Lien Cash Consent Fee and First Lien PIK Consent Fee constitute separate fees or instead constitute part of the consideration received for the First Lien Indebtedness. In the case of a Non-U.S. Holder, the Company intends to take the position that the First Lien Exchange Fee, First Lien Cash Consent Fee and First Lien PIK Consent Fee are part of the consideration received in exchange for the First Lien Indebtedness, and accordingly, the Company does not intend to withhold U.S. federal income tax from any of the First Lien Exchange Fee, First Lien Cash Consent Fee or First Lien PIK Consent Fee paid to a Non-U.S. Holder. However, if the First Lien Exchange Fee, First Lien Cash Consent Fee and First Lien PIK Consent Fee were to be treated as separate consideration for acceptance of the First Lien Exchange Offer or First Lien Amendment, as applicable, then such payment could result in a U.S. federal income tax liability to certain Non-U.S. Holders. Each Non-U.S. Holder is urged to consult its tax advisor regarding the tax consequences of the receipt of the First Lien Exchange Fee, First Lien Cash Consent Fee and First Lien PIK Consent Fee.

### *Ownership and Disposition of the Amended First Lien Indebtedness and New Second Lien Loans*

#### *Payments of Interest on the Amended First Lien Indebtedness and New Second Lien Loans*

The discussion in "Restructuring Transactions" regarding amounts received in respect of accrued but unpaid interest generally applies with respect to payments of interest on the amended First Lien Indebtedness and New Second Lien Loans.

#### *Sale, Exchange, Retirement or Other Disposition of the Amended First Lien Indebtedness and New Second Lien Loans*

Subject to the discussion below in "Information Reporting and Backup Withholding", if a Non-U.S. Holder owns amended First Lien Indebtedness or New Second Lien Loans, the Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain or loss realized on the sale, exchange, retirement or other taxable disposition of such amended First Lien Indebtedness or New Second Lien Loans, unless:

- the Non-U.S. Holder is an individual who is present in the U.S. for 183 days or more in the taxable year of disposition, and certain other conditions are met;

- such gain represents accrued but unpaid interest not previously included in income, in which case the rules regarding interest would apply; or

- such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the U.S. (see "—Effectively Connected Income and Loss").

### *Ownership and Disposition of Common Shares*

#### *Distributions on Common Shares*

Distributions of cash and property that QCE Parent makes in respect of Common Shares will constitute dividends for U.S. federal income tax purposes to the extent of its current or accumulated earnings and profits (as determined under U.S. federal income tax principles).  Distributions of cash and property that constitute dividends

Ex. 1 p. 175

for U.S. federal income tax purposes generally will be subject to U.S. federal withholding at a thirty percent (30%) rate unless a reduced rate is prescribed by an applicable income tax treaty.  If the amount of a distribution exceeds QCE Parent's current and accumulated earnings and profits, such excess first will be treated as a return of capital to the extent of a Non-U.S. Holder's tax basis in the Common Shares and thereafter will be treated as gain from the disposition of such share of Common Shares, subject to tax as described below in "Sale, Exchange, Retirement or Other Disposition of the Common Shares."

In order to obtain a reduced rate of U.S. withholding tax under an applicable income tax treaty, a Non-U.S. Holder will be required to provide a properly executed IRS Form W-8BEN certifying its entitlement to benefits under the treaty.  If a Non-U.S. Holder is eligible for a reduced rate of U.S. withholding tax under a treaty, the Non-U.S. Holder may obtain a refund or credit of any excess amounts withheld by filing an appropriate claim for a refund with the IRS.  Each Non-U.S. Holder should consult its own tax advisor regarding its possible entitlement to benefits under a treaty.

The U.S. federal withholding tax described above will not apply to dividends paid to a Non-U.S. Holder if such dividends represent U.S. trade or business income for the Non-U.S. Holder and the Non-U.S. Holder provides a properly executed IRS Form W-8ECI certifying that the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the U.S., as the dividends will be subject to tax as described below under "—Effectively Connected Income and Loss."

