Appendix E

**PRIVILEGED AND CONFIDENTIAL**

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**QCE PARENT LLC**

(a Delaware limited liability company)

effective as of

_____ __, 2012

Article I        DEFINITIONS ............................................................................................1
    1.1      Definitions.......................................................................................1
    1.2      Usage Generally...............................................................................6

Article II       THE COMPANY AND ITS BUSINESS ..........................................7
    2.1      Formation .........................................................................................7
    2.2      Company Name ................................................................................7
    2.3      Effective Date ..................................................................................7
    2.4      Term..................................................................................................7
    2.5      Offices...............................................................................................7
    2.6      Registered Office and Registered Agent.........................................7
    2.7      Filings ..............................................................................................7
    2.8      Purposes ...........................................................................................7

Article III      CAPITAL CONTRIBUTIONS; DISTRIBUTIONS ............................8
    3.1      Admission ........................................................................................8
    3.2      Additional Capital Contributions...................................................8
    3.3      No Interest in Company Property ...................................................9
    3.4      Distributions....................................................................................9

Article IV       [RESERVED]...............................................................................9

Article V        SHARES ........................................................................................9
    5.1      Shares...............................................................................................9
    5.2      Designation of Shares .....................................................................9
    5.3      Issue of Shares; Register; Transfer ................................................9
    5.4      Certificates ......................................................................................9

Article VI       MANAGEMENT OF THE COMPANY ............................................10
    6.1      Management and Control of the Company.....................................10
    6.2      Members Shall Not Manage or Control.........................................10
    6.3      Board of Managers..........................................................................10
    6.4      Meetings of the Board of Managers...............................................11
    6.5      Quorum and Voting ........................................................................12
    6.6      Procedural Matters of the Board of Managers .............................12
    6.7      Officers ............................................................................................13
    6.8      Terms of Office; Resignation; Removal .........................................13
    6.9      Compensation ..................................................................................14
    6.10     Related Party Transactions ...........................................................14

Article VII      MEMBERS AND MEETINGS ........................................................15
    7.1      Members ...........................................................................................15
    7.2      Admission of New Members ...........................................................15
    7.3      Resignation ......................................................................................15
    7.4      Power of Members...........................................................................15
    7.5      Meetings of Members ......................................................................16

7.6    Place of Meetings ............................................................................16
7.7    Notice of Members' Meetings ........................................................16
7.8    Waiver of Notice .............................................................................16
7.9    Voting ..............................................................................................17
7.10  Quorum; Vote Required ..................................................................17
7.11  Action by Written Consent of Members .........................................17
7.12  Voting by Ballot ..............................................................................17
7.13  No Cumulative Voting .....................................................................17

Article VIII    EXCULPATION; INDEMNIFICATION; LIABILITY; Opportunity .................18
8.1    Exculpation ......................................................................................18
8.2    Indemnification ................................................................................18
8.3    Liability; Duties ...............................................................................19
8.4    Insurance ..........................................................................................20
8.5    Limited Liability Company Opportunity ........................................21

Article IX    ACCOUNTING; FINANCIAL AND TAX MATTERS .....................................21
9.1    Books and Records; Reports ............................................................22
9.2    Fiscal Year .......................................................................................23
9.3    Bank and Investment Accounts .......................................................23
9.4    Tax Election .....................................................................................23

Article X    TRANSFERS OF SHARES; RIGHT OF FIRST OFFER;
    TAG ALONG RIGHT; DRAG ALONG RIGHT;
    PREEMPTIVE RIGHTS ......................................................................24
10.1  Limitation on Transfer ....................................................................24
10.2  Permitted Transfers .........................................................................24
10.3  Right of First Offer .........................................................................24
10.4  Tag-Along Right ..............................................................................25
10.5  Drag-Along Right ............................................................................26
10.6  Condition to Transfers ....................................................................28
10.7  Effect of Transfer ............................................................................29
10.8  Tolling .............................................................................................29
10.9  Preemptive Rights ...........................................................................29
10.10  Certain Transfers ............................................................................31

Article XI    REGISTRATION RIGHTS ..................................................................31
11.1  Demand Registration Right .............................................................31
11.2  Piggyback Registration Right .........................................................33
11.3  Effective Demand Registration .......................................................34
11.4  Cutback ...........................................................................................34
11.5  Form S-3 Registration ....................................................................34
11.6  Holdback Agreements .....................................................................36
11.7  Registration Procedures ..................................................................36
11.8  Seller Information ............................................................................39
11.9  Notice to Discontinue .....................................................................39
11.10  Registration Expenses ....................................................................39

11.11   Indemnification; Contribution .................................................................................40

Article XII     DISSOLUTION OF COMPANY;
                    LIQUIDATION AND DISTRIBUTION OF ASSETS ........................................42
12.1   Events of Dissolution.............................................................................................42
12.2   Liquidation; Winding Up.......................................................................................43
12.3   Survival of Rights, Duties and Obligations ..........................................................43
12.4   Claims of the Members..........................................................................................44

Article XIII    MISCELLANEOUS ........................................................................................44
13.1   Expenses ................................................................................................................44
13.2   Further Assurances.................................................................................................44
13.3   Notices ...................................................................................................................44
13.4   Amendments ..........................................................................................................44
13.5   Severability ............................................................................................................45
13.6   Headings and Captions ..........................................................................................45
13.7   Counterparts...........................................................................................................45
13.8   GOVERNING LAW...............................................................................................45
13.9   Entire Agreement; Non-Waiver .............................................................................45
13.10  No Third Party Beneficiaries .................................................................................45
13.11  No Right to Partition..............................................................................................45
13.12  Investment Representation and Indemnity.............................................................46
13.13  Confidentiality .......................................................................................................46

Schedule 3.1        Members, Addresses, Capital Contributions, Shares and Percentage

Ex. 2 p. 4

**AMENDED AND RESTATED**
**LIABILITY COMPANY AGREEMENT**
**OF**
**QCE PARENT LLC**

**THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (this "Agreement") of QCE PARENT LLC, a Delaware limited liability company (the "Company"), effective as of _____ __, 2012, is adopted and entered into by and among the Persons who are parties hereto as listed on Schedule 3.1 hereto (collectively, the "Members," which term shall also include such other Persons who shall become members of the Company in accordance with the terms of this Agreement and pursuant to and in accordance with the Delaware Limited Liability Company Act, as amended from time to time (the "Act")), in order to amend and restate in its entirety the Limited Liability Company Agreement of the Company, dated as of December 22, 2011.

WHEREAS, the Company was formed pursuant to a Certificate of Formation, dated December 22, 2011, which was executed and filed with the Secretary of State of the State of Delaware on December 22, 2011;

WHEREAS, this Agreement supersedes the Limited Liability Company Agreement of the Company, dated as of December 22, 2011;

WHEREAS, the parties hereto desire to set forth the terms and conditions for the operation of the Company.

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1     Definitions.

As used in this Agreement, the following terms shall have the meanings set forth below:

"Act" has the meaning set forth in the preamble hereto.

"Additional Capital Contribution" has the meaning set forth in Section 3.2(b).

"Affiliate" means any Person that, directly or indirectly, controls, is controlled by, or is under common control with such Person. The term "control" (including the terms "controlled by" and "under common control with") as used in this definition means the possession, directly or indirectly (including through one or more intermediaries), of the power or authority to direct or cause the direction of the management, whether through the ownership of voting securities, by contract or otherwise.  In calculating any Member's ownership of Shares for the purposes of determining whether a Member shall have certain rights under this Agreement,

E-1

all Shares held by Affiliated Members shall be aggregated for the purposes of such determination.

"Agreement" means this Agreement as the same may be amended, supplemented or modified in accordance with the terms hereof.

"Approved Sale" has the meaning set forth in Section 10.5(b).

"Avenue Managers" has the meaning set forth in Section 6.3(a).

"Avenue Members" means [____], [____] and [____] and each of their Permitted Transferees.

"Board of Managers" means the Board of Managers provided for in Article VI.

"Business Day" means any calendar day that is not a Saturday, Sunday or other calendar day on which banks are required or authorized to be closed in the City of New York.

"Buyout Notice" has the meaning set forth in Section 10.5(a).

"Capital Contribution" means the contribution made by a Member in accordance with Section 3.1.

"CEO" means the person from time to time serving as chief executive officer of the Company in accordance with this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended, including any successor provisions and transition rules.

"Commission" means the United States Securities and Exchange Commission.

"Common Share" means a Share representing a fractional part of the equity interests in the Company having the preferences, rights, obligations and limitations specified with respect to the Common Shares in this Agreement.

"Company" has the meaning set forth in the preamble to this Agreement.

"Company Underwriter" has the meaning set forth in Section 11.2(a).

"Confidential Information" has the meaning set forth in Section 13.13(a).

"Demand Registration" has the meaning set forth in Section 11.1(a).

"Drag-Along Sale" has the meaning set forth in Section 10.5(a).

"Effective Transfer Time" has the meaning set forth in Section 10.7.

"Event of Dissolution" has the meaning set forth in Section 12.1.

**Ex. 2 p. 6**

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto.

"Expiration Date" has the meaning set forth in Section 10.3(a).

"Family Member" means an individual's spouse, sibling, child, or other lineal descendant of such individual.

"Federal Income Tax" means any Tax imposed under Subtitle A of the Code or any other provision of United States federal income tax law (including, without limitation, the Taxes imposed by Sections 11, 55, 59A, and 1201(a) of the Code), and any interest, additions to Tax or penalties applicable or related to such Tax.

"Fortress Manager" has the meaning set forth in Section 6.3(a).

"Fortress Members" means [___] and its Permitted Transferees.

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Governmental Authority" means the government of any nation, state, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"Incentive Shares" has the meaning set forth in Section 10.9(a).

"Incidental Registration" has the meaning set forth in Section 11.2(a).

"Indemnified Party" has the meaning set forth in Section 11.11(c).

"Indemnifying Party" has the meaning set forth in Section 11.11(c).

"Indemnitee" has the meaning set forth in Section 8.2(a).

"Initial Public Offering" means a bona fide firm commitment underwritten public offering of the equity interests of the Company, pursuant to an effective registration statement filed under the Securities Act that raises a minimum of $[___] in gross proceeds.

"Initiating Member" has the meaning set forth in Section 11.1(a).

"Liabilities" and "Liability" has the meaning set forth in Section 11.11(a).

"Manager" means a Person serving as a member of the Board of Managers in accordance with this Agreement.

"Members" has the meaning set forth in the preamble hereto; provided, however, that a Person shall cease to be a Member for purposes of this Agreement at such time as such Person ceases to own any Share.

"Members' Counsel" has the meaning set forth in Section 11.7(a)(i).

"New Securities" has the meaning set forth in Section 10.9(a).

"Non-Initiating Members" has the meaning set forth in Section 11.2(a).

"Notice of Acceptance" has the meaning set forth in Section 10.9(b).

"Offer Notice" has the meaning set forth in Section 10.3(a).

"Offer Price" has the meaning set forth in Section 10.3(a).

"Offered Securities" has the meaning set forth in Section 10.9(a).

"Offered Shares" has the meaning set forth in Section 10.3(a).

"Old Second Lien Facility" means that certain Credit Agreement dated as of May 5, 2006, by and among QCE Finance LLC, QCE LLC, as Borrower, the Lenders party thereto, Deutsche Bank Trust Company Americas, as Administrative Agent, Goldman Sachs Credit Partners L.P., as Syndication Agent, Credit Suisse Securities (USA) LLC and BNP Paribas Securities Corp., as Co-Documentation Agents, and Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as Joint Lead Arrangers and as Joint Bookrunners.

"Option Period" has the meaning set forth in Section 10.3(b).

"Other Indemnitors" means (a) any employer of a Manager; (b) any entity in which a Manager is a partner, member or equity holder; (c) any entity for whom a Manager is serving as a manager of the Company at the request of such entity; (d) any insurer of an Other Indemnitor, and in each such case, where such Manager has certain rights to indemnification and/or insurance provided by such entity in connection with his or her service as a manager of the Company.

"Permitted Transferees" has the meaning set forth in Section 10.2.

"Person" means any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, estate, unincorporated organization, governmental authority or other entity and shall include any "group" within the meaning of the regulations promulgated by the Commission under Section 13(d) of the Exchange Act.

"Preemptive Offer" has the meaning set forth in Section 10.9(a).

"Preemptive Right" has the meaning set forth in Section 10.9(a).

"Proportionate Percentage" has the meaning set forth in Section 10.9(a).

"Proposed Transfer" has the meaning set forth in Section 10.4(b).

"Protected Person" has the meaning set forth in Section 8.1(a).

"Records" has the meaning set forth in Section 11.7(a)(vii).

"Registration Expenses" has the meaning set forth in Section 11.10.

"Registration Statement" means any Registration Statement filed pursuant to the Securities Act.

"Rightholders" has the meaning set forth in Section 10.3(a).

"S-3 Initiating Member" has the meaning set forth in Section 11.5(a).

"S-3 Non-Initiating Members" has the meaning set forth in Section 11.5(a).

"S-3 Registration" has the meaning set forth in Section 11.5(a).

"S-3 Underwriter" has the meaning set forth in Section 11.5(a).

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the Commission thereunder.

"Selling Members" has the meaning set forth in Section 10.5(a).

"Selling ROFO Member" has the meaning set forth in Section 10.3(a).

"Selling Tag Member" has the meaning set forth in Section 10.4(a).

"Share" means an ownership interest of a Member in the Company, including each of the Common Shares or any other class or series of Shares designated by the Board of Managers.

"Share Holding Company" has the meaning set forth in Section 10.10.

"Stock" has the meaning set forth in Section 11.1(e).

"Subject Purchaser" has the meaning set forth in Section 10.9(a).

"Subscription Agreement" means that certain Subscription Agreement dated as of the date hereof, by and among [_____].

"Subsidiary" means, as of the relevant date of determination, with respect to any Person, a corporation or other entity of which more than 50% of the voting power of the outstanding voting equity securities or more than 50% of the outstanding economic equity interest is held, directly or indirectly, by such Person.

