December 23, 2011

To the Holders of Lender Claims
Referred to Below

Ladies and Gentlemen:

      This letter agreement (this "**Agreement**") sets forth certain terms and conditions pursuant to which QCE Finance LLC ("**QCE Finance**") and all of its direct and indirect subsidiaries, (collectively, the "**Company**") will propose a restructuring (the "**Restructuring**") of the Company's outstanding obligations under the First Lien Facility and the Second Lien Facility (each as defined below), to be effectuated either (a) in an out-of-court transaction pursuant to the offering memorandum and consent solicitation statement relating to the  First Lien Facility and Second Lien Facility or (b) pursuant to a joint "pre-packaged" chapter 11 plan of reorganization, in each case with the support of the undersigned persons signatory hereto (collectively, the "**Participating Lenders**" and, each Lender under the First Lien Facility, and each Lender under the Second Lien Facility generally referred to as a "**Lender**") party to (a) that certain Credit Agreement, dated as of May 5, 2006, by and among QCE Finance, QCE LLC, as Borrower, the Lenders party thereto, Goldman Sachs Credit Partners L.P., as Administrative Agent (the "**First Lien Agent**"), Deutsche Bank Securities Inc., as Syndication Agent, Credit Suisse Securities (USA) LLC, Wachovia Bank, N.A. and BNP Paribas Securities Corp., as Co-Documentation Agents, and Goldman Sachs Credit Partners L.P. and Deutsche Bank Securities Inc., as Joint Lead Arrangers and as Joint Bookrunners (the "**First Lien Credit Agreement**" and, together with related documents, as amended, modified or supplemented through the date hereof, the "**First Lien Facility**"), and/or (b) that certain Credit Agreement dated as of May 5, 2006, by and among QCE Finance, QCE LLC, as Borrower, the Lenders party thereto, Deutsche Bank Trust Company Americas, as Administrative Agent (the "**Second Lien Agent**" and together with the First Lien Agent, the "**Agents**"), Goldman Sachs Credit Partners L.P., as Syndication Agent, Credit Suisse Securities (USA) LLC and BNP Paribas Securities Corp., as Co-Documentation Agents, and Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as Joint Lead Arrangers and as Joint Bookrunners (the "**Second Lien Credit Agreement**" and, together with related documents, as amended, modified, or supplemented through the date hereof, the "**Second Lien Facility**" and, together with the First Lien Facility, the "**Credit Agreements**"). QCE Holding LLC ("**QCE Holding**") is the ultimate parent entity of the Company and QCE Incentive LLC ("**QCE Incentive**") is a subsidiary of QCE Holding and the parent entity of the Company. The existing members of QCE Holding (the "**Existing Members**") are set forth on the signature pages hereto. QCE Holding, QCE Incentive, the Existing Members, and the Company are collectively referred to as the "**Company Parties**". The Company Parties, each Participating Lender and each person that becomes a party hereto in accordance with the terms hereof are collectively referred to as the "**Parties**" and individually as a "**Party**."

      For purposes of this Agreement, the term "**Requisite Participating Lenders**" shall be defined as each of Avenue Capital Group and its affiliates ("**Avenue**") and Fortress Investment Group, LLC and its affiliates ("**Fortress**"), so long as they shall collectively hold not less than (a) 25% of the First Lien Facility and (b) 66⅔% of the Second Lien Facility and, thereafter, Participating Lenders which collectively hold at least such percentages of the First Lien Facility and Second Lien Facility, respectively, and the term "**Approving Lenders**" shall be defined as each of Avenue, Fortress, Caspian

Doc#: US1:7670046v4

Capital LP and its affiliates ("**Caspian**") and Oaktree Capital Management, L.P. and its affiliates ("**Oaktree**"), provided, that such term shall include Caspian and Oaktree so long as they shall collectively with Avenue and Fortress hold not less than 51% of the First Lien Facility.

The Parties hereto hereby agree as follows:

1.      Proposed Restructuring.  The principal terms of the Restructuring are set forth in the term sheet attached hereto as Exhibit A (which term sheet is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein, the "**Term Sheet**").

(a)      The Company intends to implement the Restructuring on a consensual basis in an out-of-court transaction, which will, consistent with the Term Sheet, provide for, among other things, modification or satisfaction of the claims of the Lenders under the First Lien Facility and Second Lien Facility (collectively, the "**Lender Claims**").  The out-of-court Restructuring will be implemented through:

(i)      an exchange offer of the outstanding indebtedness under the Second Lien Facility for 100% of the equity interests of QCE Finance, with such equity interests of QCE Finance being simultaneously assigned by the Lenders under the Second Lien Facility to QCE Parent LLC, a new entity formed by Avenue, to facilitate the Restructuring ("**QCE Parent**") in exchange for 40% of the new common equity securities to be issued by QCE Parent (the "**Second Lien Exchange Offer**"),[1] before accounting for potential dilution from equity to be issued in connection with the Management Incentive Plan (as defined in the Term Sheet).  Promptly after the Closing, the Company will merge with and into QCE Parent with QCE Parent being the surviving entity in the merger.  QCE Parent will change its name to QCE Finance LLC in connection with the merger.  As a condition to the closing of the Restructuring through the Qualified Out-of-Court Transaction (as defined below), holders of no less than 100% of the Second Lien Debt must accept the terms of the Second Lien Exchange Offer;[2]

(ii)      a private placement offering of $150 million of new common equity securities to Avenue equal to 60% of the new common equity securities of QCE

---

[1]   If the filing of the Pre-Packaged Chapter 11 Plan (as defined herein) is necessary, the holders of the Second Lien Facility will receive their pro rata share of 25% of the new common equity securities to be issued by QCE Finance, before accounting for potential dilution from equity to be issued in connection with the Management Incentive Plan.

[2]   This exchange is the first step of a three-step process.  In Step 1, the Second Lien Lenders would exchange their debt for 100% of the membership interest in QCE Finance (which will be treated for tax purposes as a foreclosure on the assets of QCE Finance in exchange for 100% of the Second Lien Facility).  In Step 2, the equity interests in QCE Finance are assigned and to be issued to QCE Parent (and not to the Second Lien Lenders) with the Second Lien Lenders being issued 100% of the equity interests in QCE Parent.  In Step 3 (described in section 1(a)(ii)), Avenue will be issued new equity interests in QCE Parent in exchange for $150 million, which will dilute the Second Lien Lenders to 40% of outstanding QCE Parent equity interests (subject to further dilution for the Management Incentive Plan).  All three steps are pursuant to a single plan and will occur immediately after the preceding step.

Doc#: US1:7670046v4

Parent (the "**Private Placement Transaction**"),[3] before accounting for potential dilution from equity to be issued in connection with the Management Incentive Plan.  Avenue shall cause Parent to immediately contribute the proceeds received from the Private Placement to the Company.  The new equity investment shall be used by the Company for (a) the repayment of $75 million of outstanding indebtedness under the First Lien Facility, (b) payment of all accrued but unpaid interest under the First Lien Facility, (c) payment of fees and expenses in connection with the Restructuring, and (d) working capital and other general corporate purposes.  Avenue shall be entitled to a $10 million cash commitment fee, which shall be earned upon execution of the Subscription Agreement (as defined in Section 1(b) below), and which shall be paid on the Closing Date (as defined in Section 1(c)(i) below);

        (iii)      an exchange offer of at least $150 million of outstanding indebtedness under the First Lien Facility (as adjusted to take into account the total cash paydown of $75 million on a pro rata paydown basis of the outstanding indebtedness under the First Lien Facility, as contemplated by the Term Sheet in an out-of-court Restructuring) into a new second lien facility substantially in the form attached as Exhibit C, (the "**New Second Lien Facility**"), at par with an approximately five year and three month term (the "First Lien Exchange Offer" and, together with the Second Lien Exchange Offer, the "**Exchange Offers**").[4]  Certain holders of the First Lien Facility indebtedness, Avenue, Fortress, and, to the extent they are a party hereto, Goldman Sachs Credit Partners, L.P. (the "**Exchanging Participating Lenders**") agree, and each shall use commercially reasonable efforts to cause affiliates to agree,[5] to exchange the amount of First Lien Facility indebtedness owned by them (as adjusted to take into account the total cash paydown of $75 million) and set forth on the signature pages hereto (which amount shall be in the aggregate at least $150 million) for their pro rata portion of the New Second Lien Facility.  To the extent that other First Lien Lenders elect to exchange their First Lien Facility indebtedness for their pro rata portion of the New Second Lien Facility ("Electing First Lien Lenders" and, together with the Exchanging Participating Lenders, the "**Exchanging Lenders**"), such that the New Second Lien Facility would otherwise exceed $200 million (as adjusted to take into account the cash paydown contemplated hereby, but excluding any indebtedness issued as the Exchange Fee (as defined below)), the Exchanging Lenders shall be cut back on a pro rata basis, based upon the relative amounts elected to be exchanged.  All Exchanging Lenders that exchange their First Lien Facility indebtedness for the New Second Lien Facility shall receive their pro rata portion of a 500 bps exchange fee (the "**Exchange Fee**"), payable in additional New Second Lien Facility indebtedness.  The Exchange Fee will be calculated

---

[3]    If the filing of the Pre-Packaged Chapter 11 Plan (as defined herein) is necessary, the Private Placement Transaction of $150 million of new common equity securities to Avenue will equal 75% of the new common equity securities of QCE Finance, before accounting for potential dilution from equity to be issued in connection with the Management Incentive Plan.

[4]    If filing of the Pre-Packaged Chapter 11 Plan (as defined herein) is necessary, the exchange offer of at least $150 million of outstanding indebtedness under the First Lien Facility would be adjusted to take into account the total cash paydown of $65 million on a pro rata paydown basis of the outstanding indebtedness under the First Lien Facility.

[5]    Fortress entities that cannot be directed to be carved out.

Doc#: US1:7670046v4

as a percentage of the outstanding principal amount of New Second Lien Facility indebtedness excluding any indebtedness to be issued as the Exchange Fee;

      (iv)    an amendment to the First Lien Facility, which amendment shall, among other things, include an extension of the maturity date of the First Lien Facility, substantially in the form attached as Exhibit D (the "**First Lien Facility Amendment**"). The aggregate principal amount outstanding under the First Lien Facility following the exchange offer and partial repayment contemplated by the Restructuring shall not exceed $455 million (before taking into account the new first lien letter of credit facility) (the "**Amended First Lien Facility**") including the aggregate principal amount of Amended First Lien Facility indebtedness to be issued as the PIK Consent Fee (as defined below)). All consenting First Lien Lenders shall be entitled to receive their pro rata portion of a 50 bps cash consent fee (the "**Cash Consent Fee**") on the new outstanding Amended First Lien Facility indebtedness and 350 bps on the new outstanding Amended First Lien Facility indebtedness, payable in Amended First Lien Facility indebtedness (the "**PIK Consent Fee**"). Both the Cash Consent Fee and the PIK Consent Fee shall be calculated as a percentage of the new outstanding principal amount of Amended First Lien Facility indebtedness excluding any indebtedness to be issued as the PIK Consent Fee. As a condition to the closing of the Restructuring through the Qualified Out-of-Court Transaction (as defined below), holders of no less than 100% of the indebtedness under the First Lien Facility must accept the terms of the amendment. The Company and Holders of First Lien Debt and the Holders of the New Second Lien Debt will enter into an amended and restated intercreditor agreement which shall be substantially in the form attached as Exhibit E (the "**Amended Intercreditor Agreement**");

      (v)    the Marketing Fund Trust Credit Facility shall remain outstanding with an extension of the maturity date pursuant to the terms set forth in that certain Commitment Letter dated as of December 15, 2011 among Vectra Bank Colorado, QAFT, Inc. as Trustee for the Regional Advertising Program Trust, QAFT, Inc., as Trustee for the National Marketing Fund Trust and QCE LLC (as amended, supplemented, or modified from time to time, the "**Vectra Commitment Letter**");

      (vi)    upon effectiveness of the Restructuring, all claims, liens, guarantees, and rights of the holders of indebtedness arising under or in connection with the First Lien Facility and the Second Lien Facility and the Company Parties shall automatically be waived, released, modified pursuant to or cancelled in exchange for (x) in the case of holders of indebtedness arising under or in connection with the First Lien Facility, payment of all accrued but unpaid interest as provided in the First Lien Facility and $75 million of the aggregate principal amount outstanding under the First Lien Facility and (I) to the extent such holders are Exchanging Lenders, the rights under the New Second Lien Facility and, if applicable, the Amended First Lien Facility, and (II) to the extent such holders are not Exchanging Lenders, the rights under the Amended First Lien Facility, provided, that, the claims, liens, guarantees and rights arising under the First Lien Facility shall extend to the Amended First Lien Facility in accordance with the terms thereof; (y) in the case of holders of indebtedness arising under or in connection with the Second Lien Facility, their applicable share of 40% of the post-restructuring common equity of the Company, before accounting for potential dilution from shares issued in connection with the Management Incentive Plan; and (z) in the case of the Company Parties, the releases and additional consideration contemplated in the Term Sheet; and

Doc#: US1:7670046v4

(vii)    such other transactions related to the Restructuring as set forth in the Term Sheet.

(b)    Such consensual modifications and satisfactions will be implemented pursuant to various agreements and related documentation, including, but not limited to, (a) an offering memorandum and consent solicitation for the First Lien Exchange Offer, (b) an offering memorandum for the Second Lien Exchange Offer, (c) the First Lien Facility Amendment, (d) the New Second Lien Facility, (e) a subscription agreement evidencing the Private Placement Transaction attached hereto as Exhibit F (the "**Subscription Agreement**"), which shall be consistent in all respects with this Agreement (f) such other definitive documentation (including, without limitation, various releases of liens and guarantees and mutual releases of claims for the Parties, Agents, Lenders, the Company Parties and related persons and entities, other than with respect to the Amended First Lien Facility) as is necessary to consummate the Restructuring, all on substantially the same economic terms and otherwise in all material respects on the terms set forth in the Term Sheet, and (g) any required organizational documents for QCE Parent and for QCE Finance and its subsidiaries (subsections (a)-(g), collectively, the "**Transaction Documents**"). Each of the Transaction Documents, other than the Subscription Agreement, which shall be in the form attached and as to which any changes shall be subject to the approval of the Company and the Approving Lenders, shall be in form and substance acceptable to the Company and the Requisite Participating Lenders, and, in addition, the First Lien Facility Amendment, the New Second Lien Facility, the Amended Intercreditor Agreement and the DIP Documents (being the DIP Facility, the DIP Motion and the DIP Order) (the "**Lender Transaction Documents**"), other than the First Lien Facility Amendment, the New Second Lien Facility, and the Amended Intercreditor Agreement, which shall be in the form attached and as to which any changes shall be subject to the approval of the Approving Lenders, shall be in form and substance acceptable to the Company and the Approving Lenders (the Transaction Documents in the foregoing forms or with the foregoing required approvals are collectively referred to herein as the "**Approved Transaction Documents**" and the Restructuring contemplated by the Approved Transaction Documents is referred to herein as the "**Qualified Out-of- Court Transaction**"); provided, that, any Transaction Documents attached hereto shall be deemed to be Approved Transaction Documents in the form so attached.

(c)    The obligations of the Company and the Participating Lenders to consummate the Qualified Out-of-Court Transaction are conditioned upon the following to occur:

(i)    on or before the scheduled closing date of the Qualified Out-of-Court Transaction to be set forth in the Approved Transaction Documents (the "Closing Date"), the Company shall have disclosed, by press release or by other public disclosure any then material nonpublic information theretofore disclosed by the Company or its representatives to the Lenders who had agreed to receive private information from the Company;

(ii)    the Private Placement Transaction will close with consummation of the Exchange Offers in the order set forth in Section 1(a);

(iii)    each of the Approved Transaction Documents, which by their terms are to be effective at or prior to consummation of the Exchange Offers, shall be in full force and effect;

(iv)    by the Closing Date, 100% of the lenders under the Second Lien Facility shall have (a) agreed to the Second Lien Exchange Offer and validly and timely

tendered, and delivered the requisite tender (when solicited to do so and by the applicable deadline for doing so) of such Lender Claims in the Second Lien Exchange Offer and (b) not changed, revoked or withdrawn such agreement, or tender;

(v)     by the Closing Date, 100% of the lenders under the First Lien Facility shall have (a) consented to the First Lien Facility Amendment and validly and timely tendered, and delivered the requisite consent (when solicited to do so and by the applicable deadline for doing so) and (b) not changed, revoked or withdrawn such consent, or tender;

(vi)     upon the earlier of the Closing Date or filing of the Chapter 11 Cases (as defined below), the current obligations and rights arising from the employment agreement with Richard E. Schaden dated May 5, 2006 (as amended, the "**Schaden Employment Agreement**") will be cancelled, *including, without limitation*, obligations for unpaid severance payments under Section 7.5 (Severance Payments) and any obligations or rights arising under Section 8 (Noncompetition and Nonsolicitation), at no cost or expense to the Company; and

(vii)     on December 31, 2011, the management agreement between The Cervantes Holding Company and TQSC II LLC dated January 1, 2009 (as amended, the "**Management Agreement**") shall be cancelled at no cost or expense to the Company, except as may have been actually incurred in connection with the services provided under the Management Agreement prior to such cancellation and termination. For the avoidance of doubt there will be no damages paid under the Management Agreement in connection with the termination thereof.

(d)     If, within five (5) business days following the Solicitation Termination Date (as defined in Section 5(e)(ii) below), unless extended by the Company and the Requisite Participating Lenders in writing, all the conditions to the Qualified Out-of-Court Transaction as set forth in the Approved Transaction Documents, have not been satisfied to allow the Restructuring to take place outside of a bankruptcy proceeding, the Company will effectuate the Restructuring by commencing voluntary "pre-packaged" cases (the "**Chapter 11 Cases**") under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). As part of the Chapter 11 Cases, the Company intends to file the Company's plan of reorganization, substantially in the form of Exhibit G, (the "**Plan**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), the Plan and the plan-related documents (the "**Plan Related Documents**"), which shall include, but not be limited to, (a) a disclosure statement (the "**Disclosure Statement**"), (b) the materials related to the solicitation of votes for the Plan pursuant to sections 1125, 1126 and 1145 of the Bankruptcy Code (the "**Solicitation**"), (c) any other documents or agreements required in connection with the Plan and Disclosure Statement or the Chapter 11 Cases, including, but not limited to, (1) a proposed confirmation order (the "**Confirmation Order**"), (2) any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement, (3) the Subscription Agreement, (4) definitive documentation relating to the debtor-in-possession financing, all on the same economic terms and otherwise in all material respects on the terms set forth in the DIP financing term sheet (the "**DIP Financing Term Sheet**") attached hereto as Exhibit H (the "**DIP Facility**"), (5) such other definitive documentation relating to a recapitalization of the Company (including, without limitation, various releases of liens and guarantees) as is necessary to consummate the Restructuring, all on the same economic terms and otherwise in all material respects on the terms set forth in the Term

Sheet, (6) any motion (the "**DIP Motion**") and proposed order (the "**DIP Order**") relating to the DIP Facility and/or use of cash collateral, (7) any required organizational documents for the reorganized Company and its subsidiaries, (8) a motion to approve the Subscription Agreement and the fees thereunder (the "**Approval Motion**") and (9) motion to reject the headquarters lease of the Company or assume such lease on modified terms no less favorable to the Company and as otherwise agreed to among the landlord and the Company and acceptable to Avenue. Each of the Plan Related Documents shall, (i) to the extent applicable, be consistent with the applicable form attached hereto or with the Approved Plan (defined below), as the case might be, or (ii) if no applicable form exists, be in form and substance acceptable to the Company and the Requisite Participating Lenders, except that the Plan, the Confirmation Order and the Lender Transaction Documents (together, the "**Lender Approved Documents**") shall be consistent in all respects with this Agreement, and shall, with respect to the treatment of the Participating Lenders be in form and substance acceptable to the Company and each of the Participating Lenders and shall otherwise be in form and substance reasonably acceptable to the Company, the Requisite Participating Lenders and, as to the Lender Approved Documents acceptable to the Approving Lenders (each of the Plan Related Documents in the foregoing forms or with the foregoing required approvals are collectively referred to herein as the "**Approved Plan Documents**" and the Restructuring contemplated by the Approved Plan Documents is referred to herein as the "**Approved Plan**"). For further clarity, notwithstanding anything to the contrary in this Agreement, each of the documents attached to this Agreement as exhibits are in form and substance acceptable to the Company and each of the Requisite Participating Lenders, the Approving Lenders or the Participating Lenders, as applicable.

(e)  Notwithstanding anything herein to the contrary, if, at any time before the Solicitation Termination Date, the Company determines (i) that the Qualified Out-of-Court Transaction will not be successfully consummated or (ii) to pursue the Chapter 11 Cases in lieu of a Qualified Out-of-Court Transaction, the Company may, subject to the consent of Avenue and Fortress, commence voluntary pre-packaged cases (the "**Pre-Packaged Cases**") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Commensurate with the filing of the Pre-Packaged Cases, the Company shall file (a) the Approved Plan Documents, (b) the Solicitation documents, and (c) any other materials required to be filed in connection with the Approved Plan or the Disclosure Statement including, but not limited to, a proposed confirmation order. The Pre-Packaged Cases shall proceed along the timeline proscribed by applicable law.

2.  Representations of the Parties.

Each Party hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(a)  It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)  The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse

C-7

**Ex. 3 p. 7**

of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, except, in each case, for (A) matters as to which waivers or consents have been previously obtained or (B) matters relating to the First Lien Facility or the Second Lien Facility that will be resolved as part of the Restructuring.

(c)     This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(d)     The execution, delivery and performance by it of this Agreement does not and shall not require any material registration or material filing with, material consent or material approval of, or material notice to, or other material action to, with or by, any federal, state or other governmental authority or regulatory body.

(e)     If such Party is a Participating Lender, such Participating Lender (i) either (A) is the sole legal and beneficial owner of the Lender Claims set forth below its name on the signature page hereof, free and clear of all claims, liens and encumbrances, or (B) has investment and voting discretion with respect to such Lender Claims in respect to matters relating to the Restructuring contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such Lender Claims to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Lender Claims in respect to matters relating to the Restructuring contemplated by this Agreement and dispose of, exchange, assign and transfer such Lender Claims (with respect to a Participating Lender, all of such Lender Claims under clauses (A) and (B) and any additional such Lender Claims it owns or has such control over from time to time, collectively, its "**Participating Lender Claims**"). For the purposes of this Agreement, "**Participating Lenders**" shall not include (A) a holder of Lender Claims signatory hereto in its capacity or to the extent of its holdings as a broker or dealer of Lender Claims or any other claim against or security in the Company or (B) any subsidiary or affiliate of a holder of Lender Claims signatory hereto (x) over which the holder of Lender Claims does not have corporate authority or control or (y) whose credit decisions, including credit decisions to be bound by agreements such as this Agreement, under the internal policies or rules of such subsidiary or holder, are not subject to control by such holder. Further, such Participating Lender has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in such Lender Claims that are subject to this Agreement, the terms of which agreement are, as of the date hereof, inconsistent with the representations and warranties of such Participating Lender herein or would render such Participating Lender otherwise unable to comply with this Agreement and perform its obligations hereunder.

(f)     If such party is a Participating Lender, such Participating Lender (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended).

Doc#: US1:7670046v4

3.      Agreements of the Participating Lenders

(a)      Subject to the terms and conditions hereof and except as the Company may expressly release the Participating Lenders in writing from any of the following obligations, each Participating Lender:

(i)      hereby agrees (A) to any Qualified Out-of-Court Transaction (including, in the case of Avenue, to complete the Private Placement Transaction, subject to the terms and conditions of the Subscription Agreement) and to validly and timely tender (including by any early tender deadline set forth in any Approved Transaction Documents) and not withdraw its Participating Lender Claims in the Exchange Offers, (B) to the terms of the DIP Credit Agreement, including the priming liens to be granted to the lenders thereunder to secure the obligations under the DIP Facility, (C) to deliver and not withdraw the requisite consents and vote (when solicited to do so and by the applicable deadline for doing so) such Participating Lender Claims in favor of the Approved Plan, (D) to deliver and not withdraw the requisite consents and vote (when solicited to do so and by the applicable deadline for doing so) of such Participating Lender Claims under the First Lien Facility in favor of the First Lien Facility Amendment, and (E) to not change or withdraw such tender, agreement or vote (or cause or direct such tender, agreement or vote to be changed or withdrawn), provided that such tender, agreement and vote may be revoked, terminated or withdrawn immediately upon the occurrence of a Support Termination Event (as defined in Section 5 below);

(ii)      shall not object to, or vote any of such Lender Claims to reject or impede a Qualified Out-of-Court Transaction or Approved Plan, support directly or indirectly any such objection or impediment or otherwise take any action or commence any proceeding to oppose or to seek any modification of a Qualified Out-of-Court Transaction or Approved Plan, to the extent applicable, or any Approved Transaction Documents or Approved Plan Documents, as applicable, prepared in connection with consummation of a Qualified Out-of-Court Transaction or an Approved Plan;

(iii)      hereby agrees to provide draft copies of the Transaction Documents and the Plan Related Documents that it may prepare or cause the preparation thereof to Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**") and, with respect to any financing documents, to Vinson & Elkins L.L.P. ("**V&E**") in addition to Paul Weiss, in each case, within a reasonable amount of time prior to the launch of the Exchange Offers, the proposed execution date for such documents or the filing of an Approved Plan, as applicable;

(iv)      hereby agrees (A) to use commercially reasonable efforts to (1) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Approved Transaction Documents or Approved Plan Documents, as applicable, and (2) take any and all necessary and appropriate actions in furtherance of the Restructuring, the Approved Transaction Documents and the Approved Plan Documents, as applicable, and (B) to not take any actions inconsistent with this Agreement, the Approved Transaction Documents or the Approved Plan Documents; and

Ex. 3 p. 9

(v)      shall not, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to, or enter into any agreements relating to (i) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of the Company, other than a Qualified Out-of-Court Transaction or Approved Plan or (ii) any other action that is inconsistent with, or that would delay or obstruct a Qualified Out-of-Court Transaction or Approved Plan, nor shall the Participating Lenders solicit or direct any person or entity to undertake any of the foregoing.

The Parties agree that this Agreement does not constitute a commitment to, nor shall it obligate any of the Parties to, provide any new financing or credit support, other than, as set forth herein and solely with respect to Avenue, the Private Placement Transaction, subject to the terms and conditions of the Subscription Agreement.

(b)      Each Participating Lender expressly consents to execution by the Company of this Agreement and agrees that, as long as this Agreement has not terminated in accordance with its terms, (i) to the extent of its Participating Lender Claims under the First Lien Facility, it shall not (a) direct the First Lien Agent to pursue any right, remedy or claim under the First Lien Facility (including, without limitation, the acceleration of any obligation owing in respect of the First Lien Facility) against the Company or the guarantors thereunder or its or their respective property or interests in property or (b) initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the obligations under the First Lien Facility and First Lien Debt other than to enforce this Agreement; provided, however, that no Participating Lender shall be required to provide any indemnity to the First Lien Agent in connection therewith; and (ii) to the extent of its Participating Lender Claims under the Second Lien Facility, it shall not (a) direct the Second Lien Agent to pursue any right, remedy or claim under the Second Lien Facility (including, without limitation, the acceleration of any obligation owing in respect of the Second Lien Facility) against the Company or the guarantors thereunder or its or their respective property or interests in property or (b) initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the obligations under the Second Lien Facility and Second Lien Debt other than to enforce this Agreement; provided, however, that no Participating Lender shall be required to provide any indemnity to the Second Lien Agent in connection therewith. The Participating Lenders under the First Lien Facility and the Second Lien Facility further agree that, as long as this Agreement has not terminated in accordance with its terms, the Company can continue to make its Interest Election Request (as defined in the Credit Agreements) to convert or to continue the Loans (as defined in the Credit Agreements) and the Participating Lenders shall not direct their respective Agents to pursue any right, remedy or claim under Section 2.07(e) of the First Lien Credit Agreement or Section 2.07(e) of the Second Lien Credit Agreement.

(c)      Each Participating Lender agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not sell, transfer, assign or otherwise dispose of any Participating Lender Claims, or any option thereon or any right or interest (voting or otherwise) in any or all of its Participating Lender Claims (including, without limitation, any participation therein), unless (i) the transferee, participant or other party (A) is a Participating Lender or (B) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as

C-10

**Ex. 3 p. 10**

amended) and agrees in writing to assume and be bound by all of the terms of this Agreement with respect to all Lender Claims such transferee, participant or other party currently holds or shall acquire in the future by executing the Joinder attached hereto as Exhibit B (such transferee, participant or other party, if any, to also be a "Participating Lender" hereunder), and (ii) the transferor complies with any applicable transfer restrictions and/or conditions to transfer set forth herein and in the First Lien Facility or the Second Lien Facility as the case may be. If a transferee of any of the Lender Claims is not a Participating Lender or does not execute a Joinder in substantially the form attached hereto as Exhibit B prior to the completion of such transfer, participation or other grant, then such sale, transfer, assignment or other disposition of the Participating Lender Claims or related option, right or interest shall be deemed void *ab initio*. This Agreement shall in no way be construed to preclude any Participating Lender from acquiring additional Lender Claims; provided, however, that any such additional holdings shall automatically be deemed to be subject to all of the terms of this Agreement and each such Participating Lender agrees that such additional Lender Claims shall be subject to this Agreement. Each Participating Lender agrees to provide to counsel for the Company (i) a copy of any Joinder and (ii) a notice of the acquisition of any additional Lender Claims, in each case within three (3) business days of the consummation of the transaction disposing of, or acquiring, Lender Claims in addition to any notices or other documents required under the Credit Agreements. Notwithstanding the foregoing, this Section 3(c) shall not apply to any transferee that specifies in the documentation executed in connection with the transfer of Lender Claims that it is acting as a "Riskless Principal," as such term is defined by the Loan Syndications and Trading Association in its Standard Terms and Conditions for Distressed Trade Confirmations; provided, however, that any subsequent transferee of such Riskless Principal shall be required to execute the Joinder annexed hereto as Exhibit B, provided further, however, that the "Riskless Principal" exception described above shall not be applicable during the voting period in connection with the Qualified Out-of-Court Transaction or the Chapter 11 Cases.

    4.    Agreements of the Company Parties

    (a)    Subject to the terms and conditions hereof and except as the Approving Lenders may expressly release the Company Parties in writing from any of the following obligations,

    (i)    The Company hereby agrees (A) to prepare or cause the preparation of the Transaction Documents and the Plan Related Documents, (B) to provide draft copies of (I) the Transaction Documents and the Plan Related Documents to Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") and Weil, Gotshal & Manges LLP, and (II) the Lender Approved Documents to Willkie Farr & Gallagher LLP ("**WFG**"), within a reasonable amount of time prior to the launch of the Exchange Offers, solicitation of votes on an Approved Plan, commencement of the Chapter 11 Cases or the proposed execution date of any such documents, as applicable and (C) that it shall, except in an emergency where it is not reasonably practicable, provide draft copies of all motions, including "first day" motions, and applications and other documents the Company intends to file with the Bankruptcy Court to Akin Gump and WFG as soon as reasonably practicable, but in no event less than three (3) business days before such documents are filed with the Bankruptcy Court, and shall consult in good faith with Akin Gump regarding the form and substance of any such proposed filing.

Doc#: US1:7670046v4

(ii)    The Company Parties agree to (A) use commercially reasonable efforts to (1) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Approved Transaction Documents and the Approved Plan Documents, (2) take any and all necessary and appropriate actions in furtherance of the Restructuring the Approved Transaction Documents and the Approved Plan Documents, and (3) to cause the Company to obtain any and all required regulatory approvals and third-party approvals for the Restructuring, and (B) not take any actions inconsistent with this Agreement, the Approved Transaction Documents or the Approved Plan Documents.

(iii)    The Company Parties (A) shall cease and cause to be terminated any ongoing solicitation, discussions and negotiations with respect to any alternative proposal other than the Qualified Out-of-Court Transaction and the Approved Plan and (B) shall not, directly or indirectly, seek, solicit, negotiate, support, engage, initiate or participate in discussions relating to, or enter into any agreements relating to, any alternative proposal other than the Qualified Out-of-Court Transaction or the Approved Plan, nor shall the Company Parties solicit or direct any person or entity, including, without limitation, any member of the Company Parties' board of managers or any holder of equity in QCE Holding, QCE Incentive or the Company, to undertake any of the foregoing, provided, however, that, if initiated by a third party, the Company Parties may, directly or indirectly, participate in discussions relating to any alternative proposal in the Chapter 11 Cases.

(b)    The Company shall pay all reasonable and documented fees and expenses of (i) Akin Gump and Lazard Freres & Co. ("**Lazard**") and one local Delaware counsel, advisors to the Steering Committee, in each case, which are due and owing prior to the termination of this Agreement, in accordance with the terms of the existing engagement letters with Akin Gump and Lazard and any engagement letter with such local counsel, (ii) WFG, Blackstone Advisory Partners L.P. (in accordance with the terms of the existing engagement letter with Blackstone), and one local Delaware counsel, advisors to the committee of First Lien Lenders, (iii) Milbank, Tweed, Hadley & McCloy LLP, and Skadden, Arps, Slate, Meagher & Flom LLP & Affiliates ("**Skadden Arps**"), (iv) the First Lien Agent and the Second Lien Agent in accordance with the terms of the First Lien Credit Agreement and Second Lien Credit Agreement, respectively, and (v) Existing Members, whose fees and expenses shall not exceed (A) in the case of Cervantes Master LLC and Quiznos Finance LLC, $500,000 in the aggregate, and (B) in the case of JPMP/Q, LLC, J.P. Morgan Partners Global Investors, L.P. and J.P. Morgan Partners Global Investors (Selldown), L.P., $500,000 in the aggregate; with the accrued and the unpaid reasonable fees and expenses incurred by (x) the advisors listed in (i)-(iv) to be paid, after receipt of applicable invoices, as soon as practicable after the launch of the Exchange Offers, but, in no event later than the earlier of (A) Solicitation Termination Date and (B) the Closing Date, and (y) the Existing Members in (v) to be paid, after receipt of applicable invoices (including invoices previously paid by the Existing Members), on the Closing Date.

(c)    If the Restructuring is pursued pursuant to the Chapter 11 Cases, the Company shall pay, subject to receipt of applicable invoices, all reasonable and documented fees and expenses of the advisors set forth in section 4(b)(i)-(iii) above and the counsel to the agents under each of the First Lien Facility and the Second Lien Facility pursuant to the DIP Order, in each case in accordance with applicable engagement letters, if any, and in the case of 4(b)(v) pursuant to a plan of reorganization.

