*EXECUTION VERSION*

## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (the "*Agreement*"), dated as of December 23, 2011, is made and entered into by and among QCE Parent LLC, a Delaware limited liability company ("*Parent*"), QCE Finance LLC, a Delaware limited liability company (the "*Company*") and the entities set forth on the signature pages hereto, (each a "*Purchaser*" and, collectively, the "*Purchasers*"). Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings provided in the Support Agreement (as defined below).

### WITNESSETH:

**WHEREAS**, the Company has proposed an out-of-court restructuring (the "*Restructuring*") of its outstanding obligations under the First Lien Facility and the Second Lien Facility;

**WHEREAS**, on or about December 23, 2011, the Company, on behalf of it and its subsidiaries, certain of its Affiliates and the Participating Lenders, entered into that certain Restructuring Support Agreement (together with the exhibits and schedules annexed thereto or referred to therein, and as such may be modified or amended from time to time, the "*Support Agreement*");

**WHEREAS**, on or about December 23, 2011, the Company intends to make an exchange offer pursuant to an exchange offer memorandum (together with the exhibits and schedules annexed thereto or referred to therein, as such may be modified or amended from time to time, the "*Offering Memorandum*") in connection with (i) the exchange offer (the "*First Lien Exchange Offer*") to existing holders of the First Lien Facility to exchange a portion of the loans under the First Lien Facility into loans under a new second lien facility (the "*New Second Lien Facility*"); (ii) the amendment to, extension of and partial cash payoff of the First Lien Facility (the "*Amendment*") and (iii) the exchange offer of loans under the Second Lien Facility for 100% of new limited liability company membership units to be issued by the Company (the "*Common Shares*"), with such Common Shares of the Company being simultaneously assigned by the holders of loans under the Second Lien Facility to Parent (an entity formed to facilitate the Transactions) in exchange for 100% of the new limited liability company membership units to be issued by Parent ("*Parent Common Shares*"), which upon completion of all of the steps in the Restructuring (including the merger of the Company with and into Parent after the consummation of the Private Placement and the renaming of Parent to QCE Finance LLC) will represent (x) forty percent (40%) of the Common Shares or (y) in the case of an In-Court Process (as defined below), twenty-five percent (25%) of the Common Shares, in each case after accounting for the Private Placement (as described herein), but before accounting for potential dilution from equity to be issued in connection with the Management Incentive Plan (the "*Second Lien Exchange Offer*," and together with the First Lien Exchange Offer, the "*Exchange Offers*");

**WHEREAS**, if, within five business days following the Solicitation Termination Date, all conditions to closing the Exchange Offers have not been satisfied to allow the Restructuring to take place outside of a case under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*.

**Ex. 4 p. 1**

(the "**Bankruptcy Code**"), the Company will effectuate the Restructuring by commencing (together with certain of its Affiliates) one or more voluntary "pre-packaged" cases (the "**Bankruptcy Cases**") under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), in connection with which the Company intends to file the Company's plan of reorganization, substantially in the form of Exhibit C hereto (the "**Plan**"), and related documents (such process, an "**In-Court Process**," and the date of the commencement of such case, the "**Petition Date**") and the terms of the Exchange Offers shall be superseded by the terms of the Plan;

WHEREAS, the Support Agreement contemplates, among other things, that Avenue Capital Group and certain of its Affiliates will subscribe for and purchase from Parent, simultaneously with the consummation of the Second Lien Exchange Offer, newly-issued Parent Common Shares, which after the merger of the Company with and into Parent after the consummation of the Private Placement and the renaming of Parent to QCE Finance LLC will represent (i) sixty percent (60%) of the Common Shares, or (ii) in the case of an In-Court Process, seventy-five percent (75%) of the Common Shares, in each case, before accounting for potential dilution from equity to be issued in connection with the Management Incentive Plan, for an aggregate price of $150,000,000 (the "**Private Placement**" and, together with the Exchange Offers, the Amendment and/or the In-Court Process, the "**Transactions**"); and

WHEREAS, the proceeds of the Private Placement shall be used by the Company for (i) the repayment of $75 million of outstanding indebtedness under the First Lien Facility, if the Exchange Offers are implemented and the In-Court Process is not commenced, or $65 million of outstanding indebtedness under the First Lien Facility, if the In-Court Process is commenced, (ii) payment of all accrued but unpaid interest under the First Lien Facility, (iii) payment of fees and expenses incurred in connection with the Restructuring, and (iv) working capital and other general corporate purposes;

NOW, THEREFORE, for and in consideration of the premises, and other good and valuable consideration the receipt and sufficiency of all of which is hereby acknowledged, the parties hereto agree as follows:

1.     The Commitment.   Subject to the terms, conditions and limitations set forth herein, each Purchaser agrees to purchase from Parent, and Parent agrees to issue and sell to Purchaser 6,000,000 Common Shares of Parent if the Exchange Offers are consummated or 7,500,000 Common Shares of Parent if the In-Court Process is commenced (as the case may be, the "**Purchased Shares**") at a price equal to: $25.00 per Common Share if the Exchange Offers are consummated or $20.00 per Common Share if the In-Court Process is commenced (as the case may be, the "**Purchase Price**"), for an aggregate purchase price of $150 million.  The obligations of Purchasers described in this Section 1 shall be referred to herein as the "**Commitment**."

2.     The Closing.

(a)     The delivery of and payment for the Purchased Shares is referred to herein as the "**Closing**."  The Closing shall occur on or before the date (the "**Closing Date**") that is not later than the fifth (5th) Business Day following the satisfaction and/or waiver of all conditions to the Closing as set forth in Section 4 (other than conditions which by their nature can be

**Ex. 4 p. 2**

satisfied only at the Closing).  The Closing shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 at 10:00 AM New York City time, as specified below, unless another date, time and/or place is agreed in writing by each of the parties hereto.

(b)     The following shall occur contemporaneously at the Closing:

(i)     Each Purchaser, in satisfaction of its Commitment, shall pay to Parent, at the Closing, its respective Purchase Price pursuant to Section 1, by wire transfer in immediately available funds to such account of Parent as Parent shall have designated no later than two Business Day prior to the Closing by notice to Purchasers.

(ii)     the Purchased Shares to be purchased by each Purchaser, in the name of each Purchaser, shall be recorded in the books and records of Parent by Parent or by a transfer agent selected by the Board of Managers of Parent to maintain such records;

(iii)     subject to the entry of the Agreement Approval Order in the event of an In-Court Process, the Company shall pay the reasonable out-of-pocket fees, costs, and expenses incurred in connection with this Agreement by Purchasers, if not paid previously, including reasonable attorney's fees and expenses of such attorneys acting on behalf of Purchasers (all of the fees, costs, and expenses set forth in this Section 2(b)(iii) collectively, the "*Expenses*"); and

(iv)     each Purchaser shall become a party to, to be bound by, the terms and conditions of the Amended and Restated Limited Liability Company Agreement of Parent, dated as of the Closing Date, in the form of Exhibit A (the "*New LLC Agreement*").

3.     Representations and Warranties.

(a)     Except as set forth in the Offering Memorandum and the corresponding section of the disclosure schedules delivered by the Company to Purchasers in connection with the execution of this Agreement (the "*Company Disclosure Schedules*"), the Company represents and warrants the following to each Purchaser:

(i)     Organization and Qualification.  The Company and each of its subsidiaries is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite corporate, partnership or limited liability company power and authority to own, lease, and operate their respective properties and assets and to conduct their respective businesses as now being conducted.  The Company and each of its subsidiaries is duly qualified to transact business in each jurisdiction in which the nature of property owned or leased by them or the conduct of their business requires them to be so qualified, except where the failure to be duly qualified to transact business, would not reasonably be expected to have a Material Adverse Effect.

(ii)     Company's Ownership.  Upon the consummation of the Transactions, the ownership interests of Parent will be as set forth on Schedule 3(a)(ii)-1 of the Company Disclosure Schedules (or in the event of an In-Court Process, Schedule 3(a)(ii)-2 of the Company Disclosure Schedules) herein, and all such ownership interests will be duly authorized,

validly issued, fully paid, and nonassessable, and, all such ownership interests will be free and clear of all Liens (as defined below) and (except as provided in the New LLC Agreement) not subject to any preemptive rights, rights of first refusal, option, warrant, call, subscription, and similar rights, other than, in each case, created by any of the Purchasers or as set forth in the New LLC Agreement.

   (iii) <u>Subsidiaries' Equity Interests</u>. All of the issued ownership interests of each of the subsidiaries of the Company are duly and validly authorized and issued, fully paid, nonassessable, and directly owned by the Company or its applicable subsidiary free and clear of all Liens (other than Liens permitted under the First Lien Facility and the Second Lien Facility) and not subject to any preemptive rights, rights of first refusal, option, warrant, call, subscription, and similar rights.

   (iv) <u>Power and Authority; Enforceability</u>.

   (A) The Company and each of its subsidiaries, as the case may be, has the requisite corporate, partnership or limited liability company power and authority to execute and deliver this Agreement (in the case of an In-Court Process, subject to entry of the Agreement Approval Order) and the definitive documents necessary or appropriate to consummate the Transactions, and, in the case of an In-Court Process, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the fourteen-day period set forth in Rule 3020(e) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), to perform its obligations hereunder and thereunder.  This Agreement and such documents executed in connection herewith or therewith have been (1) duly and validly authorized by all necessary corporate, partnership, limited liability company or other action on the part of the Company and its subsidiaries, as applicable, and (2) duly and validly executed and delivered by the Company and its subsidiaries, as applicable.

   (B) In the event of an In-Court Process, if and when filed, the Company and each of its subsidiaries, as applicable, will have the requisite power and authority to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the fourteen-day period set forth in Bankruptcy Rule 3020(e), to perform its obligations thereunder, and will have taken all necessary actions required for the due authorization and performance by it of the Plan by the Closing Date.

   (v) <u>No Conflict</u>.  Except as may occur as the result of commencement of the In-Court Process, (A) the execution and delivery of this Agreement and each of the definitive documents necessary to effect the Transactions contemplated hereby by the Company and its subsidiaries, do not and shall not (1) violate any provision of the operating agreement, articles of incorporation or by-laws or other organizational documents of QCE Holdings LLC ("***Holdings***"), QCE Incentive LLC ("***Incentive***") or the Company or any of its subsidiaries, except for matters as to which waivers or consents have been previously obtained or (2) conflict with, violate, constitute a breach of, or result in the creation of a Lien or any other encumbrance against the Company or any of its subsidiaries or their properties pursuant to, or give rise to any termination or other rights under, any material contract, agreement, or instrument by which Holdings, Incentive or the Company or any of its subsidiaries are bound, or any judgment, order,

decree, law, statute, rule, regulation, or other judicial or governmental restriction to which the Company or any of its subsidiaries are subject except, (i) in each case for matters as to which waivers or consents have been previously obtained or (ii) in each case for matters relating to the First Lien Facility or the Second Lien Facility that will be resolved as a part of the Transactions; and (B) the performance of this Agreement and each of the definitive documents necessary to effect the Transactions contemplated hereby and thereby by the Company and its subsidiaries, as applicable, and the consummation by the Company and its subsidiaries of the Transactions contemplated hereby and thereby in accordance with the terms hereof and thereof, do not (1) violate any provision of the operating agreement, the articles of incorporation or by-laws or other organizational documents of Holdings, Incentive or the Company or any of its subsidiaries, or (2) except for violations that have been previously waived or consented to, conflict with, violate, constitute a breach of, or result in the creation of a Lien or any other encumbrance against the Company or any of its subsidiaries or their properties pursuant to, or give rise to any termination or other rights under, any material contract, agreement, or instrument by which Holdings, Incentive or the Company or any of its subsidiaries shall be bound, or any judgment, order, decree, law, statute, rule, regulation, or other judicial or governmental restriction to which Holdings, Incentive or the Company or any of its subsidiaries shall be subject in each case as of, and following, the Closing Date.

(vi)     Enforceability.     This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid, and binding obligation of the Company, enforceable against the Company in accordance with its terms, provided that in the event of an In-Court Process, upon the entry of the Agreement Approval Order, and assuming this Agreement will constitute the valid and binding agreement of the other parties hereto, this Agreement will constitute the valid and binding obligations of the Company, enforceable against the Company in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or similar law affecting the enforcement of creditors' rights generally and subject to general principles of equity (whether enforcement is sought by proceeding in equity or at law).

(vii)     No Material Adverse Effect.     Since the date of the most recent historical consolidated financial statements of the Company included in the Offering Memorandum, except as otherwise stated in the Offering Memorandum or the occurrence of an In-Court Process, (A) there has been no Material Adverse Effect, and (B) other than in connection with the transactions contemplated by the Support Agreement, neither the Company nor its subsidiaries, considered as one entity, has incurred any material liability or obligation, direct or contingent, other than in the ordinary course of business.

(viii)     Sufficiency of Assets; Title to Assets. Each of the Company and its subsidiaries owns, leases or licenses all such properties as are necessary to the conduct of its operations as presently conducted in all material respects (such properties, the "*Company Assets*").   The Company Assets are in each case free and clear of any Liens other than (A) statutory, mechanics' or other liens that were incurred in the Company's and its subsidiaries' ordinary course of business, (B) Liens that are being contested in good faith and for which adequate reserves have been made on the Company's consolidated balance sheet set forth in the Offering Memorandum, (C) Liens for taxes incurred but not yet due and payable, (D) Liens set forth on Schedule 3(a)(viii) of the Company Disclosure Schedules, (E) easements, rights-of-way,

Ex. 4 p. 5

restrictions and other similar charges and Liens of record not interfering materially with the ordinary conduct of the business of the Company, (F) purchase money Liens securing rental payments under capital lease arrangements, (G) other Liens arising in the ordinary course of business and not incurred in connection with the borrowing of money, (H) Liens under the First Lien Facility and the Second Lien Facility, and (I) Liens permitted under the First Lien Facility.

(ix)     Litigation.  Except for the In-Court Process (if commenced) or as disclosed in the Offering Memorandum, there is no pending litigation, proceeding, or governmental investigation (collectively, "*Litigation*") (A) to which the Company or any of its subsidiaries is a party, that would, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect or (B) to the knowledge of the Company or any of its subsidiaries, threatened against the Company or any of its subsidiaries or any properties or rights of the Company or any of its subsidiaries, that would, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect.

(x)     No Violation or Default.  Except as disclosed in the Offering Memorandum or as set forth in Schedule 3(a)(x) of the Company Disclosure Schedules, neither the Company nor any of its subsidiaries is: (A) in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries is bound or to which any of the property or assets of the Company or any of its subsidiaries is subject, except for defaults, violations or otherwise that could not (individually or in the aggregate) reasonably be expected to have a Material Adverse Effect; or (B) in violation of any law or order of any Governmental Authority, except for defaults, violations or otherwise that could not (individually or in the aggregate) reasonably be expected to have a Material Adverse Effect.

(xi)     Offering Memorandum.  The Offering Memorandum, as of the date hereof, does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, provided that, the Company makes no representation or warranty as to the information contained in the Offering Memorandum in reliance upon and in conformity with information furnished to the Company by or on behalf of the Purchasers.

(xii)     Securities Registration Exemption.  Assuming the representations of the Purchasers set forth in Section 3(b)(v) and (vi) are true and correct, the issuance of the Purchased Shares to the Purchasers shall be exempt from registration pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "*Securities Act*").

(xiii)     Investment Company Act.  Neither the Company nor any of its subsidiaries is and, after giving effect to the offering and sale of the Purchased Shares and the application of the proceeds thereof as contemplated by this Agreement, will be, required to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder.

(xiv)   Takeover Statutes; Charter.   No "fair price," "moratorium," "control share acquisition," "business combination" or other similar anti-takeover statute or regulation is applicable to the Company or any of its subsidiaries, the Common Shares, the sale and issuance of the Purchased Shares or the Transactions.

(xv)   No Broker's Fees.   Except as set forth on Schedule 3(a)(xv) of the Company Disclosure Schedules, neither the Company nor any of its subsidiaries is a party to any contract, agreement or understanding (other than this Agreement) with any Person that would give rise to a valid claim against the Company or any of its subsidiaries for a brokerage commission, finder's fee or like payment in connection with the Transactions.

(xvi)   Financial Statements.   The historical consolidated financial statements and the related notes thereto of the Company and its subsidiaries included in the Offering Memorandum present fairly in all material respects the financial position of the Company and its subsidiaries as of the dates indicated and the results of their operations and the changes in their cash flows for the periods specified; such financial statements have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby; and the other financial information included in the Offering Memorandum has been derived from the accounting records of the Company and its subsidiaries and presents fairly the information shown thereby (except for information set forth under the headings "Projections of Certain Financial Data Following Consummation of the Plan of Reorganization," "Liquidation Analysis" and "Summary—Conditions to the Exchange Offers and Plan of Reorganization—Enterprise Valuation" and except as otherwise set forth therein).

(xvii)   Consents and Approvals.   No material consent, approval, authorization, Order, registration or qualification of or with any Governmental Authority having jurisdiction over Holdings, Incentive or the Company, any of its subsidiaries or any of their properties is required for the sale, issuance and delivery of the Purchased Shares and the consummation of the Transactions and the execution and delivery by the Company of this Agreement, the performance by the Company of the provisions hereof, except (A) in the event of an In-Court Process, the entry of the Agreement Approval Order and the Confirmation Order, and the expiration, or waiver by the Bankruptcy Court, of the fourteen-day period set forth in Bankruptcy Rules 3020(e), as applicable, (B) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or Blue Sky Laws in connection with the issuance and/or purchase of the Purchased Shares or as disclosed in the Offering Memorandum, (C) such as have been made or obtained and are in full force and effect.

(xviii)   No Undisclosed Liabilities.   The Company and its subsidiaries, considered as one entity, do not have any material Liabilities of a nature required to be disclosed on a balance sheet and the notes thereto, except (A) as set forth in the Company's consolidated balance sheet as of September 30, 2011 set forth in the Offering Memorandum or as otherwise disclosed in the Offering Memorandum, (B) incurred in the ordinary course of business since the date of such balance sheet, (C) for fees and expenses incurred in connection with the Transactions, and (D) obligations required to be performed after the date of this Agreement under any contract to which the Company or any subsidiary is a party.

7

**Ex. 4 p. 7**

(xix)   Labor and Employment Matters.

(A)    Neither the Company nor any of its subsidiaries is a party to or bound by any collective bargaining agreement or any labor union contract or agreement with a labor organization.

(B)    The Company and each of its subsidiaries are in compliance in all material respects with all applicable material laws and regulations relating to labor and employment, including but not limited to laws relating to discrimination, equal employment opportunities, disability, labor relations, hours of work, payment of wages, overtime pay, immigration, workers' compensation, employee benefits, unemployment benefits, working conditions, occupational safety and health, family and medical leave, employee terminations, and all material laws regarding the hiring, promotion, assignment, and termination of employees.  To the knowledge of the Company, the Company and its subsidiaries have not misclassified any employees as independent contractors, leased employees, volunteers, or any other type of workers, and no individual has been improperly classified as an "exempt" employee or excluded from any Company Benefit Plans.  Schedule 3(a)(xix) of the Company Disclosure Schedules sets forth a summary description of all material Company Benefit Plans and no Company Benefit Plan is a Title IV Plan or a Retiree Welfare Plan.

(xx)   Affiliate Transactions.

(A)    Except as disclosed on Schedule 3(a)(xx)(A) of the Company Disclosure Schedules (other than intercompany items between and among the Company and/or its subsidiaries), (1) there are no outstanding notes payable to, accounts receivable from or advances by the Company or its Affiliates in connection with the Company's business or involving any assets thereof, and neither the Company nor any of its subsidiaries is otherwise a debtor or creditor of, or has any Liability of any nature to, any Related Party of the Company and (2) except for compensation or benefits paid to employees in the ordinary course, since December 31, 2010, neither the Company nor any of its subsidiaries has incurred any material Liability to, or entered into or agreed to enter into any contract or transaction with or for the benefit of, any Related Party of the Company, other than the Transactions.  On the the last day of the month in which consummation of the Transactions occurs, each of (i) the Area Director Marketing Agreement dated September 17, 2009 with Chicago Franchise Support Services LLC and the related Agreement to Manage Business Operations effective January 1, 2011 between Chicago Franchise Support Services LLC and Al Raheem Group, Inc. (as amended) and (ii) the Management Agreement dated January 16, 2004 with Rockford Manager LLC and the related Agreement to Manage Business Operations effective January 1, 2011 between Rockford Manager LLC and Al Raheem Group, Inc. (as amended), will be terminated without cost, expense or liability to the Company or any of its subsidiaries, except as may have been actually incurred in connection with the services provided under the such agreements prior to such cancellation and termination.  On the earlier of the Closing Date or the Petition Date, the Third Amended and Restated Employment Agreement dated as of May 5, 2006, between QCE Holding LLC, QCE LLC and Richard E. Schaden, as further amended on January 1, 2009, December 31, 2009 and June 30, 2010, will be terminated without cost, expense or liability to the Company or any of its subsidiaries.  (x) As of December 31, 2011, the Management Agreement, entered into as of January 1, 2009, between the Cervantes Holding Company and TQSC II LLC

Ex. 4 p. 8

(as amended) and (y) as of the Closing Date, the other agreements between the Company or its subsidiaries and Related Parties of the Company that are indicated on Schedule 3(a)(xx)(A) to be terminated at Closing, shall be terminated and cancelled, without cost, expense or liability to the Company or any of its subsidiaries, except as may have been actually incurred in connection with the services provided under such agreements prior to such cancellation and termination.

(B)     For purposes of this Agreement, "**Related Party**" means: (1) any Affiliate of the Company, or any director, executive officer, general partner or managing member of such Affiliate; (2) any Person who serves or within the past 12 months has served as a director, executive officer, partner, member or in a similar capacity of the Company or any of its Affiliates; (3) any immediate family member of a Person described in clause (2); or (4) any other Person who directly or indirectly holds, individually or together with any Affiliate of such other Person and any member(s) of such Person's immediate family, more than 5% of the outstanding equity or ownership interests of the Company or any of its Affiliates prior to the Transactions.

(xxi)   Capitalization.  Except as disclosed in the Offering Memorandum, none of Holdings, Incentive or the Company or any of its subsidiaries is a party to or otherwise bound by or subject to any outstanding option, warrant, call, subscription or other right (including any preemptive right), agreement or commitment which (A) obligates Holdings, Incentive or the Company or any of its subsidiaries to issue, deliver, sell or transfer or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred or repurchased, redeemed or otherwise acquired, any shares of the equity securities of, or other equity or voting interests in the Company or any of its subsidiaries or any security convertible or exercisable for or exchangeable into any equity security of, or other equity or voting interest or loan stock in the Company or any of its subsidiaries, (B) obligates Holdings, Incentive or the Company or any of its subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or undertaking, (C) restricts the transfer of any shares of equity security of the Company or any of its subsidiaries or (D) relates to the voting of any equity securities of Holdings, Incentive or the Company or any of its subsidiaries.

(b)     Each Purchaser hereby represents and warrants the following to Parent and the Company:

(i)     Organization; Power and Authority.  It is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority to execute, deliver, and perform its obligations hereunder and to consummate the Transactions contemplated hereby.

(ii)    Execution and Delivery.  The execution, delivery, and performance by such Purchaser of this Agreement, and the consummation by such Purchaser of the Transactions contemplated hereby have been duly and validly authorized by all necessary action on the part of such Purchaser.

(iii)   Enforceability.  This Agreement has been duly executed and delivered by each Purchaser and constitutes the legal, valid, and binding obligation of such Purchaser, enforceable against such Purchaser in accordance with its terms, except as such

**Ex. 4 p. 9**

enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or affecting the enforcement of creditors' rights in general and by general principles of equity.

(iv)    No Conflict.  The execution, delivery, and performance of this Agreement and the consummation by such Purchaser of the Transactions contemplated hereby do not and shall not (A) violate any provision of the operating agreement, articles of incorporation or by-laws or other organizational documents of such Purchaser or (B) conflict with, violate, constitute a breach of, or result in the creation of a Lien or any other encumbrance against, such Purchaser or its properties pursuant to any material contract, agreement, or instrument by which such Purchaser is bound or any judgment, order, decree, law, statute, rule, regulation, or other judicial or governmental restriction to which such Purchaser is subject.

(v)    Accredited Investor.  It is an "accredited investor" within the meaning of Regulation D of the Securities Act, with such knowledge and experience in financial and business matters as are necessary in order to evaluate the merits and risks of an investment in the Purchased Shares.

(vi)    Securities Laws Compliance.  The Purchased Shares to be received by such Purchaser hereunder will be acquired for such Purchaser's own account or on behalf of managed accounts and not with a view to the resale or distribution of any part thereof in violation of the Securities Act, and such Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same in violation of the Securities Act. Notwithstanding anything in this Section 3(b)(vi) to the contrary, by making the representations herein, such Purchaser does not agree to hold the Purchased Shares for any minimum or other specific term and reserves the right to dispose of its respective Purchased Shares at any time in accordance with or pursuant to a registration statement or an exemption from the registration requirements under the Securities Act and any applicable state securities laws.

(vii)    Independent Investigation; Retention of Tax Advisors.  It has made its own inquiry and investigation into the Company and has undertaken such investigation and had access to such information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  It has consulted its own tax advisors with regard to the Transactions contemplated by this Agreement and the tax consequences thereof.

(viii)    No Registration Under the Securities Act.  It understands (A) that the Purchased Shares to be purchased by it pursuant to the terms of this Agreement have not been registered under the Securities Act or any state securities laws, (B) that the Company shall not be required to effect any registration or qualification of the Purchased Shares under the Securities Act or any state securities laws, (C) that the Purchased Shares will be issued in reliance upon exemptions contained in the Securities Act or interpretations thereof and in the applicable state securities laws and (D) that the Purchased Shares may not be offered for sale, sold or otherwise transferred except pursuant to a registration statement under the Securities Act or in a transaction exempt from or not subject to registration under the Securities Act.

(ix)      No Proceedings.      No litigation or proceeding against such Purchaser is pending before any court, arbitrator, or administrative or governmental body, nor, to such Purchaser's knowledge, is any such proceeding threatened against such Purchaser that would adversely affect such Purchaser's ability to enter into this Agreement or fully perform its obligations hereunder.

(x)      No Authorization or Consents Required. No notice to or consent, approval or authorization of, or designation, declaration or filing with, any Governmental Authority or other Person is required by the Company with respect to the execution or delivery of the Agreement or the consummation of the Transactions, including, but not limited to, the applicable requirements of the Hart-Scott-Rodino Improvements Act of 1976.

