# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| Avenue Capital Management II, L.P. et al., | § | Case No. 1:14-cv-02031-PAB-KLM |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| Richard F. Schaden, et al., | § | |
| Defendants. | § | JUDGE PHILIP A. BRIMMER |

## PLAINTIFFS' RESPONSE TO MANAGER DEFENDANTS' MOTION TO DISMISS (CM-ECF #27) COMPLAINT

## INTRODUCTION

The Manager Defendants' Motion to Dismiss Complaint (CM-ECF #27) ("Motion") fails. **First**, contrary to Defendants' argument, the Assignment, Assumption and Release Agreement ("AARA") between the parties does not release, but rather explicitly excludes, claims based on unlawful acts such as those alleged in the Complaint. Federal securities and applicable state law also prohibit the waiver or release of the alleged wrongful conduct. **Second**, Defendants' challenge to the Section 20(a) claims fail because Plaintiffs have pled specific facts detailing how the Defendants exerted control over the Officer Defendants and orchestrated the conspiracy designed to induce the Plaintiffs to enter into the transaction at issue. **Third**, the Complaint states a claim for aiding and abetting liability because it adequately alleges how the Defendants had actual knowledge of the fraud and provided substantial assistance to enable the fraud. **Fourth**, Plaintiffs state a claim for civil conspiracy by alleging that Defendants entered into an agreement to conceal and misrepresent Quiznos' financial projections and other material information in connection with the transaction.

1

## FACTUAL BACKGROUND

Quiznos, one of the world's largest restaurant franchisors, is headquartered in Denver, Colorado.  Compl. ¶¶ 46-47.[1]  Although Quiznos was once public, in 2001, the Company went private and reverted to the control of its founders, Defendants Richard F. Schaden ("Rick Schaden") and his son Richard E. Schaden ("Richard Schaden").  *Id.* ¶ 47.  In 2006, the Schadens sold a portion of their interest in Quiznos for $585 million and Quiznos entered into a $650 million loan facility, a $225 million loan facility, and a $75 million revolver.  *Id.* ¶ 51.

Quiznos' performance declined over time from 5,200 to 2,000 franchisee locations from 2007 to 2011, and EBITDA declined from $184 million to $99 million.  *Id.* ¶ 54.  These declines caused the Company to violate loan covenants and, in August 2011, the Company began discussing an alternative transaction.  *Id.* ¶¶ 56-61.  A transaction with Plaintiffs occurred in January 2012 with the execution of: (1) the Offering Memorandum; (2) the Restructuring Support Agreement; and (3) the Subscription Agreement ("Transaction").  *Id.* ¶ 68.  The parties concurrently entered into the AARA.  Garrett Decl. Ex. 5.  Plaintiffs invested $150 million and restructured debt obligations, including debt forgiveness (which collectively consisted of $215 million first lien debt and $162 million second lien debt) and received a 70% ownership in the post-transaction entity.  Compl. ¶¶ 15, 69-77.

Unbeknownst to Plaintiffs, Defendants, with the Officer Defendants, conspired to defraud Plaintiffs by knowingly concealing, misrepresenting, and artificially inflating present facts and projected gross profits, cash flow, future store counts, average unit volume, franchisee royalties,

---

[1] QCE Holding LLC was the parent entity in the Quiznos structure and its Board controlled all Quiznos entities, which had nearly the same officers.  Compl. ¶ 16-18.

and related metrics. *Id.* ¶¶ 1, 66-77, 81, 83-91, 137. Defendants knowingly used false statements and misleading financial projections to give the false impression that, after the Transaction, Quiznos could and would service its debt obligations and sustain its new capital structure. *Id.* ¶¶ 2-8. Defendants' fraud, however, was revealed with two-year variances that signaled the depth of the fraudulent scheme including: (1) ending store count down 22.2%; (2) store openings down 68%; (3) store closings up 90%; (4) total revenue down 33.9%; and (5) average unit volume down 14.2%. *Id.* ¶ 153.

