IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-02031-PAB-KLM

AVENUE CAPITAL MANAGEMENT II, L.P., a Delaware limited partnership,
AVENUE INTERNATIONAL MASTER, L.P., a Cayman Islands exempted limited partnership,
AVENUE INVESTMENTS, L.P., a Delaware limited partnership,
AVENUE SPECIAL SITUATIONS FUND VI (MASTER), L.P., a Delaware limited partnership,
MANAGED ACCOUNTS MASTER FUND SERVICES-MAP10, a sub-trust of an umbrella unit trust constituted by a trust deed governed by the laws of Ireland,
AVENUE-CDP GLOBAL OPPORTUNITIES FUND, L.P., a Cayman Islands exempted limited partnership,
AVENUE SPECIAL OPPORTUNITIES CO-INVESTMENT FUND I, L.P., a Delaware limited partnership,
AVENUE SPECIAL OPPORTUNITIES FUND I, L.P., a Delaware limited partnership,
DRAWBRIDGE SPECIAL OPPORTUNITIES FUND L.P., a Delaware limited partnership,
DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LTD, a Cayman Islands company,
FCI HOLDINGS I LTD, a Cayman Islands company,
FCI HOLDINGS II LTD, a Cayman Islands company,
FCOF II UB SECURITIES LLC, a Delaware limited liability company,
FCOF UB INVESTMENTS LLC, a Delaware limited liability company,
FTS SIP L.P., a Jersey limited partnership,
PANGAEA CLO 2007-1 LTD, a Cayman Islands company,
SARGAS CLO I LTD, a Cayman Islands company,
WORDEN MASTER FUND II L.P., a Cayman Islands exempted limited partnership, and
WORDEN MASTER FUND L.P., a Cayman Islands exempted limited partnership,

     Plaintiffs,

v.

RICHARD F. SCHADEN, an individual,
RICHARD E. SCHADEN, an individual,
FREDERICK H. SCHADEN, an individual,
GREG MACDONALD, an individual,
DENNIS SMYTHE, an individual,
ANDREW R. LEE, an individual,
PATRICK E. MEYERS, an individual,
JOHN M. MOORE, an individual,
THOMAS RYAN, an individual, and

CONSUMER CAPITAL PARTNERS LLC a/k/a Cervantes Capital LLC, a Delaware limited liability company,

    Defendants.

_____

## ORDER
_____

This matter is before the Court on the Motion to Dismiss [Docket No. 26] filed by Greg MacDonald and Dennis Smythe (the "officer defendants") and the Motion to Dismiss [Docket No. 27] filed by Richard F. Schaden ("Richard Schaden"), Richard E. Schaden ("Rick Schaden"), Frederick Schaden, Andrew Lee, Patrick Meyers, John Moore, Thomas Ryan, and Consumer Capital Partners LLC (the "manager defendants"). The Court has jurisdiction over plaintiffs' securities fraud claims pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331 and, for purposes of resolving this motion, exercises jurisdiction over plaintiffs' state law claims pursuant to § 1367.

## I. BACKGROUND[1]

This case arises out of the corporate restructuring of QCE, LLC and its affiliated entities (collectively, "Quiznos"). Plaintiffs accuse the officer defendants and manager defendants of making fraudulent representations regarding Quiznos' financial condition

---

[1]The following facts are taken from plaintiffs' complaint and are presumed true for purposes of resolving this motion. In resolving a Rule 12(b)(6) motion, a court "may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation omitted); *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013) ("In a securities case, we may consider, in addition to the complaint, documents incorporated by reference into the complaint, public documents filed with the SEC, and documents the plaintiffs relied upon in bringing suit."). In the absence of argument to the contrary, the Court finds that the documents mentioned herein meet these criteria.

in order to induce plaintiffs to restructure Quiznos' debt. Plaintiffs and defendants ultimately reached an agreement (the "transaction") whereby plaintiffs agreed to fund Quiznos' restructuring in exchange for a 70% ownership interest in the company. Plaintiffs brought the present case seeking to recover damages they suffered as a result of defendants' allegedly fraudulent representations during the transaction.