*Sale, Exchange, Retirement or Other Disposition of the Common Shares*

Subject to the discussion below concerning backup withholding, if a Non-U.S. Holder owns Common Shares, the Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain or loss realized on the sale, exchange or other taxable disposition of such Common Shares, unless:

- the Non-U.S. Holder is an individual who is present in the U.S. for 183 days or more in the taxable year of disposition, and certain other conditions are met;

- such gain represents accrued but unpaid interest not previously included in income, in which case the rules regarding interest would apply (see "—Restructuring Transactions"); or

- such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the U.S. (see "—Effectively Connected Income and Loss").

*Effectively Connected Income and Loss*

If a Non-U.S. Holder is engaged in a trade or business in the U.S. and if interest received in respect of amended First Lien Indebtedness or New Second Lien Loans; dividends received in respect of Common Shares; gain or loss realized on the disposition of amended First Lien Indebtedness, New Second Lien Loans or Common Shares; or fee income received for participating in the Restructuring Transactions is "effectively connected" with the conduct of such U.S. trade or business, any such interest, fee income, gain or loss realized by a Non-U.S. Holder will be subject to full net-basis U.S. federal income tax in the same manner as if the Non-U.S. Holder were a U.S. Holder, unless an applicable income tax treaty provides otherwise.  In addition, if the Non-U.S. Holder is a foreign corporation, the Non-U.S. Holder may also be subject to a "branch profits tax" on earnings and profits effectively connected with such U.S. trade or business (subject to certain adjustments) at a rate of thirty percent (30%), unless the branch profits tax is reduced or eliminated by an applicable income tax treaty.  Even though any such effectively connected income would be subject to income tax, and might also be subject to branch profits tax, it would not be subject to withholding tax if the Non-U.S. Holder satisfied the applicable certification requirements described above.  Non-U.S. Holders should discuss the applicability of the "effectively connected" rules with their tax advisors.

*Information Reporting and Backup Withholding*

Unless certain exceptions apply, the Company must report annually to the IRS and to each Non-U.S. Holder the amount of any interest paid to the Non-U.S. Holder (whether such interest income is subject to U.S. withholding tax

or is exempt from such tax pursuant to an income tax treaty), as well as the amount of any dividends paid to the Non-U.S. Holder (whether such dividend income is subject to U.S. withholding tax or is exempt from such tax pursuant to an income tax treaty). Copies of these information returns may also be made available under the provisions of a specific treaty or other agreement to the tax authorities of the country in which a Non-U.S. Holder resides.

Under current U.S. federal income tax law, backup withholding tax will not apply to payments of interest or dividends by the Company or its paying agent if the Non-U.S. Holder provides a properly executed IRS Form W-8BEN (or successor form), or otherwise establishes its eligibility for an exemption, provided that the Company or its paying agent, as the case may be, does not have actual knowledge or reason to know that the payee Non-U.S. Holder is a U.S. person.

Backup withholding is not an additional tax. Any amounts withheld from a payment to a Non-U.S. Holder under the backup withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the holder furnishes the required information to the IRS. A Non-U.S. Holder should consult its tax advisor regarding the application of information reporting and backup withholding in such holder's particular situation, the availability of an exemption from backup withholding and the procedure for obtaining such an exemption, if available.

**U.S. Federal Income Tax Consequences to the Company**

The U.S. federal income tax consequences of the Restructuring Transactions to the Company are complex and somewhat uncertain. Prior to the consummation of the Restructuring Transactions the Company will be treated as a "disregarded entity" of Holdings, which will itself be treated as a disregarded entity for U.S. federal income tax purposes. Accordingly, the Company believes that the U.S. federal income tax consequences of the Restructuring Transactions, including any cancellation of debt ("**COD**") income generated or gain incurred as a result of the deemed sale of Company assets as a result of the Restructuring Transactions, will be for the account of the owners of Holdings immediately prior to the consummation of the Restructuring Transactions and will not subject the Company to any U.S. federal income tax liability.