"Successor Corporation" has the meaning set forth in Section 11.1(c).

"Tag-Along Notice" has the meaning set forth in Section 10.4(b).

"Tag-Along Notice Period" has the meaning set forth in Section 10.4(b).

"Tag-Along Rightholder" has the meaning set forth in Section 10.4(a).

"Tax" and "Taxes" means (i) any form of taxation or duties imposed, or required to be collected or withheld, including, without limitation, charges, together with any related interest, penalties or other additional amounts, (ii) liability for the payment of any amount of the type described in the preceding clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group, and (iii) liability for the payment of any amounts as a result of being party to any Tax sharing agreement (other than the Agreement) or as a result of any express or implied obligation to indemnify any other person with respect to the payment of any amount described in the immediately preceding clauses (i) or (ii) (other than an obligation to indemnify under the Agreement).

"Third Party Purchaser" has the meaning set forth in Section 10.3(a).

"Transfer" means any, direct or indirect, transfer, sale, assignment, pledge, hypothecation or other disposition of any Share, whether voluntary or involuntary, or any agreement to transfer, sell, assign, pledge, hypothecate or otherwise dispose of any Share, including, without limitation, any such disposition by operation of law or otherwise to an heir, successor or assign.

"Valid Business Reason" has the meaning set forth in Section 11.1(a).

1.2     Usage Generally.  The definitions in this Article I or the Schedules to this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Articles, Sections and Schedules shall be deemed to be references to Articles and Sections of, and Schedules to, this Agreement unless the context shall otherwise require.  All Schedules attached hereto shall be deemed incorporated herein as if set forth in full herein and, unless otherwise defined therein, all terms used in any Schedule shall have the meaning ascribed to such term in this Agreement.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All accounting terms not defined in this Agreement shall have the meanings determined by GAAP.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.

## ARTICLE II
## THE COMPANY AND ITS BUSINESS

2.1    <u>Formation</u>.  The Members hereby agree to continue the Company, which was formed pursuant to the provisions of the Act on December 22, 2011, and hereby agree that the Company shall be governed by the terms and conditions of this Agreement and, except as otherwise provided herein, the Act.

2.2    <u>Company Name</u>.  The name of the Company is "QCE Parent LLC." The Board of Managers may (without the consent of any Member) change the Company's name at any time and from time to time in accordance with the provisions of the Act and upon notice to the other Members.

2.3    <u>Effective Date</u>.  The Limited Liability Company Agreement of the Company, dated as of December 22, 2011, took effect on such date.  This Amended and Restated Limited Liability Company Agreement of the Company is entered into on _____ __, 2012 and is effective as of such date.

2.4    <u>Term</u>.  The Company shall continue until dissolved and its affairs wound up in accordance with the Act and the terms of this Agreement.

2.5    <u>Offices</u>.  The principal office of the Company shall be established and maintained at 1001 Seventeenth Street, Suite 200, Denver, Colorado 80202 or at such other or additional place or places as the Board of Managers shall determine from time to time. The Company may have other offices at such place or places as the Board of Managers may from time to time designate.

2.6    <u>Registered Office and Registered Agent</u>.  The address of the Company's registered office in the State of Delaware and the name and address of the Company's registered agent in the State of Delaware shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle.  The Board of Managers may designate another registered agent and/or registered office from time to time in accordance with the provisions of the Act and any other applicable laws.

2.7    <u>Filings</u>.  The Members shall execute and deliver such documents and perform such acts consistent with the terms of this Agreement as may be necessary to comply with the requirements of law for the formation, qualification and operation of a limited liability company, the ownership of property and the conduct of business under the laws of the State of Delaware and each other jurisdiction in which the Company shall own property or conduct business.  Shawna Evans was designated as an "authorized person," within the meaning of the Act, to execute, deliver and file the Certificate of Formation of the Company, and the execution, delivery and filing of such Certificate of Formation by Shawna Evans on December 22, 2011 is hereby ratified.

2.8    <u>Purposes</u>.  The Company is formed for the purposes of engaging in any lawful acts or activities for which limited liability companies may be organized under the Act.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; DISTRIBUTIONS

3.1     Admission.

(a)     On the date hereof, each of the Members (i) purchased newly authorized and issued Common Shares from the Company for a Capital Contribution of [$____] per Common Share pursuant to the Subscription Agreement, and/or (ii) exchanged indebtedness under the Old Second Lien Facility for newly authorized and issued Common Shares from the Company for a Capital Contribution of [$____] in indebtedness under the Old Second Lien Facility per Common Share, in each case, as set forth on Schedule 3.1 opposite such Member's name.  After giving effect to the transactions set forth in this Section 3.1(a), each Member holds the Common Shares set forth on Schedule 3.1 opposite such Member's name.  Notwithstanding anything to the contrary, no further approval of the Board of Managers or the Members shall be required with respect to the foregoing.

(b)     Schedule 3.1 shall be amended by the Board of Managers following any Transfer as provided by Article X or any issuance of additional Shares in accordance with this Agreement.

(c)     Each Person designated for admission to the Company as an additional Member in accordance with this Agreement (other than in connection with a Transfer made in accordance with Article X) shall contribute cash and/or other property (including securities) in the amount and of the type designated by the majority vote of the Board of Managers and Schedule 3.1 shall be amended at the time of such additional Members' admission as a Member by the Board of Managers to reflect such contribution.

3.2     Additional Capital Contributions.

(a)     No Member shall be obligated to make an Additional Capital Contribution (to the Company, in addition to its initial Capital Contribution.

(b)     Subject to Section 10.9, each Member may be permitted from time to time, but shall not be obligated, to make Additional Capital Contributions (or cause an Affiliate of the Member to make such Additional Capital Contributions), pro rata in accordance with the number of Common Shares held by each, if it is determined by the Board of Managers that such Additional Capital Contributions are necessary or appropriate for the conduct of the Company's business and affairs; provided that the Company shall provide each Member with no less than twenty (20) days advance written notice of any request for Additional Capital Contributions. Subject to the provisions of this Agreement, the Board of Managers (or a duly authorized committee thereof) shall be required to approve all aspects of any such Additional Capital Contribution, such as the amount and nature of the consideration to be contributed to the Company, the resulting Shares (including the class or series of Shares) to be received by the contributing Member, and the resulting dilution of interest to be incurred by the other Members. All amounts paid to the Company by a Member as additional equity capital (other than initial Capital Contributions) shall be deemed to be an "Additional Capital Contribution" by such

**Ex. 2 p. 12**

Member for the purposes of this Agreement, and Schedule 3.1 shall be amended at the time of such Additional Capital Contribution.

       3.3    No Interest in Company Property.  A Member's Shares shall for all purposes be personal property.  A Member has no interest in specific Company property.

       3.4    Distributions.  No Member shall be entitled to receive any distribution from the Company except as provided in this Agreement.  Distributions under this Section 3.3 (whether interim distributions or distributions on liquidation) made after the date hereof shall be made in amounts determined by the Board of Managers to the Members pro rata in accordance with the number of Common Shares held by each.

## ARTICLE IV
## [RESERVED]

## ARTICLE V
## SHARES

       5.1    Shares.  As of the date hereof, the ownership interests in the Company are evidenced by one class of Shares, Common Shares.

       5.2    Designation of Shares.  The Board of Managers shall have the power to designate the ownership interests in the Company into one or more classes and/or series of Shares and to fix for such class or series such voting powers, full or limited, or no voting powers, and such distinctive designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof, as shall be stated and expressed in the properly approved resolution or resolutions of the Board of Managers providing for such designation, and such resolution or resolutions of the Board of Managers shall set forth such amendments to this Agreement as shall be necessary or reasonable in the sole judgment of the Board of Managers to effect such resolution and such amendments shall be binding upon all of the Members of the Company upon proper adoption by the Board of Managers.

       5.3    Issue of Shares; Register; Transfer.  Subject to Sections 3.3 and 10.9, Shares may be issued from time to time in such portions of the entire interests in the Company as the Board of Managers shall properly approve, either for cash, services, securities, property or other value, or in exchange for other Shares, and at such price and upon such terms as the Board of Managers may, subject to the terms of this Agreement, in its absolute discretion determine. The Board of Managers may in its absolute discretion (a) provide that a register of holders of any or all Shares shall be kept and (b) may appoint one or more transfer agents and one or more registrars, all in accordance with such rules, regulations and procedures as the Board of Managers may determine.

       5.4    Certificates.  The Company may, in the discretion of the Board of Managers, issue certificates of limited liability company interests evidencing the Shares.  Each certificate evidencing any Share shall bear such appropriate legend indicating the existence of this Agreement and the restrictions on Transfer contained herein.

## ARTICLE VI
## MANAGEMENT OF THE COMPANY

6.1     <u>Management and Control of the Company</u>.  The management, operation and control of the business and affairs of the Company shall be vested exclusively in the Board of Managers, except as otherwise expressly provided for in this Agreement.  The Board of Managers shall have full and complete power, authority and discretion for, on behalf of and in the name of the Company, to perform all contracts and other undertakings that it may in its sole discretion deem necessary or advisable to carry out any and all of the objects and purposes of the Company.  A Manager acting individually will not have the power to bind the Company.  The power and authority of the Board of Managers may be delegated by the Board of Managers to a committee of Managers, to any officer of the Company or to any other Person engaged to act on behalf of the Company.

6.2     <u>Members Shall Not Manage or Control</u>. The Members, other than as they may act by and through the Board of Managers, shall take no part in the management of the business and affairs of the Company, shall transact no business for the Company and shall have no power to act for or to bind the Company, in each case other than as specifically delegated by the Board of Managers.

6.3     <u>Board of Managers</u>.

(a)     A Board of Managers shall be established and shall consist of nine (9) members, subject to this <u>Section 6.3(a)</u>.  The Avenue Members shall have in the aggregate seven (7) members of the Board of Managers which shall be designated by the majority vote of the Avenue Members (the "<u>Avenue Managers</u>"); the Fortress Members shall have in the aggregate one (1) member of the Board of Managers (the "<u>Fortress Manager</u>"), which shall be designated by the majority vote of the Fortress Members; and one member of the Board of Managers shall be the CEO of the Company.  One of the Avenue Managers shall serve as the chairperson of the Board of Managers.  As of the date hereof, the Avenue Managers are [__], [__], [__], [__], [__], [__], and [__]; the Fortress Manager is [__]; and the CEO is [__].  Members of the Board of Managers need not be Members.  In the event that either the Avenue Members or the Fortress Members (or their transferees who then hold the right to designate one or more Managers) Transfer Shares in compliance with <u>Article X</u> equal to more than 10% of all of the then outstanding Common Shares (excluding Incentive Shares) of the Company, then such Member may also transfer its right to designate a Manager hereunder with respect to each 10% of all then outstanding Common Shares (excluding Incentive Shares) Transferred hereunder.  In the event that either the Avenue Members or the Fortress Members (or their transferees who then hold the right to designate one or more Managers) Transfer Shares in compliance with <u>Article X</u> equal to more than 10% of all of the then outstanding Common Shares (excluding Incentive Shares) of the Company without also transferring the right to designate a Manager hereunder, then such Member shall forfeit the right to designate one (1) Manager for each 10% of all of the then outstanding Common Shares (excluding Incentive Shares) Transferred, and if any such Member (together with its Affiliates and Permitted Transferees (but only Permitted Transferees qualified as such pursuant to clause (i) of <u>Section 10.2</u>)) ceases to hold an aggregate of at least 5% of all of the then outstanding Common Shares (excluding Incentive Shares for purposes of the numerator and denominator), then such Member shall forfeit the right to designate any Managers.  The

vacancies created by any such forfeitures shall be filled by the majority vote of all of the Members holding Common Shares voting together as a single class; provided that in no event shall the Members holding Common Shares be entitled to elect more than three (3) Managers as a result of such forfeitures; provided further that, if applicable, the size of the Board of Managers shall be reduced automatically to reflect changes in the designation of Managers as contemplated under this Section 6.3(a).  The Company shall send prompt written notice to all Members of any change in the composition or size of the Board of Managers.  All members of the Board of Managers who are not employees of the Company shall receive identical compensation for their services as members of the Board of Managers.  All Managers (and non-voting observers) shall be entitled to reimbursement of their reasonable and documented out-of-pocket expenses incurred in connection with their attendance of meetings of the Board of Managers and any committees of the Board of Managers.

(b)     All or any number of the Managers may be removed at any time, with or without cause, by the Members that appointed such Manager, in accordance with Section 6.3(a). For the avoidance of doubt, the Fortress Manager may not be removed, with or without cause, except by the Fortress Members or as a result of the forfeiture of the Fortress Members' right to designate a Manager as provided in Section 6.3(a).

(c)     Any Manager may resign at any time by so notifying the chairman in writing. Such resignation shall take effect upon receipt of such notice by the chairman or at such later time as is therein specified, and unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective.

(d)     If at any time a vacancy is created on the Board of Managers by reason of the incapacity, death, removal or resignation of any Manager, the vacancy will be filled by another individual selected in accordance with Section 6.3(a).

(e)     The designation of an individual as a Manager shall not of itself create a right to continued membership on the Board of Managers or employment with the Company.

(f)     For so long as the Avenue Members have the right to designate at least one Avenue Manager pursuant to Section 6.3(a), the Avenue Members shall have the right, exercisable by delivering notice to the Company, to designate three (3) non-voting observers to attend any meetings of the Board of Managers (or any committee thereof) and any meetings of the board of any Subsidiary (or any committee thereof).  For so long as the Fortress Members have the right to designate the Fortress Manager pursuant to Section 6.3(a), the Fortress Members shall have the right, exercisable by delivering notice to the Company, to designate two (2) non-voting observers to attend any meetings of the Board of Managers (or any committee thereof) and any meetings of the board of any Subsidiary (or any committee thereof).  Notice of applicable board and committee meetings shall be furnished to the non-voting observers no later than, and using the same form of communication as, notice of applicable Board of Managers or committee meetings are furnished to Managers in accordance with this Agreement.  The observers shall not be counted as members of the Board of Managers for the purpose of determining whether a quorum is present, at any meeting of the Board of Managers, any board of any Subsidiary or any committee thereof.  Copies of any materials prepared for applicable Board of Manager or committee meetings shall be furnished to the non-voting observers no later than

the time such materials are furnished to Managers in accordance with this Agreement.  The Avenue Members and the Fortress Members may change the identity of their respective non-voting observers by providing notice to the Company.  The non-voting observers shall be considered to be representatives for the Avenue Members or the Fortress Members, as applicable, for the purposes of <u>Section 13.13</u> hereof and shall be bound by the confidentiality obligations therein.