Doc#: US1:7670046v4

(d)     If the Restructuring is pursued pursuant to the Chapter 11 Cases, the Company shall file and timely prosecute the Approval Motion (which shall be in form and substance acceptable to Avenue) seeking the entry of an order (the "**Approval Order**") authorizing the Company to execute the Subscription Agreement and authorizing and approving the transactions contemplated therein, including (without limitation) the payment of all consideration and fees contemplated under the Subscription Agreement, and authorizing the indemnification provisions set forth in the Subscription Agreement, which Approval Order shall be in full force and effect and shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Requisite Participating Lenders.

(e)     on the earlier of the Closing Date or upon filing the Chapter 11 Cases, the current obligations and rights arising from the Schaden Employment Agreement will be cancelled, including, without limitation, obligations for unpaid severance payments under Section 7.5 (Severance Payments) and any obligations or rights arising under Section 8 (Noncompetition and Nonsolicitation), at no cost or expense to the Company.

(f)     on December 31, 2011, the Management Agreement shall be cancelled at no cost or expense to the Company, except as may have been actually incurred in connection with the services provided under the Management Agreement prior to such cancellation and termination. For the avoidance of doubt there will be no damages paid under the Management in connection with the termination thereof.

5.     Termination of Obligations.  This Agreement shall terminate and, except as otherwise provided herein, all obligations of the parties hereto shall immediately terminate and be of no further force and effect as follows (each, a "**Support Termination Event**"),

(a)     upon termination of this Agreement by the mutual written consent of the Company and the Requisite Participating Lenders, provided, however, that notice of such termination is provided within one (1) business day to the persons and entities listed on Schedule 2 annexed hereto, in accordance with Section 14 hereof;

(b)     in the Chapter 11 Cases, upon the Company or its affiliated entities determining in good faith that continued performance under this Agreement would be inconsistent with the exercise of applicable duties imposed on the Company's Board of Managers by law, provided, that the Company shall provide five (5) business days' notice thereof to the Requisite Participating Lenders;

(c)     upon the material breach by the Company Parties of any of the undertakings, representations, warranties or covenants of the Company Parties set forth in this Agreement, including the Company Parties' obligations under Section 4, that would have a material adverse effect on the Participating Lenders or the consummation of the Restructuring, which breach remains uncured for a period of three (3) business days after the receipt of written notice of such breach from the Requisite Participating Lenders unless waived by the Requisite Participating Lenders; provided, however, that if such breach would have a material adverse effect on any Approving Lender, such Approving Lender would also be required to waive any such breach;

(d)     upon the material breach by any of the Participating Lenders of any of the undertakings, representations, warranties or covenants of such Participating Lender(s) set forth in

this Agreement, including the Participating Lenders' obligations under Section 3, that would have a material adverse effect on the Company Parties or the consummation of the Restructuring, which breach remains uncured for a period of three (3) business days after the receipt by the Participating Lender(s) of notice of such breach from the Company; provided however that, (i) if the breaching Participating Lender is a Requisite Participating Lenders, or (ii) upon the termination of the Subscription Agreement, then each other Participating Lender, who is not the breaching Participating Lender, may elect to terminate this Agreement; provided further however that, except as explicitly set forth herein (including in the immediately preceding proviso), the foregoing shall constitute a Support Termination Event in favor of the Company only and shall not give rise to a termination of this Agreement unless the Company elects to terminate this Agreement as a result of such event, and none of the foregoing shall constitute a Support Termination Event in favor of any of the Participating Lenders (including the breaching Participating Lender); provided further however that in the event the Company or a Participating Lender (a "Terminating Lender") terminates this Agreement with respect to the foregoing Support Termination Event, such termination shall be effective only with respect to the breaching Participating Lender(s) or, as applicable, Terminating Lender and this Agreement shall remain in full force and effect with respect to all other Participating Lenders;

(e)     upon the occurrence of any of the following, unless such Support Termination Event is waived or extended by the Company and the Requisite Participating Lenders in writing (and the Approving Lenders as to (iii)(B), (C), (F), (G), (H) and (I), (v) and (vi)):

(i)     at 5:00 P.M. prevailing Eastern Time on December 28, 2011, unless the Company has commenced the Exchange Offers (such date that the Exchange Offers actually commence, the "**Solicitation Commencement Date**");

(ii)     if the Restructuring through a Qualified Out-of-Court Transaction has not been consummated within 20 business days after the Solicitation Commencement Date (the "**Solicitation Termination Date**") and the Company has not commenced the Chapter 11 Cases as provided herein;

(iii)     if a Qualified Out-of-Court Transaction has not been consummated by the Solicitation Termination Date, then:

(A)     at 5:00 p.m. prevailing Eastern Time on the date that is five (5) business days after the Solicitation Termination Date unless the Company shall have commenced the Chapter 11 Cases (the date that the Chapter 11 Cases are commenced is referred to herein as the "**Commencement Date**") and the Company has filed, and is pursuing confirmation of, the Approved Plan, and has filed the Approval Motion;[6]

---

[6]     The entities that would be Debtors in the Chapter 11 Cases (along with the last four digits of such Debtor's federal tax identification number) are:  American Food Distributors LLC (8099), Continental Lending Group LLC (2772), QCE Finance LLC (2208), QCE Gift Card LLC (0715), QCE LLC (2969), QFA Royalties LLC (2402), QIP Holder LLC (2353), QCE Holding LLC (1823), QCE Incentive LLC (4579), Quiz-CAN LLC (7714), Quiz-DIA LLC (8967), Quizmark LLC (8100), Quizno's Canada Holding LLC (3220), Restaurant Realty LLC (8293), Seattle Area Directorship II LLC (3722), Source One Distribution LLC (9983), The Quizno's Master LLC (3148), The Quizno's Operating Company LLC (8945), The Quizno's Realty Company LLC (7061) and TQSC II LLC (8683).

(B)     at 5:00 p.m. prevailing Eastern Time on the date that is 120 calendar days after the Commencement Date, unless the Bankruptcy Court shall have entered the Approval Order, approved the Disclosure Statement and confirmed the Approved Plan;

(C)     at 5:00 p.m. prevailing Eastern Time on the date that is 30 calendar days following entry by the Bankruptcy Court of an order confirming the Approved Plan if there has not occurred substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Approved Plan on or before such date;

(D)     upon the filing by the Company of any motion or other request for relief seeking to (1) dismiss any of the Chapter 11 Cases, (2) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (3) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, unless such motion or other request for relief is withdrawn prior to the earlier of (x) three (3) business days after filing such motion or other request for relief with the Bankruptcy Court and (y) entry of an order by the Bankruptcy Court approving the requested relief;

(E)     upon the entry of an order by the Bankruptcy Court (1) dismissing any of the Chapter 11 Cases, (2) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (3) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, or (4) making a finding of fraud, dishonesty or misconduct by any executive, officer or director of the Company, regarding or relating to the Company;

(F)     upon the withdrawal, amendment or modification by the Company or any other Party of the Approved Plan or any of the Approved Plan Documents, or the filing of a pleading seeking to amend or modify the Approved Plan or any of the Approved Plan Documents, which withdrawal, amendment, modification or filing is materially inconsistent with the Approved Plan (with such amendments and modifications as have been effected in accordance with the terms hereof) or is materially adverse to the Participating Lenders, or, if the Company files any motion or pleading with the Bankruptcy Court that is not consistent in any material respect with this Agreement or the Approved Plan or any of the Approved Plan Documents (in each case with such amendments and modifications as have been effected in accordance with the terms hereof) and such motion or pleading has not been withdrawn prior to the earlier of (i) three (3) business days after the Company receives written notice from the Requisite Participating Lenders that such motion or pleading is inconsistent with this Agreement or the Approved Plan or the Approved Plan Documents, as applicable, and (ii) the entry of an order of the Bankruptcy Court approving such motion;

(G)     the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Approved Plan in any material respect (in each case with such amendments and modifications as have been effected in accordance with the terms hereof); or

Doc#: US1:7670046v4

(H)     any of the Company Parties files, proposes or otherwise supports any plan of reorganization other than the Approved Plan;

(I)     at 5:00 P.M. prevailing Eastern Time on the date that is 60 business days after the Solicitation Commencement Date if a Qualified Out-of Court Transaction has not been consummated or if the Company has not commenced the Chapter 11 Cases, unless extended by the Company and the Approving Lenders;

(iv)     the issuance by any governmental authority, or any other regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring;

(v)     the entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the claims and liens of the Lenders under the First Lien Facility and claims and liens of the Lenders under the Second Lien Facility, other than an order approving the transactions as contemplated by this Agreement and the Approved Plan;

(vi)     any material breach of or default under the First Lien Facility or Second Lien Facility other than the defaults or events of default set forth on Schedule 1 attached hereto);

(vii)     if an involuntary case against the Company is commenced or an involuntary petition is filed seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of the Company or their debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership or similar law now or hereafter in effect, provided that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof, or if any court order grants the relief sought in such involuntary proceeding; or

(viii)     if the Company (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except as provided for in this Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official for the Company or for a substantial part of its assets, (D) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) makes a general assignment or arrangement for the benefit of creditors or (F) takes any corporate action for the purpose of authorizing any of the foregoing.

Upon occurrence of a Support Termination Event, this Agreement shall forthwith become void and of no further force or effect, each Party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement and any of the Approved Transaction Documents and Approved Plan Documents, as applicable, and there shall be no

C-16

**Ex. 3 p. 16**

liability or obligation on the part of any Party hereto; provided, however, that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination, notwithstanding any termination of this Agreement by any other Party, and (ii) obligations under this Agreement which expressly survive any such termination pursuant to Section 17 hereunder; and provided, further that, notwithstanding anything to the contrary herein, any Support Termination Event may be waived in accordance with the procedures established by Section 9 hereof, in which case the Support Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Parties hereto shall be restored, subject to any modification set forth in such waiver.  Upon termination of this Agreement, any and all consents, tenders and votes delivered by a Participating Lender prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Company.  Upon the occurrence of the Support Termination Event under this Agreement, the fees and expense reimbursements required by Section 4(b) hereof shall be payable for work through the termination date.

6.      Good Faith Cooperation; Further Assurances; Transaction Documents. The Parties shall, and the Company Parties shall cause each of its affiliates to, cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.  Furthermore, each of the Parties shall, and the Company Parties shall cause each of its affiliates to, take such action (including executing and delivering any other agreements and making and filing any required regulatory filings as may be reasonably necessary to carry out the purposes and intent of this Agreement.  Each of the Company Parties and Requisite Participating Lenders or Approving Lenders, as applicable, hereby covenants and agrees (a) to negotiate in good faith the Approved Transaction Documents, the Approved Plan and the Approved Plan Documents, each of which shall, except as otherwise provided for herein, (i) contain the same economic terms as, and other terms consistent in all material respects with, the terms set forth in the Term Sheet (as amended, supplemented or otherwise modified as provided herein), (ii) be in form and substance reasonably acceptable in all respects to the Parties, and (iii) be consistent with this Agreement and the Term Sheet in all material respects, and (b) to execute the Approved Transaction Documents, and, to the extent necessary, the Approved Plan Documents (in each case to the extent such Party is contemplated to be a party thereto).

7.      Remedies. All remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party; provided, however, that if there is a breach of the Agreement by a Participating Lender, money damages shall be an insufficient remedy to the other Participating Lenders or the Company Parties and either the Company Parties or any Participating Lender can seek specific performance as against another Participating Lender; provided further that in connection with any remedy asserted in connection with this Agreement, each Party agrees to waive any requirement for the securing or posting of a bond in connection with any remedy.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party or any other Party.

8.      Prior Negotiations. This Agreement together with the Exhibits hereto and the Subscription Agreement supersede all prior negotiations, and documents reflecting such prior negotiations, between and among the Company Parties and the Participating Lenders (and their respective

Doc#: US1:7670046v4

advisors) with respect to the subject matter hereof; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Company and any Participating Lender shall continue in full force and effect, as provided therein.

9. Amendments and Waivers. This Agreement, including the Exhibits hereto, may be amended only upon written approval of (i) the Company and (ii) the Requisite Participating Lenders; provided, however, that no amendment may be made to this Agreement or any Exhibit hereto that would materially and adversely affect the treatment, or change the approval rights under this Agreement (including rights to approve documents, as such documents may be amended), if applicable, of any Participating Lender without the written approval of such Participating Lender; provided, further that the written approval of J.P. Morgan Partners Global Investors, L.P. shall be required with respect to any amendment or modification to or waiver of provisions affecting matters that are the subject of the JPMP Consent Rights (defined below). Any waiver of any condition, term or provision to this Agreement must be in writing signed by the Persons entitled to waive such condition, term or provision. For purposes of this Section 9, "**JPMP Consent Rights**" means any amendment, change, waiver, consent or agreement that could reasonably be expected to result in (a) any of Richard E. Schaden, Richard F. Schaden or Patrick E. Meyers not irrevocably terminating and waiving his right to be paid any and all amounts under the Company's deferred compensation plans, (b) the Schaden Employment Agreement not being cancelled and terminated as described in Section 1(c)(vi) herein, (c) the payment obligations under the Company's deferred compensation plans and AD Notes being reduced by less than $10.3 million in the aggregate or (d) the Restructuring not being treated as a taxable sale or exchange of all or substantially all of QCE Finance's assets for U.S. federal income tax purposes.

10. Independent Analysis. Each Participating Lender hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

11. Representation by Counsel. Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived.

12. Governing Law. This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State and County of New York. By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

13.     Effective Date.  This Agreement shall become effective, and each Participating Lender shall be bound to the terms of this Agreement, upon delivery by Lenders owning Participating Lender Claims of no less than two-thirds of the First Lien Debt and Lenders owning Participating Lenders Claims of no less than sixty six and two-thirds percent (66 2/3%) of the Second Lien Debt, in each case with full power and authority to act on behalf of, vote and consent to all matters with respect to such First Lien Debt or Second Lien Debt, as applicable, of their duly executed counterpart signature page to the Company and upon due execution and delivery of this Agreement by the Company Parties (the "**Effective Date**").

14.     Notices.  All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email or facsimile, at the addresses and facsimile numbers set forth on Schedule 2 hereto.

15.     Reservation of Rights.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Party to protect and preserve its rights, remedies and interests, including the Lender Claims and any other claims against the Company or other parties, or its full participation in any bankruptcy proceeding.  Without limiting the foregoing sentence in any way, after a Support Termination Event, the Parties hereto each fully reserve any and all of their respective rights, remedies, claims and interests, subject to Section 5, in the case of any claim for breach of this Agreement.  Furthermore, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Approved Plan and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring.

16.     Rule of Interpretation.    Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include (a) votes or voting on a plan of reorganization under the Bankruptcy Code and (b) all means of expressing agreement with, or rejection of, as the case may be, a restructuring or reorganization transaction that is not implemented under the Bankruptcy Code.

17.     Survival.  Notwithstanding (i) any sale of the Lender Claims in accordance with Section 3(c) or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Sections 4(b) (solely to the extent of fees and expenses accrued before termination), 8, 10, 11, 12, 15, 23, 24 and 25 shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Participating Lenders and the Company in accordance with the terms hereof.

18.     Successors and Assigns; Severability; Several Obligations.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction.  The agreements, representations and obligations of the Participating Lenders under this Agreement are, in all respects, several and not joint.

19.     Third-Party Beneficiary.  This Agreement is intended for the benefit of the Parties hereto and no other person or entity shall be a third party beneficiary hereof or have any rights hereunder.

Doc#: US1:7670046v4

**Ex. 3 p. 19**

20.     Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

21.     Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Approved Transaction Documents; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Company and any Participating Lender shall continue in full force and effect as provided therein.

22.     Headings.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

23.     Settlement Discussions.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

24.     Publicity.  The Company shall not (a) use the name of any Participating Lender in any press release without such Participating Lender's prior written consent or (b) disclose to any person, other than legal, accounting, financial and other advisors to the Company, the principal amount or percentage of Lender Claims held by any Participating Lender or any of its respective subsidiaries; provided, however, that the Company shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of Lender Claims held by the Participating Lenders as a group and by First Lien Debt and Second Lien Debt.  Notwithstanding the foregoing, the Participating Lenders hereby consent to the disclosure by the Company in the Approved Transaction Documents, the Approved Plan Documents, or the Approved Plan, as applicable, or as otherwise required by law or regulation, of the execution, terms and contents of this Agreement and the aggregate principal amount of, and aggregate percentage of, any class of Lender Claims held by the Participating Lenders as a group including by First Lien Debt and Second Lien Debt.  Notwithstanding the foregoing, the Company will submit to Akin Gump and WFG all press releases, public filings, public announcements or other communications with any news media in each case to be made by the Company relating to this Agreement or the transactions contemplated hereby and any amendments thereof for review and potential suggestions on the same basis as in Section 4(a)(i) hereof.  The Participating Lenders will submit to counsel for the Company all press releases, public filings, public announcements or other communications with any news media relating to this Agreement or the transactions contemplated hereby and any amendments thereof for review and potential suggestions on the same basis as in Section 3(a)(iii) hereof.  The Participating Lenders shall not use the name of the Company in any press release without the Company's prior written consent.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Company and any Participating Lender, including the confidentiality and non-disclosure provisions contained in the Credit Agreements.

25.     Fiduciary Duties.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of the Company Parties or any members, managers or officers of the Company Parties or their affiliated entities, in such Person's capacity as a member, manager or officer of the Company Parties or their affiliated entities that such

entities did not have prior to the execution of this Agreement.  None of the Participating Lenders shall have any fiduciary duty or other duties or responsibilities to each other, any Lender, the Company or any of the Company's creditors or other stakeholders.

[<em>Remainder of page intentionally left blank</em>]

Doc#: US1:7670046v4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

QCE HOLDING LLC

By: _____
Name: Greg MacDonald
Its: _____

QCE INCENTIVE LLC

By: _____
Name: Greg MacDonald
Its: _____

QCE FINANCE LLC
(on behalf of itself and all of its direct and indirect affiliates)

By: _____
Name: Greg MacDonald
Its: _____

QCE LLC
(on behalf of itself and all of its direct and indirect subsidiaries)

By: _____
Name: Greg MacDonald
Its: _____

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 22

**Existing Members**

CERVANTES MASTER LLC

By: _____
     Name:  Patrick E. Meyers
     Title: Executive Vice President


QUIZNOS FINANCE LLC

By: _____
     Name:  Patrick E. Meyers
     Title: Executive Vice President

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 23

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above. Additionally, the undersigned hereby consents to the consummation of the Qualified Out-of-Court Transaction or the Approved Plan, as applicable, on the terms of and subject to the conditions of this Agreement. This consent shall satisfy the consent requirements of the Third Amended and Restated Limited Liability Company Agreement of QCE Holding LLC dated April 26, 2010.

**Existing Members**

JPMP/Q, LLC

By: _____
Name: STEPHEN P. MURRAY
Title: MA PRESIDENT and CEO

J.P. MORGAN PARTNERS GLOBAL
INVESTORS, L.P.

By:      CCMP Capital Advisors, LLC,
         as Attorney in Fact

By: _____
Name: STEPHEN P. MURRAY
Title: PRESIDENT and CEO

J.P. MORGAN PARTNERS GLOBAL
INVESTORS (SELLDOWN), LP.

By:      CCMP Capital Advisors, LLC,
         as Attorney in Fact

By: _____
Name: STEPHEN P. MURRAY
Title: President and CEO

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 24

Dated: _____

**PARTICIPATING LENDER**

Name of     DRAWBRIDGE SPECIAL OPPORTUNITIES
Institution:   FUND LP

By:          Drawbridge Special Opportunities GP LLC, its
              general partner

By:          _____
Name:        CONSTANTINE M. DAKOLIAS
Title:           PRESIDENT

Telephone:  _____
Facsimile:   _____

**First Lien Debt Claims**

$   _____

**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$       _____

**Second Lien Debt Claims**

$   _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:      DRAWBRIDGE SPECIAL OPPORTUNITIES
                  FUND LTD.

By:               _____
Name:             _____
Title:            CONSTANTINE M. DAKOLIAS
                           DIRECTOR

Telephone:        _____
Facsimile:        _____

**First Lien Debt Claims**

$   _____

**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$   _____

**Second Lien Debt Claims**

$   _____

Ex. 3 p. 26

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:        FORTRESS CREDIT INVESTMENTS I LTD

By: _____
Name:        CONSTANTINE M. DAKOLIAS
Title:        DIRECTOR

Telephone: _____
Facsimile: _____

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Ex. 3 p. 27

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:   FORTRESS CREDIT INVESTMENTS II LTD

By: _____
Name: _____CONSTANTINE M. DAKOLIAS_____
Title: _____DIRECTOR_____

Telephone: _____
Facsimile: _____

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:    FORTRESS CREDIT OPPORTUNITIES I LP

By:        Fortress Credit Opportunities I GP LLC, its
general partner

By: _____
Name: CONSTANTINE M. DAKOLIAS
Title: PRESIDENT

Telephone: _____
Facsimile: _____

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Ex. 3 p. 29

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:      FCOF UB SECURITIES LLC

By:      _____
Name:         CONSTANTINE M. DAKOLIAS
Title:              PRESIDENT

Telephone:   _____
Facsimile:    _____

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:     FCOF SECURITIES LTD

By:
Name:                    CONSTANTINE M. DAKOLIAS
Title:                              DIRECTOR

Telephone:     _____
Facsimile:      _____

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:   FTS SIP LP

By:       FCO MA GP LLC, its general partner


By:      _____
Name:     CONSTANTINE M. DAKOLIAS
Title:        PRESIDENT

Telephone:  _____
Facsimile:   _____

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:    FCOF II UB SECURITIES

By:
Name:    CONSTANTINE M. DAKOLIAS
Title:    PRESIDENT

Telephone:
Facsimile:

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Ex. 3 p. 33

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:    WORDEN MASTER FUND LP

By:             Fortress Special Opportunities I GP LLC, its
                general partner

By:
Name:           CONSTANTINE M. DAKOLIAS
Title:          PRESIDENT

Telephone:      _____
Facsimile:      _____

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Ex. 3 p. 34

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:      WORDEN MASTER FUND II LP

By:               Fortress Special Opportunities I GP LLC, its
                  general partner


By:               _____
Name:             _____
Title:            CONSTANTINE M. DAKOLIAS
                  PRESIDENT
                  _____
Telephone:        _____
Facsimile:        _____

**First Lien Debt Claims**

$ _____


**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$ _____


**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:    FORTRESS CREDIT FUNDING II LP

By:             Fortress Credit Funding II I GP LLC, its general
                partner

By:             _____
Name:           CONSTANTINE M. DAKOLIAS
Title:          PRESIDENT

Telephone:      _____
Facsimile:      _____

**First Lien Debt Claims**

$       _____

**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$       _____

**Second Lien Debt Claims**

$       _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:    FORTRESS CREDIT FUNDING I LP

By:        Fortress Credit Funding I GP LLC, its general partner

By:
Name:      CONSTANTINE M. DAKOLIAS
Title:       PRESIDENT

Telephone: _____
Facsimile: _____

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:    PANGAEA CLO 2007-1 LTD

By:             Pangaea   CLO   Management,   its   collateral
                manager

By:             _____
Name:           CONSTANTINE M. DAKOLIAS
Title:          PRESIDENT

Telephone:      _____
Facsimile:      _____

**First Lien Debt Claims**

$    _____

**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$    _____    _____

**Second Lien Debt Claims**

$    _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:   SARGAS CLO I LTD

By:   Pangaea CLO Management, its collateral
manager

By: _____
Name: _____
~~CONSTANTINE M. DAKOLIAS~~
Title: _____
~~PRESIDENT~~

Telephone: _____
Facsimile: _____

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:    CIFC FUNDING 2006-I, LTD.

By:    CIFC Asset Management LLC, its Collateral
Manager

By:    _____
Name:    Stephen J. Vaccaro
Title:    Authorized Signatory
Telephone:    212-624-1203
Facsimile:    212-624-1199

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:    CIFC FUNDING 2006-IB, LTD.

By:    CIFC Asset Management LLC, its Collateral
Manager

By:
Name:    Stephen J. Vaccaro
Title:    Authorized Signatory
Telephone:    212-624-1203
Facsimile:    212-624-1199

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:       CIFC FUNDING 2006-II, LTD.

By:            CIFC Asset Management LLC, its Collateral
               Manager

By:            _____
Name:          Stephen J. Vaccaro
Title:         Authorized Signatory
Telephone:     212-624-1203
Facsimile:     212-624-1199

**First Lien Debt Claims**

$    _____

**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$    _____

**Second Lien Debt Claims**

$    _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:   CIFC FUNDING 2007-I, LTD.

By:       CIFC Asset Management LLC, its Collateral
Manager

By: _____
Name:   Stephen J. Vaccaro
Title:     Authorized Signatory
Telephone:  212-624-1203
Facsimile:  212-624-1199

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:    CIFC FUNDING 2007-II, LTD.

By:    CIFC Asset Management LLC, its Collateral
Manager

By:
Name:    Stephen J. Vaccaro
Title:    Authorized Signatory
Telephone:    212-624-1203
Facsimile:    212-624-1199

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:   CIFC FUNDING 2007-IV, LTD.

By:            CIFC Asset Management LLC, its Collateral
               Manager

By:            _____
Name:          Stephen J. Vaccaro
Title:         Authorized Signatory
Telephone:     212-624-1203
Facsimile:     212-624-1199

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Ex. 3 p. 45

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:   COLUMBUSNOVA CLO LTD. 2006-I

By:       Columbus Nova Credit Investments
          Management, LLC, its Collateral Manager

By:
Name:     Stephen J. Vaccaro
Title:    Authorized Signatory
Telephone: 212-624-1203
Facsimile: 212-624-1199

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____   _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:    COLUMBUSNOVA CLO LTD. 2006-II

By:      Columbus Nova Credit Investments
         Management, LLC, its Collateral Manager

By:
Name:      Stephen J. Vaccaro
Title:       Authorized Signatory
Telephone:  212-624-1203
Facsimile:   212-624-1199

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

Name of
Institution:   COLUMBUSNOVA CLO IV LTD. 2007-II

By:     Columbus Nova Credit Investments
       Management, LLC, its Collateral Manager

By: _____
Name:    Stephen J. Vaccaro
Title:      Authorized Signatory
Telephone:  212-624-1203
Facsimile:   212-624-1199

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second
Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Dated: _____

**PARTICIPATING LENDER**

| | |
|---|---|
| Name of Institution: | AVENUE CAPITAL MANAGEMENT II, L.P., solely on behalf of certain of the investment funds it manages |
| By: | Avenue Capital Management II GenPar, LLC, its general partner |

By: _____

Name: ~~Marc Lasry~~

Title: ~~Managing Member~~

Telephone: (212) 850 7511

Facsimile: (212) 850 7506

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

Ex. 3 p. 49

Dated: 12/23/11

**PARTICIPATING LENDER**

Name of Institution: _Hayman Capital Master Fund, LP_

By: _Debby LaMoy_

Name: _Debby LaMoy_

Title: _Chief Operating Officer_

Telephone: 214-347-8050

Facsimile: 214-347-8051

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

_Signature Page to Restructuring Support Agreement_

Ex. 3 p. 50

Dated: _____

**PARTICIPATING LENDER**

Name of Institution: _CASPIAN CAPITAL PARTNERS, L.P._

By: _____

Name: ~~Richard D. Holahan, Jr.~~

Title: ~~Authorized Signatory~~

Telephone: _212-826-7539_

Facsimile: _212-826-6980_

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 51

Dated: _____

**PARTICIPATING LENDER**

Name of Institution: ___HLSCI LLC___

By: _____
Name: ___Richard D. Holahan, Jr.___
Title: ___Authorized Signatory___

Telephone: ___212-826-7539___
Facsimile: ___212-826-6980___

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

*Signature Page to Restructuring Support Agreement*

Dated: _____

**PARTICIPATING LENDER**

Name of Institution:  _CASPIAN SELECT CREDIT MASTER FUND LTD._

By:
Name:  ~~Richard D. Holahan, Jr.~~
Title:  ~~Authorized Signatory~~

Telephone:  _212-826-7539_
Facsimile:  _212-826-6980_

**First Lien Debt Claims**

$  _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$  _____

**Second Lien Debt Claims**

$  _____

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 53

Dated: _____

**PARTICIPATING LENDER**

Name of Institution: _CASPIAN SOLITUDE MASTER FUND LP_

By: _____

Name: ~~Richard D. Holahan, Jr.~~

Title: Authorized Signatory

Telephone: 212-826-7539

Facsimile: 212-826-6980

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

*Signature Page to Restructuring Support Agreement*

Dated: _____

**PARTICIPATING LENDER**

Name of Institution:   MARINER LOC

By:
Name:        Richard D. Holahan, Jr.
Title:        Authorized Signatory

Telephone:    212-826-7539
Facsimile:    212-826-6986

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 55

Dated: _____

**PARTICIPATING LENDER**

Name of Institution: _CASPIAN ALPHA LONG CREDIT FUND LP_

By: _____
Name: _____
Title: _____
Richard D. Holahan, Jr.
Authorized Signatory
Telephone: _212-826-9539_
Facsimile: _212-826-6980_

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 56

Dated: December ___, 2011

**PARTICIPATING LENDER**

Name of Institution:   The Royal Bank of Scotland plc
                       By: RBS Securities Inc., its
                       agent

By:
Name:      Jon Weiss
Title:     Authorized Signatory

Telephone:   203.897.2430
Email:       Jon.weiss@rbs.com

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

1

Dated: 12/22/11

**PARTICIPATING LENDER**

Name of Institution: Barclays Bank PLC

By:
Name: Peter Bencist
Title: Managing Director

Telephone: (212) 412 - 2865
Facsimile:

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

1

Dated: <u>12/21/2011</u>

## PARTICIPATING LENDER

Name of Institution:   Melbourne Holdings 1, L.P.
                  By:   Melbourne Holdings GP, LLC
                  Its:   General Partner

                  By:   Oaktree Capital Management, L.P.
                  Its:   Managing Member

By:
Name:      Matt Wilson
Title:       Managing Director


By:
Name:      Cass Traub
Title:       Vice President


Telephone:   (213)-830-6327
Facsimile:    (213) 830-8833


### First Lien Debt Claims

$ _____


### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____


### Second Lien Debt Claims

$ _____


*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 59

Dated: <u>12/21/2011</u>

### PARTICIPATING LENDER

Name of Institution:   Melbourne Holdings 2, L.P.
              By:   Melbourne Holdings GP, LLC
              Its:   General Partner

              By:   Oaktree Capital Management, L.P.
              Its:   Managing Member

By:
Name:        Matt Wilson
Title:        Managing Director

By:
Name:        Cass Traub
Title:        Vice President

Telephone:    (213)-830-6327
Facsimile:    (213) 830-8833

### First Lien Debt Claims

$ _   _____

### First Lien Debt Claims to be exchanged for New Second Lien Facility

$   _____

### Second Lien Debt Claims

$   _____

*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 60**

Dated: <u>12/21/2011</u>

## PARTICIPATING LENDER

Name of Institution:  Melbourne Holdings 3, L.P.
             By:  Melbourne Holdings GP, LLC
             Its:  General Partner

             By:  Oaktree Capital Management, L.P.
             Its:  Managing Member

By:
Name:      Matt Wilson
Title:      Managing Director

By:
Name:      Cass Traub
Title:      Vice President

Telephone:  (213)-830-6327
Facsimile:   (213) 830-8833

### First Lien Debt Claims

$ _____

### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____

### Second Lien Debt Claims

$ _____

*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 61**

Dated: <u>12/21/2011</u>

**PARTICIPATING LENDER**

Name of Institution:   Melbourne Holdings 4, L.P.
            By:   Melbourne Holdings GP, LLC
            Its:   General Partner

            By:   Oaktree Capital Management, L.P.
            Its:   Managing Member

By:
Name:        Matt Wilson
Title:        Managing Director

By:
Name:        Cass Traub
Title:        Vice President

Telephone:   (213)-830-6327
Facsimile:   (213) 830-8833

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New
Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 62**

Dated: <u>12/21/2011</u>

**PARTICIPATING LENDER**

Name of Institution:  Melbourne Holdings 5, L.P.
                 By:  Melbourne Holdings GP, LLC
                 Its:  General Partner

                 By:  Oaktree Capital Management, L.P.
                 Its:  Managing Member

By:
Name:    Matt Wilson
Title:    Managing Director


By:
Name:    Cass Traub
Title:    Vice President


Telephone:    (213)-830-6327
Facsimile:    (213) 830-8833


**First Lien Debt Claims**

$ _____


**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____


**Second Lien Debt Claims**

$ _____


*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 63**

Dated: 12/21/2011

## PARTICIPATING LENDER

Name of Institution:   Melbourne Holdings 6, L.P.
     By:   Melbourne Holdings GP, LLC
     Its:   General Partner

     By:   Oaktree Capital Management, L.P.
     Its:   Managing Member


By:
Name:  Matt Wilson
Title:   Managing Director


By:
Name:  Cass Traub
Title:   Vice President


Telephone: (213)-830-6327
Facsimile:  (213) 830-8833


### First Lien Debt Claims

$ _____


### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____


### Second Lien Debt Claims

$ _____


*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 64**

Dated: 12/21/2011

## PARTICIPATING LENDER

Name of Institution:   Melbourne Holdings 7, L.P.
                By:   Melbourne Holdings GP, LLC
                Its:   General Partner

                By:   Oaktree Capital Management, L.P.
                Its:   Managing Member

By:
Name:        Matt Wilson
Title:        Managing Director

By:
Name:        Cass Traub
Title:        Vice President

Telephone:    (213)-830-6327
Facsimile:    (213) 830-8833

### First Lien Debt Claims

$ _____    _____

### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____

### Second Lien Debt Claims

$ _____

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 65

Dated: <u>12/21/2011</u>

**PARTICIPATING LENDER**

Name of Institution:   Melbourne Holdings 8, L.P.
              By:   Melbourne Holdings GP, LLC
              Its:   General Partner

              By:   Oaktree Capital Management, L.P.
              Its:   Managing Member

By:
Name:      Matt Wilson
Title:      Managing Director


By:
Name:      Cass Traub
Title:      Vice President


Telephone:   (213)-830-6327
Facsimile:   (213) 830-8833


**First Lien Debt Claims**

$ _____   . _____


**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____


**Second Lien Debt Claims**

$ _____


*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 66**

Dated: <u>12/21/2011</u>

**PARTICIPATING LENDER**

Name of Institution:   Melbourne Holdings 10, L.P.
            By:  Melbourne Holdings GP, LLC
            Its:  General Partner

            By:  Oaktree Capital Management, L.P.
            Its:  Managing Member

By:
Name:     Matt Wilson
Title:     Managing Director

By:
Name:     Cass Traub
Title:     Vice President

Telephone:   (213)-830-6327
Facsimile:    (213) 830-8833

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 67**

Dated: <u>12/21/2011</u>

**PARTICIPATING LENDER**

Name of Institution:  Melbourne Holdings 12, L.P.
    By:  Melbourne Holdings GP, LLC
    Its:  General Partner

    By:  Oaktree Capital Management, L.P.
    Its:  Managing Member

By:
Name:    Matt Wilson
Title:    Managing Director

By:
Name:    Cass Traub
Title:    Vice President

Telephone:    (213)-830-6327
Facsimile:    (213) 830-8833

**First Lien Debt Claims**

$ _____    _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 68**

Dated: <u>12/21/2011</u>

### PARTICIPATING LENDER

Name of Institution:   Melbourne Holdings 13, L.P.
           By:   Melbourne Holdings GP, LLC
           Its:   General Partner

           By:   Oaktree Capital Management, L.P.
           Its:   Managing Member

By:
Name:       Matt Wilson
Title:        Managing Director

By:
Name:       Cass Traub
Title:        Vice President

Telephone:   (213)-830-6327
Facsimile:    (213) 830-8833

### First Lien Debt Claims

$ _____

### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____

### Second Lien Debt Claims

$ _____

*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 69**

Dated: <u>12/21/2011</u>

## PARTICIPATING LENDER

Name of Institution:   Melbourne Holdings 14, L.P.
            By:   Melbourne Holdings GP, LLC
            Its:   General Partner

            By:   Oaktree Capital Management, L.P
            Its:   Managing Member

By:
Name:      Matt Wilson
Title:       Managing Director

By:
Name:      Cass Traub
Title:       Vice President

Telephone:   (213)-830-6327
Facsimile:    (213) 830-8833

### First Lien Debt Claims

$ _____

### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____

### Second Lien Debt Claims

$ _____

*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 70**

Dated: <u>12/21/2011</u>

### PARTICIPATING LENDER

Name of Institution:   Melbourne Holdings 15, L.P.
By:   Melbourne Holdings GP, LLC
Its:   General Partner

By:   Oaktree Capital Management, L.P.
Its:   Managing Member

By:   _____
Name:   Matt Wilson
Title:   Managing Director

By:   _____
Name:   Cass Traub
Title:   Vice President

Telephone:   (213)-830-6327
Facsimile:   (213) 830-8833

**First Lien Debt Claims**

$ _____  _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 71**

Dated: <u>12/21/2011</u>

## PARTICIPATING LENDER

Name of Institution:   Second Street Holdings 1, L.P.
           By:  PF5 GP, LLC
           Its:  General Partner

           By:  Oaktree Capital Management, L.P.
           Its:  Managing Member

By:
Name:       Matt Wilson
Title:       Managing Director

By:
Name:       Cass Traub
Title:       Vice President

Telephone:  (213)-830-6327
Facsimile:   (213) 830-8833

### First Lien Debt Claims

$ _____

### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____

### Second Lien Debt Claims

$ _____

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 72

Dated: <u>12/21/2011</u>                                    .