4.      Certain Conditions.

(a)      The obligations of each Purchaser to consummate the Transactions contemplated herein shall be subject to the satisfaction (or waiver by Avenue Capital Management II, L.P. (the "**Purchasers' Representative**") on behalf of each Purchaser, as applicable) of each of the following conditions:

(i)      other than in the case of an In-Court Process, (A) the Company shall have commenced the Exchange Offers, (B) the Exchange Offers shall have been conducted in accordance with, and on the terms set forth in, the Support Agreement and the Offering Memorandum and in accordance with this Agreement, (C) the Exchange Offers shall not have been extended, modified, supplemented or amended unless such extension, modification, supplement or amendment is approved by such Purchaser, except with respect to immaterial technical or conforming amendments or modifications, (D) each of the conditions to closing of the Exchange Offers set forth in the Support Agreement and the Offering Memorandum shall have been satisfied or, with the consent of such Purchaser, waived, and (E) the closing of the Exchange Offers shall occur simultaneously with the Closing;

(ii)      in the event of an In-Court Process, the Agreement Approval Order and the Confirmation Order shall have been entered by the Bankruptcy Court and shall not have been stayed.  The Plan, as approved, and the Confirmation Order, as entered, in each case by the Bankruptcy Court, shall be consistent with the requirements for the Plan and the Confirmation Order set forth in this Agreement, and the conditions to confirmation and the conditions to the effective date of the Plan shall have been satisfied or waived, with the consent of the Purchasers, by the Company in accordance with the Plan;

(iii)      in the event of an In-Court Process, the LLC Agreement shall have been approved by the Bankruptcy Court and shall have been executed by the parties thereto in substantially the same form as the form thereof filed with the Bankruptcy Court;

(iv)      no Support Termination Event under the Support Agreement shall have occurred, unless cured or waived by the Purchasers' Representative;

(v)      other than in the case of the In-Court Process, the equity holder of the Company shall have executed and delivered the release and unit termination agreement, in

11

the form provided to the Purchasers on December 23, 2011, with any changes thereto being subject to the approval of the Purchasers' Representative in its sole discretion;

(vi)     the Amended First Lien Facility and the New Second Lien Facility shall be duly executed and delivered, each in the form attached hereto as <u>Exhibit E,</u> with any changes thereto being subject to the approval of the Purchasers' Representative in its sole discretion and the New/Amended Marketing Fund Trust Credit Facility shall be duly executed and delivered, in form and substance reflecting the terms of the Commitment Letter dated as of December 15, 2011 among Vectra Bank Colorado, QAFT, Inc., as Trustee for the Regional Advertising Program Trust, QAFT, Inc., as Trustee for the National Marketing Fund Trust and QCE LLC in the form provided to the Purchasers on December 23, 2011, and otherwise satisfactory to the Purchasers' Representative;

(vii)     the Purchased Shares shall, in the aggregate, constitute sixty percent (60%) (or in the case of an In-Court Process, seventy-five (75%)) of all issued and outstanding equity securities of Parent as of the Closing on a fully diluted basis before dilution from equity to be issued in connection with the Management Incentive Plan;

(viii)     (A) the representations and warranties of the Company contained in this Agreement that are qualified as to materiality, material adverse effect, Material Adverse Effect, or similar qualifiers, and the representation and warranty contained in <u>Section 3(a)(vii)</u> (No Material Adverse Effect), shall be true and correct in all respects on and as of the date hereof and as of the Closing Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all respects as of such specified date), and (B) the representations and warranties of the Company contained in this Agreement that are not so qualified shall be true and correct in all material respects on and as of the date hereof and as of the Closing Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such specified date), and (C) in all material respects, the Company shall have performed or complied with, or caused its subsidiaries to have performed or complied with, all covenants required to be performed or complied with under this Agreement on or prior to the Closing Date, and the Company shall have delivered to Purchasers a certificate of its Chief Executive Officer or Chief Financial Officer (in their capacity as such) to the effect that, to the knowledge of the person executing the same, each of the conditions specified in this <u>Section 4(a)(viii)</u> is satisfied in all respects;

(ix)     no action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued in each case by any Governmental Authority that, as of the Closing Date, prohibits the issuance or sale pursuant to this Agreement of the Purchased Shares or the Transactions;

(x)     the amendment to the real estate lease for the headquarters of the Company shall be duly executed and delivered by the Company and the landlord for the property, or in the case of the In-Court Process, rejected or otherwise renegotiated, in accordance

with the terms and conditions acceptable to the Purchasers' Representative shall have been accomplished;

(xi)     the individuals set forth on Schedule 4(a)(xi) of the Company Disclosure Schedules shall have executed and delivered deferred compensation termination or modification agreements, as the case may be, in the form provided to the Purchasers on December 23, 2011, with any changes thereto being subject to the approval of the Purchasers' Representative in its sole discretion or in an In-Court Process, such deferred compensation arrangements shall be extinguished or modified, as the case may be, in accordance with such agreements;

(xii)    since the date of the most recent historical consolidated financial statements of the Company included in the Offering Memorandum, there shall have been no judgments or settlements related to any litigation or claims in excess of $5 million in the aggregate;

(xiii)   the Company shall have in place directors' and officers' insurance policies and errors and omissions insurance policies in form and substance satisfactory to the Purchasers' Representative in its sole discretion;

(xiv)    all material notifications, filings, consents, waivers and approvals of or to any Governmental Authority or any third Person required for the consummation of the Transactions shall have been made or received and shall remain in full force and effect;

(xv)     other than in the case of an In-Court Process, an opinion of counsel, from counsel to the Company as to the matters set forth on Exhibit B shall have been delivered to Purchasers; and

(xvi)    on the Closing Date, no options, warrants or other rights to acquire equity securities of the Company will be outstanding.

(b)     The obligations of the Company to consummate the Transactions contemplated herein shall be subject to the satisfaction (or waiver by the Company) of each of the following conditions:

(i)      in the event of an In-Court Process, the Confirmation Order in form and substance reasonably satisfactory to the Company shall have been entered by the Bankruptcy Court and such order shall not have been stayed.  The Plan as approved and the Confirmation Order as entered in each case by the Bankruptcy Court shall be consistent with the requirements for the Plan and the Confirmation Order set forth in this Agreement, and the conditions to confirmation and the conditions to the effective date of the Plan shall have been satisfied or waived by the Company in accordance with the Plan.

(ii)     (A) the representations and warranties of Purchasers contained in this Agreement that are qualified as to materiality, material adverse effect, or similar qualifiers shall be true and correct in all respects, on and as of the date hereof and the Closing Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation

or warranty shall be true and correct as of such specified date), and (B) the representations and warranties of Purchasers contained in this Agreement that are not so qualified shall be true and correct in all material respects on and as of the date hereof and the Closing Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such specified date), and (C) in all material respects, each Purchaser shall have performed or complied with its covenants required to be performed or complied with under this Agreement on or prior to the Closing Date, and each Purchaser shall have delivered to the Company a certificate to the effect that each of the conditions specified in this Section 4(b)(ii) is satisfied in all respects; and

(iii)    No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued in each case by any Governmental Authority that, as of the Closing Date, prohibits the issuance or sale pursuant to this Agreement of the Purchased Shares or the Transactions.

(iv)    No Purchaser shall have defaulted on such Purchaser's obligation under the Commitment.

(v)    Other than in the event of an In-Court Process, the Exchange Offers and the Amendment are not consummated in accordance with the terms of the Offering Memorandum and Support Agreement.

(vi)    No Support Termination Event under the Support Agreement shall have occurred, unless cured or waived in accordance with Section 9 of the Support Agreement.

5.    Certain Covenants.

(a)    Reasonable Best Efforts.  The Company shall use reasonable best efforts to cause the conditions set forth in Section 4(a) and 4(b) (Certain Conditions) to be satisfied and to consummate the Transactions contemplated herein by the Closing.

(b)    Plan and Disclosure Statement; Confirmation Order.  In the event of an In-Court Process, the Company shall (i) file the Plan and the other Lender Approved Documents, as applicable, and (ii) use its reasonable best efforts to obtain the entry of an order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code (the "***Confirmation Order***") by the Bankruptcy Court.  The Company and its applicable subsidiaries shall use their reasonable best efforts to seek confirmation of the Plan.  Any amendment, modification or change to the Plan, Disclosure Statement or Confirmation Order (other than immaterial technical or conforming amendments or modifications) shall (A) be acceptable in form and substance to the Purchasers' Representative, (B) not affect the releases provided for in the Support Agreement, and (C) have the conditions to confirmation and the effective date as set forth in the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement.  The Company and its applicable subsidiaries will provide to counsel to the Purchasers a copy of the proposed Confirmation Order and a reasonable opportunity to review and comment on such order prior to such order being filed with the Bankruptcy Court.  The Company and its applicable subsidiaries will provide to counsel to the

14

Purchasers a copy of any proposed amendment, modification or change to the Plan, Confirmation Order or the Disclosure Statement and a reasonable opportunity to review and comment on such documents and such amendment, modification or change shall not be made if objected to by the Purchasers including to the extent Purchasers do not believe the proposed amendment, modification or change is not immaterial, technical or confirming.

(c)     <u>Payment of Expenses</u>.  Subject to the entry of the Confirmation Order in the event of an In-Court Process, the Company shall pay or cause to be paid in full all Expenses incurred by Purchasers in accordance with <u>Section 2(b)(iii)</u> or, if this Agreement is terminated prior to the Closing Date, at the time of any such termination.

(d)     <u>Use of Purchase Price</u>.  The Purchasers shall cause Parent to immediately contribute the proceeds received from the Private Placement to the Company.  The Company shall apply the proceeds of the Private Placement to (i) the repayment of $75 million, or in the event of the In-Court Process, the repayment of $65 million, of outstanding indebtedness under the First Lien Facility, (ii) payment of all accrued but unpaid interest under the First Lien Facility and the Second Lien Facility, (iii) payment of fees and expenses incurred in connection with the Transactions, and (iv) working capital and other general corporate purposes.

(e)     <u>Notice of Changes</u>.  The Company shall promptly deliver to Purchasers and each Purchaser shall deliver to the Company, as applicable, written notice upon becoming aware of any matter, event, or development that would (i) render any representation or warranty made by it herein inaccurate or incomplete in any material respect or (ii) constitute or result in a material breach by it of, or a failure by it to comply with, any covenant, condition or agreement in the Support Agreement or herein to be complied with or satisfied by it on or prior to the Closing Date.

(f)     <u>Further Assurances</u>.  The Company and each Purchaser shall, and shall cause their respective subsidiaries to, execute and deliver, or cause to be executed and delivered, such further instruments or documents or take such other action and cause entities controlled by them to take such action as may be reasonably necessary (or as reasonably requested by the Company or the Purchasers' Representative, as applicable) to carry out the Transactions.

(g)     <u>Equity Securities and Affiliated Transactions Prior to Closing Date</u>.  The Company shall take all actions necessary so that (i) on the Closing Date, all equity securities of the Company, including agreements, plans and understandings relating to ownership of equity securities, other than this Agreement and the Exchange Offers will be cancelled and terminated, and (ii) with respect to those contracts, agreements and arrangements between any of the Company or any of its subsidiaries, on the one hand, and any of Incentive, Holdings or Related Parties thereof, on the other hand, that are not in respect of ordinary course employee benefits as described on <u>Schedule 3(a)(xix)</u> under Employee Benefit Packages and Section 1 of the Bonus Plan section, and such other arrangements set forth on <u>Schedule 3(a)(xx)(A)</u> that are not scheduled for termination, in each case existing prior to the Closing Date, shall be cancelled and, with respect to such agreements and arrangements that are scheduled to terminate as set forth on <u>Schedule 3(a)(xx)(A)</u>, the termination of such contracts, agreements and arrangements shall be effected on the dates specified on <u>Schedule 3(a)(xx)(A)</u>, in the case of each of clauses (i) and (ii) above, without cost, expense or liability to the Company or any of its subsidiaries, except as may

15

have been actually incurred in connection with the services provided under such agreements prior to such cancellation and termination.

(h)     Conduct of Business.  Except as explicitly set forth herein or otherwise contemplated by the transactions described in the Offering Memorandum and as set forth on Schedule 5(h) of the Company Disclosure Schedules, during the period from the date of this Agreement to the Closing Date, the Company shall, and shall cause the subsidiaries to, carry on their businesses in the ordinary course and, to the extent consistent therewith, use their commercially reasonable efforts to preserve intact their current material business organizations, keep available the services of their current officers and employees and preserve their material relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its subsidiaries.  Without limiting the generality of the foregoing, and except as otherwise expressly provided or permitted by this Agreement or required to effect the transactions contemplated in the Offering Memorandum, prior to the Closing Date, the Company shall not, and shall cause its subsidiaries not to, take any of the following actions without the prior written consent of Purchasers' Representative (not to be unreasonably withheld, conditioned or delayed):

(i)     amend, authorize or propose to amend its certificate of formation, LLC Agreement or equivalent organizational documents;

(ii)     (A) in the case of the Company, declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its equity securities, (B) split, sub-divide, combine or reclassify any of its equity securities or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its equity securities, (C) purchase, redeem or otherwise acquire any shares of equity securities of the Company or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities, or (D) make any payment, or incur any liability, to any of its direct or indirect equity securities holders or any Related Party thereof, other than employee compensation made in the ordinary course of business consistent with past practices and other payments in respect of, and in accordance with the present terms of, agreements set forth on Schedule 5(h)(ii) hereto;

(iii)     issue, deliver, grant, sell, pledge, dispose of or otherwise encumber any of its equity securities or any securities convertible into, or any rights, warrants or options to acquire, any such equity securities;

(iv)     incur or commit to incur any capital expenditure or authorization or commitment with respect thereto that in the aggregate are in excess of $2.5 million;

(v)     acquire or agree to acquire by merging or consolidating with, or purchase any portion of the stock of, or other ownership interests in, or substantial portion of assets of, or by any other manner, any business or any corporation, partnership, association, joint venture, limited liability company or other entity or division thereof except for purchases from or to franchise owners in the ordinary course of business and any acquisitions of the Company's area directors and master franchisees costs of which are not to exceed, individually or in the aggregate, (1) $1,000,000 in the case of area directors and master franchisees that are not

Affiliates of the Company, and (2) zero dollars in the case of area directors and master franchisees that are Affiliates of the Company;

(vi)     sell, lease, mortgage, pledge, grant a lien, mortgage, pledge, security interest, charge, claim or other encumbrance of any kind or nature on or otherwise encumber or dispose of any of its properties or assets, except in the ordinary course of business consistent with past practice, except as are permitted under the DIP Facility;

(vii)    incur any indebtedness for borrowed money or guarantee any such indebtedness of another individual or entity, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company or any of its subsidiaries, guarantee any debt securities of another individual or entity, enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (other than a subsidiary) or enter into any arrangement having the economic effect of any of the foregoing, except that the Company shall be permitted to engage in intercompany transactions, to incur indebtedness under its existing revolving credit facility and provide franchise guarantees in the ordinary course of business, except as are permitted under the DIP Facility;

(viii)   except as required to comply with law or as disclosed on Schedule 5(h)(viii) and, in the case of clauses (C) and (D), except in the ordinary course of business consistent with past practice: (A) enter into, adopt, amend or terminate any Company Benefit Plan, (B) increase in any material manner the compensation or fringe benefits of any existing director or officer of the Company or any of its subsidiaries other than in the ordinary course of business, (C) enter into, renew (other than contracts, commitments or arrangements that by their terms renew automatically without action by either party) or terminate any contract, commitment or arrangement providing for the payment of compensation or benefits to any director or executive of the Company or any of its subsidiaries, (D) terminate the employment of or hire any executive or director of the Company (other than termination for cause) or (E) provide severance benefits to any employee, director or officer of the Company or its subsidiaries in excess of three months base salary (or six months base salary in the case of severance for any executive).  For the purposes of this Agreement, the term "executive" shall mean any employee of the Company or any of its subsidiaries at the Senior Vice President level or higher.

(ix)     (A) pay, discharge, settle or satisfy any claims, liabilities or obligations (whether absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction of claims, liabilities or obligations (1) in the ordinary course of business consistent with past practice, (2) as are disclosed on Schedule 5(h)(ix) hereto or (3) as required by their terms as in effect on the date of this Agreement of claims, liabilities or obligations reflected or reserved against in the financial statements (or the notes thereto) of the Company (for amounts not in excess of such reserves) or incurred since the date of such financial statements in the ordinary course of business consistent with past practice, (B) cancel any material indebtedness except as disclosed on Schedule 5(h)(ix) or (C) waive, release, grant or transfer any right of material value;

(x)      terminate or cancel any material contract other than in the ordinary course of business;

17

(xi)     (A) except for the commencement of the Bankruptcy Cases and other than in the ordinary course of business consistent with past practice or except for such Actions (as defined below) disclosed on Schedule 5(h)(xi), commence, prosecute, compromise or settle any action, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, arbitration, mediation, hearing, inquiry, investigation or similar event, occurrence, or proceeding (an "*Action*") by the Company or any of its subsidiaries against any third party (other than an Action as a result of an Action commenced against the Company or any of its subsidiaries) and other than to enforce its rights under this Agreement or the Support Agreement or (B) except as disclosed on Schedule 5(h)(xi), compromise or settle any Action commenced against the Company or any of its subsidiaries that involves the payment of money damages by the Company or any of its subsidiaries, individually or in the aggregate, in excess of $2 million, or that involves the imposition of any equitable relief on, or the admission of wrongdoing by, the Company or any of its subsidiaries;

(xii)     change any material financial or material tax accounting methods, principles or practices, except insofar as may have been required by a change in GAAP or applicable law, or revalue any of its material assets;

(xiii)     except as contemplated hereby or under the Support Agreement, amend, or enter into any new, arrangements, understandings or agreements with any present or former executive officer, director or Affiliate of the Company or any of its subsidiaries;

(xiv)     Except as contemplated by the Plan, file a motion in the Bankruptcy Court seeking to (A) reject a material contract or (B) enter into or materially amend or modify or terminate a material contract;

(xv)     subject to compliance with applicable law and to applicable duties imposed on the Company's Board of Managers by law, seek to place the Company or any of its subsidiaries into any insolvency, receivership, or bankruptcy process (including but not limited to liquidation and examinership) or to seek an arrangement with its creditors other than as expressly contemplated by the Offering Memorandum;

(xvi)     except as contemplated thereby or with the consent of the Purchasers, extend, amend or modify any of the terms of the Exchange Offers or the Transactions, or waive any of the conditions to the Exchange Offers, except with respect to immaterial technical or conforming amendments or modifications; or

(xvii)     commit, or agree to take, any of the foregoing actions.

(i)     Access and Information.  From the date hereof until the Closing Date, subject to any applicable laws and except for privileged information or information required to held confidential under applicable laws, the Company shall at the Company's expense (i) afford any Purchaser and its representatives access, during regular business hours, upon reasonable advance notice and in a manner as would not be unreasonably disruptive to the normal business or operations of the Company or any of its subsidiaries, to the assets, books and records of the Company and its subsidiaries (including tax work papers and tax returns), (ii) furnish, or cause to be furnished, to the Purchasers any financial and operating data and other information that is

18

available with respect to the Company and its subsidiaries as any Purchaser from time to time reasonably requests and (iii) instruct their respective employees and their and the subsidiaries' legal and financial advisors to cooperate, during regular business hours, with such Purchaser in its investigation of the Company and its subsidiaries, provided that any Purchaser exercising its rights pursuant to this Section 5(i) shall be subject to a confidentiality or non-disclosure agreement in accordance with the terms of the Support Agreement and any such Purchasers' Representative shall be bound by the same confidentiality obligations as such Purchaser.

(j)       Competing Proposals.   Until the earlier of the termination of this Agreement and the Closing Date, subject to the duties imposed on the Company by law, the Company shall and shall cause its representatives, advisors and agents to, immediately (i) cease and cause to be terminated any ongoing solicitation, discussions and negotiations with respect to Alternative Transactions and (ii) not solicit any inquiries or proposals, or enter into any discussions, negotiations, understandings, arrangements or agreements, relating to an Alternative Transaction, provided that in the event of an In-Court Process, the Company may respond to inquiries or proposals or enter into any discussions relating to an Alternative Transaction.

6.       Termination.  This Agreement may be terminated at any time prior to the Closing Date as follows:

(a)       By mutual written consent of the Company and Purchasers;

(b)       By the Company, upon written notice given to Purchasers if any Purchaser shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 4(b) and (ii) cannot be cured within three (3) Business Days after the Company provides written notice to such Purchaser of such breach (in which event upon failure to so cure within such time period);

(c)       By the Purchasers' Representative, upon written notice given to the Company if the Company shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 4(a) and (ii) cannot be cured within three (3) Business Days after the Purchasers' Representative provides written notice to the Company of such breach (in which event upon failure to so cure within such time period);

(d)       By any Purchaser in the event that Bankruptcy Court has not entered (x) an interim DIP order or an interim cash collateral order within three (3) business days after the Petition Date; (y) a final DIP order or a final cash collateral order within 20 business days after the Petition Date; or (z) an order approving this Agreement within 30 days after the Petition Date (the "*Agreement Approval Order*");

(e)       By the Purchasers' Representative, in the event of an In-Court Process, upon the failure of the Bankruptcy Court to approve the Disclosure Statement by the date specified in the Support Agreement (subject to any extension thereof to the extent approved in accordance with the terms of the Support Agreement);

**Ex. 4 p. 19**

(f)     By the Purchasers' Representative, in the event of an In-Court Process, upon the failure of the Bankruptcy Court to enter a Confirmation Order by the date specified in the Support Agreement (subject to any extension thereof to the extent approved in accordance with the terms of the Support Agreement);

(g)     By the Purchasers' Representative, in the event of an In-Court Process, if the Company's and its subsidiaries' Chapter 11 cases shall have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code or if an interim or permanent trustee or an examiner with expanded powers shall have been appointed to oversee or operate the Company in its Chapter 11 case;

(h)     By the Purchasers' Representative, if the Closing has not occurred by 5:00 PM prevailing Eastern Time on January 24, 2012, or, in the event of an In-Court Process, May 30, 2012;

(i)     By either the Company or the Purchasers' Representative, if any portion of the Transactions contemplated by either this Agreement or the Support Agreement is enjoined by a Governmental Authority;

(j)     By the Purchasers' Representative, upon the occurrence of a Support Termination Event (without giving effect to any waivers or extensions of such Support Termination Event that may be granted or made pursuant to the Support Agreement); or

(k)     By either the Company or the Purchasers' Representative, in the event of a termination of the Support Agreement in accordance with its terms.

Upon the termination of this Agreement in accordance with and pursuant to this Section 6, then all rights and obligations of the parties under this Agreement shall terminate; provided, however, that nothing herein shall relieve any party from liability for any breach of this Agreement prior to such termination; provided, further, that, that Sections 7, 9, 11, 13, 17 and 18 shall survive any termination of this Agreement.

7.     Commitment Fee.    The Company shall pay to Purchasers an aggregate commitment fee equal to $10,000,000 (the "**Commitment Fee**") in cash, pro rata to each Purchaser based on the number of Purchased Shares each has committed to acquire hereunder, which fee shall be fully earned by Purchasers upon execution of this Agreement by the Company and payable to Purchasers upon Closing of this Agreement (subject, in the event of an In-Court Process, to the entry of the Agreement Approval Order) or upon termination of this Agreement for any reason other than pursuant to Section 6(b); provided, however, that if the Closing does not occur and a different transaction, which is not sponsored by Purchasers, is consummated solely in an In-Court Process (whether or not approved by Purchasers), then Purchasers shall be entitled to an aggregate break-up fee (in lieu of the Commitment Fee) equal to $5,000,000 in cash, pro rata to each Purchaser based on the number of Purchased Shares each has committed to acquire hereunder, which fee shall be fully earned by Purchasers upon execution of this Agreement by the Company and payable to Purchasers upon the closing of such alternative transaction unless this Agreement shall have been terminated pursuant to Section 6(b); no such $5,000,000 break-up fee shall be payable except for in an In-Court Process.

8.      No Survival.  The Company and the Purchasers agree and acknowledge that the representations and warranties set forth in Section 3(a) (the "*Surviving Representations*") shall survive for one year after the Closing, except in an In-Court Process, in which event the representations and warranties shall not survive Closing.

9.      Indemnification.  Subject, in the case of an In-Court Process, to the approval of entry of the Approval Order Agreement, the Company and its subsidiaries, jointly and severally, (each, an "*Indemnifying Party*") shall indemnify, defend, and hold harmless each Purchaser and each of such Purchaser's Affiliates, officers, directors, members, managers, partners, stockholders, employees, attorneys, advisors, agents, and other representatives and any Affiliate of the foregoing, and each of their respective successors and permitted assigns (each, an "*Indemnified Party*") from and against, and shall promptly reimburse each Indemnified Party for, any and all losses, damages, liabilities, claims, costs, and expenses, including, interest, court costs, and reasonable attorneys' fees and expenses relating to, arising out of, resulting from or in connection with (a) any breach or inaccuracy of the Surviving Representations, (b) any breach or violation by the Company or its subsidiaries of their covenants and agreements set forth in this Agreement, and (c) any such action, suit, or proceeding by a third-party arising out of or related to this Agreement or the Transactions contemplated hereby (collectively, "*Indemnified Liabilities*"); provided that, nothing herein shall be deemed to obligate the Company or any of its subsidiaries to indemnify, defend or hold any Indemnified Party harmless of, from or against any losses, damages, liabilities, claims, costs, and expenses, including interest, court costs, attorneys' fees or expenses relating thereto, to the extent that they are finally judicially determined to have resulted from the unlawful acts of such Indemnified Party.

10.      Notices.

(a)      All notices, requests, and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by facsimile or electronic mail transmission, by nationally recognized overnight courier or mailed (first class postage prepaid) to the parties at the following addresses or facsimile numbers.

If to Purchasers:

To the address set forth beneath Purchaser's signature to this Agreement

-- and --

If to the Company:

QCE Finance LLC
1001 17th Street, Suite S-175
Denver, Colorado  80202
Attn: Courtney L. Seely

With a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas

New York, New York  10019
Attn: Alan W. Kornberg
        Elizabeth R. McColm
        akornberg@paulweiss.com
        emccolm@paulweiss.com

(b)     All such notices, requests and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile or electronic mail, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch and (iii) in the case of mailing, on the fifth Business Day after the posting thereof.

11.     Successors and Assigns; Assignment.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Any Purchaser may assign, delegate, or otherwise transfer this Agreement or any of its rights or obligations hereunder without the consent of any other party hereto, to any of its Affiliates or any entity or person over which such Purchaser or any of its Affiliates exercises investment authority, including with respect to voting and dispositive rights, but such assignment, delegation or transfer shall not modify or eliminate obligations of such Purchaser hereunder.  Neither the Company nor any of its subsidiaries may assign, delegate, or otherwise transfer this Agreement or any of their rights or obligations hereunder without the consent of Purchasers, and any purported assignment in violation of this Section 11 shall be null and void *ab initio* without limiting any other remedies available to the other parties hereto.  Nothing in this Agreement is intended to confer upon any person not a party hereto (other than Indemnified Parties) any right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement, including any right to confer third party beneficiary rights.