### *The Schadens*

The strategic direction and guidance of the Company was dictated by its founders Rick Schaden and Richard Schaden, who were also the pre-Transaction majority owners and Board Members of Quiznos. *Id.* ¶¶ 27-29. The Schadens' control over the Quiznos entities and certain other Defendants was demonstrated by, inter alia, (i) their indirectly-held majority equity ownership in QCE Holding's LLC interests (through several entities, including Consumer Capital Partners ("CCP"), QCE Finance and Cervantes Master LLC); (ii) their close relationships with the other Manager Defendants (described below); (iii) and their manipulative consultation with the Officer Defendants about the Transaction. *Id.* ¶¶ 33-40. While Rick Schaden purported to resign from the Board before the Transaction, he and the other Manager Defendants had significant influence and control over the Officer Defendants and the misrepresentations and omissions in the transaction documents. Id. ¶¶ 35-41, 61-65, 185-86. Plaintiffs allege that the Schadens were aware of and approved the fraud. Id. ¶¶ 62-63, 80, 87-89, 91-92, 185-86. Evidence also exists that Rick Schaden was involved in pressuring management to use

excessively aggressive and misleading projections, and even after his so-called resignation from the Board, consulted with the Officer Defendants regarding the Transaction and to ensure the use of the false projections. *Id.* ¶¶ 62-63, 87-89, 91-92. Rick Schaden was described by another Board member as having an ulterior "agenda." *Id.* ¶ 89.

### *Consumer Capital Partners*

The Schadens and other Defendants used CCP to exercise their control. *Id.* ¶ 21. Rick Schaden is the founder and Chairman of CCP and Richard Schaden is a founding partner of CCP. *Id.* The Schadens handpicked Quiznos Board members from within CCP. *Id.* ¶ 35. QCE Finance and Cervantes Master LLC were subsidiaries and/or affiliates of CCP that had majority control over QCE Holding. *Id.* ¶¶ 16-20. Defendant and former Quiznos CFO Smythe also was CCP's Vice President of Investments and actively "manag[ed] the firm's liquid portfolio" and provided "financial oversight of the firm's majority ownership of Quiznos." *Id.* ¶ 23. Smythe also believed that his continued and future employment with CCP hinged on the success of the Transaction, and, indeed, he continued to work at CCP after the Transaction. *Id.* ¶¶ 23, 161.

### *The Other Manager Defendants*

Other pre-Transaction members of the Board of Directors and Schaden loyalists included Fred Schaden, Andrew Lee, Patrick Meyers, John Moore, and Thomas Ryan.[2] Compl. ¶¶ 30-40.

---

[2] Andrew Lee has been in-house counsel to RFS Investments, LLC ("RFS Investments"), a private holding company owned by Richard Schaden since 2006. Compl. ¶ 36.

Patrick Meyers held, during the relevant time period, the following positions: Executive Vice President of QCE Holding, Cervantes Master LLC, and QCE Finance. In fact, he signed QCE Holding's most recent LLC agreement on behalf of the latter two entities. Meyers is also a longtime college friend of Rick Schaden. According to CCP's website, "in 1997 [Meyers] started the general counsel's office at Quiznos, and subsequently became a minority owner of the

These other Manager Defendants were drawn from CCP's ranks and placed on the QCE

Holdings' Board at the Schadens' specific direction. *Id.* ¶ 35.

### *Additional Allegations of Defendants' Control of the Officer Defendants and Transaction*

As set forth in the Complaint, the control exerted by each of the Defendants is evidenced,

in part, by the following:

- During 2011, each Defendant was intimately involved with the Transaction and, despite knowing of the false projections used, exercised control over the Company's affairs, including, for example: (a) By resolution of June 15, 2011, the Board (i) approved the creation of a Special Committee, chaired by Rick Schaden and including Meyers (and later Lee and Moore), to consider options such as the Transaction; and (ii) approved the engagement of advisors and lawyers; (b) Considering proposals with respect to restructuring the Company's business, including at Board meetings held on August 19, September 14, and October 12, 2011, which also were attended by Smythe and MacDonald, who briefed the Board on the Company's current and projected future results. *Id.* ¶141.