Quiznos is a franchisor of sandwich shops. Prior to the transaction, QCE, LLC was the operating entity by which Quiznos' business was conducted. Docket No. 1 at 3, ¶ 1 n.1. QCE, LLC's sole member was QCE Finance LLC ("QCE Finance"). *Id.* QCE Holding LLC ("QCE Holding") was the parent company in the Quiznos corporate structure and was managed by the Board of Managers ("the board"), which controlled and operated Quiznos, including the aforementioned entities. *Id.* at 7, ¶ 16. QCE Holding was controlled in part by Cervantes Master LLC, which was in turn a subsidiary and/or affiliate of Consumer Capital Partners LLC ("CCP"). *Id.* at 7, ¶¶ 19-20. Rick Schaden is the founder and chairman of CCP. Richard Schaden is a founding partner of CCP. *Id.* at 8, ¶ 21.

Mr. MacDonald served as Quiznos' president and CEO from July 2009 until August 2012. *Id.* at 8, ¶ 22. Between October 2009 and October 2010, Mr. Smythe served as executive vice president of QCE Finance and Accounting and, between October 2010 and April 2012, he served as Quiznos' CFO. *Id.* at 8, ¶ 23. In 2010 and 2011, Mr. Smythe also served as CCP's vice president of investments. *Id.* From 1991 until the transaction, Richard Schaden and his son Rick owned a majority stake in Quiznos. *Id.* at 9, ¶ 27. In 2010 and 2011, CCP's website stated that the Schadens

were co-founders of Quiznos and that Rick Schaden was the founder, chairman, and majority shareholder of Quiznos. *Id.* Richard Schaden and his brother Fred were members of the board from 2006 until the transaction and Rick Schaden was member and chairman of the board from 2006 until his resignation, which appears to have occurred before the transaction. *Id.* at 9-10, ¶¶ 28-30.

In 2006, the Schadens sold a portion of their interest in Quiznos to J.P. Morgan Partners. *Id.* at 14, ¶ 50. As a result of that sale, QCE borrowed a $650 million loan facility (the "first lien facility") from the various lenders (collectively, the "first lien lenders") and a $225 million loan facility (the "second lien facility") from various lenders (collectively, the "second lien lenders"). *Id.* at 15, ¶ 51. Plaintiff Avenue Capital Management II, L.P. and its affiliated funds (collectively, "Avenue") and Fortress Investment Group LLC and its affiliated funds (collectively, "Fortress") were first lien lenders and second lien lenders. *Id.* at 6, ¶ 12. Avenue and Fortress collectively owned $215 million (33%) of the first lien facility and $162 million (72%) of the second lien facility, making them Quiznos' largest lenders. *Id.* at 19, ¶ 74.

After the 2006 sale, the number of franchise locations declined by approximately 2000 stores between 2007 and 2011. *Id.* at 15, ¶ 54. During that time, Quiznos' earnings before interest, taxes, depreciation, and amortization ("EBITDA") dropped from $184 million to $99 million and its AUV – a key metric Quiznos used to analyze franchisees' profitability – declined by approximately 23%. *Id.* at 15, ¶¶ 54-55. This caused Quiznos to fall out of compliance with its combined leverage ratio covenant, which authorized its lenders to, among other things, call in their debt, accelerate

payments, or foreclose. *Id.* at 15-16, ¶¶ 56-57. Quiznos determined that, in order to address this issue, it need to amend its credit facilities, restructure, or secure additional capital. *Id.* at 16, ¶ 58. The board determined that Quiznos' debt could be restructured through an out-of-court restructuring (the "transaction plan") or by filing for bankruptcy (the "reorganization plan"). *Id.* at 3, ¶ 3.

In August 2011, the board decided to move forward with the transaction plan. *Id.* at 16, ¶ 61. At that time, the Schadens and the majority-member manager defendants made up a majority of the board. *Id.* Rick Schaden communicated with Mr. MacDonald and Mr. Smythe regarding the transaction, but appears to have resigned from the board before the transaction closed in January 2012. *Id.* at 17, ¶¶ 62-63. After his resignation, Mr. MacDonald and Mr. Smythe continued to consult with Rick Schaden regarding Quiznos' financial position and prospects. *Id.* Plaintiffs allege that the Schadens and the majority-member manager defendants attended board meetings and voted in favor of the transaction. *Id.* at 35-36, ¶ 141.