Ex. 1 p. 177

# TRANSFER RESTRICTIONS

The Common Shares have not been and may not be registered under the Securities Act (and we have no obligation or intention to do so and is being offered hereby only to (a) ''accredited investors'' within the meaning of Rule 501 of Regulation D under the Securities Act and (b) outside the U.S. to holders of Second Lien Term Loans who are persons other than U.S. persons in reliance upon Regulation S under the Securities Act. Accordingly, the Common Shares may not be offered or sold within the U.S. or to, or for the account or benefit of, persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

We reserve the right to refuse your assignment or settlement of Second Lien Term Loans in the Second Lien Exchange Offers and/or your vote on the Plan of Reorganization if you are not an eligible holder or if you fail to properly certify that you are an eligible holder.

In addition, the Common Shares will be subject to certain additional restrictions on transfer.  Each eligible holder who assign or settles Second Lien Loans in the Second Lien Exchange Offer or votes to accept the Plan of Reorganization will be deemed to have represented and agreed as follows, in addition to the representations and agreements contained in the Subscription Agreement relating to such Second Lien Lenders:

(a) The eligible holder is either (a) a ''accredited investor'' within the meaning of Rule 501 of Regulation D under the Securities Act or (b) receiving the Common Shares in reliance on Regulation S under the Securities Act.

(b) The eligible holder understands that the Common Shares are being offered in a transaction not involving any public offering in the United States within the meaning of the Securities Act, that the Common Shares have not been registered under the Securities Act and that (i) such securities may be offered, resold, pledged, exercised, converted or otherwise transferred only to (A)(1) a person who the seller reasonably believes is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act purchasing for its own account or the account of a qualified institutional buyer in a transaction meeting the requirements of Rule 144A, (2) pursuant to an exemption from registration under the Securities Act provided by Rule 144, if available, (B) us or any of our subsidiaries or (C) under an effective registration statement and, in each case, in compliance with the limitations in Holdings' Operating Agreement (as may be amended from time to time) and any applicable securities laws of any State of the United States or any other applicable jurisdiction and (ii) the eligible holder will, and each subsequent eligible holder is required to, notify any later purchaser from it of the resale restrictions described in (i) above and any later purchaser shall be subject to such resale restrictions.

(c) The eligible holder confirms that (i) the eligible holder has requisite knowledge and experience in financial and business matters so that it is capable of evaluating the merits and risks of acquiring Common Shares and the eligible holder and any accounts for which it is acting are each able to bear the economic risks of its or their investment, including a complete loss of the investment, (ii) the eligible holder is not acquiring Common Shares with a view to any distribution of Common Shares in a transaction that would violate the Securities Act or the securities laws of any State of the United States or another applicable jurisdiction and (iii) the eligible holder has received a copy of this Offering Memorandum and Disclosure Statement and acknowledges that the eligible holder has had access to the financial and other information, and has been afforded the opportunity to ask questions of our representatives and receive answers to those questions, as it deemed necessary in connection with its decision to assign the Second Lien Loans in the Exchange Offer, or vote on the Plan of Reorganization.

(d) The eligible holder understands that the Common Shares will bear a legend substantially to the following effect:

> "THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE ''SECURITIES ACT''), OR ANY STATE OR OTHER SECURITIES LAWS. THIS SECURITY AND ANY INTEREST OR PARTICIPATION HEREIN (A) MAY BE OFFERED, RESOLD,

PLEDGED OR OTHERWISE TRANSFERRED ONLY (1)(a) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A OR (b) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT, IF AVAILABLE, OR (c) OUTSIDE THE UNITED STATES TO A PERSON THAT IS NOT A ''U.S. PERSON'' IN AN ''OFFSHORE TRANSACTION'' (EACH AS DEFINED IN REGULATION S PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED) MEETING THE REQUIREMENTS OF REGULATION S UNDER THE SECURITIES ACT, (2) TO US OR ANY OF OUR SUBSIDIARIES OR (3) UNDER AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN COMPLIANCE WITH OUR SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION (AS IT MAY BE AMENDED FROM TIME TO TIME) AND OUR STOCKHOLDERS' AGREEMENT (AS IT MAY BE AMENDED FROM TIME TO TIME) AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY LATER PURCHASER FROM IT OF THE RESALE RESTRICTIONS DESCRIBED IN (A) ABOVE AND ANY LATER PURCHASER SHALL BE SUBJECT TO SUCH RESALE RESTRICTIONS.''