   6.4 <u>Meetings of the Board of Managers</u>.  The Board of Managers shall hold regular meetings at least once during each fiscal quarter at such time and place as shall be determined by the Board of Managers.  Special meetings of the Board of Managers may be called at any time by any Manager.  Written notice shall be required with respect to any meeting of the Board of Managers, and written notice of any special meetings shall specify the purpose of the special meeting.  Unless waived by all of the Managers in writing (before, during or after a meeting) or with respect to any Manager at such meeting, prior notice of any regular or special meeting (including reconvening a meeting following any adjournments or postponements thereof) shall be given to each Manager and non-voting observer at least four (4) Business Days before the date of such meeting. Notice of any meeting need not be given to any Manager who shall submit, either before, during or after such meeting, a signed waiver of notice.  Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except when the Manager attends the meeting for the express purpose of objecting at the beginning thereof to the transaction of any business because the meeting is not properly called or convened.

   6.5 <u>Quorum and Voting</u>.

   (a) No action may be taken by the Board of Managers unless a quorum is present.  A quorum shall consist of the presence, in person or by proxy, of a majority of the Managers.

   (b) The Board of Managers shall act by majority vote, and each Manager shall have one vote.

   (c) No Manager shall be disqualified from acting on any matter because such member is interested in the matter to be acted upon by the Board of Managers so long as all material aspects of such matter have been disclosed in reasonable detail to all Managers who are to act on such matter.  Each Manager may authorize another person or persons to vote and act for such member by proxy, and such person or persons holding such proxy shall be counted towards the determination of whether a quorum of the Board of Managers is present.  One person may hold more than one proxy and each such proxy held by such person shall be counted towards the determination of whether a quorum of the Board of Managers exists.

   6.6 <u>Procedural Matters of the Board of Managers</u>.

   (a) Any action required or permitted to be taken by the Board of Managers (or any committee thereof) may be taken without a meeting, if all of the Managers consent in writing to such action.  Such consent shall have the same effect as a vote of the Board of Managers.

   (b) The Board of Managers (and each committee thereof) shall cause to be kept a book of minutes of all of its actions by written consent and in which there shall be

recorded with respect to each meeting of the Board of Managers (or any committee thereof) the time and place of such meeting, whether regular or special (and if special, how called), the names of those present and the proceedings thereof.

(c)     Managers and non-voting observers may participate in a meeting of the Board of Managers (or any committee thereof) by conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear one another, and such participation shall constitute presence in person at such meeting.

(d)     At each meeting of the Board of Managers, the chairperson shall preside and, in his or her absence, Managers holding a majority of the votes present may appoint any member of the Board of Managers to preside at such meeting. The Secretary (or such other person as shall be designated by the Board Managers) shall act as secretary at each meeting of the Board of Managers. In case the Secretary shall be absent from any meeting of the Board of Managers, an Assistant Secretary shall perform the duties of secretary at such meeting or the person presiding at the meeting may appoint any person to act as secretary of the meeting.

(e)     The Board of Managers may designate one or more committees to take any action that may be taken hereunder by the Board of Managers, which committees shall take actions under such procedures (not inconsistent with this Agreement) as shall be designated by it; provided, however, that not later than sixty (60) days following the date hereof, the Board of Managers shall ensure that it has at all times a compensation committee and an audit committee, each consisting of not less than [__] members.  The compensation committee shall approve all executive compensation, executive bonuses and all equity incentives or option grants (including the vesting schedules with respect to such equity incentives or option grants).  The audit committee shall approve the engagement of the Company's auditors, subject to Section 9.1(g).

6.7     Officers.

(a)     The day-to-day operations of the Company shall be the responsibility of the officers of the Company.  All officers shall have such authority and perform such duties as may be provided in this Agreement or, to the extent not so provided, by resolution passed by the Board of Managers.  The officers of the Company shall, at a minimum, consist of a CEO, a president, chief financial officer and a secretary.  The officers shall be appointed by the Board of Managers.  Each officer shall be a natural person eighteen years of age or older.  One person may hold more than one office.  In all cases where the duties of any officer, agent, or employee are not prescribed by this Agreement, such officer, agent or employee shall follow the orders and instructions of the CEO unless otherwise directed by the Board of Managers.  The officers, to the extent of their powers set forth in this Agreement or as delegated to them by the Board of Managers, are agents of the Company and the actions of the officers taken in accordance with such powers shall bind the Company.

(b)     The secretary of the Company will generally perform all the duties usually appertaining to the office of secretary of a limited liability company.

6.8     Terms of Office; Resignation; Removal.

(a)     Each officer shall hold office until he or she is removed in accordance with clause (c) below or his or her earlier death, disability or resignation.  Any vacancy occurring in any of the officers of the Company, for any reason, shall be filled by action of the Board of Managers.

(b)     Any officer may resign at any time by giving written notice to the Board of Managers.  Such resignation shall take effect at the time specified in such notice or, if the time be not specified, upon receipt thereof by the Board of Managers.  Unless otherwise specified therein, acceptance of such resignation shall not be necessary to make it effective.

(c)     Each officer shall be subject to removal by the Board of Managers.

6.9     Compensation.  The compensation and terms of employment of all of the officers shall be fixed by the Board of Managers subject to Section 6.6(e).

6.10    Related Party Transactions.   Neither the Company nor any of its Subsidiaries shall enter into any transaction with the Avenue Members or any of their Affiliates unless such transactions are on an arm's-length basis, in each case containing terms and conditions that, in the aggregate, are not less favorable to the Company or its Subsidiaries, as applicable, than would be the case with an unrelated third party; provided that, if any such transaction (or series of transactions) involves the payment from, or receipt by, the Company or any of its Subsidiaries of greater than $2,500,000, then the Company shall not, and shall cause its Subsidiaries not to, consummate such transaction unless the Company obtains either, at the Company's option, (i) an opinion of an investment banking firm, chosen by the Board of Managers, that such transaction is fair to the Company or its applicable Subsidiaries, or (ii) as long as the Fortress Members (together with their Affiliates) hold at least an aggregate of 10% of the Common Shares then outstanding, the written consent of a majority-in-interest of the Fortress Members to such transaction, such consent not to be unreasonably withheld, conditioned or delayed.  In addition, the Company shall provide notice to at least one of the Fortress Members prior to the consummation of any transactions between the Company or any of its Subsidiaries, on the one hand, and any Affiliate of the Company, on the other hand.

**ARTICLE VII**
**MEMBERS AND MEETINGS**

7.1     Members.  The name, address, class and number and type of Shares of each Member are set forth on Schedule 3.1 hereto, as such schedule may be amended from time to time to reflect the admission of new Members, Additional Capital Contributions of the Members, and the Transfer of Shares, each as permitted by the terms of this Agreement.  Each update to Schedule 3.1 shall be identified in sequence and dated as of the date of such update as follows:  Schedule 3.1A (dated the date hereof), Schedule 3.1B (dated [_____]), Schedule 3.1C (dated [____]), etc.

7.2     Admission of New Members.  New Members may be admitted (i) by the Board of Managers or (ii) in accordance with the transfer provisions contained in Article X.

E-14

7.3     Resignation.  A Member may not resign or withdraw from the Company prior to the dissolution and winding up of the Company.  A resigning Member shall not be entitled to receive any distribution and shall not otherwise be entitled to receive the fair value of its Shares except as expressly provided in this Agreement.  Notwithstanding the foregoing, as of the date hereof, QCE Incentive LLC is resigning as a Member, all of its ownership interests in the Company are being canceled, and QCE Incentive LLC shall not be entitled to any distribution in connection therewith or with respect to any prior or future period.

7.4     Power of Members.  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Act.  The Members shall elect the Board of Managers in accordance with Section 6.3.  Except as otherwise specifically provided by this Agreement or required by the Act, no Member shall have the power to act for or on behalf of, or to bind, the Company.  Notwithstanding the foregoing sentence, all Members shall constitute one class or group of members for purposes of the Act.

7.5     Meetings of Members.  Meetings of the Members shall be at least annually or as otherwise required by law or when called by the Board of Managers.  The Members may vote, approve a matter or take any action by vote of the Members at a meeting, in person or by proxy, or without a meeting by written consent of the Members pursuant to Section 7.11.

7.6     Place of Meetings.   The Board of Managers or a duly authorized committee thereof may designate any place, either within or outside of the State of Delaware, as the place of meeting for any annual meeting or for any special meeting of the Members.  If no designation is made, the place of meeting shall be the principal executive offices of the Company.  Members may participate in a meeting by means of a conference telephone or electronic media by means of which all Persons participating in the meeting can communicate concurrently with each other, and any such participation in a meeting shall constitute presence in person of such Member at such meeting.

7.7     Notice of Members' Meetings.

(a)     In connection with the calling of any meeting of the Members, the Board of Managers may set a record date for determining the Members entitled to vote at such meeting.  Written notice stating the place, day, and hour of the meeting and, in case of a special meeting, the purpose for which the meeting is called shall be delivered not less than ten (10) days nor more than fifty (50) days before the date of the meeting, either personally, by facsimile or by mail, by or at the direction of any Manager calling the meeting to each Member, whether or not such Member is entitled to vote at such meeting.

(b)     Notice to Members shall be given in accordance with Section 13.3.

(c)     When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Company may transact any business which might have been transacted at the original meeting.  If the adjournment is for

more than thirty (30) days, a notice of the adjourned meeting shall be given to each Member holding Common Shares entitled to vote at the meeting.

7.8    Waiver of Notice.

(a)    When any notice is required to be given to any Member of the Company under the provisions of this Agreement, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

(b)    By attending a meeting, a Member:

(i)    Waives objection to lack of notice or defective notice of such meeting unless the Member, at the beginning of the meeting, objects to the holding of the meeting or the transacting of business at the meeting; and

(ii)    Waives objection to consideration at such meeting of a particular matter not within the purpose or purposes described in the meeting notice unless the Member objects to considering the matter when it is presented.

7.9    Voting.  Each holder of Common Shares shall be entitled to one (1) vote for each Common Share owned by such holder, except as expressly provided otherwise in this Agreement.

7.10    Quorum; Vote Required.  The presence at a meeting, in person or by proxy, of Members owning a majority of the outstanding Common Shares entitled to vote on the subject matter of the meeting at the time of the action taken constitutes a quorum for the transaction of business required.  When a quorum is present, the affirmative vote, in person or by proxy, of Members owning a majority of the Common Shares entitled to vote on the subject matter shall be the act of the Members, unless the vote of a greater proportion or number or voting by classes is required by the Act or by this Agreement.  If a quorum is not represented at any meeting of the Members, such meeting may be adjourned to a period not to exceed sixty (60) days at any one adjournment.

7.11    Action by Written Consent of Members.  Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting if Members holding not less than the minimum number of Common Shares that would be necessary to approve the action pursuant to the terms of this Agreement, consent thereto in writing, and the writing or writings are filed with the minutes of the proceedings of the Members; provided, however, that no such written consent shall become effective until four (4) Business Days after notice thereof has been sent to the Fortress Members.  In no instance where action is authorized by written consent shall a meeting of Members be called or notice be given; however, a copy of the action taken by written consent shall be with the records of the Company.  Reasonably prompt notice of the taking of any action taken without a meeting by less than unanimous written consent shall be given to those Members who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of Members to take the action were obtained.  Written consent by the Members pursuant to this Section 7.11

shall have the same force and effect as a vote of such Members taken at a duly held meeting of the Members and may be stated as such in any document.

       7.12    <u>Voting by Ballot</u>.  Voting on any question or in any election may be by voice vote unless the presiding officer shall order or any Member shall demand that voting be by ballot.

       7.13    <u>No Cumulative Voting</u>.  No Member shall be entitled to cumulative voting in any circumstance.

**ARTICLE VIII**
**EXCULPATION; INDEMNIFICATION; LIABILITY; OPPORTUNITY**

       8.1    <u>Exculpation</u>.

       (a)    No manager, officer or Member, in any way, guarantees the return of any Members' capital contributions or a profit for the Members from the operations of the Company. To the fullest extent permitted by Section 18-1101 of the Act, none of the Members, Managers, any of their respective Affiliates, nor any of their respective officers, directors, employees, partners, members or shareholders (each, a "<u>Protected Person</u>") will be liable to the Company or any Member for any loss or damage sustained by the Company or any Member except as specifically provided to the contrary in the immediately following sentence.  None of the Protected Persons shall be liable to the Company or its Members for any loss or damage resulting from any act or omission taken or suffered by such Protected Person in connection with the conduct of the affairs of the Company or otherwise in connection with this Agreement or the matters contemplated hereby, unless such loss or damage is incurred by reason of such Protected Person's acts or omissions that constitute a bad faith violation of the implied contractual covenant of good faith and fair dealing.  None of the officers of the Company shall be liable to the Company or its Members for any loss or damage resulting from any act or omission taken or suffered by such officer in connection with the conduct of the affairs of the Company or otherwise in connection with this Agreement or the matters contemplated hereby, unless such loss or damage is incurred by reason of such officer's gross negligence, willful misconduct or willful breach of this Agreement.  Any Protected Person or officer may consult with legal counsel and accountants with respect to the Company's affairs and shall be fully protected and justified in any action or inaction that is taken or omitted in good faith, in reliance upon and in accord with the opinion or advice of such counsel or accountants, provided they shall have been selected in good faith.