## PARTICIPATING LENDER

Name of Institution:   Second Street Holdings 2, L.P.
                  By:   PF5 GP, LLC
                  Its:   General Partner

                  By:   Oaktree Capital Management, L.P.
                  Its:   Managing Member

By:
Name:   Matt Wilson
Title:   Managing Director

By:
Name:   Cass Traub
Title:   Vice President

Telephone:   (213)-830-6327
Facsimile:   (213) 830-8833

### First Lien Debt Claims

$ _____

### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____

### Second Lien Debt Claims

$ _____

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 73

Dated: 12/21/2011

## PARTICIPATING LENDER

Name of Institution:   Second Street Holdings 3, L.P.
                 By:   PF5 GP, LLC
                 Its:  General Partner

                 By:   Oaktree Capital Management, L.P.
                 Its:  Managing Member

By:      _____
Name:    Matt Wilson
Title:   Managing Director


By:      _____
Name:    Cass Traub
Title:   Vice President


Telephone:   (213)-830-6327
Facsimile:   (213) 830-8833


### First Lien Debt Claims

$ _____


### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____


### Second Lien Debt Claims

$ _____


*Signature Page to Restructuring Support Agreement*

Dated: <u>12/21/2011</u>

## PARTICIPATING LENDER

Name of Institution: Second Street Holdings 4, L.P.
            By: PF5 GP, LLC
            Its: General Partner

            By: Oaktree Capital Management, L.P.
            Its: Managing Member

By: _____
Name:      Matt Wilson
Title:       Managing Director

By: _____
Name:      Cass Traub
Title:       Vice President

Telephone:    (213)-830-6327
Facsimile:     (213) 830-8833

### First Lien Debt Claims

$ _____

### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____

### Second Lien Debt Claims

$ _____

*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 75**

Dated: <u>12/21/2011</u>

**PARTICIPATING LENDER**

Name of Institution:  Second Street Holdings 5, L.P.
By:  PF5 GP, LLC
Its:  General Partner

By:  Oaktree Capital Management, L.P.
Its:  Managing Member

By:
Name:  Matt Wilson
Title:  Managing Director

By:
Name:  Cass Traub
Title:  Vice President

Telephone:  (213)-830-6327
Facsimile:  (213) 830-8833

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 76

Dated: <u>12/21/2011</u>

**PARTICIPATING LENDER**

Name of Institution:  Second Street Holdings 6, L.P.
     By:  PF5 GP, LLC
     Its:  General Partner

     By:  Oaktree Capital Management, L.P.
     Its:  Managing Member

By:
Name:     Matt Wilson
Title:     Managing Director

By:
Name:     Cass Traub
Title:     Vice President

Telephone:  (213)-830-6327
Facsimile:   (213) 830-8833

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 77

Dated: <u>12/21/2011</u>

## PARTICIPATING LENDER

Name of Institution:   Second Street Holdings 7, L.P.
             By:   PF5 GP, LLC
             Its:   General Partner

             By:   Oaktree Capital Management, L.P.
             Its:   Managing Member

By:
Name:   Matt Wilson
Title:   Managing Director

By:
Name:   Cass Traub
Title:   Vice President

Telephone:   (213)-830-6327
Facsimile:   (213) 830-8833

### First Lien Debt Claims

$ _____

### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____

### Second Lien Debt Claims

$ _____

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 78

Dated: <u>12/21/2011</u>

**PARTICIPATING LENDER**

Name of Institution:   Second Street Holdings 8, L.P.
                By:  PF5 GP, LLC
                Its:  General Partner

                By:  Oaktree Capital Management, L.P.
                Its:  Managing Member

By:
Name:     Matt Wilson
Title:     Managing Director

By:
Name:     Cass Traub
Title:     Vice President

Telephone:   (213)-830-6327
Facsimile:    (213) 830-8833

**First Lien Debt Claims**

$

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$

**Second Lien Debt Claims**

$

*Signature Page to Restructuring Support Agreement*

Ex. 3 p. 79

Dated: <u>12/21/2011</u>

### PARTICIPATING LENDER

Name of Institution:   Second Street Holdings 10, L.P.
           By:   PF5 GP, LLC
           Its:   General Partner

           By:   Oaktree Capital Management, L.P.
           Its:   Managing Member


By:   _____
Name:   Matt Wilson
Title:   Managing Director


By:   _____
Name:   Cass Traub
Title:   Vice President


Telephone:   (213)-830-6327
Facsimile:   (213) 830-8833


### First Lien Debt Claims

$ _____


### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____


### Second Lien Debt Claims

$ _____


*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 80**

Dated: <u>12/21/2011</u>

**PARTICIPATING LENDER**

Name of Institution:   Second Street Holdings 12, L.P.
         By:   PF5 GP, LLC
         Its:   General Partner

         By:   Oaktree Capital Management, L.P.
         Its:   Managing Member

By:
Name:   Matt Wilson
Title:   Managing Director

By:
Name:   Cass Traub
Title:   Vice President

Telephone:   (213)-830-6327
Facsimile:   (213) 830-8833

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 81**

Dated: <u>12/21/2011</u>

### PARTICIPATING LENDER

Name of Institution:   Second Street Holdings 13, L.P.
         By:   PF5 GP, LLC
         Its:   General Partner

         By:   Oaktree Capital Management, L.P.
         Its:   Managing Member

By:
Name:   Matt Wilson
Title:   Managing Director


By:
Name:   Cass Traub
Title:   Vice President


Telephone:   (213)-830-6327
Facsimile:   (213) 830-8833


### First Lien Debt Claims

$ _____


### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____


### Second Lien Debt Claims

$ _____


*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 82**

Dated: 12/21/2011

### PARTICIPATING LENDER

Name of Institution:   Second Street Holdings 14, L.P.
           By:   PF5 GP, LLC
           Its:   General Partner

           By:   Oaktree Capital Management, L.P.
           Its:   Managing Member

By:
Name:   Matt Wilson
Title:   Managing Director


By:
Name:   Cass Traub
Title:   Vice President


Telephone:   (213)-830-6327
Facsimile:   (213) 830-8833


### First Lien Debt Claims

$ _____


### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____


### Second Lien Debt Claims

$ _____


*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 83**

Dated: <u>12/21/2011</u>

## PARTICIPATING LENDER

Name of Institution:  Second Street Holdings 15, L.P.
                 By:  PF5 GP, LLC
                 Its:  General Partner

                 By:  Oaktree Capital Management, L.P.
                 Its:  Managing Member

By:
Name:          Matt Wilson
Title:         Managing Director

By:
Name:          Cass Traub
Title:         Vice President

Telephone:     (213)-830-6327
Facsimile:     (213) 830-8833

### First Lien Debt Claims

$ _____

### First Lien Debt Claims to be exchanged for New Second Lien Facility

$ _____

### Second Lien Debt Claims

$ _____

*Signature Page to Restructuring Support Agreement*

**Ex. 3 p. 84**

Dated: _____

**PARTICIPATING LENDER**

Name of Institution: _Western Asset Management Company, as agent and investment manager on behalf of client accounts_

By: _WMN_

Name: ~~W. Stephen Venable, Jr.~~

Title: ~~Manager, US Legal and Corporate Affairs~~

Telephone: _626-844-9400_

Facsimile: _626-844-9451_

**First Lien Debt Claims**

$ _____

**First Lien Debt Claims to be exchanged for New Second Lien Facility**

$ _____

**Second Lien Debt Claims**

$ _____

## SCHEDULE 1

PERMITTED DEFAULTS

1.  Defaults and Events of Default under the First Lien Credit Agreement due to failure to comply with the Financial Performance Covenants.

2.  Defaults and Events of Default under the First Lien Credit Agreement or the Second Lien Credit Agreement resulting from a bankruptcy filing in accordance with the terms of the Restructuring Support Agreement.

3.  Defaults and Events of Default under the First Lien Credit Agreement or the Second Lien Credit Agreement resulting from the execution or performance of the Transaction Documents or the Restructuring Support Agreement or from any of the transactions contemplated by the Restructuring Support Agreement.

4.  Defaults and Events of Default under the First Lien Credit Agreement for the failure to make payments when due (other than the failure to pay interest, commitment fees and letter of credit fees when due or within the applicable grace period), unless required to be made under the Restructuring Support Agreement.

5.  Defaults and Events of Default under the Second Lien Credit Agreement resulting from the failure to make any payment when due, unless required to be made under the Restructuring Support Agreement.

Ex. 3 p. 86

SCHEDULE 2

NOTICE ADDRESSES

**If to the Company:**

QCE Finance LLC
1001 17th Street, Suite S-175
Denver, Colorado  80202
Attn: Courtney L. Seely

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York  10019
Attn:  Alan W. Kornberg
        Elizabeth R. McColm
akornberg@paulweiss.com
emccolm@paulweiss.com

**If to any Participating Lenders:**

If to any Participating Lender, at the address shown for such Participating Lender on the applicable signature page hereto, to the attention of the person who has executed this Agreement on behalf of such Participating Lender.

with a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn.: Ira Dizengoff, Esq.
        Philip Dublin, Esq.
idizengoff@akingump.com
pdublin@akingump.com

and

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attn: Rachel Strickland, Esq.
        William Hiller, Esq.
rstrickland@willkie.com
whiller@willkie.com

3

EXHIBIT A

TERM SHEET

1

QUIZNOS

**Restructuring Term Sheet**
**Summary of Terms and Conditions**

This term sheet (the "*Term Sheet*") summarizing the principal terms of certain potential transactions concerning the Company (as defined below) and its subsidiaries is not legally binding or a complete list of all the terms and conditions of the potential transactions described herein. This Term Sheet shall not constitute an offer to sell or buy, nor the solicitation of an offer to sell or buy any of the securities referred to herein or the solicitation of acceptances of a chapter 11 plan. Any such offer or solicitation shall only be made in compliance with all applicable laws. Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of definitive documentation. This Term Sheet shall be attached to, and incorporated into a restructuring support agreement (the "*Restructuring Support Agreement*") entered into by and among the Company and certain existing lenders that are signatories thereto (the "*Participating Lenders*"). In the event of an inconsistency between this Term Sheet and the definitive documentation attached to the Restructuring Support Agreement as Exhibits [C through F], the provisions of such definitive documentation shall govern. For purposes of this Term Sheet, the term "*Requisite Participating Lenders*" shall be defined as each of Avenue Capital Group and its affiliates ("*Avenue*") and Fortress Investment Group, LLC and its affiliates ("*Fortress*") so long as they shall collectively hold not less than 25% of the amounts outstanding under the First Lien Facility and 66⅔% of the amounts outstanding under the Second Lien Facility and, thereafter, Participating Lenders which collectively hold at least such percentages of the amounts outstanding of the First Lien Facility and Second Lien Facility, respectively, and the term "*Approving Lenders*" shall be defined as each of Avenue, Fortress, Caspian Capital LP and its affiliates ("*Caspian*") and Oaktree Capital Management, L.P. and its affiliates ("*Oaktree*"), provided, that, such term shall include Caspian and Oaktree so long as they shall collectively with Avenue and Fortress hold not less than 51% of the amounts outstanding under the First Lien Facility. This Term Sheet is subject to the approval of the Company's Board of Managers. This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import.

*THIS TERM SHEET IS BEING PROVIDED AS PART OF A PROPOSED COMPREHENSIVE RESTRUCTURING TRANSACTION, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE DEBT OF THE COMPANY AND ITS SUBSIDIARIES. NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS, OR DEFENSES OF THE COMPANY (AS DEFINED BELOW) AND ITS SUBSIDIARIES.*

| | |
|---|---|
| **Company** | QCE LLC ("*QCE*"), a Delaware limited liability company |
| **Holdco** | QCE Finance LLC ("*Holdco*" and together with its direct and indirect subsidiaries, the "*Company*"), a Delaware limited liability company |
| **Current Capital Structure** | The following outstanding indebtedness of, and equity interests in, the Company shall be restructured through out-of-court transactions with a pre-packaged chapter 11 plan as a backstop alternative, if required, as set forth in Exhibit A (the "*Pre-Packaged Chapter 11 Plan*"), in |

1

each case consistent with the material terms and conditions described in this Term Sheet:

(a) Indebtedness under the Credit Agreement, dated as of May 5, 2006, among QCE LLC, as Borrower, QCE Finance LLC, the lenders party thereto (the "*First Lien Lenders*"), Goldman Sachs Credit Partners L.P., as Administrative Agent (the "*First Lien Agent*"), Deutsche Bank Securities Inc., as Syndication Agent, and Credit Suisse Securities (USA) LLC, Wachovia Bank, N.A., and BNP Paribas Securities Corp., as Co-Documentation Agents (as amended, supplemented, or modified from time to time, the "*First Lien Facility*"), comprised of the term loan (the "*First Lien Term Loan*"), the revolving loan (the "*First Lien Revolving Loan*") and letters of credit ("*Letters of Credit*"). As of June 2011, the aggregate outstanding principal amount of (i) the First Lien Term Loan was $577.3 million and (ii) the First Lien Revolving Loan and Letters of Credit was $69.2 million;

(b) Indebtedness under the Credit Agreement, dated as of May 5, 2006, among QCE LLC, as Borrower, QCE Finance LLC, the lenders party thereto (the "*Second Lien Lenders*" and together with the First Lien Lenders, the "*Existing Lenders*"), Deutsche Bank Trust Company Americas, as Administrative Agent (the "*Second Lien Agent*" and together with the First Lien Agent, the "*Existing Agents*"), Goldman Sachs Credit Partners L.P., as Syndication Agent, and Credit Suisse Securities (USA) LLC and BNP Paribas Securities Corp., as Co-Documentation Agents (as amended, supplemented, or modified from time to time, the "*Second Lien Facility*"), comprised of the term loan (the "*Second Lien Term Loan*").   As of June 2011, the aggregate outstanding principal amount of the Second Lien Term Loan was $225.0 million;

(c) Indebtedness under the Credit Agreement, dated as of September 26, 2007, among QAFT, Inc., solely in its capacity as Trustee for The Regional Advertising Program Trust and The National Marketing Fund Trust, as Borrowers, the lenders party thereto, and Vectra Bank Colorado, National Association, as Administrative Agent (as amended, supplemented, or modified from time to time, the "*Marketing Fund Trust Credit Facility*"). As of June 2011, the aggregate outstanding principal amount of the indebtedness under the Marketing Fund Trust Credit Facility was $17.5 million; and

(d) all equity interests in QCE Holding LLC, QCE Incentive LLC, and the Company and rights or options to acquire such equity interests owned by existing equity holders (the "*Existing Equity Holders*").

| Restructuring/Treatment of Indebtedness and Equity Interests | The proposed restructuring (the "***Restructuring***") contemplates a refinancing of nearly all outstanding indebtedness and existing equity interests of the Company. The Restructuring contemplates, among other things, (i) an exchange offer for existing holders of the First Lien Facility into a New Second Lien Facility (as defined below), (ii) payment of all accrued but unpaid interest and a $75 million cash paydown of the First Lien Facility on a pro rata basis, including payment of accrued interest and breakage fees relating to the amount prepaid, before the consideration of the exchange offer for the existing holders of the First Lien Facility[7]; (iii) an amendment to the First Lien Facility, (iv) an exchange offer for the Second Lien Facility and (v) a $150 million private placement offering of new common equity securities to Avenue Capital Group and its affiliates ("***Avenue***"), a portion of the proceeds of which shall be used for the partial paydown on the First Lien Facility.

The "***Effective Date***" shall be the date on which the exchange offers and new equity issuance is completed and the transactions described herein consummated or, if the filing of the Pre-Packaged Chapter 11 Plan is made as provided in this Term Sheet, the effective date of the Plan of Reorganization (as defined below). The new indebtedness and common equity securities shall be distributed on the Effective Date.

The Restructuring would be accomplished through:[8]

    (i)    an exchange offer of the outstanding indebtedness under the Second Lien Facility for 100% of the common equity interest of QCE Finance, with such common equity interest of QCE Finance being simultaneously assigned by the Lenders under the Second Lien Facility to QCE Parent in exchange for 100% of the new common equity securities to be issued by QCE Parent, before accounting for potential dilution from equity to be issued in connection with the Management Incentive Plan (as defined below).[9]  Promptly after the Closing, the Company |

---

[7]    The use of proceeds is subject to agreement between the Company and the private placement investor, but such agreements shall at least permit the cash pay down contemplated herein.

[8]    Indebtedness with respect to any trade payables to remain outstanding and satisfied in the ordinary course of business.

[9]    This exchange is the first step of a three-step process. In Step 1, the Second Lien Lenders would exchange their debt for 100% of the equity interest in QCE Finance LLC (which will be treated for tax purposes as a foreclosure on the assets of QCE Finance LLC in exchange for 100% of the Second Lien Facility). In Step 2, the equity interest in QCE Finance is assigned and to be issued to QCE Parent (and not to the Second Lien Lenders), with the Second Lien Lenders being issued 100% of the equity interest in QCE Parent. In Step 3, (described in section (ii) immediately below), Avenue will be issued new equity interests in QCE Parent in

will merge with and into QCE Parent with QCE Parent being the surviving entity in the merger. QCE Parent will change its name to QCE Finance LLC in connection with the merger. As a condition to the closing of the Restructuring, holders of no less than 100% of the indebtedness under the Second Lien Facility must accept the terms of the exchange offer.

(ii)   a private placement offering of $150 million of new common equity securities equal to 60% of the new common equity securities of QCE Parent to Avenue, before accounting for potential dilution from equity to be issued in connection with the Management Incentive Plan (as defined below). The new equity investment shall be used by the Company for (a) the repayment of $75 million of outstanding indebtedness under the First Lien Facility, (b) payment of all accrued but unpaid interest under the First Lien Facility, (c) payment of fees and expenses in connection with the Restructuring, and (d) working capital and other general corporate purposes. Avenue shall be entitled to a $10 million cash commitment fee, which shall be earned upon the execution of the Subscription Agreement and which shall be paid on the Closing Date.

(iii)   an exchange offer of at least $150 million of outstanding indebtedness under the First Lien Facility (as adjusted to take into account the total cash paydown of $75 million) into a new PIK Toggle Second Lien Facility at par with an approximately five year and three month term (the "*New Second Lien Facility*").[10] The indebtedness under the New Second Lien Facility shall bear interest for the first two years at the rate of Libor plus 7.5% per annum, payable quarterly, with a portion of accrued interest equal to Libor (no floor) plus 1% to be paid in cash and the remainder to be paid in kind. Thereafter, the Company shall have the option to pay interest in cash, if an interest coverage ratio test to be determined is satisfied, or to pay interest in kind. After the first two years, the indebtedness under the New Second Lien Facility shall bear interest at

---

exchange for $150 million, which will dilute the Second Lien Lenders to 40% of outstanding QCE Parent Equity interests (subject to further dilution for the Management Incentive Plan).

[10]   If filing of the Pre-Packaged Chapter 11 Plan is necessary, the exchange offer of at least $150 million of outstanding indebtedness under the First Lien Facility would be adjusted to take into account the total cash paydown of $65 million on a pro rata paydown basis of the outstanding indebtedness under the First Lien Facility.

[11]   Fortress entities that cannot be directed to be carved out.

the rate of Libor plus 6% per annum if interest is paid in cash or Libor plus 7.5% if interest is paid in kind.  Such interest will be payable quarterly, (x) if the Company chooses the cash election, in cash, and (y) if the Company chooses the PIK election, a portion of accrued interest equal to Libor (no floor) plus 1% to be paid in cash and the remainder to be paid in kind.  For purposes of the New Second Lien Facility, the Libor rate would be subject to a floor of 5% per annum.  Certain holders of the First Lien Facility indebtedness, Avenue, Fortress, and, to the extent they are a party hereto, Goldman Sachs Credit Partners, L.P. (the "*Exchanging Participating Lenders*") agree, and each shall use commercially reasonable efforts to cause affiliates to agree,[11] to exchange the amount of First Lien Facility indebtedness owned by them (as adjusted to take into account the pro rata paydown contemplated hereby) and set forth on the signature pages to the Restructuring Support Agreement (which amounts shall be in the aggregate at least $150 million) for their pro rata portion of the New Second Lien Facility.  To the extent that other First Lien Lenders elect to exchange their First Lien Facility indebtedness for their pro rata portion of the New Second Lien Facility ("*Electing First Lien Lenders*" and, together with the Exchanging Participating Lenders, the "*Exchanging Lenders*"), such that the New Second Lien Facility would otherwise exceed $200 million (as adjusted to take into account the cash paydown contemplated hereby, but excluding any indebtedness issued as the Exchange Fee), the Exchanging Lenders shall be cut back on a pro rata basis, based upon the relative amounts elected to be exchanged.  All Exchanging Lenders that exchange their First Lien Facility indebtedness for the New Second Lien Facility shall receive their pro rata portion of a 500 bps exchange fee (the "*Exchange Fee*"), payable in additional New Second Lien Facility indebtedness.  The Exchange Fee will be calculated as a percentage of the outstanding principal amount of New Second Lien Facility indebtedness excluding any indebtedness to be issued as the Exchange Fee.

(iv)   an amendment to the First Lien Facility, which amendment shall, among other things, include an extension of the maturity date of the First Lien Facility.  The aggregate principal amount outstanding under the First Lien Facility following the exchange offer and repayment contemplated by the Restructuring shall be up to $455 million. (the "*Amended First Lien Facility*") including the aggregate principal amount of Amended First Lien Facility indebtedness to be issued as the PIK Consent Fee (as defined below).  All consenting First Lien Lenders shall be entitled to receive their pro rata portion of a 50 bps cash

5

|  | consent fee (the "***Cash Consent Fee***") on the new outstanding Amended First Lien Facility indebtedness and 350 bps on the new outstanding Amended First Lien Facility indebtedness, payable in Amended First Lien Facility indebtedness (the "***PIK Consent Fee***"). Both the Cash Consent Fee and the PIK Consent Fee shall be calculated as a percentage of the new outstanding principal amount of Amended First Lien Facility indebtedness excluding any indebtedness to be issued as the PIK Consent Fee. As a condition to the closing of the Restructuring, holders of no less than 100% of the indebtedness under the First Lien Facility must accept the terms of the amendment. |
|--|--|
|  | (v)   the Marketing Fund Trust Credit Facility shall remain outstanding with an extension of the maturity date pursuant to the terms set forth in the Vectra Commitment Letter. |
|  | Upon effectiveness of the Restructuring, all claims, liens, guarantees, and rights of the holders of indebtedness arising under or in connection with the First Lien Facility and the Second Lien Facility and the Existing Equity Holders shall automatically be waived, released, modified pursuant to or cancelled in exchange for (x) in the case of holders of indebtedness arising under or in connection with the First Lien Facility, payment of all accrued but unpaid interest as provided in the First Lien Facility and payment of $75 million of the aggregate principal amount outstanding under the First Lien Facility and (I) to the extent such holders are Exchanging Lenders, the rights under the New Second Lien Facility and (II) to the extent such holders are not Exchanging Lenders, the rights under the Amended First Lien Facility, provided, that the liens arising under the First Lien Facility shall continue under the Amended First Lien Facility; (y) in the case of holders of indebtedness arising under or in connection with the Second Lien Facility, their applicable share of 40% of the post-restructuring common equity of the Company, before accounting for potential dilution from shares issued in connection with the Management Incentive Plan; and (z) in the case of Existing Equity Holders, the releases and additional consideration contemplated hereby. |
| **Amended First Lien Facility** | *Description:* Up to $455 million term loan commitment including the aggregate principal amount of Amended First Lien Facility indebtedness to be issued as the PIK Consent Fee, but not including the new first lien letter of credit facility.<br><br>*Guarantees:* Guaranteed by same subsidiaries of the Company that guarantee the existing First Lien Facility.<br><br>*Maturity:* Five years after the Effective Date. |

6

| | |
|---|---|
| | *Interest:*  Libor plus 7.5% per annum with a Libor floor of 1.5% or base rate plus 6.5% per annum with a base rate floor of 2.5%. |
| | *Amortization:*  1% annually, payable on a quarterly basis, commencing on March 31, 2012. |
| | *Consent Fee:*  50 bps cash consent fee on the new outstanding Amended First Lien Facility indebtedness and 350 bps on the new outstanding Amended First Lien Facility indebtedness, payable in Amended First Lien Facility indebtedness, in each case, calculated as a percentage of the outstanding principal amount of Amended First Lien Facility indebtedness without giving effect to the 350 bps consent fee payable in Amended First Lien Facility indebtedness. |
| | *ECF Prepayment:*  75% of ECF, reducing to 50% upon achievement of first lien secured debt leverage ratio to be determined. |
| | *Collateral:*  Substantially the same as the collateral securing existing First Lien Facility. |
| | *Voting:*  Any first lien debt held by an insider or affiliate of the Company will be excluded from voting or giving consents under the Amended First Lien Facility (excluding certain debt funds that do not directly, or indirectly hold equity interests in QCE LLC or QCE Finance, LLC, and other than issues requiring the vote or consent of all lenders or all affected lenders). |
| | *Representations/Warranties/Covenants*:  Substantially the same as the existing First Lien Facility, subject to any necessary modifications to reflect the current operations of the Company.  Only financial covenant will be maximum leverage ratio of 8.0x first lien credit agreement debt to EBITDA, with first test date on June 30, 2013 and 4 equity cures permitted (with 2 clean quarters in any 4 quarter period) with additional limitations on general basket for restricted payments. |
| | *Amended First Lien Revolver:* Revolving credit facility of up to $5 million solely to permit the issuance of letters of credit. |
| **New Second Lien Facility** | *Description:*  At least $150 million, but not more than $200 million, term loan commitment, in each case as adjusted to take into account the cash paydown of the indebtedness under the First Lien Facility as contemplated hereby, plus the aggregate principal amount of New Second Lien Facility indebtedness to be issued as the Exchange Fee. |
| | *Guarantees:*  Guaranteed by same subsidiaries of the Company that guarantee the existing Second Lien Facility. |
| | *Maturity:*  Approximately five years and three months after the Effective Date. |

7

| | |
|---|---|
| | *Interest:* For the first two years, Libor plus 7.5% per annum payable in kind. Thereafter, Libor plus 6% per annum if cash pay and Libor plus 7.5% if PIK. Company may only elect the cash pay option if an interest coverage test to be agreed in the Amended First Lien Facility is satisfied (election and notice mechanics to be agreed). Libor will be deemed to be not less than 5% per annum. During the first two years, and, thereafter, if the PIK option is elected, a portion of accrued interest equal to Libor (no floor) plus 1% will be required to be paid in cash, and the remainder shall be paid in kind.<br><br>*Amortization:* None.<br><br>*Exchange Fee:* 500 bps exchange fee, which is payable in additional New Second Lien Facility indebtedness, calculated as a percentage of the outstanding principal amount of New Second Lien Facility indebtedness without giving effect to the 500 bps exchange fee payable in additional New Second Lien Facility indebtedness.<br><br>*Collateral:* Substantially the same as the collateral securing existing Second Lien Facility.<br><br>*Representations/Warranties/Covenants:* Substantially the same as the existing Second Lien Facility, subject to any necessary modifications to reflect the current operations of the Company. |
| **Deferred Compensation Plans/AD Notes** | Prior to consummation of the Restructuring, (i) each of Richard E. Schaden, Richard F. Schaden and Patrick E. Meyers shall agree to irrevocably terminate and waive his right to be paid any and all amounts under the Company's deferred compensation plans and (ii) the payment obligations under the Company's deferred compensation plans and AD Notes shall have been reduced by $15 million in the aggregate (which amount shall include the payments waived pursuant to clause (i) above) (the "***Reduction Amount***"), provided, however, that the Reduction Amount may be waived by Avenue in its sole discretion. |
| **Management Fees** | On December 31, 2011, the management agreement between The Cervantes Holding Company and TQSC II LLC dated January 1, 2009 (as amended, the "***Management Agreement***") shall be cancelled at no cost or expense to the Company, except as may have been actually incurred in connection with the services provided under the Management Agreement prior to such cancellation and termination. For the avoidance of doubt there will be no damages paid under the Management Agreement in connection with the termination thereof. |
| **Severance Payments** | On the earlier of the Closing Date or filing of the Chapter 11 Cases (as defined below), the current obligations and rights arising from the employment agreement with Richard E. Schaden dated May 5, 2006 (as amended, the "***Schaden Employment Agreement***") will be cancelled, including, without limitation, obligations for unpaid severance payments under Section 7.5 (Severance Payments) and any |

8

| | |
|---|---|
| | obligations or rights arising under Section 8 (Noncompetition and Nonsolicitation). Ongoing obligations and rights arising from the Schaden Employment Agreement shall terminate at no cost or expense to the Company. |
| **CFSS and Rockford** | As of the last day of the month in which the consummation of the Restructuring occurs, the Area Director Marketing Agreement dated September 17, 2009 with Chicago Franchise Support Services LLC (as amended, the "*CFSS Agreement*") and Management Agreement dated January 16, 2004 with Rockford Manager LLC (as amended, the "*Rockford Agreement*") shall terminate at no cost or expense to the Company, except as may have been actually incurred in connection with the services provided under the CFSS Agreement and Rockford Agreement prior to such termination. For the avoidance of doubt there will be no damages paid under the CFSS Agreement or Rockford Agreement in connection with the termination thereof. |
| **Chapter 11 Cases** | If filing of the Pre-Packaged Chapter 11 Plan is necessary, and subject to the consent of Avenue and Fortress, the Company and certain of its subsidiaries (collectively, the "*Debtors*") shall file voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "*Chapter 11 Cases*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"). The plan of reorganization describing the Pre-Packaged Chapter 11 Plan (the "*Plan of Reorganization*") and the disclosure statement describing the Plan of Reorganization (the "*Disclosure Statement*") shall be filed on the same day as the filing of the Chapter 11 Cases (the "*Petition Date*"). The Plan of Reorganization shall be in all material respects consistent with Exhibit A hereto. |
| **Implementation of Restructuring and Definitive Documentation** | The parties to the Restructuring Support Agreement shall have executed same to commence the transactions contemplated herein by no later than [DATE], 2011 (the "*RSA Date*"). The Restructuring Support Agreement shall be terminable upon the conditions contained therein.<br><br>The Restructuring Support Agreement shall require Participating Lenders, and any successors or assigns thereof, to (i) approve and participate in the Restructuring, as applicable, (ii) vote to accept the Plan of Reorganization, if required and (iii) forbear from exercising remedies under the First Lien Facility and the Second Lien Facility, as applicable, as a result of any of the defaults or events of default set forth on Schedule 1 to the Restructuring Support Agreement.<br><br>The Company and the Requisite Participating Lenders shall, in good faith, negotiate definitive documentation concerning the Restructuring that is consistent with the terms described in this Term Sheet and any related documentation, including, without limitation, the Restructuring Support Agreement, the Plan of Reorganization and Disclosure Statement, all post-Effective Date corporate organization |

| | and governance documents, and all other documents necessary to effectuate the Restructuring. |
|---|---|
| **Motions and Other Bankruptcy Court Filings** | If filing the Chapter 11 Cases is necessary, all motions and other filings with the Bankruptcy Court, including any proposed orders (including, without limitation, the order confirming the Plan of Reorganization (the "***Confirmation Order***")) shall be in form and substance acceptable to the Requisite Participating Lenders and Approving Lenders, to the extent required in the Restructuring Support Agreement. |
| **Tax/Business Considerations** | The parties to the Restructuring Support Agreement shall use good faith efforts to structure the Restructuring and the transactions contemplated herein and in the Restructuring Support Agreement to the maximum extent possible in a tax-efficient and cost-effective manner for the Company, Existing Equity Holders, and the Existing Lenders.<br><br>All items of income, gain, loss, and deduction relating to QCE Finance LLC up to and including the deemed transfer of the QCE Finance LLC assets to the Second Lien Lenders referenced in Step 1 of footnote 3 shall be reported on the partnership tax return filed by QCE Incentive LLC (which owns 100% of QCE Finance LLC until the Restructuring) and the post-restructuring equity owners of QCE Finance LLC shall not file tax returns inconsistent with such treatment.  Existing Equity Holders shall be responsible for the calculation of such items and for the preparation and filing of the QCE Incentive LLC partnership return that includes such items. Existing Equity Holders will control any audits of tax returns that include items relating to QCE Finance LLC for years occurring prior to and including the Effective Date. |
| **Board Members/Corporate Governance** | Upon effectiveness of the Restructuring, the Company's organizational documents shall be amended, and all parties receiving equity in the Company (and all persons to whom such parties may sell their equity in the future and all persons who purchase or acquire equity from the Company in future transactions) shall be required to become parties to an operating agreement or shareholders agreement, as applicable, in each case providing for (a) the number of board members; (b) the ability to designate board members; and (c) other standard provisions and minority protections to be negotiated between the parties. |
| **Management Incentive Plan** | The Requisite Participating Lenders and the Company shall work in good faith to negotiate on a management incentive plan (taking into account tax implications) for the Company (the "***Management Incentive Plan***"), which shall provide for grants of options and/or restricted units/equity reserved for management, directors, and employees for up to 10% of the new common equity securities to be issued by Holdco.  The amount, form, exercise price, allocation and vesting of such equity-based awards, and any limitations thereon, |

10

| | |
|---|---|
| | shall be determined and approved by the new Board of Managers or the Board of Directors, as applicable. |
| **Conditions Precedent to Closing** | The occurrence of the Effective Date shall be subject to the satisfaction of conditions precedent customary for transactions of this type and the satisfaction of such other conditions precedent agreed upon by the Requisite Participating Lenders and the Company, including but not limited to, the following:<br><br>• The negotiation, execution and delivery of definitive documentation with respect to the Restructuring contemplated by this Term Sheet and the Restructuring Support Agreement, reasonably acceptable to Avenue and otherwise consistent with the terms and conditions set forth in this Term Sheet and the Restructuring Support Agreement.<br><br>• If the Restructuring is consummated through the Plan of Reorganization, approval of such plan by the Bankruptcy Court, on terms consistent with Exhibit A and the Restructuring Support Agreement (including the agreed upon milestones).<br><br>• Renegotiation of headquarters lease with landlord on terms and conditions acceptable to the Requisite Participating Lenders and the Company.<br><br>• Other conditions typical for transactions of this nature, including non-disparagement agreements. |
| **Releases** | To the fullest extent permitted by applicable law, the Restructuring shall include a full release from liability in favor of QCE Holding, QCE Incentive, the Company, the Existing Equity Holders, the Existing Lenders, and all current and former direct and indirect equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives) of QCE Holding, QCE Incentive, the Company, the Existing Equity Holders and the Existing Lenders from any claims and causes of action related to or arising on or prior to the Effective Date, except for any claims and causes of action for unlawful acts. The Existing Equity Holders shall also exchange a full release as to any claims that may exist between the Existing Equity Holders. |

11

Ex. 3 p. 99

| Other Terms | • Forbearance by First Lien Lenders and Second Lien Lenders through effectiveness of the Restructuring, solely to the extent provided in the Restructuring Support Agreement. |
|---|---|
| | • Assumption/continuation by QCE LLC of all indemnification provisions and agreements currently in place for current and former directors, officers, managers, members, employees and agents of QCE Holding LLC, QCE LLC, the Company and their subsidiaries and of current and former members of the Board of Managers of QCE Holding LLC. |
| | • The Company shall obtain D&O and E&O insurance for current and former directors, officers, managers, employees and agents and purchase "tail" coverage for any such insurance that terminates on terms and conditions acceptable to Avenue.[12] |
| | • In connection with any pending or future litigation that names any current or former director, officer, manager, member, employee and agent of QCE Finance LLC, the Company and their subsidiaries and/or current and former members of the Board of Managers of QCE Holding or QCE Incentive as a party (each a *"**Non-Company Litigation Party**"*), the Company shall cooperate in good faith with each Non-Company Litigation Party in the defense of such litigation and the Company shall not settle any such pending or future litigation without the written consent of each Non-Company Litigation Party named therein; provided that no such consent shall be necessary (i) if such settlement, or the portion thereof as it relates to a named Non-Company Litigation Party, involves only the payment of money and such payment is made by the Company and/or the Company's insurers and the Non-Company Litigation Party is released s part of the settlement or (ii) if such settlement does not relate to a named Non-Company Litigation Party or such Non-Company Litigation Party is either not eligible for indemnification by the Company or not covered by the Company's insurance with respect to such litigation; provided further, that if such Non-Company Litigation Party is not entitled to indemnification from QCE Finance LLC, the Company or their subsidiaries, then QCE Finance LLC, the Company or their subsidiaries shall not and shall have no obligation to settle such claim on behalf of such Non-Company Litigation Party. |
| | • Payment by the Company of the reasonable and documented fees and expenses of (a) Akin Gump Strauss Hauer & Feld LLP and Lazard Freres & Co., and one local Delaware counsel, advisors to the Steering Committee, in accordance with the agreements |

---

[12] To be documented.