12.     Entire Agreement.  This Agreement, including the recitals hereto and the Index of Defined Terms, other definitive documents entered into as part of the Transactions, and the Support Agreement contain the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, written or oral, with respect to such subject matter.  The parties hereto represent and warrant that there are no other agreements or understandings, written or oral, regarding any of the subject matter hereof other than as set forth herein.  In the event of any conflict between this Agreement and the Support Agreement, the terms of this Agreement will control to the extent of such conflict.

13.     Interpretation and Construction.  For purposes of this Agreement, (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, any

reference in this Agreement made to an Article, Section, Exhibit, Annex or Schedule refers to an Article or Section of, or Exhibit, Annex or Schedule to, this Agreement; (e) unless otherwise stated, the words "herein," "hereof" and ''hereto'' refer to this Agreement in its entirety rather than to a particular portion of this Agreement; and (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof.

14.    Amendments.   This Agreement may not be amended or modified except by a written instrument signed by each Purchaser and the Company, and, to the extent required, the approval of the Bankruptcy Court.   Except as otherwise set forth in this Agreement, any reference in this Agreement to documents, conditions, or other items that require the satisfaction or consent of the Purchasers, the taking of any affirmative action by them shall require the satisfaction, consent, or agreement to waive by Purchasers, which shall not be unreasonably denied, withheld or delayed.

15.    Extensions; Waivers.   Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein.   Any such extension or waiver will be valid only if set forth in a writing signed by the party to be bound thereby.   No waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.   Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

16.    Counterparts.   This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute an original and all of which when taken together shall constitute one and the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (pdf).

17.    Non-Recourse.   No past, present or future manager, director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of party hereto or any Affiliate of any party hereto shall have any liability for any obligations or liabilities of such party (or, in the case of a Purchaser) any other Purchaser under this Agreement, or for any claim based on, in respect of, or by reason of, the Transactions contemplated hereby.

18.    Governing Law; Jurisdiction; Waiver of Jury Trial.   This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.   By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action,

**Ex. 4 p. 23**

suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State and County of New York.  By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.  EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

*[Remainder of Page Intentionally Blank]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Subscription Agreement as of the date first written above.

QCE FINANCE LLC

By: _____

Name: Greg MacDonald

Title: CEO

**AVENUE CAPITAL MANAGEMENT II, L.P., solely on behalf of certain of the investment funds it manages**

**By: Avenue Capital Management II GenPar, LLC, its general**

**partner**

By: _____

Name: _____

Title: _____

Number of Shares: _____

Purchase Price:

Address: 399 Park Avenue, 6th Floor
New York, New York 10022

With a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036-6745
Attention       Ira S. Dizengoff, Esq.
Facsimile:      (212) 872-1002

**IN WITNESS WHEREOF**, the parties hereto have executed this Subscription Agreement as of the date first written above.

**QCE FINANCE LLC**

By: _____

Name: _____

Title: _____

**AVENUE CAPITAL MANAGEMENT II, L.P., solely on behalf of certain of the investment funds it manages**

**By: Avenue Capital Management II GenPar, LLC, its general partner**

By: _____

Name: _Marc Lasry_____

Title: _Managing Member_____

Address:         399 Park Avenue, 6th Floor
                        New York, New York 10022

With a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036-6745
Attention         Ira S. Dizengoff, Esq.
Facsimile:         (212) 872-1002

**Ex. 4 p. 26**

**QCE PARENT LLC**

**By:  Avenue Capital Management II, L.P., solely on behalf of certain of the investment funds it manages**

**By: Avenue Capital Management II GenPar, LLC, its general partner**

By: _____

Name: _Marc Lasry_____

Title: _Managing Member_____

**Index of Defined Terms**

"***Affiliate***" means, with respect to any person or entity, any person or entity directly or indirectly controlling, controlled by or under common control with, such other person or entity. For purposes of this definition, "control" when used with respect to any person or entity, means the possession, directly or indirectly, of the power to cause the direction of management and/or policies of such person, whether through the ownership of voting securities, by contract, or otherwise.

"***Alternative Transaction***" means any transaction providing for or contemplating (a) a capital raising transaction, including a plan of reorganization, that does not contemplate or is inconsistent with any of the Transactions, (b) a sale of any equity or debt securities of the Company's or any of its subsidiaries or (c) a sale of all or substantially all the assets of the Company or any of its subsidiaries; provided, however, that any transaction approved by the Purchasers shall not be considered an Alternative Transaction.

"***Amended First Lien Facility***" means, the First Lien Facility as amended by an amendment including an extension of the maturity date thereof with an aggregate principal amount outstanding following the First Lien Exchange Offer and the repayment contemplated by the Restructuring (as defined in the Support Agreement) up to $425 million.

"***Business Day***" means any calendar day that is not a Saturday, Sunday or other calendar day on which banks are required or authorized to be closed in the City of New York.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Commission***" means the United States Securities and Exchange Commission.

"***Company Benefit Plan***" means any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which the Company or any of its subsidiaries is the owner, the beneficiary, or both), "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the Transactions or otherwise) under which any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of the Company or any of its subsidiaries has any present or future right to benefits or to which the Company could have any Liability.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any regulations promulgated thereunder.

"*ERISA Affiliate*" means, with respect to the Company, any trade or business (whether or not incorporated) that, together with the Company, is treated as a single employer within the meaning of Sections 414(b), (c), (m) or (o) of the Code.

"*ERISA Plan*" means at any time, an "employee benefit plan," as defined in Section 3(3) of ERISA, that the Company or ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by the Company.

"*GAAP*" means the generally accepted accounting principles in the United States.

"*Governmental Authority*" means (a) any court, tribunal, judicial or arbitral body and (b) any government, multilateral organization or international organization or any agency, bureau, board, commission, ministry, authority, department, official, political subdivision or other instrumentality thereof, whether federal, state or local, domestic or foreign as well as any Persons owned or chartered by any of the foregoing.

"*Liability*" means any liability or obligation of any kind, whether accrued, absolute, fixed or contingent or otherwise, whether known or unknown.

"*Lien*" means any charge, security interest, community property interest, condition, equitable interest, lien, option, pledge, mortgage, right of way, easement, encroachment, servitude, right of first offer, right of first refusal or contractual restriction of any kind, including any restriction or covenant with respect to use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"*Material Adverse Effect*" shall mean any change, effect, event, occurrence, development, circumstance, or state of facts which, either alone or in combination, has had or would reasonably be expected to have in the short term or long term a materially adverse effect on the business, properties, operations, financial condition or results of operations of the Company and its subsidiaries taken as a whole, or which would reasonably be expected to materially impair its or their ability to perform its or their obligations under this Agreement or have a materially adverse effect on or prevent or materially delay the consummation of the Transactions contemplated by this Agreement, the Support Agreement or the Offering Memorandum, provided, that none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: any adverse change, effect, event, occurrence, development, circumstance, or state of facts to the extent attributable to: (a) conditions affecting the U.S. economy as a whole; (b) the commencement, continuation or escalation of a war, civil unrest, material armed hostilities or other material international or national calamity or act of terrorism; (c) actions and omissions of the Company taken with prior express written consent of the Purchasers in contemplation of the Transactions; (d) conditions generally affecting the industry in which the Company participates; (e) any changes in laws of general applicability to companies in the same industry as the Company; or (f) changes in GAAP; which, in the case of any of the foregoing clauses (a) – (f) does not disproportionately affect the Company relative to other companies in the industry in which it operates (but then only the extent of the disproportionate impact shall be considered for the purposes of determining whether a material adverse effect has occurred).

"**_Multiemployer Plan_**" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, and to which the Company or ERISA Affiliate is making, is obligated to make or has made or been obligated to make, contributions on behalf of participants who are or were employed by any of them.

"**_New/Amended Marketing Fund Trust Credit Facility_**" means the amendment to or replacement of the indebtedness under the Credit Agreement, dated as of September 26, 2007, among QAFT, Inc., solely in its capacity as Trustee for The Regional Advertising Program Trust and The National Marketing Fund Trust, as Borrowers, the lenders party thereto, and Vectra Bank Colorado, National Association, as Administrative Agent.

"**_Pension Plan_**" means an ERISA Plan described in Section 3(2) of ERISA.

"**_Person_**" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"**_Retiree Welfare Plan_**" means, at any time, a Welfare Plan that provides for continuing coverage or benefits for any participant or any beneficiary of a participant after such participant's termination of employment, other than continuation coverage provided pursuant to Section 4980B of the Code and at the sole expense of the participant or the beneficiary of the participant.

"**_Title IV Plan_**" means a Pension Plan (other than a Multiemployer Plan), that is covered by Title IV of ERISA, and that the Company or ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"**_Welfare Plan_**" means an ERISA Plan described in Section 3(l) of ERISA.

| **Term** | **Section** |
| --- | --- |
| Action | Section 5(h)(xi)(A) |
| Agreement | Preamble |
| Agreement Approval Order | Section 6(d) |
| Amendment | Recitals |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Rules | Section 3(a)(iv)(A) |
| Closing | Section 2(a) |
| Closing Date | Section 2(a) |
| Commitment | Section 1 |
| Commitment Fee | Section 7 |
| Common Shares | Recitals |
| Confirmation Order | Section 5(b) |

| | |
|---|---|
| Company | Preamble |
| Company Assets | Section 3(a)(viii) |
| Company Disclosure Schedules | Section 3(a) |
| Exchange Offers | Recitals |
| Expenses | Section 2(b)(iii) |
| First Lien Exchange Offer | Recitals |
| Holdings | Section 3(a)(v) |
| Incentive | Section 3(a)(v) |
| In-Court Process | Recitals |
| Indemnified Liabilities | Section 9 |
| Indemnifying Party | Section 9 |
| Indemnified Party | Section 9 |
| Litigation | Section 3(a)(ix) |
| New LLC Agreement | Section 2(b)(iv) |
| New Second Lien Facility | Recitals |
| Offering Memorandum | Recitals |
| Plan | Recitals |
| Petition Date | Recitals |
| Private Placement | Recitals |
| Purchased Shares | Section 1 |
| Purchase Price | Section 1 |
| Purchaser | Preamble |
| Purchasers' Representative | Section 4(a) |
| Related Party | Section 3(a)(xx)(B) |
| Restructuring | Recitals |
| Second Lien Exchange Offer | Recitals |
| Securities Act | Section 3(a)(xii) |
| Support Agreement | Recitals |
| Surviving Representations | Section 8 |
| Transactions | Recitals |

# SCHEDULE 3(a)(ii)-1

## Company's Ownership

| Member | Common Shares | Common Share Percentage |
|---|---|---|
| Avenue Capital Management II, L.P., solely on behalf of certain of the investment funds it manages | 7,260,089 | 72.60% |
| Other Second Lien Lenders | 2,739,911 | 27.40% |
| Total | 10,000,000 | 100.00% |

# SCHEDULE 3(a)(ii)-2

# Company's Ownership

| Member | Common Shares | Common Share Percentage |
|---|---|---|
| Avenue Capital Management II, L.P., solely on behalf of certain of the investment funds it manages | 8,287,556 | 82.88% |
| Other Second Lien Lenders | 1,712,444 | 17.12% |
| Total | 10,000,000 | 100.00% |

**SCHEDULE 3(a)(viii)**

**Liens**

1. Liens on the assets of The Regional Advertising Program Trust under Declaration of Trust dated June 6, 2000, as amended from time to time, and The National Marketing Fund Trust under Declaration of Trust dated April 11, 1997, as amended from time to time, securing the Credit Agreement dated as of September 26, 2007, as amended from time to time, among QAFT, Inc., solely in its capacity as Trustee for The Regional Advertising Program Trust and The National Marketing Fund Trust, the several financial institutions from time to time party thereto, as Lenders, and Vectra Bank Colorado, National Association, as Administrative Agent.

## SCHEDULE 3(a)(x)

## No Violation or Default

(A)

1. Defaults and Events of Default under the First Lien Credit Agreement resulting from (i) the execution or performance of the Transaction Documents or the Support Agreement (or from any of the transactions contemplated by the Support Agreement); (ii) the failure to comply with the Financial Performance Covenants; and (iii) the failure to make any payment when due (other than the failure to pay interest when due or within the applicable grace period), unless required to be made under the Support Agreement.

2. Defaults and Events of Default under the Second Lien Credit Agreement resulting from (i) the execution or performance of the Transaction Documents or the Support Agreement (or from any of the transactions contemplated by the Support Agreement); and (ii) the failure to make any payment when due, unless required to be made under the Support Agreement.

3. Upon expiration of a waiver from Vectra Bank Colorado, National Association, set to expire on March 1, 2012, there will be a default under the Credit Agreement dated as of September 26, 2007, as amended from time to time, among QAFT, Inc., solely in its capacity as Trustee for The Regional Advertising Program Trust and The National Marketing Fund Trust, the several financial institutions from time to time party thereto, as Lenders, and Vectra Bank Colorado, National Association, as Administrative Agent due to failure to comply with the required annual rest period.

(B)

None.

## SCHEDULE 3(a)(xv)

### Broker's Fees

1.  Memorandum of Understanding, by and between QCE LLC and CRESA Partners – Denver, Inc. ("CresaPartners"), dated December 23, 2010, as amended by that certain Addendum dated March 9, 2011 and that certain Second Addendum dated July 5, 2011 (as amended, the "MOU", which, together with the Exclusive Right-to-Lease Listing Contract to which the Memorandum of Understanding is attached, the "Agreement"): Under certain circumstances as specified in Exhibit A to the MOU, CresaPartners is entitled to a "Termination Agreement Commission" defined as the lesser of (i) $250,000 and (ii) five percent (5%) of Net Savings (defined as Quiznos' Rent, Operating Expenses, and Tenant's Parking Allotment).

2.  Engagement Letter, by and between QCE Holding LLC and its direct and indirect subsidiaries and Moelis & Company LLC ("Moelis"), dated as of June 15, 2011 and as amended on December 22, 2011.  During the term of the agreement, Moelis will be paid a non-refundable cash fee (the "Monthly Fee") of $150,000 per month.  At the closing of the Restructuring, Moelis is entitled to a non-refundable cash fee (the "Restructuring Fee") of $4.75 million, subject to credits of 50% of any monthly fees paid to Moelis after the third monthly fee of Moelis' engagement.

3.  Retention Letter, by and between Lazard Fréres & Co. LLC ("Lazard") and Akin Gump Strauss Hauer & Feld LLP ("Akin"), as counsel to and acting on behalf of the parties specified therein, dated as of August 2, 2011 (the "Lazard Retention Letter"):  A fee (the "Restructuring Fee"), payable upon consummation of a Restructuring (as defined therein), equal to (a) $3,250,000 to the extent a Restructuring is consummated through a pre-packaged, pre-arranged or pre-negotiated plan of reorganization under chapter 11 of the Bankruptcy Code proposed pursuant to a plan support agreement executed by the Informal Group (as that term is defined therein); (b) $3,000,000 to the extent a Restructuring is consummated through any other plan of reorganization under chapter 11 of the Bankruptcy Code; or (c) $3,250,000 to the extent a Restructuring is consummated out-of-court.

4.  Retention Letter between Blackstone Advisory Partners L.P. ("Blackstone") and Willkie Farr & Gallagher LLP ("Counsel"), dated as of November 10, 2011 (the "Blackstone Retention Letter"):  A fee (the "Restructuring Fee") equal to $2,250,000, which will be earned and payable upon the consummation of a Restructuring (as defined therein), provided, however, if the Restructuring provides for the payment in cash to the holders of the First Lien Credit Facility in an amount not less than the face amount of the First Lien Credit Facility (as defined therein), Blackstone will not be entitled to a Restructuring Fee.

**SCHEDULE 3(a)(xix)**

**Company Benefit Plans**

**<u>EMPLOYEE BENEFIT PACKAGES</u>**

1. **Corporate Employee Benefit Package**
   a. Medical OAP
   b. Medical HRA 1
   c. Medical HRA 2
   d. Dental High Plan
   e. Dental Low Plan
   f. Vision
   g. Flexible Spending Accounts (Medical, Dependent Care & Parking)
   h. Basic Life/AD&D
   i. Short Term Disability
   j. Long Term Disability
   k. Voluntary Life/AD&D
   l. EAP
   m. Subsidized Garage Parking
   n. Regional Transportation District (RTD) Eco Pass
   o. Quiznos Gift Cards ($75 Quarterly)
   p. Pet Insurance
   q. 401k Plan (Company match after 1 year – 100% match of first 3%, 50% on next 2%)
   r. Holiday Pay (9 days per year)
   s. Vacation Pay (up to 20 days per year; use it or lose it during calendar year)
   t. Sick Pay (up to 7 days per year, use it or lose it during calendar year)

2. **Corporate Restaurant Employee Benefit Package**
   a. Medical HRA 2
   b. Medical Starbridge 2
   c. Medical Starbridge 3
   d. Dental Low Plan
   e. Vision
   f. Regional Transportation District (RTD) Eco Pass or Parking Pass
   g. 401k Plan (Company match after 1 year – 100% match of first 3%, 50% on next 2%)
   h. Vacation Pay (up to 1 week after 3 years of employment)
   i. Discounted Frontier Flights

3. **Canada Employee Benefit Package**
   a. Health Care/Hospitalization
   b. Dental Care
   c. Critical Illness
   d. Extended Health Benefits (Benefits with Deductibles and Reimbursement)
   e. Basic Life Insurance
   f. AD&D
   g. Optional Life Insurance

**Ex. 4 p. 37**

h. Paid Leave of Absence
i. RRSP (Company match after 1 year – 100% up to 6%)
j. Holiday Pay (10 days per year)
k. Vacation Pay (20 days per year; use it or lose it during calendar year)
l. Sick Pay (up to 7 days per year; use it or lose it during calendar year)

## OTHER COMPENSATION

**1. Bonus Plans**
   a. 2011 Development Bonus Plan (commission based plan)
   b. 2011 Corporate Company Quarterly Bonus Plan (based on company performance)
   c. 2011 Travel Bonus (15 employees)
   d. DIA Manager Bonus Plan
   e. Auto/Fuel Allowance (approximately 60 employees)
   f. Cell Phone Allowance (approximately 145 employees)
   g. Internet Allowance (4 employees)

**2. Deferred Compensation Plans**
   a. The QCE LLC Key Management Wealth Building Program (SAR 2)
   b. The Quizno's Master LLC Amended Director, Advisor and Executive SAR and Deferred Compensation Plan (SAR1/SONP)
   c. The Quizno's Corporation Deferred Bonus Plan (DBPA/DBPB)

**3. Option Plans**
   a. 2010 QCE Incentive LLC Option Plan

## EMPLOYEE AGREEMENTS

**1. Employment Agreements**
   a. MacDonald, Greg
      i. Restated Employment Agreement effective as of October 1, 2010, and as amended from time to time (the "Amendments"), and most recently amended by the Second Amendment to the Amended and Restated Employment Agreement, dated as of July 7, 2011, between QCE LLC and Greg MacDonald (collectively, the "MacDonald Employment Agreement"), provides terms specifying, among others, the scope of employment, compensation consisting of a base salary and a discretionary performance bonus, benefits, and severance payment subject to the terms of termination, and indemnification including coverage under any D&O Insurance policies.  In addition, the MacDonald Employment Agreement incorporates a Release Agreement and Golden Parachute Excise Tax Gross-Up Provisions.
   b. Robson, Jason
      i. Offer of Employment, Employment Agreement dated as of October 29, 2009, between QCE LLC and Jason Robson (the "Robson Employment Agreement") provides terms specifying, among others, the scope of

**Ex. 4 p. 38**

employment, compensation in the form of base salary, discretionary performance bonus, benefits, severance payments subject to the terms of termination, and indemnification. In addition, the Robson Employment Agreement incorporates a Release Agreement.

c. Seely, Courtney

  i. The Employment Agreement, as amended by the First Amendment Employment Agreement effective May 24, 2011, and by letter dated July 19, 2011, and by letter dated November 30, 2011, between QCE LLC and Courtney Seely (collectively, the "<u>Seely Employment Agreement</u>") provides terms specifying, among others, the scope of employment, compensation consisting of base salary, discretionary performance bonus, incentive compensation in the form of deferred compensation, benefits, severance payments subject to the terms of termination, and indemnification including coverage under any D&O Insurance policies. In addition, the Seely Employment Agreement incorporates a Release Agreement.

d. Smythe, Dennis

  i. Employment Agreement dated January 25, 2010, with an effective date of October 19, 2009, between QCE LLC and Dennis Smythe (the "<u>Smythe Employment Agreement</u>") provides terms specifying, among others, the scope of employment, compensation in the form of base salary, discretionary performance bonus, incentive compensation in the form of deferred compensation, benefits, severance payments subject to the terms of termination, and indemnification including coverage under any D&O Insurance policies. In addition, the Smythe Employment Agreement incorporates a Release Agreement.

**2. Retention Agreements- (agreements to pay severance if terminated without cause)**

a. Belmont, Brian- Retention Agreement dated June 6, 2011.

b. Bellamy, Teggie- Retention Agreement dated June 6, 2011.

c. Brooks, David- Retention Agreement dated July 28, 2011.

d. Calkins, Zach- Retention Agreement dated June 6, 2011.

e. Choy, Marc- Retention Agreement dated June 6, 2011.

f. Corrigan, Chad- Retention Agreement dated June 6, 2011.

g. Cox, Mark- Retention Agreement dated June 6, 2011.

h. Farley, Cha Nye- Retention Agreement dated June 6, 2011.

i. Fearrin, Brett- Retention Agreement Agreement, dated June 27, 2011.

j. Goldstein, Todd- Retention Agreement dated June 6, 2011.

k. Jeffrey, George- Retention Agreement dated June 6, 2011.

l. Keefe, Ryan- Retention Agreement dated August 31, 2011.

m. Riggle, Tim- Retention Agreement dated June 6, 2011.

n. Rogers, Mark- Retention Agreement dated June 6, 2011.

o. Roper, Mike- Retention Agreement dated June 6, 2011.

p. Sommers, Matt- Retention Agreement dated June 6, 2011.

q. Tress, Jonathan- Retention Agreement dated June 6, 2011.

r. Vala, Ali- Retention Agreement dated June 6, 2011.

s.   Wilson, Mark- Retention Agreement dated June 6, 2011.

**3. Former Employees Currently Receiving Severance Pay**
a.   Bourg, Curtis (through Feb. 2012)
b.   Pillari, Andy (through May 2012)
c.   Schaden, Richard (though Oct. 2013) (to be terminated at Closing)
d.   Stahlhut, Jeff (through Dec. 2011)
e.   Taylor, Allyn (through Feb. 2012)

**4. Consultants and Contractors**

a.   Woodhouse, Terri-Lynn- Independent Contractor Agreement by and between Terri-Lynn Woodhouse and QCE LLC, effective May 3, 2010.
b.   Colvin, Tony-"Contractor" for Development, working on Real Estate.
c.   Mann, Joe- "Contractor" for Development, working on Real Estate.
d.   Boudreaux, Ron- "Contractor" for Ops/Training, teaching at QU.
e.   Arango, Andrea- "Contractor" for Field Ops, specifically working on Hess.
f.   Klein, Adam- "Contractor" for Field Ops, specifically working on Hess.
g.   Cordoba, Roberto- "Contractor" for Field Ops, specifically working on Hess.
h.   Malley, Skyler- Interactive Marketing Intern.
i.   Vandel, Raymon- "Contractor" for Marketing, Graphic Design.
j.   Crossland, Jerdie- "Contractor" for Legal, Risk Management.
k.   Kannegieter, Samantha-Temp to Hire through Agency, Staff Accountant.
l.   Lamson, Bethany-Temp to Hire through Agency, Accounts Payable Specialist.
m.   Domer, Todd- "Contractor", VP Tax.
n.   Bovey, Chelsea-"Contractor", Canada Office Administrator.
o.   Nakagawa, Jane- "Contractor", Canada Design & Procurement Coordinator.
p.   Basarowich, Doug- Letter Confirming Terms of Contract Offer from Quizno's Canada Restaurant Corporation and, as applicable, its subsidiaries, to retain Doug Basarowich, dated January 1, 2011.

## INDEMNITY AGREEMENTS

a.   Manager indemnification agreement, as of August 30th, 2006, by and between QCE Holding LLC and David Deno, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

b.   Manager indemnification agreement, as of October 1, 2010, by and between QCE Holding LLC and David Prokupek, a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.

c.   Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and Frederick H. Schaden, a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.

d.   Manager indemnification agreement, effective as of November 27, 2006, by and between QCE Holding LLC and Greg Brenneman, who has been employed to serve as the

Company's Chief Executive Officer, President, and to be appointed as a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.]

e.  Manager indemnification agreement, as of January 9, 2007, by and between QCE Holding LLC and J. Brandon Turner, who has been employed to serve as the Company's Chief Financial Officer and Executive Vice President.  To be assumed by QCE LLC at the Closing.

f.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and J. Eric Lawrence, a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.

g.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and John M. Warner, a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.

h.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and Mathew Lori, a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.

i.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and Patrick E. Meyers, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

j.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and Richard E. Schaden, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

k.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and Richard F. Schaden, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

l.  Manager indemnification agreement, as of August 30, 2006, by and between QCE Holding LLC and Stephen P. Murray, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

m. Manager indemnification agreement, effective as of August 18, 2008, by and between QCE Holding LLC and Thomas Ryan, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

n.  Manager indemnification agreement, effective as of March 5, 2008, by and between QCE Holding LLC and John D. Bowlin, a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.

o.  Manager indemnification agreement, effective as of August 4, 2011, by and between QCE Holding LLC and Andrew R. Lee, a member of the Company's Board of Managers. To be assumed by QCE LLC at the Closing.

p.  Manager indemnification agreement, effective as of July 29, 2011, by and between QCE Holding LLC and John M. Moore, a member of the Company's Board of Managers.  To be assumed by QCE LLC at the Closing.

**SCHEDULE 3(a)(xx)(A)**

**Affiliate Transactions**

1.  In accordance with the Third Amended and Restated Limited Liability Company Agreement of QCE Holding LLC ("QCEH"), effective as of April 26, 2010, the Company's subsidiaries pay certain costs on behalf of QCEH, including certain professional services and certain allocated employee compensation expenses.   In order to present stand alone financial statements in accordance with GAAP, these expenses are allocated from QCE LLC to QCEH through intercompany accounts.  As of September 30, 2011, the QCE LLC intercompany receivable balance was approximately $343,000. It is expected that this balance will be approximately $550,000 as of December 31, 2011.