- Each Defendant remaining on the Board "determined [that] it was in the best interests of the Company to proceed with [the] restructuring" (*i.e.*, the Transaction), and "approved the resolutions" attached to the December 21, 2011 Board minutes, which expressly approved "the form, terms and provisions of, and the transactions contemplated by" the Offering Memorandum, the Subscription Agreement, and the Restructuring Support Agreement. *Id.*

- They had "ultimate direct authority over the Quiznos entities and certain other Defendants vis-à-vis their positions at QCE Holding, their intimate involvement in and approval of the Transaction, their involvement with the Transaction-related documents that included material

---

company. [He] served at various times as the head of Quiznos legal, finance, administration, information technology and human resources departments." Meyers presently is the Chief Legal Officer, Managing Director and a Partner of CCP. *Id.* ¶ 37.

John Moore served as CCP's Executive Vice President and General Counsel and previously "was a Senior Vice President and Special Counsel for Quiznos, and responsible for all commercial transactions, corporate finance, and tax matters there. In this capacity, he was involved in the negotiation and structuring of more than two billion dollars in transaction value over a four year period." *Id.* ¶ 38.

Thomas Ryan was CCP's Managing Partner and Chief Concept Officer and previously "was the President of the Ventures group, Chief Marketing Officer, and Branding Officer at Quiznos." *Id.* ¶ 39.

misstatements and omissions, and their indirect authority over Quiznos and certain other Defendants vis-à-vis their positions at CCP and relationships with the Schadens." *Id.* ¶ 40.

- They were aware of and approved of the Officer Defendants' intent to increase prices on franchisees to increase revenue and meet the short-term targets that had been represented to the Investor Plaintiffs, but fraudulently hid the known effect of such actions. *Id.* ¶ 135.

- Each Defendant knew that internal projections differed from the projections shared with Plaintiffs, which Defendants knew were false. *Id.* ¶¶ 138, 148-149.

- Board members Lee, Meyers, Moore, Ryan, and Fred Schaden were informed by the Officer Defendants in November 2011 of the gap between internal projections and projections shared with Plaintiffs, but kept these statements, which they knew were false, hidden in order to consummate the Transaction under false pretenses. *Id.* ¶ 139.

In addition, Meyers and the Officer Defendants, Smythe, and MacDonald, exchanged emails with Quiznos employees about ideas for manipulating projected EBITDA. *Id.* ¶ 83. Certain non-defendant, minority Board members accused Meyers of including misstatements and misrepresentations in draft projections designed to be (and indeed later) shared externally to the Plaintiffs. *Id.* ¶ 89. These minority Board members also asked if Meyers and Rick Schaden (whose "behavior" with respect to Quiznos was described by one minority Board member as "increasingly not rational") had some ulterior "agenda" in pushing excessively aggressive and misleading projections. *Id.* Another Board member directly asserted that Meyers was in violation of his duties as Board member. *Id.* In fact, Meyers sanctioned the use of false inputs for the projections and noted that such projections could be used "as a matter of strategy in dealing with the creditors." *Id.* ¶¶ 87-91.

Contrary to Defendants' mischaracterization of the Complaint, Plaintiffs have properly stated claims for violations of Section 20(a), aiding and abetting liability, and common law conspiracy.

## ARGUMENT AND AUTHORITIES

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When presented with a motion to dismiss, the Court assumes all properly pled allegations are true.  *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1533 (10th Cir. 1992).