The key components of the transaction plan were set forth in three documents, dated December 23, 2011: the Offering Memorandum ("OM") [Docket No. 29-1], the Restructuring Support Agreement ("RSA") [Docket No. 29-3], and the Subscription Agreement ("SA") [Docket No. 29-4]. Docket No. 1 at 18, ¶¶ 67-68. The transaction plan provided that first lien lenders would receive accrued, unpaid interest and a pro rata share of $75 million of the aggregate principal amount outstanding under the first lien facility. Each first lien lender also had the option to modify the applicable indebtedness or exchange the indebtedness for loans pursuant to the new second lien

facility. *Id.* at 18, ¶ 69.  Each second lien lender was to receive membership interests ("LLC membership interests") in QCE Parent LLC ("QCE Parent"), a new limited liability company ("LLC") which was the successor by merger to QCE Finance.  QCE Parent would become the post-transaction parent company of QCE.  *Id.* at 18, ¶ 70.

The debt restructuring was to be funded, in part, by the private placement of LLC membership interests to the lenders as set forth in the SA.  *Id.* at 19, ¶ 72.  The SA committed Avenue to subscribe for QCE Parent common shares "representing either (i) 60% of the aggregate outstanding Common Shares if QCE consummated the Transaction; or (ii) 75% of the aggregate outstanding Common Shares if QCE affected the Plan of Reorganization through a Chapter 11 filing."  *Id.* at 19, ¶ 73.

Attached as Exhibit E to the OM was the Amended and Restated Limited Liability Company Agreement of QCE Parent LLC (the "QCE Parent LLC agreement") [Docket No. 29-2].  Docket No. 29-1 at 8.  The QCE Parent LLC agreement set forth the terms and conditions governing the operation of QCE Parent.  *See generally* Docket No. 29-2. The agreement provided that, among other things, QCE Parent would be managed by a nine-member Board of Managers and that plaintiffs would collectively have the right to appoint eight of the board members.  *Id.* at 14.  The relevant terms of the QCE Parent LLC agreement are set forth in greater detail below.

Plaintiffs allege that the OM and the SA contained material misrepresentations and omissions.  For example, plaintiffs allege that the OM contained projections that were "not reasonable, factually based or made in good faith," including projections regarding ending store count, store openings, store closing, royalty payments, AFD

gross revenue, gross profit, total revenue, U.S. franchisee weekly AUV, SNO count, and SNO terminations.  Docket No. 1 at 38-40, ¶ 153; *see also* Docket No. 29-1 at 163-64.[2]  Plaintiffs also allege that the projections contained in the OM omitted "the known gross profits gap between internal financial models and the Company's inability to close it, and the known likely future negative impact that the Defendants' operational changes would have on each key Company metric."  Docket No. 1 at 40, ¶ 154.  The OM stated that, "As a result of the Restructuring Transactions, we will reduce our indebtedness, improve our liquidity position and enhance our capital levels while providing additional resources to execute our business strategies."  Docket No. 29-1 at 19; *see also* Docket No. 1 at 41, ¶ 156.  The OM stated that the intent of the company's "Better Than Ever" re-branding program "is to increase the quality of our products and customer experience as well as to attract additional customers into our restaurants, ultimately leading to higher franchise owner AUVs as well as royalties and food distribution revenue for the Company."  Docket No. 29-1 at 19; *see also id.* at 158; *id.* at 159.  Plaintiffs allege that they relied on the above-mentioned projections and statements in deciding to restructure Quiznos' existing debt through the transaction.  Docket No. 1 at 42, ¶ 157.  Plaintiffs assert that the above-mentioned projections and statements induced them to consummate the transaction, rather than pursue the reorganization plan.  *Id.* at 19, ¶ 73.

The transaction closed in January 2012.  *Id.* at 18, ¶ 67.  Pursuant to the transaction documents, Avenue made an equity investment of $150 million in exchange

---

[2]Plaintiffs' complaint does not define the foregoing acronyms.

for at least a 70% ownership in Quiznos. *Id.* at 19-20, ¶ 75. Plaintiffs also forgave or otherwise reduced Quiznos' debt as part of the transaction. *Id.* at 20, ¶ 76. In 2012 and 2013, the restructured entity's performance was materially worse than what the OM had projected. *Id.* at 41, ¶ 155. Plaintiffs allege that they suffered damages because of their purchase of the LLC membership interests. *Id.* at 47, ¶ 182.