(e) The eligible holder acknowledges that none of Holdings, nor any person representing us has made any representations to it with respect to our company, or the Exchange Offers, the Plan of Reorganization and the consolidated financial statements of our company, other than the information contained in this Offering Memorandum and Disclosure Statement, which has been delivered to it and upon which it is relying in making its investment decision.

(f) The eligible holder understands that upon consummation of the Restructuring Transactions, or at any time thereafter while the Holdings Operating Agreement remains in effect, it will be deemed to be a party to the Holdings Operating Agreement for so long as such holder holds Common Shares and any transferee of such Common Shares will also become party to the Holdings Operating Agreement.

(g) The eligible holder acknowledges that we and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements and agrees that, if any of the foregoing acknowledgements, representations or agreements deemed to have been made by it are no longer accurate, it shall promptly notify us.

Ex. 1 p. 179

# SECURITIES LAW MATTERS

This section discusses certain securities law matters that are raised by the Second Lien Exchange Offer and the Plan of Reorganization.  This section should not be considered applicable to all situations or to all Second Lien Lenders.  Second Lien Lenders should consult their own legal counsel with respect to these and other issues.

## The Second Lien Exchange Offer

The Second Lien Exchange Offer is not being registered under the Securities Act in reliance upon an exemption from registration for transactions by an issuer not involving a public sale. The securities are being offered only to persons whom the Company believes have the qualifications necessary to permit such securities to be offered and sold in reliance upon this exemption.  The Second Lien Exchange Offer is also, pursuant to Section 18(b)(4)(D) of the Securities Act, exempt from state securities law requirements.  Section 18(b)(4)(D) provides, among other things, that state securities laws will not apply to securities that are exempt from federal registration under Section 4(2) of the Securities Act. We have received assurances that no person will provide, and neither we nor any person representing us has provided any information to the Second Lien Lenders relating to the Second Lien Exchange Offer other than to refer the Second Lien Lenders to the information contained in this Offering Memorandum and Disclosure Statement.  In addition, no broker, dealer, salesperson, agent, or any other person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Second Lien Exchange Offer.

## Issuance and Resale of the Common Shares

In the event that the conditions to the Exchange Offers are satisfied and we consummate the Second Lien Exchange Offer, the Common Shares will be restricted securities and may not be transferred or resold without registration under the Securities Act and applicable state registration and qualification unless an exemption from registration under applicable federal and state securities laws is then available.

Any certificate representing the Common Shares, subject to the Holdings Operating Agreement, if issued, shall be stamped or otherwise imprinted with a legend substantially in the following form:

> "THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE OR OTHER SECURITIES LAWS. THIS SECURITY AND ANY INTEREST OR PARTICIPATION HEREIN (A) MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (1)(a) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A OR (b) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT, IF AVAILABLE, OR (c) OUTSIDE THE UNITED STATES TO A PERSON THAT IS NOT A "U.S. PERSON" IN AN "OFFSHORE TRANSACTION" (EACH AS DEFINED IN REGULATION S PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED) MEETING THE REQUIREMENTS OF REGULATION S UNDER THE SECURITIES ACT, (2) TO US OR ANY OF OUR SUBSIDIARIES OR (3) UNDER AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN COMPLIANCE WITH OUR SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION (AS IT MAY BE AMENDED FROM TIME TO TIME) AND OUR STOCKHOLDERS' AGREEMENT (AS IT MAY BE AMENDED FROM TIME TO TIME) AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B)

THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY LATER PURCHASER FROM IT OF THE RESALE RESTRICTIONS DESCRIBED IN (A) ABOVE AND ANY LATER PURCHASER SHALL BE SUBJECT TO SUCH RESALE RESTRICTIONS."

**Issuance and Resale of the Common Shares Under the Plan of Reorganization**

In the event that we complete a restructuring pursuant to the Plan of Reorganization under Chapter 11 of the Bankruptcy Code, we also will rely on Section 1145 of the Bankruptcy Code, to the extent it is applicable, to exempt the Common Shares from the registration requirements of the Securities Act (and of any state securities or "blue sky" laws). Section 1145 exempts from registration the sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administration expense in a case concerning, such debtor. In reliance upon this exemption, the Common Shares generally will be exempt from the registration requirements of the Securities Act.