       (b)    None of the Members, by reason of their execution of this Agreement or their status as members of the Company, or the Company shall be responsible or liable for any indebtedness, liability or obligation of any other Member incurred either before or after the execution of this Agreement, except that the Company shall be responsible and liable for indebtedness, liabilities or obligations incurred in connection with activities within the proper business purposes of the Company and purse ant to direct authorization of the Board of Managers or a duly authorized officer of the Company.

E-17

8.2     Indemnification.

(a)     To the fullest extent permitted under the Act and applicable law, the Company shall indemnify and hold harmless each of the Members, Protected Persons and officers of the Company (including Members when acting in the capacity as an officer of the Company), the Managers, their respective Affiliates and their respective officers, directors, employees, partners, members and shareholders (each, an "Indemnitee") from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee, and arise out of or in connection with (i) the affairs of the Company or the performance by such Indemnitee of any of the Indemnitee's responsibilities hereunder, (ii) the service at the request of the Company by such Indemnitee as a partner, member, director, officer, trustee, employee or agent of any other Person or (iii) the matters contemplated herein; provided, however, that an Indemnitee shall not be entitled to indemnification hereunder if indemnification is prohibited by applicable law; and provided further that, (1) if the Indemnitee is an officer of the Company, such officer's acts or omissions did not constitute gross negligence, willful misconduct or willful breach of this Agreement, and (2) if the Indemnitee is other than an officer of the Company, the Indemnitee acted in good faith and in a manner such Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such Indemnitee's conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Indemnitee did not act in good faith and in a manner which such Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such Indemnitee's conduct was unlawful.  The indemnification obligations of the Company pursuant to this Section 8.2 shall be satisfied from and limited to the Company's assets and no Member shall have any personal liability on account thereof.

(b)     The Company shall pay reasonable, documented expenses incurred by any Indemnitee in defending any action, suit or proceeding described in subsection (a) of this Section 8.2 in advance of the final disposition of such action, suit or proceeding, as such expenses are incurred; provided, however, that any such advance shall only be made if such Indemnitee provides written affirmation to repay such advance if it shall ultimately be determined by a court of competent jurisdiction that such Indemnitee is not entitled to be indemnified by the Company pursuant to this Section 8.2.

(c)     The indemnification provided by this Section 8.2 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement, determination of the Board of Managers or otherwise.  The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 8.2 shall continue as to an Indemnitee who has ceased to be a Member, Manager or officer (or other person indemnified hereunder) and shall inure to the benefit of the successors, executors, administrators, legatees and distributees of such Person.

(d)     The provisions of this Section 8.2 shall be a contract between the Company, on the one hand, and each Indemnitee who served at any time while this Section 8.2 is in effect in any capacity entitling such Indemnitee to indemnification hereunder, on the other hand, pursuant to which the Company and each such Indemnitee intend to be legally bound. No repeal or modification of this Section 8.2 shall affect any rights or obligations with respect to any state of facts then or theretofore existing or thereafter arising or any action, suit or proceeding theretofore or thereafter brought or threatened based in whole or in part upon such state of facts.

(e)     The Company may enter into indemnity contracts with Indemnitees and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this Section 8.2 hereof and containing such other procedures regarding indemnification as are appropriate.  For the avoidance of doubt, each of the Managers shall be entitled to receive indemnity contracts with the Company on terms no less favorable than any other indemnity contract entered into between the Company (or any of its Subsidiaries) and any other Manager.

8.3     Liability; Duties.

(a)     No Member, Manager or officer of the Company shall be personally liable for any indebtedness, liability or obligation of the Company, except as specifically provided for in this Agreement or required pursuant to the Act or any other applicable law.  To the fullest extent permitted by Section 18-1101 of the Act, except as specifically provided to the contrary in this Agreement, each Member agrees that any fiduciary or other duties imposed under Delaware law (including the duty of loyalty and the duty of care) on the Managers are hereby eliminated.

(b)     Any duties (including fiduciary duties) of a Member (but not the duties of the officers of the Company or Managers, in their capacity as such) that would otherwise apply at law or in equity (including the duty of loyalty and the duty of care) are hereby eliminated to the fullest extent permitted under Delaware law and any other applicable law; provided that (i) the foregoing shall not eliminate the obligation of each Member to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing.  In furtherance of the foregoing (but subject to the provisos in the foregoing), when any Member (but not the officers of the Company, in their capacity as such) takes any action under this Agreement to give or withhold its consent or approval, such Member shall have no duty (fiduciary or other) to consider the interests of the Company, its Subsidiaries or the other Members, and may act exclusively in its own interest.

(c)     The officers of the Company, in their capacity as such, shall owe the same duties (including fiduciary duties) to the Company and the Members as the duties officers of a Delaware corporation owe to such corporation and its stockholders.

(d)     The Members acknowledge and agree that the foregoing is intended to comply with the provisions of the Act (including Section 18-1101 of the Act) permitting members and managers of a limited liability company to eliminate fiduciary duties to the fullest extent permitted under the Act.

8.4     <u>Insurance</u>.   The Company shall purchase and maintain insurance, on behalf of such Indemnitees, and may purchase and maintain insurance on behalf of the Company, against any liability that may be asserted against or expenses that may be incurred by any such person or entity in connection with the activities of the Company or such Indemnitees, and in such amounts, as the Board of Managers reasonably determines are customary for similarly-situated businesses such as the Company and its Subsidiaries, regardless of whether the Company would have the power to indemnify such person or entity against such liability under the provisions of this Agreement.

8.5     <u>Limited Liability Company Opportunity</u>.  The Members acknowledge and agree that they are involved in acquiring and investing in various companies and business opportunities, and in making any such investment, none of the Members, or any of their respective Affiliates, including any Manager who is not an officer or employee of the Company, shall have any obligation to present any such acquisition or investment opportunities to the Company.

### ARTICLE IX
### ACCOUNTING; FINANCIAL AND TAX MATTERS

9.1     <u>Books and Records; Reports</u>.

(a)     The books of the Company will be maintained at the Company's principal place of business.

(b)     The Board of Managers shall maintain or cause to be maintained a system of accounting established and administered in accordance with the accrual method of accounting or as shall be required by GAAP, and shall set aside on the books of the Company or otherwise record all such proper reserves pursuant to the accrual method of accounting or as shall be required by GAAP.

(c)     Such books of the Company, together with a copy of this Agreement and any certificates of limited liability company interests evidencing the Shares, shall be open to inspection, examination and copying at reasonable times and during normal business hours by the Fortress Members and their duly authorized representatives, including their legal, accounting and financial advisors.  For the avoidance of doubt, such information and documents shall be considered "Confidential Information" for the purposes of <u>Section 13.13</u>.

(d)     As soon as reasonably practicable after the close of each fiscal year of the Company, but not later than one hundred ten (110) days after the end of each fiscal year of the Company, the Company shall provide to (i) each Member and (ii) such other Persons as the Board of Managers shall direct in its sole discretion, a copy of the audited consolidated financial statements of the Company (including a balance sheet and statement of income, together with the notes thereto) as of the end of such year, setting forth in each case in comparative form the figures for the previous year, all in reasonable detail and accompanied by the opinion of a recognized independent certified public accounting firm with respect to such financial statements.

Ex. 2 p. 24

(e)     Commencing with the first full fiscal quarter following the date hereof, as soon as reasonably practicable after the end of the quarter, but in any event not later than forty-five (45) days after the end of each quarter, the Company shall provide to (i) each Member and (ii) such other Persons as the Board of Managers shall direct in its sole discretion the unaudited consolidated financial statements of the Company (including a balance sheet and statement of income), all certified by an appropriate officer.

(f)     (i)     The Board of Managers may, in its sole discretion, require a Person that wishes to receive information pursuant to Sections 9.1(d) or (e) hereof or otherwise, prior to receiving such information, to enter into a confidentiality agreement respecting such information on such terms as the Board of Managers deems appropriate.   In connection therewith, the Board of Managers shall be deemed the manager for purposes of Section 18-305 of the Act.

(ii)     Each Member confirms that it is aware, and that its directors, officers, employees, agents, consultants, advisors or other representatives, including legal counsel, accountants and financial advisors, have been advised, that any information provided to such Member by the Company under this Section 9.1 may constitute material non-public information regarding the Company or its securities and does and will constitute Confidential Information of the Company and its Subsidiaries.  Each Member agrees to maintain the confidentiality of such information in accordance with the provisions of Section 3.13 of this Agreement.

(g)     The current accounting firm of the Company is KPMG LLP.  The audit committee shall retain the current accounting firm or select a new accounting firm for the Company annually.  Any new accounting firm shall be selected from among the following "big four" nationally recognized accounting firms:   KPMG, PriceWaterhouseCoopers, Deloitte & Touche or Ernst & Young.

(h)     Notwithstanding the foregoing, (i) to the extent that any financial reports or other material information concerning the business or operations of the Company or any of its Subsidiaries (e.g., weekly or monthly unaudited financial statements or annual budgets) is distributed or made available to any of the Avenue Managers (or the Avenue Members' non-voting observers) by the Company or any of its Subsidiaries, such information shall be made available to the Fortress Manager (including non-voting observers), and (ii) to the extent that any financial reports or other material information concerning the business or operations of the Company or any of its Subsidiaries (e.g., weekly or monthly unaudited financial statements or annual budgets) is distributed or made available to the Fortress Manager (or the Fortress Members' non-voting observers) by the Company or any of its Subsidiaries, such information shall be made available to the Avenue Managers (including non-voting observers).

9.2     Fiscal Year; Taxable Year.  The fiscal year of the Company for financial accounting purposes shall end on December 31.  The taxable year of the Company for federal, state and local income tax purposes shall end on December 31 unless another date is required by the Code.

9.3     <u>Bank and Investment Accounts</u>.  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Board of Managers, in such checking, savings or other accounts, or held in its name in the form of such other investments, as shall be designated by the Board of Managers. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such officer or officers of the Company as the Board of Managers may designate.

9.4     <u>Tax Election</u>.  The Company shall elect to be taxed as a corporation for federal and state Tax purposes.

**ARTICLE X**
**TRANSFERS OF SHARES; RIGHT OF FIRST OFFER;**
**TAG ALONG RIGHT; DRAG ALONG RIGHT; PREEMPTIVE RIGHTS**

10.1     <u>Limitation on Transfer</u>.  The Members shall not directly or indirectly Transfer any Shares except in accordance with the provisions of this Agreement.  Any attempt to Transfer any Shares in violation of the other provisions of this <u>Article X</u> shall be null and void *ab initio* and the Company shall not register or effect any such Transfer.  Notwithstanding anything to the contrary in this Agreement, (a) the rights and restrictions contained in <u>Sections 10.3</u>, <u>10.4</u>, <u>10.5</u> and <u>10.9</u> shall cease to apply following a public offering of securities by the Company, and (b) in the event that an Initial Public Offering is not completed within sixty (60) months of the date of this Agreement, the right of first offer set forth in <u>Section 10.3</u> shall no longer apply to the Fortress Members.

10.2     <u>Permitted Transfers</u>.  Without compliance with <u>Sections 10.3</u> or <u>10.4</u> hereof: (i) a Member may Transfer its Shares or any portion thereof to any direct or indirect stockholder, member, partner or Affiliate of such Member; (ii) a Member may Transfer his or her Shares or any portion thereof to any Family Member (or a Family Member of such Member's spouse, parent or sibling), a company, partnership or a trust established for the benefit of any of the foregoing or any personal representative, estate or executor under any will of such Member or pursuant to the laws of intestate succession, provided that, in each case, such Transfer is made in accordance with the applicable provisions of <u>Section 10.6</u>; or (iii) a Member may Transfer its Shares pursuant to or following a registered public offering.  The Persons to whom Members may Transfer their Shares or any portion thereof pursuant to this <u>Section 10.2</u> are referred to hereinafter as "<u>Permitted Transferees</u>"), provided that, in each case, such Transfer is made in accordance with <u>Section 10.6</u>.

10.3     <u>Right of First Offer</u>.

(a)     Except in a transaction pursuant to which <u>Section 10.5</u> applies or pursuant to a Registration Statement, if at any time a Member (the "<u>Selling ROFO Member</u>"), wishes to Transfer, all or any portion of such Member's Common Shares to any Person (other than to a Permitted Transferee) (a "<u>Third Party Purchaser</u>"), such Selling ROFO Member shall, first offer such Common Shares that are proposed to be transferred by sending written notice (an "<u>Offer Notice</u>") to the other Members holding (together with their Affiliates and Permitted Transferees) at least an aggregate of 5% of the Common Shares then outstanding (the "<u>Rightholders</u>"), which

E-22

shall state (i) the amount of Common Shares proposed to be transferred (the "Offered Shares"), (ii) the proposed purchase price proposed by the Selling ROFO Member (the "Offer Price"), (iii) the name of the Third Party Purchaser, and (iv) the material terms and conditions of such Transfer and that the proposed purchase of the Offered Shares shall be consummated after the expiration or termination of the Option Period (as defined below) but on or prior to the first business day (the "Expiration Date") which occurs sixty (60) days after the expiration of the Option Period.

(b)    On or prior to thirty (30) days after the delivery of the Offer Notice delivered pursuant to paragraph (a) above (the "Option Period"):

(i)    The Rightholders shall have the right to purchase all of the Offered Shares at a purchase price equal to the Offer Price and upon the terms and conditions of the Offer Notice.  Each Rightholder shall have the right to purchase its pro rata portion (based upon its ownership of Common Shares) of the Offered Shares upon the terms and conditions contained in the Offer Notice.  If any Rightholder does not fully subscribe for its pro rata portion of the Offered Shares, then each other participating Rightholder shall have the right, pro rata, to purchase the unsubscribed portion.

(ii)   The option of a Rightholder under this Section 10.3 shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the Option Period, to the Selling ROFO Member with a copy to the Company and the other Rightholders.  Such notice shall state (i) such Rightholder's pro rata portion of the Offered Shares and (ii) the amount of the Offered Shares that such Rightholder desires to purchase pursuant to this Section 10.3, including whether such Rightholder desires to purchase any Offered Shares not subscribed for by other Rightholders.  Any failure of a Rightholder to respond within the Option Period to the Selling ROFO Member shall be deemed to be a waiver of its rights under this Section 10.3.