12

|  | between the Company and such firms, (b) Willkie Farr & Gallagher LLP and Blackstone Advisory Partners L.P. (in accordance with the terms of Blackstone's engagement letter), and one local Delaware counsel, advisors to certain First Lien Lenders, (c) Skadden Arps and Milbank, Tweed, Hadley & McCloy LLP., (d) First Lien Agent and Second Lien Agent in accordance with the terms of the First Lien Credit Agreement and Second Lien Credit Agreement, respectively, and (d) Existing Equity Holders, whose fees and expenses shall not exceed (A) in the case of Cervantes Master LLC and Quiznos Finance LLC, $500,000 in the aggregate, and (B) in the case of JPMP/Q, LLC, J.P. Morgan Partners Global Investors, L.P. and J.P. Morgan Partners Global Investors (Selldown), L.P., $500,000 in the aggregate; in each case in accordance with the terms of the Restructuring Support Agreement. |
|---|---|
| **Governing Law and Forum** | New York governing law and consent to exclusive New York jurisdiction. |

13

EXHIBIT B

JOINDER

JOINDER

The undersigned ("Transferee") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [_____](the "Agreement"), by and among (i) QCE Finance, LLC and all of its direct and indirect affiliates, (collectively, the "Company"), **[Transferor's Name]** ("Transferor"), and the other holders of claims against the Company signatory thereto, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a "Participating Lender" under the terms of the Agreement.

Date Executed: _____

**TRANSFEREE**

Name of Institution: _____

By: _____
Name: _____
Its: _____
Telephone: _____
Facsimile: _____

**First Lien Debt Claims**

$ _____

**Second Lien Debt Claims**

$ _____

## EXHIBIT C

### NEW SECOND LIEN FACILITY

**SEE APPENDIX H OF THE OFFERING MEMORANDUM AND DISCLOSURE STATEMENT**

EXHIBIT D

FIRST LIEN FACILITY AMENDMENT

**DRAFT**

## SECOND AMENDMENT
## TO CREDIT AGREEMENT

      **THIS SECOND AMENDMENT TO CREDIT AGREEMENT** (this **"Amendment"**) is dated as of __, 2012 and is entered into by and among QCE LLC, a Delaware limited liability company (the **"Borrower"**), QCE Finance LLC, a Delaware limited liability company (**"Holdco"**), **GOLDMAN SACHS CREDIT PARTNERS L.P.** (**"GSCP"**), as the administrative agent (in such capacity, the **"Administrative Agent"**), the Lenders party hereto and, for purposes of Section IV hereof, the **GUARANTORS** listed on the signature pages hereto, and is made with reference to that certain **CREDIT AGREEMENT** dated as of May 5, 2006 (as amended, restated, amended and restated, supplemented or otherwise modified through the date hereof, the **"Existing Credit Agreement"**) by and among the Borrower, Holdco, the Lenders, the Administrative Agent and the other Agents named therein.  Capitalized terms used herein without definition shall have the same meanings herein as set forth in the Existing Credit Agreement after giving effect to this Amendment (the **"Restated Credit Agreement"**).

## RECITALS

      **WHEREAS,** the Loan Parties have requested that the Lenders agree to amend and restate in its entirety the Existing Credit Agreement as provided for herein;

      **WHEREAS**, in connection with the amendment and restatement of the Existing Credit Agreement, the First Lien Exchange Offer, the Second Lien Exchange Offer, the Private Placement Transaction and the Existing Credit Agreement Prepayment (collectively, the **"Transactions"**) will occur; and

      **WHEREAS,** subject to certain conditions, the Lenders have agreed to amend and restate in its entirety the Existing Credit Agreement as provided herein.

      **NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION I.   AMENDMENTS TO CREDIT AGREEMENT; EXECUTION OF INTERCREDITOR AGREEMENT

      **A.   Amendment and Restatement of Credit Agreement**.   Effective as of the Amendment Effective Date, the Existing Credit Agreement (excluding, except as expressly set forth herein, any schedule or exhibit thereto, each of which shall remain as in effect immediately prior to the Amendment Effective Date) is hereby amended and restated to be in the form attached as Exhibit A hereto

**B.    Amendments to Schedules and Exhibits**.    Effective as of the Amendment Effective Date, Schedules [1.01(a), 2.01, 3.04, 3.07(b), 3.08(a), 3.17, 3.18, 3.21, 6.01, 6.02(a), 6.04 and 6.07] shall be amended and restated to be in the forms attached as Exhibit C hereto and Schedule 1.01(b) shall be deleted in its entirety.[1]

**C.    Intercreditor Agreement**.    The Lenders hereby authorize the Goldman Sachs Credit Partners L.P. in its capacity as Collateral Agent to execute the Intercreditor Agreement attached hereto as Exhibit D hereto.

**SECTION II.    CONDITIONS TO EFFECTIVENESS**

This Amendment shall become effective as of the date hereof only upon the satisfaction of all of the following conditions precedent (the date of satisfaction of such conditions being referred to herein as the **"Amendment Effective Date"**):[2]

**A.    Execution**.    The Administrative Agent shall have executed a counterpart signature page of this Amendment and received a counterpart signature page of this Amendment duly executed by each of the Loan Parties and the Lenders.

**B.    Fees**.    The Administrative Agent shall have received for distribution to the Lenders the consent fees set forth in Section 2.12 of the Restated Credit Agreement.

**C.    Loan Prepayment and Termination of Revolving Facility Commitments**.    The Borrower shall have made the Existing Credit Agreement Prepayment.    The aggregate principal amount of Loans under the Restated Credit Agreement shall not exceed $455,000,000 (before taking into account any letter of credit facility and related revolving credit facility under the Restated Credit Agreement).

**D.    Consummation of Private Placement**.    The Private Placement Transaction shall be consummated and the net cash proceeds from such issuance shall be contributed to the capital of the Borrower, each substantially concurrently with the effectiveness of this Amendment.

**E.    Consummation of Second Lien Exchange Offer**.    The Second Lien Exchange Offer shall be consummated substantially concurrently with the effectiveness of this Amendment.    All claims, liens, guarantees, and rights of lenders under the Second Lien Credit Agreement and any related document shall be released and terminated.

**F.    Consummation of First Lien Exchange Offer**.    The First Lien Exchange Offer shall be consummated, and the Second Lien Credit Agreement (the **"New Second Lien Facility"**) in the form of **Exhibit B** hereto shall have been executed by the parties thereto, each substantially concurrently with the effectiveness of the Amendment.

---

[1] Schedules need to be updated as corresponding reps and covenants will be brought down to amendment effective date.

[2] If necessary, appropriate changes to be made to reflect nature of the Restated Credit Agreement as an exit facility, including such changes as are contemplated by the Restructuring Support Agreement.

**G.     Necessary Consents.** Each Loan Party shall have obtained all consents necessary in connection with the transactions contemplated by this Amendment.

**H.     Collateral and Guarantee Requirement.**   The Collateral and Guarantee Requirement shall be satisfied as of the Amendment Effective Date.

**I.     Absence of Default or Event of Default.** No Default or Event of Default shall have occurred and be continuing as of the Amendment Effective Date after giving effect to the transactions occurring on such date.

**J.     Representations and Warranties.** The representations and warranties set forth in Article III of the Restated Credit Agreement shall be true and correct in all material respects as of such date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

**K.     Closing Certificates, Opinions, etc.**  The conditions set forth in Section 4.02(b), (c), (d), (g), (h), (j)(x), (n) and (o) of the Restated Credit Agreement shall be satisfied with respect to the Restated Credit Agreement and the Amendment Effective Date.   The Administrative Agent shall have received evidence reasonably satisfactory to it that the conditions set forth in this Section II (including consummation of the First Lien Exchange Offer, the Second Lien Exchange Offer, the Private Placement Transaction and the Existing Credit Agreement Prepayment) have occurred.

**L.     Other Documents.**  The Administrative Agent and the Lenders shall have received such other documents, information or agreements regarding Loan Parties as the Administrative Agent or any Lender may reasonably request.

**M.     Deadline**.  The Restructuring Support Agreement dated as of December __, 2011 among Holdco, the Borrower, the lenders under the Existing Credit Agreement and the Second Lien Credit Agreement party thereto shall not have been terminated, other than due to the consummation of the Transactions.

**N.     Payment of Fees and Expenses.**  The Borrower shall have paid all reasonable documented fees and expenses payable on or before the Amendment Effective Date required under Section 9.05 of the Restated Credit Agreement, including, without limitation, reasonable fees and expenses of Latham & Watkins, LLP, counsel to the Administrative Agent, and of all financial and legal advisers to the ad hoc committee of lenders under the Existing Credit Agreement (including The Blackstone Group, Willkie Farr & Gallagher LLP and Milbank, Tweed, Hadley & McCloy LLP) in connection with the Transactions (including due diligence), whether or not the Transactions are consummated.

**O.     Post-Closing Deposit Account Control Agreements.**  From and after the date that is 60 days after the Amendment Effective Date, as such date may be extended in the discretion of the Administrative Agent, each deposit account of each Loan Party (other than deposit accounts maintained with JPMorgan Chase Bank, N.A. and Wells Fargo Bank, N.A.) shall be subject to a control agreement with respect to collection and control of all deposits and balances held in such deposit account in form and substance reasonably satisfactory to the Administrative Agent (a

3

"**Deposit Account Control Agreement**"). From and after the date that is 90 days after the Amendment Effective Date, as such date may be extended in the discretion of the Administrative Agent, each deposit account of each Loan Party maintained with JPMorgan Chase Bank, N.A. and Wells Fargo Bank, N.A. shall be subject to a Deposit Account Control Agreement. Notwithstanding the foregoing, control agreements shall not be required for (i) escrow accounts, (ii) accounts exclusively used for payroll, payroll taxes or employee benefits and (iii) accounts containing less than $250,000 in the aggregate at any one time.

## SECTION III.   REPRESENTATIONS AND WARRANTIES[3]

In order to induce Lenders to enter into this Amendment and to amend the Existing Credit Agreement in the manner provided herein, each Loan Party which is a party hereto represents and warrants to each Lender that the following statements are true and correct in all material respects as of the date hereof after giving effect to the Transactions:

**A.   Corporate Power and Authority.** Each Loan Party, which is party hereto, has all requisite power and authority to enter into this Amendment and to carry out the transactions contemplated by, and perform its obligations under, the Restated Credit Agreement.

**B.   Authorization of Agreements.** The execution and delivery of this Amendment and the performance of the Restated Credit Agreement have been duly authorized by all necessary action on the part of each Loan Party.

**C.   No Conflict.** The execution and delivery by each Loan Party of this Amendment and the performance by each Loan Party of the Restated Credit Agreement do not and will not (i) violate (A) any provision of (x) any law, statute, rule or regulation applicable to such party, or (y) of the certificate or articles of incorporation or other constitutive documents or by-laws of Holdco, the Borrower or any such Subsidiary Loan Party or (B) any applicable order of any court or any rule, regulation or order of any Governmental Authority, or (C) any provision of any indenture, certificate of designation for preferred stock, agreement or other instrument to which Holdco, the Borrower or any such Subsidiary Loan Party is a party or by which any of them or any of their property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) or to a loss of a material benefit under any such indenture, certificate of designation for preferred stock, agreement or other instrument, where any such conflict, violation, breach or default referred to in clause (i)(A)(x), (i)(B), (i)(C) or (ii) of this Section III.C., could reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, property, operations or condition of the Borrower or its Subsidiaries, taken as a whole, or the validity or enforceability of any of the Loan Documents or the rights and remedies of the Administrative Agent and the Lenders thereunder or (iii) except as permitted under the Restated Credit Agreement, result in the creation or imposition of any Lien upon or with respect to any property or assets owned by Holdco, the Borrower or any such Subsidiary Loan Party (other than

---

[3] If necessary, appropriate changes to be made to reflect nature of the Restated Credit Agreement as an exit facility, including such changes as are contemplated by the Restructuring Support Agreement.

any Liens created under any of the Loan Documents and Liens permitted by Section 6.02 of the Restated Credit Agreement).

**D.    Governmental Consents.**[4]  No action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required in connection with the execution and delivery by each Loan Party of this Amendment and the performance by the Borrower and Holdco of the Restated Credit Agreement, except for such actions, consents and approvals the failure to obtain or make which could not reasonably be expected to have a material adverse effect on the business, property, operations or condition of the Borrower and its Subsidiaries, taken as a whole, or the validity or enforceability of any of the Loan Documents or the rights and remedies of the Administrative Agent and the Lenders thereunder.

**E.    Binding Obligation.**  This Amendment has been duly executed and delivered by each of the Loan Parties party hereto and constitutes a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing.

**F.    Incorporation of Representations and Warranties from Restated Credit Agreement.**  The representations and warranties contained in Article III of the Restated Credit Agreement are and will be true and correct in all material respects on and as of the Amendment Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case they were true and correct in all material respects on and as of such earlier date.

**G.    Absence of Default.**  No event has occurred and is continuing or will result from the consummation of the transactions contemplated by this Amendment that would constitute an Event of Default or a Default after giving effect to the Transactions..

**SECTION IV.    ACKNOWLEDGMENT AND CONSENT**

**A.    <u>Guarantor Acknowledgement and Consent.</u>**

Each guarantor party to the Collateral Agreement (each, a "**Guarantor**") hereby acknowledges that it has reviewed the terms and provisions of the Credit Agreement and this Amendment and consents to the amendment of the Credit Agreement effected pursuant to this Amendment. Each Guarantor hereby confirms that each Loan Document to which it is a party or otherwise bound and all Collateral encumbered thereby will continue to guarantee or secure, as the case may be, to the fullest extent possible in accordance with the Loan Documents the payment and performance of all "Obligations" under each of the Loan Documents to which it is a party (in each case, as such term is defined in the applicable Loan Document).

---

[4]If necessary, appropriate changes to be made to reflect nature of the Restated Credit Agreement as an exit facility, including such changes as are contemplated by the Restructuring Support Agreement.

Each Guarantor acknowledges and agrees that any of the Loan Documents to which it is a party or otherwise bound shall continue in full force and effect as amended by this Amendment and that all of its obligations thereunder shall not be impaired or limited by the execution or effectiveness of this Amendment.  Each Guarantor party hereto represents and warrants that all representations and warranties of such Guarantor contained in this Amendment and the Loan Documents to which it is a party or otherwise bound are true and correct in all material respects on and as of the Amendment Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case they were true and correct in all material respects on and as of such earlier date.

Each Guarantor acknowledges and agrees that (i) notwithstanding the conditions to effectiveness set forth in this Amendment, such Guarantor is not required by the terms of the Existing Credit Agreement or any other Loan Document to consent to the amendments to the Existing Credit Agreement effected pursuant to this Amendment and (ii) nothing in the Existing Credit Agreement, this Amendment or any other Loan Document shall be deemed to require the consent of such Guarantor to any future amendments to the Restated Credit Agreement.

**B.**     **Lender Consent to First Lien Exchange Offer**.  By execution of this Amendment, each Lender hereby (i) consents to the consummation of the First Lien Exchange Offer and (ii) waives (a) any Default or Event of Default that has occurred under the Existing Credit Agreement and (b) any rights or claims it may have with respect thereto pursuant to Section 2.18(c) of the Existing Credit Agreement.  For the avoidance of doubt, the waiver provided for in clause (ii)(a) of this Section IV(B) shall not constitute a waiver of any Default or Event of Default that would exist under the Restated Credit Agreement as of the Amendment Effective Date.

## SECTION V.     MISCELLANEOUS

**A.**     **Reference to and Effect on the Existing Credit Agreement and the Other Loan Documents**.

(i)     On and after the Amendment Effective Date, each reference in the Restated Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the Credit Agreement, and each reference in the other Loan Documents to the "Agreement", "thereunder", "thereof" or words of like import referring to the Existing Credit Agreement shall mean and be a reference to the Restated Credit Agreement.

(ii)     Except as specifically amended by this Amendment, the Existing Credit Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.

(iii)     Except as specifically set forth in this Amendment, the execution, delivery and performance of this Amendment shall not constitute a waiver of any provision of, or operate as a waiver of any right, power or remedy of any Agent or Lender under, the Existing Credit Agreement or any of the other Loan Documents.

**B.    Headings.** Section and Subsection headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purpose or be given any substantive effect.

**C.    Applicable Law.   THIS AMENDMENT AND THE RIGHTS AND OB-LIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THEREOF TO THE EXTENT THE APPLICATION OF SUCH PRINCIPLES WOULD PROVIDE THAT THE LAWS OF ANOTHER JURISDICTION WOULD GOVERN.**

**D.    Counterparts.** This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.   Delivery of an executed counterpart of a signature page of this Agreement by telecopy, "pdf." format or other similar electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

*[Remainder of this page intentionally left blank.]*

7

Ex. 3 p. 112

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.


**BORROWER:**                          **QCE LLC**


                                        By: _____
                                             Name:
                                             Title:

**GUARANTORS :**

**QCE FINANCE LLC**

By: _____
     Name:
     Title:

**AMERICAN FOOD DISTRIBUTORS LLC**

By: _____
     Name:
     Title:

**CONTINENTAL LENDING GROUP LLC**

By: _____
     Name:
     Title:

**QFA ROYALTIES LLC**

By: _____
     Name:
     Title:

**QIP HOLDER LLC**

By: _____
     Name:
     Title:

**QUIZ-CAN LLC**

By: _____
     Name:
     Title:

**QUIZ-DIA LLC**

By: _____
      Name:
      Title:

**QUIZNO'S CANADA HOLDING LLC**

By: _____
      Name:
      Title:

**SOURCE ONE DISTRIBUTION LLC**

By: _____
      Name:
      Title:

**THE QUIZNO'S MASTER LLC**

By: _____
      Name:
      Title:

**TQSC II LLC**

By: _____
      Name:
      Title:

**RESTAURANT REALTY LLC**

By: _____

　　　Name:
　　　Title:

**GOLDMAN SACHS CREDIT PARTNERS L.P.,**
as Administrative Agent


By: _____
       Authorized Signatory

**LENDER:**

By signing below, you have indicated your consent
to the Second Amendment to Credit Agreement

Name of Institution:

_____

By: _____
      Name:
      Title:

**EXHIBIT A**

Form of Amended and Restated Credit Agreement

**EXHIBIT B**

<u>Form of New Second Lien Facility</u>

EXHIBIT E

AMENDED INTERCREDITOR AGREEMENT

**DRAFT**

## INTERCREDITOR AGREEMENT

This **INTERCREDITOR AGREEMENT** ("**Agreement**"), is dated as of [•], 2012, and entered into by and among QCE LLC (the "**Company**"), Goldman Sachs Credit Partners L.P. ("**GSCP**"), in its capacity as collateral agent for the First Lien Obligations (as defined below), including its successors and assigns from time to time (the "**First Lien Collateral Agent**"), and [•] in its capacity as collateral agent for the Second Lien Obligations (as defined below), including its successors and assigns from time to time (the "**Second Lien Collateral Agent**"). Capitalized terms used in this Agreement have the meanings assigned to them in Section 1 below.

## RECITALS

The Company, QCE Finance LLC ("**Holdings**"), [QCE Parent], the lenders and agents party thereto, GSCP, as Administrative Agent and Collateral Agent and Deutsche Bank Securities Inc. ("**DB**"), as Syndication Agent, have entered into that Amended and Restated Credit Agreement dated as of the date hereof providing for a revolving credit facility and term loan (as amended, restated, supplemented, modified, replaced or refinanced from time to time, the "**First Lien Credit Agreement**");

The Company, Holdings, [QCE Parent], the lenders and agents party thereto and [•], as Administrative Agent and Collateral Agent, have entered into that Credit Agreement, dated as of the date hereof providing for a term loan (as amended, restated, supplemented, modified, replaced or refinanced from time to time, the "**Second Lien Credit Agreement**");

Pursuant to (i) the First Lien Credit Agreement, Holdings has agreed to guaranty the First Lien Obligations (the "**First Lien Holdings Guaranty**") and Holdings and the Company have agreed to cause certain current and future Subsidiaries to agree to guaranty the First Lien Obligations (the "**First Lien Subsidiary Guaranty**") and certain Subsidiaries have entered into the First Lien Subsidiary Guaranty and (ii) the Second Lien Credit Agreement, Holdings has agreed to guaranty the Second Lien Obligations (the "**Second Lien Holdings Guaranty**") and Holdings and the Company have agreed to cause certain current and future Subsidiaries to agree to guaranty the Second Lien Obligations (the "**Second Lien Subsidiary Guaranty**") and certain Subsidiaries have entered into the Second Lien Subsidiary Guaranty;

The obligations of the Company under the First Lien Credit Agreement and any Hedge Agreements or Cash Management Agreements with a Lender Counterparty, the obligations of Holdings under the First Lien Holdings Guaranty and the obligations of the Subsidiary guarantors under the First Lien Subsidiary Guaranty will be secured on a first priority basis by liens on substantially all the assets of the Company, Holdings and the Subsidiary guarantors (such current and future Subsidiaries of the Company providing a guaranty thereof, the "**Guarantor Subsidiaries**"), respectively, pursuant to the terms of the First Lien Collateral Documents;

The obligations of the Company under the Second Lien Credit Agreement, the obligations of Holdings under the Second Lien Holdings Guaranty and the obligations of the

**Ex. 3 p. 122**

Guarantor Subsidiaries under the Second Lien Subsidiary Guaranty will be secured on a second priority basis by liens on substantially all the assets of the Company, Holdings and the Guarantor Subsidiaries, respectively, pursuant to the terms of the Second Lien Collateral Documents;

The First Lien Loan Documents and the Second Lien Loan Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral; and

In order to induce the First Lien Collateral Agent and the First Lien Claimholders to consent to the Grantors incurring the Second Lien Obligations and to induce the First Lien Claimholders to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any other Grantor, the Second Lien Collateral Agent on behalf of the Second Lien Claimholders has agreed to the intercreditor and other provisions set forth in this Agreement.

## AGREEMENT

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1.  Definitions**.

**1.1**  Defined Terms.  As used in the Agreement, the following terms shall have the following meanings:

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.  For purposes of this definition, a Person shall be deemed to "**control**" or be "**controlled by**" a Person if such Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through ownership of equity interests, by contract or otherwise.

"**Agreement**" means this Intercreditor Agreement, as amended, restated, renewed, extended, supplemented or otherwise modified from time to time.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Law**" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"**Cap Amount**" has the meaning assigned to that term within the definition of "First Lien Obligation".

"**Cash Management Agreement**" means any agreement evidencing "Cash Management Obligations" (as defined in the First Lien Credit Agreement as in effect on the date hereof) entered into by (i) Holdings, the Borrower or any of its Subsidiaries and (ii) a Lender Counterparty.

"**Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, constituting both First Lien Collateral and Second Lien Collateral.

"**Commodities Agreement**" means any commodity exchange, swap, forward, cap, floor, collar or other similar agreement or arrangement, each of which is for the purpose of hedging the commodities price risk associated with Holdings', the Borrower's and its Subsidiaries' operations and not for speculative purposes.

"**Company**" has the meaning assigned to that term in the Preamble to this Agreement.

"**Comparable Second Lien Collateral Document**" means, in relation to any Collateral subject to any Lien created under any First Lien Collateral Document, the Second Lien Loan Document which creates a Lien on the same Collateral, granted by the same Grantor.

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with Holdings', the Borrower's and its Subsidiaries' operations and not for speculative purposes.

"**DIP Financing**" has the meaning assigned to that term in Section 6.1.

"**Discharge of First Lien Obligations**" means, except to the extent otherwise expressly provided in Section 5.5:

(a)     payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding), on all Indebtedness outstanding under the First Lien Loan Documents and constituting First Lien Obligations;

(b)     payment in full in cash of all other First Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid;

(c)     termination or expiration of all commitments, if any, to extend credit that would constitute First Lien Obligations; and

(d)     termination, cash collateralization (in an amount and manner reasonably satisfactory to the First Lien Collateral Agent, but in no event greater than 105% of the aggregate undrawn face amount) or backstopping (with letters of credit having terms and conditions reasonably satisfactory to the First Lien Collateral Agent) of all letters of credit issued under the First Lien Loan Documents and constituting First Lien Obligations.

"**Disposition**" has the meaning assigned to that term in Section 5.1(a)(2).

"**First Lien Claimholders**" means, at any relevant time, the holders of First Lien Obligations at that time, including the First Lien Lenders and the agents under the First Lien Loan Documents.

"**First Lien Collateral Agent**" has the meaning assigned to that term in the Recitals to this Agreement.

"**First Lien Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any First Lien Obligations.

"**First Lien Collateral Documents**" means the Security Documents (as defined in the First Lien Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted securing any First Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**First Lien Credit Agreement**" has the meaning assigned to that term in the Recitals to this Agreement.

"**First Lien Holdings Guaranty**" has the meaning assigned to that term in the Recitals to this Agreement.

"**First Lien Lenders**" means the "Lenders" under and as defined in the First Lien Loan Documents.

"**First Lien Loan Documents**" means (i) the First Lien Credit Agreement and the Loan Documents (as defined in the First Lien Credit Agreement) and (ii) any Hedge Agreements or Cash Management Agreements entered into with a Lender Counterparty, and each of the other agreements, documents and instruments providing for or evidencing any other First Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any First Lien Obligations, including any intercreditor or joinder agreement among holders of First Lien Obligations, to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

"**First Lien Mortgages**" means a collective reference to the mortgage, deeds of trust and other documents or instruments under which any Lien on real property owned or leased by any Grantor is granted to secure any First Lien Obligations or under which rights or remedies with respect to any such Liens are governed.

"**First Lien Obligations**" means, subject to the next sentence, all Obligations outstanding under the First Lien Credit Agreement and the other First Lien Loan Documents, including Hedge Agreements and Cash Management Agreements entered into with any Lender Counterparty. "First Lien Obligations" shall include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified

in the relevant First Lien Loan Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

Notwithstanding the foregoing, if the sum of: (1) Indebtedness for borrowed money constituting principal outstanding under the First Lien Credit Agreement and the other First Lien Documents; plus (2) the aggregate face amount of any letters of credit issued but not reimbursed under the First Lien Credit Agreement, is in excess of $[560][1] million in the aggregate (the "**Cap Amount**"), then only that portion of such Indebtedness and such aggregate face amount of letters of credit equal to the Cap Amount shall be included in First Lien Obligations and interest and reimbursement obligations with respect to such Indebtedness and letters of credit shall only constitute First Lien Obligations to the extent related to Indebtedness and face amounts of letters of credit included in the First Lien Obligations.

For the avoidance of doubt, obligations outstanding under the Second Lien Loan Documents shall not be considered a refinancing or replacement of obligations outstanding under the First Lien Loan Documents and will not constitute First Lien Obligations.

"**First Lien Subsidiary Guaranty**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Grantors**" means the Company, Holdings, after the effectiveness of the Holdco Merger (as defined in the First Lien Credit Agreement), [QCE Parent], each of the Guarantor Subsidiaries and each other Person that has or may from time to time hereafter execute and deliver a First Lien Collateral Document or a Second Lien Collateral Document as a "Grantor" (or the equivalent thereof).

"**Guarantor Subsidiaries**" has the meaning set forth in the Recitals to this Agreement.

"**Hedge Agreements**" means an Interest Rate Agreement, Commodities Agreement or a Currency Agreement entered into with a Lender Counterparty in order to satisfy the requirements of the First Lien Credit Agreement or otherwise in the ordinary course of Holding's, the Borrower's or any of its Subsidiaries' businesses.

"**Holdings**" has the meaning set forth in the Recitals to this Agreement.

---

[1]    To be $100M above first lien term loan and LC facility amount.

**Ex. 3 p. 126**

"**Indebtedness**" means and includes all Obligations that constitute "Indebtedness" within the meaning of the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable.

"**Insolvency or Liquidation Proceeding**" means:

(a)      any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor;

(b)      any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of their respective assets;

(c)      any liquidation, dissolution, reorganization or winding up of any Grantor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy; or

(d)      any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement each of which is for the purpose of hedging the interest rate exposure associated with Holdings', the Borrower's and its Subsidiaries' operations and not for speculative purposes.

"**Lender Counterparty**" means any counterparty to a Hedge Agreement or Cash Management Agreement that, at the time such Hedge Agreement or Cash Management Agreement was entered into, was a Joint Lead Arranger (as defined in the First Lien Credit Agreement as in effect on the date hereof), a First Lien Lender or an Affiliate thereof.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust, UCC financing statement or other preferential arrangement having the practical effect of any of the foregoing.

"**New Agent**" has the meaning assigned to that term in Section 5.5.

"**Obligations**" means all obligations of every nature of each Grantor from time to time owed to any agent or trustee, the First Lien Claimholders, the Second Lien Claimholders or any of them or their respective Affiliates, in each case under the First Lien Loan Documents, the Second Lien Loan Documents or Hedge Agreements and Cash Management Agreements, whether for principal, interest or payments for early termination of Interest Rate Agreements, fees, expenses, indemnification or otherwise and all guarantees of any of the foregoing.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"**Pledged Collateral**" has the meaning set forth in Section 5.4.

"**Recovery**" has the meaning set forth in Section 6.5.

"**Refinance**" means, in respect of any Indebtedness, to refinance, extend, renew, defease, amend, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for, such Indebtedness in whole or in part. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Second Lien Claimholders**" means, at any relevant time, the holders of Second Lien Obligations at that time, including the Second Lien Lenders and the agents under the Second Lien Loan Documents.

"**Second Lien Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted as security for any Second Lien Obligations.

"**Second Lien Collateral Agent**" has the meaning assigned to that term in the Preamble of this Agreement.

"**Second Lien Collateral Documents**" means the Security Documents (as defined in the Second Lien Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted securing any Second Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**Second Lien Credit Agreement**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Second Lien Holdings Guaranty**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Second Lien Lenders**" means the "Lenders" under and as defined in the Second Lien Credit Agreement.

"**Second Lien Loan Documents**" means the Second Lien Credit Agreement and the Loan Documents (as defined in the Second Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other Second Lien Obligation, and any other document or instrument executed or delivered at any time in connection with any Second Lien Obligations, including any intercreditor or joinder agreement among holders of Second Lien Obligations to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed or extended from time to time in accordance with the provisions of this Agreement.

"**Second Lien Mortgages**" means a collective reference to the mortgages, deeds of trust and any other documents or instruments under which any Lien on real property owned or leased by any Grantor is granted to secure any Second Lien Obligations or under which rights or remedies with respect to any such Liens are governed.