    Prior to June 30, 2011, these intercompany accounts were settled by recording a deemed distribution from QCE LLC to QCEH with a corresponding credit to the QCE LLC intercompany receivable balance.  Although the essence of the settlement transaction was to provide a means for QCEH to satisfy its intercompany liabilities, no cash was distributed.  Rather, these entries served to reduce member's equity.  This intercompany account has not been settled since June 30, 2011 and QCE LLC expects to settle its receivable as of December 31, 2011 through a non-cash adjustment to member's equity in conjunction with the proposed Transactions as QCEH will no longer serve as the Member of QCE LLC.  (Such arrangement will cease at Closing).

2.

    a.  Health insurance for the benefit of Consumer Capital Partners, the Company's indirect Sponsor.  (Such plans will expire on 12/31/2011).

        i.    Medical OAP

        ii.   Medical HRA 1

        iii.  Medical HRA 2

        iv.   Dental High Plan

        v.    Dental Low Plan

        vi.   Vision

        vii.  Flexible Spending Accounts (Medical, Dependent Care & Parking)

        viii. Basic Life/AD&D

        ix.   Short Term Disability

        x.    Long Term Disability

     xi.  Voluntary Life/AD&D

b. Management Agreement, entered into as of January 1, 2009, between the Cervantes Holding Company and TQSC II LLC (as amended). (Such Management Agreement will expire on 12/31/2011).

c. Area Director Marketing Agreement dated September 17, 2009, as amended, with Chicago Franchise Support Services LLC ("CFSS") pursuant to which CFSS is responsible for operating and managing the Chicago, Illinois territory. (Such Area Director Marketing Agreement will terminate on the final day of the month in which the Closing occurs).

d. Management Agreement effective January 16, 2004, with Rockford Manager LLC ("Rockford"), pursuant to which Rockford is responsible for operating and managing the Rockford, Illinois and Madison, Wisconsin territories. (Such Management Agreement will terminate on the final day of the month in which the Closing occurs).

e. Third Amended and Restated Employment Agreement, dated as of May 5, 2006, between QCE Holding LLC, QCE LLC, and Richard E. Schaden, as further amended on January 1, 2009, December 31, 2009, and June 30, 2010. (Such Employment Agreement will terminate on the earlier to occur of the Closing Date or the Petition Date).

f. The Deferred Compensation Plans and Option Plans set forth on Schedule 3(a)(xix) hereto under "Other Compensation" items 2 and 3, respectively, are incorporated herein by reference. (Such Deferred Compensation Plans and Option Plans will terminate at Closing).

g. Any compensation and benefits paid to any Affiliate employees under the "Employment Agreements" set forth on Schedule 3(a)(xix) hereto. (Except for the Employment Agreement listed in 2(e) above, such agreements will not terminate).

h. Agreement to Manage Business Operations, effective January 1, 2011, between Rockford Manager LLC and Al Raheem Group, Inc. (as amended). (Such Agreement will terminate on the final day of the month in which the Closing occurs).

i. Agreement to Manage Business Operations, effective January 1, 2011, between Chicago Franchise Support Services LLC and Al Raheem Group, Inc. (as amended). (Such Agreement will terminate on the final day of the month in which the Closing occurs).

**SCHEDULE 4(a)(xi)**

**Deferred Compensation**

1. Branam, Janice

2. Bromberg, Mark

3. Crider, John

4. Flaherty, William

5. Gallivan, John

6. Heusinger, Steve

7. Lawrence, Eric

8. MacDonald, Greg

9. McNeely, Perry

10. McPherson, Jane

11. Meyers, Patrick

12. Moore, John M.

13. Paddock, Regina

14. Ryan, Thomas

15. Schaden, Fred

16. Schaden, Richard

17. Schaden, Richard F

18. Selvaggio, Andrew J.

19. Stewart, Lyle B.

20. Todd, John

21. Warschauer, Bonnie

## SCHEDULE 5(h)

### Conduct of Business

1. Up to approximately $1,100,000 in the aggregate of payments of amounts due in respect of the fourth quarter under the Bonus Plans set forth on Schedule 3(a)(xix) hereto under "Other Compensation" item 1, including but not limited to item 1(a).

2. Separation payments to certain participants of Deferred Compensation plans set forth on Schedule 4(a)(xi) hereto who separated from the Company in 2011. As of the date hereof, two participants of such plans separated from the Company in 2011 and will be due their first payment, in an aggregate amount of $106,943, within 60 days of the end of the current year.

3. $500,000 payment for full and complete resolution of all claims and disputes in the action known as Joe Martrano and Terry Schallenberger, et al. vs. The Quizno's Franchise Company, LLC, et al. in the United States District Court for the Western District of Pennsylvania

4. $750,000 payment, if the Company's settlement offer is accepted, for resolution of all claims and disputes in the action known as Quizno's Canada Restaurant Corporation AD Case (Kileel).

5. Up to $1,500,000 in payments in aggregate, net of any insurance recovery, for resolution of all claims and disputes in the actions brought by those in Colorado who claim to have opted out of the Siemer v. The Quizno's Franchise Company LLC national class action settlement agreement (Colorado Opt-Out Cases).

6. Any meetings or mediations attended by employees of the Company in respect of the action known as Quizno's Canada Restaurant  Corporation Class Action (Q2).

7. Up to $2,000,000 in payments in aggregate, net of any insurance recovery, for resolution of all claims and disputes in respect of the Quizno's Canada Restaurant Corporation Class Action (Q2).

8. On December 6, 2011, Quiznos sent a letter to Maple Leaf Bakery Inc., the primary supplier of bread to the Quiznos system, regarding Maple Leaf's ongoing failure to supply bread that conforms to Quiznos' specifications, as required by Quiznos' agreements with Maple Leaf.  In that letter, Quiznos demanded a meeting between management teams to discuss resolution of these issues.  This meeting is scheduled for December 21, 2011 at Quiznos' Denver offices.

9. From the launch of the exchange offers and consent solicitation contemplated by the Support Agreement until the conclusion thereof, Quiznos will cease disclosing its October 2011 Franchise Disclosure Document to prospective franchise owners.  As promptly as possible after the exchange offers and consent solicitation have concluded, Quiznos will begin disclosing to prospective franchise owners an amended Franchise

Disclosure Document, which includes next steps for the restructure and material updates in respect thereof.

10. Any professional fees and expenses to be paid by the Company to consummate the Transactions as contemplated by the Support Agreement.

11. Any applicable consent fees, commitment fees and break-up fees contemplated by the Support Agreement.

# SCHEDULE 5(h)(ii)

## Payments in Respect of Agreements.

1. The Management Agreement effective January 16, 2004 between Rockford Manager LLC and FHS LLC, an entity owned 100% by Frederick Schaden.

2. The Area Director Marketing Agreement dated September 17, 2009, as amended, between Illinois Food Management, Inc. and Chicago Franchise Support Services LLC.

3. Third Amended and Restated Employment Agreement, dated as of May 5, 2006, between QCE Holding LLC, QCE LLC, and Richard E. Schaden, as further amended on January 1, 2009, December 31, 2009, and June 30, 2010.

4. The Deferred Compensation Plans and Option Plans set forth on Schedule 3(a)(xix) hereto under "Other Compensation" items 2 and 3, respectively, are incorporated herein by reference.

5. Agreement to Manage Business Operations, effective January 1, 2011, between Rockford Manager LLC and Al Raheem Group, Inc. (as amended).

6. Agreement to Manage Business Operations, effective January 1, 2011, between Chicago Franchise Support Services LLC and Al Raheem Group, Inc. (as amended).

7. Management Agreement, entered into as of January 1, 2009, between The Cervantes Holding Company and TQSC II LLC (as amended).

8. Any "Indemnity Agreements" set forth on Schedule 3(a)(xx)(A) hereto are hereby incorporated by reference.

9. Any professional fees and expenses to be paid by the Company to consummate the Transactions as contemplated by the Support Agreement.

10. Any applicable consent fees, commitment fees and break-up fees contemplated by the Support Agreement.

**SCHEDULE 5(h)(viii)**

**Company Benefit Plans.**

1.  Up to approximately $1,100,000 in the aggregate of payments of amounts due in respect of the fourth quarter under the Bonus Plans set forth on Schedule 3(a)(xix) hereto under "Other Compensation" item 1, including but not limited to item 1(a).

## SCHEDULE 5(h)(ix)

## Claims, Liabilities or Obligations

1. Up to approximately $1,100,000 in the aggregate of payments of amounts due in respect of the fourth quarter under the Bonus Plans set forth on Schedule 3(a)(xix) hereto under "Other Compensation" item 1, including but not limited to item 1(a).

2. In accordance with the Third Amended and Restated Limited Liability Company Agreement of QCE Holding LLC ("QCEH"), effective as of April 26, 2010, the Company's subsidiaries pay certain costs on behalf of QCEH, including certain professional services and certain allocated employee compensation expenses.   In order to present stand alone financial statements in accordance with GAAP, these expenses are allocated from QCE LLC to QCEH through intercompany accounts.  As of September 30, 2011, the QCE LLC intercompany receivable balance was approximately $343,000. It is expected that this balance will be approximately $550,000 as of December 31, 2011.

   Prior to June 30, 2011, these intercompany accounts were settled by recording a deemed distribution from QCE LLC to QCEH with a corresponding credit to the QCE LLC intercompany receivable balance.  Although the essence of the settlement transaction was to provide a means for QCEH to satisfy its intercompany liabilities, no cash was distributed.  Rather, these entries served to reduce member's equity.  This intercompany account has not been settled since June 30, 2011 and QCE LLC expects to settle its receivable as of December 31, 2011 through a non-cash adjustment to member's equity in conjunction with the proposed Transactions as QCEH will no longer serve as the Member of QCE LLC.

3. A subsidiary of the Company offered financing to qualified franchise owners on a limited basis in 2009, 2010 and 2011.   These include loans for renovating and remodeling restaurants, as well as loans to assist franchise owners in the acquisition of restaurants.  A default or bankruptcy by a franchise owner borrower could have a substantial negative impact on our ability to collect amounts due under such franchise owner's borrowing arrangement. As of September 30, 2011 the amounts due under such loans were approximately $5,000,000 in the aggregate.

4. $500,000 payment for full and complete resolution of all claims and disputes in the action known as Joe Martrano and Terry Schallenberger, et al. vs. The Quizno's Franchise Company, L.L.C., et al. in the United States District Court for the Western District of Pennsylvania

5. $750,000 payment, if the Company's settlement offer is accepted, for resolution of all claims and disputes in the action known as Quizno's Canada Restaurant Corporation AD Case (Kileel).

6. Up to $1,500,000 in payments in aggregate, net of any insurance recovery, for resolution of all claims and disputes in the actions brought by those in Colorado who claim to have

opted out of the Siemer v. The Quizno's Franchise Company LLC national class action settlement agreement (Colorado Opt-Out Cases).

7. Up to $2,000,000 in payments in aggregate, net of any insurance recovery, for resolution of all claims and disputes in respect of the Quizno's Canada Restaurant  Corporation Class Action (Q2).

**SCHEDULE 5(h)(xi)**

**Third Party Actions**

1.   Actions against our current E&O carrier.

2.   On December 6, 2011, Quiznos sent a letter to Maple Leaf Bakery Inc., the primary supplier of bread to the Quiznos system, regarding Maple Leaf's ongoing failure to supply bread that conforms to Quiznos' specifications, as required by Quiznos' agreements with Maple Leaf.   In that letter, Quiznos demanded a meeting between management teams to discuss resolution of these issues.   This meeting is scheduled for December 21, 2011 at Quiznos' Denver offices. We may take action to enforce our rights under our agreements with Maple Leaf.

EXHIBIT A

Appendix E

**PRIVILEGED AND CONFIDENTIAL**

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**QCE PARENT LLC**

(a Delaware limited liability company)

effective as of

_____ __, 2012

Article I       DEFINITIONS ..................................................................................................1
   1.1   Definitions.......................................................................................................1
   1.2   Usage Generally...............................................................................................6

Article II      THE COMPANY AND ITS BUSINESS ...................................................7
   2.1   Formation .........................................................................................................7
   2.2   Company Name ................................................................................................7
   2.3   Effective Date ..................................................................................................7
   2.4   Term..................................................................................................................7
   2.5   Offices ..............................................................................................................7
   2.6   Registered Office and Registered Agent...........................................................7
   2.7   Filings ..............................................................................................................7
   2.8   Purposes ...........................................................................................................7

Article III      CAPITAL CONTRIBUTIONS; DISTRIBUTIONS .................................8
   3.1   Admission .........................................................................................................8
   3.2   Additional Capital Contributions.....................................................................8
   3.3   No Interest in Company Property......................................................................9
   3.4   Distributions.....................................................................................................9

Article IV      [RESERVED]...........................................................................................9

Article V        SHARES ...................................................................................................9
   5.1   Shares................................................................................................................9
   5.2   Designation of Shares .......................................................................................9
   5.3   Issue of Shares; Register; Transfer ..................................................................9
   5.4   Certificates........................................................................................................9

Article VI      MANAGEMENT OF THE COMPANY ..................................................10
   6.1   Management and Control of the Company.......................................................10
   6.2   Members Shall Not Manage or Control...........................................................10
   6.3   Board of Managers..........................................................................................10
   6.4   Meetings of the Board of Managers.................................................................11
   6.5   Quorum and Voting .........................................................................................12
   6.6   Procedural Matters of the Board of Managers.................................................12
   6.7   Officers ...........................................................................................................13
   6.8   Terms of Office; Resignation; Removal..........................................................13
   6.9   Compensation..................................................................................................14
   6.10  Related Party Transactions .............................................................................14

Article VII     MEMBERS AND MEETINGS ...............................................................15
   7.1   Members ..........................................................................................................15
   7.2   Admission of New Members ...........................................................................15
   7.3   Resignation .....................................................................................................15
   7.4   Power of Members...........................................................................................15
   7.5   Meetings of Members ......................................................................................16

7.6    Place of Meetings ........................................................................................16
7.7    Notice of Members' Meetings ....................................................................16
7.8    Waiver of Notice .........................................................................................16
7.9    Voting ..........................................................................................................17
7.10   Quorum; Vote Required ..............................................................................17
7.11   Action by Written Consent of Members .....................................................17
7.12   Voting by Ballot ..........................................................................................17
7.13   No Cumulative Voting .................................................................................17

Article VIII    EXCULPATION; INDEMNIFICATION; LIABILITY; Opportunity .................18
8.1    Exculpation ..................................................................................................18
8.2    Indemnification ...........................................................................................18
8.3    Liability; Duties ..........................................................................................19
8.4    Insurance .....................................................................................................20
8.5    Limited Liability Company Opportunity .....................................................21

Article IX       ACCOUNTING; FINANCIAL AND TAX MATTERS ......................................21
9.1    Books and Records; Reports .......................................................................22
9.2    Fiscal Year ..................................................................................................23
9.3    Bank and Investment Accounts ..................................................................23
9.4    Tax Election ................................................................................................23

Article X        TRANSFERS OF SHARES; RIGHT OF FIRST OFFER;
                 TAG ALONG RIGHT; DRAG ALONG RIGHT;
                 PREEMPTIVE RIGHTS ...................................................................................24
10.1   Limitation on Transfer ................................................................................24
10.2   Permitted Transfers .....................................................................................24
10.3   Right of First Offer .....................................................................................24
10.4   Tag-Along Right ..........................................................................................25
10.5   Drag-Along Right ........................................................................................26
10.6   Condition to Transfers .................................................................................28
10.7   Effect of Transfer ........................................................................................29
10.8   Tolling .........................................................................................................29
10.9   Preemptive Rights .......................................................................................29
10.10  Certain Transfers .........................................................................................31

Article XI       REGISTRATION RIGHTS ...............................................................................31
11.1   Demand Registration Right .........................................................................31
11.2   Piggyback Registration Right .....................................................................33
11.3   Effective Demand Registration ...................................................................34
11.4   Cutback ........................................................................................................34
11.5   Form S-3 Registration .................................................................................34
11.6   Holdback Agreements ..................................................................................36
11.7   Registration Procedures ..............................................................................36
11.8   Seller Information ........................................................................................39
11.9   Notice to Discontinue ..................................................................................39
11.10  Registration Expenses .................................................................................39

        11.11   Indemnification; Contribution ...............................................................................40

Article XII      DISSOLUTION OF COMPANY;
                 LIQUIDATION AND DISTRIBUTION OF ASSETS ........................................42
        12.1    Events of Dissolution...............................................................................42
        12.2    Liquidation; Winding Up..........................................................................43
        12.3    Survival of Rights, Duties and Obligations ........................................43
        12.4    Claims of the Members............................................................................44

Article XIII     MISCELLANEOUS ...........................................................................44
        13.1    Expenses ...................................................................................................44
        13.2    Further Assurances....................................................................................44
        13.3    Notices ......................................................................................................44
        13.4    Amendments .............................................................................................44
        13.5    Severability ..............................................................................................45
        13.6    Headings and Captions ...........................................................................45
        13.7    Counterparts..............................................................................................45
        13.8    GOVERNING LAW...................................................................................45
        13.9    Entire Agreement; Non-Waiver...............................................................45
        13.10   No Third Party Beneficiaries ..................................................................45
        13.11   No Right to Partition................................................................................45
        13.12   Investment Representation and Indemnity..............................................46
        13.13   Confidentiality ........................................................................................46


Schedule 3.1             Members, Addresses, Capital Contributions, Shares and Percentage

**AMENDED AND RESTATED**
**LIABILITY COMPANY AGREEMENT**
**OF**
**QCE PARENT LLC**

**THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (this "Agreement") of QCE PARENT LLC, a Delaware limited liability company (the "Company"), effective as of _____ __, 2012, is adopted and entered into by and among the Persons who are parties hereto as listed on Schedule 3.1 hereto (collectively, the "Members," which term shall also include such other Persons who shall become members of the Company in accordance with the terms of this Agreement and pursuant to and in accordance with the Delaware Limited Liability Company Act, as amended from time to time (the "Act")), in order to amend and restate in its entirety the Limited Liability Company Agreement of the Company, dated as of December 22, 2011.

WHEREAS, the Company was formed pursuant to a Certificate of Formation, dated December 22, 2011, which was executed and filed with the Secretary of State of the State of Delaware on December 22, 2011;

WHEREAS, this Agreement supersedes the Limited Liability Company Agreement of the Company, dated as of December 22, 2011;

WHEREAS, the parties hereto desire to set forth the terms and conditions for the operation of the Company.

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1     Definitions.

As used in this Agreement, the following terms shall have the meanings set forth below:

"Act" has the meaning set forth in the preamble hereto.

"Additional Capital Contribution" has the meaning set forth in Section 3.2(b).

"Affiliate" means any Person that, directly or indirectly, controls, is controlled by, or is under common control with such Person. The term "control" (including the terms "controlled by" and "under common control with") as used in this definition means the possession, directly or indirectly (including through one or more intermediaries), of the power or authority to direct or cause the direction of the management, whether through the ownership of voting securities, by contract or otherwise.  In calculating any Member's ownership of Shares for the purposes of determining whether a Member shall have certain rights under this Agreement,

E-1

all Shares held by Affiliated Members shall be aggregated for the purposes of such determination.

"Agreement" means this Agreement as the same may be amended, supplemented or modified in accordance with the terms hereof.

"Approved Sale" has the meaning set forth in Section 10.5(b).

"Avenue Managers" has the meaning set forth in Section 6.3(a).

"Avenue Members" means [____], [____] and [____] and each of their Permitted Transferees.

"Board of Managers" means the Board of Managers provided for in Article VI.

"Business Day" means any calendar day that is not a Saturday, Sunday or other calendar day on which banks are required or authorized to be closed in the City of New York.

"Buyout Notice" has the meaning set forth in Section 10.5(a).

"Capital Contribution" means the contribution made by a Member in accordance with Section 3.1.

"CEO" means the person from time to time serving as chief executive officer of the Company in accordance with this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended, including any successor provisions and transition rules.

"Commission" means the United States Securities and Exchange Commission.

"Common Share" means a Share representing a fractional part of the equity interests in the Company having the preferences, rights, obligations and limitations specified with respect to the Common Shares in this Agreement.

"Company" has the meaning set forth in the preamble to this Agreement.

"Company Underwriter" has the meaning set forth in Section 11.2(a).

"Confidential Information" has the meaning set forth in Section 13.13(a).

"Demand Registration" has the meaning set forth in Section 11.1(a).

"Drag-Along Sale" has the meaning set forth in Section 10.5(a).

"Effective Transfer Time" has the meaning set forth in Section 10.7.

"Event of Dissolution" has the meaning set forth in Section 12.1.

**Ex. 4 p. 59**

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto.

"Expiration Date" has the meaning set forth in Section 10.3(a).

"Family Member" means an individual's spouse, sibling, child, or other lineal descendant of such individual.

"Federal Income Tax" means any Tax imposed under Subtitle A of the Code or any other provision of United States federal income tax law (including, without limitation, the Taxes imposed by Sections 11, 55, 59A, and 1201(a) of the Code), and any interest, additions to Tax or penalties applicable or related to such Tax.

"Fortress Manager" has the meaning set forth in Section 6.3(a).

"Fortress Members" means [____] and its Permitted Transferees.

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Governmental Authority" means the government of any nation, state, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"Incentive Shares" has the meaning set forth in Section 10.9(a).

"Incidental Registration" has the meaning set forth in Section 11.2(a).

"Indemnified Party" has the meaning set forth in Section 11.11(c).

"Indemnifying Party" has the meaning set forth in Section 11.11(c).

"Indemnitee" has the meaning set forth in Section 8.2(a).

"Initial Public Offering" means a bona fide firm commitment underwritten public offering of the equity interests of the Company, pursuant to an effective registration statement filed under the Securities Act that raises a minimum of $[____] in gross proceeds.

"Initiating Member" has the meaning set forth in Section 11.1(a).

"Liabilities" and "Liability" has the meaning set forth in Section 11.11(a).

"Manager" means a Person serving as a member of the Board of Managers in accordance with this Agreement.

"Members" has the meaning set forth in the preamble hereto; provided, however, that a Person shall cease to be a Member for purposes of this Agreement at such time as such Person ceases to own any Share.

"Members' Counsel" has the meaning set forth in Section 11.7(a)(i).

"New Securities" has the meaning set forth in Section 10.9(a).

"Non-Initiating Members" has the meaning set forth in Section 11.2(a).

"Notice of Acceptance" has the meaning set forth in Section 10.9(b).

"Offer Notice" has the meaning set forth in Section 10.3(a).

"Offer Price" has the meaning set forth in Section 10.3(a).

"Offered Securities" has the meaning set forth in Section 10.9(a).

"Offered Shares" has the meaning set forth in Section 10.3(a).

"Old Second Lien Facility" means that certain Credit Agreement dated as of May 5, 2006, by and among QCE Finance LLC, QCE LLC, as Borrower, the Lenders party thereto, Deutsche Bank Trust Company Americas, as Administrative Agent, Goldman Sachs Credit Partners L.P., as Syndication Agent, Credit Suisse Securities (USA) LLC and BNP Paribas Securities Corp., as Co-Documentation Agents, and Deutsche Bank Securities Inc. and Goldman Sachs Credit Partners L.P., as Joint Lead Arrangers and as Joint Bookrunners.

"Option Period" has the meaning set forth in Section 10.3(b).

"Other Indemnitors" means (a) any employer of a Manager; (b) any entity in which a Manager is a partner, member or equity holder; (c) any entity for whom a Manager is serving as a manager of the Company at the request of such entity; (d) any insurer of an Other Indemnitor, and in each such case, where such Manager has certain rights to indemnification and/or insurance provided by such entity in connection with his or her service as a manager of the Company.

"Permitted Transferees" has the meaning set forth in Section 10.2.

"Person" means any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, estate, unincorporated organization, governmental authority or other entity and shall include any "group" within the meaning of the regulations promulgated by the Commission under Section 13(d) of the Exchange Act.

"Preemptive Offer" has the meaning set forth in Section 10.9(a).

"Preemptive Right" has the meaning set forth in Section 10.9(a).

"Proportionate Percentage" has the meaning set forth in Section 10.9(a).

"Proposed Transfer" has the meaning set forth in Section 10.4(b).

"Protected Person" has the meaning set forth in Section 8.1(a).

"Records" has the meaning set forth in Section 11.7(a)(vii).

"Registration Expenses" has the meaning set forth in Section 11.10.

"Registration Statement" means any Registration Statement filed pursuant to the Securities Act.

"Rightholders" has the meaning set forth in Section 10.3(a).

"S-3 Initiating Member" has the meaning set forth in Section 11.5(a).

"S-3 Non-Initiating Members" has the meaning set forth in Section 11.5(a).

"S-3 Registration" has the meaning set forth in Section 11.5(a).

"S-3 Underwriter" has the meaning set forth in Section 11.5(a).

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the Commission thereunder.

"Selling Members" has the meaning set forth in Section 10.5(a).

"Selling ROFO Member" has the meaning set forth in Section 10.3(a).

"Selling Tag Member" has the meaning set forth in Section 10.4(a).

"Share" means an ownership interest of a Member in the Company, including each of the Common Shares or any other class or series of Shares designated by the Board of Managers.

"Share Holding Company" has the meaning set forth in Section 10.10.

"Stock" has the meaning set forth in Section 11.1(e).

"Subject Purchaser" has the meaning set forth in Section 10.9(a).

"Subscription Agreement" means that certain Subscription Agreement dated as of the date hereof, by and among [_____].

"Subsidiary" means, as of the relevant date of determination, with respect to any Person, a corporation or other entity of which more than 50% of the voting power of the outstanding voting equity securities or more than 50% of the outstanding economic equity interest is held, directly or indirectly, by such Person.

"Successor Corporation" has the meaning set forth in Section 11.1(c).

"Tag-Along Notice" has the meaning set forth in Section 10.4(b).

"Tag-Along Notice Period" has the meaning set forth in Section 10.4(b).

"Tag-Along Rightholder" has the meaning set forth in Section 10.4(a).

"Tax" and "Taxes" means (i) any form of taxation or duties imposed, or required to be collected or withheld, including, without limitation, charges, together with any related interest, penalties or other additional amounts, (ii) liability for the payment of any amount of the type described in the preceding clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group, and (iii) liability for the payment of any amounts as a result of being party to any Tax sharing agreement (other than the Agreement) or as a result of any express or implied obligation to indemnify any other person with respect to the payment of any amount described in the immediately preceding clauses (i) or (ii) (other than an obligation to indemnify under the Agreement).

"Third Party Purchaser" has the meaning set forth in Section 10.3(a).

"Transfer" means any, direct or indirect, transfer, sale, assignment, pledge, hypothecation or other disposition of any Share, whether voluntary or involuntary, or any agreement to transfer, sell, assign, pledge, hypothecate or otherwise dispose of any Share, including, without limitation, any such disposition by operation of law or otherwise to an heir, successor or assign.