## I.   Plaintiffs' Claims Have Not Been Released Through The AARA

### A.   The AARA Does Not Release the Unlawful Acts Committed By Defendants

Defendants argue that the release and covenant language in the AARA excuses their fraud.  Not so.  The AARA states that "the foregoing releases shall not apply to claims arising from unlawful acts committed by a Releasing/Released Party."  *See* Garrett Decl. Ex. 5, Section 3(a).  Violating the federal securities laws, as alleged in the Complaint, is "unlawful."  Thus, the release in the AARA does not apply and Defendants' motions should be denied.

#### 1.   The AARA Explicitly Excludes Claims Based on Unlawful Acts and Must Be Interpreted According to Its Plain Meaning

The release in the AARA is clear and unambiguous: "[T]he foregoing releases shall not apply to claims arising from <u>unlawful acts</u> committed by a Releasing/Released Party…" *See* Garrett Decl. Ex. 5, Section 3(a) (emphasis added). As such, the plain meaning of the AARA must be enforced.  *See Kolbe v. Tibbetts*, 22 N.Y.3d 344, 353 (2013) (quoting *Greenfield v. Phillies Records*, 98 N.Y. 2d 562, 569 (2002)) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."); *see*

*also MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (rejecting alternative reading where contract "complete, clear and unambiguous on its face").

### 2.   Each of the Claims in the Complaint Is Based on Unlawful Acts

Plaintiffs' claims under federal securities law—violations of sections 10(b) and 20(a) of the Securities Exchange Act, and violations of SEC Rule 10b-5—are all, by definition, based on unlawful acts. *See* 15 U.S.C.A. § 78(t)(a) ("it shall be unlawful for any person . . . to use or employ . . . any manipulative or deceptive device or contrivance."); 17 C.F.R. § 240.10b-5 ("It shall be unlawful for any person . . . . To [inter alia] employ any device, scheme, or artifice to defraud . . . ."); 15 U.S.C.A. § 78(t)(a) (providing for liability of controlling persons and persons who aid and abet violations, "[i]t shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter . . . ."). Further, under New York law,[3] civil conspiracy, common law fraud, and aiding and abetting fraud claims are "unlawful acts." *See, e.g., Carvel Corp. v. Noonan*, 3 N.Y. 3d 182, 190 (2004) ("unlawful means" element for tortious inference with prospective contract claim requires conduct that amounts to either a crime or an independent tort); *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001) (characterizing common law "unfair competition" claim as "a form of unlawful business injury"); *Yuk Fung Ma v. J.C. Sake Inc.*, 932 N.Y.S.2d 764 (N.Y., Kings Cty. 2011) ("unlawful act" necessary for claim of economic duress

---

[3] The AARA is governed by New York law. *See* Garrett Decl. Ex. 5, Section 6.

need not be "per se illegal").  As such, the AARA permits Plaintiffs to assert the claims in the

Complaint.  *See Kolbe*, 22 N.Y.3d at 353; *MHR Capital Partners*, 12 N.Y.3d at 645.[4]

**B.    Federal Securities Law and Applicable State Law Prohibit the Waiver or
Release of the Alleged Conduct**

Defendants' motion must be denied because intentional wrongdoing cannot be waived or

released under the Securities Exchange Act or New York law.

Section 29(a) of the Securities Exchange Act states that "any condition, stipulation, or

provision binding any person to waive compliance with any provision of this title [15 U.S.C.S.

§§78a et seq.] or of any rule or regulation thereunder…shall be void." 15 U.S.C.S. § 78cc(a).