On July 22, 2014, plaintiffs filed the present case. Plaintiffs bring claims against the officer defendants for violation of § 10(b) of the Act and SEC Rule 10b-5 and for common law fraud. *Id.* at 45, 50. Plaintiffs bring claims against the manager defendants for violation of § 20(a) of the Act and for common law aiding and abetting fraud. *Id.* at 48, 51. Plaintiffs bring a common law claim for civil conspiracy against all defendants. *Id.* at 49. On October 3, 2014, defendants filed the present motions, seeking the dismissal of plaintiffs' complaint. Docket Nos. 26 and 27. The manager defendants' motion to dismiss adopts the arguments asserted in the officer defendants' motion to dismiss. *See* Docket No. 27 at 1.

## II. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal

quotation marks and alteration marks omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted ).[3]

## III. ANALYSIS

### A. Securities Fraud Claims

Plaintiffs allege that the LLC membership interests purchased as part of the transactions are considered "securities" as that term is defined under the Securities Exchange Act (the "Act") because the relevant limited liability companies were manager-managed and because the LLCs' officers controlled the day-to-day operations of those entities. Docket No. 1 at 45, ¶ 173.

Under Section 10(b) of the Securities Exchange Act, it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any

---

[3]The Private Securities Litigation Reform Act imposes specific and more stringent pleading requirements on complaints alleging securities fraud under Section 10(b). *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003). However, because the Court resolves the present motions on other grounds, the Court need not set forth such requirements or determine whether plaintiffs have satisfied them. *See, e.g.*, *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014).

manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5 provides that it is unlawful for any person

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. In order to plead a claim for violations of § 10(b) and Rule 10b-5, a plaintiff must establish "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, --- U.S. ----, 133 S. Ct. 1184, 1192 (2013). Defendants challenge the third element, arguing that the transaction did not involve the purchase or sale of securities as that term is employed in the Act.

"Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called" and it therefore "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) (emphasis in original); *see also* 15 U.S.C. § 77b(1). In special cases, some instruments "are obviously within the class Congress intended to regulate because they are by their nature investments." *Reves*, 494 U.S. at 62. Stock, for example, falls into

this category because it is negotiable, offers potential capital appreciation, and carries the right to dividends. *Id.* More commonly, however, courts do not rely solely on legal formalisms, "but instead take account of the economics of the transaction under investigation." *Reves*, 494 U.S. at 61. LLC membership interests are not specifically mentioned in § 77b(1) and, "because of the sheer diversity of LLCs membership interests, therein resist categorical classification." *United States v. Leonard*, 529 F.3d 83, 89 (2d Cir. 2008). Courts confronted with the task of determining whether LLC membership interests constitute a security under the Act generally evaluate whether such interests fall within the definition of "investment contracts." *See, e.g.*, *Affco Invs. 2001, L.L.C. v. Proskauer Rose,* L.L.P., 625 F.3d 185, 189 (5th Cir. 2010); *Leonard*, 529 F.3d at 87; *Robinson v. Glynn*, 349 F.3d 166, 170 (4th Cir. 2003); *see also Nutek Info. Sys., Inc. v. Ariz. Corp. Comm'n*, 977 P.2d 826, 830 (Ariz. 1998) (interpreting statutory definition of "security" substantially similar to definition contained in the Act). Plaintiffs do not argue that the LLC membership interests at issue in this case should be evaluated in any other way. *See, e.g.*, *Robinson*, 349 F.3d at 170 (considering argument that LLC membership interests were both investment contracts and stocks). Thus, the Court will determine whether plaintiffs have stated a claim that the LLC membership interests plaintiffs received as a result of the transaction are investment contracts as that term is used in § 77b(1).

Although undefined in the Act, the Supreme Court has defined "investment contract" as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter

or a third party." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). This definition has subsequently been formulated into a three-element test (the "*Howey* test"), which requires plaintiffs to establish that the contract or transaction at issue was "(1) an investment, (2) in a common enterprise, (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Banghart v. Hollywood Gen. P'ship*, 902 F.2d 805, 807 (10th Cir. 1990). In applying the test, "'form should be disregarded for substance' and courts should focus on the 'economic realities underlying a transaction, and not on the name appended thereto.'" *Shields*, 744 F.3d at 643 (citation omitted) (quoting *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 848-49 (1975)). The parties dispute whether the LLC membership interests satisfy the third element.