Recipients will be able to resell the Common Shares without registration under the Securities Act or other federal securities laws, unless the recipient is an "underwriter" with respect to such securities, within the meaning of Section 1145(b) of the Bankruptcy Code. Section 1145(b)(i) of the Bankruptcy Code defines "underwriter" as one of (a) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (b) offers to sell securities issued under a plan for the holders of such securities, or (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (d) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act.

An entity is not an "underwriter" under Section 2(a)(11) of the Securities Act with regard to securities received under Section 1145(a)(1), in "ordinary trading transactions" made on a national securities exchange or a Nasdaq market. However, the Company and Holdings do not anticipate that the Common Shares will be listed in the near term on an exchange or a Nasdaq market. What constitutes "ordinary trading transactions" within the meaning of Section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC. Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the plan, any amendments thereto, and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934, or (iii) payment of special compensation to brokers or dealers in connection with the sale.

The term "issuer" is defined in Section 2(4) of the Securities Act; however, the reference contained in Section 1145(b)(l)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the voting securities of such issuer. Additionally, the legislative history of Section 1145 of the Bankruptcy Code provides that a creditor who receives at least 10% of the voting securities of an issuer under a plan of reorganization will be presumed to be a statutory underwriter within the meaning of Section 1145(b)(i) of the Bankruptcy Code.

To the extent persons are deemed to be "underwriters," such persons will be deemed to be "Restricted Holders." Resales by Restricted Holders would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Restricted Holders may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state and foreign securities laws. Parties which believe they may

be statutory underwriters as defined in Section 1145 of the Bankruptcy Code are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144.

## INDEPENDENT AUDITORS

The consolidated financial statements of QCE LLC and subsidiaries as of December 31, 2010 and 2009 and for each of the years in the three-year period ended December 31, 2010 included in this Offering Memorandum and Disclosure Statement have been audited by KPMG LLP, independent auditors as stated in their report included in this Offering Memorandum and Disclosure Statement.

THE INDEPENDENT AUDITORS HAVE NEITHER EXAMINED NOR COMPILED ANY FINANCIAL INFORMATION, PRO FORMA ADJUSTMENTS OR SUMMARY FINANCIAL PROJECTIONS INCLUDED IN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT, AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL INFORMATION, PRO FORMA ADJUSTMENTS OR SUMMARY FINANCIAL PROJECTIONS, AND DO NOT ASSUME RESPONSIBILITY FOR THE FINANCIAL INFORMATION, PRO FORMA ADJUSTMENTS OR SUMMARY FINANCIAL PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL INFORMATION, PRO FORMA ADJUSTMENTS OR SUMMARY FINANCIAL PROJECTIONS INCLUDED IN THIS OFFERING MEMORANDUM AND DISCLOSURE STATEMENT EXCEPT FOR THE AUDITED CONSOLIDATED FINANCIAL STATEMENTS OF QCE LLC AND SUBSIDIARIES AS OF DECEMBER 31, 2010 AND 2009 AND FOR EACH OF THE YEARS IN THE THREE-YEAR PERIOD ENDED DECEMBER 31, 2010, ATTACHED HERETO AS APPENDIX F.

## WHERE YOU CAN FIND MORE INFORMATION

Requests for any information may be directed to the Company, Attn: Chief Financial Officer, at 1001 17th Street, Suite S-175, Denver, CO 80202.  Our telephone number is (720) 359-3300.

Each First Lien Lender and Second Lien Lender will be provided with a copy of this Offering Memorandum and Disclosure Statement and any related amendments or supplements to this Offering Memorandum and Disclosure Statement. Each person receiving this Offering Memorandum and Disclosure Statement acknowledges that:

(1)     such person has been afforded an opportunity to request from us, and to review and has received, all additional information considered by it to be necessary to verify the accuracy and completeness of the information herein; and

(2)     except as provided pursuant to (1) above, no person has been authorized to give any information or to make any representation concerning us or the Exchange Offers and Solicitation of Acceptances other than those contained herein and, if given or made, such other information or representation should not be relied upon as having been authorized by us.

Ex. 1 p. 183