(c)    The closing of the purchase of the Offered Shares subscribed for by purchasing Rightholders under this Section 10.3 shall be held at the principal office of the Company at 11:00 a.m. local time on the first business day which occurs thirty (30) days after the expiration of the Option Period or at such other time and place as the parties to the transaction may agree.  At such closing, the Selling ROFO Member shall deliver to the purchasing Rightholders the Offered Shares, including certificates (if any) representing the Offered Shares, and such Offered Shares shall be free and clear of any liens, claims, options, charges, encumbrances or rights, and the Selling ROFO Member shall so represent and warrant and shall further represent and warrant that it is the beneficial and record owner of such Offered Shares.  Each purchasing Rightholder shall, at the closing, deliver to the Selling ROFO Member payment in full in immediately available funds for the Offered Shares purchased by it.  At such closing, all the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate.

(d)    Unless the Rightholders elect to purchase all of the Offered Shares pursuant to this Section 10.3, the Selling ROFO Member may sell any Offered Shares not purchased by the Rightholders to a Third Party Purchaser on the terms and conditions no more favorable to a Third Party Purchaser than those set forth in the Offer Notice; provided, however,

that such sale is bona fide and made prior to or on the Expiration Date on the terms and conditions contained in the Offer Notice.  If such sale is not consummated prior to the Expiration Date for any reason, then the restrictions provided for herein shall again become effective, and no Transfer of such Offered Shares may be made thereafter by the Selling ROFO Member without again offering the same to the Rightholders in accordance with this <u>Section 10.3</u>.

10.4    <u>Tag-Along Right</u>.

(a)    If a Member or group of Members (the "<u>Selling Tag Member</u>") elects to Transfer directly or indirectly, Common Shares comprising 25% or more of all then outstanding Common Shares to a Third Party Purchaser, in one or a series of related transactions, then, in lieu of complying with the provisions of <u>Section 10.3</u>, such Selling Tag Member shall offer the other Members (each a "<u>Tag-Along Rightholder</u>") the right to include in such Selling Tag Member's Transfer to the Third Party Purchaser the Tag-Along Rightholder's pro-rata portion of the Common Shares proposed to be Transferred by the Selling Tag Member at the same price and on the same terms and conditions described in the Tag-Along Notice (as defined below).

(b)    Prior to the consummation of any proposed Transfer described in <u>Section 10.4(a)</u> (a "<u>Proposed Transfer</u>"), the Selling Tag Member proposing to make the Proposed Transfer shall offer to the other Tag-Along Rightholders the right to be included in the Proposed Transfer by sending written notice (the "<u>Tag-Along Notice</u>") to the Company and the Tag-Along Rightholders, which notice shall (i) state the name of such Selling Tag Member, (ii) state the name and address of the proposed Third Party Purchaser, (iii) state the portion of such Selling Tag Members' Common Shares to be sold, (iv) state the proposed purchase price and form of consideration of payment and all other material terms and conditions of such sale (including the identity of the Third Party Purchaser), (v) include a calculation of the consideration to be received by each Tag-Along Rightholder, (vi) include a representation that the Third Party Purchaser has been informed of the "tag-along" rights provided in this <u>Section 10.4</u> and has agreed to purchase the Common Shares in accordance with the terms hereof, and (vii) be accompanied by a written offer from the Third Party Purchaser.  Such right shall be exercisable by written notice to the Selling Tag Member proposing to make the Proposed Transfer (with a copy to the Company) given within thirty (30) days after delivery of the Tag-Along Notice (the "<u>Tag-Along Notice Period</u>").  The Selling Tag Member and the Tag-Along Rightholder shall sell the number of Common Shares to be sold to such Third Party Purchaser pursuant to this <u>Section 10.4</u> (or such lesser number as indicated by the Tag-Along Rightholder to the Selling Tag Member), and the number of Common Shares to be sold to such Third Party Purchaser by the Selling Tag Member shall be reduced accordingly.  Failure by a Tag-Along Rightholder to respond within the Tag-Along Notice Period shall be regarded as a rejection of the offer made pursuant to the Tag-Along Notice and a decline by such Tag-Along Rightholder of its rights under this <u>Section 10.4</u>.

10.5    <u>Drag-Along Right</u>.

(a)    If a Member or group of Members (the "<u>Selling Members</u>") wish to sell Shares comprising 50% or more of all then outstanding Common Shares to a Third Party Purchaser for value (a "<u>Drag-Along Sale</u>"), then such Selling Members shall have the right, in lieu of complying with the provisions of <u>Sections 10.3</u> and <u>10.4</u>, to require the other Members to

sell all of their Shares to such Third Party Purchaser in connection with such Drag-Along Sale and otherwise on the same terms as such Selling Members selling such Shares.  Such right shall be exercisable by written notice (a "Buyout Notice") given to each Member other than the Selling Members which shall state (i) that such Selling Members propose to effect the sale of all of the Shares of every Member of the Company (other than the Selling Members) to such Third Party Purchaser, (ii) the name of the Third Party Purchaser, and (iii) the purchase price the Third Party Purchaser is paying for the Shares and which attaches a copy of any definitive agreements between such Selling Members and the other parties to such transaction.  Each such Member agrees that, upon receipt of a Buyout Notice, each such Member shall be obligated to sell all of its Shares for the purchase price set forth in the Buyout Notice and upon the other terms and conditions of such transaction (and otherwise take all reasonably necessary action to cause consummation of the proposed transaction, including voting such Shares in favor of such transaction).

(b)     If the Board of Managers approves the sale of all or substantially all of the assets of the Company to, or a merger or consolidation of the Company with, a Person who is not an Affiliate of the Company (an "Approved Sale"), then so long as distributions of consideration to the Members are made in accordance with the provisions of Section 3.4, then each Member agrees to vote in favor thereof and will use its best efforts to cooperate in the Approved Sale and will take all necessary and desirable actions in connection with the consummation of the Approved Sale as are reasonably requested by the Board of Managers.

(c)     The closing with respect to any Drag-Along Sale pursuant to this Section 10.5 shall be held at the time and place specified in the Buyout Notice but in any event within sixty (60) days of the date the Buyout Notice is delivered to the Members (the "Drag-Along Outside Date").  Consummation of the Transfer of Shares by any Member to the Third Party Purchaser in a Drag-Along Sale (i) shall be conditioned upon consummation of the Transfer by each Selling Member to such Third Party Purchaser of the Shares proposed to be Transferred by the Selling Members and (ii) may be effected by a Transfer of the Shares or the merger, consolidation or other combination of the Company with or into the Third Party Purchaser or its Affiliate, in one (1) or a series of related transactions.  If the proposed Transfer with respect to the applicable Shares subject to the Buyout Notice does not meet the requirements of Section 10.5(a) prior to the Outside Transfer Date, such Selling Members shall be deemed to have forfeited their rights to require the other Members to sell all of their Shares to such Third Party Purchaser in connection with such Drag-Along Sale.

(d)     The Selling Members shall arrange for payment in cash (by bank cashier's check or certified check or by wire transfer of immediately available funds to the accounts designated by the other Members) directly by the Third Party Purchaser to each other Member, upon delivery of an appropriate assignment in form and substance reasonably satisfactory to the Third Party Purchaser, which assignment shall be made free and clear of all liens, claims and encumbrances, except as provided by this Agreement or as otherwise agreed to by such Third Party Purchaser.  In connection with any Transfer pursuant to a Buyout Notice, no other Member shall be required to (i) make any representations or warranties except that it has the authority to Transfer its Shares, is the sole owner of such Shares and has good and valid title to such Shares, and that the Transfer of such Shares does not violate any agreement to which it is a party or by which it is bound, or (ii) be subject to any post-closing covenants, including any non-competition

or non-solicitation covenants, in connection with such Transfer, other than confidentiality covenants with respect to information about the Company and its subsidiaries.  The agreement effecting any proposed Transfer pursuant to a Buyout Notice shall provide that a Member who is not a Selling Member shall have no individual liability, including with respect to any indemnification provided by the Members (other than to the extent covered by a post-closing indemnity escrow), other than in connection with any breach of any representations or warranties that may be delivered as set forth in clause (i) of the preceding sentence, in which case liability resulting from a breach of such representations or warranties may not exceed the lesser of (x) its pro rata share of the aggregate consideration received and (y) the net proceeds actually received by such Member pursuant to such Transfer, and in the case of indemnification shall be on a several, not joint, basis.

(e)     Any transaction costs, including transfer taxes and legal, accounting and investment banking fees incurred by the Company and the Selling Members and any other Member participating in a Transfer pursuant to pursuant to a Buyout Notice shall, unless the applicable Third Party Purchaser refuses, be borne by the Company in the event of an Approved Sale and shall otherwise be borne by the Members on a pro rata basis based on the consideration received by each Member in such Transfer.

(f)     Notwithstanding any of the foregoing, until the earlier to occur of (A) the consummation of an Initial Public Offering or (B) the Fortress Members (together with their Affiliates) no longer holding at least an aggregate of 10% of the Common Shares then outstanding, no Drag-Along Sale or Approved Sale shall be consummated unless (i) a majority-in-interest of the Fortress Members consent in writing to such transaction, or (ii) the Company obtains an opinion of an investment banking firm, chosen by the Board of Managers but reasonably acceptable to a majority-in-interest of the Fortress Members, to the effect that the consideration to be received by the Members pursuant to such Drag-Along Sale or Approved Sale is at least eighty percent (80%) of the fair market value of the Company (the "Minimum Sale Price") as determined not more than three (3) months prior to the execution of definitive agreements as to such Drag-Along Sale or Approval Sale; provided that if the Drag-Along Sale or the Approved Sale involves less than all of the assets or capital stock of the Company, then the "Minimum Sale Price" shall be at least 80% of the fair market value of the Company (determined as set forth above) multiplied by the percentage of the Company subject to the Drag Along Sale or Approved Sale, as the case may be.

10.6   Condition to Transfers.  In addition to all other terms and conditions contained in this Agreement, no Transfers permitted under this Article X (excluding Transfers pursuant to Section 10.5) shall be completed or effective for any purpose unless prior thereto:

(a)     The Member making such Transfer shall have provided to the Company (i) at least five (5) business days' prior notice of such Transfer and (ii) a certificate of the Member making such Transfer, delivered with such notice, containing a statement that such Transfer is permitted under this Article X, together with such information as is reasonably necessary for the Company to make such determination and (iii) such other information or documents as may be reasonably requested by the Company in order for it to make such determination.

(b)     The transferee of such Shares shall have executed and delivered to the Company an agreement by which it shall become a party to and be bound by the applicable terms and provisions of this Agreement.

(c)     If requested by the Board of Managers in its reasonable judgment, the Company shall have received the opinion of counsel to the Company, at the expense of the Member making such Transfer, reasonably satisfactory in form and substance to the Board of Managers, to the effect that: (i) such Transfer would not violate the Securities Act or any state securities or "blue sky" laws applicable to the Company or the Shares to be Transferred, (ii) such Transfer shall not impose liability or reporting obligations on the Company or any Member thereof in any jurisdiction, whether domestic or foreign, or result in the Company or any Member thereof becoming subject to the jurisdiction of any court or governmental entity anywhere, other than the states, courts and governmental entities in which the Company is then subject to such liability, reporting obligation or jurisdiction, (iii) such Transfer would not, individually or together with other concurrently proposed Transfers, cause the Company to be regarded as an "investment company" under the Investment Company Act of 1940, as amended, and (iv) such Transfer shall not cause an Event of Dissolution or, unless the Board of Managers determines it to be immaterial, a termination of the Company pursuant to Section 708 of the Code.

10.7    Effect of Transfer.  Upon the close of business on the effective date of any Transfer of Shares (the "Effective Transfer Time") in accordance with the provisions of this Agreement, (a) the transferee shall be admitted as a Member (if not already a Member) and for purposes of this Agreement such transferee shall be deemed a Member, and (b) the Transferred Shares shall continue to be subject to all the provisions of this Agreement.  Unless the transferor and transferee otherwise agree in writing, and give written notice of such agreement to the Company at least seven (7) days prior to such Effective Transfer Time, all distributions declared to be payable to the transferor at or prior to such Effective Transfer Time shall be made to the transferor.  No Transfer shall relieve the transferor (or any of its Affiliates) of any of their obligations or liabilities under this Agreement arising prior to the closing of the consummation of such Transfer.

10.8    Tolling.   All time periods specified in this Article X are subject to reasonable extension for the purpose of complying with requirements of law or regulation as determined by the Board of Managers in its sole discretion.

10.9    Preemptive Rights.

(a)     If the Company shall propose to issue and sell any Shares or any security convertible into or exchangeable for any Shares (other than any Shares to be issued (i) to persons who are, or who are becoming, employees, managers, directors or consultants of the Company or its Subsidiaries in connection with a bona fide option or equity participation plan or other bona fide compensation arrangement that is duly approved by the Board of Managers ("Incentive Shares"), (ii) as part of a debt financing transaction or as consideration for an acquisition, a joint venture or joint venture partner duly approved by the Board of Managers or (iii) pursuant to an Initial Public Offering) (collectively, the "New Securities") or enter into any contracts relating to the issuance or sale of any New Securities to any Person (the "Subject Purchaser"), each Member

who is an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) and holds Shares (together with its Affiliates and Permitted Transferees) comprising at least an aggregate of 5% of all then outstanding Common Shares shall have the right (a "Preemptive Right") to purchase such Member's pro rata portion (based on ownership of Common Shares and determined without regard to Members not eligible for such Preemptive Right) of the New Securities at the same price and on the same other terms proposed to be issued and sold (excluding from such Member's allocated portion an amount of Shares necessary to account for any options, warrants, SARs or other equity rights of Members if the holders of any such options, warrants, SARs or other equity rights are entitled to preemptive rights in any transaction to which this Section 10.9 applies, such that the number of New Securities to be purchased by Members pursuant to this Section 10.9 shall be reduced to permit such preemptive rights following the issuance of the New Securities to such holders upon exercise of their preemptive rights) (the "Proportionate Percentage").  The Company shall offer to sell to any such Member its Proportionate Percentage of such New Securities (the "Offered Securities") and to sell to any such Member such of the Offered Securities as shall not have been subscribed for by the other Members as hereinafter provided, at the price and on the terms described above, which shall be specified by the Company in a written notice delivered to any such Member which such notice shall also state (x) the number of New Securities proposed to be issued and (y) the portion of the New Securities available for purchase by such Member and shall be given to such Members not later than ten (10) business days prior to any issuance giving rights under this Section 10.9 (the "Preemptive Offer").  The Preemptive Offer shall by its terms remain open for a period of at least thirty (30) days from the date of receipt thereof and shall specify the date on which the Offered Securities will be sold to accepting Members (which shall be at least thirty (30) but not more than one hundred and eighty (180) days from the date of the Preemptive Offer).  The failure of any Member to respond to the Preemptive Offer during the thirty (30) day period shall be deemed a waiver of such Members' Preemptive Right.