"**Second Lien Obligations**" means all Obligations outstanding under the Second Lien Credit Agreement and the other Second Lien Loan Documents. "Second Lien Obligations" shall include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant Second Lien Loan Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

"**Second Lien Subsidiary Guaranty**" has the meaning assigned to that term in the Recitals to this Agreement.

"**Standstill Period**" has the meaning set forth in Section 3.1.

"**Subsidiary**" means, with respect to any person (herein referred to as the "parent"), any corporation, partnership, association or other business entity (i) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, controlled or held, or (i) that is, at the time any determination is made, otherwise controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

**1.2**    Terms Generally.  The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise:

(a)    any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented, modified, renewed or extended;

(b)    any reference herein to any Person shall be construed to include such Person's permitted successors and assigns;

(c)    the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(d)    all references herein to Sections shall be construed to refer to Sections of this Agreement; and

(e)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## SECTION 2. **Lien Priorities**.

**2.1**     Relative Priorities.   Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing the Second Lien Obligations granted on the Collateral or of any Liens securing the First Lien Obligations granted on the Collateral and notwithstanding any provision of the UCC, or any other applicable law or the Second Lien Loan Documents or any defect or deficiencies in, or failure to perfect, the Liens securing the First Lien Obligations or any other circumstance whatsoever, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby agrees that:

(a)     any Lien on the Collateral securing any First Lien Obligations now or hereafter held by or on behalf of the First Lien Collateral Agent or any First Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any Second Lien Obligations; and

(b)     any Lien on the Collateral securing any Second Lien Obligations now or hereafter held by or on behalf of the Second Lien Collateral Agent, any Second Lien Claimholders or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any First Lien Obligations.  All Liens on the Collateral securing any First Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Second Lien Obligations for all purposes, whether or not such Liens securing any First Lien Obligations are subordinated to any Lien securing any other obligation of the Company, any other Grantor or any other Person.

**2.2**     Prohibition on Contesting Liens.   Each of the Second Lien Collateral Agent, for itself and on behalf of each Second Lien Claimholder, and the First Lien Collateral Agent, for itself and on behalf of each First Lien Claimholder, agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in the First Lien Collateral or by or on behalf of any of the Second Lien Claimholders in the Second Lien Collateral, as the case may be, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of the First Lien Collateral Agent or any First Lien Claimholder to enforce this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the First Lien Obligations as provided in Sections 2.1 and 3.1.

**2.3**     No New Liens.   So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, the parties hereto agree that the Company shall not, and shall not permit any other Grantor to:

(a)     grant or permit any additional Liens on any asset or property to secure any Second Lien Obligation unless it has granted or concurrently grants a Lien on such asset or property to secure the First Lien Obligations; or

Ex. 3 p. 130

(b)     grant or permit any additional Liens on any asset or property to secure any First Lien Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the Second Lien Obligations.

To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Lien Collateral Agent and/or the First Lien Claimholders, the Second Lien Collateral Agent, on behalf of Second Lien Claimholders, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.2.

**2.4**     <u>Similar Liens and Agreements</u>.  The parties hereto agree that it is their intention that the First Lien Collateral and the Second Lien Collateral be identical.   In furtherance of the foregoing and of Section 8.9, the parties hereto agree, subject to the other provisions of this Agreement:

(a)     upon request by the First Lien Collateral Agent or the Second Lien Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the First Lien Collateral and the Second Lien Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the First Lien Loan Documents and the Second Lien Loan Documents; and

(b)     that the documents and agreements creating or evidencing the First Lien Collateral and the Second Lien Collateral and guarantees for the First Lien Obligations and the Second Lien Obligations, subject to Section 5.3(d), shall be in all material respects the same forms of documents other than with respect to the first lien and the second lien nature of the Obligations thereunder.

## SECTION 3. <u>Enforcement</u>.

**3.1**     <u>Exercise of Remedies</u>.

(a)     Until the Discharge of First Lien Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, the Second Lien Collateral Agent and the Second Lien Claimholders:

(1)     will not exercise or seek to exercise any rights or remedies with respect to any Collateral (including the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Lien Collateral Agent or any Second Lien Claimholder is a party) or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure); <u>provided</u>, <u>however</u>, that the Second Lien Collateral Agent may exercise any or all such rights or remedies after the passage of a period of at least 180 days has elapsed since the later of: (i) the date on which the Second Lien Collateral Agent declares the existence of any Event of Default under any Second Lien Loan Documents and demands the repayment of all the principal amount of any Second Lien Obligations; and (ii) the date on which the First Lien Collateral Agent receives notice from the Second Lien Collateral Agent of such

declarations of an Event of Default, (the "**Standstill Period**"); <u>provided</u>, <u>further</u>, <u>however</u>, that notwithstanding anything herein to the contrary, in no event shall the Second Lien Collateral Agent or any Second Lien Claimholder exercise any rights or remedies with respect to the Collateral if, notwithstanding the expiration of the Standstill Period, the First Lien Collateral Agent or First Lien Claimholders shall have commenced and be diligently pursuing the exercise of their rights or remedies with respect to all or any material portion of the Collateral (prompt notice of such exercise to be given to the Second Lien Collateral Agent);

(2)     will not contest, protest or object to any foreclosure proceeding or action brought by the First Lien Collateral Agent or any First Lien Claimholder or any other exercise by the First Lien Collateral Agent or any First Lien Claimholder of any rights and remedies relating to the Collateral under the First Lien Loan Documents or otherwise; and

(3)     subject to their rights under clause (a)(1) above and except as may be permitted in Section 3.1(c), will not object to the forbearance by the First Lien Collateral Agent or the First Lien Claimholders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral;

<u>provided</u>, <u>that</u>, in the case of (1), (2) and (3) above, the Liens granted to secure the Second Lien Obligations of the Second Lien Claimholders shall attach to any proceeds resulting from actions taken by the First Lien Collateral Agent or any First Lien Claimholder in accordance with this Agreement after application of such proceeds to the extent necessary to meet the requirements of a Discharge of First Obligations.

(b)     Until the Discharge of First Lien Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, subject to Section 3.1(a)(1), the First Lien Collateral Agent and the First Lien Claimholders shall have the right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the Second Lien Collateral Agent or any Second Lien Claimholder; <u>provided</u>, that the Lien securing the Second Lien Obligations shall remain on the proceeds of such Collateral released or disposed of subject to the relative priorities described in Section 2. In exercising rights and remedies with respect to the Collateral, the First Lien Collateral Agent and the First Lien Claimholders may enforce the provisions of the First Lien Loan Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(c)     Notwithstanding the foregoing, the Second Lien Collateral Agent and any Second Lien Claimholder may:

Ex. 3 p. 132

(1)   file a claim or statement of interest with respect to the Second Lien Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor;

(2)   take any action (not adverse to the priority status of the Liens on the Collateral securing the First Lien Obligations, or the rights of any First Lien Collateral Agent or the First Lien Claimholders to exercise remedies in respect thereof) in order to create, perfect, preserve or protect its Lien on the Collateral;

(3)   file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Claimholders, including any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement;

(4)   file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either any Insolvency or Liquidation Proceeding or applicable non-bankruptcy law, in each case not inconsistent with the terms of this Agreement;

(5)   vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Second Lien Obligations and the Collateral; and

(6)   exercise any of its rights or remedies with respect to the Collateral after the termination of the Standstill Period to the extent permitted by Section 3.1(a)(1).

The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including set-off) with respect to any Collateral in its capacity as a creditor in violation of this Agreement.

Without limiting the generality of the foregoing, unless and until the Discharge of First Lien Obligations has occurred, except as expressly provided in Sections 3.1(a), 6.3(b) and this Section 3.1(c), the sole right of the Second Lien Collateral Agent and the Second Lien Claimholders with respect to the Collateral is to hold a Lien on the Collateral pursuant to the Second Lien Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First Lien Obligations has occurred.

(d)   Subject to Sections 3.1(a) and (c) and Section 6.3(b):

(1)   the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, agrees that the Second Lien Collateral Agent and the Second Lien Claimholders will not take any action that would hinder any exercise of remedies under the First Lien Loan Documents or is otherwise prohibited hereunder, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise;

(2)     the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby waives any and all rights it or the Second Lien Claimholders may have as a junior lien creditor or otherwise to object to the manner in which the First Lien Collateral Agent or the First Lien Claimholders seek to enforce or collect the First Lien Obligations or the Liens securing the First Lien Obligations granted in any of the First Lien Collateral undertaken in accordance with this Agreement, regardless of whether any action or failure to act by or on behalf of the First Lien Collateral Agent or First Lien Claimholders is adverse to the interest of the Second Lien Claimholders; and

(3)     the Second Lien Collateral Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second Lien Collateral Documents or any other Second Lien Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the First Lien Collateral Agent or the First Lien Claimholders with respect to the Collateral as set forth in this Agreement and the First Lien Loan Documents.

(e)     Except as otherwise specifically set forth in Sections 3.1(a) and (d), the Second Lien Collateral Agent and the Second Lien Claimholders may exercise rights and remedies as unsecured creditors against the Company or any other Grantor that has guaranteed or granted Liens to secure the Second Lien Obligations in accordance with the terms of the Second Lien Loan Documents and applicable law; *provided* in the event that any Second Lien Claimholder becomes a judgment Lien creditor in respect of Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Lien Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Lien Obligations) as the other Liens securing the Second Lien Obligations are subject to this Agreement.

(f)     Nothing in this Agreement shall prohibit the receipt by the Second Lien Collateral Agent or any Second Lien Claimholders of the required payments of interest, principal and other amounts owed in respect of the Second Lien Obligations so long as such receipt is not the direct or indirect result of the exercise by the Second Lien Collateral Agent or any Second Lien Claimholders of rights or remedies as a secured creditor (including set-off) or enforcement in contravention of this Agreement of any Lien held by any of them.  Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Lien Collateral Agent or the First Lien Claimholders may have with respect to the First Lien Collateral.

### SECTION 4.  <u>Payments</u>.

**4.1**     <u>Application of Proceeds</u>.   So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies by the First Lien Collateral Agent or First Lien Claimholders, shall be applied by the First Lien Collateral Agent to the First Lien Obligations in such order as specified in the relevant First Lien Loan Documents.  Upon the Discharge of First Lien Obligations, the First Lien Collateral Agent shall deliver to the Second Lien Collateral Agent any

Collateral and proceeds of Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the Second Lien Collateral Agent to the Second Lien Obligations in such order as specified in the Second Lien Collateral Documents.

**4.2** Payments Over in Violation of Agreement. So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, any Collateral or proceeds thereof (including assets or proceeds subject to Liens referred to in the final sentence of Section 2.3) received by the Second Lien Collateral Agent or any Second Lien Claimholders in connection with the exercise of any right or remedy (including set-off) relating to the Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The First Lien Collateral Agent is hereby authorized to make any such endorsements as agent for the Second Lien Collateral Agent or any such Second Lien Claimholders. This authorization is coupled with an interest and is irrevocable until the Discharge of First Lien Obligations.

### SECTION 5. Other Agreements.

**5.1** Releases. (a) If in connection with the exercise of the First Lien Collateral Agent's remedies in respect of the Collateral provided for in Section 3.1, the First Lien Collateral Agent, for itself or on behalf of any of the First Lien Claimholders, releases any of its Liens on any part of the Collateral or releases any Grantor from its obligations under its guaranty of the First Lien Obligations in connection with the sale of the stock, or substantially all the assets, of such Grantor, then the Liens, if any, of the Second Lien Collateral Agent, for itself or for the benefit of the Second Lien Claimholders, on such Collateral, and the obligations of such Grantor under its guaranty of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released. The Second Lien Collateral Agent, for itself or on behalf of any such Second Lien Claimholders, promptly shall execute and deliver to the First Lien Collateral Agent or such Grantor such termination statements, releases and other documents as the First Lien Collateral Agent or such Grantor may request to effectively confirm such release.

(b) If in connection with any sale, lease, exchange, transfer or other disposition of any Collateral (collectively, a "**Disposition**") permitted under the terms of both the First Lien Loan Documents and the Second Lien Loan Documents, the First Lien Collateral Agent, for itself or on behalf of any of the First Lien Claimholders, releases any of its Liens on any part of the Collateral, or releases any Grantor from its obligations under its guaranty of the First Lien Obligations in connection with the sale of the stock, or substantially all the assets, of such Grantor, then the Liens, if any, of the Second Lien Collateral Agent, for itself or for the benefit of the Second Lien Claimholders, on such Collateral, and the obligations of such Grantor under its guaranty of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released. The Second Lien Collateral Agent, for itself or on behalf of any such Second Lien Claimholders, promptly shall execute and deliver to the First Lien Collateral Agent

or such Grantor such termination statements, releases and other documents as the First Lien Collateral Agent or such Grantor may request to effectively confirm such release.

(c)     The Second Lien Collateral Agent shall not be required to release its Liens on the Collateral (A) in connection with the Discharge of First Lien Obligations or (B) after the occurrence and during the continuance of any Event of Default under the Second Lien Credit Agreement, except as otherwise specified in clause (a) or (b) above.

(d)     Until the Discharge of First Lien Obligations occurs, the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby irrevocably constitutes and appoints the First Lien Collateral Agent and any officer or agent of the First Lien Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Second Lien Collateral Agent or such holder or in the First Lien Collateral Agent's own name, from time to time in the First Lien Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release.

(e)     Until the Discharge of First Lien Obligations occurs, to the extent that the First Lien Collateral Agent or the First Lien Claimholders (i) have released any Lien on Collateral or any Grantor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (ii) obtain any new liens or additional guarantees from any Grantor, then the Second Lien Collateral Agent, for itself and for the Second Lien Claimholders, shall be granted a Lien on any such Collateral, subject to the lien subordination provisions of this Agreement, and an additional guaranty, as the case may be.

(f)     In the event that the principal amount of funded First Lien Obligations plus the aggregate face amount of letters of credit, if any, issued under the First Lien Credit Agreement and not reimbursed plus the aggregate principal amount of unfunded commitments under the First Lien Credit Agreement (collectively, the "**First Lien Obligations Amount**"), at any date of determination no longer constitute at least 15% of the sum of (i) the First Lien Obligations Amount and (ii) the principal amount of funded Second Lien Obligations plus the aggregate principal amount of unfunded commitments under the Second Lien Credit Agreement (collectively, the "**Second Lien Obligations Amount**"), then any agreement provided for in Section 5.1(a) and (b) above (except for releases given in connection with a Disposition permitted under the First Lien Loan Documents and the Second Lien Loan Documents) shall require the consent of First Lien Claimholders and Second Lien Claimholders representing in the aggregate more than 50% of the sum of (i) the First Lien Obligations Amount and (ii) the Second Lien Obligations Amount

**5.2**     Insurance.  Unless and until the Discharge of First Lien Obligations has occurred, subject to the terms of, and the rights of the Grantors under, the First Lien Loan Documents, the First Lien Collateral Agent and the First Lien Claimholders shall have the sole and exclusive right to adjust settlement for any insurance policy covering the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral.  Unless and until the

Ex. 3 p. 136

Discharge of First Lien Obligations has occurred, and subject to the rights of the Grantors under the First Lien Loan Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect to the Collateral and to the extent required by the First Lien Loan Documents shall be paid to the First Lien Collateral Agent for the benefit of the First Lien Claimholders pursuant to the terms of the First Lien Loan Documents (including, without limitation, for purposes of cash collateralization of letters of credit) and thereafter, to the extent no First Lien Obligations are outstanding, and subject to the rights of the Grantors under the Second Lien Collateral Documents, to the Second Lien Collateral Agent for the benefit of the Second Lien Claimholders to the extent required under the Second Lien Collateral Documents and then, to the extent no Second Lien Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct.  Until the Discharge of First Lien Obligations has occurred, if the Second Lien Collateral Agent or any Second Lien Claimholders shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such proceeds over to the First Lien Collateral Agent in accordance with the terms of Section 4.2.

     **5.3**    <u>Amendments to First Lien Loan Documents and Second Lien Loan Documents</u>.  (a)  The First Lien Loan Documents may be amended, supplemented or otherwise modified in accordance with their terms and the First Lien Credit Agreement may be Refinanced, in each case, without notice to, or the consent of the Second Lien Collateral Agent or the Second Lien Claimholders, all without affecting the lien subordination or other provisions of this Agreement; <u>provided</u>, <u>however</u>, that the holders of such Refinancing debt bind themselves in a writing addressed to the Second Lien Collateral Agent and the Second Lien Claimholders to the terms of this Agreement and any such amendment, supplement, modification or Refinancing shall not, without the consent of the Second Lien Collateral Agent:

        (1)    increase the sum of (without duplication) (A) the then outstanding aggregate principal amount of the First Lien Credit Agreement and (B) the aggregate amount of Revolving Commitment under the First Lien Credit Agreement and (C) the aggregate face amount of any letters of credit issued under the First Lien Credit Agreement and not reimbursed in excess of the Cap Amount;

        (2)    increase the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to the First Lien Obligations by more than 3% per annum (excluding increases resulting from the accrual of interest at the default rate, but including any amount of MFN Increases (as defined below));

        (3)    add additional restrictions on the payment of cash interest under the Second Lien Credit Agreement; or

        (4)    contravene the provisions of this Agreement.

Notwithstanding anything herein or in the First Lien Credit Agreement to the contrary, the Applicable Margin, under and as defined in the First Lien Credit Agreement, shall be increased by an amount (calculated as a percentage per annum) equal to 50% of any increase in the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to

the Second Lien Obligations (excluding increases resulting from the accrual of interest at the default rate) (any such increase, a "MFN Increase"); provided that, the Applicable Margin, under and as defined in the First Lien Credit Agreement, shall not be increased pursuant to the foregoing to the extent that any such MFN Increase, together with all other increases in the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to the First Lien Obligations (excluding increases resulting from the accrual of interest at the default rate, but including any amount of prior MFN Increases) will exceed 3% per annum.

(b)     Without the prior written consent of the First Lien Collateral Agent, no Second Lien Loan Document may be Refinanced, amended, supplemented or otherwise modified or entered into to the extent such Refinancing, amendment, supplement or modification, or the terms of any new Second Lien Loan Document, would:

(1)     increase the principal amount of the Second Lien Credit Agreement in excess of the amount permitted under the First Lien Credit Agreement;

(2)     increase the "Applicable Margin" or similar component of the interest rate or yield provisions applicable to the Second Lien Obligations by more than 3% per annum (excluding increases resulting from the accrual of interest at the default rate);

(3)     change any default or Event of Default thereunder in a manner adverse to the loan parties thereunder (other than to eliminate any such Event of Default or increase any grace period related thereto or otherwise make such Event of Default or condition less restrictive or burdensome on the Company);

(4)     change the final maturity date thereof to an earlier date;

(5)     change the mandatory prepayment provisions thereof in a manner adverse to any Grantor or First Lien Lenders;

(6)     increase materially the obligations of the obligor thereunder or to confer any additional material rights on the lenders under the Second Lien Credit Agreement (or a representative on their behalf) which would be adverse to any Loan Party or any First Lien Lender; or

(7)     contravene the provisions of this Agreement.

The Second Lien Credit Agreement may be Refinanced to the extent the terms and conditions of such Refinancing debt meet the requirements of this Section 5.3(b), and the holders of such Refinancing debt bind themselves in a writing addressed to the First Lien Collateral Agent and the First Lien Claimholders to the terms of this Agreement.

(c)     The Company agrees that each Second Lien Collateral Document shall include the following language (or language to similar effect approved by the First Lien Collateral Agent):

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the Second Lien Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Second Lien Collateral Agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of [•], 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**"), among QCE LLC, Goldman Sachs Credit Partners L.P., as First Lien Collateral Agent and [Deutsche Bank Trust Company Americas], as Second Lien Collateral Agent and certain other persons party or that may become party thereto from time to time.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

In addition, the Company agrees that each Second Lien Mortgage covering any Collateral shall contain such other language as the First Lien Collateral Agent may reasonably request to reflect the subordination of such Second Lien Mortgage to the First Lien Collateral Document covering such Collateral.

(d)     In the event any First Lien Collateral Agent or the First Lien Claimholders and the relevant Grantor enter into any amendment, waiver or consent in respect of any of the First Lien Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Lien Collateral Document or changing in any manner the rights of the First Lien Collateral Agent, such First Lien Claimholders, the Company or any other Grantor thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Second Lien Collateral Document without the consent of the Second Lien Collateral Agent or the Second Lien Claimholders and without any action by the Second Lien Collateral Agent, the Company or any other Grantor, provided, that:

(1)     no such amendment, waiver or consent shall have the effect of:

(A)     removing or releasing assets subject to the Lien of the Second Lien Collateral Documents, except to the extent that a release of such Lien is permitted or required by Section 5.1 of this Agreement and provided that there is a corresponding release of the Liens securing the First Lien Obligations;

(B)     imposing duties on the Second Lien Collateral Agent without its consent;

(C)     permitting other Liens on the Collateral not permitted under the terms of the Second Lien Loan Documents or Section 6; or

(D)     being materially adverse to the interests of the Second Lien Claimholders unless the interests of the First Lien Claimholders are affected in the same or a similar manner; and

(2)     notice of such amendment, waiver or consent shall have been given to the Second Lien Collateral Agent within ten (10) Business Days after the effective date of such amendment, waiver or consent.

**5.4**   Bailee for Perfection.   (a)   The First Lien Collateral Agent agrees to hold that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC (such Collateral being the "**Pledged Collateral**") as collateral agent for the First Lien Claimholders and as bailee for the Second Lien Collateral Agent (such bailment being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2) and 9-313(c) of the UCC) and any assignee solely for the purpose of perfecting the security interest granted under the First Lien Loan Documents and the Second Lien Loan Documents, respectively, subject to the terms and conditions of this Section 5.4.

(b)   The First Lien Collateral Agent shall have no obligation whatsoever to the First Lien Claimholders, the Second Lien Collateral Agent or any Second Lien Claimholder to ensure that the Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.4. The duties or responsibilities of the First Lien Collateral Agent under this Section 5.4 shall be limited solely to holding the Pledged Collateral as bailee in accordance with this Section 5.4 and delivering the Pledged Collateral upon a Discharge of First Lien Obligations as provided in paragraph (d) below.

(c)   The First Lien Collateral Agent acting pursuant to this Section 5.4 shall not have by reason of the First Lien Collateral Documents, the Second Lien Collateral Documents, this Agreement or any other document a fiduciary relationship in respect of the First Lien Claimholders, the Second Lien Collateral Agent or any Second Lien Claimholder.

(d)   Upon the Discharge of First Lien Obligations under the First Lien Loan Documents to which the First Lien Collateral Agent is a party, the First Lien Collateral Agent shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements, first, to the Second Lien Collateral Agent to the extent Second Lien Obligations remain outstanding, and second, to the Company to the extent no First Lien Obligations or Second Lien Obligations remain outstanding (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral). The First Lien Collateral Agent further agrees to take all other action reasonably requested by the Second Lien Collateral Agent in connection with the Second Lien Collateral Agent obtaining a first-priority interest in the Collateral or as a court of competent jurisdiction may otherwise direct.

(e)   Subject to the terms of this Agreement, so long as the Discharge of First Lien Obligations has not occurred, the First Lien Collateral Agent shall be entitled to deal with the Pledged Collateral or Collateral within its "control" in accordance with the terms of this Agreement and other First Lien Loan Documents as if the Liens of the Second Lien Collateral Agent and Second Lien Claimholders did not exist.

**5.5**   When Discharge of First Lien Obligations Deemed to Not Have Occurred. If concurrently with the Discharge of First Lien Obligations, the Company thereafter enters into any Refinancing of any First Lien Loan Document evidencing a First Lien Obligation which Refinancing is permitted by the Second Lien Loan Documents, then such Discharge of First Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken as a result of the occurrence of such first

**Ex. 3 p. 140**

Discharge of First Lien Obligations), and, from and after the date on which the New First Lien Debt Notice is delivered to the Second Lien Collateral Agent in accordance with the next sentence, the obligations under such Refinancing of the First Lien Loan Document shall automatically be treated as First Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the First Lien Collateral Agent under such First Lien Loan Documents shall be the First Lien Collateral Agent for all purposes of this Agreement. Upon receipt of a notice (the "**New First Lien Debt Notice**") stating that the Company has entered into a new First Lien Loan Document (which notice shall include the identity of the new first lien collateral agent, such agent, the "**New Agent**"), the Second Lien Collateral Agent shall promptly (a) enter into such documents and agreements (including amendments or supplements to this Agreement) as the Company or such New Agent shall reasonably request in order to provide to the New Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement and (b) deliver to the New Agent any Pledged Collateral held by it together with any necessary endorsements (or otherwise allow the New Agent to obtain control of such Pledged Collateral). The New Agent shall agree in a writing addressed to the Second Lien Collateral Agent and the Second Lien Claimholders to be bound by the terms of this Agreement. If the new First Lien Obligations under the new First Lien Loan Documents are secured by assets of the Grantors constituting Collateral that do not also secure the Second Lien Obligations, then the Second Lien Obligations shall be secured at such time by a second priority Lien on such assets to the same extent provided in the Second Lien Collateral Documents and this Agreement.

      **5.6**    Purchase Right.  Without prejudice to the enforcement of the First Lien Claimholders remedies, the First Lien Claimholders agree at any time following an acceleration of the First Lien Obligations in accordance with the terms of the First Lien Credit Agreement, the First Lien Claimholders will offer the Second Lien Claimholders the option to purchase the entire aggregate amount of outstanding First Lien Obligations (including unfunded commitments under the First Lien Credit Agreement) at par plus accrued interest (without regard to any prepayment penalty or premium), without warranty or representation or recourse, on a pro rata basis across First Lien Claimholders. The Second Lien Claimholders shall irrevocably accept or reject such offer within ten (10) Business Days of the receipt thereof and the parties shall endeavor to close promptly thereafter. If the Second Lien Claimholders accept such offer, it shall be exercised pursuant to documentation mutually acceptable to each of the First Lien Collateral Agent and the Second Lien Collateral Agent. If the Second Lien Claimholders reject such offer (or do not so irrevocably accept such offer within the required timeframe), the First Lien Claimholders shall have no further obligations pursuant to this Section 5.6 and may take any further actions in their sole discretion in accordance with the First Lien Loan Documents and this Agreement.

      **5.7**    Cash Interest under the Second Lien Credit Agreement.  Notwithstanding anything to the contrary in the Second Lien Credit Agreement, interest owing under the Second Lien Credit Agreement may not be paid in cash to the extent that such cash interest payments would be prohibited pursuant to the terms of the First Lien Credit Agreement.

Ex. 3 p. 141

## SECTION 6. <u>Insolvency or Liquidation Proceedings</u>.

**6.1** <u>Finance and Sale Issues</u>. Until the Discharge of First Lien Obligations has occurred, if the Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the First Lien Collateral Agent shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code), on which the First Lien Collateral Agent or any other creditor has a Lien or to permit the Company or any other Grantor to obtain financing, whether from the First Lien Claimholders or any other Person under Section 364 of the Bankruptcy Code or any similar Bankruptcy Law ("**DIP Financing**") then the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will raise no objection to such Cash Collateral use or DIP Financing so long as such Cash Collateral use or DIP Financing is (i) on commercially reasonable terms, (ii) the Second Lien Collateral Agent and the Second Lien Claimholders retain the right to object to any ancillary agreements or arrangements regarding the Cash Collateral use or the DIP Financing that are materially prejudicial to their interests and (iii) the DIP Financing (a) does not compel the Company to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the DIP Financing documentation or a related document or (b) the DIP Financing documentation or Cash Collateral order does not expressly require the liquidation of the Collateral prior to a default under the DIP Financing documentation or Cash Collateral order. To the extent the Liens securing the First Lien Obligations are subordinated to or pari passu with such DIP Financing which meets the requirements of clauses (i) through (iii) above, the Second Lien Collateral Agent will subordinate its Liens in the Collateral to the Liens securing such DIP Financing (and all Obligations relating thereto) and will not request adequate protection or any other relief in connection therewith (except, as expressly agreed by the First Lien Collateral Agent or to the extent permitted by Section 6.3).

**6.2** <u>Relief from the Automatic Stay</u>. Until the Discharge of First Lien Obligations has occurred, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral, without the prior written consent of the First Lien Collateral Agent, unless a motion for adequate protection permitted under Section 6.3 has been denied by the Bankruptcy Court.

**6.3** <u>Adequate Protection</u>.

(a) The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that none of them shall contest (or support any other Person contesting):

(1) any request by the First Lien Collateral Agent or the First Lien Claimholders for adequate protection; or

(2) any objection by the First Lien Collateral Agent or the First Lien Claimholders to any motion, relief, action or proceeding based on the First Lien Collateral Agent or the First Lien Claimholders claiming a lack of adequate protection.

(b)      Notwithstanding the foregoing provisions in this Section 6.3, in any Insolvency or Liquidation Proceeding:

(1)      if the First Lien Claimholders (or any subset thereof) are granted adequate protection in the form of additional collateral in connection with any Cash Collateral use or DIP Financing, then the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, may seek or request adequate protection in the form of a Lien on such additional collateral, which Lien will be subordinated to the Liens securing the First Lien Obligations and such Cash Collateral use or DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the First Lien Obligations under this Agreement; and

(2)      in the event the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations and such adequate protection is granted in the form of additional collateral, then the Second Lien Collateral Agent, on behalf of itself or any of the Second Lien Claimholders, agrees that the First Lien Collateral Agent shall also be granted a senior Lien on such additional collateral as security for the First Lien Obligations and for any Cash Collateral use or DIP Financing provided by the First Lien Claimholders and that any Lien on such additional collateral securing the Second Lien Obligations shall be subordinated to the Lien on such collateral securing the First Lien Obligations and any such DIP Financing provided by the First Lien Claimholders (and all Obligations relating thereto) and to any other Liens granted to the First Lien Claimholders as adequate protection on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to such First Lien Obligations under this Agreement. Except as otherwise expressly set forth in Section 6.1 or in connection with the exercise of remedies with respect to the Collateral, nothing herein shall limit the rights of the Second Lien Collateral Agent or the Second Lien Claimholders from seeking adequate protection with respect to their rights in the Collateral in any Insolvency or Liquidation Proceeding (including adequate protection in the form of a cash payment, periodic cash payments or otherwise).

6.4      No Waiver. Subject to Sections 3.1(a) and (d), nothing contained herein shall prohibit or in any way limit the First Lien Collateral Agent or any First Lien Claimholder from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the Second Lien Collateral Agent or any of the Second Lien Claimholders, including the seeking by the Second Lien Collateral Agent or any Second Lien Claimholders of adequate protection or the asserting by the Second Lien Collateral Agent or any Second Lien Claimholders of any of its rights and remedies under the Second Lien Loan Documents or otherwise.

6.5      Avoidance Issues. If any First Lien Claimholder is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Company or any other Grantor any amount paid in respect of First Lien Obligations (a "**Recovery**"), then such First Lien Claimholders shall be entitled to a reinstatement of First Lien Obligations with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and

Ex. 3 p. 143

such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

      **6.6**    <u>Reorganization Securities</u>.    If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, both on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

      **6.7**    <u>Post-Petition Interest</u>. (a) Neither the Second Lien Collateral Agent nor any Second Lien Claimholder shall oppose or seek to challenge any claim by the First Lien Collateral Agent or any First Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of First Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of any First Lien Claimholder's Lien, without regard to the existence of the Lien of the Second Lien Collateral Agent on behalf of the Second Lien Claimholders on the Collateral.

      (b)    Neither the First Lien Collateral Agent nor any other First Lien Claimholder shall oppose or seek to challenge any claim by the Second Lien Collateral Agent or any Second Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of Second Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien of the Second Lien Collateral Agent on behalf of the Second Lien Claimholders on the Collateral (after taking into account the First Lien Collateral).

      **6.8**    <u>Waiver</u>. The Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, waives any claim it may hereafter have against any First Lien Claimholder arising out of the election of any First Lien Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code, and/or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in any Insolvency or Liquidation Proceeding.

      **6.9**    <u>Separate Grants of Security and Separate Classification</u>. The Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, and the First Lien Collateral Agent for itself and on behalf of the First Lien Claimholders, acknowledges and agrees that:

      (a)    the grants of Liens pursuant to the First Lien Collateral Documents and the Second Lien Collateral Documents constitute two separate and distinct grants of Liens; and (b) because of, among other things, their differing rights in the Collateral, the Second Lien Obligations are fundamentally different from the First Lien Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding.

Ex. 3 p. 144

To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Lien Claimholders and the Second Lien Claimholders in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then each of the parties hereto hereby acknowledges and agrees that, subject to Sections 2.1 and 4.1, all distributions shall be made as if there were separate classes of senior and junior secured claims against the Grantors in respect of the Collateral (with the effect being that, to the extent that the aggregate value of the Collateral is sufficient (for this purpose ignoring all claims held by the Second Lien Claimholders), the First Lien Claimholders shall be entitled to receive, in addition to amounts otherwise distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, including any additional interest payable pursuant to the First Lien Credit Agreement, arising from or related to a default, which is disallowed as a claim in any Insolvency or Liquidation Proceeding) before any distribution is made in respect of the claims held by the Second Lien Claimholders with respect to the Collateral, with the Second Lien Collateral Agent, for itself and on behalf of the Second Lien Claimholders, hereby acknowledging and agreeing to turn over to the First Lien Collateral Agent, for itself and on behalf of the First Lien Claimholders, amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence (with respect to the payment of post-petition interest), even if such turnover has the effect of reducing the claim or recovery of the Second Lien Claimholders).

      **6.1**    <u>Sale Issues</u>.  The Second Lien Collateral Agent, as a holder of a Lien on the Collateral and on behalf of the Second Lien Claimholders, will not contest, protest, or object to, and will be deemed to have consented pursuant to section 363(f) of the Bankruptcy Code, to a Disposition of Collateral free and clear of its Liens or other interests under section 363 of the Bankruptcy Code if the First Lien Collateral Agent consents in writing to the Disposition; <u>provided</u> that (x) such Disposition is made on commercial reasonable terms and (y) either (i) pursuant to court order, the Liens of the Second Lien Claimholders attach to the net proceeds of the Disposition with the same priority and validity as the Liens held by the Second Lien Claimholders on such disposed Collateral, and the Liens remain subject to the terms of this Agreement, or (ii) the proceeds of a Disposition of Collateral received by the First Lien Collateral Agent in excess of those necessary to achieve the Discharge of the First Lien Obligations are distributed in accordance with the UCC.

## SECTION 7.  <u>Reliance; Waivers; Etc.</u>

      **7.1**    <u>Reliance</u>.  Other than any reliance on the terms of this Agreement, the First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under its First Lien Loan Documents, acknowledges that it and such First Lien Claimholders have, independently and without reliance on the Second Lien Collateral Agent or any Second Lien Claimholders, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into such First Lien Loan Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the First Lien Credit Agreement or this Agreement. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, acknowledges that it and the Second Lien Claimholders have, independently and without reliance on the First Lien Collateral Agent or any First Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of

the Second Lien Loan Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Second Lien Loan Documents or this Agreement.