"Valid Business Reason" has the meaning set forth in Section 11.1(a).

1.2     Usage Generally.  The definitions in this Article I or the Schedules to this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Articles, Sections and Schedules shall be deemed to be references to Articles and Sections of, and Schedules to, this Agreement unless the context shall otherwise require.  All Schedules attached hereto shall be deemed incorporated herein as if set forth in full herein and, unless otherwise defined therein, all terms used in any Schedule shall have the meaning ascribed to such term in this Agreement.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All accounting terms not defined in this Agreement shall have the meanings determined by GAAP.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise expressly provided herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.

## ARTICLE II
## THE COMPANY AND ITS BUSINESS

2.1     <u>Formation</u>.  The Members hereby agree to continue the Company, which was formed pursuant to the provisions of the Act on December 22, 2011, and hereby agree that the Company shall be governed by the terms and conditions of this Agreement and, except as otherwise provided herein, the Act.

2.2     <u>Company Name</u>.  The name of the Company is "QCE Parent LLC." The Board of Managers may (without the consent of any Member) change the Company's name at any time and from time to time in accordance with the provisions of the Act and upon notice to the other Members.

2.3     <u>Effective Date</u>.   The Limited Liability Company Agreement of the Company, dated as of December 22, 2011, took effect on such date.  This Amended and Restated Limited Liability Company Agreement of the Company is entered into on _____ __, 2012 and is effective as of such date.

2.4     <u>Term</u>.  The Company shall continue until dissolved and its affairs wound up in accordance with the Act and the terms of this Agreement.

2.5     <u>Offices</u>.  The principal office of the Company shall be established and maintained at 1001 Seventeenth Street, Suite 200, Denver, Colorado 80202 or at such other or additional place or places as the Board of Managers shall determine from time to time. The Company may have other offices at such place or places as the Board of Managers may from time to time designate.

2.6     <u>Registered Office and Registered Agent</u>.  The address of the Company's registered office in the State of Delaware and the name and address of the Company's registered agent in the State of Delaware shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle.  The Board of Managers may designate another registered agent and/or registered office from time to time in accordance with the provisions of the Act and any other applicable laws.

2.7     <u>Filings</u>.  The Members shall execute and deliver such documents and perform such acts consistent with the terms of this Agreement as may be necessary to comply with the requirements of law for the formation, qualification and operation of a limited liability company, the ownership of property and the conduct of business under the laws of the State of Delaware and each other jurisdiction in which the Company shall own property or conduct business.  Shawna Evans was designated as an "authorized person," within the meaning of the Act, to execute, deliver and file the Certificate of Formation of the Company, and the execution, delivery and filing of such Certificate of Formation by Shawna Evans on December 22, 2011 is hereby ratified.

2.8     <u>Purposes</u>.  The Company is formed for the purposes of engaging in any lawful acts or activities for which limited liability companies may be organized under the Act.

# ARTICLE III
# CAPITAL CONTRIBUTIONS; DISTRIBUTIONS

3.1     Admission.

(a)     On the date hereof, each of the Members (i) purchased newly authorized and issued Common Shares from the Company for a Capital Contribution of [$____] per Common Share pursuant to the Subscription Agreement, and/or (ii) exchanged indebtedness under the Old Second Lien Facility for newly authorized and issued Common Shares from the Company for a Capital Contribution of [$____] in indebtedness under the Old Second Lien Facility per Common Share, in each case, as set forth on Schedule 3.1 opposite such Member's name.  After giving effect to the transactions set forth in this Section 3.1(a), each Member holds the Common Shares set forth on Schedule 3.1 opposite such Member's name.  Notwithstanding anything to the contrary, no further approval of the Board of Managers or the Members shall be required with respect to the foregoing.

(b)     Schedule 3.1 shall be amended by the Board of Managers following any Transfer as provided by Article X or any issuance of additional Shares in accordance with this Agreement.

(c)     Each Person designated for admission to the Company as an additional Member in accordance with this Agreement (other than in connection with a Transfer made in accordance with Article X) shall contribute cash and/or other property (including securities) in the amount and of the type designated by the majority vote of the Board of Managers and Schedule 3.1 shall be amended at the time of such additional Members' admission as a Member by the Board of Managers to reflect such contribution.

3.2     Additional Capital Contributions.

(a)     No Member shall be obligated to make an Additional Capital Contribution (to the Company, in addition to its initial Capital Contribution.

(b)     Subject to Section 10.9, each Member may be permitted from time to time, but shall not be obligated, to make Additional Capital Contributions (or cause an Affiliate of the Member to make such Additional Capital Contributions), pro rata in accordance with the number of Common Shares held by each, if it is determined by the Board of Managers that such Additional Capital Contributions are necessary or appropriate for the conduct of the Company's business and affairs; provided that the Company shall provide each Member with no less than twenty (20) days advance written notice of any request for Additional Capital Contributions. Subject to the provisions of this Agreement, the Board of Managers (or a duly authorized committee thereof) shall be required to approve all aspects of any such Additional Capital Contribution, such as the amount and nature of the consideration to be contributed to the Company, the resulting Shares (including the class or series of Shares) to be received by the contributing Member, and the resulting dilution of interest to be incurred by the other Members. All amounts paid to the Company by a Member as additional equity capital (other than initial Capital Contributions) shall be deemed to be an "Additional Capital Contribution" by such

E-8

Member for the purposes of this Agreement, and Schedule 3.1 shall be amended at the time of such Additional Capital Contribution.

        3.3    No Interest in Company Property.   A Member's Shares shall for all purposes be personal property.  A Member has no interest in specific Company property.

        3.4    Distributions.  No Member shall be entitled to receive any distribution from the Company except as provided in this Agreement.  Distributions under this Section 3.3 (whether interim distributions or distributions on liquidation) made after the date hereof shall be made in amounts determined by the Board of Managers to the Members pro rata in accordance with the number of Common Shares held by each.

## ARTICLE IV
## [RESERVED]

## ARTICLE V
## SHARES

        5.1    Shares.  As of the date hereof, the ownership interests in the Company are evidenced by one class of Shares, Common Shares.

        5.2    Designation of Shares.  The Board of Managers shall have the power to designate the ownership interests in the Company into one or more classes and/or series of Shares and to fix for such class or series such voting powers, full or limited, or no voting powers, and such distinctive designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof, as shall be stated and expressed in the properly approved resolution or resolutions of the Board of Managers providing for such designation, and such resolution or resolutions of the Board of Managers shall set forth such amendments to this Agreement as shall be necessary or reasonable in the sole judgment of the Board of Managers to effect such resolution and such amendments shall be binding upon all of the Members of the Company upon proper adoption by the Board of Managers.

        5.3    Issue of Shares; Register; Transfer.   Subject to Sections 3.3 and 10.9, Shares may be issued from time to time in such portions of the entire interests in the Company as the Board of Managers shall properly approve, either for cash, services, securities, property or other value, or in exchange for other Shares, and at such price and upon such terms as the Board of Managers may, subject to the terms of this Agreement, in its absolute discretion determine. The Board of Managers may in its absolute discretion (a) provide that a register of holders of any or all Shares shall be kept and (b) may appoint one or more transfer agents and one or more registrars, all in accordance with such rules, regulations and procedures as the Board of Managers may determine.

        5.4    Certificates.   The Company may, in the discretion of the Board of Managers, issue certificates of limited liability company interests evidencing the Shares.  Each certificate evidencing any Share shall bear such appropriate legend indicating the existence of this Agreement and the restrictions on Transfer contained herein.

# ARTICLE VI
## MANAGEMENT OF THE COMPANY

6.1     <u>Management and Control of the Company</u>.  The management, operation and control of the business and affairs of the Company shall be vested exclusively in the Board of Managers, except as otherwise expressly provided for in this Agreement.  The Board of Managers shall have full and complete power, authority and discretion for, on behalf of and in the name of the Company, to perform all contracts and other undertakings that it may in its sole discretion deem necessary or advisable to carry out any and all of the objects and purposes of the Company.  A Manager acting individually will not have the power to bind the Company.  The power and authority of the Board of Managers may be delegated by the Board of Managers to a committee of Managers, to any officer of the Company or to any other Person engaged to act on behalf of the Company.

6.2     <u>Members Shall Not Manage or Control</u>. The Members, other than as they may act by and through the Board of Managers, shall take no part in the management of the business and affairs of the Company, shall transact no business for the Company and shall have no power to act for or to bind the Company, in each case other than as specifically delegated by the Board of Managers.

6.3     <u>Board of Managers</u>.

(a)     A Board of Managers shall be established and shall consist of nine (9) members, subject to this <u>Section 6.3(a)</u>.  The Avenue Members shall have in the aggregate seven (7) members of the Board of Managers which shall be designated by the majority vote of the Avenue Members (the "<u>Avenue Managers</u>"); the Fortress Members shall have in the aggregate one (1) member of the Board of Managers (the "<u>Fortress Manager</u>"), which shall be designated by the majority vote of the Fortress Members; and one member of the Board of Managers shall be the CEO of the Company.  One of the Avenue Managers shall serve as the chairperson of the Board of Managers.  As of the date hereof, the Avenue Managers are [__], [__], [__], [__], [__], [__], and [__]; the Fortress Manager is [__]; and the CEO is [__].  Members of the Board of Managers need not be Members.  In the event that either the Avenue Members or the Fortress Members (or their transferees who then hold the right to designate one or more Managers) Transfer Shares in compliance with <u>Article X</u> equal to more than 10% of all of the then outstanding Common Shares (excluding Incentive Shares) of the Company, then such Member may also transfer its right to designate a Manager hereunder with respect to each 10% of all then outstanding Common Shares (excluding Incentive Shares) Transferred hereunder.  In the event that either the Avenue Members or the Fortress Members (or their transferees who then hold the right to designate one or more Managers) Transfer Shares in compliance with <u>Article X</u> equal to more than 10% of all of the then outstanding Common Shares (excluding Incentive Shares) of the Company without also transferring the right to designate a Manager hereunder, then such Member shall forfeit the right to designate one (1) Manager for each 10% of all of the then outstanding Common Shares (excluding Incentive Shares) Transferred, and if any such Member (together with its Affiliates and Permitted Transferees (but only Permitted Transferees qualified as such pursuant to clause (i) of <u>Section 10.2</u>)) ceases to hold an aggregate of at least 5% of all of the then outstanding Common Shares (excluding Incentive Shares for purposes of the numerator and denominator), then such Member shall forfeit the right to designate any Managers.  The

**Ex. 4 p. 67**

vacancies created by any such forfeitures shall be filled by the majority vote of all of the Members holding Common Shares voting together as a single class; provided that in no event shall the Members holding Common Shares be entitled to elect more than three (3) Managers as a result of such forfeitures; provided further that, if applicable, the size of the Board of Managers shall be reduced automatically to reflect changes in the designation of Managers as contemplated under this Section 6.3(a).  The Company shall send prompt written notice to all Members of any change in the composition or size of the Board of Managers.  All members of the Board of Managers who are not employees of the Company shall receive identical compensation for their services as members of the Board of Managers.  All Managers (and non-voting observers) shall be entitled to reimbursement of their reasonable and documented out-of-pocket expenses incurred in connection with their attendance of meetings of the Board of Managers and any committees of the Board of Managers.

(b)     All or any number of the Managers may be removed at any time, with or without cause, by the Members that appointed such Manager, in accordance with Section 6.3(a). For the avoidance of doubt, the Fortress Manager may not be removed, with or without cause, except by the Fortress Members or as a result of the forfeiture of the Fortress Members' right to designate a Manager as provided in Section 6.3(a).

(c)     Any Manager may resign at any time by so notifying the chairman in writing. Such resignation shall take effect upon receipt of such notice by the chairman or at such later time as is therein specified, and unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective.

(d)     If at any time a vacancy is created on the Board of Managers by reason of the incapacity, death, removal or resignation of any Manager, the vacancy will be filled by another individual selected in accordance with Section 6.3(a).

(e)     The designation of an individual as a Manager shall not of itself create a right to continued membership on the Board of Managers or employment with the Company.

(f)     For so long as the Avenue Members have the right to designate at least one Avenue Manager pursuant to Section 6.3(a), the Avenue Members shall have the right, exercisable by delivering notice to the Company, to designate three (3) non-voting observers to attend any meetings of the Board of Managers (or any committee thereof) and any meetings of the board of any Subsidiary (or any committee thereof).  For so long as the Fortress Members have the right to designate the Fortress Manager pursuant to Section 6.3(a), the Fortress Members shall have the right, exercisable by delivering notice to the Company, to designate two (2) non-voting observers to attend any meetings of the Board of Managers (or any committee thereof) and any meetings of the board of any Subsidiary (or any committee thereof).  Notice of applicable board and committee meetings shall be furnished to the non-voting observers no later than, and using the same form of communication as, notice of applicable Board of Managers or committee meetings are furnished to Managers in accordance with this Agreement.  The observers shall not be counted as members of the Board of Managers for the purpose of determining whether a quorum is present, at any meeting of the Board of Managers, any board of any Subsidiary or any committee thereof.  Copies of any materials prepared for applicable Board of Manager or committee meetings shall be furnished to the non-voting observers no later than

the time such materials are furnished to Managers in accordance with this Agreement.  The Avenue Members and the Fortress Members may change the identity of their respective non-voting observers by providing notice to the Company.  The non-voting observers shall be considered to be representatives for the Avenue Members or the Fortress Members, as applicable, for the purposes of <u>Section 13.13</u> hereof and shall be bound by the confidentiality obligations therein.

6.4     <u>Meetings of the Board of Managers</u>.  The Board of Managers shall hold regular meetings at least once during each fiscal quarter at such time and place as shall be determined by the Board of Managers.  Special meetings of the Board of Managers may be called at any time by any Manager.  Written notice shall be required with respect to any meeting of the Board of Managers, and written notice of any special meetings shall specify the purpose of the special meeting.  Unless waived by all of the Managers in writing (before, during or after a meeting) or with respect to any Manager at such meeting, prior notice of any regular or special meeting (including reconvening a meeting following any adjournments or postponements thereof) shall be given to each Manager and non-voting observer at least four (4) Business Days before the date of such meeting. Notice of any meeting need not be given to any Manager who shall submit, either before, during or after such meeting, a signed waiver of notice.  Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except when the Manager attends the meeting for the express purpose of objecting at the beginning thereof to the transaction of any business because the meeting is not properly called or convened.

6.5     <u>Quorum and Voting</u>.

(a)     No action may be taken by the Board of Managers unless a quorum is present.  A quorum shall consist of the presence, in person or by proxy, of a majority of the Managers.

(b)     The Board of Managers shall act by majority vote, and each Manager shall have one vote.

(c)     No Manager shall be disqualified from acting on any matter because such member is interested in the matter to be acted upon by the Board of Managers so long as all material aspects of such matter have been disclosed in reasonable detail to all Managers who are to act on such matter.  Each Manager may authorize another person or persons to vote and act for such member by proxy, and such person or persons holding such proxy shall be counted towards the determination of whether a quorum of the Board of Managers is present.  One person may hold more than one proxy and each such proxy held by such person shall be counted towards the determination of whether a quorum of the Board of Managers exists.

6.6     <u>Procedural Matters of the Board of Managers</u>.

(a)     Any action required or permitted to be taken by the Board of Managers (or any committee thereof) may be taken without a meeting, if all of the Managers consent in writing to such action.  Such consent shall have the same effect as a vote of the Board of Managers.

(b)     The Board of Managers (and each committee thereof) shall cause to be kept a book of minutes of all of its actions by written consent and in which there shall be

recorded with respect to each meeting of the Board of Managers (or any committee thereof) the time and place of such meeting, whether regular or special (and if special, how called), the names of those present and the proceedings thereof.

(c)     Managers and non-voting observers may participate in a meeting of the Board of Managers (or any committee thereof) by conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear one another, and such participation shall constitute presence in person at such meeting.

(d)     At each meeting of the Board of Managers, the chairperson shall preside and, in his or her absence, Managers holding a majority of the votes present may appoint any member of the Board of Managers to preside at such meeting. The Secretary (or such other person as shall be designated by the Board Managers) shall act as secretary at each meeting of the Board of Managers. In case the Secretary shall be absent from any meeting of the Board of Managers, an Assistant Secretary shall perform the duties of secretary at such meeting or the person presiding at the meeting may appoint any person to act as secretary of the meeting.

(e)     The Board of Managers may designate one or more committees to take any action that may be taken hereunder by the Board of Managers, which committees shall take actions under such procedures (not inconsistent with this Agreement) as shall be designated by it; provided, however, that not later than sixty (60) days following the date hereof, the Board of Managers shall ensure that it has at all times a compensation committee and an audit committee, each consisting of not less than [__] members.  The compensation committee shall approve all executive compensation, executive bonuses and all equity incentives or option grants (including the vesting schedules with respect to such equity incentives or option grants).   The audit committee shall approve the engagement of the Company's auditors, subject to Section 9.1(g).

6.7     Officers.

(a)     The day-to-day operations of the Company shall be the responsibility of the officers of the Company.  All officers shall have such authority and perform such duties as may be provided in this Agreement or, to the extent not so provided, by resolution passed by the Board of Managers.  The officers of the Company shall, at a minimum, consist of a CEO, a president, chief financial officer and a secretary.  The officers shall be appointed by the Board of Managers.  Each officer shall be a natural person eighteen years of age or older.  One person may hold more than one office.  In all cases where the duties of any officer, agent, or employee are not prescribed by this Agreement, such officer, agent or employee shall follow the orders and instructions of the CEO unless otherwise directed by the Board of Managers.  The officers, to the extent of their powers set forth in this Agreement or as delegated to them by the Board of Managers, are agents of the Company and the actions of the officers taken in accordance with such powers shall bind the Company.

(b)     The secretary of the Company will generally perform all the duties usually appertaining to the office of secretary of a limited liability company.

6.8     Terms of Office; Resignation; Removal.

(a)     Each officer shall hold office until he or she is removed in accordance with clause (c) below or his or her earlier death, disability or resignation.  Any vacancy occurring in any of the officers of the Company, for any reason, shall be filled by action of the Board of Managers.

(b)     Any officer may resign at any time by giving written notice to the Board of Managers.  Such resignation shall take effect at the time specified in such notice or, if the time be not specified, upon receipt thereof by the Board of Managers.  Unless otherwise specified therein, acceptance of such resignation shall not be necessary to make it effective.

(c)     Each officer shall be subject to removal by the Board of Managers.

6.9     Compensation.  The compensation and terms of employment of all of the officers shall be fixed by the Board of Managers subject to Section 6.6(e).

6.10     Related Party Transactions.     Neither the Company nor any of its Subsidiaries shall enter into any transaction with the Avenue Members or any of their Affiliates unless such transactions are on an arm's-length basis, in each case containing terms and conditions that, in the aggregate, are not less favorable to the Company or its Subsidiaries, as applicable, than would be the case with an unrelated third party; provided that, if any such transaction (or series of transactions) involves the payment from, or receipt by, the Company or any of its Subsidiaries of greater than $2,500,000, then the Company shall not, and shall cause its Subsidiaries not to, consummate such transaction unless the Company obtains either, at the Company's option, (i) an opinion of an investment banking firm, chosen by the Board of Managers, that such transaction is fair to the Company or its applicable Subsidiaries, or (ii) as long as the Fortress Members (together with their Affiliates) hold at least an aggregate of 10% of the Common Shares then outstanding, the written consent of a majority-in-interest of the Fortress Members to such transaction, such consent not to be unreasonably withheld, conditioned or delayed.  In addition, the Company shall provide notice to at least one of the Fortress Members prior to the consummation of any transactions between the Company or any of its Subsidiaries, on the one hand, and any Affiliate of the Company, on the other hand.

**ARTICLE VII**
**MEMBERS AND MEETINGS**

7.1     Members.  The name, address, class and number and type of Shares of each Member are set forth on Schedule 3.1 hereto, as such schedule may be amended from time to time to reflect the admission of new Members, Additional Capital Contributions of the Members, and the Transfer of Shares, each as permitted by the terms of this Agreement.  Each update to Schedule 3.1 shall be identified in sequence and dated as of the date of such update as follows:  Schedule 3.1A (dated the date hereof), Schedule 3.1B (dated [_____]), Schedule 3.1C (dated [____]), etc.

7.2     Admission of New Members.  New Members may be admitted (i) by the Board of Managers or (ii) in accordance with the transfer provisions contained in Article X.

7.3     Resignation.  A Member may not resign or withdraw from the Company prior to the dissolution and winding up of the Company.  A resigning Member shall not be entitled to receive any distribution and shall not otherwise be entitled to receive the fair value of its Shares except as expressly provided in this Agreement.  Notwithstanding the foregoing, as of the date hereof, QCE Incentive LLC is resigning as a Member, all of its ownership interests in the Company are being canceled, and QCE Incentive LLC shall not be entitled to any distribution in connection therewith or with respect to any prior or future period.

7.4     Power of Members.  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Act.  The Members shall elect the Board of Managers in accordance with Section 6.3. Except as otherwise specifically provided by this Agreement or required by the Act, no Member shall have the power to act for or on behalf of, or to bind, the Company.  Notwithstanding the foregoing sentence, all Members shall constitute one class or group of members for purposes of the Act.

7.5     Meetings of Members.  Meetings of the Members shall be at least annually or as otherwise required by law or when called by the Board of Managers.  The Members may vote, approve a matter or take any action by vote of the Members at a meeting, in person or by proxy, or without a meeting by written consent of the Members pursuant to Section 7.11.

7.6     Place of Meetings.  The Board of Managers or a duly authorized committee thereof may designate any place, either within or outside of the State of Delaware, as the place of meeting for any annual meeting or for any special meeting of the Members.  If no designation is made, the place of meeting shall be the principal executive offices of the Company. Members may participate in a meeting by means of a conference telephone or electronic media by means of which all Persons participating in the meeting can communicate concurrently with each other, and any such participation in a meeting shall constitute presence in person of such Member at such meeting.

7.7     Notice of Members' Meetings.

(a)     In connection with the calling of any meeting of the Members, the Board of Managers may set a record date for determining the Members entitled to vote at such meeting. Written notice stating the place, day, and hour of the meeting and, in case of a special meeting, the purpose for which the meeting is called shall be delivered not less than ten (10) days nor more than fifty (50) days before the date of the meeting, either personally, by facsimile or by mail, by or at the direction of any Manager calling the meeting to each Member, whether or not such Member is entitled to vote at such meeting.

(b)     Notice to Members shall be given in accordance with Section 13.3.

(c)     When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Company may transact any business which might have been transacted at the original meeting.  If the adjournment is for

more than thirty (30) days, a notice of the adjourned meeting shall be given to each Member holding Common Shares entitled to vote at the meeting.

7.8     Waiver of Notice.

(a)     When any notice is required to be given to any Member of the Company under the provisions of this Agreement, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

(b)     By attending a meeting, a Member:

(i)     Waives objection to lack of notice or defective notice of such meeting unless the Member, at the beginning of the meeting, objects to the holding of the meeting or the transacting of business at the meeting; and

(ii)     Waives objection to consideration at such meeting of a particular matter not within the purpose or purposes described in the meeting notice unless the Member objects to considering the matter when it is presented.

7.9     Voting.  Each holder of Common Shares shall be entitled to one (1) vote for each Common Share owned by such holder, except as expressly provided otherwise in this Agreement.

7.10     Quorum; Vote Required.  The presence at a meeting, in person or by proxy, of Members owning a majority of the outstanding Common Shares entitled to vote on the subject matter of the meeting at the time of the action taken constitutes a quorum for the transaction of business required.  When a quorum is present, the affirmative vote, in person or by proxy, of Members owning a majority of the Common Shares entitled to vote on the subject matter shall be the act of the Members, unless the vote of a greater proportion or number or voting by classes is required by the Act or by this Agreement.  If a quorum is not represented at any meeting of the Members, such meeting may be adjourned to a period not to exceed sixty (60) days at any one adjournment.

7.11     Action by Written Consent of Members.  Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting if Members holding not less than the minimum number of Common Shares that would be necessary to approve the action pursuant to the terms of this Agreement, consent thereto in writing, and the writing or writings are filed with the minutes of the proceedings of the Members; provided, however, that no such written consent shall become effective until four (4) Business Days after notice thereof has been sent to the Fortress Members.  In no instance where action is authorized by written consent shall a meeting of Members be called or notice be given; however, a copy of the action taken by written consent shall be with the records of the Company.  Reasonably prompt notice of the taking of any action taken without a meeting by less than unanimous written consent shall be given to those Members who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of Members to take the action were obtained.  Written consent by the Members pursuant to this Section 7.11

shall have the same force and effect as a vote of such Members taken at a duly held meeting of the Members and may be stated as such in any document.

        7.12    <u>Voting by Ballot</u>.  Voting on any question or in any election may be by voice vote unless the presiding officer shall order or any Member shall demand that voting be by ballot.

        7.13    <u>No Cumulative Voting</u>.  No Member shall be entitled to cumulative voting in any circumstance.

**ARTICLE VIII**
**EXCULPATION; INDEMNIFICATION; LIABILITY; OPPORTUNITY**

        8.1    <u>Exculpation</u>.

        (a)    No manager, officer or Member, in any way, guarantees the return of any Members' capital contributions or a profit for the Members from the operations of the Company. To the fullest extent permitted by Section 18-1101 of the Act, none of the Members, Managers, any of their respective Affiliates, nor any of their respective officers, directors, employees, partners, members or shareholders (each, a "<u>Protected Person</u>") will be liable to the Company or any Member for any loss or damage sustained by the Company or any Member except as specifically provided to the contrary in the immediately following sentence.  None of the Protected Persons shall be liable to the Company or its Members for any loss or damage resulting from any act or omission taken or suffered by such Protected Person in connection with the conduct of the affairs of the Company or otherwise in connection with this Agreement or the matters contemplated hereby, unless such loss or damage is incurred by reason of such Protected Person's acts or omissions that constitute a bad faith violation of the implied contractual covenant of good faith and fair dealing.  None of the officers of the Company shall be liable to the Company or its Members for any loss or damage resulting from any act or omission taken or suffered by such officer in connection with the conduct of the affairs of the Company or otherwise in connection with this Agreement or the matters contemplated hereby, unless such loss or damage is incurred by reason of such officer's gross negligence, willful misconduct or willful breach of this Agreement.  Any Protected Person or officer may consult with legal counsel and accountants with respect to the Company's affairs and shall be fully protected and justified in any action or inaction that is taken or omitted in good faith, in reliance upon and in accord with the opinion or advice of such counsel or accountants, provided they shall have been selected in good faith.

        (b)    None of the Members, by reason of their execution of this Agreement or their status as members of the Company, or the Company shall be responsible or liable for any indebtedness, liability or obligation of any other Member incurred either before or after the execution of this Agreement, except that the Company shall be responsible and liable for indebtedness, liabilities or obligations incurred in connection with activities within the proper business purposes of the Company and purse ant to direct authorization of the Board of Managers or a duly authorized officer of the Company.