This means that securities fraud claims cannot be waived. *See Vacold LLC v. Cerami*, 545 F.3d

114, 122 (2d Cir. 2008) ("we do not give effect to contractual language [] purporting to be a

general waiver or release of Rule 10b-5 liability altogether."); *Petro-Ventures v. Takessian*, 967

F.2d 1337, 1340-41 (9th Cir. 1992) ("unknown or subsequently maturing causes of action may

not be waived" under Section 29(a))[5]; *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 490

---

[4] Defendants' argument that the term "unlawful" refers only to criminal actions because of a reference in QCE Parent's Operating Agreement is not only contrary to the applicable securities laws and New York law, but it defies a logical reading of the context in which it is used.  The cited Section states only that Indemnitees of QCE Parent will not be denied indemnification if "the Indemnitee acted in good faith and in a manner such Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such Indemnitee's conduct was unlawful."  *See* Garrett Decl., Ex. 2 p.22.  This reference does not limit the definition of "unlawful" to criminal acts as Defendants claim.

[5] Defendants wrongly claim that *Petro-Ventures* helps their cause.  That case involved releases executed to settle existing litigation, rather than a situation like the one here in which the parties "were not acting in the adversarial setting that is characteristic of litigation" and where it is therefore appropriate to apply the general rule "that unknown or subsequently maturing causes of action may not be waived." *Id.* at 1340-1341, 1342.

(S.D.N.Y. 2005) (Section 29(a) "invalidates releases that attempt to insulate beneficiaries from compliance with the Exchange Act.").[6]

Similarly, Defendants' reliance on AARA Section 3(b) ("Exculpated Claims") is: (1) incorrect in light of the express language of Section 3(a) carving out "unlawful acts" from those released; and (2) contrary to applicable New York law, which holds that exculpatory clauses do not immunize a party from intentional wrongdoing.  *See AHA Gen. Constr., Inc. v. N.Y.C. Housing Auth.*, 92 N.Y.2d 20, 31 (1998) (exculpatory clause will not be enforced where behavior alleged rises to level of intentional conduct); *Abacus Fed. Sav. Bank v. ADT Sec. Services, Inc.*, 18 N.Y.3d 675, 682-83 (2012) (exculpatory clauses are unenforceable if defendant's alleged conduct was at least grossly negligent); *Kalisch-Jarcho, Inc. v. City of N.Y.*, 58 N.Y.2d 377, 384-85 (1983) ("an exculpatory clause is unenforceable when…the misconduct for which it would grant immunity smacks of intentional wrongdoing"); *see also XeDAR Corp. v. Rakestraw*, No. 12-cv-01907, 2013 U.S. Dist. LEXIS 3416, at *15 (D. Colo. Jan. 8, 2013) (applying Colorado law and holding  covenant not to sue unenforceable where intentional conduct was alleged).

As such, Defendants' motion to dismiss must be denied because the releases and covenants they rely on cannot waive or release the intentional wrongdoing alleged.[7]

---

[6] Defendants' citation to *Mittendorf v. J.R. Williston & Beane, Inc.*, 372 F. Supp. 821 (S.D.N.Y. 1974) is misplaced.  *Mittendorf* dealt with a release entered into a connection with threatened litigation and "at a time when plaintiff had actual knowledge or could, upon reasonable inquiry, have discovered all the facts he now alleges." *Id.* at 834.

[7] *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 277 (2011) is inapposite because plaintiffs there did not allege that they justifiably relied on defendants' fraudulent statements in executing the release.  Moreover, in *Centro*, plaintiffs knew that defendants had not supplied them with the financial information that they needed and were entitled to, "[y]et they chose to cash out their interests and release defendants from fraud claims

II.   **The Complaint Adequately Alleges Section 20(a) Claims**

To state a prima facie case of control person liability, the Plaintiff must establish: (1) a primary violation of the securities laws; and (2) control over the primary violator by the alleged controlling person. *See Maher v. Durango Metals*, 144 F.3d 1302, 1305 (10th Cir. 1998). Here, it is effectively conceded that a primary violation is sufficiently pled in the Complaint.