The Tenth Circuit has not decided the circumstances under which an LLC membership interest constitutes an investment contract. Nonetheless, the Tenth Circuit has said of the third prong of the *Howey* test, "'[t]he proper inquiry includes an examination of the investor's powers under the terms of the agreement, the information available to and the sophistication of the investor, adequacy of financing, degree of speculation, whether or not the risks involved were normal business risks and so on.'" *Shields*, 744 F.3d at 645 (quoting *Maritan v. Birmingham Props.*, 875 F.2d 1451, 1457 (10th Cir. 1989)); *see also Robinson*, 349 F.3d at 170-71. The contribution of time and effort to the enterprise is a relevant factor, but "[c]onsideration must be given to control over the factors essential to the success of the enterprise." *Id.* However, because the "principal purpose of the securities acts is to protect investors by promoting full

disclosure of information necessary to informed investment decisions," "access to information about the investment, and not managerial control, is the most significant factor." *Maritan*, 875 F.2d at 1457 (quotation omitted). In all cases, the proper focus of the examination of the third element of the *Howey* test is on the contract itself. *Maritan*, 875 F.2d at 1458 ("[W]e do not find it necessary to label the relationship . . . . It is sufficient for our analysis to focus, among other things, on the power which Maritan had under the agreement when it was signed.").[4]

The only allegation in the complaint that plaintiffs cite in response to defendants'

---

[4] *Shields* concerned whether a general partnership interest constituted a security. Where general partnerships are concerned, the Tenth Circuit applies a "strong presumption that an interest in a general partnership is not a security" whenever a partnership agreement "allocates powers to general partners that are specific and unambiguous" and provide those partners "with access to information and the ability to protect their investment." *Shields*, 744 F.3d at 643-44 (quoting *Banghart*, 902 F.2d at 808). This presumption can be rebutted in three non-exhaustive situations:
> (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Shields*, 744 F.3d at 643-44 (quotation omitted) (adopting approach set forth in *Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir. 1981)). Given the various important differences between general partnerships and LLCs, the Court will not apply any such presumption in this case. *See Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 391-92 (D. Del. 2000) ("the grounds for creating a per se rule, or at least a presumption, that interests in general partnerships are not securities are lacking in the context of LLCs."). However, the Tenth Circuit has made clear that the considerations relevant to the third element of the *Howey* test apply regardless of the label given the investment relationship. *See Shields*, 744 F.3d at 645 ("we view the *Williamson* approach as a supplement to controlling Supreme Court and circuit precedent in determining if allegations are sufficient to raise a fact question regarding whether a particular investment is a security"); *see also Maritan*, 875 F.2d at 1458.

argument states that "the subject LLC(s) at which level actual management was exercised were manager-managed and not member managed. Also, the LLC's officers – not its members – were responsible for day-to-day management and control of these entities." Docket No. 1 at 45, ¶ 173; *see also* Docket No. 31 at 7. Although, as discussed below, this fact may weigh in plaintiffs' favor, it is not dispositive or, by itself, sufficient to state a claim. *See Maritan*, 875 F.2d at 1457; *Great Lakes*, 96 F. Supp. 2d at 392 (holding that, despite members' inability to manage or control the business affairs of the company, members of LLC retained right to remove manager at any time and dissolve company and had not therefore entered into an investment contract).

Plaintiffs also point out that the QCE Parent Board of Managers retains the sole authority to dissolve QCE Parent, Docket No. 31 at 8 (citing Docket No. 29-2 at 45), a fact which is similarly not dispositive, especially in light of the fact that plaintiffs had the combined right to appoint eight of the nine members of that body, including the board chair. Docket No. 29-2 at 14.

In addition, plaintiffs argue that their claims arise out of Mr. MacDonald's and Mr. Smythe's control and influence over QCE Holding, "not the proper exercise of their powers under the LLC agreement." Docket No. 31 at 8. This argument misunderstands the third element of the *Howey* test. The relevant question is not what degree of control Mr. MacDonald and Mr. Smythe may have exercised under the pre-transaction corporate structure, but on the power that the QCE Parent LLC agreement conferred upon plaintiffs when that agreement was signed. *See Maritan*, 875 F.2d at

1458.[5]  Plaintiffs do not identify any additional allegations in the complaint or provisions of the QCE Parent LLC agreement that tend to establish the third element of the *Howey* test.  The facts plaintiffs have identified do not, alone or in combination, state a claim that the LLC membership interests gave rise to a reasonable expectation that plaintiffs' profits would be derived from the managerial efforts of others.  *See Robinson*, 349 F.3d at 172 ("Robinson was not a passive investor relying on the efforts of others, but a knowledgeable executive actively protecting his interest and position in the company.").