(b)     Each such Member shall have the right, during the period of the Preemptive Offer, to purchase any or all of its Proportionate Percentage of the Offered Securities at the purchase price and on the terms stated in the Preemptive Offer.  Notice by any Member of its acceptance, in whole or in part, of a Preemptive Offer shall be in writing (a "Notice of Acceptance") signed by such Member and delivered to the Company prior to the end of the specified period of the Preemptive Offer, setting forth the Offered Securities such Member elects to purchase.

(c)     Each such Member shall have the additional right to offer in its Notice of Acceptance to purchase any of the Offered Securities not accepted for purchase by any other Members, in which event such Offered Securities not accepted by such other Members shall be deemed to have been offered to and accepted by the Members exercising such additional right under this paragraph (c) pro rata in accordance with their respective Proportionate Percentages (determined without regard to those Members not electing to purchase their full respective Proportionate Percentages under the foregoing paragraph (a)) on the same terms and conditions as those specified in the Preemptive Offer, but in no event shall any such electing Member be allocated a number of New Securities in the Company in excess of the maximum number of Offering Securities such Member has elected to purchase in its Notice of Acceptance.

(d)     At the closing of the purchase of New Securities subscribed for by the Members under this Article X, the Company shall deliver certificates (if applicable) representing the New Securities, and such New Securities shall be issued free and clear of all liens and the Company shall so represent and warrant, and further represent and warrant that such New Securities shall be, upon issuance thereof to the Members that elected to purchase New Securities and after payment therefor, duly authorized, validly issued, fully paid and non-assessable.  Each Member purchasing the New Securities shall deliver at the closing payment in full in immediately available funds for the New Securities purchased by it.  At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate.

(e)     Sale to Subject Purchaser.  In the case of any Preemptive Offer, if Notices of Acceptance given by the Members do not cover in the aggregate all of the Offered Securities, the Company may during the period of one hundred and eighty (180) days following the date of expiration of such Preemptive Offer sell to any other Person or Persons all or any part of the New Securities not covered by a Notice of Acceptance, but only on terms and conditions that are no more favorable to such Person or Persons or less favorable to the Company than those set forth in the Preemptive Offer.  If such sale is not consummated within such 180-day period for any reason, then the restrictions provided for herein shall again become effective, and no issuance and sale of New Securities may be made thereafter by the Company without again offering the same in accordance with this Article X.  The closing of any issuance and purchase pursuant to this Section 10.9 shall be held at a time and place as the parties to the transaction may agree.

10.10   Certain Transfers.  Each Member that is an entity that was formed for the sole purpose of directly or indirectly acquiring Shares or that has no substantial assets other than Shares or direct or indirect interests in Shares (any such Member, a "Share Holding Company") agrees that (i) certificates for shares of its common stock or other instruments reflecting equity interests in such entity (and the certificates for shares of common stock or other equity interests in any similar entities controlling such entity) will note the restrictions contained in this Agreement on the restrictions on Transfer of shares as if such common stock or other equity interests were Shares, (ii) no shares of such common stock or other equity interests may be transferred to any Person other than in accordance with the terms and provisions of this Agreement as if such common stock or other equity interests were Shares and (iii) any transfer of such common stock or other equity interests shall be deemed to be a Transfer of the proportionate percentage number of Common Shares hereunder (calculated proportionately by assuming for such calculation that Common Shares were actually held directly by the owners of the shares of the common stock or other equity interests of the Share Holding Company).

## ARTICLE XI
## REGISTRATION RIGHTS

11.1   Demand Registration Right.

(a)     Following the Company's Initial Public Offering, each Member (together with its Affiliates and Permitted Transferees) holding at least an aggregate of 5% of all then outstanding Common Shares (the "Initiating Member") may make a written request (specifying

the intended method of disposition and the amount of Common Shares proposed to be sold) that the Company effect, and the Company shall use its reasonable best efforts to effect, a Public Offering (a "Demand Registration") of all or a portion of the Common Shares collectively held by the Members (subject to Section 11.4(a)).  The Company shall not be obligated to effect a Demand Registration if the Initiating Member proposes to sell its Common Shares at an aggregate price to the public of less than [$____].  If the Board of Managers, in its good faith judgment, determines that any registration of Common Shares should not be made or continued because it would materially interfere with any material financing, acquisition, corporate reorganization or merger or other material transaction involving the Company (a "Valid Business Reason"), the Company may (y) postpone filing a Registration Statement relating to a Demand Registration until such Valid Business Reason no longer exists, but in no event for more than one hundred and eighty (180) days, and (z) in case a Registration Statement has been filed relating to a Demand Registration, if the Valid Business Reason has not resulted from actions taken by the Company, the Company, upon the approval of a majority of the Board of Managers, acting in good faith, may cause such Registration Statement to be withdrawn and its effectiveness terminated provided that a new Registration Statement is filed within one hundred and eighty (180) days thereafter or may postpone amending or supplementing such Registration Statement, but in no event for more than one hundred and eighty (180) days; provided, however, that if the registration of Common Shares is postponed pursuant to clause (y), the Company shall not be permitted to register under the Securities Act equity securities of the Company owned by other Members of the Company during any such postponement.  The Company shall give written notice of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof. Notwithstanding anything to the contrary contained herein, the Company may not postpone or withdraw a filing under this Section 11.1 more than once in any twelve (12) month period. For the avoidance of doubt, any postponement or withdrawal of a Registration Statement shall not constitute a Demand Registration.

(b)     The Company shall use its reasonable best efforts to cause such Demand Registration to be in the form of a firm commitment underwritten offering and the managing underwriter or underwriter selected for such offering shall be the Company Underwriter. In connection with any Demand Registration under this Section 11 involving an underwritten offering, none of the Common Shares held by the Initiating Member making a request for inclusion of such Common Shares shall be included in such underwritten offering unless the Initiating Member accepts the terms of the offering as agreed upon by the Company and the Company Underwriter, such terms to be in an underwriting agreement in customary form, and then only in such quantity as will not, in the opinion of the Company Underwriter, jeopardize the success of such offering.

(c)     In connection with an Initial Public Offering of the Company, all Members shall and shall cause their owners to take all necessary or desirable actions in connection with the consummation of such transaction to (i) as the Board of Managers may reasonably request (a) to convert the Company to a corporate form in a Tax-free transaction (except to the extent of taxable income or gain required to be recognized by a Member in an amount that does not exceed the amount of cash or any property or rights (other than stock) received by such Member upon the consummation of such transaction and/or any concurrent transaction), (ii) to accomplish the foregoing by effecting a transaction that is treated as the

E-30

**Ex. 2 p. 34**

contribution of the Common Shares of the Company into a newly formed "shell" corporation pursuant to Section 351 of the Code, with the result that each Member shall hold capital stock of such surviving corporation or business entity (the "Successor Corporation"), and (b) to cause the Successor Corporation to assume all of the obligations of the Company under this Article XI. Following the Initial Public Offering, references to Common Shares in this Article XI shall be deemed to mean the shares of common stock of the Successor Corporation that are issued pursuant to this Section 11.1(c). The charter documents shall reflect the capital structure after giving effect to the provisions of this Agreement and shall otherwise be in a form customary for publicly traded companies in, the reasonable judgment of the Board of Managers.

(d)     The Company and the Board of Managers will use their respective best efforts to perform any conversion or restructuring contemplated in Section 11.1(c) in the most Tax efficient manner for the Members, including any Members that are treated as corporations for Federal Income Tax purposes ("Corporation Members").  Upon the unanimous vote of the Board of Managers that such action is necessary to preserve the benefits of "tacking" under Rule 144 of the Securities Act, such conversion or merger may be structured to occur without any action on the part of any Member, and each Member hereby consents in advance to any action that the Board of Managers shall deem necessary to accomplish such result.

(e)     In connection with an Initial Public Offering, all of the outstanding Common Shares of the Company shall automatically convert into shares of common stock of the Successor Corporation (the "Stock") immediately prior to the consummation of the Initial Public Offering or at such other time as the Board of Managers may determine.

(f)     In the event that the Company determines to permit sales of shares of Stock held by Members in connection with an Initial Public Offering, all Members shall have the right to include in such offering a pro rata number of such Member's Shares.

11.2   Piggyback Registration Right.

(a)     Within ten (10) business days following receipt by the Company of a request from an Initiating Member to effect a Demand Registration, the Company shall give written notice of such request to all other Members (the "Non-Initiating Members") which shall describe the anticipated filing date, the proposed registration and distribution, and offer the Non-Initiating Members the opportunity to register their pro rata share of Common Shares (an "Incidental Registration"). Following the receipt of such notice, each Non-Initiating Member shall be entitled, by delivery of a written request to the Company delivered no later than ten (10) business days following receipt of notice from the Company, to include all or any portion of their Common Shares in such Demand Registration (subject to Section 11.4(a)).  The right of each Non-Initiating Member to have Common Shares included in a Demand Registration pursuant to this Section 11.2(a) shall be conditioned upon each Non-Initiating Member entering into (together with the Initiating Member) an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting by the Company (the "Company Underwriter"). The Company shall use its reasonable best efforts (within ten (10) business days of the notice provided for above) to cause the Company Underwriter to permit the Non-Initiating Member to participate in the Incidental Registration to include its Common

Shares in such offering on the same terms and conditions as the Common Shares being sold for the account of the Member requesting the Demand Registration.

(b)     In connection with an offering by the Company or the Successor Corporation for its own account (other than a registration statement on Form S-4 or S-8 or any successor thereto), the Company shall give written notice to all of the Members within ten (10) business days of the proposed offering. Following the receipt of such notice, each Member shall be entitled, by delivery of a written request to the Company delivered no later than ten (10) days following receipt of notice from the Company, to include all or any portion of its Common Shares in such offering (subject to <u>Section 11.4(b)</u>). The right of each Member to have Common Shares included in an offering pursuant to this <u>Section 11.2(b)</u> shall be conditioned (if an underwritten offering) upon each Member entering into (together with the Company) an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting by the Company.  The Company shall use its reasonable best efforts (within ten (10) business days of the notice provided for above) to cause the Company Underwriter to permit the Non-Initiating Member to participate in the Incidental Registration to include its Common Shares in such offering on the same terms and conditions as the Common Shares being sold for the account of the Company.

11.3     <u>Effective Demand Registration</u>.   The Company shall use reasonable commercial efforts to cause any Demand Registration to become effective not later than ninety (90) days after it receives a request under <u>Section 11.1(a)</u> hereof and to remain effective for the lesser of (i) the period during which all Common Shares registered in the Demand Registration are sold and (ii) ninety (90) days, <u>provided</u>, <u>however</u>, that a registration shall not constitute a Demand Registration if (x) after such Demand Registration has become effective, such registration or the related offer, sale or distribution of Common Shares thereunder is interfered with by any stop order, injunction or other order or requirement of the Commission or other Governmental Authority for any reason not solely attributable to the Initiating Member and such interference is not thereafter eliminated or (y) the conditions specified in the underwriting agreement, if any, entered into in connection with such Demand Registration are not satisfied or waived, other than by reason of a failure by the Initiating Member.

11.4     <u>Cutback</u>.

(a)     If the Company Underwriter, in connection with a Demand Registration, shall advise the Company in writing on or before the date five (5) days prior to the date then scheduled for such offering that, in its opinion, the amount of Common Shares requested to be included in such Demand Registration exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Common Shares being offered, then the Company will reduce the Common Shares to be included in such registration pro rata based on the number of Common Shares owned by each such Initiating Member and Non-Initiating Member.

(b)     If the Company Underwriter, in connection with an offering by the Successor Corporation for its own account (other than a registration statement on Form S-4 or S-8 or any successor thereto) shall advise the Company in writing on or before the date five (5) days prior to the date then scheduled for such offering that, in its opinion, the amount of

Common Shares requested to be included in such registration exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Common Shares being offered, then the Company will reduce the Common Shares to be included in such registration pro rata based on the number of Common Shares owned by each such Initiating Member and Non-Initiating Member.