       **7.2**    No Warranties or Liability. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under the First Lien Loan Documents, acknowledges and agrees that each of the Second Lien Collateral Agent and the Second Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Lien Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided herein, the Second Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Second Lien Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. Except as otherwise provided herein, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Obligations, acknowledges and agrees that the First Lien Collateral Agent and the First Lien Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Lien Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided herein, the First Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective First Lien Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Second Lien Collateral Agent and the Second Lien Claimholders shall have no duty to the First Lien Collateral Agent or any of the First Lien Claimholders, and the First Lien Collateral Agent and the First Lien Claimholders shall have no duty to the Second Lien Collateral Agent or any of the Second Lien Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Company or any other Grantor (including the First Lien Loan Documents and the Second Lien Loan Documents), regardless of any knowledge thereof which they may have or be charged with.

       **7.3**    No Waiver of Lien Priorities. (a) No right of the First Lien Claimholders, the First Lien Collateral Agent or any of them to enforce any provision of this Agreement or any First Lien Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or any other Grantor or by any act or failure to act by any First Lien Claimholder or the First Lien Collateral Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First Lien Loan Documents or any of the Second Lien Loan Documents, regardless of any knowledge thereof which the First Lien Collateral Agent or the First Lien Claimholders, or any of them, may have or be otherwise charged with.

       (b)    Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of the Company and the other Grantors under the First Lien Loan Documents and subject to the provisions of Section 5.3(a)), the First Lien Claimholders, the First Lien Collateral Agent and any of them may, at any time and from time to time in accordance with the First Lien Loan Documents and/or applicable law, without the consent of, or notice to, the Second Lien Collateral Agent or any Second Lien Claimholders, without incurring any liabilities to the Second Lien Collateral Agent or any Second Lien Claimholders and without

impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the Second Lien Collateral Agent or any Second Lien Claimholders is affected, impaired or extinguished thereby) do any one or more of the following:

(1)     change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the First Lien Obligations or any Lien on any First Lien Collateral or guaranty thereof or any liability of the Company or any other Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the First Lien Obligations, without any restriction as to the tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the First Lien Collateral Agent or any of the First Lien Claimholders, the First Lien Obligations or any of the First Lien Loan Documents; provided that any such increase in the First Lien Obligations shall not increase the sum of the Indebtedness constituting principal under the First Lien Credit Agreement and the face amount of any letters of credit issued under the First Lien Credit Agreement and not reimbursed to an amount in excess of the Cap Amount;

(2)     sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the First Lien Collateral or any liability of the Company or any other Grantor to the First Lien Claimholders or the First Lien Collateral Agent, or any liability incurred directly or indirectly in respect thereof;

(3)     settle or compromise any First Lien Obligation or any other liability of the Company or any other Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the First Lien Obligations) in any manner or order; and

(4)     exercise or delay in or refrain from exercising any right or remedy against the Company or any security or any other Grantor or any other Person, elect any remedy and otherwise deal freely with the Company, any other Grantor or any First Lien Collateral and any security and any guarantor or any liability of the Company or any other Grantor to the First Lien Claimholders or any liability incurred directly or indirectly in respect thereof.

(c)     Except as otherwise provided herein, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, also agrees that the First Lien Claimholders and the First Lien Collateral Agent shall have no liability to the Second Lien Collateral Agent or any Second Lien Claimholders, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any claim against any First Lien Claimholder or the First Lien Collateral Agent, arising out of any and all actions which the First Lien Claimholders or the First Lien Collateral Agent may take or permit or omit to take with respect to:

(1)     the First Lien Loan Documents (other than this Agreement);

(2)     the collection of the First Lien Obligations; or

(3)     the foreclosure upon, or sale, liquidation or other disposition of, any First Lien Collateral. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Claimholders and the First Lien Collateral Agent have no duty to them in respect of the maintenance or preservation of the First Lien Collateral, the First Lien Obligations or otherwise.

(d)     Until the Discharge of First Lien Obligations, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

**7.4**     Obligations Unconditional.     All rights, interests, agreements and obligations of the First Lien Collateral Agent and the First Lien Claimholders and the Second Lien Collateral Agent and the Second Lien Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

(a)     any lack of validity or enforceability of any First Lien Loan Documents or any Second Lien Loan Documents;

(b)     except as otherwise expressly set forth in this Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the First Lien Obligations or Second Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First Lien Loan Document or any Second Lien Loan Document;

(c)     except as otherwise expressly set forth in this Agreement, any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First Lien Obligations or Second Lien Obligations or any guaranty thereof;

(d)     the commencement of any Insolvency or Liquidation Proceeding in respect of the Company or any other Grantor; or

(e)     any other circumstances which otherwise might constitute a defense available to, or a discharge of, the Company or any other Grantor in respect of the First Lien Collateral Agent, the First Lien Obligations, any First Lien Claimholder, the Second Lien Collateral Agent, the Second Lien Obligations or any Second Lien Claimholder in respect of this Agreement.

## SECTION 8. Miscellaneous.

**8.1**     Conflicts.     In the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Loan Documents or the Second Lien Loan Documents, the provisions of this Agreement shall govern and control.

**8.2**     Effectiveness; Continuing Nature of this Agreement; Severability.   This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement of lien subordination and the First Lien Claimholders may continue, at any time and without notice to the Second Lien Collateral Agent or any Second Lien Claimholder subject to the Second Lien Loan Documents, to extend credit and other financial accommodations and lend monies to or for the benefit of the Company or any Grantor constituting First Lien Obligations in reliance hereof.  The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to the Company or any other Grantor shall include the Company or such Grantor as debtor and debtor-in-possession and any receiver or trustee for the Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect:

(a)     with respect to the First Lien Collateral Agent, the First Lien Claimholders and the First Lien Obligations, on the date of Discharge of First Lien Obligations, subject to the rights of the First Lien Claimholders under Section 6.5; and

(b)     with respect to the Second Lien Collateral Agent, the Second Lien Claimholders and the Second Lien Obligations, upon the later of (1) the date upon which the obligations under the Second Lien Credit Agreement terminate if there are no other Second Lien Obligations outstanding on such date and (2) if there are other Second Lien Obligations outstanding on such date, the date upon which such Second Lien Obligations terminate.

**8.3**     Amendments; Waivers.  No amendment, modification or waiver of any of the provisions of this Agreement by the Second Lien Collateral Agent or the First Lien Collateral Agent shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  The Company shall have the right to consent to or approve any amendment, modification or waiver of any provision of this Agreement to the extent its rights, obligations or interests hereunder or under the First Lien Loan Documents or Second Lien Loan Documents are directly affected (which includes, but is not limited to any amendment to the Grantors' ability to cause additional obligations to constitute First Lien Obligations or Second Lien Obligations as the Company may designate). Except as specified in the preceding sentence, the Company shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement.

**8.4**     Information Concerning Financial Condition of the Company and its Subsidiaries.  The First Lien Collateral Agent and the First Lien Claimholders, on the one hand, and the Second Lien Claimholders and the Second Lien Collateral Agent, on the other hand, shall each be responsible for keeping themselves informed of (a) the financial condition of the

Company and its Subsidiaries and all endorsers and/or guarantors of the First Lien Obligations or the Second Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations or the Second Lien Obligations. The First Lien Collateral Agent and the First Lien Claimholders shall have no duty to advise the Second Lien Collateral Agent or any Second Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event the First Lien Collateral Agent or any of the First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Second Lien Collateral Agent or any Second Lien Claimholder, it or they shall be under no obligation:

       (a)    to make, and the First Lien Collateral Agent and the First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

       (b)    to provide any additional information or to provide any such information on any subsequent occasion;

       (c)    to undertake any investigation; or

       (d)    to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

       **8.5**    <u>Subrogation</u>. With respect to the value of any payments or distributions in cash, property or other assets that any of the Second Lien Claimholders or the Second Lien Collateral Agent pays over to the First Lien Collateral Agent or the First Lien Claimholders under the terms of this Agreement, the Second Lien Claimholders and the Second Lien Collateral Agent shall be subrogated to the rights of the First Lien Collateral Agent and the First Lien Claimholders; <u>provided</u> that, the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of First Lien Obligations has occurred. The Company acknowledges and agrees that the value of any payments or distributions in cash, property or other assets received by the Second Lien Collateral Agent or the Second Lien Claimholders that are paid over to the First Lien Collateral Agent or the First Lien Claimholders pursuant to this Agreement shall not reduce any of the Second Lien Obligations.

       **8.6**    <u>Application of Payments</u>. All payments received by the First Lien Collateral Agent or the First Lien Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the First Lien Obligations provided for in the First Lien Loan Documents. The Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, assents to any extension or postponement of the time of payment, subject to Section 5.3(a)(3), of the First Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the First Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

**Ex. 3 p. 150**

**8.7** SUBMISSION TO JURISDICTION; WAIVERS. (a) ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY:

(1) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS;

(2) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS;

(3) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 8.8; AND

(4) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (3) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.

(b) EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER HEREOF, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE; MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 8.7(b) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c)     **EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER FIRST LIEN LOAN DOCUMENT OR SECOND LIEN LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.**

**8.8**     Notices.  All notices to the Second Lien Claimholders and the First Lien Claimholders permitted or required under this Agreement shall also be sent to the Second Lien Collateral Agent and the First Lien Collateral Agent, respectively.  Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed. For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

**8.9**     Further Assurances.  The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under the First Lien Loan Documents, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders under the Second Lien Loan Documents, and the Company, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the First Lien Collateral Agent or the Second Lien Collateral Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

**8.10     APPLICABLE LAW.     THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

**8.11**     Binding on Successors and Assigns.  This Agreement shall be binding upon the First Lien Collateral Agent, the First Lien Claimholders, the Second Lien Collateral Agent, the Second Lien Claimholders and their respective successors and assigns.

**8.12**     Specific Performance.  Each of the First Lien Collateral Agent and the Second Lien Collateral Agent may demand specific performance of this Agreement. The First Lien Collateral Agent, on behalf of itself and the First Lien Claimholders under the First Lien Loan Documents, and the Second Lien Collateral Agent, on behalf of itself and the Second Lien Claimholders, hereby irrevocably waive any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the First Lien Collateral Agent or the First Lien Claimholders or the Second Lien Collateral Agent or the Second Lien Claimholders, as the case may be.

**8.13**     Headings.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

Ex. 3 p. 152

**8.14**   Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**8.15**   Authorization.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

**8.16**   No Third Party Beneficiaries.  This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the First Lien Claimholders and the Second Lien Claimholders.  Nothing in this Agreement shall impair, as between the Company and the other Grantors and the First Lien Collateral Agent and the First Lien Claimholders, or as between the Company and the other Grantors and the Second Lien Collateral Agent and the Second Lien Claimholders, the obligations of the Company and the other Grantors to pay principal, interest, fees and other amounts as provided in the First Lien Loan Documents and the Second Lien Loan Documents, respectively.

**8.17**   Provisions Solely to Define Relative Rights.   The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Collateral Agent and the First Lien Claimholders on the one hand and the Second Lien Collateral Agent and the Second Lien Claimholders on the other hand.  None of the Company, any other Grantor or any other creditor thereof shall have any rights hereunder and neither the Company nor any Grantor may rely on the terms hereof.  Nothing in this Agreement is intended to or shall impair the obligations of the Company or any other Grantor, which are absolute and unconditional, to pay the First Lien Obligations and the Second Lien Obligations as and when the same shall become due and payable in accordance with their terms.

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

GOLDMAN SACHS CREDIT PARTNERS L.P., as First Lien Collateral Agent

By:_____
Name:
Title:

[•], as Second Lien Collateral Agent

By:_____
Name:
Title:

Acknowledged and Agreed to by:

QCE LLC

By:_____
Name:
Title:

EXHIBIT F

SUBSCRIPTION AGREEMENT

*EXECUTION VERSION*

## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (the "*Agreement*"), dated as of December 23, 2011, is made and entered into by and among QCE Parent LLC, a Delaware limited liability company ("*Parent*"), QCE Finance LLC, a Delaware limited liability company (the "*Company*") and the entities set forth on the signature pages hereto, (each a "*Purchaser*" and, collectively, the "*Purchasers*"). Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings provided in the Support Agreement (as defined below).

### WITNESSETH:

**WHEREAS**, the Company has proposed an out-of-court restructuring (the "*Restructuring*") of its outstanding obligations under the First Lien Facility and the Second Lien Facility;

**WHEREAS**, on or about December 23, 2011, the Company, on behalf of it and its subsidiaries, certain of its Affiliates and the Participating Lenders, entered into that certain Restructuring Support Agreement (together with the exhibits and schedules annexed thereto or referred to therein, and as such may be modified or amended from time to time, the "*Support Agreement*");

**WHEREAS**, on or about December 23, 2011, the Company intends to make an exchange offer pursuant to an exchange offer memorandum (together with the exhibits and schedules annexed thereto or referred therein, and as such may be modified or amended from time to time, the "*Offering Memorandum*") in connection with (i) the exchange offer (the "*First Lien Exchange Offer*") to existing holders of the First Lien Facility to exchange a portion of the loans under the First Lien Facility into loans under a new second lien facility (the "*New Second Lien Facility*"); (ii) the amendment to, extension of and partial cash payoff of the First Lien Facility (the "*Amendment*") and (iii) the exchange offer of loans under the Second Lien Facility for 100% of new limited liability company membership units to be issued by the Company (the "*Common Shares*"), with such Common Shares of the Company being simultaneously assigned by the holders of loans under the Second Lien Facility to Parent (an entity formed to facilitate the Transactions) in exchange for 100% of the new limited liability company membership units to be issued by Parent ("*Parent Common Shares*"), which upon completion of all of the steps in the Restructuring (including the merger of the Company with and into Parent after the consummation of the Private Placement and the renaming of Parent to QCE Finance LLC) will represent (x) forty percent (40%) of the Common Shares or (y) in the case of an In-Court Process (as defined below), twenty-five percent (25%) of the Common Shares, in each case after accounting for the Private Placement (as described herein), but before accounting for potential dilution from equity to be issued in connection with the Management Incentive Plan (the "*Second Lien Exchange Offer*," and together with the First Lien Exchange Offer, the "*Exchange Offers*");

**WHEREAS**, if, within five business days following the Solicitation Termination Date, all conditions to closing the Exchange Offers have not been satisfied to allow the Restructuring to take place outside of a case under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

1

(the "**Bankruptcy Code**"), the Company will effectuate the Restructuring by commencing (together with certain of its Affiliates) one or more voluntary "pre-packaged" cases (the "**Bankruptcy Cases**") under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), in connection with which the Company intends to file the Company's plan of reorganization, substantially in the form of Exhibit C hereto (the "**Plan**"), and related documents (such process, an "**In-Court Process**," and the date of the commencement of such case, the "**Petition Date**") and the terms of the Exchange Offers shall be superseded by the terms of the Plan;

WHEREAS, the Support Agreement contemplates, among other things, that Avenue Capital Group and certain of its Affiliates will subscribe for and purchase from Parent, simultaneously with the consummation of the Second Lien Exchange Offer, newly-issued Parent Common Shares, which after the merger of the Company with and into Parent after the consummation of the Private Placement and the renaming of Parent to QCE Finance LLC will represent (i) sixty percent (60%) of the Common Shares, or (ii) in the case of an In-Court Process, seventy-five percent (75%) of the Common Shares, in each case, before accounting for potential dilution from equity to be issued in connection with the Management Incentive Plan, for an aggregate price of $150,000,000 (the "**Private Placement**" and, together with the Exchange Offers, the Amendment and/or the In-Court Process, the "**Transactions**"); and

WHEREAS, the proceeds of the Private Placement shall be used by the Company for (i) the repayment of $75 million of outstanding indebtedness under the First Lien Facility, if the Exchange Offers are implemented and the In-Court Process is not commenced, or $65 million of outstanding indebtedness under the First Lien Facility, if the In-Court Process is commenced, (ii) payment of all accrued but unpaid interest under the First Lien Facility, (iii) payment of fees and expenses incurred in connection with the Restructuring, and (iv) working capital and other general corporate purposes;

NOW, THEREFORE, for and in consideration of the premises, and other good and valuable consideration the receipt and sufficiency of all of which is hereby acknowledged, the parties hereto agree as follows:

1.      The Commitment.  Subject to the terms, conditions and limitations set forth herein, each Purchaser agrees to purchase from Parent, and Parent agrees to issue and sell to Purchaser 6,000,000 Common Shares of Parent if the Exchange Offers are consummated or 7,500,000 Common Shares of Parent if the In-Court Process is commenced (as the case may be, the "**Purchased Shares**") at a price equal to: $25.00 per Common Share if the Exchange Offers are consummated or $20.00 per Common Share if the In-Court Process is commenced (as the case may be, the "**Purchase Price**"), for an aggregate purchase price of $150 million.  The obligations of Purchasers described in this Section 1 shall be referred to herein as the "**Commitment**."

2.      The Closing.

(a)      The delivery of and payment for the Purchased Shares is referred to herein as the "**Closing**."  The Closing shall occur on or before the date (the "**Closing Date**") that is not later than the fifth (5th) Business Day following the satisfaction and/or waiver of all conditions to the Closing as set forth in Section 4 (other than conditions which by their nature can be

2

satisfied only at the Closing).  The Closing shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 at 10:00 AM New York City time, as specified below, unless another date, time and/or place is agreed in writing by each of the parties hereto.

(b)      The following shall occur contemporaneously at the Closing:

(i)      Each Purchaser, in satisfaction of its Commitment, shall pay to Parent, at the Closing, its respective Purchase Price pursuant to Section 1, by wire transfer in immediately available funds to such account of Parent as Parent shall have designated no later than two Business Day prior to the Closing by notice to Purchasers.

(ii)      the Purchased Shares to be purchased by each Purchaser, in the name of each Purchaser, shall be recorded in the books and records of Parent by Parent or by a transfer agent selected by the Board of Managers of Parent to maintain such records;

(iii)      subject to the entry of the Agreement Approval Order in the event of an In-Court Process, the Company shall pay the reasonable out-of-pocket fees, costs, and expenses incurred in connection with this Agreement by Purchasers, if not paid previously, including reasonable attorney's fees and expenses of such attorneys acting on behalf of Purchasers (all of the fees, costs, and expenses set forth in this Section 2(b)(iii) collectively, the "*Expenses*"); and

(iv)      each Purchaser shall become a party to, to be bound by, the terms and conditions of the Amended and Restated Limited Liability Company Agreement of Parent, dated as of the Closing Date, in the form of Exhibit A (the "*New LLC Agreement*").

3.      Representations and Warranties.

(a)      Except as set forth in the Offering Memorandum and the corresponding section of the disclosure schedules delivered by the Company to Purchasers in connection with the execution of this Agreement (the "*Company Disclosure Schedules*"), the Company represents and warrants the following to each Purchaser:

(i)      Organization and Qualification.  The Company and each of its subsidiaries is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite corporate, partnership or limited liability company power and authority to own, lease, and operate their respective properties and assets and to conduct their respective businesses as now being conducted.  The Company and each of its subsidiaries is duly qualified to transact business in each jurisdiction in which the nature of property owned or leased by them or the conduct of their business requires them to be so qualified, except where the failure to be duly qualified to transact business, would not reasonably be expected to have a Material Adverse Effect.

(ii)      Company's Ownership.  Upon the consummation of the Transactions, the ownership interests of Parent will be as set forth on Schedule 3(a)(ii)-1 of the Company Disclosure Schedules (or in the event of an In-Court Process, Schedule 3(a)(ii)-2 of the Company Disclosure Schedules) herein, and all such ownership interests will be duly authorized,

3

validly issued, fully paid, and nonassessable, and, all such ownership interests will be free and clear of all Liens (as defined below) and (except as provided in the New LLC Agreement) not subject to any preemptive rights, rights of first refusal, option, warrant, call, subscription, and similar rights, other than, in each case, created by any of the Purchasers or as set forth in the New LLC Agreement.

        (iii)    <u>Subsidiaries' Equity Interests</u>.    All of the issued ownership interests of each of the subsidiaries of the Company are duly and validly authorized and issued, fully paid, nonassessable, and directly owned by the Company or its applicable subsidiary free and clear of all Liens (other than Liens permitted under the First Lien Facility and the Second Lien Facility) and not subject to any preemptive rights, rights of first refusal, option, warrant, call, subscription, and similar rights.

        (iv)    <u>Power and Authority; Enforceability</u>.

        (A)    The Company and each of its subsidiaries, as the case may be, has the requisite corporate, partnership or limited liability company power and authority to execute and deliver this Agreement (in the case of an In-Court Process, subject to entry of the Agreement Approval Order) and the definitive documents necessary or appropriate to consummate the Transactions, and, in the case of an In-Court Process, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the fourteen-day period set forth in Rule 3020(e) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), to perform its obligations hereunder and thereunder.  This Agreement and such documents executed in connection herewith or therewith have been (1) duly and validly authorized by all necessary corporate, partnership, limited liability company or other action on the part of the Company and its subsidiaries, as applicable, and (2) duly and validly executed and delivered by the Company and its subsidiaries, as applicable.

        (B)    In the event of an In-Court Process, if and when filed, the Company and each of its subsidiaries, as applicable, will have the requisite power and authority to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the fourteen-day period set forth in Bankruptcy Rule 3020(e), to perform its obligations thereunder, and will have taken all necessary actions required for the due authorization and performance by it of the Plan by the Closing Date.

        (v)    <u>No Conflict</u>.  Except as may occur as the result of commencement of the In-Court Process, (A) the execution and delivery of this Agreement and each of the definitive documents necessary to effect the Transactions contemplated hereby by the Company and its subsidiaries, do not and shall not (1) violate any provision of the operating agreement, articles of incorporation or by-laws or other organizational documents of QCE Holdings LLC ("***Holdings***"), QCE Incentive LLC ("***Incentive***") or the Company or any of its subsidiaries, except for matters as to which waivers or consents have been previously obtained or (2) conflict with, violate, constitute a breach of, or result in the creation of a Lien or any other encumbrance against the Company or any of its subsidiaries or their properties pursuant to, or give rise to any termination or other rights under, any material contract, agreement, or instrument by which Holdings, Incentive or the Company or any of its subsidiaries are bound, or any judgment, order,

4

decree, law, statute, rule, regulation, or other judicial or governmental restriction to which the Company or any of its subsidiaries are subject except, (i) in each case for matters as to which waivers or consents have been previously obtained or (ii) in each case for matters relating to the First Lien Facility or the Second Lien Facility that will be resolved as a part of the Transactions; and (B) the performance of this Agreement and each of the definitive documents necessary to effect the Transactions contemplated hereby and thereby by the Company and its subsidiaries, as applicable, and the consummation by the Company and its subsidiaries of the Transactions contemplated hereby and thereby in accordance with the terms hereof and thereof, do not (1) violate any provision of the operating agreement, the articles of incorporation or by-laws or other organizational documents of Holdings, Incentive or the Company or any of its subsidiaries, or (2) except for violations that have been previously waived or consented to, conflict with, violate, constitute a breach of, or result in the creation of a Lien or any other encumbrance against the Company or any of its subsidiaries or their properties pursuant to, or give rise to any termination or other rights under, any material contract, agreement, or instrument by which Holdings, Incentive or the Company or any of its subsidiaries shall be bound, or any judgment, order, decree, law, statute, rule, regulation, or other judicial or governmental restriction to which Holdings, Incentive or the Company or any of its subsidiaries shall be subject in each case as of, and following, the Closing Date.

(vi)     Enforceability.     This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid, and binding obligation of the Company, enforceable against the Company in accordance with its terms, provided that in the event of an In-Court Process, upon the entry of the Agreement Approval Order, and assuming this Agreement will constitute the valid and binding agreement of the other parties hereto, this Agreement will constitute the valid and binding obligations of the Company, enforceable against the Company in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or similar law affecting the enforcement of creditors' rights generally and subject to general principles of equity (whether enforcement is sought by proceeding in equity or at law).

(vii)     No Material Adverse Effect.     Since the date of the most recent historical consolidated financial statements of the Company included in the Offering Memorandum, except as otherwise stated in the Offering Memorandum or the occurrence of an In-Court Process, (A) there has been no Material Adverse Effect, and (B) other than in connection with the transactions contemplated by the Support Agreement, neither the Company nor its subsidiaries, considered as one entity, has incurred any material liability or obligation, direct or contingent, other than in the ordinary course of business.

(viii)     Sufficiency of Assets; Title to Assets. Each of the Company and its subsidiaries owns, leases or licenses all such properties as are necessary to the conduct of its operations as presently conducted in all material respects (such properties, the "**Company Assets**"). The Company Assets are in each case free and clear of any Liens other than (A) statutory, mechanics' or other liens that were incurred in the Company's and its subsidiaries' ordinary course of business, (B) Liens that are being contested in good faith and for which adequate reserves have been made on the Company's consolidated balance sheet set forth in the Offering Memorandum, (C) Liens for taxes incurred but not yet due and payable, (D) Liens set forth on Schedule 3(a)(viii) of the Company Disclosure Schedules, (E) easements, rights-of-way,

5

restrictions and other similar charges and Liens of record not interfering materially with the ordinary conduct of the business of the Company, (F) purchase money Liens securing rental payments under capital lease arrangements, (G) other Liens arising in the ordinary course of business and not incurred in connection with the borrowing of money, (H) Liens under the First Lien Facility and the Second Lien Facility, and (I) Liens permitted under the First Lien Facility.

(ix)     Litigation.  Except for the In-Court Process (if commenced) or as disclosed in the Offering Memorandum, there is no pending litigation, proceeding, or governmental investigation (collectively, "***Litigation***") (A) to which the Company or any of its subsidiaries is a party, that would, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect or (B) to the knowledge of the Company or any of its subsidiaries, threatened against the Company or any of its subsidiaries or any properties or rights of the Company or any of its subsidiaries, that would, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect.

(x)     No Violation or Default.  Except as disclosed in the Offering Memorandum or as set forth in Schedule 3(a)(x) of the Company Disclosure Schedules, neither the Company nor any of its subsidiaries is: (A) in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries is bound or to which any of the property or assets of the Company or any of its subsidiaries is subject, except for defaults, violations or otherwise that could not (individually or in the aggregate) reasonably be expected to have a Material Adverse Effect; or (B) in violation of any law or order of any Governmental Authority, except for defaults, violations or otherwise that could not (individually or in the aggregate) reasonably be expected to have a Material Adverse Effect.

(xi)     Offering Memorandum.  The Offering Memorandum, as of the date hereof, does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, provided that, the Company makes no representation or warranty as to the information contained in the Offering Memorandum in reliance upon and in conformity with information furnished to the Company by or on behalf of the Purchasers.

(xii)     Securities Registration Exemption.  Assuming the representations of the Purchasers set forth in Section 3(b)(v) and (vi) are true and correct, the issuance of the Purchased Shares to the Purchasers shall be exempt from registration pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "***Securities Act***").

(xiii)     Investment Company Act.  Neither the Company nor any of its subsidiaries is and, after giving effect to the offering and sale of the Purchased Shares and the application of the proceeds thereof as contemplated by this Agreement, will be, required to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder.

(xiv)   <u>Takeover Statutes; Charter</u>.   No "fair price," "moratorium," "control share acquisition," "business combination" or other similar anti-takeover statute or regulation is applicable to the Company or any of its subsidiaries, the Common Shares, the sale and issuance of the Purchased Shares or the Transactions.

(xv)   <u>No Broker's Fees</u>.   Except as set forth on <u>Schedule 3(a)(xv)</u> of the Company Disclosure Schedules, neither the Company nor any of its subsidiaries is a party to any contract, agreement or understanding (other than this Agreement) with any Person that would give rise to a valid claim against the Company or any of its subsidiaries for a brokerage commission, finder's fee or like payment in connection with the Transactions.

(xvi)   <u>Financial Statements</u>.   The historical consolidated financial statements and the related notes thereto of the Company and its subsidiaries included in the Offering Memorandum present fairly in all material respects the financial position of the Company and its subsidiaries as of the dates indicated and the results of their operations and the changes in their cash flows for the periods specified; such financial statements have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby; and the other financial information included in the Offering Memorandum has been derived from the accounting records of the Company and its subsidiaries and presents fairly the information shown thereby (except for information set forth under the headings "Projections of Certain Financial Data Following Consummation of the Plan of Reorganization," "Liquidation Analysis" and "Summary—Conditions to the Exchange Offers and Plan of Reorganization—Enterprise Valuation" and except as otherwise set forth therein).

(xvii)   <u>Consents and Approvals</u>.   No material consent, approval, authorization, Order, registration or qualification of or with any Governmental Authority having jurisdiction over Holdings, Incentive or the Company, any of its subsidiaries or any of their properties is required for the sale, issuance and delivery of the Purchased Shares and the consummation of the Transactions and the execution and delivery by the Company of this Agreement, the performance by the Company of the provisions hereof, except (A) in the event of an In-Court Process, the entry of the Agreement Approval Order and the Confirmation Order, and the expiration, or waiver by the Bankruptcy Court, of the fourteen-day period set forth in Bankruptcy Rules 3020(e), as applicable, (B) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or Blue Sky Laws in connection with the issuance and/or purchase of the Purchased Shares or as disclosed in the Offering Memorandum, (C) such as have been made or obtained and are in full force and effect.

(xviii)   <u>No Undisclosed Liabilities</u>.   The Company and its subsidiaries, considered as one entity, do not have any material Liabilities of a nature required to be disclosed on a balance sheet and the notes thereto, except (A) as set forth in the Company's consolidated balance sheet as of September 30, 2011 set forth in the Offering Memorandum or as otherwise disclosed in the Offering Memorandum, (B) incurred in the ordinary course of business since the date of such balance sheet, (C) for fees and expenses incurred in connection with the Transactions, and (D) obligations required to be performed after the date of this Agreement under any contract to which the Company or any subsidiary is a party.

(xix)    Labor and Employment Matters.

(A)    Neither the Company nor any of its subsidiaries is a party to or bound by any collective bargaining agreement or any labor union contract or agreement with a labor organization.

(B)    The Company and each of its subsidiaries are in compliance in all material respects with all applicable material laws and regulations relating to labor and employment, including but not limited to laws relating to discrimination, equal employment opportunities, disability, labor relations, hours of work, payment of wages, overtime pay, immigration, workers' compensation, employee benefits, unemployment benefits, working conditions, occupational safety and health, family and medical leave, employee terminations, and all material laws regarding the hiring, promotion, assignment, and termination of employees.  To the knowledge of the Company, the Company and its subsidiaries have not misclassified any employees as independent contractors, leased employees, volunteers, or any other type of workers, and no individual has been improperly classified as an "exempt" employee or excluded from any Company Benefit Plans.  Schedule 3(a)(xix) of the Company Disclosure Schedules sets forth a summary description of all material Company Benefit Plans and no Company Benefit Plan is a Title IV Plan or a Retiree Welfare Plan.

(xx)    Affiliate Transactions.

(A)    Except as disclosed on Schedule 3(a)(xx)(A) of the Company Disclosure Schedules (other than intercompany items between and among the Company and/or its subsidiaries), (1) there are no outstanding notes payable to, accounts receivable from or advances by the Company or its Affiliates in connection with the Company's business or involving any assets thereof, and neither the Company nor any of its subsidiaries is otherwise a debtor or creditor of, or has any Liability of any nature to, any Related Party of the Company and (2) except for compensation or benefits paid to employees in the ordinary course, since December 31, 2010, neither the Company nor any of its subsidiaries has incurred any material Liability to, or entered into or agreed to enter into any contract or transaction with or for the benefit of, any Related Party of the Company, other than the Transactions.  On the the last day of the month in which consummation of the Transactions occurs, each of (i) the Area Director Marketing Agreement dated September 17, 2009 with Chicago Franchise Support Services LLC and the related Agreement to Manage Business Operations effective January 1, 2011 between Chicago Franchise Support Services LLC and Al Raheem Group, Inc. (as amended) and (ii) the Management Agreement dated January 16, 2004 with Rockford Manager LLC and the related Agreement to Manage Business Operations effective January 1, 2011 between Rockford Manager LLC and Al Raheem Group, Inc. (as amended), will be terminated without cost, expense or liability to the Company or any of its subsidiaries, except as may have been actually incurred in connection with the services provided under the such agreements prior to such cancellation and termination.  On the earlier of the Closing Date or the Petition Date, the Third Amended and Restated Employment Agreement dated as of May 5, 2006, between QCE Holding LLC, QCE LLC and Richard E. Schaden, as further amended on January 1, 2009, December 31, 2009 and June 30, 2010, will be terminated without cost, expense or liability to the Company or any of its subsidiaries.  (x) As of December 31, 2011, the Management Agreement, entered into as of January 1, 2009, between the Cervantes Holding Company and TQSC II LLC

8

(as amended) and (y) as of the Closing Date, the other agreements between the Company or its subsidiaries and Related Parties of the Company that are indicated on Schedule 3(a)(xx)(A) to be terminated at Closing, shall be terminated and cancelled, without cost, expense or liability to the Company or any of its subsidiaries, except as may have been actually incurred in connection with the services provided under such agreements prior to such cancellation and termination.

(B)    For purposes of this Agreement, "*Related Party*" means: (1) any Affiliate of the Company, or any director, executive officer, general partner or managing member of such Affiliate; (2) any Person who serves or within the past 12 months has served as a director, executive officer, partner, member or in a similar capacity of the Company or any of its Affiliates; (3) any immediate family member of a Person described in clause (2); or (4) any other Person who directly or indirectly holds, individually or together with any Affiliate of such other Person and any member(s) of such Person's immediate family, more than 5% of the outstanding equity or ownership interests of the Company or any of its Affiliates prior to the Transactions.

(xxi)    Capitalization.  Except as disclosed in the Offering Memorandum, none of Holdings, Incentive or the Company or any of its subsidiaries is a party to or otherwise bound by or subject to any outstanding option, warrant, call, subscription or other right (including any preemptive right), agreement or commitment which (A) obligates Holdings, Incentive or the Company or any of its subsidiaries to issue, deliver, sell or transfer or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred or repurchased, redeemed or otherwise acquired, any shares of the equity securities of, or other equity or voting interests in the Company or any of its subsidiaries or any security convertible or exercisable for or exchangeable into any equity security of, or other equity or voting interest or loan stock in the Company or any of its subsidiaries, (B) obligates Holdings, Incentive or the Company or any of its subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or undertaking, (C) restricts the transfer of any shares of equity security of the Company or any of its subsidiaries or (D) relates to the voting of any equity securities of Holdings, Incentive or the Company or any of its subsidiaries.

(b)    Each Purchaser hereby represents and warrants the following to Parent and the Company:

(i)    Organization; Power and Authority.  It is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority to execute, deliver, and perform its obligations hereunder and to consummate the Transactions contemplated hereby.