E-17

8.2    Indemnification.

(a)    To the fullest extent permitted under the Act and applicable law, the Company shall indemnify and hold harmless each of the Members, Protected Persons and officers of the Company (including Members when acting in the capacity as an officer of the Company), the Managers, their respective Affiliates and their respective officers, directors, employees, partners, members and shareholders (each, an "Indemnitee") from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee, and arise out of or in connection with (i) the affairs of the Company or the performance by such Indemnitee of any of the Indemnitee's responsibilities hereunder, (ii) the service at the request of the Company by such Indemnitee as a partner, member, director, officer, trustee, employee or agent of any other Person or (iii) the matters contemplated herein; provided, however, that an Indemnitee shall not be entitled to indemnification hereunder if indemnification is prohibited by applicable law; and provided further that, (1) if the Indemnitee is an officer of the Company, such officer's acts or omissions did not constitute gross negligence, willful misconduct or willful breach of this Agreement, and (2) if the Indemnitee is other than an officer of the Company, the Indemnitee acted in good faith and in a manner such Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such Indemnitee's conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Indemnitee did not act in good faith and in a manner which such Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such Indemnitee's conduct was unlawful.  The indemnification obligations of the Company pursuant to this Section 8.2 shall be satisfied from and limited to the Company's assets and no Member shall have any personal liability on account thereof.

(b)    The Company shall pay reasonable, documented expenses incurred by any Indemnitee in defending any action, suit or proceeding described in subsection (a) of this Section 8.2 in advance of the final disposition of such action, suit or proceeding, as such expenses are incurred; provided, however, that any such advance shall only be made if such Indemnitee provides written affirmation to repay such advance if it shall ultimately be determined by a court of competent jurisdiction that such Indemnitee is not entitled to be indemnified by the Company pursuant to this Section 8.2.

(c)    The indemnification provided by this Section 8.2 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement, determination of the Board of Managers or otherwise.  The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 8.2 shall continue as to an Indemnitee who has ceased to be a Member, Manager or officer (or other person indemnified hereunder) and shall inure to the benefit of the successors, executors, administrators, legatees and distributees of such Person.

(d)     The provisions of this <u>Section 8.2</u> shall be a contract between the Company, on the one hand, and each Indemnitee who served at any time while this <u>Section 8.2</u> is in effect in any capacity entitling such Indemnitee to indemnification hereunder, on the other hand, pursuant to which the Company and each such Indemnitee intend to be legally bound. No repeal or modification of this <u>Section 8.2</u> shall affect any rights or obligations with respect to any state of facts then or theretofore existing or thereafter arising or any action, suit or proceeding theretofore or thereafter brought or threatened based in whole or in part upon such state of facts.

(e)     The Company may enter into indemnity contracts with Indemnitees and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this <u>Section 8.2</u> hereof and containing such other procedures regarding indemnification as are appropriate.  For the avoidance of doubt, each of the Managers shall be entitled to receive indemnity contracts with the Company on terms no less favorable than any other indemnity contract entered into between the Company (or any of its Subsidiaries) and any other Manager.

8.3     <u>Liability; Duties.</u>

(a)     No Member, Manager or officer of the Company shall be personally liable for any indebtedness, liability or obligation of the Company, except as specifically provided for in this Agreement or required pursuant to the Act or any other applicable law.  To the fullest extent permitted by Section 18-1101 of the Act, except as specifically provided to the contrary in this Agreement, each Member agrees that any fiduciary or other duties imposed under Delaware law (including the duty of loyalty and the duty of care) on the Managers are hereby eliminated.

(b)     Any duties (including fiduciary duties) of a Member (but not the duties of the officers of the Company or Managers, in their capacity as such) that would otherwise apply at law or in equity (including the duty of loyalty and the duty of care) are hereby eliminated to the fullest extent permitted under Delaware law and any other applicable law; <u>provided</u> that (i) the foregoing shall not eliminate the obligation of each Member to act in compliance with the express terms of this Agreement and (ii) the foregoing shall not be deemed to eliminate the implied contractual covenant of good faith and fair dealing.  In furtherance of the foregoing (but subject to the provisos in the foregoing), when any Member (but not the officers of the Company, in their capacity as such) takes any action under this Agreement to give or withhold its consent or approval, such Member shall have no duty (fiduciary or other) to consider the interests of the Company, its Subsidiaries or the other Members, and may act exclusively in its own interest.

(c)     The officers of the Company, in their capacity as such, shall owe the same duties (including fiduciary duties) to the Company and the Members as the duties officers of a Delaware corporation owe to such corporation and its stockholders.

(d)     The Members acknowledge and agree that the foregoing is intended to comply with the provisions of the Act (including Section 18-1101 of the Act) permitting members and managers of a limited liability company to eliminate fiduciary duties to the fullest extent permitted under the Act.

8.4     Insurance.   The Company shall purchase and maintain insurance, on behalf of such Indemnitees, and may purchase and maintain insurance on behalf of the Company, against any liability that may be asserted against or expenses that may be incurred by any such person or entity in connection with the activities of the Company or such Indemnitees, and in such amounts, as the Board of Managers reasonably determines are customary for similarly-situated businesses such as the Company and its Subsidiaries, regardless of whether the Company would have the power to indemnify such person or entity against such liability under the provisions of this Agreement.

8.5     Limited Liability Company Opportunity.  The Members acknowledge and agree that they are involved in acquiring and investing in various companies and business opportunities, and in making any such investment, none of the Members, or any of their respective Affiliates, including any Manager who is not an officer or employee of the Company, shall have any obligation to present any such acquisition or investment opportunities to the Company.

## ARTICLE IX
## ACCOUNTING; FINANCIAL AND TAX MATTERS

9.1     Books and Records; Reports.

(a)     The books of the Company will be maintained at the Company's principal place of business.

(b)     The Board of Managers shall maintain or cause to be maintained a system of accounting established and administered in accordance with the accrual method of accounting or as shall be required by GAAP, and shall set aside on the books of the Company or otherwise record all such proper reserves pursuant to the accrual method of accounting or as shall be required by GAAP.

(c)     Such books of the Company, together with a copy of this Agreement and any certificates of limited liability company interests evidencing the Shares, shall be open to inspection, examination and copying at reasonable times and during normal business hours by the Fortress Members and their duly authorized representatives, including their legal, accounting and financial advisors.  For the avoidance of doubt, such information and documents shall be considered "Confidential Information" for the purposes of Section 13.13.

(d)     As soon as reasonably practicable after the close of each fiscal year of the Company, but not later than one hundred ten (110) days after the end of each fiscal year of the Company, the Company shall provide to (i) each Member and (ii) such other Persons as the Board of Managers shall direct in its sole discretion, a copy of the audited consolidated financial statements of the Company (including a balance sheet and statement of income, together with the notes thereto) as of the end of such year, setting forth in each case in comparative form the figures for the previous year, all in reasonable detail and accompanied by the opinion of a recognized independent certified public accounting firm with respect to such financial statements.

(e)     Commencing with the first full fiscal quarter following the date hereof, as soon as reasonably practicable after the end of the quarter, but in any event not later than forty-five (45) days after the end of each quarter, the Company shall provide to (i) each Member and (ii) such other Persons as the Board of Managers shall direct in its sole discretion the unaudited consolidated financial statements of the Company (including a balance sheet and statement of income), all certified by an appropriate officer.

(f)     (i)     The Board of Managers may, in its sole discretion, require a Person that wishes to receive information pursuant to Sections 9.1(d) or (e) hereof or otherwise, prior to receiving such information, to enter into a confidentiality agreement respecting such information on such terms as the Board of Managers deems appropriate.  In connection therewith, the Board of Managers shall be deemed the manager for purposes of Section 18-305 of the Act.

(ii)     Each Member confirms that it is aware, and that its directors, officers, employees, agents, consultants, advisors or other representatives, including legal counsel, accountants and financial advisors, have been advised, that any information provided to such Member by the Company under this Section 9.1 may constitute material non-public information regarding the Company or its securities and does and will constitute Confidential Information of the Company and its Subsidiaries.  Each Member agrees to maintain the confidentiality of such information in accordance with the provisions of Section 3.13 of this Agreement.

(g)     The current accounting firm of the Company is KPMG LLP.  The audit committee shall retain the current accounting firm or select a new accounting firm for the Company annually.  Any new accounting firm shall be selected from among the following "big four" nationally recognized accounting firms:   KPMG, PriceWaterhouseCoopers, Deloitte & Touche or Ernst & Young.

(h)     Notwithstanding the foregoing, (i) to the extent that any financial reports or other material information concerning the business or operations of the Company or any of its Subsidiaries (e.g., weekly or monthly unaudited financial statements or annual budgets) is distributed or made available to any of the Avenue Managers (or the Avenue Members' non-voting observers) by the Company or any of its Subsidiaries, such information shall be made available to the Fortress Manager (including non-voting observers), and (ii) to the extent that any financial reports or other material information concerning the business or operations of the Company or any of its Subsidiaries (e.g., weekly or monthly unaudited financial statements or annual budgets) is distributed or made available to the Fortress Manager (or the Fortress Members' non-voting observers) by the Company or any of its Subsidiaries, such information shall be made available to the Avenue Managers (including non-voting observers).

9.2     Fiscal Year; Taxable Year.  The fiscal year of the Company for financial accounting purposes shall end on December 31.  The taxable year of the Company for federal, state and local income tax purposes shall end on December 31 unless another date is required by the Code.

9.3    <u>Bank and Investment Accounts</u>.  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Board of Managers, in such checking, savings or other accounts, or held in its name in the form of such other investments, as shall be designated by the Board of Managers. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such officer or officers of the Company as the Board of Managers may designate.

9.4    <u>Tax Election</u>.  The Company shall elect to be taxed as a corporation for federal and state Tax purposes.

## ARTICLE X
## TRANSFERS OF SHARES; RIGHT OF FIRST OFFER;
## TAG ALONG RIGHT; DRAG ALONG RIGHT; PREEMPTIVE RIGHTS

10.1    <u>Limitation on Transfer</u>.  The Members shall not directly or indirectly Transfer any Shares except in accordance with the provisions of this Agreement.  Any attempt to Transfer any Shares in violation of the other provisions of this <u>Article X</u> shall be null and void *ab initio* and the Company shall not register or effect any such Transfer.  Notwithstanding anything to the contrary in this Agreement, (a) the rights and restrictions contained in <u>Sections 10.3</u>, <u>10.4</u>, <u>10.5</u> and <u>10.9</u> shall cease to apply following a public offering of securities by the Company, and (b) in the event that an Initial Public Offering is not completed within sixty (60) months of the date of this Agreement, the right of first offer set forth in <u>Section 10.3</u> shall no longer apply to the Fortress Members.

10.2    <u>Permitted Transfers</u>.  Without compliance with <u>Sections 10.3</u> or <u>10.4</u> hereof: (i) a Member may Transfer its Shares or any portion thereof to any direct or indirect stockholder, member, partner or Affiliate of such Member; (ii) a Member may Transfer his or her Shares or any portion thereof to any Family Member (or a Family Member of such Member's spouse, parent or sibling), a company, partnership or a trust established for the benefit of any of the foregoing or any personal representative, estate or executor under any will of such Member or pursuant to the laws of intestate succession, provided that, in each case, such Transfer is made in accordance with the applicable provisions of <u>Section 10.6</u>; or (iii) a Member may Transfer its Shares pursuant to or following a registered public offering.  The Persons to whom Members may Transfer their Shares or any portion thereof pursuant to this <u>Section 10.2</u> are referred to hereinafter as "<u>Permitted Transferees</u>"), provided that, in each case, such Transfer is made in accordance with <u>Section 10.6</u>.

10.3    <u>Right of First Offer</u>.

(a)    Except in a transaction pursuant to which <u>Section 10.5</u> applies or pursuant to a Registration Statement, if at any time a Member (the "<u>Selling ROFO Member</u>"), wishes to Transfer, all or any portion of such Member's Common Shares to any Person (other than to a Permitted Transferee) (a "<u>Third Party Purchaser</u>"), such Selling ROFO Member shall, first offer such Common Shares that are proposed to be transferred by sending written notice (an "<u>Offer Notice</u>") to the other Members holding (together with their Affiliates and Permitted Transferees) at least an aggregate of 5% of the Common Shares then outstanding (the "<u>Rightholders</u>"), which

**Ex. 4 p. 79**

shall state (i) the amount of Common Shares proposed to be transferred (the "Offered Shares"), (ii) the proposed purchase price proposed by the Selling ROFO Member (the "Offer Price"), (iii) the name of the Third Party Purchaser, and (iv) the material terms and conditions of such Transfer and that the proposed purchase of the Offered Shares shall be consummated after the expiration or termination of the Option Period (as defined below) but on or prior to the first business day (the "Expiration Date") which occurs sixty (60) days after the expiration of the Option Period.

(b)     On or prior to thirty (30) days after the delivery of the Offer Notice delivered pursuant to paragraph (a) above (the "Option Period"):

(i)     The Rightholders shall have the right to purchase all of the Offered Shares at a purchase price equal to the Offer Price and upon the terms and conditions of the Offer Notice. Each Rightholder shall have the right to purchase its pro rata portion (based upon its ownership of Common Shares) of the Offered Shares upon the terms and conditions contained in the Offer Notice. If any Rightholder does not fully subscribe for its pro rata portion of the Offered Shares, then each other participating Rightholder shall have the right, pro rata, to purchase the unsubscribed portion.

(ii)     The option of a Rightholder under this Section 10.3 shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the Option Period, to the Selling ROFO Member with a copy to the Company and the other Rightholders. Such notice shall state (i) such Rightholder's pro rata portion of the Offered Shares and (ii) the amount of the Offered Shares that such Rightholder desires to purchase pursuant to this Section 10.3, including whether such Rightholder desires to purchase any Offered Shares not subscribed for by other Rightholders. Any failure of a Rightholder to respond within the Option Period to the Selling ROFO Member shall be deemed to be a waiver of its rights under this Section 10.3.

(c)     The closing of the purchase of the Offered Shares subscribed for by purchasing Rightholders under this Section 10.3 shall be held at the principal office of the Company at 11:00 a.m. local time on the first business day which occurs thirty (30) days after the expiration of the Option Period or at such other time and place as the parties to the transaction may agree. At such closing, the Selling ROFO Member shall deliver to the purchasing Rightholders the Offered Shares, including certificates (if any) representing the Offered Shares, and such Offered Shares shall be free and clear of any liens, claims, options, charges, encumbrances or rights, and the Selling ROFO Member shall so represent and warrant and shall further represent and warrant that it is the beneficial and record owner of such Offered Shares. Each purchasing Rightholder shall, at the closing, deliver to the Selling ROFO Member payment in full in immediately available funds for the Offered Shares purchased by it. At such closing, all the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate.

(d)     Unless the Rightholders elect to purchase all of the Offered Shares pursuant to this Section 10.3, the Selling ROFO Member may sell any Offered Shares not purchased by the Rightholders to a Third Party Purchaser on the terms and conditions no more favorable to a Third Party Purchaser than those set forth in the Offer Notice; provided, however,

that such sale is bona fide and made prior to or on the Expiration Date on the terms and conditions contained in the Offer Notice.  If such sale is not consummated prior to the Expiration Date for any reason, then the restrictions provided for herein shall again become effective, and no Transfer of such Offered Shares may be made thereafter by the Selling ROFO Member without again offering the same to the Rightholders in accordance with this <u>Section 10.3</u>.

        10.4    <u>Tag-Along Right</u>.

        (a)    If a Member or group of Members (the "<u>Selling Tag Member</u>") elects to Transfer directly or indirectly, Common Shares comprising 25% or more of all then outstanding Common Shares to a Third Party Purchaser, in one or a series of related transactions, then, in lieu of complying with the provisions of <u>Section 10.3</u>, such Selling Tag Member shall offer the other Members (each a "<u>Tag-Along Rightholder</u>") the right to include in such Selling Tag Member's Transfer to the Third Party Purchaser the Tag-Along Rightholder's pro-rata portion of the Common Shares proposed to be Transferred by the Selling Tag Member at the same price and on the same terms and conditions described in the Tag-Along Notice (as defined below).

        (b)    Prior to the consummation of any proposed Transfer described in <u>Section 10.4(a)</u> (a "<u>Proposed Transfer</u>"), the Selling Tag Member proposing to make the Proposed Transfer shall offer to the other Tag-Along Rightholders the right to be included in the Proposed Transfer by sending written notice (the "<u>Tag-Along Notice</u>") to the Company and the Tag-Along Rightholders, which notice shall (i) state the name of such Selling Tag Member, (ii) state the name and address of the proposed Third Party Purchaser, (iii) state the portion of such Selling Tag Members' Common Shares to be sold, (iv) state the proposed purchase price and form of consideration of payment and all other material terms and conditions of such sale (including the identity of the Third Party Purchaser), (v) include a calculation of the consideration to be received by each Tag-Along Rightholder, (vi) include a representation that the Third Party Purchaser has been informed of the "tag-along" rights provided in this <u>Section 10.4</u> and has agreed to purchase the Common Shares in accordance with the terms hereof, and (vii) be accompanied by a written offer from the Third Party Purchaser.  Such right shall be exercisable by written notice to the Selling Tag Member proposing to make the Proposed Transfer (with a copy to the Company) given within thirty (30) days after delivery of the Tag-Along Notice (the "<u>Tag-Along Notice Period</u>").  The Selling Tag Member and the Tag-Along Rightholder shall sell the number of Common Shares to be sold to such Third Party Purchaser pursuant to this <u>Section 10.4</u> (or such lesser number as indicated by the Tag-Along Rightholder to the Selling Tag Member), and the number of Common Shares to be sold to such Third Party Purchaser by the Selling Tag Member shall be reduced accordingly.  Failure by a Tag-Along Rightholder to respond within the Tag-Along Notice Period shall be regarded as a rejection of the offer made pursuant to the Tag-Along Notice and a decline by such Tag-Along Rightholder of its rights under this <u>Section 10.4</u>.

        10.5    <u>Drag-Along Right</u>.

        (a)    If a Member or group of Members (the "<u>Selling Members</u>") wish to sell Shares comprising 50% or more of all then outstanding Common Shares to a Third Party Purchaser for value (a "<u>Drag-Along Sale</u>"), then such Selling Members shall have the right, in lieu of complying with the provisions of <u>Sections 10.3</u> and <u>10.4</u>, to require the other Members to

sell all of their Shares to such Third Party Purchaser in connection with such Drag-Along Sale and otherwise on the same terms as such Selling Members selling such Shares.  Such right shall be exercisable by written notice (a "Buyout Notice") given to each Member other than the Selling Members which shall state (i) that such Selling Members propose to effect the sale of all of the Shares of every Member of the Company (other than the Selling Members) to such Third Party Purchaser, (ii) the name of the Third Party Purchaser, and (iii) the purchase price the Third Party Purchaser is paying for the Shares and which attaches a copy of any definitive agreements between such Selling Members and the other parties to such transaction.  Each such Member agrees that, upon receipt of a Buyout Notice, each such Member shall be obligated to sell all of its Shares for the purchase price set forth in the Buyout Notice and upon the other terms and conditions of such transaction (and otherwise take all reasonably necessary action to cause consummation of the proposed transaction, including voting such Shares in favor of such transaction).

(b)     If the Board of Managers approves the sale of all or substantially all of the assets of the Company to, or a merger or consolidation of the Company with, a Person who is not an Affiliate of the Company (an "Approved Sale"), then so long as distributions of consideration to the Members are made in accordance with the provisions of Section 3.4, then each Member agrees to vote in favor thereof and will use its best efforts to cooperate in the Approved Sale and will take all necessary and desirable actions in connection with the consummation of the Approved Sale as are reasonably requested by the Board of Managers.

(c)     The closing with respect to any Drag-Along Sale pursuant to this Section 10.5 shall be held at the time and place specified in the Buyout Notice but in any event within sixty (60) days of the date the Buyout Notice is delivered to the Members (the "Drag-Along Outside Date").  Consummation of the Transfer of Shares by any Member to the Third Party Purchaser in a Drag-Along Sale (i) shall be conditioned upon consummation of the Transfer by each Selling Member to such Third Party Purchaser of the Shares proposed to be Transferred by the Selling Members and (ii) may be effected by a Transfer of the Shares or the merger, consolidation or other combination of the Company with or into the Third Party Purchaser or its Affiliate, in one (1) or a series of related transactions.  If the proposed Transfer with respect to the applicable Shares subject to the Buyout Notice does not meet the requirements of Section 10.5(a) prior to the Outside Transfer Date, such Selling Members shall be deemed to have forfeited their rights to require the other Members to sell all of their Shares to such Third Party Purchaser in connection with such Drag-Along Sale.

(d)     The Selling Members shall arrange for payment in cash (by bank cashier's check or certified check or by wire transfer of immediately available funds to the accounts designated by the other Members) directly by the Third Party Purchaser to each other Member, upon delivery of an appropriate assignment in form and substance reasonably satisfactory to the Third Party Purchaser, which assignment shall be made free and clear of all liens, claims and encumbrances, except as provided by this Agreement or as otherwise agreed to by such Third Party Purchaser.  In connection with any Transfer pursuant to a Buyout Notice, no other Member shall be required to (i) make any representations or warranties except that it has the authority to Transfer its Shares, is the sole owner of such Shares and has good and valid title to such Shares, and that the Transfer of such Shares does not violate any agreement to which it is a party or by which it is bound, or (ii) be subject to any post-closing covenants, including any non-competition

or non-solicitation covenants, in connection with such Transfer, other than confidentiality covenants with respect to information about the Company and its subsidiaries. The agreement effecting any proposed Transfer pursuant to a Buyout Notice shall provide that a Member who is not a Selling Member shall have no individual liability, including with respect to any indemnification provided by the Members (other than to the extent covered by a post-closing indemnity escrow), other than in connection with any breach of any representations or warranties that may be delivered as set forth in clause (i) of the preceding sentence, in which case liability resulting from a breach of such representations or warranties may not exceed the lesser of (x) its pro rata share of the aggregate consideration received and (y) the net proceeds actually received by such Member pursuant to such Transfer, and in the case of indemnification shall be on a several, not joint, basis.

(e)      Any transaction costs, including transfer taxes and legal, accounting and investment banking fees incurred by the Company and the Selling Members and any other Member participating in a Transfer pursuant to pursuant to a Buyout Notice shall, unless the applicable Third Party Purchaser refuses, be borne by the Company in the event of an Approved Sale and shall otherwise be borne by the Members on a pro rata basis based on the consideration received by each Member in such Transfer.

(f)      Notwithstanding any of the foregoing, until the earlier to occur of (A) the consummation of an Initial Public Offering or (B) the Fortress Members (together with their Affiliates) no longer holding at least an aggregate of 10% of the Common Shares then outstanding, no Drag-Along Sale or Approved Sale shall be consummated unless (i) a majority-in-interest of the Fortress Members consent in writing to such transaction, or (ii) the Company obtains an opinion of an investment banking firm, chosen by the Board of Managers but reasonably acceptable to a majority-in-interest of the Fortress Members, to the effect that the consideration to be received by the Members pursuant to such Drag-Along Sale or Approved Sale is at least eighty percent (80%) of the fair market value of the Company (the "Minimum Sale Price") as determined not more than three (3) months prior to the execution of definitive agreements as to such Drag-Along Sale or Approval Sale; provided that if the Drag-Along Sale or the Approved Sale involves less than all of the assets or capital stock of the Company, then the "Minimum Sale Price" shall be at least 80% of the fair market value of the Company (determined as set forth above) multiplied by the percentage of the Company subject to the Drag Along Sale or Approved Sale, as the case may be.

10.6   Condition to Transfers.   In addition to all other terms and conditions contained in this Agreement, no Transfers permitted under this Article X (excluding Transfers pursuant to Section 10.5) shall be completed or effective for any purpose unless prior thereto:

(a)      The Member making such Transfer shall have provided to the Company (i) at least five (5) business days' prior notice of such Transfer and (ii) a certificate of the Member making such Transfer, delivered with such notice, containing a statement that such Transfer is permitted under this Article X, together with such information as is reasonably necessary for the Company to make such determination and (iii) such other information or documents as may be reasonably requested by the Company in order for it to make such determination.

(b)     The transferee of such Shares shall have executed and delivered to the Company an agreement by which it shall become a party to and be bound by the applicable terms and provisions of this Agreement.

(c)     If requested by the Board of Managers in its reasonable judgment, the Company shall have received the opinion of counsel to the Company, at the expense of the Member making such Transfer, reasonably satisfactory in form and substance to the Board of Managers, to the effect that: (i) such Transfer would not violate the Securities Act or any state securities or "blue sky" laws applicable to the Company or the Shares to be Transferred, (ii) such Transfer shall not impose liability or reporting obligations on the Company or any Member thereof in any jurisdiction, whether domestic or foreign, or result in the Company or any Member thereof becoming subject to the jurisdiction of any court or governmental entity anywhere, other than the states, courts and governmental entities in which the Company is then subject to such liability, reporting obligation or jurisdiction, (iii) such Transfer would not, individually or together with other concurrently proposed Transfers, cause the Company to be regarded as an "investment company" under the Investment Company Act of 1940, as amended, and (iv) such Transfer shall not cause an Event of Dissolution or, unless the Board of Managers determines it to be immaterial, a termination of the Company pursuant to Section 708 of the Code.

10.7    Effect of Transfer.  Upon the close of business on the effective date of any Transfer of Shares (the "Effective Transfer Time") in accordance with the provisions of this Agreement, (a) the transferee shall be admitted as a Member (if not already a Member) and for purposes of this Agreement such transferee shall be deemed a Member, and (b) the Transferred Shares shall continue to be subject to all the provisions of this Agreement.  Unless the transferor and transferee otherwise agree in writing, and give written notice of such agreement to the Company at least seven (7) days prior to such Effective Transfer Time, all distributions declared to be payable to the transferor at or prior to such Effective Transfer Time shall be made to the transferor.  No Transfer shall relieve the transferor (or any of its Affiliates) of any of their obligations or liabilities under this Agreement arising prior to the closing of the consummation of such Transfer.

10.8    Tolling.    All time periods specified in this Article X are subject to reasonable extension for the purpose of complying with requirements of law or regulation as determined by the Board of Managers in its sole discretion.