As for control, "[a]s long as a plaintiff pleads facts from which the court can reasonably infer the defendants were control persons, the control person determination is a factual question not ordinarily subject to resolution on a motion to dismiss." *In re NPS Pharms., Inc.*, 2007 WL 1976589, at *6 (D. Utah July 3, 2007) (citation omitted); *see also In Re Cabletron Sys.*, 311 F.3d 11, 41 (1st Cir. 2002) ("Control is a question of fact that 'will not ordinarily be resolved summarily at the pleading stage.' ") (citation omitted). The Complaint adequately pleads that Defendants Richard Schaden, CCP, and the other Manager Defendants had control over the specific misrepresentations and omissions in the transaction documents. Defendants' cursory mischaracterization of the allegations is contradicted by a reading of the entire Complaint.

For example, during the relevant period, Richard Schaden was self-described as "the Founder, Chairman, and majority shareholder of Quiznos" and represented that he "and his son Rick are the co-Founders of Quiznos and continue to control the majority of its shares." Compl. ¶ 27. Even if Rick Schaden resigned from the Board before the transaction, there is no question that he had significant influence over the remaining Manager Defendants, including his own

---

without demanding either access to the information or assurances as to its accuracy." *Id*. at 279. In contrast, the Complaint here alleges that Plaintiffs relied on their fraudulent statements ***and*** they requested and received the information; it was simply ***fraudulent***.

father and uncle.  Id. ¶ 30. This is because together they exercised control by "their indirectly held majority equity ownership in QCE Holding's LLC interests, . . . their close relationships with the Majority-Member Manager Defendants, and their consultation and communications with Management leading up[] to the Transaction."  Id. ¶ 33.  CCP is the entity through which Defendants exercised their control.  Id. ¶ 21.  *See Maher*, 144 F.3d at 1305 (the Tenth Circuit "requir[es] only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable.")

The other Manager Defendants "were Schaden loyalists who were drawn from CCP's ranks and placed on the QCE Holdings' Board at the Schadens' specific direction.  They had unfettered access to the Company's Management and its books and records."  Compl. ¶ 35.  They "routinely had confidential Quiznos information, including projections related to the Transaction, sent to their CCP email addresses," so that they could maintain control.  Id. ¶ 35.  These Manager Defendants had "ultimate direct authority over the Quiznos entities and certain other Defendants vis-à-vis their positions at QCE Holding, their intimate involvement in and approval of the Transaction, their involvement with the Transaction-related documents that included material misstatements and omissions, and their indirect authority over Quiznos and certain other Defendants vis-à-vis their positions at CCP and relationships with the Schadens."  Id. ¶ 40.

Thus, both a primary violation of the securities laws and control has been established to support a valid claim against Defendants under § 20(a).  *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165 (D.N.M. 2010) (noting control person had power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting

securities, by contract, or *otherwise*); *see In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1262 n.11 (D. Okla. 2003).  The Tenth Circuit has "expressly 'reject[ed] those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation.'  Rather, once the plaintiff establishes the prima facie case, the burden shifts to the defendant to show lack of culpable participation or knowledge." *Maher*, 144 F.3d at 1306 (quoting *First Interstate Bank*, 969 F.2d at 897; citing *San Francisco–Okla. Petroleum Exploration Corp. v. Carstan Oil Co.*, 765 F.2d 962, 964 (10th Cir. 1985)).  Defendants have not met their burden to show lack of culpable participation by the Manager Defendants, where, as here, the founders, family members, and majority shareholders controlled the Transaction, and cannot do so at the pleading stage.

### III.    The Complaint Properly Alleges Aiding and Abetting Liability

The Manager Defendants assert that there can be no aiding and abetting liability because Plaintiffs have not shown: (1) substantial assistance of the Manager Defendants; and (2) actual knowledge of the fraud.  Mot. to Dismiss at 12.  These arguments lack merit.