Although plaintiffs' failure to identify facts stating a plausible claim that the LLC membership interests are investment contracts is, by itself, a sufficient basis to dismiss plaintiffs' securities fraud claims, the terms of the QCE Parent LLC agreement support defendants' argument.  Members meetings take place annually, where each member is entitled to one vote per common share held.  Docket No. 29-2 at 19-20.  Avenue alone owns 70% of Quiznos.  Members can amend the QCE Parent LLC agreement by majority vote.  *Id.* at 46.  Management of the company is vested exclusively in the Board of Managers.  *Id.* at 14.  Plaintiffs collectively have the right to appoint eight of the nine members of the Board of Managers – one of whom serves as chair – and to remove any of their appointed board members with or without cause.  *Id.* at 14-15.  The Board of Managers acts by majority vote.  *Id.* at 16.

The day-to-day operations of QCE Parent are the responsibility of the officers.

---

[5]Moreover, even if plaintiffs argued – which they do not – that Mr. MacDonald and Mr. Smythe continued to exceed their authority after the execution of the QCE Parent LLC agreement, it is the agreement's language that controls; plaintiffs' "delegation of membership responsibilities, or the failure to exercise membership powers does not diminish the investor's legal right to a voice in partnership matters." *Nelson v. Stahl*, 173 F. Supp. 2d 153, 165 (S.D.N.Y. 2001) (quotation omitted).

*Id.* at 17. Although the fact that officers of QCE Parent – not its members – conduct day-to-day operations weighs somewhat in plaintiffs' favor, the officers are appointed by the Board of Managers and the Board of Managers has authority over them. *Id.* at 17 ("[officers] shall follow the orders and instructions of the CEO unless otherwise directed by the Board of Managers"). Thus, although plaintiffs' LLC membership interests do not afford them the right to directly manage the company, they exert ultimate control over the Board of Managers to whom the task of managing Quiznos is assigned. *Cf. Robinson*, 349 F.3d at 170 ("Robinson not only had the power to appoint two of the board members, but he himself assumed one of the board seats and was named as the board's vice chairman."); *Great Lakes*, 96 F. Supp. 2d at 392. Moreover, by virtue of the fact that the manager defendants ceased to serve on the board after the transaction, it appears that plaintiffs exercised the control afforded them under the QCE Parent LLC agreement. *See Shields*, 744 F.3d at 646 ("post-investment conduct is relevant to the intent of the parties at the time the agreement was signed"); *Robinson*, 349 F.3d at 171.

With respect to access to information regarding Quiznos, the Board of Mangers is responsible for maintaining the accounting system and, as a result, has access to Quiznos' financial information. Docket No. 29-2 at 24-25. Fortress members may examine the company's books at any time during normal business hours and, at the end of each year, all members are provided with a copy of the company's audited financial statements and, at the end of each quarter, all members are provided with the company's unaudited financial statements. *Id.* Thus, plaintiffs have access to financial

information to protect their investment. *Cf. Maritan*, 875 F.2d at 1458. The agreement provides that members holding 5% of the aggregate Common Shares have a right of first refusal when another member seeks to sell its shares to entities unaffiliated with current members. Docket No. 29-2 at 26. By virtue of the fact that plaintiffs collectively own more than 50% of the company, they have the right to force a "Drag-Along Sale" of the entire company to a third-party purchaser. *Id.* at 28-29.

Nothing in the complaint or the QCE Parent LLC agreement suggests that plaintiffs are unsophisticated, dependent on a particular member or manager for expertise in the restaurant franchising industry, or that plaintiffs must rely on others to ensure the success of the company. *Cf. Shields*, 744 F.3d at 646-47.