11.5    Form S-3 Registration.

(a)    S-3 Registration.  Upon the Successor Corporation becoming eligible for use of Form S-3 (or any successor form thereto) under the Securities Act in connection with a public offering of its securities, in the event that the Successor Corporation shall receive from any Member (the "S-3 Initiating Member") a written request that the Successor Corporation register, under the Securities Act on Form S-3 (or any successor form then in effect) (an "S-3 Registration"), all or a portion of the Stock owned by such S-3 Initiating Member, the Successor Corporation shall give written notice of such request to all of the other Members (other than S-3 Initiating Member) at least ten (10) business days before the anticipated filing date of such Form S-3, and such notice shall describe the proposed registration and offer such other Members the opportunity to register the number of shares of Stock as each other Member may request in writing to the Successor Corporation, given within ten (10) business days after their receipt from the Successor Corporation of the written notice of such registration. If requested by the S-3 Initiating Member such S-3 Registration shall be for an offering on a continuous basis pursuant to Rule 415 under the Securities Act. The Successor Corporation shall use its reasonable best efforts to (x) cause such registration pursuant to this Section 11.5(a) to become and remain effective as soon as practicable, but in any event not later than forty-five (45) days after it receives a request therefor and (y) include in such offering the Stock of the other Members (other than S-3 Initiating Member) (the "S-3 Non-Initiating Members") who have requested in writing to participate in such S-3 Registration on the same terms and conditions as the Stock of the S-3 Initiating Member. The right of each S-3 Non-Initiating Member to have Stock included in a S-3 Registration pursuant to this Section 11.5(a) shall be conditioned upon each S-3 Non-Initiating Member entering into (together with the S-3 Initiating Member) an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting by the Successor Corporation (the "S-3 Underwriter").

(b)    Delay of S-3 Registration. If the Board of Managers has a Valid Business Reason, the Successor Corporation may (x) postpone filing a Registration Statement relating to a S-3 Registration until such Valid Business Reason no longer exists, but in no event for more than ninety (90) days, and (y) in case a Registration Statement has been filed relating to a S-3 Registration, if the Valid Business Reason has not resulted from actions taken by the Successor Corporation, the Successor Corporation, upon the approval of a majority of the Board of Managers acting in good faith, may cause such Registration Statement to be withdrawn and its effectiveness terminated or may postpone amending or supplementing such Registration Statement. The Successor Corporation shall give written notice to the Members of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof. Notwithstanding anything to the contrary contained herein, the Successor Corporation may not postpone or withdraw a filing due to a Valid Business Reason more than once in any twelve (12) month period. In addition, the Successor Corporation shall not

be required to effect any registration pursuant to Section 11.1, (i) within ninety (90) days after the effective date of any other Registration Statement of the Successor Corporation, (ii) if within the twelve (12) month period preceding the date of such request, the Successor Corporation has effected two (2) registrations on Form S-3 pursuant to Section 11.5, (iii) if Form S-3 is not available for such offering by the S-3 Initiating Holder or (iv) if the S-3 Initiating Holder, proposes to sell its Stock at an aggregate price to the public of less than [$_____].

(c)　　Cutback.  If the S-3 Underwriter in connection with any S-3 Registration shall advise the Successor Corporation in writing on or before the date five (5) business days prior to the date then scheduled for such offering that, in its opinion, the amount of Stock requested to be included in such S-3 Registration exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Stock being offered, then the Successor Corporation will reduce the Common Shares to be included in such S-3 Registration pro rata based on the number of shares of Stock owned by each S-3 Initiating Member and the S-3 Non-Initiating Members.

### 11.6　　Holdback Agreements.

(a)　　To the extent not inconsistent with applicable law and requested (i) by the Company, the Successor Corporation, the Initiating Member or the S-3 Initiating Member, as the case may be, in the case of a non-underwritten public offering and (ii) by the underwriter, in the case of an underwritten public offering, each Member agrees not to effect any public sale or distribution of any Common Shares or of any securities convertible into or exchangeable or exercisable for such Common Shares, including a sale pursuant to Rule 144 under the Securities Act, or offer to sell, contract to sell (including without limitation any short sale), grant any option to purchase or enter into any hedging or similar transaction with the same economic effect as a sale of Common Shares, in each case, during the one-hundred eighty (180) day period (or such lesser period as the underwriter may agree) beginning on the effective date of the registration statement (except as part of such registration) for such public offering.

(b)　　The Company agrees not to effect any public sale or distribution of any of its securities, or any securities convertible into or exchangeable or exercisable for such securities (except pursuant to registrations on Form S-4 or S-8 or any successor thereto), during the period beginning on the effective date of any Registration Statement filed pursuant to Section 11.1 in which the Members are participating and ending on the earlier of (i) the date on which all shares of Stock on such registration statement are sold and (ii) one hundred and eighty (180) days (or such lesser period as the underwriter may agree) after the effective date of such registration statement (except as part of such registration).

### 11.7　　Registration Procedures.

(a)　　Whenever registration of Registrable Securities has been requested pursuant to Section 11.1, Section 11.2 or Section 11.5, the Company or Successor Corporation, as applicable, shall use its reasonable best efforts to effect the registration and sale of such Common Shares or shares of Stock, as applicable, in accordance with the intended method of distribution thereof as quickly as practicable, and in connection with any such request, the Company shall, as expeditiously as possible (as used in this Section 11.7, the term Company

shall also include Successor Corporation and the term Common Shares shall also include Stock, as the case may be):

        (i)      prepare and file with the Commission a Registration Statement on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate and which form shall be available for the sale of such Common Shares in accordance with the intended method of distribution thereof, and cause such Registration Statement to become effective; provided, however, that (x) before filing a Registration Statement or prospectus or any amendments or supplements thereto, the Company shall provide counsel selected by the Members ("Members' Counsel") with an adequate and appropriate opportunity to review and comment on such Registration Statement and each prospectus included therein (and each amendment or supplement thereto) to be filed with the Commission, subject to such documents being under the Company's control, and (y) the Company shall promptly notify the Members' Counsel and each seller of Common Shares of any stop order issued or threatened by the Commission and promptly take all action required to prevent the entry of such stop order or to remove it if entered;

        (ii)      prepare and file with the Commission such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for the lesser of (x) one hundred and twenty (120) days and (y) such shorter period which will terminate when all Common Shares covered by such Registration Statement have been sold; provided, however, that if the S-3 Initiating Holder has requested that an S-3 Registration be for an offering on a continuous basis pursuant to Rule 415 under the Securities Act, then the Company shall keep such Registration Statement effective until all Common Shares covered by such Registration Statement have been sold; and shall comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement;

        (iii)     furnish to each seller of Common Shares, prior to filing a Registration Statement, a reasonable number of copies of such Registration Statement as is proposed to be filed, and thereafter such number of copies of such Registration Statement, each amendment and supplement thereto (in each case including all exhibits thereto), and the prospectus included in such Registration Statement (including each preliminary prospectus) and any prospectus filed under Rule 424 under the Securities Act as each such seller may reasonably request in order to facilitate the disposition of the Common Shares owned by such seller;

        (iv)     register or qualify such Common Shares under such other securities or "blue sky" laws of such jurisdictions as any seller of Common Shares may request, and to continue such qualification in effect in such jurisdiction for as long as permissible pursuant to the laws of such jurisdiction, or for as long as any such seller requests or until all of such Common Shares are sold, whichever is shortest, and do any and all other acts and things which may be reasonably necessary or advisable to enable

any such seller to consummate the disposition in such jurisdictions of the Common Shares owned by such seller; provided, however, that the Company shall not be required to (x) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 11.7(a)(iv), (y) subject itself to taxation in any such jurisdiction or (z) consent to general service of process in any such jurisdiction;

(v)     notify each seller of Common Shares at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such Registration Statement contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and the Company shall promptly prepare a supplement or amendment to such prospectus and furnish to each seller of Common Shares a reasonable number of copies of such supplement to or an amendment of such prospectus as may be necessary so that, after delivery to the purchasers of such Common Shares, such prospectus shall not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(vi)     enter into and perform customary agreements (including an underwriting agreement in customary form with the Company Underwriter) and take such other actions as are prudent and reasonably required in order to expedite or facilitate the disposition of such Common Shares, including causing its officers to participate in "road shows" and other information meetings organized by the Company Underwriter;

(vii)     upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Company, which shall be consistent with the due diligence and disclosure obligations under securities laws applicable to the Company and the Members, make available at reasonable times for inspection by any managing underwriter participating in any disposition of such Common Shares pursuant to a Registration Statement, Members' Counsel and any attorney, accountant or other agent retained by any managing underwriter, all financial and other records, pertinent corporate documents and properties of the Company and its Subsidiaries (collectively, the "Records") as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Company's and its Subsidiaries' officers, directors and employees, and the independent public accountants of the Company, to supply all information reasonably requested by any such Person in connection with such Registration Statement;

(viii)     if such sale is pursuant to an underwritten offering, obtain a "cold comfort" letters dated the effective date of the Registration Statement and the date of the closing under the underwriting agreement from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by "cold comfort" letters as Members' Counsel or the managing underwriter reasonably requests;

(ix)     furnish, at the request of any seller of Common Shares on the date such securities are delivered to the underwriters for sale pursuant to such registration or, if such securities are not being sold through underwriters, on the date the Registration Statement with respect to such securities becomes effective, an opinion, dated such date, of counsel representing the Company for the purposes of such registration, addressed to the underwriters, if any, and to the seller making such request, covering such legal matters with respect to the registration in respect of which such opinion is being given as the underwriters, if any, and such seller may reasonably request and are customarily included in such opinions;

(x)     comply with all applicable rules and regulations of the Commission, and make available to its security holders, as soon as reasonably practicable but no later than fifteen (15) months after the effective date of the Registration Statement, an earnings statement covering a period of twelve (12) months beginning after the effective date of the Registration Statement, in a manner which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(xi)     cause all such Common Shares to be listed on each securities exchange on which similar securities issued by the Company are then listed, provided that the applicable listing requirements are satisfied;

(xii)     keep Members' Counsel advised as to the initiation and progress of any registration under Section 11.1, Section 11.2 or Section 11.5 hereunder;

(xiii)     cooperate with each seller of Common Shares and each underwriter participating in the disposition of such Common Shares and their respective counsel in connection with any filings required to be made with the NASD; and

(xiv)     take all other steps reasonably necessary to effect the registration of the Common Shares contemplated hereby.

11.8     Seller Information.  The Company may require each seller of Common Shares as to which any registration is being effected to furnish, and such seller shall furnish, to the Company such information regarding the distribution of such securities as the Company may from time to time reasonably request in writing.

11.9     Notice to Discontinue.  Each Member agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 11.7(a)(v), such Member shall forthwith discontinue disposition of Common Shares pursuant to the Registration Statement covering such Common Shares until such Members' receipt of the copies of the supplemented or amended prospectus contemplated by Section 11.7(a)(v) and, if so directed by the Company, such Member shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Members' possession, of the prospectus covering such Common Shares which is current at the time of receipt of such notice. If the Company shall give any such notice, the Company shall extend the period during which such Registration Statement shall be maintained effective pursuant to this Agreement (including, without limitation, the period referred to in Section 11.7(a)(ii)) by the number of days during the

**Ex. 2 p. 41**

period from and including the date of the giving of such notice pursuant to Section 11.7(a)(v) to and including the date when sellers of such Common Shares under such Registration Statement shall have received the copies of the supplemented or amended prospectus contemplated by and meeting the requirements of Section 11.7(a)(v).

      11.10  <u>Registration Expenses</u>.  The Company shall pay all expenses arising from or incident to its performance of, or compliance with, this Agreement, including, without limitation, (i) Commission, stock exchange and NASD registration and filing fees, (ii) all fees and expenses incurred in complying with securities or "blue sky" laws (including reasonable fees, charges and disbursements of counsel to any underwriter incurred in connection with "blue sky" qualifications of the Common Shares as may be set forth in any underwriting agreement), (iii) all printing, messenger and delivery expenses, (iv) the fees, charges and expenses of counsel to the Company and of its independent public accountants and any other accounting fees, charges and expenses incurred by the Company (including, without limitation, any expenses arising from any "cold comfort" letters or any special audits incident to or required by any registration or qualification) and, in an amount not exceeding $50,000, the reasonable legal fees, charges and expenses of a single counsel to the Members incurred, in the case of a Demand Registration, an Incidental Registration or an S-3 Registration initiated by the Initiating Member, and (v) any liability insurance or other premiums for insurance obtained in connection with any Demand Registration or piggy-back registration thereon, Incidental Registration or S-3 Registration pursuant to the terms of this Agreement, regardless of whether such Registration Statement is declared effective. All of the expenses described in the preceding sentence of this Section 11.10 are referred to herein as "<u>Registration Expenses</u>." The holder of Common Shares sold pursuant to a Registration Statement shall bear the expense of any broker's commission or underwriter's discount or commission relating to registration and sale of such Members' Common Shares and, subject to clause (iv) above, shall bear the fees and expenses of their own counsel.

      11.11  <u>Indemnification; Contribution</u>.

      (a)    <u>Indemnification by the Company</u>.  The Company shall indemnify and hold harmless each Member, its partners, directors, officers, Affiliates and each Person who controls (within the meaning of Section 15 of the Securities Act) the Member from and against any and all losses, claims, damages, liabilities and expenses (including reasonable costs of investigation) (each, a "<u>Liability</u>" and collectively, "<u>Liabilities</u>"), arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, under the circumstances such statements were made), except insofar as such Liability arises out of or is based upon any untrue statement or alleged untrue statement or omission or alleged omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning any Member furnished in writing to the Company by such Member expressly for use therein, including, without limitation, the information furnished to the Company pursuant to Section 11.11(a). The Company shall also provide customary indemnities to any underwriters of the Common Shares, their officers, directors and employees and each

E-38

Person who controls such underwriters (within the meaning of Section 15 of the Securities Act) to the same extent as provided above with respect to the indemnification of the Members.

(b)      Indemnification by the Members.  In connection with any Registration Statement in which any Member is participating pursuant to Section 11.1, Section 11.1 or Section 11.5 hereof, each Member shall promptly furnish to the Company in writing such information with respect to such Member as the Company may reasonably request or as may be required by law for use in connection with any such Registration Statement or prospectus and all information required to be disclosed in order to make the information previously furnished to the Company by such Member not materially misleading or necessary to cause such Registration Statement not to omit a material fact with respect to such Member necessary in order to make the statements therein not misleading. Each Member agrees to indemnify and hold harmless the Company, its partners, directors, officers, Affiliates, any underwriter retained by the Company and each Person who controls the Company or such underwriter (within the meaning of Section 15 of the Securities Act) from and against any and all Liabilities arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, under the circumstances such statements were made), but if and only to the extent that such Liability arises out of or is based upon any untrue statement or alleged omission or alleged untrue statement or omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning such Member furnished in writing by such Member expressly for use therein, provided, however, that the total amount to be indemnified by each Member pursuant to this Section 11.11(b) shall be limited to such Members' pro rata portion of the net proceeds (after deducting the underwriters' discounts and commissions) received by such Member in the offering to which the Registration Statement or prospectus relates.