(ii)    Execution and Delivery.  The execution, delivery, and performance by such Purchaser of this Agreement, and the consummation by such Purchaser of the Transactions contemplated hereby have been duly and validly authorized by all necessary action on the part of such Purchaser.

(iii)    Enforceability.  This Agreement has been duly executed and delivered by each Purchaser and constitutes the legal, valid, and binding obligation of such Purchaser, enforceable against such Purchaser in accordance with its terms, except as such

9

enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or affecting the enforcement of creditors' rights in general and by general principles of equity.

(iv) <u>No Conflict</u>. The execution, delivery, and performance of this Agreement and the consummation by such Purchaser of the Transactions contemplated hereby do not and shall not (A) violate any provision of the operating agreement, articles of incorporation or by-laws or other organizational documents of such Purchaser or (B) conflict with, violate, constitute a breach of, or result in the creation of a Lien or any other encumbrance against, such Purchaser or its properties pursuant to any material contract, agreement, or instrument by which such Purchaser is bound or any judgment, order, decree, law, statute, rule, regulation, or other judicial or governmental restriction to which such Purchaser is subject.

(v) <u>Accredited Investor</u>. It is an "accredited investor" within the meaning of Regulation D of the Securities Act, with such knowledge and experience in financial and business matters as are necessary in order to evaluate the merits and risks of an investment in the Purchased Shares.

(vi) <u>Securities Laws Compliance</u>. The Purchased Shares to be received by such Purchaser hereunder will be acquired for such Purchaser's own account or on behalf of managed accounts and not with a view to the resale or distribution of any part thereof in violation of the Securities Act, and such Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same in violation of the Securities Act. Notwithstanding anything in this <u>Section 3(b)(vi)</u> to the contrary, by making the representations herein, such Purchaser does not agree to hold the Purchased Shares for any minimum or other specific term and reserves the right to dispose of its respective Purchased Shares at any time in accordance with or pursuant to a registration statement or an exemption from the registration requirements under the Securities Act and any applicable state securities laws.

(vii) <u>Independent Investigation; Retention of Tax Advisors</u>. It has made its own inquiry and investigation into the Company and has undertaken such investigation and had access to such information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. It has consulted its own tax advisors with regard to the Transactions contemplated by this Agreement and the tax consequences thereof.

(viii) <u>No Registration Under the Securities Act</u>. It understands (A) that the Purchased Shares to be purchased by it pursuant to the terms of this Agreement have not been registered under the Securities Act or any state securities laws, (B) that the Company shall not be required to effect any registration or qualification of the Purchased Shares under the Securities Act or any state securities laws, (C) that the Purchased Shares will be issued in reliance upon exemptions contained in the Securities Act or interpretations thereof and in the applicable state securities laws and (D) that the Purchased Shares may not be offered for sale, sold or otherwise transferred except pursuant to a registration statement under the Securities Act or in a transaction exempt from or not subject to registration under the Securities Act.

(ix)    No Proceedings.  No litigation or proceeding against such Purchaser is pending before any court, arbitrator, or administrative or governmental body, nor, to such Purchaser's knowledge, is any such proceeding threatened against such Purchaser that would adversely affect such Purchaser's ability to enter into this Agreement or fully perform its obligations hereunder.

(x)    No Authorization or Consents Required.  No notice to or consent, approval or authorization of, or designation, declaration or filing with, any Governmental Authority or other Person is required by the Company with respect to the execution or delivery of the Agreement or the consummation of the Transactions, including, but not limited to, the applicable requirements of the Hart-Scott-Rodino Improvements Act of 1976.

4.    Certain Conditions.

(a)    The obligations of each Purchaser to consummate the Transactions contemplated herein shall be subject to the satisfaction (or waiver by Avenue Capital Management II, L.P. (the "**Purchasers' Representative**") on behalf of each Purchaser, as applicable) of each of the following conditions:

(i)    other than in the case of an In-Court Process, (A) the Company shall have commenced the Exchange Offers, (B) the Exchange Offers shall have been conducted in accordance with, and on the terms set forth in, the Support Agreement and the Offering Memorandum and in accordance with this Agreement, (C) the Exchange Offers shall not have been extended, modified, supplemented or amended unless such extension, modification, supplement or amendment is approved by such Purchaser, except with respect to immaterial technical or conforming amendments or modifications, (D) each of the conditions to closing of the Exchange Offers set forth in the Support Agreement and the Offering Memorandum shall have been satisfied or, with the consent of such Purchaser, waived, and (E) the closing of the Exchange Offers shall occur simultaneously with the Closing;

(ii)    in the event of an In-Court Process, the Agreement Approval Order and the Confirmation Order shall have been entered by the Bankruptcy Court and shall not have been stayed.  The Plan, as approved, and the Confirmation Order, as entered, in each case by the Bankruptcy Court, shall be consistent with the requirements for the Plan and the Confirmation Order set forth in this Agreement, and the conditions to confirmation and the conditions to the effective date of the Plan shall have been satisfied or waived, with the consent of the Purchasers, by the Company in accordance with the Plan;

(iii)    in the event of an In-Court Process, the LLC Agreement shall have been approved by the Bankruptcy Court and shall have been executed by the parties thereto in substantially the same form as the form thereof filed with the Bankruptcy Court;

(iv)    no Support Termination Event under the Support Agreement shall have occurred, unless cured or waived by the Purchasers' Representative;

(v)    other than in the case of the In-Court Process, the equity holder of the Company shall have executed and delivered the release and unit termination agreement, in

11

the form provided to the Purchasers on December 23, 2011, with any changes thereto being subject to the approval of the Purchasers' Representative in its sole discretion;

(vi)     the Amended First Lien Facility and the New Second Lien Facility shall be duly executed and delivered, each in the form attached hereto as Exhibit E, with any changes thereto being subject to the approval of the Purchasers' Representative in its sole discretion and the New/Amended Marketing Fund Trust Credit Facility shall be duly executed and delivered, in form and substance reflecting the terms of the Commitment Letter dated as of December 15, 2011 among Vectra Bank Colorado, QAFT, Inc., as Trustee for the Regional Advertising Program Trust, QAFT, Inc., as Trustee for the National Marketing Fund Trust and QCE LLC in the form provided to the Purchasers on December 23, 2011, and otherwise satisfactory to the Purchasers' Representative;

(vii)     the Purchased Shares shall, in the aggregate, constitute sixty percent (60%) (or in the case of an In-Court Process, seventy-five (75%)) of all issued and outstanding equity securities of Parent as of the Closing on a fully diluted basis before dilution from equity to be issued in connection with the Management Incentive Plan;

(viii)     (A) the representations and warranties of the Company contained in this Agreement that are qualified as to materiality, material adverse effect, Material Adverse Effect, or similar qualifiers, and the representation and warranty contained in Section 3(a)(vii) (No Material Adverse Effect), shall be true and correct in all respects on and as of the date hereof and as of the Closing Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all respects as of such specified date), and (B) the representations and warranties of the Company contained in this Agreement that are not so qualified shall be true and correct in all material respects on and as of the date hereof and as of the Closing Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such specified date), and (C) in all material respects, the Company shall have performed or complied with, or caused its subsidiaries to have performed or complied with, all covenants required to be performed or complied with under this Agreement on or prior to the Closing Date, and the Company shall have delivered to Purchasers a certificate of its Chief Executive Officer or Chief Financial Officer (in their capacity as such) to the effect that, to the knowledge of the person executing the same, each of the conditions specified in this Section 4(a)(viii) is satisfied in all respects;

(ix)     no action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued in each case by any Governmental Authority that, as of the Closing Date, prohibits the issuance or sale pursuant to this Agreement of the Purchased Shares or the Transactions;

(x)     the amendment to the real estate lease for the headquarters of the Company shall be duly executed and delivered by the Company and the landlord for the property, or in the case of the In-Court Process, rejected or otherwise renegotiated, in accordance

12

with the terms and conditions acceptable to the Purchasers' Representative shall have been accomplished;

(xi)     the individuals set forth on Schedule 4(a)(xi) of the Company Disclosure Schedules shall have executed and delivered deferred compensation termination or modification agreements, as the case may be, in the form provided to the Purchasers on December 23, 2011, with any changes thereto being subject to the approval of the Purchasers' Representative in its sole discretion or in an In-Court Process, such deferred compensation arrangements shall be extinguished or modified, as the case may be, in accordance with such agreements;

(xii)    since the date of the most recent historical consolidated financial statements of the Company included in the Offering Memorandum, there shall have been no judgments or settlements related to any litigation or claims in excess of $5 million in the aggregate;

(xiii)   the Company shall have in place directors' and officers' insurance policies and errors and omissions insurance policies in form and substance satisfactory to the Purchasers' Representative in its sole discretion;

(xiv)   all material notifications, filings, consents, waivers and approvals of or to any Governmental Authority or any third Person required for the consummation of the Transactions shall have been made or received and shall remain in full force and effect;

(xv)    other than in the case of an In-Court Process, an opinion of counsel, from counsel to the Company as to the matters set forth on Exhibit B shall have been delivered to Purchasers; and

(xvi)   on the Closing Date, no options, warrants or other rights to acquire equity securities of the Company will be outstanding.

(b)     The obligations of the Company to consummate the Transactions contemplated herein shall be subject to the satisfaction (or waiver by the Company) of each of the following conditions:

(i)     in the event of an In-Court Process, the Confirmation Order in form and substance reasonably satisfactory to the Company shall have been entered by the Bankruptcy Court and such order shall not have been stayed.  The Plan as approved and the Confirmation Order as entered in each case by the Bankruptcy Court shall be consistent with the requirements for the Plan and the Confirmation Order set forth in this Agreement, and the conditions to confirmation and the conditions to the effective date of the Plan shall have been satisfied or waived by the Company in accordance with the Plan.

(ii)    (A) the representations and warranties of Purchasers contained in this Agreement that are qualified as to materiality, material adverse effect, or similar qualifiers shall be true and correct in all respects, on and as of the date hereof and the Closing Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation

13

or warranty shall be true and correct as of such specified date), and (B) the representations and warranties of Purchasers contained in this Agreement that are not so qualified shall be true and correct in all material respects on and as of the date hereof and the Closing Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such specified date), and (C) in all material respects, each Purchaser shall have performed or complied with its covenants required to be performed or complied with under this Agreement on or prior to the Closing Date, and each Purchaser shall have delivered to the Company a certificate to the effect that each of the conditions specified in this Section 4(b)(ii) is satisfied in all respects; and

(iii)     No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued in each case by any Governmental Authority that, as of the Closing Date, prohibits the issuance or sale pursuant to this Agreement of the Purchased Shares or the Transactions.

(iv)     No Purchaser shall have defaulted on such Purchaser's obligation under the Commitment.

(v)     Other than in the event of an In-Court Process, the Exchange Offers and the Amendment are not consummated in accordance with the terms of the Offering Memorandum and Support Agreement.

(vi)     No Support Termination Event under the Support Agreement shall have occurred, unless cured or waived in accordance with Section 9 of the Support Agreement.

5.     Certain Covenants.

(a)     Reasonable Best Efforts.  The Company shall use reasonable best efforts to cause the conditions set forth in Section 4(a) and 4(b) (Certain Conditions) to be satisfied and to consummate the Transactions contemplated herein by the Closing.

(b)     Plan and Disclosure Statement; Confirmation Order.  In the event of an In-Court Process, the Company shall (i) file the Plan and the other Lender Approved Documents, as applicable, and (ii) use its reasonable best efforts to obtain the entry of an order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code (the "*Confirmation Order*") by the Bankruptcy Court.  The Company and its applicable subsidiaries shall use their reasonable best efforts to seek confirmation of the Plan.  Any amendment, modification or change to the Plan, Disclosure Statement or Confirmation Order (other than immaterial technical or conforming amendments or modifications) shall (A) be acceptable in form and substance to the Purchasers' Representative, (B) not affect the releases provided for in the Support Agreement, and (C) have the conditions to confirmation and the effective date as set forth in the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement.  The Company and its applicable subsidiaries will provide to counsel to the Purchasers a copy of the proposed Confirmation Order and a reasonable opportunity to review and comment on such order prior to such order being filed with the Bankruptcy Court.  The Company and its applicable subsidiaries will provide to counsel to the

14

Purchasers a copy of any proposed amendment, modification or change to the Plan, Confirmation Order or the Disclosure Statement and a reasonable opportunity to review and comment on such documents and such amendment, modification or change shall not be made if objected to by the Purchasers including to the extent Purchasers do not believe the proposed amendment, modification or change is not immaterial, technical or confirming.

(c)     Payment of Expenses.  Subject to the entry of the Confirmation Order in the event of an In-Court Process, the Company shall pay or cause to be paid in full all Expenses incurred by Purchasers in accordance with Section 2(b)(iii) or, if this Agreement is terminated prior to the Closing Date, at the time of any such termination.

(d)     Use of Purchase Price.  The Purchasers shall cause Parent to immediately contribute the proceeds received from the Private Placement to the Company.  The Company shall apply the proceeds of the Private Placement to (i) the repayment of $75 million, or in the event of the In-Court Process, the repayment of $65 million, of outstanding indebtedness under the First Lien Facility, (ii) payment of all accrued but unpaid interest under the First Lien Facility and the Second Lien Facility, (iii) payment of fees and expenses incurred in connection with the Transactions, and (iv) working capital and other general corporate purposes.

(e)     Notice of Changes.  The Company shall promptly deliver to Purchasers and each Purchaser shall deliver to the Company, as applicable, written notice upon becoming aware of any matter, event, or development that would (i) render any representation or warranty made by it herein inaccurate or incomplete in any material respect or (ii) constitute or result in a material breach by it of, or a failure by it to comply with, any covenant, condition or agreement in the Support Agreement or herein to be complied with or satisfied by it on or prior to the Closing Date.

(f)     Further Assurances.  The Company and each Purchaser shall, and shall cause their respective subsidiaries to, execute and deliver, or cause to be executed and delivered, such further instruments or documents or take such other action and cause entities controlled by them to take such action as may be reasonably necessary (or as reasonably requested by the Company or the Purchasers' Representative, as applicable) to carry out the Transactions.

(g)     Equity Securities and Affiliated Transactions Prior to Closing Date.  The Company shall take all actions necessary so that (i) on the Closing Date, all equity securities of the Company, including agreements, plans and understandings relating to ownership of equity securities, other than this Agreement and the Exchange Offers will be cancelled and terminated, and (ii) with respect to those contracts, agreements and arrangements between any of the Company or any of its subsidiaries, on the one hand, and any of Incentive, Holdings or Related Parties thereof, on the other hand, that are not in respect of ordinary course employee benefits as described on Schedule 3(a)(xix) under Employee Benefit Packages and Section 1 of the Bonus Plan section, and such other arrangements set forth on Schedule 3(a)(xx)(A) that are not scheduled for termination, in each case existing prior to the Closing Date, shall be cancelled and, with respect to such agreements and arrangements that are scheduled to terminate as set forth on Schedule 3(a)(xx)(A), the termination of such contracts, agreements and arrangements shall be effected on the dates specified on Schedule 3(a)(xx)(A), in the case of each of clauses (i) and (ii) above, without cost, expense or liability to the Company or any of its subsidiaries, except as may

15

have been actually incurred in connection with the services provided under such agreements prior to such cancellation and termination.

(h)     Conduct of Business.  Except as explicitly set forth herein or otherwise contemplated by the transactions described in the Offering Memorandum and as set forth on Schedule 5(h) of the Company Disclosure Schedules, during the period from the date of this Agreement to the Closing Date, the Company shall, and shall cause the subsidiaries to, carry on their businesses in the ordinary course and, to the extent consistent therewith, use their commercially reasonable efforts to preserve intact their current material business organizations, keep available the services of their current officers and employees and preserve their material relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its subsidiaries.  Without limiting the generality of the foregoing, and except as otherwise expressly provided or permitted by this Agreement or required to effect the transactions contemplated in the Offering Memorandum, prior to the Closing Date, the Company shall not, and shall cause its subsidiaries not to, take any of the following actions without the prior written consent of Purchasers' Representative (not to be unreasonably withheld, conditioned or delayed):

(i)     amend, authorize or propose to amend its certificate of formation, LLC Agreement or equivalent organizational documents;

(ii)     (A) in the case of the Company, declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its equity securities, (B) split, sub-divide, combine or reclassify any of its equity securities or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its equity securities, (C) purchase, redeem or otherwise acquire any shares of equity securities of the Company or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities, or (D) make any payment, or incur any liability, to any of its direct or indirect equity securities holders or any Related Party thereof, other than employee compensation made in the ordinary course of business consistent with past practices and other payments in respect of, and in accordance with the present terms of, agreements set forth on Schedule 5(h)(ii) hereto;

(iii)     issue, deliver, grant, sell, pledge, dispose of or otherwise encumber any of its equity securities or any securities convertible into, or any rights, warrants or options to acquire, any such equity securities;

(iv)     incur or commit to incur any capital expenditure or authorization or commitment with respect thereto that in the aggregate are in excess of $2.5 million;

(v)     acquire or agree to acquire by merging or consolidating with, or purchase any portion of the stock of, or other ownership interests in, or substantial portion of assets of, or by any other manner, any business or any corporation, partnership, association, joint venture, limited liability company or other entity or division thereof except for purchases from or to franchise owners in the ordinary course of business and any acquisitions of the Company's area directors and master franchisees costs of which are not to exceed, individually or in the aggregate, (1) $1,000,000 in the case of area directors and master franchisees that are not

16

Affiliates of the Company, and (2) zero dollars in the case of area directors and master franchisees that are Affiliates of the Company;

(vi)     sell, lease, mortgage, pledge, grant a lien, mortgage, pledge, security interest, charge, claim or other encumbrance of any kind or nature on or otherwise encumber or dispose of any of its properties or assets, except in the ordinary course of business consistent with past practice, except as are permitted under the DIP Facility;

(vii)    incur any indebtedness for borrowed money or guarantee any such indebtedness of another individual or entity, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company or any of its subsidiaries, guarantee any debt securities of another individual or entity, enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (other than a subsidiary) or enter into any arrangement having the economic effect of any of the foregoing, except that the Company shall be permitted to engage in intercompany transactions, to incur indebtedness under its existing revolving credit facility and provide franchise guarantees in the ordinary course of business, except as are permitted under the DIP Facility;

(viii)   except as required to comply with law or as disclosed on Schedule 5(h)(viii) and, in the case of clauses (C) and (D), except in the ordinary course of business consistent with past practice: (A) enter into, adopt, amend or terminate any Company Benefit Plan, (B) increase in any material manner the compensation or fringe benefits of any existing director or officer of the Company or any of its subsidiaries other than in the ordinary course of business, (C) enter into, renew (other than contracts, commitments or arrangements that by their terms renew automatically without action by either party) or terminate any contract, commitment or arrangement providing for the payment of compensation or benefits to any director or executive of the Company or any of its subsidiaries, (D) terminate the employment of or hire any executive or director of the Company (other than termination for cause) or (E) provide severance benefits to any employee, director or officer of the Company or its subsidiaries in excess of three months base salary (or six months base salary in the case of severance for any executive).  For the purposes of this Agreement, the term "executive" shall mean any employee of the Company or any of its subsidiaries at the Senior Vice President level or higher.

(ix)     (A) pay, discharge, settle or satisfy any claims, liabilities or obligations (whether absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction of claims, liabilities or obligations (1) in the ordinary course of business consistent with past practice, (2) as are disclosed on Schedule 5(h)(ix) hereto or (3) as required by their terms as in effect on the date of this Agreement of claims, liabilities or obligations reflected or reserved against in the financial statements (or the notes thereto) of the Company (for amounts not in excess of such reserves) or incurred since the date of such financial statements in the ordinary course of business consistent with past practice, (B) cancel any material indebtedness except as disclosed on Schedule 5(h)(ix) or (C) waive, release, grant or transfer any right of material value;

(x)      terminate or cancel any material contract other than in the ordinary course of business;

17

**Ex. 3 p. 172**

(xi)     (A) except for the commencement of the Bankruptcy Cases and other than in the ordinary course of business consistent with past practice or except for such Actions (as defined below) disclosed on Schedule 5(h)(xi), commence, prosecute, compromise or settle any action, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, arbitration, mediation, hearing, inquiry, investigation or similar event, occurrence, or proceeding (an "***Action***") by the Company or any of its subsidiaries against any third party (other than an Action as a result of an Action commenced against the Company or any of its subsidiaries) and other than to enforce its rights under this Agreement or the Support Agreement or (B) except as disclosed on Schedule 5(h)(xi), compromise or settle any Action commenced against the Company or any of its subsidiaries that involves the payment of money damages by the Company or any of its subsidiaries, individually or in the aggregate, in excess of $2 million, or that involves the imposition of any equitable relief on, or the admission of wrongdoing by, the Company or any of its subsidiaries;

(xii)     change any material financial or material tax accounting methods, principles or practices, except insofar as may have been required by a change in GAAP or applicable law, or revalue any of its material assets;

(xiii)     except as contemplated hereby or under the Support Agreement, amend, or enter into any new, arrangements, understandings or agreements with any present or former executive officer, director or Affiliate of the Company or any of its subsidiaries;

(xiv)     Except as contemplated by the Plan, file a motion in the Bankruptcy Court seeking to (A) reject a material contract or (B) enter into or materially amend or modify or terminate a material contract;

(xv)     subject to compliance with applicable law and to applicable duties imposed on the Company's Board of Managers by law, seek to place the Company or any of its subsidiaries into any insolvency, receivership, or bankruptcy process (including but not limited to liquidation and examinership) or to seek an arrangement with its creditors other than as expressly contemplated by the Offering Memorandum;

(xvi)     except as contemplated thereby or with the consent of the Purchasers, extend, amend or modify any of the terms of the Exchange Offers or the Transactions, or waive any of the conditions to the Exchange Offers, except with respect to immaterial technical or conforming amendments or modifications; or

(xvii)     commit, or agree to take, any of the foregoing actions.

(i)     Access and Information.  From the date hereof until the Closing Date, subject to any applicable laws and except for privileged information or information required to held confidential under applicable laws, the Company shall at the Company's expense (i) afford any Purchaser and its representatives access, during regular business hours, upon reasonable advance notice and in a manner as would not be unreasonably disruptive to the normal business or operations of the Company or any of its subsidiaries, to the assets, books and records of the Company and its subsidiaries (including tax work papers and tax returns), (ii) furnish, or cause to be furnished, to the Purchasers any financial and operating data and other information that is

18

available with respect to the Company and its subsidiaries as any Purchaser from time to time reasonably requests and (iii) instruct their respective employees and their and the subsidiaries' legal and financial advisors to cooperate, during regular business hours, with such Purchaser in its investigation of the Company and its subsidiaries, provided that any Purchaser exercising its rights pursuant to this Section 5(i) shall be subject to a confidentiality or non-disclosure agreement in accordance with the terms of the Support Agreement and any such Purchasers' Representative shall be bound by the same confidentiality obligations as such Purchaser.

(j)    Competing Proposals.  Until the earlier of the termination of this Agreement and the Closing Date, subject to the duties imposed on the Company by law, the Company shall and shall cause its representatives, advisors and agents to, immediately (i) cease and cause to be terminated any ongoing solicitation, discussions and negotiations with respect to Alternative Transactions and (ii) not solicit any inquiries or proposals, or enter into any discussions, negotiations, understandings, arrangements or agreements, relating to an Alternative Transaction, provided that in the event of an In-Court Process, the Company may respond to inquiries or proposals or enter into any discussions relating to an Alternative Transaction.

6.    Termination.  This Agreement may be terminated at any time prior to the Closing Date as follows:

(a)    By mutual written consent of the Company and Purchasers;

(b)    By the Company, upon written notice given to Purchasers if any Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 4(b) and (ii) cannot be cured within three (3) Business Days after the Company provides written notice to such Purchaser of such breach (in which event upon failure to so cure within such time period);

(c)    By the Purchasers' Representative, upon written notice given to the Company if the Company shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 4(a) and (ii) cannot be cured within three (3) Business Days after the Purchasers' Representative provides written notice to the Company of such breach (in which event upon failure to so cure within such time period);

(d)    By any Purchaser in the event that Bankruptcy Court has not entered (x) an interim DIP order or an interim cash collateral order within three (3) business days after the Petition Date; (y) a final DIP order or a final cash collateral order within 20 business days after the Petition Date; or (z) an order approving this Agreement within 30 days after the Petition Date (the "***Agreement Approval Order***");

(e)    By the Purchasers' Representative, in the event of an In-Court Process, upon the failure of the Bankruptcy Court to approve the Disclosure Statement by the date specified in the Support Agreement (subject to any extension thereof to the extent approved in accordance with the terms of the Support Agreement);

19

(f)     By the Purchasers' Representative, in the event of an In-Court Process, upon the failure of the Bankruptcy Court to enter a Confirmation Order by the date specified in the Support Agreement (subject to any extension thereof to the extent approved in accordance with the terms of the Support Agreement);

(g)     By the Purchasers' Representative, in the event of an In-Court Process, if the Company's and its subsidiaries' Chapter 11 cases shall have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code or if an interim or permanent trustee or an examiner with expanded powers shall have been appointed to oversee or operate the Company in its Chapter 11 case;

(h)     By the Purchasers' Representative, if the Closing has not occurred by 5:00 PM prevailing Eastern Time on January 24, 2012, or, in the event of an In-Court Process, May 30, 2012;

(i)     By either the Company or the Purchasers' Representative, if any portion of the Transactions contemplated by either this Agreement or the Support Agreement is enjoined by a Governmental Authority;

(j)     By the Purchasers' Representative, upon the occurrence of a Support Termination Event (without giving effect to any waivers or extensions of such Support Termination Event that may be granted or made pursuant to the Support Agreement); or

(k)     By either the Company or the Purchasers' Representative, in the event of a termination of the Support Agreement in accordance with its terms.

Upon the termination of this Agreement in accordance with and pursuant to this Section 6, then all rights and obligations of the parties under this Agreement shall terminate; provided, however, that nothing herein shall relieve any party from liability for any breach of this Agreement prior to such termination; provided, further, that, that Sections 7, 9, 11, 13, 17 and 18 shall survive any termination of this Agreement.

7.     Commitment Fee.     The Company shall pay to Purchasers an aggregate commitment fee equal to $10,000,000 (the "**Commitment Fee**") in cash, pro rata to each Purchaser based on the number of Purchased Shares each has committed to acquire hereunder, which fee shall be fully earned by Purchasers upon execution of this Agreement by the Company and payable to Purchasers upon Closing of this Agreement (subject, in the event of an In-Court Process, to the entry of the Agreement Approval Order) or upon termination of this Agreement for any reason other than pursuant to Section 6(b); provided, however, that if the Closing does not occur and a different transaction, which is not sponsored by Purchasers, is consummated solely in an In-Court Process (whether or not approved by Purchasers), then Purchasers shall be entitled to an aggregate break-up fee (in lieu of the Commitment Fee) equal to $5,000,000 in cash, pro rata to each Purchaser based on the number of Purchased Shares each has committed to acquire hereunder, which fee shall be fully earned by Purchasers upon execution of this Agreement by the Company and payable to Purchasers upon the closing of such alternative transaction unless this Agreement shall have been terminated pursuant to Section 6(b); no such $5,000,000 break-up fee shall be payable except for in an In-Court Process.

8.     No Survival.  The Company and the Purchasers agree and acknowledge that the representations and warranties set forth in Section 3(a) (the "**Surviving Representations**") shall survive for one year after the Closing, except in an In-Court Process, in which event the representations and warranties shall not survive Closing.

9.     Indemnification.  Subject, in the case of an In-Court Process, to the approval of entry of the Approval Order Agreement, the Company and its subsidiaries, jointly and severally, (each, an "**Indemnifying Party**") shall indemnify, defend, and hold harmless each Purchaser and each of such Purchaser's Affiliates, officers, directors, members, managers, partners, stockholders, employees, attorneys, advisors, agents, and other representatives and any Affiliate of the foregoing, and each of their respective successors and permitted assigns (each, an "**Indemnified Party**") from and against, and shall promptly reimburse each Indemnified Party for, any and all losses, damages, liabilities, claims, costs, and expenses, including, interest, court costs, and reasonable attorneys' fees and expenses relating to, arising out of, resulting from or in connection with (a) any breach or inaccuracy of the Surviving Representations, (b) any breach or violation by the Company or its subsidiaries of their covenants and agreements set forth in this Agreement, and (c) any such action, suit, or proceeding by a third-party arising out of or related to this Agreement or the Transactions contemplated hereby (collectively, "**Indemnified Liabilities**"); provided that, nothing herein shall be deemed to obligate the Company or any of its subsidiaries to indemnify, defend or hold any Indemnified Party harmless of, from or against any losses, damages, liabilities, claims, costs, and expenses, including interest, court costs, attorneys' fees or expenses relating thereto, to the extent that they are finally judicially determined to have resulted from the unlawful acts of such Indemnified Party.

10.     Notices.

(a)     All notices, requests, and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by facsimile or electronic mail transmission, by nationally recognized overnight courier or mailed (first class postage prepaid) to the parties at the following addresses or facsimile numbers.

If to Purchasers:

To the address set forth beneath Purchaser's signature to this Agreement

-- and --

If to the Company:

QCE Finance LLC
1001 17th Street, Suite S-175
Denver, Colorado  80202
Attn: Courtney L. Seely

With a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas

New York, New York  10019
Attn: Alan W. Kornberg
      Elizabeth R. McColm
      akornberg@paulweiss.com
      emccolm@paulweiss.com


       (b)     All such notices, requests and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile or electronic mail, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch and (iii) in the case of mailing, on the fifth Business Day after the posting thereof.

       11.    Successors and Assigns; Assignment.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Any Purchaser may assign, delegate, or otherwise transfer this Agreement or any of its rights or obligations hereunder without the consent of any other party hereto, to any of its Affiliates or any entity or person over which such Purchaser or any of its Affiliates exercises investment authority, including with respect to voting and dispositive rights, but such assignment, delegation or transfer shall not modify or eliminate obligations of such Purchaser hereunder.  Neither the Company nor any of its subsidiaries may assign, delegate, or otherwise transfer this Agreement or any of their rights or obligations hereunder without the consent of Purchasers, and any purported assignment in violation of this Section 11 shall be null and void *ab initio* without limiting any other remedies available to the other parties hereto.  Nothing in this Agreement is intended to confer upon any person not a party hereto (other than Indemnified Parties) any right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement, including any right to confer third party beneficiary rights.

       12.    Entire Agreement.  This Agreement, including the recitals hereto and the Index of Defined Terms, other definitive documents entered into as part of the Transactions, and the Support Agreement contain the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, written or oral, with respect to such subject matter.  The parties hereto represent and warrant that there are no other agreements or understandings, written or oral, regarding any of the subject matter hereof other than as set forth herein.  In the event of any conflict between this Agreement and the Support Agreement, the terms of this Agreement will control to the extent of such conflict.

       13.    Interpretation and Construction.  For purposes of this Agreement, (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, any

reference in this Agreement made to an Article, Section, Exhibit, Annex or Schedule refers to an Article or Section of, or Exhibit, Annex or Schedule to, this Agreement; (e) unless otherwise stated, the words "herein," "hereof" and ''hereto'' refer to this Agreement in its entirety rather than to a particular portion of this Agreement; and (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof.

14.    Amendments.  This Agreement may not be amended or modified except by a written instrument signed by each Purchaser and the Company, and, to the extent required, the approval of the Bankruptcy Court.  Except as otherwise set forth in this Agreement, any reference in this Agreement to documents, conditions, or other items that require the satisfaction or consent of the Purchasers, the taking of any affirmative action by them shall require the satisfaction, consent, or agreement to waive by Purchasers, which shall not be unreasonably denied, withheld or delayed.

15.    Extensions; Waivers.  Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein.  Any such extension or waiver will be valid only if set forth in a writing signed by the party to be bound thereby.  No waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.  Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

16.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute an original and all of which when taken together shall constitute one and the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (pdf).

17.    Non-Recourse.  No past, present or future manager, director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of party hereto or any Affiliate of any party hereto shall have any liability for any obligations or liabilities of such party (or, in the case of a Purchaser) any other Purchaser under this Agreement, or for any claim based on, in respect of, or by reason of, the Transactions contemplated hereby.

18.    Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action,

23

suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State and County of New York.  By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.  EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

*[Remainder of Page Intentionally Blank]*

24

**IN WITNESS WHEREOF**, the parties hereto have executed this Subscription Agreement as of the date first written above.

**QCE FINANCE LLC**

By:_____

Name:_____

Title:_____

**AVENUE CAPITAL MANAGEMENT II, L.P., solely on behalf of certain of the investment funds it manages**

**By: Avenue Capital Management II GenPar, LLC, its general partner**

By:_____

Name:_____

Title:_____

Address:        399 Park Avenue, 6th Floor
                New York, New York 10022

With a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036-6745
Attention        Ira S. Dizengoff, Esq.
Facsimile:       (212) 872-1002

**QCE PARENT LLC**

**By: Avenue Capital Management II, L.P., solely on behalf of certain of the investment funds it manages**

**By: Avenue Capital Management II GenPar, LLC, its general partner**

By:_____

Name:_____

Title:_____

## Index of Defined Terms

"*Affiliate*" means, with respect to any person or entity, any person or entity directly or indirectly controlling, controlled by or under common control with, such other person or entity. For purposes of this definition, "control" when used with respect to any person or entity, means the possession, directly or indirectly, of the power to cause the direction of management and/or policies of such person, whether through the ownership of voting securities, by contract, or otherwise.

"*Alternative Transaction*" means any transaction providing for or contemplating (a) a capital raising transaction, including a plan of reorganization, that does not contemplate or is inconsistent with any of the Transactions, (b) a sale of any equity or debt securities of the Company's or any of its subsidiaries or (c) a sale of all or substantially all the assets of the Company or any of its subsidiaries; provided, however, that any transaction approved by the Purchasers shall not be considered an Alternative Transaction.

"*Amended First Lien Facility*" means, the First Lien Facility as amended by an amendment including an extension of the maturity date thereof with an aggregate principal amount outstanding following the First Lien Exchange Offer and the repayment contemplated by the Restructuring (as defined in the Support Agreement) up to $425 million.

"*Business Day*" means any calendar day that is not a Saturday, Sunday or other calendar day on which banks are required or authorized to be closed in the City of New York.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Commission*" means the United States Securities and Exchange Commission.

"*Company Benefit Plan*" means any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which the Company or any of its subsidiaries is the owner, the beneficiary, or both), "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the Transactions or otherwise) under which any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of the Company or any of its subsidiaries has any present or future right to benefits or to which the Company could have any Liability.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any regulations promulgated thereunder.

Signature page to Subscription Agreement

Ex. 3 p. 182

"*ERISA Affiliate*" means, with respect to the Company, any trade or business (whether or not incorporated) that, together with the Company, is treated as a single employer within the meaning of Sections 414(b), (c), (m) or (o) of the Code.