10.9    Preemptive Rights.

(a)     If the Company shall propose to issue and sell any Shares or any security convertible into or exchangeable for any Shares (other than any Shares to be issued (i) to persons who are, or who are becoming, employees, managers, directors or consultants of the Company or its Subsidiaries in connection with a bona fide option or equity participation plan or other bona fide compensation arrangement that is duly approved by the Board of Managers ("Incentive Shares"), (ii) as part of a debt financing transaction or as consideration for an acquisition, a joint venture or joint venture partner duly approved by the Board of Managers or (iii) pursuant to an Initial Public Offering) (collectively, the "New Securities") or enter into any contracts relating to the issuance or sale of any New Securities to any Person (the "Subject Purchaser"), each Member

who is an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) and holds Shares (together with its Affiliates and Permitted Transferees) comprising at least an aggregate of 5% of all then outstanding Common Shares shall have the right (a "Preemptive Right") to purchase such Member's pro rata portion (based on ownership of Common Shares and determined without regard to Members not eligible for such Preemptive Right) of the New Securities at the same price and on the same other terms proposed to be issued and sold (excluding from such Member's allocated portion an amount of Shares necessary to account for any options, warrants, SARs or other equity rights of Members if the holders of any such options, warrants, SARs or other equity rights are entitled to preemptive rights in any transaction to which this Section 10.9 applies, such that the number of New Securities to be purchased by Members pursuant to this Section 10.9 shall be reduced to permit such preemptive rights following the issuance of the New Securities to such holders upon exercise of their preemptive rights) (the "Proportionate Percentage").  The Company shall offer to sell to any such Member its Proportionate Percentage of such New Securities (the "Offered Securities") and to sell to any such Member such of the Offered Securities as shall not have been subscribed for by the other Members as hereinafter provided, at the price and on the terms described above, which shall be specified by the Company in a written notice delivered to any such Member which such notice shall also state (x) the number of New Securities proposed to be issued and (y) the portion of the New Securities available for purchase by such Member and shall be given to such Members not later than ten (10) business days prior to any issuance giving rights under this Section 10.9 (the "Preemptive Offer").  The Preemptive Offer shall by its terms remain open for a period of at least thirty (30) days from the date of receipt thereof and shall specify the date on which the Offered Securities will be sold to accepting Members (which shall be at least thirty (30) but not more than one hundred and eighty (180) days from the date of the Preemptive Offer).  The failure of any Member to respond to the Preemptive Offer during the thirty (30) day period shall be deemed a waiver of such Members' Preemptive Right.

(b)     Each such Member shall have the right, during the period of the Preemptive Offer, to purchase any or all of its Proportionate Percentage of the Offered Securities at the purchase price and on the terms stated in the Preemptive Offer.  Notice by any Member of its acceptance, in whole or in part, of a Preemptive Offer shall be in writing (a "Notice of Acceptance") signed by such Member and delivered to the Company prior to the end of the specified period of the Preemptive Offer, setting forth the Offered Securities such Member elects to purchase.

(c)     Each such Member shall have the additional right to offer in its Notice of Acceptance to purchase any of the Offered Securities not accepted for purchase by any other Members, in which event such Offered Securities not accepted by such other Members shall be deemed to have been offered to and accepted by the Members exercising such additional right under this paragraph (c) pro rata in accordance with their respective Proportionate Percentages (determined without regard to those Members not electing to purchase their full respective Proportionate Percentages under the foregoing paragraph (a)) on the same terms and conditions as those specified in the Preemptive Offer, but in no event shall any such electing Member be allocated a number of New Securities in the Company in excess of the maximum number of Offering Securities such Member has elected to purchase in its Notice of Acceptance.

(d)     At the closing of the purchase of New Securities subscribed for by the Members under this Article X, the Company shall deliver certificates (if applicable) representing the New Securities, and such New Securities shall be issued free and clear of all liens and the Company shall so represent and warrant, and further represent and warrant that such New Securities shall be, upon issuance thereof to the Members that elected to purchase New Securities and after payment therefor, duly authorized, validly issued, fully paid and non-assessable. Each Member purchasing the New Securities shall deliver at the closing payment in full in immediately available funds for the New Securities purchased by it. At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate.

(e)     Sale to Subject Purchaser.  In the case of any Preemptive Offer, if Notices of Acceptance given by the Members do not cover in the aggregate all of the Offered Securities, the Company may during the period of one hundred and eighty (180) days following the date of expiration of such Preemptive Offer sell to any other Person or Persons all or any part of the New Securities not covered by a Notice of Acceptance, but only on terms and conditions that are no more favorable to such Person or Persons or less favorable to the Company than those set forth in the Preemptive Offer. If such sale is not consummated within such 180-day period for any reason, then the restrictions provided for herein shall again become effective, and no issuance and sale of New Securities may be made thereafter by the Company without again offering the same in accordance with this Article X.  The closing of any issuance and purchase pursuant to this Section 10.9 shall be held at a time and place as the parties to the transaction may agree.

10.10   Certain Transfers.  Each Member that is an entity that was formed for the sole purpose of directly or indirectly acquiring Shares or that has no substantial assets other than Shares or direct or indirect interests in Shares (any such Member, a "Share Holding Company") agrees that (i) certificates for shares of its common stock or other instruments reflecting equity interests in such entity (and the certificates for shares of common stock or other equity interests in any similar entities controlling such entity) will note the restrictions contained in this Agreement on the restrictions on Transfer of shares as if such common stock or other equity interests were Shares, (ii) no shares of such common stock or other equity interests may be transferred to any Person other than in accordance with the terms and provisions of this Agreement as if such common stock or other equity interests were Shares and (iii) any transfer of such common stock or other equity interests shall be deemed to be a Transfer of the proportionate percentage number of Common Shares hereunder (calculated proportionately by assuming for such calculation that Common Shares were actually held directly by the owners of the shares of the common stock or other equity interests of the Share Holding Company).

## ARTICLE XI
## REGISTRATION RIGHTS

11.1   Demand Registration Right.

(a)     Following the Company's Initial Public Offering, each Member (together with its Affiliates and Permitted Transferees) holding at least an aggregate of 5% of all then outstanding Common Shares (the "Initiating Member") may make a written request (specifying

the intended method of disposition and the amount of Common Shares proposed to be sold) that the Company effect, and the Company shall use its reasonable best efforts to effect, a Public Offering (a "Demand Registration") of all or a portion of the Common Shares collectively held by the Members (subject to Section 11.4(a)).  The Company shall not be obligated to effect a Demand Registration if the Initiating Member proposes to sell its Common Shares at an aggregate price to the public of less than [$____].  If the Board of Managers, in its good faith judgment, determines that any registration of Common Shares should not be made or continued because it would materially interfere with any material financing, acquisition, corporate reorganization or merger or other material transaction involving the Company (a "Valid Business Reason"), the Company may (y) postpone filing a Registration Statement relating to a Demand Registration until such Valid Business Reason no longer exists, but in no event for more than one hundred and eighty (180) days, and (z) in case a Registration Statement has been filed relating to a Demand Registration, if the Valid Business Reason has not resulted from actions taken by the Company, the Company, upon the approval of a majority of the Board of Managers, acting in good faith, may cause such Registration Statement to be withdrawn and its effectiveness terminated provided that a new Registration Statement is filed within one hundred and eighty (180) days thereafter or may postpone amending or supplementing such Registration Statement, but in no event for more than one hundred and eighty (180) days; provided, however, that if the registration of Common Shares is postponed pursuant to clause (y), the Company shall not be permitted to register under the Securities Act equity securities of the Company owned by other Members of the Company during any such postponement.  The Company shall give written notice of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof. Notwithstanding anything to the contrary contained herein, the Company may not postpone or withdraw a filing under this Section 11.1 more than once in any twelve (12) month period. For the avoidance of doubt, any postponement or withdrawal of a Registration Statement shall not constitute a Demand Registration.

(b)     The Company shall use its reasonable best efforts to cause such Demand Registration to be in the form of a firm commitment underwritten offering and the managing underwriter or underwriter selected for such offering shall be the Company Underwriter. In connection with any Demand Registration under this Section 11 involving an underwritten offering, none of the Common Shares held by the Initiating Member making a request for inclusion of such Common Shares shall be included in such underwritten offering unless the Initiating Member accepts the terms of the offering as agreed upon by the Company and the Company Underwriter, such terms to be in an underwriting agreement in customary form, and then only in such quantity as will not, in the opinion of the Company Underwriter, jeopardize the success of such offering.

(c)     In connection with an Initial Public Offering of the Company, all Members shall and shall cause their owners to take all necessary or desirable actions in connection with the consummation of such transaction to (i) as the Board of Managers may reasonably request (a) to convert the Company to a corporate form in a Tax-free transaction (except to the extent of taxable income or gain required to be recognized by a Member in an amount that does not exceed the amount of cash or any property or rights (other than stock) received by such Member upon the consummation of such transaction and/or any concurrent transaction), (ii) to accomplish the foregoing by effecting a transaction that is treated as the

contribution of the Common Shares of the Company into a newly formed "shell" corporation pursuant to Section 351 of the Code, with the result that each Member shall hold capital stock of such surviving corporation or business entity (the "Successor Corporation"), and (b) to cause the Successor Corporation to assume all of the obligations of the Company under this Article XI. Following the Initial Public Offering, references to Common Shares in this Article XI shall be deemed to mean the shares of common stock of the Successor Corporation that are issued pursuant to this Section 11.1(c). The charter documents shall reflect the capital structure after giving effect to the provisions of this Agreement and shall otherwise be in a form customary for publicly traded companies in, the reasonable judgment of the Board of Managers.

(d)     The Company and the Board of Managers will use their respective best efforts to perform any conversion or restructuring contemplated in Section 11.1(c) in the most Tax efficient manner for the Members, including any Members that are treated as corporations for Federal Income Tax purposes ("Corporation Members").  Upon the unanimous vote of the Board of Managers that such action is necessary to preserve the benefits of "tacking" under Rule 144 of the Securities Act, such conversion or merger may be structured to occur without any action on the part of any Member, and each Member hereby consents in advance to any action that the Board of Managers shall deem necessary to accomplish such result.

(e)     In connection with an Initial Public Offering, all of the outstanding Common Shares of the Company shall automatically convert into shares of common stock of the Successor Corporation (the "Stock") immediately prior to the consummation of the Initial Public Offering or at such other time as the Board of Managers may determine.

(f)     In the event that the Company determines to permit sales of shares of Stock held by Members in connection with an Initial Public Offering, all Members shall have the right to include in such offering a pro rata number of such Member's Shares.

11.2   Piggyback Registration Right.

(a)     Within ten (10) business days following receipt by the Company of a request from an Initiating Member to effect a Demand Registration, the Company shall give written notice of such request to all other Members (the "Non-Initiating Members") which shall describe the anticipated filing date, the proposed registration and distribution, and offer the Non-Initiating Members the opportunity to register their pro rata share of Common Shares (an "Incidental Registration"). Following the receipt of such notice, each Non-Initiating Member shall be entitled, by delivery of a written request to the Company delivered no later than ten (10) business days following receipt of notice from the Company, to include all or any portion of their Common Shares in such Demand Registration (subject to Section 11.4(a)).  The right of each Non-Initiating Member to have Common Shares included in a Demand Registration pursuant to this Section 11.2(a) shall be conditioned upon each Non-Initiating Member entering into (together with the Initiating Member) an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting by the Company (the "Company Underwriter"). The Company shall use its reasonable best efforts (within ten (10) business days of the notice provided for above) to cause the Company Underwriter to permit the Non-Initiating Member to participate in the Incidental Registration to include its Common

Shares in such offering on the same terms and conditions as the Common Shares being sold for the account of the Member requesting the Demand Registration.

(b)     In connection with an offering by the Company or the Successor Corporation for its own account (other than a registration statement on Form S-4 or S-8 or any successor thereto), the Company shall give written notice to all of the Members within ten (10) business days of the proposed offering. Following the receipt of such notice, each Member shall be entitled, by delivery of a written request to the Company delivered no later than ten (10) days following receipt of notice from the Company, to include all or any portion of its Common Shares in such offering (subject to Section 11.4(b)). The right of each Member to have Common Shares included in an offering pursuant to this Section 11.2(b) shall be conditioned (if an underwritten offering) upon each Member entering into (together with the Company) an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting by the Company.  The Company shall use its reasonable best efforts (within ten (10) business days of the notice provided for above) to cause the Company Underwriter to permit the Non-Initiating Member to participate in the Incidental Registration to include its Common Shares in such offering on the same terms and conditions as the Common Shares being sold for the account of the Company.

11.3     Effective Demand Registration.   The Company shall use reasonable commercial efforts to cause any Demand Registration to become effective not later than ninety (90) days after it receives a request under Section 11.1(a) hereof and to remain effective for the lesser of (i) the period during which all Common Shares registered in the Demand Registration are sold and (ii) ninety (90) days, provided, however, that a registration shall not constitute a Demand Registration if (x) after such Demand Registration has become effective, such registration or the related offer, sale or distribution of Common Shares thereunder is interfered with by any stop order, injunction or other order or requirement of the Commission or other Governmental Authority for any reason not solely attributable to the Initiating Member and such interference is not thereafter eliminated or (y) the conditions specified in the underwriting agreement, if any, entered into in connection with such Demand Registration are not satisfied or waived, other than by reason of a failure by the Initiating Member.

11.4     Cutback.

(a)     If the Company Underwriter, in connection with a Demand Registration, shall advise the Company in writing on or before the date five (5) days prior to the date then scheduled for such offering that, in its opinion, the amount of Common Shares requested to be included in such Demand Registration exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Common Shares being offered, then the Company will reduce the Common Shares to be included in such registration pro rata based on the number of Common Shares owned by each such Initiating Member and Non-Initiating Member.

(b)     If the Company Underwriter, in connection with an offering by the Successor Corporation for its own account (other than a registration statement on Form S-4 or S-8 or any successor thereto) shall advise the Company in writing on or before the date five (5) days prior to the date then scheduled for such offering that, in its opinion, the amount of

Common Shares requested to be included in such registration exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Common Shares being offered, then the Company will reduce the Common Shares to be included in such registration pro rata based on the number of Common Shares owned by each such Initiating Member and Non-Initiating Member.

      11.5    <u>Form S-3 Registration</u>.

      (a)    <u>S-3 Registration</u>. Upon the Successor Corporation becoming eligible for use of Form S-3 (or any successor form thereto) under the Securities Act in connection with a public offering of its securities, in the event that the Successor Corporation shall receive from any Member (the "<u>S-3 Initiating Member</u>") a written request that the Successor Corporation register, under the Securities Act on Form S-3 (or any successor form then in effect) (an "<u>S-3 Registration</u>"), all or a portion of the Stock owned by such S-3 Initiating Member, the Successor Corporation shall give written notice of such request to all of the other Members (other than S-3 Initiating Member) at least ten (10) business days before the anticipated filing date of such Form S-3, and such notice shall describe the proposed registration and offer such other Members the opportunity to register the number of shares of Stock as each other Member may request in writing to the Successor Corporation, given within ten (10) business days after their receipt from the Successor Corporation of the written notice of such registration. If requested by the S-3 Initiating Member such S-3 Registration shall be for an offering on a continuous basis pursuant to Rule 415 under the Securities Act. The Successor Corporation shall use its reasonable best efforts to (x) cause such registration pursuant to this <u>Section 11.5(a)</u> to become and remain effective as soon as practicable, but in any event not later than forty-five (45) days after it receives a request therefor and (y) include in such offering the Stock of the other Members (other than S-3 Initiating Member) (the "<u>S-3 Non-Initiating Members</u>") who have requested in writing to participate in such S-3 Registration on the same terms and conditions as the Stock of the S-3 Initiating Member. The right of each S-3 Non-Initiating Member to have Stock included in a S-3 Registration pursuant to this <u>Section 11.5(a)</u> shall be conditioned upon each S-3 Non-Initiating Member entering into (together with the S-3 Initiating Member) an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting by the Successor Corporation (the "<u>S-3 Underwriter</u>").

      (b)    <u>Delay of S-3 Registration</u>. If the Board of Managers has a Valid Business Reason, the Successor Corporation may (x) postpone filing a Registration Statement relating to a S-3 Registration until such Valid Business Reason no longer exists, but in no event for more than ninety (90) days, and (y) in case a Registration Statement has been filed relating to a S-3 Registration, if the Valid Business Reason has not resulted from actions taken by the Successor Corporation, the Successor Corporation, upon the approval of a majority of the Board of Managers acting in good faith, may cause such Registration Statement to be withdrawn and its effectiveness terminated or may postpone amending or supplementing such Registration Statement. The Successor Corporation shall give written notice to the Members of its determination to postpone or withdraw a Registration Statement and of the fact that the Valid Business Reason for such postponement or withdrawal no longer exists, in each case, promptly after the occurrence thereof. Notwithstanding anything to the contrary contained herein, the Successor Corporation may not postpone or withdraw a filing due to a Valid Business Reason more than once in any twelve (12) month period. In addition, the Successor Corporation shall not

be required to effect any registration pursuant to <u>Section 11.1</u>, (i) within ninety (90) days after the effective date of any other Registration Statement of the Successor Corporation, (ii) if within the twelve (12) month period preceding the date of such request, the Successor Corporation has effected two (2) registrations on Form S-3 pursuant to <u>Section 11.5</u>, (iii) if Form S-3 is not available for such offering by the S-3 Initiating Holder or (iv) if the S-3 Initiating Holder, proposes to sell its Stock at an aggregate price to the public of less than [$____].

(c)     <u>Cutback</u>.  If the S-3 Underwriter in connection with any S-3 Registration shall advise the Successor Corporation in writing on or before the date five (5) business days prior to the date then scheduled for such offering that, in its opinion, the amount of Stock requested to be included in such S-3 Registration exceeds the amount which can be sold in such offering without adversely affecting the distribution of the Stock being offered, then the Successor Corporation will reduce the Common Shares to be included in such S-3 Registration pro rata based on the number of shares of Stock owned by each S-3 Initiating Member and the S-3 Non-Initiating Members.

11.6    <u>Holdback Agreements</u>.

(a)     To the extent not inconsistent with applicable law and requested (i) by the Company, the Successor Corporation, the Initiating Member or the S-3 Initiating Member, as the case may be, in the case of a non-underwritten public offering and (ii) by the underwriter, in the case of an underwritten public offering, each Member agrees not to effect any public sale or distribution of any Common Shares or of any securities convertible into or exchangeable or exercisable for such Common Shares, including a sale pursuant to Rule 144 under the Securities Act, or offer to sell, contract to sell (including without limitation any short sale), grant any option to purchase or enter into any hedging or similar transaction with the same economic effect as a sale of Common Shares, in each case, during the one-hundred eighty (180) day period (or such lesser period as the underwriter may agree) beginning on the effective date of the registration statement (except as part of such registration) for such public offering.

(b)     The Company agrees not to effect any public sale or distribution of any of its securities, or any securities convertible into or exchangeable or exercisable for such securities (except pursuant to registrations on Form S-4 or S-8 or any successor thereto), during the period beginning on the effective date of any Registration Statement filed pursuant to <u>Section 11.1</u> in which the Members are participating and ending on the earlier of (i) the date on which all shares of Stock on such registration statement are sold and (ii) one hundred and eighty (180) days (or such lesser period as the underwriter may agree) after the effective date of such registration statement (except as part of such registration).

11.7    <u>Registration Procedures</u>.

(a)     Whenever registration of Registrable Securities has been requested pursuant to <u>Section 11.1</u>, <u>Section 11.2</u> or <u>Section 11.5</u>, the Company or Successor Corporation, as applicable, shall use its reasonable best efforts to effect the registration and sale of such Common Shares or shares of Stock, as applicable, in accordance with the intended method of distribution thereof as quickly as practicable, and in connection with any such request, the Company shall, as expeditiously as possible (as used in this <u>Section 11.7</u>, the term Company

shall also include Successor Corporation and the term Common Shares shall also include Stock, as the case may be):

(i) prepare and file with the Commission a Registration Statement on any form for which the Company then qualifies or which counsel for the Company shall deem appropriate and which form shall be available for the sale of such Common Shares in accordance with the intended method of distribution thereof, and cause such Registration Statement to become effective; provided, however, that (x) before filing a Registration Statement or prospectus or any amendments or supplements thereto, the Company shall provide counsel selected by the Members ("Members' Counsel") with an adequate and appropriate opportunity to review and comment on such Registration Statement and each prospectus included therein (and each amendment or supplement thereto) to be filed with the Commission, subject to such documents being under the Company's control, and (y) the Company shall promptly notify the Members' Counsel and each seller of Common Shares of any stop order issued or threatened by the Commission and promptly take all action required to prevent the entry of such stop order or to remove it if entered;

(ii) prepare and file with the Commission such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for the lesser of (x) one hundred and twenty (120) days and (y) such shorter period which will terminate when all Common Shares covered by such Registration Statement have been sold; provided, however, that if the S-3 Initiating Holder has requested that an S-3 Registration be for an offering on a continuous basis pursuant to Rule 415 under the Securities Act, then the Company shall keep such Registration Statement effective until all Common Shares covered by such Registration Statement have been sold; and shall comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement;

(iii) furnish to each seller of Common Shares, prior to filing a Registration Statement, a reasonable number of copies of such Registration Statement as is proposed to be filed, and thereafter such number of copies of such Registration Statement, each amendment and supplement thereto (in each case including all exhibits thereto), and the prospectus included in such Registration Statement (including each preliminary prospectus) and any prospectus filed under Rule 424 under the Securities Act as each such seller may reasonably request in order to facilitate the disposition of the Common Shares owned by such seller;

(iv) register or qualify such Common Shares under such other securities or "blue sky" laws of such jurisdictions as any seller of Common Shares may request, and to continue such qualification in effect in such jurisdiction for as long as permissible pursuant to the laws of such jurisdiction, or for as long as any such seller requests or until all of such Common Shares are sold, whichever is shortest, and do any and all other acts and things which may be reasonably necessary or advisable to enable

any such seller to consummate the disposition in such jurisdictions of the Common Shares owned by such seller; provided, however, that the Company shall not be required to (x) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 11.7(a)(iv), (y) subject itself to taxation in any such jurisdiction or (z) consent to general service of process in any such jurisdiction;

(v)     notify each seller of Common Shares at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such Registration Statement contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and the Company shall promptly prepare a supplement or amendment to such prospectus and furnish to each seller of Common Shares a reasonable number of copies of such supplement to or an amendment of such prospectus as may be necessary so that, after delivery to the purchasers of such Common Shares, such prospectus shall not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(vi)     enter into and perform customary agreements (including an underwriting agreement in customary form with the Company Underwriter) and take such other actions as are prudent and reasonably required in order to expedite or facilitate the disposition of such Common Shares, including causing its officers to participate in "road shows" and other information meetings organized by the Company Underwriter;

(vii)     upon execution of confidentiality agreements in form and substance reasonably satisfactory to the Company, which shall be consistent with the due diligence and disclosure obligations under securities laws applicable to the Company and the Members, make available at reasonable times for inspection by any managing underwriter participating in any disposition of such Common Shares pursuant to a Registration Statement, Members' Counsel and any attorney, accountant or other agent retained by any managing underwriter, all financial and other records, pertinent corporate documents and properties of the Company and its Subsidiaries (collectively, the "Records") as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the Company's and its Subsidiaries' officers, directors and employees, and the independent public accountants of the Company, to supply all information reasonably requested by any such Person in connection with such Registration Statement;

(viii)     if such sale is pursuant to an underwritten offering, obtain a "cold comfort" letters dated the effective date of the Registration Statement and the date of the closing under the underwriting agreement from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by "cold comfort" letters as Members' Counsel or the managing underwriter reasonably requests;

(ix)    furnish, at the request of any seller of Common Shares on the date such securities are delivered to the underwriters for sale pursuant to such registration or, if such securities are not being sold through underwriters, on the date the Registration Statement with respect to such securities becomes effective, an opinion, dated such date, of counsel representing the Company for the purposes of such registration, addressed to the underwriters, if any, and to the seller making such request, covering such legal matters with respect to the registration in respect of which such opinion is being given as the underwriters, if any, and such seller may reasonably request and are customarily included in such opinions;

(x)    comply with all applicable rules and regulations of the Commission, and make available to its security holders, as soon as reasonably practicable but no later than fifteen (15) months after the effective date of the Registration Statement, an earnings statement covering a period of twelve (12) months beginning after the effective date of the Registration Statement, in a manner which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(xi)    cause all such Common Shares to be listed on each securities exchange on which similar securities issued by the Company are then listed, _provided_ that the applicable listing requirements are satisfied;

(xii)    keep Members' Counsel advised as to the initiation and progress of any registration under Section 11.1, Section 11.2 or Section 11.5 hereunder;

(xiii)    cooperate with each seller of Common Shares and each underwriter participating in the disposition of such Common Shares and their respective counsel in connection with any filings required to be made with the NASD; and

(xiv)    take all other steps reasonably necessary to effect the registration of the Common Shares contemplated hereby.

11.8    _Seller Information_.  The Company may require each seller of Common Shares as to which any registration is being effected to furnish, and such seller shall furnish, to the Company such information regarding the distribution of such securities as the Company may from time to time reasonably request in writing.

11.9    _Notice to Discontinue_.  Each Member agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 11.7(a)(v), such Member shall forthwith discontinue disposition of Common Shares pursuant to the Registration Statement covering such Common Shares until such Members' receipt of the copies of the supplemented or amended prospectus contemplated by Section 11.7(a)(v) and, if so directed by the Company, such Member shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Members' possession, of the prospectus covering such Common Shares which is current at the time of receipt of such notice. If the Company shall give any such notice, the Company shall extend the period during which such Registration Statement shall be maintained effective pursuant to this Agreement (including, without limitation, the period referred to in Section 11.7(a)(ii)) by the number of days during the

period from and including the date of the giving of such notice pursuant to <u>Section 11.7(a)(v)</u> to and including the date when sellers of such Common Shares under such Registration Statement shall have received the copies of the supplemented or amended prospectus contemplated by and meeting the requirements of <u>Section 11.7(a)(v)</u>.

      11.10   <u>Registration Expenses</u>.  The Company shall pay all expenses arising from or incident to its performance of, or compliance with, this Agreement, including, without limitation, (i) Commission, stock exchange and NASD registration and filing fees, (ii) all fees and expenses incurred in complying with securities or "blue sky" laws (including reasonable fees, charges and disbursements of counsel to any underwriter incurred in connection with "blue sky" qualifications of the Common Shares as may be set forth in any underwriting agreement), (iii) all printing, messenger and delivery expenses, (iv) the fees, charges and expenses of counsel to the Company and of its independent public accountants and any other accounting fees, charges and expenses incurred by the Company (including, without limitation, any expenses arising from any "cold comfort" letters or any special audits incident to or required by any registration or qualification) and, in an amount not exceeding $50,000, the reasonable legal fees, charges and expenses of a single counsel to the Members incurred, in the case of a Demand Registration, an Incidental Registration or an S-3 Registration initiated by the Initiating Member, and (v) any liability insurance or other premiums for insurance obtained in connection with any Demand Registration or piggy-back registration thereon, Incidental Registration or S-3 Registration pursuant to the terms of this Agreement, regardless of whether such Registration Statement is declared effective. All of the expenses described in the preceding sentence of this <u>Section 11.10</u> are referred to herein as "<u>Registration Expenses</u>." The holder of Common Shares sold pursuant to a Registration Statement shall bear the expense of any broker's commission or underwriter's discount or commission relating to registration and sale of such Members' Common Shares and, subject to clause (iv) above, shall bear the fees and expenses of their own counsel.