First, Plaintiffs specifically allege that the Manager Defendants had actual knowledge of the fraud.  There were repeated communications at the Board level and in emails whereby the Manager Defendants were informed of the divergence in projections.  Compl. ¶¶ 80, 83, 90-91, 110, 122, 135, 139.  In response to a caution from minority Board members for the Schaden-beholden directors to not push excessively aggressive – and thus misleading – statements and projections, Defendant Meyers pressed their use "as a matter of strategy in dealing with creditors." *Id.* ¶¶ 89-90.  Plaintiffs specifically allege that "Board members Lee, Meyers, Moore,

Ryan, and Fred Schaden were informed by the Officer Defendants in November 2011 of the status of the gap between the internal projection model and the projection model shared with the Investor Plaintiffs." *Id.* ¶ 139.  Further, the Complaint alleges that the Board was "intimately involved" with the Transaction, and that Rick Schaden continued consulting with management. Id. ¶ 62-63.  The directors were briefed by the Officer Defendants on the Board's current and projected future results.  *Id.* ¶ 141(a)-(c).

Since the Manager Defendants were briefed on the issue, knew of the fraud, and yet did nothing to reveal or stop the fraud and, instead, furthered the fraud, they are liable under New York law for aiding and abetting.  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431 (S.D.N.Y. 2012) (denying motion for summary judgment on aiding and abetting and finding that plaintiffs offered evidence that defendant manipulated the modeling process to create the ratings it desired); *see also Nathel v. Siegal*, 592 F. Supp. 2d 452, 468-70 (S.D.N.Y. 2008).

## IV.   Plaintiffs Have Properly Stated a Claim for Civil Conspiracy

The Manager Defendants assert that Plaintiffs fail to state a claim for civil conspiracy because there is no independent cause of action for conspiracy to commit fraud.  Mot. at 14-15. While "there is no substantive tort of civil conspiracy, allegations of conspiracy are permitted only to show that the tortious acts flowed from a common scheme or plan and to connect each defendant with an actionable injury."  *Danahy v Meese*, 446 N.Y.S.2d 611 (App. Div. 1981). Here, Plaintiffs sufficiently allege that the Defendants entered into an agreement between and among themselves to conceal and misrepresent the Company's likely future business results and

other material information.  Compl. ¶ 191.  As a result, Plaintiffs were harmed.  *Id.* ¶ 192.

Accordingly, Plaintiffs sufficiently allege conspiracy under New York law.

## CONCLUSION

For the foregoing reasons, the Complaint alleges well-founded claims against

Defendants. Defendants' motion to dismiss should be rejected and the Complaint upheld.[8]

Dated: October 24, 2014

*/s/ Jeffery A. Dailey*
Daniel F. Wake (CO ID No. 18086)
Kali R. Backer (CO ID No. 45436)
SHOOK HARDY & BACON LLP
1660 17th Street, Suite 450
Denver, CO 80202-1254
Telephone: (303) 285-5300
Fax: (303) 285-5301

Stephen M. Baldini
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
Bank of America Tower
New York, NY 10036-6745
Telephone: (212) 872-1000
Fax: (212) 872-1002

Jeffery A. Dailey
AKIN GUMP STRAUSS HAUER & FELD LLP
Two Commerce Square
2001 Market Street, Suite 4100
Philadelphia, PA 19103-7013
Phone: (215) 965-1200
Fax: (215) 965-1210
Attorneys for Avenue Capital Management II,
L.P. et al.

*/s/ Allen L. Lanstra*
James T. Markus (CO ID No. 25065)
Steven R. Rider (CO ID No. 7921)
MARKUS WILLIAMS YOUNG &
ZIMMERMAN LLP
1700 Lincoln Street, Suite 4550
Denver, CO 80203
Telephone: (303) 830-0800
Fax: (303) 830-0809

Van C. Durrer, II
Allen L. Lanstra
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
300 S. Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5000
Fax: (213) 687-5600
Attorneys for Fortress Investment Group, LLC
et al.

---

[8] If for any reason the Court finds Plaintiffs' allegations lacking, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires.").

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2014, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, District of Colorado, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Jeffery A. Dailey*
Jeffery A. Dailey