The remainder of plaintiffs' argument on this issue is devoted to distinguishing *Great Lakes* from the present case. *See* Docket No. 31 at 7-9. Although *Great Lakes* may not be entirely analogous to the present case, as noted herein, it is nonetheless persuasive in some respects. More importantly, plaintiffs' focus on *Great Lakes* does not overcome their failure to identify sufficient facts upon which to conclude that the LLC membership interests are investment contracts. Thus, for the foregoing reasons, the economic realities underlying the transaction do not establish that the LLC membership interests acquired through the transactions are investment contracts. *See Robinson*, 349 F.3d at 171 ("Robinson was not interested in sole managerial control of GeoPhone; he was interested instead in sufficient managerial control to ensure that other managers like Glynn could neither harm nor dilute his investment.").[6] Defendants'

---

[6]Plaintiff argues that determining whether the LLC membership interests are investment contracts is a fact-intensive inquiry, inappropriate for a motion to dismiss.

17

motions as to plaintiffs' securities fraud claims are granted. *See Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998) (holding that, in order to establish control person liability under § 20(a) of the Act, plaintiff must establish primary violation of securities laws).

### B. Remaining Claims

Having dismissed plaintiffs' claims arising under federal law, the Court turns to their remaining claims, which are based upon New York law. While courts may exercise supplemental jurisdiction over state law claims if there is otherwise a jurisdictional basis for doing so, 28 U.S.C. § 1367(c)(3) states that a court may decline to exercise jurisdiction over such claims if "the district court has dismissed all claims over which it has original jurisdiction." When § 1367(c)(3) is implicated in the Tenth Circuit, courts are advised to dismiss pendent state law claims "'absent compelling reasons to the contrary.'" *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (reversing the district court's grant of summary judgment on state law claims); *Endris v. Sheridan Cnty. Police Dep't*, 415 F. App'x 34, 36 (10th Cir. 2011) ("any state-law claims for assault and battery or mental and emotional injury were inappropriate subjects for the exercise of pendent

---

Docket No. 31 at 5-6. The Court disagrees. It is a question of law whether plaintiffs have stated a claim that the LLC membership interests are securities under the Act. *Robinson*, 349 F.3d at 170; *see, e.g., Shields*, 744 F.3d at 648. Plaintiffs do not identify any factual disputes that would preclude determination of this question, and none are apparent to the Court. *See SEC v. Thompson*, 732 F.3d 1151, 1161 (10th Cir. 2013) (rejecting argument that jury should make ultimate determination as to whether instruments were securities in part because the "Supreme Court's decisions in this area also suggest that, at least in the context of civil suits, the ultimate determination whether an instrument is a security is one of law").

jurisdiction where all federal claims had been dismissed"). *But see Henderson v. Nat'l R.R. Passenger Corp.*, 412 F. App'x 74, 79 (10th Cir. 2011) (finding no abuse of discretion in trial court's decision to retain jurisdiction over state law claims after plaintiff voluntarily dismissed claims arising under federal law).

Finding no compelling reason here to retain jurisdiction, the Court will dismiss plaintiffs' remaining claims without prejudice. *See* Colo. Rev. Stat. § 13-80-111 (permitting claims properly commenced within the statute of limitations to be re-filed if involuntarily dismissed because of lack of jurisdiction); *Dalal v. Alliant Techsystems, Inc.*, 934 P.2d 830, 834 (Colo. App. 1996) (interpreting 28 U.S.C. § 1367(d) as tolling the statute of limitations while claim is pending in federal court); *see also City of Los Angeles v. Cnty. of Kern*, 328 P.3d 56, 65 (Cal. 2014) (noting that interpretations of § 1367(d) vary between jurisdictions).

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the officer defendants' Motion to Dismiss [Docket No. 26] and the manager defendants' Motion to Dismiss [Docket No. 27] are **GRANTED**. It is further

**ORDERED** that plaintiffs' securities fraud claims are **DISMISSED** with prejudice. It is further

**ORDERED** that plaintiffs' state law claims are **DISMISSED** without prejudice. It is further

**ORDERED** that the Motion to Strike Jury Demand and Allegations in Complaint

[Docket No. 28] is **DENIED** as moot.  It is further

   **ORDERED** that this case is **DISMISSED** in its entirety.


DATED September 17, 2015.

             BY THE COURT:


              s/Philip A. Brimmer
             PHILIP A. BRIMMER
             United States District Judge