(c)      Conduct of Indemnification Proceedings.   Any Person entitled to indemnification under this Section 11.11 (the "Indemnified Party") agrees to give prompt written notice to the indemnifying party (the "Indemnifying Party") after the receipt by the Indemnified Party of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which the Indemnified Party intends to claim indemnification or contribution pursuant to this Agreement; provided, however, that the failure so to notify the Indemnifying Party shall not relieve the Indemnifying Party of any Liability that it may have to the Indemnified Party hereunder (except to the extent that the Indemnifying Party is prejudiced or otherwise forfeits substantive rights or defenses by reason of such failure). If notice of commencement of any such action is given to the Indemnifying Party as above provided, the Indemnifying Party shall be entitled to participate in and, to the extent it may wish, jointly with any other Indemnifying Party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and reasonably satisfactory to such Indemnified Party. The Indemnified Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be paid by the Indemnified Party unless (i) the Indemnifying Party agrees to pay the same, (ii) the Indemnifying Party fails to assume the defense of such action with counsel reasonably

E-39

satisfactory to the Indemnified Party or (iii) the named parties to any such action (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and the Indemnified Party has been advised by such counsel that either (x) representation of such Indemnified Party and the Indemnifying Party by the same counsel would be inappropriate under applicable standards of professional conduct or (y) there may be one or more legal defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party. In any of such cases, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all Indemnified Parties. No Indemnifying Party shall be liable for any settlement entered into without its written consent. No Indemnifying Party shall, without the consent of such Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Party is a party and indemnity has been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability for claims that are the subject matter of such proceeding.

(d)     Contribution.  If the indemnification provided for in this Section 11.11(d) from the Indemnifying Party is unavailable to an Indemnified Party hereunder in respect of any Liabilities referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions which resulted in such Liabilities, as well as any other relevant equitable considerations. The relative faults of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action.  The amount paid or payable by a party as a result of the Liabilities referred to above shall be deemed to include, subject to the limitations set forth in Sections 11.11(a), 11.11(b) and 11.11(c), any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding; provided, however, that the total amount to be contributed by any Member shall be limited to the net proceeds (after deducting the underwriters' discounts and commissions) received by the Member in the offering.

(e)     Fraud.  The parties hereto agree that it would not be just and equitable if contribution pursuant to Section 11.11(d) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

E-40

## ARTICLE XII
## DISSOLUTION OF COMPANY;
## LIQUIDATION AND DISTRIBUTION OF ASSETS

12.1     Events of Dissolution. This Section 12.1 sets forth the exclusive events which will cause the dissolution of the Company. The provisions of Section 18-801 of the Act that apply unless the limited liability company agreement otherwise provides shall not become operative. The Company shall be dissolved upon any of the following events (each, an "Event of Dissolution"):

(a)     The Board of Managers shall elect to dissolve the Company; or

(b)     the entry of a decree of judicial dissolution under Section 18-802 of the Act.

12.2     Liquidation; Winding Up.    Upon the occurrence of an Event of Dissolution, the Board of Managers shall wind up the affairs of the Company in accordance with the Act and shall supervise the liquidation of the assets and property of the Company and, except as hereinafter provided, shall have full, complete and absolute discretion in the mode, method, manner and timing of effecting such liquidation. The Board of Managers shall have absolute discretion in determining whether to sell or otherwise dispose of Company assets or to distribute the same in kind. The Board of Managers shall liquidate and wind up the affairs of the Company as follows:

(a)     The Board of Managers shall prepare (or cause to be prepared) a balance sheet of the Company in accordance with GAAP as of the date of dissolution.

(b)     The assets, properties and business of the Company shall be liquidated by the Board of Managers in an orderly and businesslike manner so as not to involve undue sacrifice. Notwithstanding the foregoing, if it is determined by the Board of Managers not to sell all or any portion of the properties and assets of the Company, such properties and assets shall be distributed in kind in the order of priority set forth in subsection (d); provided, however, that the fair market value of such properties and assets (as determined by the Board of Managers in good faith, which determination shall be binding and conclusive) shall be used in determining the extent and amount of a distribution in kind of such properties and assets in lieu of actual cash proceeds of any sale or other disposition thereof.

(c)     The proceeds of the sale of all or substantially all of the properties and assets of the Company and all other properties and assets of the Company not sold, as provided in subsection (b) above, and valued at the fair market value thereof as provided in such subsection (b), shall be applied and distributed in one or more installments as follows, and in the following order of priority:

First, to the payment of all debts and liabilities of the Company and the expenses of liquidation not otherwise adequately provided for and the setting up of any reserves that are reasonably necessary for any contingent, conditional or unmatured liabilities or obligations of the Company or of the Members arising out of, or in connection with, the Company; and

<u>Second</u>, the remaining proceeds to the Members in accordance with the applicable provisions of <u>Section 3.4</u>.

(d)  A certificate of cancellation, as required by the Act, shall be filed by the Board of Managers.

12.3  <u>Survival of Rights, Duties and Obligations</u>. Termination, dissolution, liquidation or winding up of the Company for any reason shall not release any party from liability which at the time of such termination, dissolution, liquidation or winding up already had accrued to any other party or which thereafter may accrue with respect to any act or omission prior to such termination, dissolution, liquidation or winding up.

12.4  <u>Claims of the Members</u>.  Members and former Members shall look solely to the Company's assets for the return of their contributions to the Company, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such contributions, the Members and former Members shall have no recourse against the Company or any other Member.

## ARTICLE XIII
## MISCELLANEOUS

13.1  <u>Expenses</u>.  The Company shall bear all of the expenses incurred by the Company in connection with the preparation, execution and performance of this Agreement and, the transactions contemplated hereby, including, without limitation, all fees and expenses of agents, counsel and accountants.

13.2  <u>Further Assurances</u>.  Each party to this Agreement agrees to execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and to do all such other acts and things, as may be required by law or as, in the opinion of the Board of Managers, may be necessary or advisable to carry out the intent and purposes of this Agreement.

13.3  <u>Notices</u>.  Any notice or other communication required or permitted to be given hereunder shall be in writing, and shall be deemed given and received (a) when transmitted by facsimile or electronic mail or personally delivered on a business day during normal business hours, (b) on the business day following the date of dispatch by overnight courier or (c) on the third business day following the date of mailing by registered or certified mail, return receipt requested, in each case addressed to the Company or the Board of Managers at the address of the principal office of the Company set forth in <u>Section 2.5</u>, or to a Member at such Members' address shown on <u>Schedule 3.1</u>, or in any such case to such other address as the Company or any party hereto shall have last designated to the Company and the Members by notice given in accordance with this <u>Section 13.3</u>.  No notices under <u>Section 10.3</u>, <u>10.4</u>, <u>10.5</u> or <u>10.9</u> may be given by mail pursuant to clause (c) above.

13.4  <u>Amendments</u>.  Except as otherwise expressly provided herein, this Agreement and the Certificate of Formation may only be modified, amended or restated, and provisions hereof may be waived, by an instrument in writing duly executed and delivered by Members holding at least a majority of the then outstanding Common Shares; <u>provided</u>,

E-42

however, that (a) Sections 3.2, 6.3, 6.4, 6.10, 7.11, 8.5, 9.1(c)-(e) and (h), 10.3, 10.4, 10.5, 10.9, 10.1(b), 11.1, 11.2 and 13.4(a) may not be amended, modified, restated or waived without the consent of a majority in interest of the Fortress Members, (b) any amendment, modification or waiver that would adversely affect in any respect the rights or obligations of any Member without similarly affecting the rights or obligations hereunder of all holders of the same class of Shares, shall not be effective as to such Member without such Member's prior written consent, unless such amendment, modification or waiver has been approved by Members holding (i) [if the transactions described in Section 3.1(a) were consummated as part of an out-of-court restructuring, 90% of the then outstanding Common Shares], or (ii) [if the transactions described in Section 3.1(a) were consummated as part of an in-court restructuring, 95% of the then outstanding Common Shares, as applicable, in which case no additional consent shall be required]; and (c) the Company shall automatically amend Schedule 3.1 hereto without the consent of the Members and distribute such amended Schedule 3.1 to each of the Members upon any change in any Member's information thereon.   Any waiver of any provision of this Agreement requested by any party hereto must be in writing by the party granting such waiver.

13.5   Severability.   Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the Act or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

13.6   Headings and Captions.   All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement. The Annexes are considered a part of this Agreement.

13.7   Counterparts.   This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same agreement.   Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

13.8   GOVERNING LAW.   THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

13.9   Entire Agreement; Non-Waiver.   This Agreement supersedes all prior agreements between the parties with respect to the subject matter hereof and contains the entire agreement between the parties with respect to such subject matter.   No delay on the part of any party in exercising any right hereunder shall operate as a waiver thereof, nor shall any waiver, express or implied, by any party of any right hereunder or of any failure to perform or breach hereof by any other party constitute or be deemed a waiver of any other right hereunder or of any

Ex. 2 p. 47

other failure to perform or breach hereof by the same or any other Member, whether of a similar or dissimilar nature.

13.10 <u>No Third Party Beneficiaries</u>. Nothing contained in this Agreement (other than the provisions of <u>Article VIII</u> hereof), express or implied, is intended to or shall confer upon anyone other than the parties (and their successors and permitted assigns) and the Company any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

13.11 <u>No Right to Partition</u>. The Members, on behalf of themselves and their successors and assigns, if any, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Company or any asset of the Company, or any Share which is considered to be Company property, regardless of the manner in which title to such property may be held.

13.12 <u>Investment Representation and Indemnity</u>. Each Member, by execution of this Agreement, (a) represents to each other Member and to the Company that such Member is acquiring a Share in the Company for the purpose of investment for such Members' own account, with the intent of holding such Share for investment and without the intent of participating directly or indirectly in any sale or distribution thereof in a manner that would violate the Securities Act, (b) acknowledges that such Member must bear the economic risk of loss of such Members' capital contributions to the Company because this Agreement contains substantial restrictions on Transfer and because the Shares in the Company have not been registered under applicable United States federal and state securities laws (it being understood that the Company shall be under no obligation so to register such Shares in the Company) and cannot be Transferred unless registered under such securities laws or an exemption therefrom is available, and (c) agrees to indemnify each other Member and the Company from any loss, damage, liability, claims and expenses (including reasonable attorneys' fees and expenses) incurred, suffered or sustained by any of them as a result of the inaccuracy of any representation contained in this <u>Section 13.12</u>.

13.13 <u>Confidentiality</u>.

(a) Except as and to the extent as may be required by applicable law, without the prior written consent of the Board of Managers, the Members shall not make, and shall direct its officers, directors, agents, employees and other representatives not to make, directly or indirectly, any public comment, statement, or communication with respect to, or otherwise disclose or permit the disclosure of Confidential Information or any of the terms, conditions, or other aspects of this Agreement; <u>provided</u>, <u>however</u>, that the Members and their respective equity owners may disclose Confidential Information (i) to the extent required under any agreement between the Members or their respective equity owners and their respective investors, limited partners or other similar Persons of the Members and their respective equity owners, as applicable who are subject to obligations of confidentiality and in confidential materials delivered to prospective investors, limited partners or other similar Persons of the Members and their respective equity owners, as applicable who are subject to obligations of confidentiality; <u>provided</u>, <u>however</u>, that the Members will use commercially reasonable best efforts to, or cause their respective equity owners, to, enforce their respective rights in connection with a breach of

such confidentiality obligations by any Person receiving Confidential Information pursuant to this clause (i), and (ii) to a bona fide potential purchaser of Shares held by such Member if such bona fide potential purchaser executes a confidentiality agreement with such Member containing terms at least as protective as the terms set forth in this Section 13.13 and which, among other things, provides for third-party beneficiary rights in favor of the Company to enforce the terms thereof.  As used herein, "Confidential Information" means all information, knowledge, systems or data relating to the business, operations, finances, policies, strategies, intentions or inventions of the Company (including any of the terms of this Agreement and any information provided pursuant to Article IX) from whatever source obtained, except for any such information, knowledge, systems or data which at the time of disclosure was in the public domain or otherwise in the possession of the disclosing Person unless such information, knowledge, systems or data was placed into the public domain or became known to such disclosing Person in violation of any non-disclosure obligation, including this Section 13.13.  Each Member agrees that money damages would not be a sufficient remedy for any breach of this Section 13.13 by a Member, and that in addition to all other remedies, the Company shall be entitled to injunctive or other equitable relief as a remedy for any such breach.  Each Member agrees not to oppose the granting of such relief and agrees to waive any requirement for the securing or posting of any bond in connection with such remedy.

(b)     If any Member is required by applicable law to disclose any Confidential Information, it must first provide notice reasonably in advance to the Company with respect to the content of the proposed disclosure, the reasons that such disclosure is required by law and the time and place that the disclosure will be made.  Such Member shall cooperate with the Company to obtain confidentiality agreements or arrangements with respect to any legally mandated disclosure and in any event shall disclose only such information as is required by applicable law when required to do so.

(c)     Each Member shall indemnify each other Member and the Company for any loss, damage, liability, claims and expenses (including reasonable attorneys' fees and expenses) incurred, suffered or sustained by any of them as a result of any breach by such Member of this Section 13.13.

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the date first above written.

MEMBERS:

[_____]


By: _____
     Name:
     Title:

**Schedule 3.1A**
**(dated _____ __, 2011)**

| | Addresses | Capital Contribution | Common Shares | Common Share Percentage |
|---|---|---|---|---|
| [  ] | [  ] | $[  ] | [  ] | [  ]% |
| [  ] | [  ] | $[  ] | [  ] | [  ]% |
| Total | | $[  ] | 0.00 | 0.00% |