"*ERISA Plan*" means at any time, an "employee benefit plan," as defined in Section 3(3) of ERISA, that the Company or ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by the Company.

"*GAAP*" means the generally accepted accounting principles in the United States.

"*Governmental Authority*" means (a) any court, tribunal, judicial or arbitral body and (b) any government, multilateral organization or international organization or any agency, bureau, board, commission, ministry, authority, department, official, political subdivision or other instrumentality thereof, whether federal, state or local, domestic or foreign as well as any Persons owned or chartered by any of the foregoing.

"*Liability*" means any liability or obligation of any kind, whether accrued, absolute, fixed or contingent or otherwise, whether known or unknown.

"*Lien*" means any charge, security interest, community property interest, condition, equitable interest, lien, option, pledge, mortgage, right of way, easement, encroachment, servitude, right of first offer, right of first refusal or contractual restriction of any kind, including any restriction or covenant with respect to use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"*Material Adverse Effect*" shall mean any change, effect, event, occurrence, development, circumstance, or state of facts which, either alone or in combination, has had or would reasonably be expected to have in the short term or long term a materially adverse effect on the business, properties, operations, financial condition or results of operations of the Company and its subsidiaries taken as a whole, or which would reasonably be expected to materially impair its or their ability to perform its or their obligations under this Agreement or have a materially adverse effect on or prevent or materially delay the consummation of the Transactions contemplated by this Agreement, the Support Agreement or the Offering Memorandum, provided, that none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: any adverse change, effect, event, occurrence, development, circumstance, or state of facts to the extent attributable to: (a) conditions affecting the U.S. economy as a whole; (b) the commencement, continuation or escalation of a war, civil unrest, material armed hostilities or other material international or national calamity or act of terrorism; (c) actions and omissions of the Company taken with prior express written consent of the Purchasers in contemplation of the Transactions; (d) conditions generally affecting the industry in which the Company participates; (e) any changes in laws of general applicability to companies in the same industry as the Company; or (f) changes in GAAP; which, in the case of any of the foregoing clauses (a) – (f) does not disproportionately affect the Company relative to other companies in the industry in which it operates (but then only the extent of the disproportionate impact shall be considered for the purposes of determining whether a material adverse effect has occurred).

"***Multiemployer Plan***" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, and to which the Company or ERISA Affiliate is making, is obligated to make or has made or been obligated to make, contributions on behalf of participants who are or were employed by any of them.

"***New/Amended Marketing Fund Trust Credit Facility***" means the amendment to or replacement of the indebtedness under the Credit Agreement, dated as of September 26, 2007, among QAFT, Inc., solely in its capacity as Trustee for The Regional Advertising Program Trust and The National Marketing Fund Trust, as Borrowers, the lenders party thereto, and Vectra Bank Colorado, National Association, as Administrative Agent.

"***Pension Plan***" means an ERISA Plan described in Section 3(2) of ERISA.

"***Person***" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"***Retiree Welfare Plan***" means, at any time, a Welfare Plan that provides for continuing coverage or benefits for any participant or any beneficiary of a participant after such participant's termination of employment, other than continuation coverage provided pursuant to Section 4980B of the Code and at the sole expense of the participant or the beneficiary of the participant.

"***Title IV Plan***" means a Pension Plan (other than a Multiemployer Plan), that is covered by Title IV of ERISA, and that the Company or ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"***Welfare Plan***" means an ERISA Plan described in Section 3(l) of ERISA.

| Term | Section |
|------|---------|
| Action | Section 5(h)(xi)(A) |
| Agreement | Preamble |
| Agreement Approval Order | Section 6(d) |
| Amendment | Recitals |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Rules | Section 3(a)(iv)(A) |
| Closing | Section 2(a) |
| Closing Date | Section 2(a) |
| Commitment | Section 1 |
| Commitment Fee | Section 7 |
| Common Shares | Recitals |
| Confirmation Order | Section 5(b) |

| | |
|---|---|
| Company | Preamble |
| Company Assets | Section 3(a)(viii) |
| Company Disclosure Schedules | Section 3(a) |
| Exchange Offers | Recitals |
| Expenses | Section 2(b)(iii) |
| First Lien Exchange Offer | Recitals |
| Holdings | Section 3(a)(v) |
| Incentive | Section 3(a)(v) |
| In-Court Process | Recitals |
| Indemnified Liabilities | Section 9 |
| Indemnifying Party | Section 9 |
| Indemnified Party | Section 9 |
| Litigation | Section 3(a)(ix) |
| New LLC Agreement | Section 2(b)(iv) |
| New Second Lien Facility | Recitals |
| Offering Memorandum | Recitals |
| Plan | Recitals |
| Petition Date | Recitals |
| Private Placement | Recitals |
| Purchased Shares | Section 1 |
| Purchase Price | Section 1 |
| Purchaser | Preamble |
| Purchasers' Representative | Section 4(a) |
| Related Party | Section 3(a)(xx)(B) |
| Restructuring | Recitals |
| Second Lien Exchange Offer | Recitals |
| Securities Act | Section 3(a)(xii) |
| Support Agreement | Recitals |
| Surviving Representations | Section 8 |
| Transactions | Recitals |

## SCHEDULE 3(a)(ii)-1

## Company's Ownership

| Member | Common Shares | Common Share Percentage |
|---|---|---|
| Avenue Capital Management II, L.P., solely on behalf of certain of the investment funds it manages | 7,260,089 | 72.60% |
| Other Second Lien Lenders | 2,739,911 | 27.40% |
| Total | 10,000,000 | 100.00% |

**Ex. 3 p. 186**

## SCHEDULE 3(a)(ii)-2

## Company's Ownership

| Member | Common Shares | Common Share Percentage |
|---|---|---|
| Avenue Capital Management II, L.P., solely on behalf of certain of the investment funds it manages | 8,287,556 | 82.88% |
| Other Second Lien Lenders | 1,712,444 | 17.12% |
| Total | 10,000,000 | 100.00% |

**SCHEDULE 3(a)(viii)**

**Liens**

1.  Liens on the assets of The Regional Advertising Program Trust under Declaration of Trust dated June 6, 2000, as amended from time to time, and The National Marketing Fund Trust under Declaration of Trust dated April 11, 1997, as amended from time to time, securing the Credit Agreement dated as of September 26, 2007, as amended from time to time, among QAFT, Inc., solely in its capacity as Trustee for The Regional Advertising Program Trust and The National Marketing Fund Trust, the several financial institutions from time to time party thereto, as Lenders, and Vectra Bank Colorado, National Association, as Administrative Agent.

## SCHEDULE 3(a)(x)

### No Violation or Default

(A)

1.  Defaults and Events of Default under the First Lien Credit Agreement resulting from (i) the execution or performance of the Transaction Documents or the Support Agreement (or from any of the transactions contemplated by the Support Agreement); (ii) the failure to comply with the Financial Performance Covenants; and (iii) the failure to make any payment when due (other than the failure to pay interest when due or within the applicable grace period), unless required to be made under the Support Agreement.

2.  Defaults and Events of Default under the Second Lien Credit Agreement resulting from (i) the execution or performance of the Transaction Documents or the Support Agreement (or from any of the transactions contemplated by the Support Agreement); and (ii) the failure to make any payment when due, unless required to be made under the Support Agreement.

3.  Upon expiration of a waiver from Vectra Bank Colorado, National Association, set to expire on March 1, 2012, there will be a default under the Credit Agreement dated as of September 26, 2007, as amended from time to time, among QAFT, Inc., solely in its capacity as Trustee for The Regional Advertising Program Trust and The National Marketing Fund Trust, the several financial institutions from time to time party thereto, as Lenders, and Vectra Bank Colorado, National Association, as Administrative Agent due to failure to comply with the required annual rest period.

(B)

None.

## SCHEDULE 3(a)(xv)

### Broker's Fees

1. Memorandum of Understanding, by and between QCE LLC and CRESA Partners – Denver, Inc. ("CresaPartners"), dated December 23, 2010, as amended by that certain Addendum dated March 9, 2011 and that certain Second Addendum dated July 5, 2011 (as amended, the "MOU", which, together with the Exclusive Right-to-Lease Listing Contract to which the Memorandum of Understanding is attached, the "Agreement"): Under certain circumstances as specified in Exhibit A to the MOU, CresaPartners is entitled to a "Termination Agreement Commission" defined as the lesser of (i) $250,000 and (ii) five percent (5%) of Net Savings (defined as Quiznos' Rent, Operating Expenses, and Tenant's Parking Allotment).

2. Engagement Letter, by and between QCE Holding LLC and its direct and indirect subsidiaries and Moelis & Company LLC ("Moelis"), dated as of June 15, 2011 and as amended on December 22, 2011. During the term of the agreement, Moelis will be paid a non-refundable cash fee (the "Monthly Fee") of $150,000 per month. At the closing of the Restructuring, Moelis is entitled to a non-refundable cash fee (the "Restructuring Fee") of $4.75 million, subject to credits of 50% of any monthly fees paid to Moelis after the third monthly fee of Moelis' engagement.

3. Retention Letter, by and between Lazard Fréres & Co. LLC ("Lazard") and Akin Gump Strauss Hauer & Feld LLP ("Akin"), as counsel to and acting on behalf of the parties specified therein, dated as of August 2, 2011 (the "Lazard Retention Letter"): A fee (the "Restructuring Fee"), payable upon consummation of a Restructuring (as defined therein), equal to (a) $3,250,000 to the extent a Restructuring is consummated through a pre-packaged, pre-arranged or pre-negotiated plan of reorganization under chapter 11 of the Bankruptcy Code proposed pursuant to a plan support agreement executed by the Informal Group (as that term is defined therein); (b) $3,000,000 to the extent a Restructuring is consummated through any other plan of reorganization under chapter 11 of the Bankruptcy Code; or (c) $3,250,000 to the extent a Restructuring is consummated out-of-court.

4. Retention Letter between Blackstone Advisory Partners L.P. ("Blackstone") and Willkie Farr & Gallagher LLP ("Counsel"), dated as of November 10, 2011 (the "Blackstone Retention Letter"): A fee (the "Restructuring Fee") equal to $2,250,000, which will be earned and payable upon the consummation of a Restructuring (as defined therein), provided, however, if the Restructuring provides for the payment in cash to the holders of the First Lien Credit Facility in an amount not less than the face amount of the First Lien Credit Facility (as defined therein), Blackstone will not be entitled to a Restructuring Fee.

**SCHEDULE 3(a)(xix)**

**Company Benefit Plans**

## EMPLOYEE BENEFIT PACKAGES

1. **Corporate Employee Benefit Package**
   a. Medical OAP
   b. Medical HRA 1
   c. Medical HRA 2
   d. Dental High Plan
   e. Dental Low Plan
   f. Vision
   g. Flexible Spending Accounts (Medical, Dependent Care & Parking)
   h. Basic Life/AD&D
   i. Short Term Disability
   j. Long Term Disability
   k. Voluntary Life/AD&D
   l. EAP
   m. Subsidized Garage Parking
   n. Regional Transportation District (RTD) Eco Pass
   o. Quiznos Gift Cards ($75 Quarterly)
   p. Pet Insurance
   q. 401k Plan (Company match after 1 year – 100% match of first 3%, 50% on next 2%)
   r. Holiday Pay (9 days per year)
   s. Vacation Pay (up to 20 days per year; use it or lose it during calendar year)
   t. Sick Pay (up to 7 days per year, use it or lose it during calendar year)

2. **Corporate Restaurant Employee Benefit Package**
   a. Medical HRA 2
   b. Medical Starbridge 2
   c. Medical Starbridge 3
   d. Dental Low Plan
   e. Vision
   f. Regional Transportation District (RTD) Eco Pass or Parking Pass
   g. 401k Plan (Company match after 1 year – 100% match of first 3%, 50% on next 2%)
   h. Vacation Pay (up to 1 week after 3 years of employment)
   i. Discounted Frontier Flights

3. **Canada Employee Benefit Package**
   a. Health Care/Hospitalization
   b. Dental Care
   c. Critical Illness
   d. Extended Health Benefits (Benefits with Deductibles and Reimbursement)
   e. Basic Life Insurance
   f. AD&D
   g. Optional Life Insurance

    h. Paid Leave of Absence
    i. RRSP (Company match after 1 year – 100% up to 6%)
    j. Holiday Pay (10 days per year)
    k. Vacation Pay (20 days per year; use it or lose it during calendar year)
    l. Sick Pay (up to 7 days per year; use it or lose it during calendar year)

## OTHER COMPENSATION

**1. Bonus Plans**
    a. 2011 Development Bonus Plan (commission based plan)
    b. 2011 Corporate Company Quarterly Bonus Plan (based on company performance)
    c. 2011 Travel Bonus (15 employees)
    d. DIA Manager Bonus Plan
    e. Auto/Fuel Allowance (approximately 60 employees)
    f. Cell Phone Allowance (approximately 145 employees)
    g. Internet Allowance (4 employees)

**2. Deferred Compensation Plans**
    a. The QCE LLC Key Management Wealth Building Program (SAR 2)
    b. The Quizno's Master LLC Amended Director, Advisor and Executive SAR and Deferred Compensation Plan (SAR1/SONP)
    c. The Quizno's Corporation Deferred Bonus Plan (DBPA/DBPB)

**3. Option Plans**
    a. 2010 QCE Incentive LLC Option Plan

## EMPLOYEE AGREEMENTS

**1. Employment Agreements**
    a. MacDonald, Greg
        i. Restated Employment Agreement effective as of October 1, 2010, and as amended from time to time (the "Amendments"), and most recently amended by the Second Amendment to the Amended and Restated Employment Agreement, dated as of July 7, 2011, between QCE LLC and Greg MacDonald (collectively, the "MacDonald Employment Agreement"), provides terms specifying, among others, the scope of employment, compensation consisting of a base salary and a discretionary performance bonus, benefits, and severance payment subject to the terms of termination, and indemnification including coverage under any D&O Insurance policies. In addition, the MacDonald Employment Agreement incorporates a Release Agreement and Golden Parachute Excise Tax Gross-Up Provisions.
    b. Robson, Jason
        i. Offer of Employment, Employment Agreement dated as of October 29, 2009, between QCE LLC and Jason Robson (the "Robson Employment Agreement") provides terms specifying, among others, the scope of

employment, compensation in the form of base salary, discretionary performance bonus, benefits, severance payments subject to the terms of termination, and indemnification. In addition, the Robson Employment Agreement incorporates a Release Agreement.

   c. Seely, Courtney

      i. The Employment Agreement, as amended by the First Amendment Employment Agreement effective May 24, 2011, and by letter dated July 19, 2011, and by letter dated November 30, 2011, between QCE LLC and Courtney Seely (collectively, the "<u>Seely Employment Agreement</u>") provides terms specifying, among others, the scope of employment, compensation consisting of base salary, discretionary performance bonus, incentive compensation in the form of deferred compensation, benefits, severance payments subject to the terms of termination, and indemnification including coverage under any D&O Insurance policies. In addition, the Seely Employment Agreement incorporates a Release Agreement.

   d. Smythe, Dennis

      i. Employment Agreement dated January 25, 2010, with an effective date of October 19, 2009, between QCE LLC and Dennis Smythe (the "<u>Smythe Employment Agreement</u>") provides terms specifying, among others, the scope of employment, compensation in the form of base salary, discretionary performance bonus, incentive compensation in the form of deferred compensation, benefits, severance payments subject to the terms of termination, and indemnification including coverage under any D&O Insurance policies. In addition, the Smythe Employment Agreement incorporates a Release Agreement.

**2. Retention Agreements- (agreements to pay severance if terminated without cause)**

   a. Belmont, Brian- Retention Agreement dated June 6, 2011.
   b. Bellamy, Teggie- Retention Agreement dated June 6, 2011.
   c. Brooks, David- Retention Agreement dated July 28, 2011.
   d. Calkins, Zach- Retention Agreement dated June 6, 2011.
   e. Choy, Marc- Retention Agreement dated June 6, 2011.
   f. Corrigan, Chad- Retention Agreement dated June 6, 2011.
   g. Cox, Mark- Retention Agreement dated June 6, 2011.
   h. Farley, Cha Nye- Retention Agreement dated June 6, 2011.
   i. Fearrin, Brett- Retention Agreement Agreement, dated June 27, 2011.
   j. Goldstein, Todd- Retention Agreement dated June 6, 2011.
   k. Jeffrey, George- Retention Agreement dated June 6, 2011.
   l. Keefe, Ryan- Retention Agreement dated August 31, 2011.
   m. Riggle, Tim- Retention Agreement dated June 6, 2011.
   n. Rogers, Mark- Retention Agreement dated June 6, 2011.
   o. Roper, Mike- Retention Agreement dated June 6, 2011.
   p. Sommers, Matt- Retention Agreement dated June 6, 2011.
   q. Tress, Jonathan- Retention Agreement dated June 6, 2011.
   r. Vala, Ali- Retention Agreement dated June 6, 2011.

    s.  Wilson, Mark- Retention Agreement dated June 6, 2011.

3. **Former Employees Currently Receiving Severance Pay**
   a. Bourg, Curtis (through Feb. 2012)
   b. Pillari, Andy (through May 2012)
   c. Schaden, Richard (though Oct. 2013) (to be terminated at Closing)
   d. Stahlhut, Jeff (through Dec. 2011)
   e. Taylor, Allyn (through Feb. 2012)

4. **Consultants and Contractors**

   a. Woodhouse, Terri-Lynn- Independent Contractor Agreement by and between Terri-Lynn Woodhouse and QCE LLC, effective May 3, 2010.
   b. Colvin, Tony-"Contractor" for Development, working on Real Estate.
   c. Mann, Joe- "Contractor" for Development, working on Real Estate.
   d. Boudreaux, Ron- "Contractor" for Ops/Training, teaching at QU.
   e. Arango, Andrea- "Contractor" for Field Ops, specifically working on Hess.
   f. Klein, Adam- "Contractor" for Field Ops, specifically working on Hess.
   g. Cordoba, Roberto- "Contractor" for Field Ops, specifically working on Hess.
   h. Malley, Skyler- Interactive Marketing Intern.
   i. Vandel, Raymon- "Contractor" for Marketing, Graphic Design.
   j. Crossland, Jerdie- "Contractor" for Legal, Risk Management.
   k. Kannegieter, Samantha-Temp to Hire through Agency, Staff Accountant.
   l. Lamson, Bethany-Temp to Hire through Agency, Accounts Payable Specialist.
   m. Domer, Todd- "Contractor", VP Tax.
   n. Bovey, Chelsea-"Contractor", Canada Office Administrator.
   o. Nakagawa, Jane- "Contractor", Canada Design & Procurement Coordinator.
   p. Basarowich, Doug- Letter Confirming Terms of Contract Offer from Quizno's Canada Restaurant Corporation and, as applicable, its subsidiaries, to retain Doug Basarowich, dated January 1, 2011.

## INDEMNITY AGREEMENTS

   a. Manager indemnification agreement, as of August 30th, 2006, by and between QCE Holding LLC and David Deno, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

   b. Manager indemnification agreement, as of October 1, 2010, by and between QCE Holding LLC and David Prokupek, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

   c. Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and Frederick H. Schaden, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

   d. Manager indemnification agreement, effective as of November 27, 2006, by and between QCE Holding LLC and Greg Brenneman, who has been employed to serve as the

Company's Chief Executive Officer, President, and to be appointed as a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.]

e.  Manager indemnification agreement, as of January 9, 2007, by and between QCE Holding LLC and J. Brandon Turner, who has been employed to serve as the Company's Chief Financial Officer and Executive Vice President.  To be assumed by QCE LLC at the Closing.

f.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and J. Eric Lawrence, a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.

g.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and John M. Warner, a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.

h.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and Mathew Lori, a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.

i.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and Patrick E. Meyers, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

j.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and Richard E. Schaden, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

k.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and Richard F. Schaden, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

l.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and Stephen P. Murray, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

m.  Manager indemnification agreement, effective as of August 18, 2008, by and between QCE Holding LLC and Thomas Ryan, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

n.  Manager indemnification agreement, effective as of March 5, 2008, by and between QCE Holding LLC and John D. Bowlin, a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.

o.  Manager indemnification agreement, effective as of August 4, 2011, by and between QCE Holding LLC and Andrew R. Lee, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

p.  Manager indemnification agreement, effective as of July 29, 2011, by and between QCE Holding LLC and John M. Moore, a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.

**SCHEDULE 3(a)(xx)(A)**

**Affiliate Transactions**

1. In accordance with the Third Amended and Restated Limited Liability Company Agreement of QCE Holding LLC ("QCEH"), effective as of April 26, 2010, the Company's subsidiaries pay certain costs on behalf of QCEH, including certain professional services and certain allocated employee compensation expenses.  In order to present stand alone financial statements in accordance with GAAP, these expenses are allocated from QCE LLC to QCEH through intercompany accounts.  As of September 30, 2011, the QCE LLC intercompany receivable balance was approximately $343,000. It is expected that this balance will be approximately $550,000 as of December 31, 2011.

   Prior to June 30, 2011, these intercompany accounts were settled by recording a deemed distribution from QCE LLC to QCEH with a corresponding credit to the QCE LLC intercompany receivable balance.  Although the essence of the settlement transaction was to provide a means for QCEH to satisfy its intercompany liabilities, no cash was distributed.  Rather, these entries served to reduce member's equity.  This intercompany account has not been settled since June 30, 2011 and QCE LLC expects to settle its receivable as of December 31, 2011 through a non-cash adjustment to member's equity in conjunction with the proposed Transactions as QCEH will no longer serve as the Member of QCE LLC.  (Such arrangement will cease at Closing).

2.

   a. Health insurance for the benefit of Consumer Capital Partners, the Company's indirect Sponsor.  (Such plans will expire on 12/31/2011).

      i. Medical OAP

      ii. Medical HRA 1

      iii. Medical HRA 2

      iv. Dental High Plan

      v. Dental Low Plan

      vi. Vision

      vii. Flexible Spending Accounts (Medical, Dependent Care & Parking)

      viii. Basic Life/AD&D

      ix. Short Term Disability

      x. Long Term Disability

       xi.  Voluntary Life/AD&D

b.  Management Agreement, entered into as of January 1, 2009, between the Cervantes Holding Company and TQSC II LLC (as amended). (Such Management Agreement will expire on 12/31/2011).

c.  Area Director Marketing Agreement dated September 17, 2009, as amended, with Chicago Franchise Support Services LLC ("CFSS")  pursuant to which CFSS is responsible for operating and managing the Chicago, Illinois territory.  (Such Area Director Marketing Agreement will terminate on the final day of the month in which the Closing occurs).

d.  Management Agreement effective January 16, 2004, with Rockford Manager LLC ("Rockford"), pursuant to which Rockford is responsible for operating and managing the Rockford, Illinois and Madison, Wisconsin territories. (Such Management Agreement will terminate on the final day of the month in which the Closing occurs).

e.  Third Amended and Restated Employment Agreement, dated as of May 5, 2006, between QCE Holding LLC, QCE LLC, and Richard E. Schaden, as further amended on January 1, 2009, December 31, 2009, and June 30, 2010.  (Such Employment Agreement will terminate on the earlier to occur of the Closing Date or the Petition Date).

f.  The Deferred Compensation Plans and Option Plans set forth on Schedule 3(a)(xix) hereto under "Other Compensation" items 2 and 3, respectively, are incorporated herein by reference.  (Such Deferred Compensation Plans and Option Plans will terminate at Closing).

g.  Any compensation and benefits paid to any Affiliate employees under the "Employment Agreements" set forth on Schedule 3(a)(xix) hereto.  (Except for the Employment Agreement listed in 2(e) above, such agreements will not terminate).

h.  Agreement to Manage Business Operations, effective January 1, 2011, between Rockford Manager LLC and Al Raheem Group, Inc. (as amended). (Such Agreement will terminate on the final day of the month in which the Closing occurs).

i.  Agreement to Manage Business Operations, effective January 1, 2011, between Chicago Franchise Support Services LLC and Al Raheem Group, Inc. (as amended).   (Such Agreement will terminate on the final day of the month in which the Closing occurs).

## SCHEDULE 4(a)(xi)

## Deferred Compensation

1.  Branam, Janice

2.  Bromberg, Mark

3.  Crider, John

4.  Flaherty, William

5.  Gallivan, John

6.  Heusinger, Steve

7.  Lawrence, Eric

8.  MacDonald, Greg

9.  McNeely, Perry

10. McPherson, Jane

11. Meyers, Patrick

12. Moore, John M.

13. Paddock, Regina

14. Ryan, Thomas

15. Schaden, Fred

16. Schaden, Richard

17. Schaden, Richard F

18. Selvaggio, Andrew J.

19. Stewart, Lyle B.

20. Todd, John

21. Warschauer, Bonnie

## SCHEDULE 5(h)

### Conduct of Business

1. Up to approximately $1,100,000 in the aggregate of payments of amounts due in respect of the fourth quarter under the Bonus Plans set forth on Schedule 3(a)(xix) hereto under "Other Compensation" item 1, including but not limited to item 1(a).

2. Separation payments to certain participants of Deferred Compensation plans set forth on Schedule 4(a)(xi) hereto who separated from the Company in 2011. As of the date hereof, two participants of such plans separated from the Company in 2011 and will be due their first payment, in an aggregate amount of $106,943, within 60 days of the end of the current year.

3. $500,000 payment for full and complete resolution of all claims and disputes in the action known as Joe Martrano and Terry Schallenberger, et al. vs. The Quizno's Franchise Company, LLC, et al. in the United States District Court for the Western District of Pennsylvania

4. $750,000 payment, if the Company's settlement offer is accepted, for resolution of all claims and disputes in the action known as Quizno's Canada Restaurant Corporation AD Case (Kileel).

5. Up to $1,500,000 in payments in aggregate, net of any insurance recovery, for resolution of all claims and disputes in the actions brought by those in Colorado who claim to have opted out of the Siemer v. The Quizno's Franchise Company LLC national class action settlement agreement (Colorado Opt-Out Cases).

6. Any meetings or mediations attended by employees of the Company in respect of the action known as Quizno's Canada Restaurant Corporation Class Action (Q2).

7. Up to $2,000,000 in payments in aggregate, net of any insurance recovery, for resolution of all claims and disputes in respect of the Quizno's Canada Restaurant Corporation Class Action (Q2).

8. On December 6, 2011, Quiznos sent a letter to Maple Leaf Bakery Inc., the primary supplier of bread to the Quiznos system, regarding Maple Leaf's ongoing failure to supply bread that conforms to Quiznos' specifications, as required by Quiznos' agreements with Maple Leaf. In that letter, Quiznos demanded a meeting between management teams to discuss resolution of these issues. This meeting is scheduled for December 21, 2011 at Quiznos' Denver offices.

9. From the launch of the exchange offers and consent solicitation contemplated by the Support Agreement until the conclusion thereof, Quiznos will cease disclosing its October 2011 Franchise Disclosure Document to prospective franchise owners. As promptly as possible after the exchange offers and consent solicitation have concluded, Quiznos will begin disclosing to prospective franchise owners an amended Franchise

Disclosure Document, which includes next steps for the restructure and material updates in respect thereof.

10. Any professional fees and expenses to be paid by the Company to consummate the Transactions as contemplated by the Support Agreement.

11. Any applicable consent fees, commitment fees and break-up fees contemplated by the Support Agreement.

**SCHEDULE 5(h)(ii)**

**Payments in Respect of Agreements.**

1. The Management Agreement effective January 16, 2004 between Rockford Manager LLC and FHS LLC, an entity owned 100% by Frederick Schaden.

2. The Area Director Marketing Agreement dated September 17, 2009, as amended, between Illinois Food Management, Inc. and Chicago Franchise Support Services LLC.

3. Third Amended and Restated Employment Agreement, dated as of May 5, 2006, between QCE Holding LLC, QCE LLC, and Richard E. Schaden, as further amended on January 1, 2009, December 31, 2009, and June 30, 2010.

4. The Deferred Compensation Plans and Option Plans set forth on Schedule 3(a)(xix) hereto under "Other Compensation" items 2 and 3, respectively, are incorporated herein by reference.

5. Agreement to Manage Business Operations, effective January 1, 2011, between Rockford Manager LLC and Al Raheem Group, Inc. (as amended).

6. Agreement to Manage Business Operations, effective January 1, 2011, between Chicago Franchise Support Services LLC and Al Raheem Group, Inc. (as amended).

7. Management Agreement, entered into as of January 1, 2009, between The Cervantes Holding Company and TQSC II LLC (as amended).

8. Any "Indemnity Agreements" set forth on Schedule 3(a)(xx)(A) hereto are hereby incorporated by reference.

9. Any professional fees and expenses to be paid by the Company to consummate the Transactions as contemplated by the Support Agreement.

10. Any applicable consent fees, commitment fees and break-up fees contemplated by the Support Agreement.

## SCHEDULE 5(h)(viii)

### Company Benefit Plans.

1. Up to approximately $1,100,000 in the aggregate of payments of amounts due in respect of the fourth quarter under the Bonus Plans set forth on Schedule 3(a)(xix) hereto under "Other Compensation" item 1, including but not limited to item 1(a).

**SCHEDULE 5(h)(ix)**

**Claims, Liabilities or Obligations**

1. Up to approximately $1,100,000 in the aggregate of payments of amounts due in respect of the fourth quarter under the Bonus Plans set forth on Schedule 3(a)(xix) hereto under "Other Compensation" item 1, including but not limited to item 1(a).

2. In accordance with the Third Amended and Restated Limited Liability Company Agreement of QCE Holding LLC ("QCEH"), effective as of April 26, 2010, the Company's subsidiaries pay certain costs on behalf of QCEH, including certain professional services and certain allocated employee compensation expenses. In order to present stand alone financial statements in accordance with GAAP, these expenses are allocated from QCE LLC to QCEH through intercompany accounts. As of September 30, 2011, the QCE LLC intercompany receivable balance was approximately $343,000. It is expected that this balance will be approximately $550,000 as of December 31, 2011.

   Prior to June 30, 2011, these intercompany accounts were settled by recording a deemed distribution from QCE LLC to QCEH with a corresponding credit to the QCE LLC intercompany receivable balance. Although the essence of the settlement transaction was to provide a means for QCEH to satisfy its intercompany liabilities, no cash was distributed. Rather, these entries served to reduce member's equity. This intercompany account has not been settled since June 30, 2011 and QCE LLC expects to settle its receivable as of December 31, 2011 through a non-cash adjustment to member's equity in conjunction with the proposed Transactions as QCEH will no longer serve as the Member of QCE LLC.

3. A subsidiary of the Company offered financing to qualified franchise owners on a limited basis in 2009, 2010 and 2011. These include loans for renovating and remodeling restaurants, as well as loans to assist franchise owners in the acquisition of restaurants. A default or bankruptcy by a franchise owner borrower could have a substantial negative impact on our ability to collect amounts due under such franchise owner's borrowing arrangement. As of September 30, 2011 the amounts due under such loans were approximately $5,000,000 in the aggregate.

4. $500,000 payment for full and complete resolution of all claims and disputes in the action known as Joe Martrano and Terry Schallenberger, et al. vs. The Quizno's Franchise Company, L.L.C., et al. in the United States District Court for the Western District of Pennsylvania

5. $750,000 payment, if the Company's settlement offer is accepted, for resolution of all claims and disputes in the action known as Quizno's Canada Restaurant Corporation AD Case (Kileel).

6. Up to $1,500,000 in payments in aggregate, net of any insurance recovery, for resolution of all claims and disputes in the actions brought by those in Colorado who claim to have

**Ex. 3 p. 204**

opted out of the Siemer v. The Quizno's Franchise Company LLC national class action settlement agreement (Colorado Opt-Out Cases).

7. Up to $2,000,000 in payments in aggregate, net of any insurance recovery, for resolution of all claims and disputes in respect of the Quizno's Canada Restaurant  Corporation Class Action (Q2).

**SCHEDULE 5(h)(xi)**

**Third Party Actions**

1. Actions against our current E&O carrier.

2. On December 6, 2011, Quiznos sent a letter to Maple Leaf Bakery Inc., the primary supplier of bread to the Quiznos system, regarding Maple Leaf's ongoing failure to supply bread that conforms to Quiznos' specifications, as required by Quiznos' agreements with Maple Leaf. In that letter, Quiznos demanded a meeting between management teams to discuss resolution of these issues. This meeting is scheduled for December 21, 2011 at Quiznos' Denver offices. We may take action to enforce our rights under our agreements with Maple Leaf.

EXHIBIT G

PLAN

**SEE APPENDIX A OF THE OFFERING MEMORANDUM AND DISCLOSURE STATEMENT**

EXHIBIT H

DIP FINANCING TERM SHEET

| | |
|---|---|
| Borrower: | QCE LLC (the "Borrower"). |
| Guarantors: | QCE Finance LLC ("Holdings") and subsidiaries of the Borrower that are debtors under the chapter 11 cases (together with Holdings, the "Guarantors" and, together with the Borrower, the "Debtors"). |
| DIP Lenders: | Avenue Capital Group and/or its affiliates ("Avenue"), Caspian Capital LP and/or its affiliates ("Caspian"), Fortress Investment Group, LLC and/or its affiliates ("Fortress") and Oaktree Capital Management, L.P. and/or its affiliates ("Oaktree"). It is expected that each of Avenue, Caspian, Fortress, and Oaktree will provide 25% of the DIP Facility. |
| DIP Facility: | A delayed draw term facility in an amount not to exceed $25,000,000. Availability under the DIP Facility will be subject to a budget that is satisfactory to the lenders. |
| Term: | Six (6) months after the closing date. |
| Interest Rate: | 9% |
| Up-Front Fees: | 1%, fully earned and payable upon execution of the Agreement. |
| Security/Ranking: | The DIP Facility will be secured by a perfected first priority lien and security interest, subject to the carve-out, on all pre-petition and post-petition property of the Debtors and their respective estates and will prime all liens securing the pre-petition first lien credit facility and pre-petition second lien credit facility. |
| Super-priority Administrative Expense Claim: | Subject to the carve-out, the indebtedness of the Debtors under the DIP Facility shall constitute, in accordance with section 364(c) of the Bankruptcy Code, a super-priority administrative claim having priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.[13] |
| Affirmative Covenants: | Substantially similar to the pre-petition first lien credit agreement, with modifications appropriate for debtor-in-possession financings of this type. |
| Negative Covenants: | Substantially similar to the pre-petition first lien credit agreement, with more restrictive carve-outs and modifications appropriate for debtor-in-possession financings of this type. |
| Financial Covenants: | Budget variance test to be agreed. |

---

[13] Assuming lender consent.

Ex. 3 p. 208

Events of Default:  Customary events of default, subject to grace periods in certain instances, including: material misrepresentations, failure to pay interest, principal and fees, breach of covenants, material judgments, material ERISA events, invalidity of DIP Facility agreements, change in control and bankruptcy specific events of default, including failure to reach certain bankruptcy milestones.