      11.11   <u>Indemnification; Contribution</u>.

      (a)   <u>Indemnification by the Company</u>.  The Company shall indemnify and hold harmless each Member, its partners, directors, officers, Affiliates and each Person who controls (within the meaning of Section 15 of the Securities Act) the Member from and against any and all losses, claims, damages, liabilities and expenses (including reasonable costs of investigation) (each, a "<u>Liability</u>" and collectively, "<u>Liabilities</u>"), arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, under the circumstances such statements were made), except insofar as such Liability arises out of or is based upon any untrue statement or alleged untrue statement or omission or alleged omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning any Member furnished in writing to the Company by such Member expressly for use therein, including, without limitation, the information furnished to the Company pursuant to <u>Section 11.11(a)</u>. The Company shall also provide customary indemnities to any underwriters of the Common Shares, their officers, directors and employees and each

E-38

Person who controls such underwriters (within the meaning of Section 15 of the Securities Act) to the same extent as provided above with respect to the indemnification of the Members.

(b)     Indemnification by the Members.  In connection with any Registration Statement in which any Member is participating pursuant to Section 11.1, Section 11.1 or Section 11.5 hereof, each Member shall promptly furnish to the Company in writing such information with respect to such Member as the Company may reasonably request or as may be required by law for use in connection with any such Registration Statement or prospectus and all information required to be disclosed in order to make the information previously furnished to the Company by such Member not materially misleading or necessary to cause such Registration Statement not to omit a material fact with respect to such Member necessary in order to make the statements therein not misleading. Each Member agrees to indemnify and hold harmless the Company, its partners, directors, officers, Affiliates, any underwriter retained by the Company and each Person who controls the Company or such underwriter (within the meaning of Section 15 of the Securities Act) from and against any and all Liabilities arising out of or based upon any untrue, or allegedly untrue, statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus (as amended or supplemented if the Company shall have furnished any amendments or supplements thereto) or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, under the circumstances such statements were made), but if and only to the extent that such Liability arises out of or is based upon any untrue statement or alleged omission or alleged untrue statement or omission contained in such Registration Statement, preliminary prospectus or final prospectus in reliance and in conformity with information concerning such Member furnished in writing by such Member expressly for use therein, provided, however, that the total amount to be indemnified by each Member pursuant to this Section 11.11(b) shall be limited to such Members' pro rata portion of the net proceeds (after deducting the underwriters' discounts and commissions) received by such Member in the offering to which the Registration Statement or prospectus relates.

(c)     Conduct of Indemnification Proceedings.   Any Person entitled to indemnification under this Section 11.11 (the "Indemnified Party") agrees to give prompt written notice to the indemnifying party (the "Indemnifying Party") after the receipt by the Indemnified Party of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which the Indemnified Party intends to claim indemnification or contribution pursuant to this Agreement; provided, however, that the failure so to notify the Indemnifying Party shall not relieve the Indemnifying Party of any Liability that it may have to the Indemnified Party hereunder (except to the extent that the Indemnifying Party is prejudiced or otherwise forfeits substantive rights or defenses by reason of such failure). If notice of commencement of any such action is given to the Indemnifying Party as above provided, the Indemnifying Party shall be entitled to participate in and, to the extent it may wish, jointly with any other Indemnifying Party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and reasonably satisfactory to such Indemnified Party. The Indemnified Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel shall be paid by the Indemnified Party unless (i) the Indemnifying Party agrees to pay the same, (ii) the Indemnifying Party fails to assume the defense of such action with counsel reasonably

satisfactory to the Indemnified Party or (iii) the named parties to any such action (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and the Indemnified Party has been advised by such counsel that either (x) representation of such Indemnified Party and the Indemnifying Party by the same counsel would be inappropriate under applicable standards of professional conduct or (y) there may be one or more legal defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party. In any of such cases, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all Indemnified Parties. No Indemnifying Party shall be liable for any settlement entered into without its written consent. No Indemnifying Party shall, without the consent of such Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Party is a party and indemnity has been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability for claims that are the subject matter of such proceeding.

(d)     Contribution.  If the indemnification provided for in this Section 11.11(d) from the Indemnifying Party is unavailable to an Indemnified Party hereunder in respect of any Liabilities referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions which resulted in such Liabilities, as well as any other relevant equitable considerations. The relative faults of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action.  The amount paid or payable by a party as a result of the Liabilities referred to above shall be deemed to include, subject to the limitations set forth in Sections 11.11(a), 11.11(b) and 11.11(c), any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding; provided, however, that the total amount to be contributed by any Member shall be limited to the net proceeds (after deducting the underwriters' discounts and commissions) received by the Member in the offering.

(e)     Fraud.  The parties hereto agree that it would not be just and equitable if contribution pursuant to Section 11.11(d) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

## ARTICLE XII
## DISSOLUTION OF COMPANY;
## LIQUIDATION AND DISTRIBUTION OF ASSETS

12.1    Events of Dissolution. This Section 12.1 sets forth the exclusive events which will cause the dissolution of the Company. The provisions of Section 18-801 of the Act that apply unless the limited liability company agreement otherwise provides shall not become operative. The Company shall be dissolved upon any of the following events (each, an "Event of Dissolution"):

(a)    The Board of Managers shall elect to dissolve the Company; or

(b)    the entry of a decree of judicial dissolution under Section 18-802 of the Act.

12.2    Liquidation; Winding Up.   Upon the occurrence of an Event of Dissolution, the Board of Managers shall wind up the affairs of the Company in accordance with the Act and shall supervise the liquidation of the assets and property of the Company and, except as hereinafter provided, shall have full, complete and absolute discretion in the mode, method, manner and timing of effecting such liquidation. The Board of Managers shall have absolute discretion in determining whether to sell or otherwise dispose of Company assets or to distribute the same in kind. The Board of Managers shall liquidate and wind up the affairs of the Company as follows:

(a)    The Board of Managers shall prepare (or cause to be prepared) a balance sheet of the Company in accordance with GAAP as of the date of dissolution.

(b)    The assets, properties and business of the Company shall be liquidated by the Board of Managers in an orderly and businesslike manner so as not to involve undue sacrifice. Notwithstanding the foregoing, if it is determined by the Board of Managers not to sell all or any portion of the properties and assets of the Company, such properties and assets shall be distributed in kind in the order of priority set forth in subsection (d); provided, however, that the fair market value of such properties and assets (as determined by the Board of Managers in good faith, which determination shall be binding and conclusive) shall be used in determining the extent and amount of a distribution in kind of such properties and assets in lieu of actual cash proceeds of any sale or other disposition thereof.

(c)    The proceeds of the sale of all or substantially all of the properties and assets of the Company and all other properties and assets of the Company not sold, as provided in subsection (b) above, and valued at the fair market value thereof as provided in such subsection (b), shall be applied and distributed in one or more installments as follows, and in the following order of priority:

First, to the payment of all debts and liabilities of the Company and the expenses of liquidation not otherwise adequately provided for and the setting up of any reserves that are reasonably necessary for any contingent, conditional or unmatured liabilities or obligations of the Company or of the Members arising out of, or in connection with, the Company; and

Ex. 4 p. 98

<u>Second</u>, the remaining proceeds to the Members in accordance with the applicable provisions of <u>Section 3.4</u>.

      (d)    A certificate of cancellation, as required by the Act, shall be filed by the Board of Managers.

      12.3    <u>Survival of Rights, Duties and Obligations</u>. Termination, dissolution, liquidation or winding up of the Company for any reason shall not release any party from liability which at the time of such termination, dissolution, liquidation or winding up already had accrued to any other party or which thereafter may accrue with respect to any act or omission prior to such termination, dissolution, liquidation or winding up.

      12.4    <u>Claims of the Members</u>.  Members and former Members shall look solely to the Company's assets for the return of their contributions to the Company, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such contributions, the Members and former Members shall have no recourse against the Company or any other Member.

**ARTICLE XIII**
**MISCELLANEOUS**

      13.1    <u>Expenses</u>.  The Company shall bear all of the expenses incurred by the Company in connection with the preparation, execution and performance of this Agreement and, the transactions contemplated hereby, including, without limitation, all fees and expenses of agents, counsel and accountants.

      13.2    <u>Further Assurances</u>.  Each party to this Agreement agrees to execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and to do all such other acts and things, as may be required by law or as, in the opinion of the Board of Managers, may be necessary or advisable to carry out the intent and purposes of this Agreement.

      13.3    <u>Notices</u>.  Any notice or other communication required or permitted to be given hereunder shall be in writing, and shall be deemed given and received (a) when transmitted by facsimile or electronic mail or personally delivered on a business day during normal business hours, (b) on the business day following the date of dispatch by overnight courier or (c) on the third business day following the date of mailing by registered or certified mail, return receipt requested, in each case addressed to the Company or the Board of Managers at the address of the principal office of the Company set forth in <u>Section 2.5</u>, or to a Member at such Members' address shown on <u>Schedule 3.1</u>, or in any such case to such other address as the Company or any party hereto shall have last designated to the Company and the Members by notice given in accordance with this <u>Section 13.3</u>.  No notices under <u>Section 10.3</u>, <u>10.4</u>, <u>10.5</u> or <u>10.9</u> may be given by mail pursuant to clause (c) above.

      13.4    <u>Amendments</u>.  Except as otherwise expressly provided herein, this Agreement and the Certificate of Formation may only be modified, amended or restated, and provisions hereof may be waived, by an instrument in writing duly executed and delivered by Members holding at least a majority of the then outstanding Common Shares; <u>provided</u>,

however, that (a) Sections 3.2, 6.3, 6.4, 6.10, 7.11, 8.5, 9.1(c)-(e) and (h), 10.3, 10.4, 10.5, 10.9, 10.1(b), 11.1, 11.2 and 13.4(a) may not be amended, modified, restated or waived without the consent of a majority in interest of the Fortress Members, (b) any amendment, modification or waiver that would adversely affect in any respect the rights or obligations of any Member without similarly affecting the rights or obligations hereunder of all holders of the same class of Shares, shall not be effective as to such Member without such Member's prior written consent, unless such amendment, modification or waiver has been approved by Members holding (i) [if the transactions described in Section 3.1(a) were consummated as part of an out-of-court restructuring, 90% of the then outstanding Common Shares], or (ii) [if the transactions described in Section 3.1(a) were consummated as part of an in-court restructuring, 95% of the then outstanding Common Shares, as applicable, in which case no additional consent shall be required]; and (c) the Company shall automatically amend Schedule 3.1 hereto without the consent of the Members and distribute such amended Schedule 3.1 to each of the Members upon any change in any Member's information thereon.  Any waiver of any provision of this Agreement requested by any party hereto must be in writing by the party granting such waiver.

13.5    Severability.  Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the Act or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

13.6    Headings and Captions.  All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement. The Annexes are considered a part of this Agreement.

13.7    Counterparts.  This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same agreement.  Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

13.8    GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

13.9    Entire Agreement; Non-Waiver.  This Agreement supersedes all prior agreements between the parties with respect to the subject matter hereof and contains the entire agreement between the parties with respect to such subject matter.  No delay on the part of any party in exercising any right hereunder shall operate as a waiver thereof, nor shall any waiver, express or implied, by any party of any right hereunder or of any failure to perform or breach hereof by any other party constitute or be deemed a waiver of any other right hereunder or of any

other failure to perform or breach hereof by the same or any other Member, whether of a similar or dissimilar nature.

13.10   No Third Party Beneficiaries.  Nothing contained in this Agreement (other than the provisions of Article VIII hereof), express or implied, is intended to or shall confer upon anyone other than the parties (and their successors and permitted assigns) and the Company any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

13.11   No Right to Partition.  The Members, on behalf of themselves and their successors and assigns, if any, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Company or any asset of the Company, or any Share which is considered to be Company property, regardless of the manner in which title to such property may be held.

13.12   Investment Representation and Indemnity.  Each Member, by execution of this Agreement, (a) represents to each other Member and to the Company that such Member is acquiring a Share in the Company for the purpose of investment for such Members' own account, with the intent of holding such Share for investment and without the intent of participating directly or indirectly in any sale or distribution thereof in a manner that would violate the Securities Act, (b) acknowledges that such Member must bear the economic risk of loss of such Members' capital contributions to the Company because this Agreement contains substantial restrictions on Transfer and because the Shares in the Company have not been registered under applicable United States federal and state securities laws (it being understood that the Company shall be under no obligation so to register such Shares in the Company) and cannot be Transferred unless registered under such securities laws or an exemption therefrom is available, and (c) agrees to indemnify each other Member and the Company from any loss, damage, liability, claims and expenses (including reasonable attorneys' fees and expenses) incurred, suffered or sustained by any of them as a result of the inaccuracy of any representation contained in this Section 13.12.

13.13   Confidentiality.

(a)   Except as and to the extent as may be required by applicable law, without the prior written consent of the Board of Managers, the Members shall not make, and shall direct its officers, directors, agents, employees and other representatives not to make, directly or indirectly, any public comment, statement, or communication with respect to, or otherwise disclose or permit the disclosure of Confidential Information or any of the terms, conditions, or other aspects of this Agreement; provided, however, that the Members and their respective equity owners may disclose Confidential Information (i) to the extent required under any agreement between the Members or their respective equity owners and their respective investors, limited partners or other similar Persons of the Members and their respective equity owners, as applicable who are subject to obligations of confidentiality and in confidential materials delivered to prospective investors, limited partners or other similar Persons of the Members and their respective equity owners, as applicable who are subject to obligations of confidentiality; provided, however, that the Members will use commercially reasonable best efforts to, or cause their respective equity owners, to, enforce their respective rights in connection with a breach of

such confidentiality obligations by any Person receiving Confidential Information pursuant to this clause (i), and (ii) to a bona fide potential purchaser of Shares held by such Member if such bona fide potential purchaser executes a confidentiality agreement with such Member containing terms at least as protective as the terms set forth in this Section 13.13 and which, among other things, provides for third-party beneficiary rights in favor of the Company to enforce the terms thereof.  As used herein, "Confidential Information" means all information, knowledge, systems or data relating to the business, operations, finances, policies, strategies, intentions or inventions of the Company (including any of the terms of this Agreement and any information provided pursuant to Article IX) from whatever source obtained, except for any such information, knowledge, systems or data which at the time of disclosure was in the public domain or otherwise in the possession of the disclosing Person unless such information, knowledge, systems or data was placed into the public domain or became known to such disclosing Person in violation of any non-disclosure obligation, including this Section 13.13.  Each Member agrees that money damages would not be a sufficient remedy for any breach of this Section 13.13 by a Member, and that in addition to all other remedies, the Company shall be entitled to injunctive or other equitable relief as a remedy for any such breach.  Each Member agrees not to oppose the granting of such relief and agrees to waive any requirement for the securing or posting of any bond in connection with such remedy.

(b)     If any Member is required by applicable law to disclose any Confidential Information, it must first provide notice reasonably in advance to the Company with respect to the content of the proposed disclosure, the reasons that such disclosure is required by law and the time and place that the disclosure will be made.  Such Member shall cooperate with the Company to obtain confidentiality agreements or arrangements with respect to any legally mandated disclosure and in any event shall disclose only such information as is required by applicable law when required to do so.

(c)     Each Member shall indemnify each other Member and the Company for any loss, damage, liability, claims and expenses (including reasonable attorneys' fees and expenses) incurred, suffered or sustained by any of them as a result of any breach by such Member of this Section 13.13.

*  *  *  *  *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the date first above written.

MEMBERS:

[_____]


By: _____
    Name:
    Title:

**Schedule 3.1A**
**(dated _____ __, 2011)**

| | Addresses | Capital Contribution | Common Shares | Common Share Percentage |
|---|---|---|---|---|
| [ ] | [ ] | $[ ] | [ ] | [ ]% |
| [ ] | [ ] | $[ ] | [ ] | [ ]% |
| Total | | $[ ] | 0.00 | 0.00% |

EXHIBIT B

DRAFT

[FORM OF OPINION]

212-373-3000

212-757-3990

[_____], 2012

[Purchaser]

Ladies and Gentlemen:

We have acted as special counsel to QCE Finance LLC, a Delaware

limited liability company (the "Company"), in connection with the Subscription

Agreement (the "Subscription Agreement"), dated as of December [__], 2011, among the

Purchasers set forth on the signature pages thereof (the "Purchasers") and the Company,

relating to the subscription for common shares of the Company by the Purchasers (the

"Common Shares").  This opinion is being furnished at the request of the Company as

contemplated by Section 4(a)(xv) of the Subscription Agreement.  Capitalized terms used

**IRS Circular 230 disclosure**: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this document is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter that is contained in this document.

and not otherwise defined in this letter have the respective meanings given those terms in the Subscription Agreement.

In connection with the furnishing of this opinion, we have examined originals, or copies certified or otherwise identified to our satisfaction, of the following documents:

1.      the Subscription Agreement;

2.      the Restructuring Support Agreement, dated as of [_____], 2011 among the Company and the Participating Lenders (as defined therein) (the "Restructuring Support Agreement"); and

3.      the Amended and Restated Limited Liability Company Agreement of QCE Finance LLC, dated as of [_____], (the "Operating Agreement").

In addition, we have examined:  (i) such limited liability company records of the Company that we have considered appropriate, including a copy of the limited liability company agreement and certificate of formation, as amended, of the Company certified by the Company as in effect on the date of this letter (collectively, the "Charter Documents") and copies of resolutions of the board of managers of the Company certified by the Company; and (ii) such other certificates, agreements and documents as we deemed relevant and necessary as a basis for the opinions and beliefs expressed below.  We have also relied upon oral and written statements of officers and representatives of the Company, the factual matters contained in the representations and warranties of the Company made in the Subscription Agreement and upon certificates of public officials and the officers of the Company.

In our examination of the documents referred to above, we have assumed, without independent investigation, the genuineness of all signatures, the legal capacity of

**Ex. 4 p. 107**

all individuals who have executed any of the documents reviewed by us, the authenticity of all documents submitted to us as originals, the conformity to the originals of all documents submitted to us as certified, photostatic, reproduced or conformed copies of valid existing agreements or other documents, the authenticity of the latter documents and that the statements regarding matters of fact in the certificates, records, agreements, instruments and documents that we have examined are accurate and complete.  We have also assumed, without independent investigation, the enforceability of the Subscription Agreement against each party other than the Company.

Whenever we indicate that our opinion is based upon our knowledge or words of similar import, our opinion is based solely on the actual knowledge of the attorneys in this firm who are representing the Company in connection with the Subscription Agreement and without any independent verification.

Based upon the above, and subject to the stated assumptions, exceptions and qualifications, we are of the opinion that:

1.      The Company and each of the subsidiaries of the Company listed on Schedule I hereto (the "Delaware Subsidiaries") is validly existing and in good standing under the laws of the State of Delaware.  Solely on the basis of good standing certificates in respect of each of the subsidiaries listed on Schedule II hereto (the "Non-Delaware Subsidiaries"), dated as of the date hereof, each of the Non-Delaware Subsidiaries  is in good standing under the laws of its jurisdiction of organization.

2.      The Company has all necessary limited liability company power and authority to execute, deliver and perform its obligations under the Subscription Agreement and the Restructuring Support Agreement.

[Purchaser]                                                                                          4

        3.      Each of the Subscription Agreement and the Restructuring Support Agreement has been duly authorized, executed and delivered by the Company.  Each of the Subscription Agreement and the Restructuring Support Agreement is a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms, except that the enforceability of such agreements may be subject to bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or similar laws affecting creditors' rights generally and subject to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law) and except to the extent that the indemnification provisions of the Subscription Agreement may be unenforceable.

        4.      The execution and delivery of the Subscription Agreement and the Restructuring Support Agreement by the Company and the performance of its obligations thereunder will not (i) result in a violation of the Charter Documents, (ii) violate any Covered Law, (iii) violate any order, writ, injunction or decree of which we have knowledge of any court or governmental authority binding upon the Company or to which the Company is subject, or (iv) breach or result in a default under any agreement, indenture or instrument listed on Schedule III to this opinion to which the Company is a party or by which the Company is bound.   For purposes of this letter, the term "Covered Law" means the Limited Liability Company Act of the State of Delaware (the "DLLCA") and those laws, rules and regulations of the United States of America and the State of New York, in each case which in our experience are normally applicable to the transactions of the type contemplated by the Subscription Agreement and the Restructuring Support Agreement (other than the United States federal securities laws,

**Ex. 4 p. 109**

[Purchaser]                                                                                      5

any state securities or Blue Sky laws of the various states and anti-fraud laws) but without us having made any special investigation as to applicability of any specific rule or regulation.

      5.      Except for filings, authorizations or approvals as are specifically provided for in the Subscription Agreement or the Restructuring Support Agreement, no authorizations or approvals of, and no filings with, any governmental authority are necessary under any Covered Law for the execution or delivery or the performance by the Company of its obligations under the Subscription Agreement or the Restructuring Support Agreement.  For purposes of this opinion, the term "governmental authority" means any executive, legislative, judicial, administrative or regulatory body of the State of New York, the State of Delaware or the United States of America.

      6.      The Common Shares have been duly authorized by all necessary limited liability company action on the part of the Company and are validly issued. When issued and delivered pursuant to the terms of the Subscription Agreement, (a) the Purchasers will have been duly admitted as members of the Company and (b) the Purchasers will have no obligation under the DLLCA to make further payments to the Company for the purchase of the Common Shares or contributions to the Company solely by reason of their ownership of the Common Shares or their status as members of the Company, except as provided in the Operating Agreement or the Subscription Agreement.  For the purposes of the opinion expressed in (a) above, we have assumed that the conditions for admission of members to the Company have been satisfied by each Purchaser.

[Purchaser]                                                                                                6

7.      Based upon the representations, warranties and agreements of the Company in Section 3(a) of the Subscription Agreement and the representations, warranties and agreements of each Purchaser in Section 3(b) of the Subscription Agreement, it is not necessary in connection with the offer, sale and delivery of the Common Shares to the Purchasers under the Subscription Agreement to register the Common Shares under the Securities Act, it being understood that we express no opinion as to any subsequent resale of the Common Shares.

8.      The Company is not and, after giving effect to the offering and sale of the Common Shares, will not be required to be registered as an investment company under the Investment Company Act of 1940, as amended.

The opinions expressed above are limited to the laws of the State of New York, the DLLCA and the federal laws of the United States of America.  Our opinions are rendered only with respect to the laws, and the rules, regulations and orders under those laws, that are currently in effect.

This letter is furnished by us solely for your benefit in connection with the transactions referred to in the Subscription Agreement and may not be circulated to, or relied upon by, any other person.

Very truly yours,


PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Schedule I

Delaware Subsidiaries

1. American Food Distributors LLC

2. Continental Lending Group LLC

3. QAFT, Inc.

4. QCE LLC

5. QFA Royalties LLC

6. QIP Holder LLC

7. Quiz-CAN LLC

8. Quiz-DIA LLC

9. Quizmark LLC

10. Quizno's Canada Holding LLC

11. Restaurant Realty LLC

12. The Quizno's Master LLC

13. The Quizno's Operating Company LLC

14. The Quizno's Realty Company LLC

<u>Schedule II</u>

<u>Non-Delaware Subsidiaries</u>

1.  Canada Food Distribution Company

2.  QCE Gift Card LLC

3.  Quizno's Canada Advertising Fund Inc.

4.  Quizno's Canada Restaurant Corporation

5.  Quizno's Canada Real Estate Corporation

6.  Quizno's Singapore Pte Ltd.

7.  Seattle Area Directorship II LLC

8.  TQSC II LLC

<u>Schedule III</u>

<u>Agreements</u>

1. Amended and Restated First Lien Credit Agreement, dated as of [_____], 2012, among QCE LLC, as borrower, the Company, the lenders party thereto, Goldman Sachs Credit Partners L.P., as administrative agent, Deutsche Bank Securities Inc., as syndication agent and Credit Suisse Securities (USA) LLC, Wachovia Bank, N.A. and BNP Paribas Securities Corp., as co-documentation agents.

2. Second Lien Credit Agreement, dated as of [_____], 2012, among QCE LLC, as borrower, the Company, the lenders party thereto, [_____], as administrative agent, Goldman Sachs Credit Partners L.P., as syndication agent and Credit Suisse Securities (USA) LLC and BNP Paribas Securities Corp., as co-documentation agents.

3. Amended and Restated Marketing Fund Trust Credit Agreement, dated as of [_____], among QAFT, Inc., solely in its capacity as trustee for The Regional Advertising Program Trust and The National Marketing Fund Trust, as borrowers, the lenders party thereto, and Vectra Bank Colorado, National Association, as administrative agent.

4. Form of QFA Royalties LLC Franchise Agreement, as amended.

5. Employment Agreement, effective as of October 1, 2010, and as amended, between QCE LLC and Greg MacDonald.

6. Employment Agreement, dated as of October 29, 2010, between QCE LLC and Jason Robson.

7. Employment Agreement, dated as of January 25, 2010, with an effective date of October 19, 2009, between QCE LLC and Dennis Smythe.

8. Employment Agreement, dated as of [_____], between QCE LLC and Michael Roper.

9. Employment Agreement, dated as of [_____], between QCE LLC and Ali Vala.

10. First Amended Employment Agreement, effective May 24, 2011, as amended, between QCE LLC and Courtney Seely.

11. Retention Agreement dated June 6, 2011 between QCE LLC and Michael Roper.

12. Retention Agreement dated June 6, 2011 between QCE LLC and Brian Belmont.

13. Retention Agreement dated June 6, 2011 between QCE LLC and Ali Vala.

**Ex. 4 p. 114**

14. Retention Agreement dated June 6, 2011 between QCE LLC and George Jeffrey.

15. Retention Agreement dated June 6, 2011 between QCE LLC and Tim Riggle.

16. Separation and Release Agreement between Curtis Bourg and QCE LLC and its affiliates, signed March 3, 2011.

17. First Amendment to Employment Agreement, dated as of July 21, 2011, by and between QCE LLC and Andy Pillari.

18. Separation and Release Agreement between Allyn Taylor and QCE LLC and its affiliates, dated August 15, 2011.

19. Office Lease Agreement, dated as of December 27, 2007, by and between MG-1005, LLC and QCE LLC, as amended.

EXHIBIT C

See Plan of Reorganization

EXHIBIT D

Reserved

EXHIBIT E

See Amended First Lien Facility and
New Second Lien Facility